**No. 26-5120**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

META PLATFORMS, INC.
*Plaintiff-Appellant*,

v.

ROB BONTA,
In His Official Capacity as Attorney General of California,
*Defendant-Appellee*.

---

On Appeal from the United States District Court, Northern District of California
Case No. 5:25-cv-09792-EJD

# DECLARATION OF MARK W. MOSIER IN SUPPORT OF PLAINTIFF-APPELLANT'S OPPOSED MOTION FOR AN INJUNCTION PENDING APPEAL

---

Isaac D. Chaput
**COVINGTON & BURLING LLP**
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
(415) 591-6000

Alexander L. Schultz
**COVINGTON & BURLING LLP**
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
(424) 332-4800

Mark W. Mosier
Teena-Ann V. Sankoorikal
Jeffrey E. Sandberg
Kuntal V. Cholera
Alexandra J. Widas
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000

*Counsel for Plaintiff-Appellant*

I, Mark W. Mosier, declare and state as follows:

1. I am a Partner at Covington & Burling LLP, and I represent Plaintiff-Appellant Meta Platforms, Inc. I am licensed to practice law in the District of Columbia and admitted to practice before this Court. The matters set forth herein are true and correct based on my own personal knowledge. If called as a witness, I could and would competently testify thereto.

2. Attached hereto as **Exhibit A** is a true and correct copy of the August 21, 2026 Order in *Meta Platforms, Inc. v. Bonta*, No. 25-9792 (N.D. Cal.) (Dkt. 141).

3. Attached hereto as **Exhibit B** is a true and correct copy of the declaration of Lars Backstrom submitted in support of Meta's Motion for Preliminary Injunction in *Meta Platforms, Inc. v. Bonta*, No. 25-9792 (N.D. Cal.), filed on November 18, 2025 (Dkt. 19-1).

4. Attached hereto as **Exhibit C** is a true and correct copy of the supplemental declaration of Lars Backstrom submitted in support of Meta's Motion for Preliminary Injunction in *Meta Platforms, Inc. v. Bonta*, No. 25-9792 (N.D. Cal.), filed on June 2, 2026 (Dkt. 116-1).

5. Attached hereto as **Exhibit D** is a true and correct copy of the declaration of Arcadiy Kantor submitted in support of Meta's Motion for Preliminary Injunction in *Meta Platforms, Inc. v. Bonta*, No. 25-9792 (N.D. Cal.), filed on November 18, 2025 (Dkt. 19-2).

6. Attached hereto as **Exhibit E** is a true and correct copy of the declaration of Sayed Otaru submitted in support of Meta's Motion for Preliminary Injunction in *Meta Platforms, Inc. v. Bonta*, No. 25-9792 (N.D. Cal.), filed on November 18, 2025 (Dkt. 19-3).

7. Attached hereto as **Exhibit F** is a true and correct copy of Meta's Complaint for Declaratory and Injunctive Relief in *Meta Platforms, Inc. v. Bonta*, No. 25-9792 (N.D. Cal.), filed on November 13, 2025 (Dkt. 1).

8. Attached hereto as **Exhibit G** is a true and correct copy of the August 5, 2026 Order in *Meta Platforms, Inc. v. Bonta*, No. 25-9792 (N.D. Cal.) (Dkt. 126).

9. Attached hereto as **Exhibit H** is a true and correct copy of the declaration of Dr. Michael Baiocchi submitted in support of Meta's Reply in Support of Motion for Preliminary Injunction in *Meta Platforms, Inc. v. Bonta*, No. 25-9792 (N.D. Cal.), filed April 10, 2026 (Dkt. 89-2).

10. Attached hereto as **Exhibit I** is a true and correct copy of the declaration of Lars Backstrom submitted in support of Meta's Motion for Injunction Pending Appeal in *Meta Platforms, Inc. v. Bonta*, No. 25-9792 (N.D. Cal.), filed on August 11, 2026 (Dkt. 131-1).

11. Attached hereto as **Exhibit J** is a true and correct copy of Meta's Notice of Appeal in *Meta Platforms, Inc. v. Bonta*, No. 25-9792 (N.D. Cal.), filed on August 11, 2026 (Dkt. 130).

12. Attached hereto as **Exhibit K** is a true and correct copy of the docket in *Meta Platforms, Inc. v. Bonta*, No. 25-9792 (N.D. Cal.) as of August 24, 2026.

Executed this 24th day of August, 2026, in Washington, District of Columbia.

/s/ Mark W. Mosier
Mark W. Mosier
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000

# Exhibit A

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

META PLATFORMS, INC.,

Plaintiff,

v.

ROB BONTA,

Defendant.

Case No. 5:25-cv-09792-EJD

**ORDER DENYING MOTIONS FOR PRELIMINARY INJUNCTION PENDING APPEAL**

Re: ECF No. 131

TIKTOK, INC.,

Plaintiff,

v.

ROB BONTA,

Defendant.

Case No. 5:25-cv-09789-EJD

**ORDER DENYING MOTIONS FOR PRELIMINARY INJUNCTION PENDING APPEAL**

Re: ECF No. 111

GOOGLE LLC et al.,

Plaintiff,

v.

ROB BONTA,

Defendant.

Case No. 5:25-cv-09795-EJD

**ORDER DENYING MOTIONS FOR PRELIMINARY INJUNCTION PENDING APPEAL**

Re: ECF No. 109

Harm to minors from social media use has become part of the national conversation over the past several years. Relatively early in the conversation, California recognized the risks and dangers presented by certain components of social media. Weighing these risks against the

benefits that social media platforms offer, California saw fit to adopt Senate Bill 976, also known as the Protecting Our Kids from Social Media Addiction Act (the "Act" or "SB 976"). This Act regulates certain features of internet-based platforms, including "addictive feeds," as discussed more *infra*, but is not sweeping in its coverage. The Act does not ban social media access for children under a certain age, nor does it deprive parents of decision-making authority in determining what is best for the children when it comes to engaging with social media.

On August 5, 2026, the Court denied TikTok, Meta, and YouTube's (collectively, Plaintiffs) motions to preliminarily enjoin enforcement of Sections 27001(a), 27002(b)(2), and 27002(b)(4) (together, the "personalized feed provisions") of the Act. Order, ECF No. 126, Case No. 5:25-cv-09792-EJD ("Meta Docket"); ECF No. 106, Case No. 5:25-cv-09789-EJD ("TikTok Docket"), ECF No. 105, Case No. 5:25-cv-09795-EJD ("YouTube Docket"). The personalized feed provisions restrict Plaintiffs' ability to provide "addictive feeds" to minors in the absence of verifiable parental consent and require Plaintiffs to develop various settings that parents can use to control their kids' social media use. As defined, an "addictive feed" refers to "an internet website, online service, online application, or mobile application, or a portion thereof," where multiple pieces of media generated or shared by users are selected for display to a user based on information provided by or associated with the user or their device. Cal. Health & Safety Code § 27000.5. After receiving extensive briefing, including sur-sur replies from Plaintiffs in support of their motions, the Court declined to enjoin SB 976's personalized feed provisions. ECF No. 106.[1]

On August 11, 2026, Plaintiffs filed notices of appeal. ECF No. 110, TikTok Docket; ECF No. 130, Meta Docket; ECF No. 108; YouTube Docket. The same day, Plaintiffs moved for an injunction of the personalized feed provisions pending appeal of this Court's order pursuant to Federal Rule of Civil Procedure 62(b). TikTok Mot., ECF No. 111, TikTok Docket; Meta Mot., ECF No. 131, Meta Docket; YouTube Mot., ECF No. 109; YouTube Docket. "If this Court [did]

[1] The Court cites to the *TikTok Inc. v. Bonta* docket (No. 5:25-cv-09789-EJD) for briefing and documents filed in all three of the above-captioned matters. To the extent a document was filed in only one of the actions, the Court will specify the relevant docket.

United States District Court
Northern District of California

not rule before close of business on August 18, 2026," Plaintiffs intended to move for an injunction pending appeal in the Ninth Circuit. TikTok Mot. 1. The Court directed Defendant Rob Bonta ("Bonta") to file a response by 12:00 p.m. PT on August 14, 2026, and informed the Parties of the Court's intention to issue a ruling by August 21, 2026. Bonta filed his response opposing Plaintiffs' motion. ECF No. 114. The Court has authority to issue an injunction pending appeal despite its denial of preliminary injunctive relief pursuant to Federal Rule of Civil Procedure 62(c). *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, No. 15-CV-03415-EMC, 2016 WL 9184999, at *1 (N.D. Cal. June 7, 2016).

## I. LEGAL STANDARD

Though not identical, "the standard for evaluating an injunction pending appeal is similar to that employed" in deciding whether to grant a preliminary injunction. *S. Bay United Pentecostal Church v. Newsom*, 959 F.3d 938, 939 (9th Cir. 2020) (quoting *Feldman v. Ariz. Sec'y of State's Office*, 843 F.3d 366, 367 (9th Cir. 2016)). Courts consider whether the moving party has demonstrated that they are likely to succeed on the merits, that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, and that an injunction is in the public interest. *Id.* The application of this four-part standard is somewhat more flexible when employed to evaluate whether to grant an injunction pending appeal. *NetChoice v. Bonta*, 761 F. Supp. 3d 1232, 1235 (N.D. Cal. Jan. 2, 2025) ("*NetChoice II*") (citing *MediNatura, Inc. v. Food & Drug Admin.*, No. 20-cv-2066, 2021 WL 1025835, at *6 (D.D.C. Mar. 16, 2021)). Additionally, courts in the Ninth Circuit may apply the "serious questions" test, a "sliding scale" version of the test established in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024). Under this test, "a party is entitled to a preliminary injunction if it shows" (1) "serious questions going to the merits," (2) "a likelihood of irreparable injury," (3) "a balance of hardships that tips sharply towards the plaintiff," and (4) "the injunction is in the public interest." *Id.* (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). The balance of equities and public interest merge when the party opposing

injunctive relief is the government. *See California Chamber of Com. v. Council of Educ. & Rsch. on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022). As this Court previously noted, a court may issue an injunction pending appeal even where it believes its analysis in denying preliminary injunctive relief is correct when "the trial court is charting a new and unexplored ground by rul[ing] on an admittedly difficult legal question[,] and when the equities of the case suggest that the status quo should be maintained." *NetChoice II*, 761 F. Supp. 3d 1235–36 (quoting *Protect Our Water v. Flowers*, 377 F. Supp. 2d 882, 884 (E.D. Cal. 2004)) (internal quotation marks omitted, alterations in original).

## II. DISCUSSION

The circumstances surrounding Plaintiffs' motions for preliminary injunction pending appeal are meaningfully different from those surrounding NetChoice's motion seeking the same relief in *NetChoice II* more than a year and a half ago. Although each Plaintiff suggests that an injunction pending appeal is appropriate for the same reasons as in *NetChoice II*, their motions highlight important differences in both the legal landscape and the current record. For example, YouTube notes that this Court now benefits from a "detailed factual record," but in *NetChoice I*, the case involved "expedited briefing and arguments from the parties." YouTube Mot. 2; Def.'s Opp'n 1, ECF No. 114 (citing *NetChoice II*, 761 F. Supp. 3d at 1234); *see also* TikTok Mot. 5 ("TikTok has now provided the platform-specific evidence mandated by *NetChoice I* and *III*.") The Parties likewise reference the Ninth Circuit's decision in *NetChoice, LLC v. Bonta*. *NetChoice, LLC v. Bonta*, 152 F.4th 1002 (9th Cir. 2025) ("*NetChoice III*"). At the time that the Court granted the previous request for preliminary injunction pending appeal, the Court did not yet have the benefit of appellate review. *See NetChoice II*, 761 F. Supp. 3d at 1236. The Circuit's subsequent decision provided guidance in analyzing requests for preliminary injunctions relating to SB 976.

The Court is not otherwise persuaded that Plaintiffs are likely to succeed on the merits of their appeal. Plaintiffs reiterate the same arguments that the Court previously considered before concluding that a decision to show users content that a predictive algorithm suggests will be



United States District Court
Northern District of California

"interesting" to them is non-expressive, and therefore not protected by the First Amendment. *See* Order 8.[2] As Bonta points out, the Court considered "substantial evidence put forward by each Plaintiff," including multiple rounds of supplemental briefing and supportive declarations, as well as "oral argument for more than five hours." Def.'s Opp'n 3; *see also id.* at 5 (collecting Plaintiffs' descriptions of how they characterize their personalized feed decisions).

Plaintiffs have not shown that they will suffer irreparable harm by complying with the personalized feed provisions of SB 976 while the Ninth Circuit considers their appeals. Plaintiffs primarily rely on the harm faced from the "loss of First Amendment freedoms" which "unquestionably constitutes irreparable injury." Meta Mot. 7 (quoting *NetChoice III*, 152 F.4th at 1024); *see also* YouTube Mot. 14. As this Court previously noted, great harm is suffered when a law restricts speech. *Bonta II*, 761 F.Supp.3d at 1236. But here, where the Court has found that the personalized feed provisions do not restrict First Amendment freedoms, the Court is unpersuaded by this asserted risk of irreparable injury. For the same reason, YouTube's argument that its free-speech rights are potentially chilled by the threat of enforcement is unconvincing. *See* YouTube Mot. 15 (citing *Cuviello v. City of Vallejo*, 944 F.3d 816, 832–33 (9th Cir. 2019)).

Plaintiffs overstate the impacts of the personalized feed provisions in asserting irreparable injury. YouTube argues that "content creators . . . will be unable to reach their intended audiences," and that "minor users will be irreparably harmed by the inability to view compilations specifically identifying, among the billions of videos on YouTube, the content that is most likely

---

[2] Plaintiffs note that the Court did not "mention, let alone try to distinguish" *Cinevision Corporation v. City of Burbank*, 745 F.2d 560 (9th Cir. 1984). Tik Tok Mot. 6. The Court need not explicitly examine every case that it finds inapposite. Having found that personalized feeds merely reflect back to users their revealed preferences and are therefore not expressive, the Court's decision did not hinge on the fact that Plaintiffs did not know specifically what content would be shown by the recommender system. *See* Order at 8 (a decision to rely on users' characteristics and history on platforms to reflect back to them their own perceived interests is not an expressive message). Nothing in the Court's Order requires that "an online platform's human employees view every video to ensure that it 'fills the blank' defined by the platform's message," as at least one Plaintiff suggests. *See* TikTok Mot. 6. Further, *Cinevision* stands for the proposition that "theater owners and booksellers, even if they are not 'expressing' themselves, further a first amendment interest in making protected materials available to the public" and act as a type of clearinghouse for expression. *Cinevision*, 745 F.2d at 568. SB 976 does not impair platforms' ability to host third-party content.



United States District Court
Northern District of California

to be enriching, valuable, and age-appropriate for them." YouTube Mot. 14–15. SB 976's personalized feed provisions include a carve-out for minor users to request specific creators' media, and the "prioritization" of such media. § 27000.5(a)(4). Meta likewise suggests that it will suffer great harm given that "billions of people globally use [its] services to share ideas." Meta Mot. 7. But SB 976 does not limit these "billions of people" from continuing to share their ideas on the platform. *See also* TikTok Mot. 11 ("Enforcement of SB 976's personalized feed provisions will deny the public" a way to connect and communicate.). Similarly, Plaintiffs raise concerns about the "substantial compliance burdens" required to fundamentally restructure their platforms, including the significant monetary resources necessary. YouTube Mot. 15; Meta Mot. 7 ; TikTok Mot. 10. Here, the costs are more akin to ordinary compliance costs, which do not typically constitute irreparable harm. *Council for Responsible Nutrition v. James*, 159 F.4th 155, 171 (2d Cir. 2025); *see also Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980) ("injury resulting from attempted compliance with government regulation ordinarily is not irreparable harm"); *Novedades Y Servicios, Inc. v. Fin. Crimes Enf't Network*, 181 F.4th 961, 977 (9th Cir. 2026) (monetary injury is not normally considered irreparable).

Plaintiffs similarly suggest that, because personalized feeds are a central part of their platforms, they will need to create an entirely new product that may be unappealing to users, resulting in a loss of customer goodwill. *See* YouTube Mot. 16; TikTok Mot. 10; Meta Mot. 7. Much like the potential compliance costs, this risk appears purely speculative. *See Goldie's Bookstore, Inc. v. Super. Ct.*, 739 F.2d 466, 472 (9th Cir. 1984); *see also Am. Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009) ("A motor carrier can refuse to sign the likely unconstitutional Concession agreements, and what will ensue, according to the record, is at the very least a loss of customer goodwill—or, indeed, of the carrier's whole drayage business . . . That goodwill would evaporate does not appear speculative at all."). Speculative injury "does not constitute irreparable injury." *Goldie's Bookstore*, 739 F.2d at 472.

Finally, the balance of equities and public interest weigh against an injunction pending appeal. Plaintiffs rely heavily on this Court's prior observations in *NetChoice II*, but as explained,

United States District Court
Northern District of California

the legal landscape has evolved since January 2025, and the record upon which the Court now relies is substantial. *See* TikTok Mot. 11 (citing *NetChoice II*); Meta Mot. 8 (same); YouTube Mot. 16 (same). Plaintiffs otherwise suggest that the public will be denied the benefits of Plaintiffs' platforms: "providing a way for people to connect and communicate" and "allowing people from all walks of life to share their talents with the world on the internet." TikTok Mot. 11; *see also* YouTube Mot. 16. SB 976's personalized feed provisions are not so sweeping. The provisions do not restrict direct messaging, nor do they restrict creators' ability to record and upload content. Rather, the personalized feed provisions were adopted by the State to protect the mental and physical health of children, an extremely important justification and one often found compelling by courts.[3] *NetChoice v. Bonta*, 761 F. Supp. 3d 1202, 1227 (N.D. Cal. 2024), *aff'd in part, rev'd in part and remanded sub nom. NetChoice, LLC v. Bonta*, 152 F.4th 1002 (9th Cir. 2025) (citing *Denver Area Educ. Telecomms.*, 518 U.S. 727, 743 (1996)). As set forth in the U.S. Surgeon General's Advisory, cited by the Act, problematic and addictive social media use has been linked to depression, anxiety, and eating disorders, among other negative health outcomes. Opp'n to Mots. for Preliminary Inj. 22, ECF No. 45. And "algorithmic designs" can promote extreme, inappropriate, and harmful content to children and adolescents. Sokolsky Decl. in Support of Opp'n, Ex. 15 at 8, ECF No. 114-1.

Further, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 148 F.4th 648, 656 (9th Cir. 2025) (citing *Trump v. CASA, Inc.*, 606 U.S. 831 (2025)). Enjoining the Act's personalized feed provisions pending appeal would undercut the State's significant interest in protecting minors' mental and physical health, and otherwise cause injury insofar as it would prevent the State from effectuating statutes enacted by its residents' representatives.

---

[3] Here, where the Court has found Plaintiffs' attempts to characterize their message as "expressive" unpersuasive such that the personalized feed provisions do not restrict Plaintiffs' First Amendment rights, whether courts might categorize this as a compelling interest does not make a meaningful difference for the present analysis.

For these reasons, the Court **DENIES** Plaintiffs' motions for an injunction of SB 976's personalized feed provisions pending appeal.

**IT IS SO ORDERED.**

Dated: August 21, 2026

EDWARD J. DAVILA
United States District Judge

# Exhibit B

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

META PLATFORMS, INC.,

Plaintiff,

v.

ROB BONTA, in his official capacity as Attorney General of California,

Defendant.

Case No.: ____________

**DECLARATION OF LARS BACKSTROM IN SUPPORT OF META'S MOTION FOR PRELIMINARY INJUNCTION**

I, Lars Backstrom, declare as follows based on personal knowledge:

1. I am Vice President of Recommendation Systems at Meta Platforms, Inc. ("Meta"). I have been employed in that position since January 2017 and have been employed at Meta (formerly "Facebook") since September 2009. I am over the age of 18 years and maintain an office at 1 Meta Way, Building 20 in Menlo Park, California. I make this Declaration in support of Meta's Motion for Preliminary Injunction in the above-captioned case. I have personal knowledge of the matters set forth in this Declaration, and if called as a witness, I could and would testify under oath as follows.

2. In my role at Meta, I am familiar with the methods Meta uses to recommend content to users on its Facebook, Instagram, and Threads services.

**Background**

3. Facebook and Instagram allow users to connect with family and friends, share about their life through various types of content (such as stories, photos, videos, captions, status updates, and links, among others), join groups, sign up for events of their interest, and follow the public pages or profiles of businesses, organizations, government entities, and public figures.

4. Threads allows users to share photos, videos, and text updates and join public conversations, as well as follow and connect with friends, creators, and the public profiles of businesses, organizations, government entities, and public figures.[1]

**Content Personalization**

5. A user cannot possibly view the billions of pieces of content available on Facebook, Instagram, and Threads at any given time. Many users cannot get through all of the content from their friends or groups. So Meta has developed ranking and recommendation systems to curate content for individual users to help users find content, in accordance with Meta's Community Standards, that users may find relevant and valuable to them.

[1] *Introducing Threads: A New Way to Share With Text*, Meta (July 5, 2023), https://about.fb.com/news/2023/07/introducing-threads-new-app-text-sharing/.

6. Meta's ranking and recommendation systems help curate content from the people or accounts that a user is connected with or follows ("connected content"),[2] as well as recommend content from people or accounts that a user may not follow or may not be connected to ("unconnected content"), to help users discover new accounts, organizations, and communities.[3]

7. ***Ranking and Recommendation Process.*** Meta employs a multi-stage process to retrieve and rank the content that is displayed to users, making it easier for users to find information that may be relevant and valuable to them. At various points, Meta excludes content, including content flagged by humans and by automated review for violating Meta's Community Standards. The retrieval stage identifies several thousand content candidates to be ranked in the next stage. Meta then uses "signals" to make predictions about which content users may find relevant and valuable. These signals include data about the user, data specific to the post being ranked (such as who created the post, how others have interacted with it, whether the content of the post likely violates Meta's content policies, and the percentage of identical content between the post and other posts), as well as data specific to the user and the post, such as how the user has previously interacted with similar posts or the post's author. Meta uses these signals to make personalized predictions about which content the user may find relevant and valuable. Meta's prediction models include the likelihood that the user will meaningfully interact with a post, the likelihood that the user's interactions with a post will encourage others to share more content in the future that is valuable to the user, how likely the user is to find the post worth their time, and how likely the user is to click on the profile of a post's author.

8. In order to produce a final score that Meta can use to rank the hundreds of content candidates that reach the final stage of the process, Meta combines the personalized predictions with

---

[2] *Our Approach to Facebook Feed Ranking*, Meta (June 11, 2025), https://transparency.meta.com/features/ranking-and-content/; *Instagram Feed AI System*, Meta (Sep. 12, 2025), https://transparency.meta.com/features/explaining-ranking/ig-feed/?referrer=1.

[3] *About Recommendations on Facebook*, Facebook Help Center, https://www.facebook.com/help/1257205004624246 (last visited Nov. 12, 2025); *Instagram Feed Recommendations AI System*, Meta (Sep. 4, 2025), https://transparency.meta.com/features/explaining-ranking/ig-feed-recommendations/.

weights using a formula it calls a value model.[4] A value model is Meta's approximation of the value that each content candidate brings to a user.

9. While Meta uses ranking and recommendation systems primarily to show users content that may be relevant and valuable to them, Meta's personalization of content is not based solely on predictions of which individual content item may be relevant and valuable to a user. Additional factors are considered that may affect which content and in what order that content is shown to the user. These include diversity rules and gap rules and what will inspire and incentivize users to express themselves and participate in content creation on Facebook, Instagram, and Threads.

10. ***Diversity and Gap Rules.*** Meta employees have created and coded diversity rules and gap rules. Diversity rules are certain rules implemented in the ranking stages for purposes of providing diversity in the set of content items shown to the user. This pertains to diversity in the topic of the content as well as the creator of the content. For example, diversity rules may mean that the user will not be shown multiple videos in a row on the same topic or multiple videos in a row from the same creator. Gap rules may also affect the order and the variety of what the user sees. For example, there are gap rules that relate to the minimum number of connected posts that must appear between two recommended posts.

11. ***Inspire Content Creation.*** Meta also uses ranking and recommendation systems to help inspire and incentivize content creators to produce high-quality content that is within the bounds of Meta's Community Standards and policies. Meta employees have designed Meta's systems to account for creator value in delivering personalized content to users. Meta accomplishes this, for example, by promoting new content from small creators to progressively larger audiences in order to provide "a new way to rank recommendations to give all creators an equal chance of breaking through."[5] Meta's systems also identify and recommend mimicable content, that is content from which it is easy for another user to create similar content, in order to incentivize users to create more content.

---

[4] *See Scaling the Instagram Explore Recommendations System*, Engineering at Meta (Aug. 9, 2023), https://engineering.fb.com/2023/08/09/ml-applications/scaling-instagram-explore-recommendations-system.

[5] *Helping Creators Find New Audiences*, Instagram for Creators (April 30, 2024), https://creators.instagram.com/recommendations-and-originality.

**<u>The Impact of California's Personalized Feeds Restrictions on Facebook, Instagram, and Threads</u>**

12. Meta intends to provide and personalize the feeds on its Facebook, Instagram, and Threads services for all of its users, adults and teens alike. A law restricting Meta's ability to deliver personalized feeds to teen users of Facebook, Instagram, and Threads based on their likes, dislikes, and interests, among other factors, will fundamentally change and diminish the user experience for teens on Facebook, Instagram, and Threads.

* * *

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated: November 12, 2025

By: Signed by: Lars Backstrom AF88A24E0D5F4C7...

Lars Backstrom

# Exhibit C

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

META PLATFORMS, INC.,

Plaintiff,

v.

ROB BONTA, in his official capacity as Attorney General of California,

Defendant.

Case No. 5:25-cv-09792-EJD

**SUPPLEMENTAL DECLARATION OF LARS BACKSTROM IN SUPPORT OF META'S MOTION FOR PRELIMINARY INJUNCTION**

I, Lars Backstrom, declare as follows based on personal knowledge:

1. I am the Vice President of Engineering at Meta Platforms, Inc. ("Meta"). I have been employed in that position since January 2017 and have been employed at Meta (formerly "Facebook") since September 2009. I am over the age of 18 years and maintain an office at 1 Meta Way, Building 20 in Menlo Park, California. I make this Supplemental Declaration in connection with Meta's Sur-Surreply and in support of its Motion for Preliminary Injunction in the above-captioned matter. I have personal knowledge of the matters set forth in this Supplemental Declaration, and if called as a witness, I could and would testify under oath as follows.

2. In my role at Meta, I am familiar with why and how Meta recommends content to users on its Facebook, Instagram, and Threads services. Meta employs thousands of engineers, scientists, and user experience researchers who contribute to the design, development and implementation of Meta's recommendation systems and whose judgments inform the design and objectives of those systems.

3. Facebook, Instagram, and Threads are services that help people connect and share, build communities, and grow small businesses. Almost all of what they show to users is content created by their billions of users, not by Meta. Meta's goal is to communicate to each of those users the user-generated content (such as videos, photos, posts, groups, and more) that Meta believes may be most relevant or valuable to them, within the framework of Meta's Community Standards and consistent with Meta's mission, which includes helping users discover and learn about what is going on in the world around them. Meta uses recommendation systems, which are designed, developed and continually refined by Meta employees, to curate these personalized recommendations at scale.

4. Human decision-making, and therefore human judgment, is essential to the design, implementation, monitoring, and refinement of Meta's recommendation systems. Meta employees choose the architecture of the system and its subsystems, the system's objectives, and the form of its output. For example, at the start of a system's recommendations pipeline, Meta engineers design and refine a variety

of "generators." Each generator is designed to take a different approach to retrieve a subset of content items, among the billions of items of content available, that Meta believes may be suitable to recommend to each individual user.

5. Meta's recommendation systems operate as Meta's engineers design them to operate. Further, Meta personnel observe system outputs and iteratively adjust the rules, models, and parameters so that these systems' operation consistently aligns with Meta's intended goals and policies. Meta employees continuously work to ensure that Meta's recommendation systems generate the kinds of feeds that Meta wants to share with its users.

6. The content Meta recommends—and how Meta orders that content—is not driven solely by users' short-term interests. In particular, Meta wishes to provide an experience in which users are offered a diversity of content that Meta believes users will find informative and entertaining, and not solely the same kind of content with which users have previously interacted.

7. Meta researchers and engineers regularly make judgments to advance Meta's goals by shaping what set of recommendations a user receives and in what order. For example, Meta researchers and engineers have designed rules that shape the degree of diversity among, and novelty of, the recommended content that a user sees in the user's feed. Meta has also designed measures to promote new content from small creators to progressively larger audiences.

8. Meta employees have a clear understanding of the kinds of experiences they want users to have on its services. Meta intends Facebook, Instagram, and Threads to be places for expression where people can have a voice. It aims to help users discover new interests or hobbies, connect them to communities they may not have otherwise encountered, and enable even niche content creators to find their audience. In addition to the previously mentioned goals, Meta's engineers have designed Meta's recommendation systems to recommend content that is consistent with its Community Guidelines and Recommendation Guidelines. These design choices reflect Meta's views about which types of content

should and should not be available on Facebook, Instagram, and Threads. Further, Meta's employees have designed its recommendation systems to account for considerations such as quality, integrity, and originality in ranking content for a user. Meta's policies and practices aim to safely and responsibly further Meta's fundamental personalization-driven product goals. As relevant here, those policies aim at maintaining a common pool of safe, high-quality, original recommendable content from which any number of unique personalized feeds can be curated for each of Meta's users.

9. I do not consider it accurate to refer to Meta's recommendation systems as "black boxes" to the extent that term is used to suggest that the systems are unknowable, uncontrolled, unpredictable, or mysterious. In practice, the operation of these systems, including the machine learning prediction models within them, is well-understood.

10. Meta's researchers and engineers routinely use tools to evaluate how particular inputs contribute to outputs, even in complex neural networks. Moreover, neural networks are only one aspect of Meta's multi-stage recommendation process. Meta's value models—which produce the final ranking scores—are human-interpretable formulas where the meaning and impact of individual terms can be understood.

* * *

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated: 6/2/2026

By: Signed by: Lars Backstrom
AF88A24E0D5F4C7...
Lars Backstrom

# Exhibit D

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

META PLATFORMS, INC.,

Plaintiff,

v.

ROB BONTA, in his official capacity as Attorney General of California,

Defendant.

Case No.: ____________

**DECLARATION OF ARCADIY KANTOR IN SUPPORT OF META'S MOTION FOR PRELIMINARY INJUNCTION**

I, Arcadiy Kantor, declare as follows based on personal knowledge:

1. I am the Director of Product Management on the Content Integrity Team at Meta Platforms, Inc. ("Meta"). I have been employed in that position since March 2023 and have been employed within Meta's Content Integrity Team since March 2018. I am over the age of 18 years and maintain an office at 1550 121st Ave NE in Bellevue, WA. I make this Declaration in support of Meta's Motion for Preliminary Injunction in the above-captioned matter. I have personal knowledge of the matters set forth in this Declaration as well as knowledge based on a review of company records kept in the ordinary course of business, and if called as a witness, I could and would testify under oath as follows.

2. In my role at Meta, I am familiar with Meta's content moderation policies and practices with respect to the Facebook, Instagram, and Threads services. I am familiar with Meta's Community Standards, Meta's Terms of Service (which apply to Facebook), Instagram's Terms of Use, the Threads Terms of Use, and Facebook's and Instagram's Recommendation Guidelines.

**<u>Content Moderation</u>**

3. Meta's commitment to expression is paramount, but Meta also recognizes that the internet creates new and increased opportunities for abuse. Meta has invested substantial resources to promote a safe experience for its Facebook, Instagram, and Threads communities. Meta has around 40,000 people overall working on safety and security.[1] And, Meta has invested over $30 billion into teams and technology in this area over the last decade.

4. This work is core to Meta's mission of building the future of human connection. Meta wants Facebook, Instagram, and Threads to be places where people feel empowered to communicate, and cannot achieve this goal if people do not feel safe while using its services. Similarly, advertisers likely will pause, reduce, or refuse altogether to advertise on Facebook, Instagram, and Threads if they do not believe that Meta is effective at removing harmful or offensive content.

5. This is why Meta's Content Policy team has, over many years, developed robust policies and practices relating to content moderation that help to determine what third-party content users see on

---

[1] *Safety and Integrity Highlights from 2024*, Meta (Dec. 9, 2024), https://www.facebook.com/business/news/safety-integrity-highlights-2024.

Facebook, Instagram, and Threads. These policies and practices reflect Meta's views about which types of content should and should not be available on Facebook, Instagram, and Threads. Meta's views on this subject also reflect Meta's judgment about how it can best create a place for free expression, give people a voice, and empower people to talk openly about the issues that matter to them, balanced by the reality that the internet creates new and increased opportunities for abuse.

6. When Meta does limit expression, it does so in the service of Meta's values of authenticity, safety, privacy, and dignity.

a. *Authenticity*. Meta believes that authenticity promotes a better environment for sharing.

b. *Safety*. Meta believes that content that threatens people has the potential to intimidate, exclude or silence others.

c. *Privacy*. Meta believes that privacy gives people the freedom to be themselves, choose how and when to share on Meta's services, and connect more easily.

d. *Dignity*. Meta believes that all people are equal in dignity and rights. Meta expects that people will respect the dignity of others and not harass or degrade others.[2]

7. ***Content Meta Removes for Everyone.*** Meta's publicly available Community Standards[3] (which users agree not to violate), Meta's Terms of Service[4] (to which users must agree to create an account on the Facebook service), Instagram Terms of Use[5] (to which users must agree to create an account on the Instagram service), and Threads Terms of Use[6] (to which users must agree to use the Threads service) describe what content is acceptable on Facebook, Instagram, and Threads.

---

[2] *Community Standards*, Meta, https://transparency.fb.com/policies/community-standards/ (last visited Nov. 13, 2025) [hereinafter Community Standards].

[3] *Id.*

[4] *Terms of Service Overview*, Meta (Jan. 1, 2025), https://www.facebook.com/terms.php [hereinafter Meta Terms].

[5] *Terms of Use*, Instagram, https://help.instagram.com/581066165581870 (last visited Nov. 13, 2025) [hereinafter Instagram Terms].

[6] *Threads Terms of Use*, Instagram, https://help.instagram.com/769983657850450 (last visited Nov. 13, 2025).

8. The Meta Terms of Service prohibit users from doing or sharing anything that is "unlawful, misleading, discriminatory or fraudulent" or that "infringes or violates someone else's rights."[7] Similarly, the Instagram Terms of Use prohibit users from doing or sharing anything that is "unlawful, misleading, or fraudulent or for an illegal or unauthorized purpose" or that would "violate[] someone else's rights," and from "post[ing] someone else's private or confidential information without permission." And the Threads Terms of Use incorporate the same prohibition from the Instagram Terms by reference.[8]

9. Meta also has Community Standards that Meta employees on its Content Policy team have developed and that are enforced by both human reviewers and automated processes that Meta has built to implement its human-developed standards. These Community Standards provide details about what user-generated content is not allowed on Facebook, Instagram, and Threads. They are organized into twenty-three separate policies restricting specific categories of content related to: (1) coordinating harm and promoting crime;[9] (2) dangerous organizations and individuals;[10] (3) fraud, scams, and deceptive practices;[11] (4) restricted goods and services;[12] (5) violence and incitement;[13] (6) adult sexual

---

[7] Meta Terms, *supra*.

[8] *Threads Policies and Terms*, Instagram, https://help.instagram.com/280495901606863/?helpref=hc_fnav (last visited Nov. 13, 2025) ("These Threads Terms of Use . . . supplement and amend the Instagram Terms of Use and the Meta Community Standards, which are incorporated into these Terms by reference.").

[9] *Coordinating Harm and Promoting Crime*, Meta (Jun. 26, 2025), https://transparency.meta.com/policies/community-standards/coordinating-harm-promoting-crime/.

[10] *Dangerous Organizations and Individuals*, Meta (Feb. 8, 2024), https://transparency.meta.com/policies/community-standards/dangerous-individuals-organizations/.

[11] *Fraud, Scams, and Deceptive Practices*, Meta (Jun. 6, 2025), https://transparency.meta.com/policies/community-standards/fraud-scams.

[12] *Restricted Goods and Services*, Meta (May 14, 2025), https://transparency.meta.com/policies/community-standards/restricted-goods-services/.

[13] *Violence and Incitement*, Meta (Sep. 27, 2024), https://transparency.meta.com/policies/community-standards/violence-incitement/.

exploitation;[14] (7) bullying and harassment;[15] (8) child sexual exploitation, abuse, and nudity;[16] (9) human exploitation;[17] (10) suicide, self-injury, and eating disorders;[18] (11) adult nudity and sexual activity;[19] (12) adult sexual solicitation and sexually explicit language;[20] (13) hateful conduct;[21] (14) privacy violations;[22] (15) violent and graphic conduct;[23] (16) authentic identity representation;[24] (17) cybersecurity;[25] (18) inauthentic behavior;[26] (19) misinformation;[27] (20) spam;[28] (21) third-party intellectual property

---

[14] *Adult Sexual Exploitation*, Meta (Oct. 30, 2025), https://transparency.meta.com/policies/community-standards/adult-sexual-exploitation/.

[15] *Bullying and Harassment*, Meta (Jan. 22, 2025), https://transparency.meta.com/policies/community-standards/bullying-harassment/ [hereinafter Bullying and Harassment].

[16] *Child Sexual Exploitation, Abuse, and Nudity*, Meta (July 31, 2025), https://transparency.meta.com/policies/community-standards/child-sexual-exploitation-abuse-nudity/.

[17] *Human Exploitation*, Meta (Sep. 19, 2025), https://transparency.meta.com/policies/community-standards/human-exploitation/.

[18] *Suicide, Self-Injury, and Eating Disorders*, Meta (May 14, 2025), https://transparency.fb.com/policies/community-standards/suicide-self-injury/ [hereinafter Suicide, Self-Injury, and Eating Disorders].

[19] *Adult Nudity and Sexual Activity*, Meta (Aug. 28, 2025), https://transparency.meta.com/policies/community-standards/adult-nudity-sexual-activity/.

[20] *Adult Sexual Solicitation and Sexually Explicit Language*, Meta (May 14, 2025), https://transparency.meta.com/policies/community-standards/sexual-solicitation/.

[21] *Hateful Conduct*, Meta (Jan. 7, 2025), https://transparency.meta.com/policies/community-standards/hateful-conduct/.

[22] *Privacy Violations*, Meta (Oct. 2, 2024), https://transparency.meta.com/policies/community-standards/privacy-violations/.

[23] *Violent and Graphic Content*, Meta (Jun. 26, 2025), https://transparency.meta.com/policies/community-standards/violent-graphic-content/.

[24] *Authentic Identity Representation*, Meta (Oct. 9, 2024), https://transparency.meta.com/policies/community-standards/authentic-identity-representation.

[25] *Cybersecurity*, Meta (June 26, 2025), https://transparency.meta.com/policies/community-standards/cybersecurity/.

[26] *Inauthentic Behavior*, Meta (Oct. 2, 2024), https://transparency.meta.com/policies/community-standards/inauthentic-behavior/.

[27] *Misinformation*, Meta (Apr. 7, 2025), https://transparency.meta.com/policies/community-standards/misinformation/.

[28] *Spam*, Meta (June 26, 2024), https://transparency.meta.com/policies/community-standards/spam/ [hereinafter Spam].

infringement;[29] (22) using Meta intellectual property and licenses;[30] and (23) locally illegal content, products, or services.[31]

10. Much of the user-generated content falling within these policies is flatly prohibited—and, when detected and determined to be violating by Meta, removed—across Facebook, Instagram, and Threads. Other category-specific policies identify content that Meta chooses to hide from teens, label, place behind a warning screen, and/or de-prioritize for certain (or all) users on Facebook, Instagram, and Threads. For example, content celebrating or promoting suicide, self-injury, or eating disorders is prohibited and is removed for all users when detected and determined to be violating content by Meta. Content discussing these topics (but not celebrating or promoting them) is generally allowed. But content about recovery from suicide, self-injury or eating disorders that may contain imagery that could be upsetting (such as a healed scar) may be placed behind a warning screen for adults aged 18 and older while being hidden entirely from teens.[32] And recently, Meta's teams reviewed Meta's age-appropriate content guidelines—the guidelines that determine what content Meta hides from teens and avoids recommending to them—against age-appropriate movie ratings, with the goal of having teens see content that is generally similar to what they would see in an age-appropriate movie.[33]

11. Meta's Content Policy team, which sits in more than a dozen locations around the world, is responsible for developing Meta's Community Standards. The team includes subject matter experts in issues like hate speech, child safety and terrorism as well as people with experience in criminal prosecution, rape crisis counseling, academics, human rights, law and education. Many have also worked

---

[29] *Third-Party Intellectual Property Infringement*, Meta (Aug. 26, 2024), https://transparency.meta.com/policies/community-standards/intellectual-property/.

[30] *Using Meta Intellectual Property and Licenses*, Meta, https://transparency.meta.com/policies/community-standards/meta-intellectual-property (last visited Nov. 13, 2025).

[31] *Locally Illegal Content, Products, or Services*, Meta (Oct. 2, 2024), https://transparency.meta.com/policies/community-standards/locally-illegal-products-services.

[32] Suicide, Self-Injury, and Eating Disorders, *supra.*

[33] *Helping Teens See Age-Appropriate Content*, Meta (Oct. 14, 2025), https://transparency.meta.com/policies/age-appropriate-content/.

on issues of voice and safety long before coming to Meta. During the policy development process, the team engages with civil society organizations, academics, and other thought leaders to gather knowledge and experience, and works with internal teams to build stakeholder feedback into policy development. Meta takes great care to create Community Standards that consider different views and beliefs, especially from people and communities that might otherwise be overlooked or marginalized.[34]

12. ***Community Standards Enforcement.*** Meta relies on both human and automated review to detect violations of its policies and terms among the billions of pieces of content that users of its services generate every day.[35]

13. Meta's human review teams consist of full-time employees who review content as part of a larger set of responsibilities, as well as content reviewers employed by Meta's partners. Human reviewers come from different backgrounds, reflect Meta's diverse community, and have an array of professional experiences. Altogether, thousands of human reviewers across the globe review potential Community Standards violations on Facebook, Instagram, and Threads in more than 80 languages.[36]

14. Given the scale of content on Meta's services, it is not possible to manually review every piece of user-generated content that potentially violates Meta's policies.[37] For this reason, Meta uses technology to enforce its Community Standards. Building the necessary technology to do so is a two-step process.

15. *First*, Meta's artificial intelligence teams build machine learning models that can perform tasks, such as recognizing what is in a photo or understanding text, and predict whether a piece of content is, for example, hate speech or violent and graphic content. To keep people safe, Meta trains artificial

---

[34] *How We Update the Community Standards*, Meta (Nov. 12, 2024), https://transparency.meta.com/policies/improving/deciding-to-change-standards/; *Input From External Stakeholders*, Meta (Jan. 18, 2023), https://transparency.meta.com/en-gb/policies/improving/input-from-external-stakeholders; Community Standards, *supra*.

[35] *Detecting Violations*, Meta, https://transparency.fb.com/enforcement/detecting-violations/ (last visited Nov. 13, 2025).

[36] *Id.*; *The People Behind Meta's Review Teams*, Meta (Jan. 19, 2022), https://transparency.meta.com/en-gb/enforcement/detecting-violations/people-behind-our-review-teams.

[37] *How Technology Detects Violations*, Meta (Oct. 18, 2023), https://transparency.meta.com/enforcement/detecting-violations/technology-detects-violations/.

intelligence on how to detect subtle distinctions between violating and non-violating content. For example, hate speech varies from country to country or even group to group—and it can evolve rapidly, drawing on current events or trends. People also try to disguise hate speech with sarcasm and slang, intentional misspellings, and sophisticated photo alterations.[38]

16. Meta's teams have built and deployed new technologies to address these challenges. For example, Meta employees iteratively train AI systems to improve their recognition and classification of violative user-generated content (including complex content such as memes, which combine text and images for a singular meaning, that humans interpret through context and common sense), mitigate biases in classification systems, and avoid false positives. And Meta's AI researchers are dedicated to developing cutting-edge classification technologies that build upon human experience to better understand content.[39]

17. *Second*, Meta's Community Integrity teams build upon these models to create enforcement technologies that determine whether to take an action on content, such as deleting it, de-prioritizing it to reduce how often people see it, or sending it to a human review team for further review. At first, a new type of technology might have low confidence about whether a piece of content violates the Community Standards. Human review teams can then make the final call, and Meta's technology can learn from each human decision. Over time, the technology becomes more accurate.[40]

18. Every day, Meta's enforcement teams work together to remove user-generated content on Facebook and Instagram that goes against the Community Standards. For example, in Q2 2025 alone, Meta, through its human reviewers and its automated technologies, removed (for all users):

---

[38] *Id.*; *How Enforcement Technology Works*, Meta (Nov. 12, 2024), https://transparency.meta.com/en-gb/enforcement/detecting-violations/how-enforcement-technology-works [hereinafter Enforcement Technology].

[39] *See, e.g.*, *Hateful Memes Challenge and Dataset for Research on Harmful Multimodal Content*, Meta (May 12, 2020), https://ai.meta.com/blog/hateful-memes-challenge-and-data-set/; *Training AI to Detect Hate Speech in the Real World*, Meta (Nov. 19, 2020), https://ai.meta.com/blog/training-ai-to-detect-hate-speech-in-the-real-world/.

[40] Enforcement Technology, *supra*.

a. 6.7 million pieces of content on Facebook and 10 million pieces of content on Instagram that violated its suicide, self-injury, and eating disorder policy;[41]

b. 4.1 million pieces of content on Facebook and 3.3 million pieces of content on Instagram that violated its bullying and harassment policy;[42] and

c. 165 million pieces of content on Facebook and 93.2 million pieces of content on Instagram that violated its spam policy.[43]

19. Meta's enforcement teams took action on even more user-generated content in other ways, such as hiding it from teens, placing it behind a warning screen, and/or de-prioritizing it for some or all users.

20. In rare cases, Meta allows content that may violate its Community Standards if it is newsworthy and keeping it visible is in the public interest. Meta does this only after conducting a thorough review that weighs the public interest against the risk of harm. Meta looks to international human rights standards to help make these judgments. From June 1, 2024 through June 1, 2025, Meta documented a total of 44 newsworthy decisions worldwide.[44]

21. ***Content Meta Avoids Recommending.*** Meta's Facebook Recommendation Guidelines (which apply to Facebook) and Instagram Recommendation Guidelines (which apply to Instagram and Threads) provide details about which content is eligible for recommendation via Meta's algorithms.[45] These Guidelines, too, are developed by Meta's Content Policy team. Much of the content that Meta

---

[41] Suicide, Self-Injury, and Eating Disorders, *supra*.

[42] Bullying and Harassment, *supra*.

[43] Spam, *supra*.

[44] *Our Approach to Newsworthy Content*, Meta (Nov. 12, 2024), https://transparency.meta.com/features/approach-to-newsworthy-content/.

[45] Guy Rosen, *Recommendation Guidelines*, Meta (Aug. 31, 2020), https://about.fb.com/news/2020/08/recommendation-guidelines/; *About Recommendations on Facebook*, Meta, https://www.facebook.com/help/1257205004624246/ (last visited Nov. 13, 2025) [hereinafter Facebook Recommendations]; *Recommendations on Instagram*, Instagram, https://help.instagram.com/313829416281232 (last visited Nov. 13, 2025) [hereinafter Instagram Recommendations].

avoids recommending to adults is already completely hidden for minors. Other content, such as content that promotes the sale or use of alcohol, is recommendable for adults but not for teens.

22. Under both sets of Guidelines, content that may not be eligible for recommendation includes:

a. Content that impedes Meta's ability to foster a safe community (such as content that discusses self-harm, suicide, or eating disorders; content that depicts or trivializes themes around death or depression; and content that may depict violence, such as people fighting);

b. Sensitive or low-quality content about health or finance (such as content that promotes or depicts cosmetic procedures; content containing exaggerated health claims; and content attempting to sell products or services based on health-related claims, such as promoting a supplement to help a person lose weight); and

c. Content associated with low-quality publishing (such as unoriginal content that is largely repurposed from another source or news content that does not include transparent information about authorship or the publisher's editorial staff).[46]

23. Within the bounds of Meta's Community Standards, Facebook's Recommendation Guidelines, and Instagram's Recommendation Guidelines, every Facebook, Instagram, and Threads user's interests and preferences are welcome on these services. Meta wants people to feel inspired to engage with or talk openly about precisely the issues that matter most to them, whether through written comments, photos, music, or other artistic mediums.

* * *

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

[46] Facebook Recommendations, *supra*; Instagram Recommendations, *supra*.

Dated: November 13, 2025

By: Signed by: Arcadiy Kantor BB72D31B359C4A0...

Arcadiy Kantor

# Exhibit E

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| META PLATFORMS, INC.,<br>Plaintiff,<br>v.<br>ROB BONTA, in his official capacity as Attorney General of California,<br>Defendant. | Case No.: ____________<br><br>**DECLARATION OF SAYED OTARU IN SUPPORT OF META'S MOTION FOR PRELIMINARY INJUNCTION** |

I, Sayed Otaru, declare as follows based on personal knowledge:

1. I am the Director of Product Management on the Youth Protections team at Instagram at Meta Platforms, Inc. ("Meta"). I have worked on the Youth Protections team at Meta since May 2020. I am over the age of 18 years and maintain an office at 1 Meta Way, Building 21 in Menlo Park, CA. I make this Declaration in support of Meta's Motion for Preliminary Injunction in the above-captioned matter. I have personal knowledge of the matters set forth in this Declaration as well as knowledge based on a review of company records kept in the ordinary course of business, and if called as a witness, I could and would testify under oath as follows.

2. In my role at Meta, I am familiar with Meta's safety protections for teens and families, including Supervision, Teen Accounts, and other tools and features such as Sensitive Content Control settings across Facebook, Instagram, and Threads.

3. Meta, formerly known as Facebook, Inc., was founded in 2004. Meta owns and operates the Facebook, Instagram, and Threads services.

**Meta's Supervision, Teen Accounts, and Sensitive Content Control Tools and Features**

4. Meta wants its services to be a place for meaningful interactions with friends and family, and cannot achieve that goal if people do not feel safe. Meta has invested substantial resources to promote a safe experience for teens aged 13-17 and empower parents to partner with their teens to ensure they have positive and fulfilling experiences on Facebook, Instagram, and Threads. As of November 2025, Meta has built more than 50 user facing tools, features and resources to help teens have safe, positive experiences, and give parents simple ways to set boundaries for their teens.[1]

5. ***Minimum Age Policy.*** Pursuant to Meta's Terms of Service and the Instagram and Threads Terms of Use, if a child in the United States is under the age of 13, they are not allowed to create an account on Facebook or Instagram—or a profile on Threads, for which an Instagram or Facebook account is a prerequisite—and should not be using the services.[2] When Meta learns an underage user has created

[1] *Our Tools, Features and Resources to Help Support Teens and Parents*, Meta, https://www.meta.com/help/policies/809291991003600/ (last visited Nov. 12, 2025).

[2] *Terms of Service*, Meta (Jan. 1, 2025), https://www.facebook.com/legal/terms/ (applicable to Facebook); *Terms of Use*, Instagram, https://help.instagram.com/termsofuse (last visited Nov. 12, 2025);

a Facebook or Instagram account, Meta removes the account from the services (including Threads if the user has created a Threads account using the Facebook or Instagram Account).

6. ***Instagram Teen Accounts.*** Meta places teens on Instagram into Teen Accounts. Teen Accounts have built-in protections that limit who can contact teens and the content they see, and help ensure their time is well spent.[3]

7. Teen Accounts offer a host of protections for teens (several of which predated the rollout of Teen Accounts). With **default private accounts**, teens need to accept new followers, and people who do not follow them cannot see their content or tag, mention, or interact with them. Teen Account protections also include Meta's strictest **messaging restrictions**, which permit teens to only be messaged by people they follow or are already connected to; **blocks on search terms** related to certain sensitive topics like suicide, self-harm, and eating disorders; Meta's most restrictive version of its **anti-bullying feature** Hidden Words, which filters offensive words and phrases out of teens' comments and direct message requests; default **nudity protection in direct messages**, which blurs images detected as possibly containing nudity, encourages people not to feel pressured to respond when receiving an image containing nudity, and encourages people to think twice before sending nude images; **time limit reminders**, which notify teens to leave the app after 60 minutes each day; and **sleep mode**, which mutes notifications overnight and sends auto-replies to direct messages (from 10 p.m. to 7 a.m.).[4]

8. Teens under 16 need a parent's permission to change any of these settings to be less strict, and teens under 18 need a parent's permission to change the above content settings to be less strict. Teens under 16 are also prohibited from going Live without parental permission.[5]

---

*Threads Terms of Use*, Instagram, https://www.facebook.com/help/instagram/769983657850450/ (last visited Nov. 12, 2025).

[3] *Introducing Instagram Teen Accounts: Built-In Protections for Teens, Peace of Mind for Parents*, Instagram (Sep. 17, 2024), https://about.fb.com/news/2024/09/instagram-teen-accounts/.

[4] *New Tools to Help Protect Against Sextortion and Intimate Image Abuse*, Instagram (April 11, 2024), https://about.instagram.com/blog/announcements/new-tools-to-help-protect-against-sextortion-and-intimate-image-abuse/.

[5] *We're Introducing New Built-In Restrictions for Instagram Teen Accounts, and Expanding to Facebook and Messenger*, Meta (April 8, 2025), https://about.fb.com/news/2025/04/introducing-new-built-in-restrictions-instagram-teen-accounts-expanding-facebook-messenger/.

9. On October 14, 2025, Meta announced it is enhancing Teen Account protections, including to block search terms related to a wider range of mature search terms such as "alcohol" and "gore," and will continue to improve its ability to block misspelled search terms. Meta will be placing a number of restrictions on teens' interactions with accounts that regularly share age-inappropriate content or whose name or bio suggests that the account is inappropriate for teens. Teens will no longer be able to follow these accounts, see or interact with these accounts' content, message these accounts, or see comments posted from these accounts; conversely, these accounts will not be able to follow teens, message teens, or comment on teens' posts. Meta will not recommend these accounts to teens and will make it harder for teens to find these accounts in Search.[6]

10. ***Facebook Teen Accounts.*** Meta also expanded Teen Accounts to Facebook.[7] Teens on Facebook are automatically defaulted to "Show less," Facebook's most restrictive **sensitive content setting**. Teens under 16 need a parent's approval to change this default content setting to be less protective. With **audience restrictions**, only Friends can see a teen's posts, stories, reels, friends list and pages they follow. Additionally, teens on Facebook need to review posts that they are tagged in before the post appears on their profile. Like on Instagram, teens on Facebook also have time limit reminders, nudity blurring, and sleep mode turned on by default, and teens under 16 need parental approval to change these default settings to be less protective.[8]

11. ***Parental Supervision.*** For years, Meta has empowered parents to work collaboratively with their teens to help them create, explore, and connect in safe, age-appropriate ways using Supervision.[9]

---

[6] *Instagram Teen Accounts Will Be Guided by PG-13 Ratings*, Meta (Oct. 14, 2025), https://about.fb.com/news/2025/10/instagram-teen-accounts-pg-13-ratings/ [hereinafter Ages 13+ Content Ratings].

[7] *Facebook and Messenger Teen Accounts: How Built-in Protections Help Keep Your Teen Safe*, Meta (Apr. 8, 2025), https://familycenter.meta.com/education/resources/teen-accounts-facebook-messenger/.

[8] *Id.*; *About Sensitive Content Control on Facebook*, Facebook, https://www.facebook.com/help/1899256577589934?cms_platform=iphone-app&helpref=platform_switcher (last visited Nov. 12, 2025).

[9] *Family Center*, Meta, https://familycenter.meta.com/ (last visited Nov. 12, 2025).

With the introduction of Teen Accounts, parents can now use Supervision tools on Facebook and Instagram to:

a. set daily time limits for their teens or limit use during select days and hours;

b. view and change their teen's content settings;

c. set reminders to close the app;

d. see the average amount of time their teen has spent on Facebook and Instagram over the last week and the total time spent on Facebook and Instagram for each specific day over the last week;

e. see who their teen follows and who follows their teen;

f. see which accounts their teen is currently blocking;

g. see when their teen reports someone and for what reason;

h. approve or deny their teens' requests to change default safety and privacy settings to a less strict state; and

i. see their teen's settings for account privacy and messaging.[10]

12. ***Content Controls.*** Facebook, Instagram, and Threads also offer tools for users to adjust the amount of certain types of content they see in the feeds on these services.

---

[10] *Giving Teens and Parents More Ways to Manage Their Time on Our Apps*, Meta (June 27, 2023), https://about.fb.com/news/2023/06/parental-supervision-and-teen-time-management-on-metas-apps/; *Introducing Stricter Message Settings for Teens on Instagram and Facebook*, Meta (Jan. 25, 2024), https://about.fb.com/news/2024/01/introducing-stricter-message-settings-for-teens-on-instagram-and-facebook/; *Parental Supervision,* Instagram, https://help.instagram.com/309877544512275 (last visited Nov. 12, 2025); *Safety Resources for Parents*, Facebook, https://www.facebook.com/help/1079477105456277 (last visited Nov. 12, 2025); *See Who Your Teen Has Chats With on Instagram*, Instagram, https://help.instagram.com/501423385831907 (last visited Nov. 12, 2025); *About Safety Settings for Teens on Threads*, Instagram, https://www.facebook.com/help/instagram/668862302931001/ (last visited Nov. 12, 2025). By virtue of teens' Instagram accounts (where Threads accounts were historically linked), these Supervision tools were also available with respect to Meta's Threads service until approximately November 2025. Meta has now started rolling out Teen Accounts to Threads-only accounts, and intends to bring back Supervision tools specific to Threads in the near future.

13. For example, users can use the **Political Content Control** on Instagram, Threads, and Facebook to see more or less of content in their feeds that Meta, in its judgment, has determined qualifies as political content (such as content that refers to governments, elections, or social topics that may affect many people).[11] Both teens and adult users on Instagram, Threads, and Facebook can modify this setting as they see fit. Meta accounts for these settings when determining what content to display in a particular user's feeds across Instagram, Threads, and Facebook.

14. On Facebook, users can also tap the **"Interested, Not Interested"** feature on all posts in Feed, Videos, and Reels to see more of the content they want to see, and less of the content they do not want to see; similarly, on Instagram and Threads, users can indicate **"Not Interested"** on a recommended post or identify **"Specific Words and Phrases"/"Hidden Words"** to hide any specific words or phrases from appearing in a user's feeds.[12] Meta accounts for these selections when determining what content to display in a particular user's feeds across Instagram, Threads, and Facebook.

15. Users on Facebook and Threads and adult users on Instagram can use the **Sensitive Content Control** to see more or less of certain categories of content in their feeds that Meta, in the judgment of its human personnel, has determined may be upsetting or offensive to some users.[13] Examples of such categories of content include content that may depict violence, such as people fighting; content

---

[11] *About Political Content Control on Facebook*, https://www.facebook.com/help/1932710690579979/?helpref=related_articles (last visited Nov. 12, 2025); *About Political Content Control on Instagram*, https://help.instagram.com/339680465107440/?helpref=uf_share (last visited Nov. 12, 2025); *About Political Content Control on Threads*, https://help.instagram.com/1060951898912604?ref=ipl (last visited Nov. 12, 2025).

[12] *New Ways to Customize Your Facebook Feed*, Facebook (Oct. 5, 2022), https://about.fb.com/news/2022/10/new-ways-to-customize-your-facebook-feed/; *How to See More of What You Want on Instagram*, Instagram (Aug. 30, 2022), https://about.instagram.com/blog/tips-and-tricks/control-your-instagram-feed#:~:text=Use%20the%20%E2%80%98Not%20Interested%E2%80%99%20control%20Whe.

[13] *About Sensitive Content Control on Instagram*, Instagram, https://tinyurl.com/5n6s58j5 (last visited Nov. 12, 2025); *About Sensitive Content Control on Threads*, Instagram, https://help.instagram.com/2031788317323900/?helpref=related_articles (last visited Nov. 12, 2025); *About Sensitive Content Control on Facebook*, Facebook, https://www.facebook.com/help/1899256577589934/?cms_platform=iphone-app&helpref=platform_switcher (last visited Nov. 12, 2025).

that may be sexually suggestive; content that may promote or depict cosmetic procedures; or content that may be attempting to sell products or services based on health-related claims, such as promoting a supplement. As mentioned above, Facebook Teen Accounts are automatically defaulted by Meta into the most restrictive "Show less" setting, and teens ages 13-15 need parental approval to change that setting. Anyone 16 years old or older can change the setting to "Show more" or "Default." Meta accounts for these settings when determining what content to display in a particular user's feeds across Instagram, Threads, and Facebook.

16. By the end of 2025, Sensitive Content Control on Instagram will be replaced by **Ages 13+, Limited Content, and More Content** settings in Teen Accounts for all United States teens (aged 13-17).[14] Teens will be automatically defaulted into the "Ages 13+" content setting on Instagram.[15] Meta's goal for the "Ages 13+" content setting is to ensure that teens see content that is generally similar to what teens would see in an age-appropriate movie, and to try and hide more content that Meta believes may be inappropriate for people under 18 (such as content where a person is describing their own personal experiences with suicide, self-injury or eating disorders). Meta's "Ages 13+" content setting, which was developed by human personnel at Meta in consultation with external experts, parents and teens, will impact the content teens see in feeds on Instagram.

17. Teens may choose to enroll in an even stricter "Limited Content" setting (and a supervising parent or guardian can also enroll their teens in this setting) that personnel at Meta have developed based on their judgment regarding what content should be permitted and not permitted in this even stricter setting. The Limited Content setting will filter even more content from the Teen Account experience and remove teens' ability to see, leave, or receive comments under posts.[16] Meta will account for teens'

---

[14] *Content Setting for Teen Accounts*, Instagram, https://help.instagram.com/1470609900735343?helpref=faq_content (last visited Nov. 12, 2025); *Helping Teens See Age-Appropriate Content*, Meta (Oct. 14, 2025), https://transparency.meta.com/policies/age-appropriate-content/.

[15] Stated-age teens will see settings reflecting a 13+ experience while predicated-age teens will continue to see Sensitive Content Control settings and will also have a 13+ experience.

[16] Ages 13+ Content Ratings, *supra*.

"Limited Content," "Ages 13+," and "More Content" settings when determining what content to display in their feeds on Instagram.

18. A teen needs to receive the permission of their supervising parent or guardian to opt out of the "Ages 13+" setting and instead enroll in the "More Content" setting.

19. ***Safety-Related Information and Resources.*** Meta provides a Safety Center with resources to inform parents and teens about how to stay safe while using Meta's services, including Facebook, Instagram, and Threads.[17] For example, Meta offers the Parent's Guide,[18] a product of collaboration between Meta and ConnectSafely, which contains the latest Instagram safety tools and privacy settings and a list of tips and conversation starters to help parents and guardians navigate discussions with their teens about their online presence. The Safety Center's Parent Portal, Youth Portal, and Child Safety Hub are focused on fostering conversations around online safety, security, and well-being. Likewise, the Meta Family Center provides conversation starters, tips, and research-backed guidance designed to support families' digital experience.[19] Meta has also published articles on the dozens of tools Meta has developed to support teens and families on its apps—including parental controls, nudges for teens to set time limits on Facebook and Instagram and giving them the ability to set scheduled breaks, nudges to encourage teens to close Instagram after 60 minutes each day, and tools that protect teens against unwanted interactions.[20]

---

[17] *Facebook and its Safety Advisory Board Launch Robust New Safety Center*, Meta (Apr. 13, 2010), https://about.fb.com/news/2010/04/facebook-and-its-safety-advisory-board-launch-robust-new-safety-center/; *Safety Center*, Meta, https://about.meta.com/actions/safety (last visited Nov. 12, 2025).

[18] *Helping Your Teen Navigate Instagram Safely*, Instagram, https://about.instagram.com/community/parents (last visited Nov. 12, 2025).

[19] *Resources Hub*, Meta, https://familycenter.meta.com/resources/ (last visited Nov. 12, 2025).

[20] Antigone Davis, *How Meta Is Working to Provide Safe, Age-Appropriate Experiences for Teens*, Meta (Jan. 9, 2023), https://about.fb.com/news/2023/01/providing-safe-experiences-for-teens/; *Giving Teens and Parents More Ways to Manage Their Time on Our Apps*, Meta (June 27, 2023), https://about.fb.com/news/2023/06/parental-supervision-and-teen-time-management-on-metas-apps/.

**The Impact of California's Personalized Feeds Restrictions on Facebook, Instagram, and Threads**

20. I understand that on or around September 20, 2024, the State of California enacted the Protecting Our Kids from Social Media Addiction Act, Cal. Health and Safety Code §§ 27000 to 27007 (the "Act").

21. I understand that Meta's Facebook, Instagram, and Threads services meet the Act's coverage definitions as each of these services: (1) constitute "internet website[s], online service[s], online application[s], or mobile application[s]" that (2) "offer users or provide users with" covered "feed[s]"—*i.e.*, "multiple pieces of media generated or shared by users [that] are, either concurrently or sequentially, recommended, selected, or prioritized for display to a user based, in whole or in part, on information provided by the user or the user's device" that do not qualify for the exclusion criteria set forth at § 27000.5(a)(1)–(7); and (3) the covered feeds constitute "a significant part of the service provided by" Facebook, Instagram, and Threads. § 27000.5(b)(1). Further, I understand that Facebook, Instagram, and Threads do not fall in the Act's exclusion criteria set forth at § 27000.5(b)(2), as these services are not limited to commercial transactions or consumer reviews and the covered feeds on them are not operated for the primary purpose of cloud storage.

22. Meta currently provides personalized feeds on its Facebook, Instagram, and Threads services for all of its users, adults and minors alike. Meta does not desire nor intend to change those feeds to publish content in accordance with the State's mandated editorial standards set forth at § 27000.5(a)(1)–(7) should the Act be enjoined.

23. I understand that the Act, unless enjoined, will restrict Meta's ability to personalize teen users' experiences on Facebook, Instagram, and Threads, including by restricting Meta's ability to account for these users' Political Content Control selections; their Sensitive Content Control selections; or their Limited Content and Ages 13+ content selections when determining what content to display to them in feeds on Facebook, Instagram, and Threads. As a result of these limitations, the user experience on Facebook, Instagram, and Threads will be less valuable for teens.

24. In short, if the personalized feeds restrictions become enforceable against Meta, they will burden Meta's ability to curate and personalize the feeds of content accessed by teens in a manner that teens and their parents feel is safe and appropriate as informed by Meta's content-moderation judgments.

* * *

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated: November 12, 2025

By: Signed by: Sayed Otaru D8202488AA634FD...

Sayed Otaru

# Exhibit F

Isaac D. Chaput (Bar No. 326923)
Daniel A. Rios (Bar No. 326919)
**COVINGTON & BURLING LLP**
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
(415) 591-6000
ichaput@cov.com
drios@cov.com

Alexander L. Schultz (Bar No. 340212)
**COVINGTON & BURLING LLP**
1999 Avenue of the Stars
Los Angeles, California 90067-4643
(424) 332-4800
aschultz@cov.com

Mark W. Mosier (pro hac vice forthcoming)
Teena-Ann V. Sankoorikal (pro hac vice forthcoming)
Alexandra J. Widas (pro hac vice forthcoming)
**COVINGTON & BURLING LLP**
850 Tenth Street, NW
Washington, D.C. 20001
(202) 662-6000
mmosier@cov.com
tsankoorikal@cov.com
awidas@cov.com

*Attorneys for Plaintiff Meta Platforms, Inc.*

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

META PLATFORMS, INC.,

Plaintiff,

v.

ROB BONTA, in his official capacity as Attorney General of California,

Defendant.

Case No.: ________________________

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. Plaintiff Meta Platforms, Inc. ("Meta") does not bring this complaint lightly. Now that the Ninth Circuit has ruled that Meta's individual participation is necessary if an as-applied challenge to Sections 27001, 27002(b)(2), and 27002(b)(4) (the "personalized feeds restrictions") of California Senate Bill 976 (the "Act" or "S.B. 976") is to go forward, Meta brings this as-applied challenge to defend its First Amendment rights.

2. Meta's Facebook, Instagram, and Threads services collectively enable billions of people around the world to share ideas, offer support, and discuss important topics, including politics, public health, and social issues. In other words, subject to Meta's content moderation policies, Meta's services "allow[] users to gain access to information and communicate with one another about it on any subject that might come to mind." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017). And "users employ these websites to engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.'" *Id.* at 105 (quotation omitted). By California's own admission, these websites are "an important tool for communication and information sharing." S.B. 976 § 1(a).

3. The Act's personalized feed restrictions unconstitutionally restrict Meta from curating and disseminating to teens aged 13–17 the very same "edited compilation[s] of third-party expression" that the Supreme Court held just last year "receive the First Amendment's protection." *Moody v. NetChoice, LLC*, 603 U.S. 707, 716 (2024).

4. All feeds[1] of third-party content that Meta makes available on its Facebook, Instagram, and Threads services (hereinafter, "Feeds") are impacted by Meta's "expressive choices." *Moody*, 603 U.S. at 740.

[1] Like the Act, this Complaint uses the term "feed" to refer to "an internet website, online service, online application, or mobile application, or a portion thereof, in which multiple pieces of media generated or shared by users are, either concurrently or sequentially, recommended, selected, or prioritized for display to a user based, in whole or in part, on information provided by the user, or otherwise associated with the user or the user's device." § 27000.5. Unless otherwise noted, statutory citations in this Complaint refer to the California Health & Safety Code. When discussing the Act's requirements, this Complaint uses "teen," "minor," "adult," and "user" to refer only to California teens, minors, adults, account holders, and users covered by the Act.

5. On these Feeds, through the efforts of individual employees who develop and implement Meta's content-moderation policies, and through algorithms that Meta employees design to curate third-party content, Meta presents each "user with a continually updating stream of other users' posts." *Moody*, 603 U.S. at 734. Given the volume of content, Meta necessarily engages in "prioritization of [this user-generated] content, achieved through the use of algorithms" at scale. *Id.* The "selection and ranking [of this content] is based on a user's expressed interests and past activities," as well as "more general features of the communication or its creator [*i.e.*, the user]." *Id.* at 734–35. For example, a user may choose to see "More" or see "Less" of certain content categories, while Meta's "Community Standards"—which apply across the Facebook, Instagram, and Threads services—"detail the messages and videos that [Meta] disfavor[s]." *Id.* at 735. Through both human and technological processes, Meta "implement[s] those [preferences and] standards," including by "remov[ing], label[ing] or demot[ing] messages." *Id.* at 735–36. And in so doing, Meta, based on its values and policies, "make[s] a wealth of . . . judgments about what kinds of speech, including what kinds of viewpoints, are not worthy of promotion. And those judgments show up in Facebook's . . . feeds" as well as the feeds on Instagram and Threads. *Id.* at 736 n.5.

6. In short, across Meta's Feeds, Meta makes "expressive choices" in deciding which user-generated "content [its] feeds will display, or how the display will be ordered and organized." *Id.* at 740. "And because that is true, [Meta's Feeds] receive First Amendment protection." *Id.* at 740. Such activity, "after all, is not unlike traditional media curated by human editors." *NetChoice v. Bonta*, 152 F.4th 1002, 1014 (9th Cir. 2025) ("*NetChoice v. Bonta III*") (citing *Moody*, 603 U.S. at 731–34, 738)). "[T]he presentation of an edited compilation of speech generated by other persons is a staple of most newspapers' opinion pages" and Meta's Feeds alike. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 570 (1995); *see also Moody*, 603, U.S. at 717–18. Meta's Feeds thus "fall squarely within the core of First Amendment security." *Hurley*, 515 U.S. at 570.

7. Additionally, "[speech] can be more effective when [the speaker] know[s] the background and . . . preferences" of their audience, which will influence "how best to present a particular . . . message." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 558 (2011). If the State passed a law prohibiting newspaper editors from selecting or prioritizing articles for publication based on the interests of a local market, that

law would be unconstitutional. *See Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974) ("It has yet to be demonstrated how governmental regulation of [the editorial] process can be exercised consistent with [the] First Amendment"); *see also 303 Creative LLC v. Elenis*, 600 U.S. 570, 590 (2023) ("[Creators cannot] be forced to choose between remaining silent, producing speech that violates their beliefs, or speaking their minds and incurring sanctions for doing so."). After all, newspaper editors, pamphleteers, parade organizers, and other curators of information have for decades selected third-party content with an eye towards presenting more interesting, engaging, and relevant content to their specific audiences, all within the editorial protection of the First Amendment. *See Sorrell*, 564 U.S. at 578 (recognizing that personalized information "allows [speakers] to shape their messages" to their audience, thus making the ensuing messages more effective and "helpful"). In more recent years, online services have done the same—for example, sports websites may present content focused on particular sports teams or leagues that a user is most interested in; news platforms may offer customized lists of stories personalized to their users' previous reading habits; and music streaming services may offer personalized playlists for each user informed by their previous listening habits.

8. Similarly, the State may not dictate how Meta disseminates its "expressive products," *Moody*, 603 U.S. at 716, by demanding that Meta select third-party content for display without regard to the individualized interests, preferences, or characteristics of Meta's users. Indeed, "[f]reedom to distribute information to every citizen wherever he desires to receive it is . . . clearly vital to the preservation of a free society." *Martin v. City of Struthers*, 319 U.S. 141, 146–47 (1943). And the First Amendment also protects speakers' ability to use individualized information to make the speech they disseminate more "persuasive" and "instructive" for its recipients. *Sorrell*, 564 U.S. at 578. Accordingly, "an individual's right to speak is implicated when information he or she possesses is subjected to restraints on the way in which the information might be used or disseminated." *Id.* at 568 (quotation omitted).

9. The Act's personalized feeds restrictions would, however, prohibit Meta from using "information [that Meta] possesses," *id.*, to disseminate fully protected "compilations of [third-party] expression" beyond a State-sanctioned audience unless Meta complies with the State's editorial dictates about how Meta should "organize and prioritize" the user-generated content in its feeds, *Moody*, 603 U.S. at 716. *See* § 27000.5(a) (exempting feeds from the Act's coverage only if they satisfy State-imposed

editorial standards); *see also Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011) (describing similar statutory regime as imposing "*governmental* authority, subject only to a parental veto"). And the Act thereby burdens Meta's ability to present third-party speech in a manner that reflects "the background and . . . preferences" of the audience receiving it. *Sorrell*, 564 U.S. at 558. Because the personalized feeds restrictions burden and restrict "a platform from compiling the third-party speech it wants in the way it wants," they are "unlikely to withstand First Amendment scrutiny." *Moody*, 603 U.S. at 718.

10. Surely, the State could not require museums or bookstores to eliminate their category classifications and place their works of art or books in random order without confronting the First Amendment—even if, in theory, the works remain available to their patrons. *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 n.15 (1976) (there is "no general principle that freedom of speech may be abridged when the speaker's listeners could come by his message by some other means"). So too here, the State cannot restrict Meta's ability to organize the fully protected user-generated speech on Meta's services in a way that will render it less "instructive" or "persuasive" for its recipients. *Sorrell*, 564 U.S. at 578. "The First Amendment [] does not go on leave when social media are involved." *Moody*, 603 U.S. at 719.

11. The personalized feeds restrictions would also inhibit Meta's ability to exercise editorial choices it has made to enhance teen safety and well-being on Facebook, Instagram, and Threads. For example, the Act inhibits Meta's ability to de-prioritize content based on its own decisions restricting, or teens' settings indicating a desire to restrict, content that some users may find upsetting but that does not violate Meta's content moderation policies.

12. Because the Act burdens Meta's editorial First Amendment rights and Meta's right to disseminate fully protected speech, the personalized feeds restrictions as applied to Meta's Facebook, Instagram, and Threads services are subject to strict First Amendment scrutiny. They are *also* subject to strict First Amendment scrutiny because they impose these speech burdens in a content- and speaker-based manner. But the personalized feeds restrictions cannot pass strict or even intermediate First Amendment scrutiny. While California "may be displeased" that Meta's use of personalized information makes Meta more "effective in promoting" fully protected user-generated speech on its services, the

State's logic that "the force of speech can justify the government's attempts to stifle it" is "reasoning [that] is incompatible with the First Amendment." *Sorrell*, 564 U.S. at 577.

13. Meta stands to suffer an irreparable First Amendment injury unless Defendant is enjoined from enforcing the personalized feeds restrictions. For these reasons and more, the Court should declare the personalized feeds restrictions invalid as applied to Meta's Facebook, Instagram, and Threads services and enjoin Defendant from enforcing them.

## PARTIES & STANDING

14. Plaintiff Meta Platforms, Inc. ("Meta") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Menlo Park, California. Meta's mission is to build the future of human connection and the technology that makes it possible.[2]

15. Meta's Facebook, Instagram, and Threads services meet the Act's coverage definitions as each of these services: (1) constitute "internet website[s], online service[s], online application[s], or mobile application[s]" that (2) "offer users or provide users with" covered "feed[s]"—*i.e.*, "multiple pieces of media generated or shared by users [that] are, either concurrently or sequentially, recommended, selected, or prioritized for display to a user based, in whole or in part, on information provided by the user" or the user's device that do not qualify the exclusion criteria set forth at § 27000.5(a)(1)–(7); and (3) the covered feeds constitute "a significant part of the service provided by" Facebook, Instagram, and Threads. § 27000.5(b)(1). Further, Facebook, Instagram, and Threads do not fall in the Act's exclusion criteria set forth at § 27000.5(b)(2), as these services are not limited to commercial transactions or consumer reviews and the covered feeds on them are not operated for the primary purpose of cloud storage.

16. Meta currently provides personalized Feeds on its Facebook, Instagram, and Threads services for all of its users, adults and minors alike. Meta neither desires to nor intends to change its Feeds to publish user-generated content in accordance with the State's mandated editorial standards set forth at § 27000.5(1)–(7) should the Act be enjoined.

17. Meta has standing to bring its challenge because it has an actual and well-founded fear that Defendant will initiate enforcement proceedings against Meta unless Meta complies with the personalized

[2] *Company Information*, Meta, https://about.meta.com/company-info/ (last visited November 11, 2025).

feeds restrictions. Moreover, the personalized feeds restrictions, unless enjoined, would interfere with and burden Meta's First Amendment editorial activity and its dissemination of expressive curations of user-generated speech. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163, 167–68 (2014) (discussing First Amendment injury of "forcing [a plaintiff] to choose between refraining from [protected] speech [activity] on the one hand, or engaging in that speech and risking [enforcement] on the other"); *Virginia v. Amer. Booksellers Ass'n*, 484 U.S. 383, 393 (1988) (plaintiff had standing to bring pre-enforcement challenge as the "State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise"); *Am. Encore v. Fontes*, 152 F.4th 1097, 1113 (9th Cir. 2025) ("First Amendment cases raise unique standing considerations that tilt dramatically toward a finding of standing," and "a chilling of the exercise of First Amendment rights is . . . a constitutionally sufficient injury." (cleaned up) (quoting *Libertarian Party of L.A. Cnty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013))).

18. Defendant Rob Bonta is the California Attorney General. Defendant is a California resident and is sued in his official capacity. The Act gives the California Attorney General exclusive authority to enforce it. § 27006(a). Defendant has publicly pursued enforcement against Meta under other laws.

**JURISDICTION AND VENUE**

19. Meta's causes of action arise under 42 U.S.C. §§ 1983 and 1988 and the United States Constitution. The Court therefore has jurisdiction under 28 U.S.C. § 1331. This Court has authority to grant legal and equitable relief under 42 U.S.C. § 1983 and *Ex parte Young*, 209 U.S. 123 (1908), injunctive relief under 28 U.S.C. § 1651, and declaratory relief under 28 U.S.C. §§ 2201(a)–2202.

20. Venue is proper in this District under 28 U.S.C. § 1391(b)(1)–(2) because Defendant performs his official duties in the Northern District of California, and is therefore considered to reside in this District as a matter of law, and because the injuries giving rise to this action have been and will continue to be suffered by Meta in San Mateo County, California.

**BACKGROUND**

21. On Facebook, individuals can sign up for an account and establish mutual connections with family and friends, sharing stories, photos, videos, captions, status updates, and links (among other types

of content). People can also follow pages managed by businesses, organizations, government agencies, and public figures (such as politicians or celebrities) that share content, as well as join groups or get information about events that relate to topics of interest to them.

22. On Instagram, individuals can likewise sign up for an account and establish mutual connections with family, friends, and other creators, sharing stories, photos, videos, captions, messages, and links (among other types of content). People can also follow and interact with Instagram accounts managed by businesses, organizations, and public figures (such as politicians or celebrities) that share content.

23. On Threads, individuals can make announcements, comment on, view, and share public conversations. People can post messages or "threads," reply to others' posts, and follow profiles managed by other users, businesses, organizations, and public figures (such as politicians or celebrities) that share content.

24. Every day, users of Meta's services share billions of posts and messages that constitute speech fully protected from government restriction. Because it is impossible to display every piece of user-generated content that a user might be interested in, and because it is similarly difficult to foster social connections without prioritizing the people and ideas a user is interested in, Facebook, Instagram, and Threads display users' speech through curated "stream[s] of other users' posts." *Moody*, 603 U.S. at 734.

25. The curation process begins long before other users' posts are displayed to users. That process includes Meta's employees deciding what content-moderation policies to adopt and maintain on Facebook, Instagram, and Threads; and then implementing them through processes that include both human and automated review. An additional "key to the scheme is prioritization [and de-prioritization] of content, achieved through the use of algorithms." *Id.* Meta builds algorithms to "implement" its mission at scale—for example, to "prefer content" that it considers higher-quality (incorporating its own expressive views of quality) while "disfavor[ing] posts" that, for example, in Meta's judgment reflect a user "encourag[ing] teen suicide and self-injury." *Id.* at 734–37.

26. One way that Facebook displays content is in Feed, which shows a constantly updated and personalized list of content—for example, status updates from friends or elected officials, photos and

Case: 26-5120, 08/24/2026, DktEntry: 6.1, Page 57 of 299

videos from family gatherings, articles from local or national news outlets, information about upcoming community events or religious services, and much more.

27. Similarly, one way that Instagram displays content is Instagram Feed, which by default shows a constantly updated and curated list of photos and videos—for example, posts from friends, family, businesses, educational institutions, elected officials, neighborhood organizations, news outlets and much more.

28. Threads also displays content in its For You feed, which shows a constantly updated mix of posts from profiles that the user follows and recommended content from creators that the user has not yet discovered.

**1. Meta enforces robust content moderation policies that affect what content appears throughout Facebook, Instagram, and Threads.**

29. Meta wants Facebook, Instagram, and Threads to be places where people feel empowered to communicate. This is why Meta has developed content moderation policies that help determine what third-party content is seen by users on Facebook, Instagram and Threads, including on each service's feeds.

30. These policies and practices reflect Meta's judgment about how it can best create a place for free expression, give people a voice, and empower people to talk openly about the issues that matter to them. When Meta does limit expression, it does so in the service of Meta's values of authenticity, safety, privacy, and dignity—*i.e.*, "the type of community [Meta] seeks to foster." *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923, 953–54 (S.D. Ohio 2025). Meta's editorial policies and practices are also in service of its belief that all people are equal in dignity and rights: Meta expects that users on its services will respect the dignity of others and not harass or degrade others, and, to ensure everyone's voice is valued, Meta prioritizes different views and beliefs, including "from people and communities that might otherwise be overlooked or marginalized."[3]

[3] *Community Standards*, Meta, https://transparency.fb.com/policies/community-standards/ (last visited Nov. 11, 2025) [hereinafter Community Standards].

Case: 26-5120, 08/24/2026, DktEntry: 6.2, Page 58 of 299

31. Meta's publicly available Community Standards[4] (which all users of Facebook, Instagram, and Threads must agree not to violate); Meta's Terms of Service[5] (to which users must agree to create an account on the Facebook service); Instagram Terms of Use[6] (to which users must agree to create an account on the Instagram service); and Threads Terms of Use[7] (to which users must agree to use the Threads service) describe what content is acceptable on Facebook, Instagram, and Threads.

32. The Meta Terms of Service prohibit users from doing or sharing anything that is "unlawful, misleading, discriminatory or fraudulent" or that "infringes or violates someone else's rights."[8] Similarly, the Instagram Terms of Use prohibit users from doing or sharing anything that is "unlawful, misleading, or fraudulent or for an illegal or unauthorized purpose" or that would "violate[] someone else's rights," and from "post[ing] someone else's private or confidential information without permission."[9] And the Threads Terms of Use incorporate the same prohibition from the Instagram Terms by reference.[10]

33. Meta also has Community Standards that Meta employees on its Content Policy team have developed and that are enforced by both human reviewers and automated processes that Meta employees have built to implement its human-developed standards. These Community Standards provide details about what user-generated content is not allowed on Facebook, Instagram, and Threads. They are organized into twenty-three separate policies restricting specific categories of content related to: (1)

---

[4] *Id.*

[5] *Terms of Service Overview*, Meta (Jan. 1, 2025), https://www.facebook.com/terms.php (last visited Nov. 11, 2025) [hereinafter Meta Terms].

[6] *Terms of Use*, Instagram, https://help.instagram.com/581066165581870 [hereinafter Instagram Terms].

[7] *Threads Terms of Use*, Instagram (May 28, 2025), https://help.instagram.com/769983657850450.

[8] Meta Terms, *supra*.

[9] Instagram Terms, *supra*.

[10] *Threads Policies and Terms*, Instagram, https://help.instagram.com/280495901606863/?helpref=hc_fnav (last visited Nov. 11, 2025) ("These Threads Terms of Use . . . supplement and amend the Instagram Terms of Use and the Meta Community Standards, which are incorporated into these Terms by reference.").

coordinating harm and promoting crime;[11] (2) dangerous organizations and individuals;[12] (3) fraud, scams, and deceptive practices;[13] (4) restricted goods and services;[14] (5) violence and incitement;[15] (6) adult sexual exploitation;[16] (7) bullying and harassment;[17] (8) child sexual exploitation, abuse, and nudity;[18] (9) human exploitation;[19] (10) suicide, self-injury, and eating disorders;[20] (11) adult nudity and sexual activity;[21] (12) adult sexual solicitation and sexually explicit language;[22] (13) hateful conduct;[23] (14)

---

[11] *Coordinating Harm and Promoting Crime*, Meta (June 26, 2025), https://transparency.meta.com/policies/community-standards/coordinating-harm-promoting-crime/.

[12] *Dangerous Organizations and Individuals*, Meta (Feb. 8, 2024), https://transparency.meta.com/policies/community-standards/dangerous-individuals-organizations/.

[13] *Fraud, Scams, and Deceptive Practices*, Meta (June 6, 2025), https://transparency.meta.com/policies/community-standards/fraud-scams.

[14] *Restricted Goods and Services*, Meta (May 14, 2025), https://transparency.meta.com/policies/community-standards/restricted-goods-services/.

[15] *Violence and Incitement*, Meta (Sep. 27, 2024), https://transparency.meta.com/policies/community-standards/violence-incitement/.

[16] *Adult Sexual Exploitation*, Meta (Oct. 30, 2025), https://transparency.meta.com/policies/community-standards/adult-sexual-exploitation/.

[17] *Bullying and Harassment*, Meta (Jan. 22, 2025), https://transparency.meta.com/policies/community-standards/bullying-harassment/ [hereinafter Bullying and Harassment].

[18] *Child Sexual Exploitation, Abuse, and Nudity*, Meta (July 31, 2025), https://transparency.meta.com/policies/community-standards/child-sexual-exploitation-abuse-nudity/.

[19] *Human Exploitation*, Meta (Sep. 19, 2025), https://transparency.meta.com/policies/community-standards/human-exploitation/.

[20] *Suicide, Self-Injury, and Eating Disorders*, Meta (May 14, 2025), https://transparency.fb.com/policies/community-standards/suicide-self-injury/ [hereinafter Suicide, Self-Injury, and Eating Disorders].

[21] *Adult Nudity and Sexual Activity*, Meta (Aug. 28, 2025), https://transparency.meta.com/policies/community-standards/adult-nudity-sexual-activity/.

[22] *Adult Sexual Solicitation and Sexually Explicit Language*, Meta (May 14, 2025), https://transparency.meta.com/policies/community-standards/sexual-solicitation/.

[23] *Hateful Conduct*, Meta (Jan. 7, 2025), https://transparency.meta.com/policies/community-standards/hateful-conduct/.

privacy violations;[24] (15) violent and graphic conduct;[25] (16) authentic identity representation;[26] (17) cybersecurity;[27] (18) inauthentic behavior;[28] (19) misinformation;[29] (20) spam;[30] (21) third-party intellectual property infringement;[31] (22) using Meta intellectual property and licenses;[32] and (23) locally illegal content, products, or services.[33]

34. Much of the user-generated content falling within these policies is flatly prohibited—and, when detected and determined to be violating by Meta, removed—across Facebook, Instagram, and Threads. Other category-specific policies identify content that Meta chooses to hide from teens, label, place behind a warning screen, and/or de-prioritize for certain (or all) users on Facebook, Instagram, and Threads. For example, content celebrating or promoting suicide, self-injury, or eating disorders is prohibited and is removed for all users when detected and determined by Meta to violate its Community Standards. Content discussing these topics (but not celebrating or promoting them) is generally allowed. But content about recovery from suicide, self-injury, or eating disorders that may contain imagery that

---

[24] *Privacy Violations*, Meta (Oct. 2, 2024), https://transparency.meta.com/policies/community-standards/privacy-violations/.

[25] *Violent and Graphic Content*, Meta (June 26, 2025), https://transparency.meta.com/policies/community-standards/violent-graphic-content/.

[26] *Authentic Identity Representation*, Meta (Oct. 9, 2024), https://transparency.meta.com/policies/community-standards/authentic-identity-representation.

[27] *Cybersecurity*, Meta (June 26, 2025), https://transparency.meta.com/policies/community-standards/cybersecurity/.

[28] *Inauthentic Behavior*, Meta (Oct. 2, 2024), https://transparency.meta.com/policies/community-standards/inauthentic-behavior/.

[29] *Misinformation*, Meta (Apr. 7, 2025), https://transparency.meta.com/policies/community-standards/misinformation/.

[30] *Spam*, Meta (June 26, 2024), https://transparency.meta.com/policies/community-standards/spam/ (last visited Nov. 11, 2025) [hereinafter Spam].

[31] *Third-Party Intellectual Property Infringement*, Meta (Aug. 26, 2024), https://transparency.meta.com/policies/community-standards/intellectual-property/.

[32] *Using Meta Intellectual Property and Licenses*, Meta, https://transparency.meta.com/policies/community-standards/meta-intellectual-property (last visited Nov. 11, 2025).

[33] *Locally Illegal Content, Products, or Services*, Meta (Oct. 2, 2024), https://transparency.meta.com/policies/community-standards/locally-illegal-products-services.

could be upsetting (such as a healed scar) may be placed behind a warning screen for adults aged 18 and older while being hidden entirely from teens.[34] And recently, Meta reviewed its age-appropriate content guidelines—the guidelines that determine what content Meta hides from teens and avoid recommending to them—against the kinds of content standards that inform age-appropriate movie ratings, with the goal of having teens see content that is generally similar to what they would see in an age-appropriate movie.[35]

35. Meta undertakes significant efforts to develop and enforce its Community Standards. Meta frequently collaborates with subject matter experts, including to receive input on and to craft these standards, which Meta updates regularly. And Meta employs dedicated human reviewers and custom-built artificial intelligence technologies to enforce these standards at scale.[36] For example, in Q2 2025 alone, Meta (through its human reviewers and its artificial intelligence technologies) took action on and removed for all users:

a. 6.7 million pieces of content on Facebook and 10 million pieces of content on Instagram that violated its suicide, self-injury, and eating disorder policy;[37]

b. 4.1 million pieces of content on Facebook and 3.3 million pieces of content on Instagram that violated its bullying and harassment policy;[38] and

c. 165 million pieces of content on Facebook and 93.2 million pieces of content on Instagram that violated its spam policy.[39]

36. Meta's enforcement teams took action on even more user-generated content in other ways, such as hiding it from teens, placing it behind a warning screen, and/or de-prioritizing it for some or all users.

---

[34] Suicide, Self-Injury, and Eating Disorders, *supra.*

[35] *Helping Teens See Age-Appropriate Content*, Meta (Oct. 14, 2025), https://transparency.meta.com/policies/age-appropriate-content/.

[36] *How Enforcement Technology Works*, Meta (Nov. 12, 2024), https://transparency.meta.com/enforcement/detecting-violations/how-enforcement-technology-works/.

[37] Suicide, Self-Injury, and Eating Disorders, *supra*.

[38] Bullying and Harassment, *supra*.

[39] Spam, *supra*.

**2. Third-party content a user sees on Facebook, Instagram, and Threads Feeds is personalized and ranked—*i.e.*, prioritized or de-prioritized—based on Meta's editorial choices; even if third-party content on Facebook, Instagram, or Threads does not violate the Community Standards, Meta may choose not to recommend it or may de-prioritize it for independent reasons.**

37. Meta wants to create an environment where users feel inspired to make and foster social connections on Facebook, Instagram, and Threads. For example, Meta might promote diverse topics and creators, prioritize new content from budding creators, and recommend content with the goal of inspiring users to create similar content. Meta also works towards this goal by personalizing recommendations and avoiding recommendations that Meta itself considers low-quality, objectionable, particularly sensitive, or inappropriate for younger audiences.[40]

38. Through its content curation efforts, Meta intends to communicate a message to its users that, within the bounds of Meta's Community Standards, their particular interests and preferences are reflected on the Facebook, Instagram, and Threads services and Meta wants them to feel empowered to communicate and talk openly about the topics that matter to them.

39. Thus, Meta's Feeds—the feeds on Facebook, Instagram, and Threads—display constantly updated, personalized, and curated lists of connected third-party content and/or recommended third-party content. "[*I*]*n toto*"—through Meta's editorial choices about what content to display and how to display it—Meta's Feeds convey its editorial "messages," including that people should be able to communicate openly about the issues that matter to them. *Moody*, 603 U.S. at 739. Meta's editorial goal is that each user sees posts from the people, interests, and ideas that they find valuable, whether that content comes from people they are already connected to or from those they may not yet know.[41]

40. Meta's user-specific and user-independent choices about how to "cull and organize uploaded posts in a variety of ways" create a speech environment that advances this editorial goal. *Moody*,

---

[40] *About Recommendations on Facebook*, Facebook Help Center, https://www.facebook.com/help/1257205004624246 (last visited Nov. 11, 2025); *Recommendations on Instagram*, Instagram, https://help.instagram.com/313829416281232 (last visited Nov. 11, 2025).

[41] *Our Approach to Facebook Feed Ranking*, Meta (June 11, 2025), https://transparency.meta.com/features/ranking-and-content/ [hereinafter Facebook Feed Ranking].

603 U.S. at 719, 739. For example, Meta may prioritize content it believes a particular user will find most relevant and valuable or that other users have identified as particularly newsworthy.[42]

41. Meta will also de-prioritize content, which makes it less likely to be seen in a user's feed. Meta de-prioritizes content that it predicts will be of low value because the commenter or poster is a frequent violator of Meta's rules or the content is of a type that users broadly dislike, such as clickbait or engagement bait. Meta also de-prioritizes third-party content if Meta predicts that the content is likely violative of its Community Standards (but has not yet confirmed as much) or if Meta predicts that the content is similar to that which a user has told Meta they do not want to see, such as through Facebook content preference settings (where users can choose to see less, *inter alia*, political or sensitive content; Instagram or Threads sensitive content controls; and Instagram's Limited Content, Ages 13+, and More Content controls.[43]

42. Meta's Facebook Recommendation Guidelines apply to Facebook, and Meta's Instagram Recommendation Guidelines apply to Instagram and Threads. These guidelines set forth categories of content that are allowed on Meta's services but may not be eligible for recommendation, such as content that impedes Meta's desire to foster a safe community (*e.g.*, content depicting or trivializing themes around death or depression) and content about health or finance that Meta itself considers sensitive or low-quality (*e.g.*, content promoting or depicting cosmetic procedures).

43. Much of the content that Meta avoids recommending to adults is already completely hidden for teens. But Meta may take the further step of not recommending to teens certain types of potentially sensitive content that is neither hidden from them nor unrecommendable for adults, such as photos or videos that may be seen as implicitly sexual.

---

[42] *Our Approach to Newsworthy Content*, Meta (Nov. 12, 2024), https://transparency.meta.com/features/approach-to-newsworthy-content/.

[43] Facebook Feed Ranking, *supra*; *How to See More of What You Want on Instagram*, Instagram (Aug. 30, 2022), https://about.instagram.com/blog/spark/tips-and-tricks/control-your-instagram-feed; *Instagram Threads Feed AI System*, Meta (Mar. 7, 2025), https://transparency.meta.com/features/explaining-ranking/ig-threads-feed/?referrer=1; *Types of Content We Demote*, Meta (July 2, 2025), https://transparency.meta.com/features/approach-to-ranking/types-of-content-we-demote.

44. Meta also offers Facebook, Instagram, and Threads users tools to adjust the amount of certain types of content they see in the feeds on these services. For example, users of these services can employ settings to adjust the amount of content that Meta itself has assessed that some people may not want to see (such as political content and sensitive content on topics like drugs or firearms).[44]

45. For example, among other settings, users can use the Political Content Control setting on Instagram, Threads, and Facebook to see more or less content in their feeds that Meta, in its judgment, has determined qualifies as political content (such as content that refers to governments, elections, or social topics that may affect many people).

46. Users on Facebook and Threads and adult users on Instagram can use the Sensitive Content Control setting to see more or less of certain categories of content in their feeds that Meta, in the judgment of its human personnel, has determined may be upsetting or offensive to some users. Through Facebook's Teen Accounts, teens aged 13-17 on Facebook are automatically defaulted by Meta into the most restrictive "Show less" setting, and teens ages 13-15 need parental approval to change that setting.

47. Through Instagram's Teen Accounts, teens aged 13–17 will, by the end of 2025, be provided Ages 13+, Limited Content, and More Content settings. Meta's goal for the "Ages 13+" content setting is to ensure that teens see content that is generally similar to what teens would see in an age-appropriate movie, and to try and hide more content that Meta believes may be inappropriate for people under 18 (such as content where a person is describing their own personal experiences with suicide, self-injury or eating disorders). Teens may also choose to enroll in an even stricter "Limited Content" setting (and a supervising parent or guardian can also enroll their teens in this setting) that personnel at Meta developed based on their judgment regarding what content should be permitted and not permitted in this even stricter setting. A teen needs to receive the permission of their supervising parent or guardian to opt

---

[44] *See Updates to the Sensitive Content Control*, Instagram (June 6, 2022), https://about.instagram.com/blog/announcements/updates-to-the-sensitive-content-control; *About Sensitive Content Control on Instagram*, Instagram, https://www.facebook.com/help/instagram/1055538028699165/ (last visited Nov. 11, 2025); *See and Adjust Your Facebook Content Preferences*, Facebook, https://www.facebook.com/help/371675846332829/ (last visited Nov. 11, 2025); *How Teen Accounts Work on Facebook*, Facebook, https://www.facebook.com/help/1123135202753352/ (last visited Nov. 11, 2025).

out of the "Ages 13+" setting and instead enroll in the "More Content" setting. Meta will account for teens' "Limited Content," "Ages 13+," and "More Content" settings when determining what content to display in their feeds on Instagram.

48. Meta's Feeds are "therefore [not] feeds whose algorithms respond solely to how users act online—giving them the content they appear to want, without any regard to independent content standards. Like them or loathe them, [Meta's] Community Standards . . . make a wealth of user-agnostic judgments about what kinds of speech, including what viewpoints, are not worthy of promotion. And those judgments show up in Facebook's . . . main feeds" in addition to those on Instagram and Threads. *Moody*, 603 U.S. at 736 n.5.

49. Moreover, Meta's ranking and recommendation systems are not based solely on predictions of what individual content item will be relevant to a user based on their activity on the service. They are also designed to promote new content from small creators to progressively larger audiences (in service of Meta's goal to inspire content creation), to ensure users see a mix of posts from users they are connected with as well as recommended posts from others, and to avoid presenting to users multiple videos in a row on the same topic or multiple videos in a row from the same creator.

**3. Parents already have several options to restrict or limit their teen's access to Facebook, Instagram, and Threads should they wish to do so.**

50. Parents who want to restrict, limit, control, and oversee their minor's access to Facebook, Instagram, and Threads have myriad options for doing so.

51. Meta empowers parents to work collaboratively with their teens to help them create, explore and connect in age-appropriate ways.[45] Parents and guardians can use supervision tools on Facebook and Instagram to, for example, set daily time limits for their teens or limit use during select days and hours; set reminders to close the app; see which accounts their teen is following, are following their teen, and that their teen has blocked; view the content topics their teen has chosen to see; remove teens' ability to see, leave, or receive comments under posts; see their teen's settings for account privacy and messaging; see and change their teen's content settings; and approve or deny their teens' requests to

[45] *Family Center*, Meta, https://familycenter.meta.com/ (last visited Nov. 11, 2025).

Case: 26-5120, 08/24/2026, DktEntry: 6.2, Page 66 of 299

change default protection and privacy settings to a less strict state.[46] Meta provides publicly accessible and free educational resources for interested parents to learn how to use these tools.[47]

52. Of course, several other options also exist for parents to restrict or limit their teen's access to internet websites (including Facebook, Instagram, or Threads) in general. Parents can decide whether and when to let their teens use computers, tablets, and smartphones in the first place. They can also determine whether, when, and how their teens access the Internet by deciding to purchase a personal phone plan for their teen or Internet service for their household. Cell carriers and broadband providers provide parents with tools to block certain apps and sites from their teens' devices, ensure that they are texting and chatting with trusted contacts only, and restrict access to screen time during certain hours of the day.[48]

53. On top of that, many wireless routers (the devices that provide wireless Internet connectivity throughout a home) offer parental control settings.[49] Parents can use these settings to block

---

[46] *Giving Teens and Parents More Ways to Manage Their Time on Our Apps*, Meta (June 27, 2023), https://about.fb.com/news/2023/06/parental-supervision-and-teen-time-management-on-metas-apps/; *Introducing Stricter Message Settings for Teens on Instagram and Facebook*, Meta (Jan. 25, 2024), https://about.fb.com/news/2024/01/introducing-stricter-message-settings-for-teens-on-instagram-and-facebook/; *Parental Supervision,* Instagram, https://help.instagram.com/309877544512275 (last visited Nov. 11, 2025); *Safety Resources for Parents*, Facebook, https://www.facebook.com/help/1079477105456277 (last visited Nov. 11, 2025); *See Who Your Teen Has Chats With on Instagram*, Instagram, https://help.instagram.com/501423385831907 (last visited Nov. 11, 2025); *Instagram Teen Accounts Will Be Guided by PG-13 Ratings*, Meta (Oct. 14, 2025), https://about.fb.com/news/2025/10/instagram-teen-accounts-pg-13-ratings/. By virtue of teens' Instagram accounts (where Threads accounts were historically linked), these Supervision tools were also available with respect to Meta's Threads service until approximately November 2025. Meta has now started rolling out Teen Accounts to Threads-only accounts, and intends to bring back Supervision tools specific to Threads in the near future.

[47] *See, e.g.*, *Helping Your Teen Navigate Instagram Safely*, Instagram, https://about.instagram.com/community/parents (last visited Nov. 11, 2025); *Well-Being Tools*, Meta, https://www.meta.com/safety/topics/safety-basics/tools/wellbeing/ (last visited Nov. 11, 2025); *Meta Family Center Resources Hub*, Meta, https://familycenter.meta.com/resources/ (last visited Nov. 11, 2025).

[48] *See, e.g.*, *Verizon Family*, Verizon, https://tinyurl.com/yc527nvx (last visited Nov. 11, 2025); *Guide to Parental Controls for Your Kid's Phone or Tablet*, AT&T, https://tinyurl.com/2mbnsfn5 (last visited Nov. 11, 2025); *Making Digital Parenting Easier with FamilyMode®*, T-Mobile, https://tinyurl.com/mpwr4tdd (last visited Nov. 11, 2025); *Set Up Parental Controls for Your Home Network*, Comcast Xfinity, https://tinyurl.com/5acdsnat (last visited Nov. 11, 2025).

[49] *See* Molly Price & Ry Crist, *Parental Controls are Easy to Set Up on Your Wi-Fi Router: Here's How to Do It*, CNET (June 26, 2025), https://tinyurl.com/ymsctasa.

certain websites or online services that they deem inappropriate, set individualized content filters for their teens, and monitor the websites their teens visit and the services they use.[50] Parents can also use router settings to turn off their home Internet at particular times of day, pause Internet access for a particular device or user, or limit the amount of time that a teen can spend on a particular website or online service.[51]

54. Additional parental controls are available at the device level. For example, iPhones and iPads enable parents to approve or decline their teen's app download requests, limit the amount of time their teens can spend on the device, choose which applications their teens can use, set age-related content restrictions for those applications, filter online content, and control privacy settings.[52] Google and Microsoft offer similar parental controls for devices using their operating systems.[53] In addition, numerous third-party applications allow parents to control and monitor their teens' use of Internet-connected devices and online services.[54]

**<u>THE ACT'S "PERSONALIZED FEEDS RESTRICTIONS"</u>**

55. The Act's personalized feeds restrictions prohibit covered services—including Facebook, Instagram, and Threads—from displaying covered feeds to individuals under the age of eighteen (18) years old without verifiable parental consent. § 27001(a); *see also* §§ 27002(b)(2), (b)(4) (requiring covered services to create default settings that are effectively duplicative of this restriction).

56. However, the Act generally exempts feeds—meaning covered services can generally display them without restriction to minors—as long as they are organized and curated in accordance with the State's prescribed editorial standards set forth at Section 27000.5(a)(1)–(7).

---

[50] *See NETGEAR Smart Parental Controls*, NETGEAR, https://www.netgear.com/home/services/smart-parental-controls/ (last visited Nov. 11, 2025).

[51] *See id.*

[52] *See Use Parental Controls to Manage Your Child's iPhone or iPad*, Apple, https://tinyurl.com/2wpjvjwh (last visited Nov. 11, 2025); *Approve What Kids Buy With Ask to Buy*, Apple, https://support.apple.com/en-us/105055 (last visited Nov. 11, 2025).

[53] *See Helping You Set Digital Ground Rules*, Google Safety Center, https://tinyurl.com/43eks8uj (last visited Nov. 11, 2025); *Microsoft Family Safety*, Microsoft, https://tinyurl.com/bp9s4yrf (last visited Nov. 11, 2025).

[54] *See* Kim Key, *The Best Parental Control Software for 2025*, PCMag (Nov. 15, 2024), https://tinyurl.com/43537k92.

57. Pursuant to those State-prescribed editorial standards, feeds are generally exempt from the Act as long as the covered service agrees to curate them by only "recommending, selecting, or prioritizing for display" user-generated content based on (1) "information [that] is not persistently associated with the user or user's device, and does not concern the user's previous interactions with media generated or shared by others" (*e.g.*, curation accounting for a device's location may be exempt as not "persistently" associated with a user or their device, but curation accounting for the minor user's stated place of residence may not be) or (2) "search terms that are not persistently associated with [a] user or user's device" (*e.g.*, curation accounting for a user's search for "San Francisco Giants" content may be exempt for a brief period, but it may be impermissible to display such content to the same user again outside of their specific search). § 27000.5(a)(1)–(2). Equally, the Act generally exempts feeds if the "media recommended, selected, or prioritized for display is exclusively the next media in a preexisting sequence from the same author, creator, poster, or source and, in the case of audio or video content, is not automatically played" (*e.g.*, a chronological feed of content created by a single user a minor follows may be exempt). § 27000.5(a)(6).

58. The effect of these statutorily prescribed standards is to restrict editorial discretion as to how content can be curated and organized on a covered service. In other words, "information [a covered service] possesses is subjected to restraints on the way in which the information might be used or disseminated." *Sorrell*, 564 U.S. at 568 (quotation omitted). While Meta may determine that it would be more "instructive" or "persuasive" to prioritize additional user-generated content about the San Francisco Giants to a user that has demonstrated an interest in such posts, *id.*, the State's standards would restrict Meta from doing so and thereby interfere with how Meta would organize or curate the user-generated content in Meta's Feeds.

59. If, however, a feed is curated and organized in a manner *other* than the State-prescribed standards set forth at Section 27000.5(a)(1)–(7), the feed is subject to the personalized feeds restrictions.

60. As applied to Meta's Feeds, the personalized feeds restrictions are both content-based and speaker-based. The Act expressly singles out "social media platform[s]" for regulation and its restrictions reflect a preference for first-party content over content "generated or shared by users" because only feeds displaying the latter are subject to the Act. § 27000.5(a); *see Students Engaged in Advancing Tex. v. Paxton*, 765 F. Supp. 3d 575, 592 (W.D. Tex. 2025) ("The elevation of . . . provider-generated content

over user-generated content is a content-based regulation . . . When a site chooses not to primarily offer news but instead focus on social engagement [*i.e.*, presenting user-generated content], it changes from an uncovered to covered platform. But the type of medium has not changed, only the content primarily expressed on the platform.”). Moreover, the restrictions’ coverage depends in part on determining whether the media displayed in a feed “is exclusively the next media in a preexisting sequence from the same author, creator, poster, or source,” § 27000.5(a)(6), *i.e.*, whether it comes from a particular speaker.

61. These statutory carveouts exempt a broad range of favored speakers and content from the personalized feeds restrictions. Facebook, Instagram, and Threads may not display personalized feeds to minors by default, but services that do not display *user-generated* content as a significant part of their service—like video and music streaming services—can continue to offer feeds, including personalized feeds, and curate them however they wish without restriction.

62. The personalized feeds restrictions are additionally content-based and speaker-based because their coverage depends on the Act’s central coverage definitions, which are themselves content-based and speaker-based insofar as they exempt: “(A) An internet website . . . for which interactions between users are limited to commercial transactions or to consumer reviews of products, sellers, services, events, or places, or any combination thereof”; and “(B) An internet website, online service, online application, or mobile application that operates a feed for the primary purpose of cloud storage.” § 27000.5(b)(2).

63. The Act “may only be enforced in a civil action brought in the name of the people of the State of California by the Attorney General.” § 27006(a). Defendant has publicly pursued enforcement against Meta under other laws.

## **CLAIMS**

64. Meta here brings an as-applied First and Fourteenth Amendment challenge to the Act’s personalized feeds restrictions as applied to Meta’s Facebook, Instagram, and Threads services.[55]

[55] Meta’s Complaint challenges the specific provision of the Act that the Ninth Circuit held Plaintiff NetChoice, LLC (“NetChoice”) lacked associational standing to challenge on behalf of NetChoice’s members, including Meta. *NetChoice v. Bonta III*, 152 F.4th at 1014. Meta is aware that NetChoice has

**COUNT ONE**

**42 U.S.C. § 1983, *Ex parte Young***

**As-Applied Violation of the First Amendment, as Incorporated by the Fourteenth Amendment**

**(Personalized Feeds Restrictions — §§ 27001, 27002(b)(2), 27002(b)(4))**

65. Meta re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

66. As applied to Facebook, Instagram, and Threads, the personalized feeds restrictions are an unconstitutional regulation of protected First Amendment expressive activity.

67. All of Meta's Feeds are impacted by Meta's "expressive choices" in deciding which user-generated "content [its] feeds will display, or how the display will be ordered and organized." *Moody*, 603 U.S. at 740. Meta "make[s] a wealth of . . . judgments about what kinds of speech, including what kinds of viewpoints, are not worthy of promotion. And those judgments show up in Facebook's . . . feeds" as well as the feeds on Instagram and Threads. *Id.* at 736 n.5. "And because that is true, [Meta's Feeds] receive First Amendment protection." *Id.* at 740. Such activity, "after all, is not unlike traditional media curated by human editors." *NetChoice v. Bonta III*, 152 F.4th at 1014 (citing *Moody*, 603 U.S. at 731–34, 738).

68. The Act's personalized feeds restrictions would prohibit Meta from disseminating these fully protected "compilations of [third-party] expression" beyond a State-sanctioned audience unless Meta complies with the State's editorial dictates about how Meta should "organize and prioritize" the user-generated content in Meta's Feeds. *Moody*, 603 U.S. at 716; *see* § 27000.5(a) (exempting feeds from coverage only if they satisfy State-imposed editorial standards). Because the personalized feeds restrictions burden and restrict Meta "from compiling the third-party speech it wants in the way it wants"

---

filed an action that seeks to enjoin other provisions of the Act both facially and as applied to Meta, and Meta maintains that such relief sought by NetChoice is and remains appropriate with respect to other provisions in the Act. Because NetChoice has associational standing with respect to its challenges to other provisions, Meta does not independently challenge them in this Complaint. Meta reserves the right to amend this Complaint, either as of right or with the Court's leave, to add additional claims regarding the other provisions of the Act already challenged by NetChoice should doing so prove necessary.

(which here includes the way Meta believes the user wants it) on Facebook, Instagram, and Threads, they are subject to and "unlikely to withstand First Amendment scrutiny." *Moody*, 603 U.S. at 718.

69. The Act's imposed editorial standards would interfere with Meta's implementation of its value-based judgments that some content should be hidden for certain types of users. For example, Meta determines, based on its exercise of judgment, what kinds of user-generated content may be appropriate across the Limited Content, Ages 13+, or More content settings on Instagram. While Meta defaults teens to the Ages 13+ setting on Instagram, teens may elect to instead be placed in the more restrictive Limited Content setting. But the Act would restrict Meta from disseminating curated compilations of third-party speech while accounting for individual users' preferences as between the Limited Content and Ages 13+ content settings. *See* § 27000.5(a) (restricting the display of feeds based "on information provided by the user" without a pertinent exception).

70. The State's editorial standards would also interfere with Meta's ability to avoid recommendations of content it believes that a user disfavors. For example, the Act would restrict Meta from de-prioritizing content that it predicts will be of low value to a particular user based on their content preference settings across Facebook, Instagram, and Threads. *See* § 27000.5(a)(4) (exempting certain feeds, but only if the user's "prioritization[] or deprioritization" requests concern "*specific* media" and the feed does not "automatically play[]" "audio and video content" (emphasis added)). For example, the Act may prevent Meta from de-prioritizing information about college marketing after the user has already accepted an offer to attend her preferred college; or posts about what Meta has determined reflect controversial or sensitive topics (such as non-violating posts on political issues) that the user has indicated they do not want to have recommended to them.

71. Meta's "right to speak is [also] implicated" by the Act because "information [Meta] possesses is subjected to restraints on the way in which the information might be used or disseminated." *Sorrell*, 564 U.S. at 568 (quotation omitted). Speech "can be more effective when [the speaker] know[s] the background and . . . preferences" of its audience, which speakers will often use to determine "how best to present a particular . . . message." *Id.* at 558. But the Act's imposed editorial standards directly interfere with Meta's ability to make personalized recommendations of third-party content in accordance with its Community Standards that are relevant and valuable to its users.

Case: 26-5120, 08/24/2026, DktEntry: 6.2, Page 72 of 299

72. For example, if a teen demonstrates an interest in science experiments or content about local scholarships, the Act would preclude Meta from recommending additional content about science experiments or local scholarships to that user unless they specifically enter keyword searches for "science experiment" or "local scholarships" every single time they log in. *See* § 27000.5(a)(2) (exempting certain feeds, but only if they are recommending content based on "search terms that are not persistently associated with the user or user's device"). The same is true as to California trade schools or college and university content, military recruitment, local volunteering opportunities, the San Francisco Chronicle's content, and content from California political officials. The list goes on and on. And if a teen has already seen content from the San Francisco Chronicle or a political official—such as a breaking news story or a sound clip from a recent debate—the Act would preclude Meta from choosing not to show the exact same content to the same teen twice. *See* § 27000.5(a)(1) (generally restricting Meta from curating content based on "the user's previous interactions with media generated or shared by others").

73. The State does not gain the right to interfere with Meta's editorial activity just because one of the factors Meta considers—in addition to Meta's value-based judgments regarding what content should be removed or recommended, and for whom—is what Meta believes its users will find particularly interesting or relevant. *See Sorrell*, 564 U.S. at 575–78 (just because speech is "instructive" or "persuasive" does not "justify the government's attempts to stifle it"). Newspaper editors, pamphleteers, parade organizers, and others to whom editorial First Amendment protection attaches have for decades selected third-party content with an eye towards presenting more interesting, engaging, and relevant content to their specific audiences. *Id.* at 578 (recognizing that personalized information "allows [speakers] to shape their messages" to their audience, thus making the message more effective and "helpful"). In more recent years, online publications (*which are generally exempt from the Act's personalization requirements*) have done the same—for example, sports websites may present content focused on the particular sports teams or leagues a user is most interested in; news aggregators or publications may offer customized lists of stories based on users' previous reading habits; and music streaming services may create custom playlists for a user based on their previous listening habits.

74. Because the Act's restrictions directly interfere with and burden Meta's editorial activity—and aim to replace it with State-preferred editorial standards—they are subject to strict First Amendment

scrutiny. After all, "the presentation of an edited compilation of speech generated by other persons is a staple of most newspapers' opinion pages"—and Meta's Feeds—which "fall squarely within the core of First Amendment security." *Hurley*, 515 U.S. at 570; *see also Moody*, 603, U.S. at 717–18. The First Amendment likewise protects speakers' use of personalized information, which "allows [speakers] to shape their messages" to their audience, thus making the message more effective and "helpful." *Sorrell*, 564 U.S. at 578. Where, as here, an Act restricts "a platform from compiling the third-party speech it wants in the way it wants"—such as the way Meta believes the user wants it—it is "unlikely to withstand First Amendment scrutiny." *Moody*, 603 U.S. at 717. Indeed, "[i]t has yet to be demonstrated how governmental regulation of [the editorial] process can be exercised consistent with [the] First Amendment." *Tornillo*, 418 U.S. at 258.

75. The Act's personalized feeds restrictions are *also* subject to strict scrutiny because they are a content-based and speaker-based burden on Meta's protected editorial activity. *See Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

76. As applied to Meta's Feeds, the personalized feeds restrictions cannot survive strict scrutiny (or even intermediate First Amendment scrutiny).

77. The State cannot establish that the personalized feeds restrictions as applied to Meta's Feeds on Facebook, Instagram, and Threads serve any legitimate government interest, let alone a compelling one. While the State "possesses legitimate power to protect children from harm, that does not include a free-floating power to restrict the ideas to which children may be exposed." *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024) ("*NetChoice v. Bonta I*") (quoting *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011)); *see also Erznoznik*, 422 U.S. at 213 (outside of constitutionally unprotected speech, the government may not "protect the young from ideas or images that a legislative body thinks unsuitable"). Equally, any "premise . . . that the force of speech can justify the government's attempts to stifle it" is "incompatible with the First Amendment." *Sorrell*, 564 U.S. at 577.

78. At bottom, the State cannot demonstrate that the personalized feeds restrictions further an interest unrelated to the suppression of free expression. Indeed, Defendant has admitted that the purpose of the Act's personalized feed restrictions are to restrict what Defendant describes as "rabbit holes of

harmful content."[56] Similarly, the Act's author and sponsors have asserted that the personalized feed restrictions are "about [the] delivery of user-created content," which they describe as "harmful material to youth."[57] This is unsurprising, as "[t]hose who seek to censor or burden free expression often assert that disfavored speech has adverse effects," but the fact "[t]hat the State finds expression too persuasive does not permit it to quiet the speech or to burden its messengers." *Sorrell*, 564 U.S. at 577. And even if these restrictions as applied to Meta furthered an interest unrelated to the suppression of free expression (they do not), the State cannot show a *causal* connection between the specific activity regulated by the personalized feeds restrictions and purported harms to minors. *Brown*, 564 U.S. at 799–801 (mere correlational evidence is insufficient).

79. The Act's personalized feeds restrictions are not properly tailored.

80. The personalized feeds restrictions are "seriously underinclusive." *Brown*, 564 U.S. at 802. Indeed, the Act is seriously underinclusive relative to Defendant's asserted interest of preventing minors from viewing purportedly "harmful" "user-created content,"[58] as the Act permits websites to continue to show precisely the same content to minors if the minors search for it, § 27000.5(a)(2); "so long as one parent . . . says it's OK," *Brown*, 564 U.S. at 802; or if the website qualifies for any of the Act's litany of exceptions, § 27000.5. Indeed, Defendant has judicially admitted that "the Act . . . allows platforms to show *the same content* to [minors] through different means;"[59] in other words, through different State-preferred editorial choices.

81. The Act is similarly underinclusive to the extent Defendant asserts that "personalized feeds" themselves are somehow harmful separate and apart from any content (which is disputed). To begin, the Act entirely exempts from regulation the personalized feeds on countless websites that primarily disseminate first-party and non-user content—including personalized feeds on video and music streaming

[56] Assembly Committee on Privacy and Consumer Protection, Report on SB 976, at 9 (July 2, 2024) (reporting statement of Defendant Rob Bonta in support of SB 976).

[57] *Id.* at 11 (reporting statement by "author and sponsors" of SB 976).

[58] *Id.* at 9, 11.

[59] Def. Rob Bonta's Opp'n to Pls' Mot. for Prelim. Inj. at 22, *NetChoice, LLC v. Bonta*, No. 5:24-cv-07885 (filed Dec. 3, 2024), ECF No. 18 (emphasis added).

services. § 27000.5. And the Act would even exempt *the exact same feed comprised of the exact same content recommended based on the exact same signals* as long as the provision of personalized feeds are not "a significant part" of the service. *Id.* § 27000(b)(1). In other words, any service can continue to provide the very same feeds that the State asserts are purportedly harmful if other aspects of the overall website mean those feeds are not a "significant part" of the website. *See, e.g.*, *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1128 (D. Utah 2024) (legislation was "underinclusive" since "the Act preserves minors' access to the addictive features Defendants express particular concern with on all internet platforms other than [covered] services"). Even as to covered websites, "[t]he California Legislature is perfectly willing" to let teenagers access personalized feeds "so long as one parent . . . says it's OK." *Brown*, 564 U.S. at 802. That the Act is "wildly underinclusive . . . is alone enough to defeat it." *Id.* (applying strict scrutiny); *see also Nat'l Inst. of Family & Life Advocs. v. Becerra*, 585 U.S. 755, 773–74 (2018) ("wildly underinclusive" provision failed even under intermediate scrutiny).

82. The personalized feeds restrictions are also seriously overinclusive. The Act's restrictions sweep in services—like Facebook, Instagram, and Threads—that voluntarily engage in substantial content moderation efforts, or voluntarily provide tools allowing parents and guardians to set daily time limits for their teens or limit their use during select days and hours, among many available supervision tools. Those are precisely the kinds of "voluntary" self-regulatory efforts that are less restrictive means to government intervention. *Brown*, 564 U.S. at 803; *see also, e.g.*, *Ashcroft*, 542 U.S. at 667; *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 826 (2000). Meta also provides publicly accessible and free educational resources for interested parents to learn how to use these tools. And California itself "could encourage websites 'to offer voluntary [tools]'" to help parents who want to supervise their children's use of social media and "educate children and parents" on the availability and importance of such tools. *NetChoice v. Bonta III*, 152 F.4th at 1017 (quoting *NetChoice v. Bonta I*, 113 F.4th at 1121). But the Act's direct "impos[ition of] *governmental* authority, subject only to a parental veto" is "vastly overinclusive," as "its entire effect is only in support of what the State thinks parents *ought* to want." *Brown*, 564 U.S. at 804. Moreover, for the websites the Act regulates, it restricts *all* minors' access to *all* personalized feeds for *any* amount of time. The Act's one-size-fits-all approach is overbroad because it treats all minors alike, from websites' youngest users to seventeen-year-olds, regardless of differences in those minors'

developmental stage. *See Reno v. Am. C.L. Union*, 521 U.S. 844, 865-66 (1997); *Am. Booksellers Ass'n*, 484 U.S. at 396. And Meta itself prohibits minors under thirteen years old from using Facebook, Instagram, and Threads.

83. The personalized feeds restrictions, unless enjoined, would interfere with and burden Meta's First Amendment editorial activity and its dissemination of fully protected user-generated speech. For these reasons, unless declared invalid and enjoined as applied to Meta's Instagram, Facebook, and Threads services, the personalized feeds restrictions will unlawfully burden Meta's exercise of its First Amendment rights and will irreparably harm Meta.

84. The Act's personalized feeds restrictions violate federal law and deprive Meta of enforceable federal rights. Federal courts have the power to enjoin unlawful actions by state officials. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

85. The Court can and should exercise its equitable power to enter an injunction prohibiting Defendant from enforcing the Act's personalized feeds restrictions against Meta.

86. The Act's personalized feeds restrictions violate the First Amendment and Due Process Clause of the Fourteenth Amendment to the Constitution, thereby depriving Meta of enforceable rights; they are therefore unlawful and unenforceable against Meta.

87. The personalized feeds restrictions are unlawful and unenforceable as applied to Facebook, Instagram, and Threads because they are unconstitutional regulations of protected First Amendment expressive activity and thereby deprive Meta of enforceable rights.

88. The personalized feeds restrictions are unlawful and unenforceable as applied to Facebook, Instagram, and Threads because they are unconstitutional restrictions on Meta's right to disseminate fully protected speech; they thereby deprive Meta of enforceable rights.

89. With exceptions not relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

90. This Court can and should exercise its equitable power to enter a declaration that the Act's personalized feeds restrictions are unconstitutional and otherwise unlawful as applied to Meta's Facebook, Instagram, and Threads services.

## PRAYER FOR RELIEF

Meta requests an order and judgment:

1. Declaring that Cal. Health & Safety Code §§ 27001 and 27002(b)(2), (b)(4) are unlawful as applied to Meta's Facebook, Instagram, and Threads services;
2. Declaring that Cal. Health & Safety Code §§ 27001 and 27002(b)(2), (b)(4) as applied to Meta's Facebook, Instagram, and Threads services, violate the First Amendment to the Constitution, as incorporated by the Fourteenth Amendment;
3. Enjoining Defendant and his agents, employees, and all persons acting under their direction or control from taking any action to enforce the Act or the challenged portions of the Act against Meta;
4. Entering judgment in favor of Meta;
5. Awarding Meta its attorneys' fees and costs incurred in bringing this action, including attorneys' fees and costs under 42 U.S.C. § 1988(b) for successful 42 U.S.C. § 1983 claims against state officials; and
6. Awarding Meta all other such relief as the Court deems proper and just.

DATED: November 13, 2025

Respectfully submitted,

By: */s/ Isaac D. Chaput*

Isaac D. Chaput (Bar No. 326923)
Daniel A. Rios (Bar No. 326919)
**COVINGTON & BURLING LLP**
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
(415) 591-6000
ichaput@cov.com
drios@cov.com

Alexander L. Schultz (Bar No. 340212)
**COVINGTON & BURLING LLP**
1999 Avenue of the Stars
Los Angeles, California 90067-4643
(424) 332-4800
aschultz@cov.com

Mark W. Mosier (pro hac vice forthcoming)
Teena-Ann V. Sankoorikal (pro hac vice forthcoming)
Alexandra J. Widas (pro hac vice forthcoming)
**COVINGTON & BURLING LLP**
850 Tenth Street, NW
Washington, D.C. 20001
(202) 662-6000
mmosier@cov.com
tsankoorikal@cov.com
awidas@cov.com

*Attorneys for Plaintiff Meta Platforms, Inc.*

# Exhibit G

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| META PLATFORMS, INC.,<br>Plaintiff,<br>v.<br>ROB BONTA,<br>Defendant. | Case No. 5:25-cv-09792-EJD<br>**ORDER DENYING MOTIONS FOR PRELIMINARY INJUNCTION**<br>Re: ECF No. 19 |
| TIKTOK, INC.,<br>Plaintiff,<br>v.<br>ROB BONTA,<br>Defendant. | Case No. 5:25-cv-09789-EJD<br>**ORDER DENYING MOTIONS FOR PRELIMINARY INJUNCTION**<br>Re: ECF No. 20 |
| GOOGLE LLC et al.,<br>Plaintiff,<br>v.<br>ROB BONTA,<br>Defendant. | Case No. 5:25-cv-09795-EJD<br>**ORDER DENYING MOTIONS FOR PRELIMINARY INJUNCTION**<br>Re: ECF No. 23 |

Cyberspace and social media have undoubtedly become among the most prominent places for people to connect with each other, exchange views, learn, and much more. Platforms like Facebook allow users to engage in debates about an array of topics ranging from politics to

favored vacation destinations. Internet-based platforms have substituted for cable television in many instances, with audiences relying on streaming services to view shows of the moment. Big-budget films traditionally screened in movie theaters are now replaced by short-form video content on platforms like YouTube, Instagram, and TikTok. TikTok estimates that it had more than 170 million monthly users in the United States alone and has become one of the world's most widely used online media platforms. TikTok Mot. for Prelim. Inj. ("TikTok Mot.") 9, Case No. 25-cv-09789, ECF No. 20. YouTube hosts 20 billion videos on its platform, with users uploading hundreds of hours of new video every minute. YouTube Mot. for Prelim Inj. ("YouTube Mot.") 6, Case No. 25-cv-09795, ECF No. 23. And through its Facebook, Instagram, and Threads services, billions of people globally use Meta's services to share ideas and stay in touch with one another. Meta Mot. for Prelim. Inj. ("Meta Mot.") 11, Case No. 25-cv-09792, ECF No. 19.

Just as the internet and social media have become important fixtures in our world, these platforms have generated positive societal impacts. Beyond providing a way for people to connect and communicate, these platforms have democratized the type of information shared through content creation process, allowing people from all walks of life to share their talents with the world on the internet—skilled singers and songwriters who were otherwise undiscovered have risen to fame because a record label or producer viewed their content on YouTube.

As technology has continued to evolve, so too have these websites, services, and online applications. Instagram users who once saw only photos posted on the platform by the friends that they followed now see short videos in which a self-proclaimed influencer recommends a new mascara, supplement, or clothing-rental-service. And the previous limited manner of displaying content in chronological order has been replaced instead with feeds prioritizing content similar to that which the user has seen before. This increasingly prominent feature of social media platforms, as well as many other internet-based platforms, has appeared through the use of algorithmic delivery of content. And, although algorithms are not new, the incorporation of generative artificial intelligence and machine learning has altered the nature of these platforms' operations full scale, including wide-spread implementation of recommendation-based feeds.

California's legislature found that this evolution has created "addictive features" of many social media platforms. S.B. 976, 2023–2024 Reg. Sess. (Cal. 2024). Unsurprisingly, minors are among the users on these platforms. Indeed, the California Legislature found that approximately 95 percent of 13- to 17-year-olds report that they use at least one social media platform and "more than one-third report using social media constantly." *Id.* A report issued by the United States Surgeon General identified urgent reasons for concern about social media usage by children and adolescents, including increased negative health outcomes, such as less healthy sleep patterns and negative mental health outcomes such as depression and self-harm behaviors. *Id.* In response to these findings and the platforms' changing features, California adopted Senate Bill 976, the "Protecting Our Kids from Social Media Addiction Act" ("SB 976" or the "Act").

Before the Court are Plaintiffs TikTok Inc. ("TikTok"), Meta Platforms, Inc. ("Meta"), and Google LLC and YouTube, LLC's (collectively, "YouTube") motions for a preliminary injunction. Plaintiffs seek to prohibit Defendant Rob Bonta ("Bonta") from enforcing §§ 27001(a), 27002(b)(2), and 27002(b)(4) (collectively, the "personalized feed provisions") of the Act against Plaintiffs, arguing these provisions unconstitutionally burden Plaintiffs' and their users' free speech rights under the First Amendment. Because Plaintiffs have not shown that the personalized feed provisions are likely to infringe upon their First Amendment rights, the Court **DENIES** Plaintiffs' preliminary injunction motions.

## I. BACKGROUND

### A. The Act

Plaintiffs challenge sections of the Act governing the provision of "addictive feeds," which Plaintiffs refer to as "personalized feeds." *See* YouTube Mot. 12; TikTok Mot. 7–8; Meta Mot. 8. The Act defines an "addictive feed" as "an internet website, online service, online application, or mobile application, or a portion thereof, in which multiple pieces of media generated or shared by users are, either concurrently or sequentially, recommended, selected, or prioritized for display to a user based, in whole or in part, on information provided by the user, or otherwise associated with the user or the user's device." § 27000.5(a). Excluded from this definition are feeds in which: (1)

"the information is not persistently associated with the user or user's device" and does not rely on the user's prior history on the platform; (2) the information is based on search terms that are unrelated to the user or the user's device; (3) the information consists of privacy or accessibility settings, technical information about the device, or device communications or signals concerning whether the user is a minor; (4) the user "expressly and unambiguously" requested the specific media, or the content creator's media, or the blocking, prioritization or deprioritization of the media; (6) the recommended, selected, or prioritized media is the next media in a preexisting sequence from the same content-creator and is not automatically played; or (7) where media is a direct, private communication between users. § 27000.5(a)(1)–(7).

The Act prohibits the operator of an addictive internet-based service or application ("operator")[1] from providing minors with addictive feeds unless: (1) the operator does not have actual knowledge that the user is a minor, or (2) the operator "has obtained verifiable parental consent" to provide such a feed to a minor. § 27001. Operators must also provide parents the ability to limit the amount of time that their child can access an addictive feed, which must be set to one hour per day by default "unless modified by the verified parent," § 27002(b)(2), as well as a mechanism to set their child's "default feed" to "one in which pieces of media are not recommended, selected, or prioritized for display based on information provided by the user, or otherwise associated with the user or the user's device, other than the user's age or status as a minor." § 27002(b)(4). By January 1, 2027, the operator must comply with regulations promulgated by the Attorney General to assess whether a user is a minor. § 27001(a)(1)(B).

**B. Procedural History**

This is not the first time that the Act has been challenged before this Court. In *NetChoice v. Bonta*, the Court considered challenges by NetChoice, an internet trade group with several

---

[1] An "addictive internet-based service or application" is defined as "an internet website, online service, online application, or mobile application, including, but not limited to, a 'social media platform' as defined in Section 22675 of the Business and Professions Code, that offers users or provides users with an addictive feed as a significant part of the service provided by that internet website, online service, online application, or mobile application." § 27000.5(b)(1).

social media companies among its members.[2] *NetChoice v. Bonta*, 761 F. Supp. 3d 1202, 1210 (N.D. Cal. 2024), *aff'd in part, rev'd in part and remanded sub nom. NetChoice, LLC v. Bonta*, 152 F.4th 1002 (9th Cir. 2025) [hereinafter "*NetChoice I*"]. NetChoice raised facial First Amendment and vagueness challenges to each of the Act's provisions, including the personalized feed provisions, as well as as-applied challenges on behalf of five of its members. *Id.* at 1218. There, as Plaintiffs do here, NetChoice argued that personalized feeds reflected the platforms' own speech such that restricting this speech violated the First Amendment. *Id.*

Looking to *Moody*, the Court declined to enjoin the personalized feed provisions because NetChoice had not met its burden to demonstrate that "most or all personalized feeds covered by SB 976 are expressive and therefore implicate the First Amendment." *Id.* (citing *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024)).[3] In addition to clarifying a plaintiff's burden in bringing a facial First Amendment challenge, the Court cautioned that although *Moody*'s "sweeping language . . . could be interpretated as saying that all acts of compiling and organizing speech, with nothing more, are protected by the First Amendment, . . . *Moody* stands only for the proposition that restrictions on a private speaker's ability to compile and organize third-party speech implicate speech rights only if those restrictions impair the speaker's *own* expression." *Id.* at 1219 (emphasis added). The Court expressed doubt that regulating feeds which responded solely to user actions would "uniformly interfere with expression," especially because "[w]hen it comes to feeds that recommend posts based solely on prior user activity there is no apparent message being conveyed." *Id.* at 1221. The Court further explained that, if a user does interpret a personalized feed as communicating the platform's belief that the user is interested in the subject matter, that belief reflects the user's own interpretation rather than the platform's expression. *Id.* at 1222. And particularly notable here, the Court held that NetChoice lacked associational standing on behalf of its individual members to raise as-applied challenges to the personalized-

---

[2] YouTube and Meta are members of NetChoice; TikTok is not.

[3] The Court enjoined §§ 27002(a); 27002(b)(1) (both default provisions preventing child from accessing or receiving notifications between certain hours); and 27005 (compelled disclosure requirement).



United States District Court
Northern District of California

feed provisions. *Id.* at 1230–31.

NetChoice appealed. *NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1012 (9th Cir. 2025). As relevant here, the Ninth Circuit agreed that NetChoice did not have associational standing to pursue its as-applied challenge to the personalized feed provisions on behalf of its members. *Id.* at 1013. To conduct the requisite analysis, the Ninth Circuit explained that a court must assess the expressive nature of each member's personalized feed and where the feed falls on the spectrum from "express[ing] a platform's unique message to the world, [to] reflect[ing] users' revealed preferences to them." *Id.* at 1014. Given each member's unique platform and algorithm design, the Circuit agreed that this analysis required the individual members' participation. *Id.*

The Ninth Circuit then considered NetChoice's facial challenge to the personalized feed provisions. "Careful not to decide more than necessary," and recognizing that the Supreme Court did not decide the outer limits of which algorithm-based feeds are expressive for First Amendment purposes in *Moody*, the Ninth Circuit concluded that "NetChoice fail[ed] to show that any unconstitutional applications of the statute substantially outweigh[ed] its constitutional application." *Id.* at 1021 (internal quotation marks omitted) (citing *Project Veritas v. Schmidt*, 125 F.4th 929, 937 (9th Cir. 2025)).

Now two of NetChoice's members, YouTube and Meta, along with TikTok, have brought individual as-applied challenges with individualized facts about how their respective personalized feeds are compiled. Plaintiffs' motions for preliminary injunctions require this Court to consider the likelihood of their success on the merits of their First Amendment challenges. In so doing, the Court looks to *Moody* as guidance, however, as the Ninth Circuit emphasized, *Moody* did not decide the issue here—the outer limits of when an algorithm-based feed is expressive.

## II. LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To secure a preliminary injunction, a plaintiff must establish that it (1) "is likely to succeed on the merits," (2) "is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [its]

favor," and (4) "that an injunction is in the public interest." *Id.* at 20. The last two factors merge when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

**III. DISCUSSION**

The Court begins its analysis with the likelihood of success on the merits, the "threshold inquiry." *Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1039 (9th Cir. 2024); *see also Developmental Servs. Network v. Douglas*, 666 F.3d 540, 544 (9th Cir. 2011). A court "need not consider the other factors" if a movant fails to show a likelihood of success on the merits. *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (quoting *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017)). Where the plaintiff alleges a First Amendment violation and injury, "the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction on speech." *California Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 478 (9th Cir. 2022) (quoting *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1115 (9th Cir. 2011), *overruled on other grounds by Bd. of Trs. of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195, 1199 (9th Cir. 2019) (en banc)).

The Court will discuss in turn arguments regarding: (1) expressive messaging; (2) users' right to receive information; (3) the right to disseminate fully protected speech; and (4) YouTube's challenge to the default provisions as unconstitutionally vague.

**A. Expressive Message**

"The touchstone of First Amendment speech rights is [] the protection of *expression*." *NetChoice I*, 761 F. Supp. 3d at 1219 (emphasis in original). Accordingly, Plaintiffs must establish that their activity is expressive in the first instance such that the First Amendment even applies. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984). Where a compilation of third-party speech is at issue, it is protected only to the extent that the compilation is "inherently expressive" in its own right. *Moody*, 603 U.S. at 781 (Alito, J., concurring) (quoting *Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 66 (2006)) [hereinafter *FAIR*]. Third-party compilations that organize speech in a "non-expressive way (e.g., chronologically) fall



United States District Court
Northern District of California

'beyond the realm of expressi[on].'" *Id.* at 783 (Alito, J. concurring) (quoting *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995)); *see cf. Mapother v. Dep't of Just.*, 3 F.3d 1533, 1540 (D.C. Cir. 1993) (finding that a chronologically organized portion of a report reflected no point of view, thus deliberative process privilege did not attach).

The Court finds Plaintiffs have failed to show at this stage of litigation that their personalized feeds are "expressive." Rather, Plaintiffs rely on predictive algorithms that incorporate users' past watch history and other data and then suggest content that the algorithms anticipate will be engaging, or "interesting" to users. Plaintiffs' decision to rely on these algorithms' number-crunching capabilities is not an expressive judgment. Although Plaintiffs' algorithms differ slightly, each Plaintiff represents that their personalized feeds are the result of multi-step processes intended to convey their desired "expressive message." In other words, each Plaintiffs' intended message is some approximation of "we think you will find this content interesting." For example, TikTok's feeds convey its message that "this content is consistent with our values and we think you will find it informative and/or entertaining." TikTok Reply 6–7, ECF No. 68. YouTube's message is similarly that "the user will likely find the displayed content interesting and enriching." YouTube Mot. 14. Meta likewise intends to communicate a message to its users that, "their particular interests and preferences are reflected on Facebook, Instagram, and Threads services." Meta Mot. 13. But, as discussed above, Plaintiffs are not making any decisions about what content will be "interesting," because they are merely relying on predictive modelling to assess what users' characteristics and history on the platform suggest will keep these same users engaged. This decision is not an "expressive" message; it is merely a mirror that reflects back to users their own perceived interests. *See* Brief of Electronic Privacy Information Center and Law & Technology Scholars as Amici Curiae Supporting Defendant 3, ECF No. 54.[4] ("[The curatorial choices] are designed to evaluate *users*, not messages, and so are blind to the

[4] The Court cites to the *TikTok Inc. v. Bonta* docket (No. 5:25-cv-09789-EJD) for briefing and documents filed in all three of the above-captioned matters. To the extent a document was filed in only one of the actions, the Court will specify the relevant docket.

meaning of the media selected and how that meaning impacts the message sent by the overall compilation."). In effect, Plaintiffs are relying on an algorithmic function to make the determination of what is "interesting," divorced from any understanding of the underlying content. Plaintiffs themselves are not making any determination of what is "interesting" when they rely on this predictive modelling, nor do they otherwise seek to convey an expressive message through their personalized feeds.

Plaintiffs' arguments to the contrary regarding the level of human involvement and comparison to content moderation are unpersuasive.

**1. Human Involvement**

First, perhaps intending to distance themselves from a finding that automated algorithms control decisions attenuated from human decision or control, Plaintiffs argue that personalized feeds are expressive because human employees make various expressive decisions while developing and monitoring Plaintiffs' recommender systems. For example, humans decided to set maximization of user engagement as an objective for Plaintiffs' algorithms. Such an argument may have intended to assuage Justice Barrett's concerns in her *Moody* concurring opinion that, where companies rely on algorithmic tools to implement their editorial judgment, technology may attenuate the connection between human judgment and technology-driven actions. *Moody*, 603 U.S. at 746 (Barrett, J. concurring). But the degree of human involvement at various points of the process does not transform a message that is not expressive at the outset into one that is—as the Court found above, Plaintiffs are not likely to succeed in showing their personalized feeds are "expressive" based on the current record. And regardless, Plaintiffs have failed to show that human behavior such as setting a company's objective to maximize user engagement by algorithmic manipulation is on its own "expressive" message. Otherwise stated, Plaintiffs decide to "'convey to users ____________ because we think whatever fills in that blank is interesting, relevant or trustworthy' . . . but [Plaintiffs are] not filling in that blank. And it's the filling in of the blank, what you're actually choosing to convey or not convey that is the exercise of editorial judgment." Transcript of Hr'g at 114:20–115:5, ECF No. 103. The Court ultimately agrees with



United States District Court
Northern District of California

Bonta that these feeds "serve as 'passive receptacle[s]' of third-party speech or as 'dumb pipes' that merely emit what they are fed." *Moody*, 603 U.S. at 782 (Alito, J. concurring) (citing *American Broadcasting Cos. v. Aereo, Inc.*, 573 U.S. 431, 458 (2014) (Scalia, J., dissenting)).

**2. Content Moderation**

Next, Plaintiffs argue that the personalization feed provisions are akin to state laws restricting social media platforms' abilities to implement their content moderation policies. Notwithstanding that content moderation policies are explicitly exempt from the Act, the Court will examine this argument with two inquiries: (1) whether processes undertaken to moderate content can be disentangled from the personalization efforts in feed generation; and (2) if so, why the two processes, and resulting feeds, are different.

The Court begins with a short examination of Plaintiffs' individual feed generation processes (also referred to as their recommendation systems), which include both content moderation and personalization processes. Each Plaintiff suggests that these two processes are so intertwined that they cannot be disentangled. *See, e.g.*, Meta Reply 13 ("[T]here is no material distinction for First Amendment purposes between content-moderation algorithms and personalization algorithms."); TikTok Mot. 18–20; YouTube Mot. 10–11. The Court disagrees.

A review of each Plaintiff's recommender system demonstrates that the multi-step feed generation process can be separated into efforts to moderate content and ensure that Plaintiffs' community standards are followed on the one hand, and efforts to "personalize" the resulting feed, on the other. Feeds resulting from the former efforts are not subject to SB 976 and not at issue in this Action; feeds resulting from the latter efforts are. *See, e.g.*, Omnibus Opp'n 35, ECF No. 45 (SB 976 does not cover content moderation, nor do Plaintiffs allege that by engaging in the application of their content moderation guidelines, they face a genuine threat of imminent prosecution); *see also* Brief of Electronic Privacy Information Center and Law & Technology Scholars as Amici Curiae Supporting Defendant 3, ECF No. 54-1 ("Behavior profiling for feed generation is very different than the content moderation practices the *Moody* Court recognized may be expressive.").

United States District Court
Northern District of California

Each system begins by identifying the universe of potential content to be considered for recommendation to users. Transcript of Hr'g at 13:10 ("There certainly is a step where there are content moderation standards that might dictate whether particular content can appear on YouTube's platform at all"); *see also* Zervas Decl. ISO YouTube's Mot. ("Zervas Decl.") 29, ECF No. 67-4 ("Content uploaded to a platform can be first checked against content moderation rules, which determine what content is allowed on the platform and could be recommended to users."). At this initial stage, Plaintiffs' content moderation systems operate to weed out content that Plaintiffs believe should not be on the platform at all, should be deprioritized, or should be accompanied by some kind of label. For example, during the first stage of its process, Meta relies on a rules-based approach to filter out "problematic items" including, among other items, "sexual/objectionable images." Mobasher Decl. ISO Meta's Reply ("Mobasher Decl.") ¶ 88, ECF No 90-1; *see also* Meta Mot. 13. Similarly, YouTube's recommender system will only recommend videos in later steps of its process that have not been removed for violation of YouTube's Community Guidelines. Goodrow Decl. ISO YouTube Mot. ("Goodrow Decl.") 10, ECF No. 23-1. And content that violates TikTok's Community Guidelines is excluded from the pool that would otherwise be eligible for recommendation in the "For You" feed, TikTok's primary personalized feed. Zhou Decl. ISO TikTok Mot. ("Zhou Decl.") 5, ECF No. 20-1.

After the identification of the content candidate pool, Plaintiffs each rely on engineer-created algorithms to sort and rank content in accordance with each Plaintiffs' "editorial judgments and goals." Transcript of Hr'g 23:6–7. YouTube's Vice President of Engineering explains that YouTube's recommender system's goal is to "predict which content will be relevant, enjoyable, and valuable to a particular user," and is "optimized for long-term user satisfaction." Goodrow Decl. 5–6. TikTok and Meta's recommendation systems work to achieve similar goals, relying on ranking processes. *See* Zhou Decl. 5 ("The [TikTok] recommendation system scores and ranks [videos eligible to be shown to a person] to determine which particular videos out of the candidate pool would be most interesting and informative to that person."); Mobasher Decl. ¶ 74 (explaining that "identifying the most relevant content items to show to a user . . . requires using a

multi-stage ranking and recommendation process").

Now, considering content-moderation efforts and personalization efforts side-by-side, the Court concludes that there are notable differences between them. It is well-established that content moderation can be expressive to the extent that it reflects decisions about what content to be included or excluded consistent with often written standards "detail[ing] the messages and videos that the platforms disfavor.: *Moody*, 603 U.S. 735. But as discussed above, *Moody* expressed skepticism about the expressive nature of personalized feeds, leaving open the question about whether there are material differences between feeds reflecting content-moderation decisions and those that are curated based on users' interests and associated characteristics. *Moody*, 603 U.S. at 736 n.5 ("We therefore do not deal here with feeds whose algorithms respond solely to how users act online—giving them the content they appear to want, without any regard to independent content standards."); *id.* at 746 ("But what if a platform's algorithm just presents automatically to each user whatever the algorithm thinks the user will like—*e.g.*, content similar to posts with which the user previously engaged?") (Barrett, J., concurring)). On the record before it, the Court finds several ways in which the incorporation of users' data into a value function intended to reflect back to users their ascertained interests differs from content moderation. *See* Transcript of Hr'g 119:5–8. As discussed below, the implementation of Plaintiffs' content moderation decisions, unlike personalization, carries with it a moral valence. Content moderation implementation also serves as an initial gating mechanism, excluding content from the platform that might have otherwise been recommended.

Meta describes its recommender system prediction models, which are "similar to prediction models used in recommender systems across the industry," as including: p(like), p(comment), and p(video completion), among others, with the "p" reflecting the probability of the event in the parentheses occurring. Mobasher Decl. ¶ 79. So, p(comment) is a prediction model that relies on an individual users' previous interactions with the Plaintiff's platform as well as other demographical information to predict the likelihood that that user will "like" a piece of content. Such prediction models are used in combination and streamlined to create a single

ranking score. *Id.*; *see also* Zhou Decl. 6; Goodrow Decl. 10. It is this value function, or some variant of it, that Plaintiffs rely upon to "fill in the blank," as Bonta argues. By contrast, when Plaintiffs seek to implement their community standards, humans are not relying on users' data and interactions to reflect to the very same users the content that an algorithmic function predicts they may find "interesting." Rather, Plaintiffs' own policy positions filter and fill in the "blank" at the outset. "Humans are saying, for example, we don't want nudity on our platforms. . . . The blank is nudity." Transcript of Hr'g 119. Meta's Community Standards, TikTok's Community Guidelines, and YouTube's Community Guidelines (collectively, "Community Standards") were written by human beings and "set forth rules about what content would not be allowed . . . and reflected a 'wealth of user-agnostic judgments about what kinds of speech, including what viewpoints, are not worthy of promotion.'" Omnibus Opp'n 37–38 (citing *Moody*, 630 U.S. at 719–20, 736 n.5)). Plaintiffs' ability to implement their content moderation standards, "continu[ing] to remove posts containing disfavored ideas, such as racist ideology," is not contravened by their compliance with SB 976. *NetChoice I,* 761 F. Supp. 3d at 1221–22.[5]

Unlike the later personalization phases of the recommender system, the Community Standards serve as an initial gating mechanism for what may remain on the platform in many instances. *See, e.g.*, YouTube Mot. 16 (noting that the recommender system will not suggest videos that violate YouTube's Community Guidelines); Meta Mot. 12; TikTok Mot. 10. This feature of content moderation allows for an intuitive application of *Miami Herald v. Tornillo* and the cases that followed it. *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974); *see also Moody*, 603 U.S. at 733–34 (noting that the settled principles set out in the seminal case, *Tornillo,* and those that followed "have much to say about the laws at issue here"). In *Tornillo*, the Miami Herald challenged a Florida "right of reply" statute that provided "that if a candidate for nomination or election is assailed regarding his personal character or official record by any

[5] The Court notes Plaintiffs' positions that their ability to present content that they deem "age appropriate" will be stymied by SB 976. *See e.g.*, Goodrow Decl. ¶ 29. Section 2700.5(3) appears to exempt from this section feeds in which the media generated is based on "device communications or signals concerning whether the user is a minor."



United States District Court
Northern District of California

newspaper, the candidate has the right to demand that the newspaper print, free of cost to the candidate, any reply the candidate may make to the newspaper's charges." *Tornillo*, 418 U.S. at 244. The Court found that the statute violated the First Amendment because it intruded on the newspaper editor's function. *Id.* at 258. By requiring the newspaper to publish a candidate's reply to any "assailment," the editors were compelled to "publish that which reason tells them should not be published." *Id.* at 256. The exercise of editorial control and judgment included the "choice of material to go into a newspaper, and the decisions made as to the limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair." *Id.* at 258. Further, the implications of upholding the right-of-reply statute were not lost on the Court: "under the operation of the Florida statute, political and electoral coverage would be blunted or reduced." *Id.* at 257.

The same "core teaching" was reflected in *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of California*, 475 U.S. 1 (1986), and in *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995). *Moody*, 603 U.S. at 734. In *Pac. Gas & Elec. Co.*, the Supreme Court answered the question of "whether the California Public Utilities Commission may require a privately owned utility company to include in its billing envelopes speech of a third party with which the utility disagrees" in the negative. *Pac. Gas & Elec. Co.*, 475 U.S. at 5, 15. The Court found that "the Commission's access order . . . impermissibly requires appellant to associate with speech with which appellant may disagree." *Id.* at 15. Likewise, in *Hurley*, the question was about whether Massachusetts could require private citizens to *include* in a parade a group imparting a message that the organizers did not wish to convey. *Hurley*, 515 U.S. at 559. In reviewing the record, the Court pointed out the special expressive quality of parades, noting that "a narrow, succinctly articulable message is not a condition of constitutional protection." *Id.* at 569. Unlike "programming offered on various channels by a cable network, the parade does not consist of individual, unrelated segments that happen to be transmitted together for individual selection by members of the audience . . . each is understood to contribute something to a common theme." *Id.* at 576. The Court held that as applied the challenged statute violated "the



United States District Court
Northern District of California

United States District Court
Northern District of California

fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Id.* at 573. As the Court in *FAIR* summarized, "the compelled speech violation in each of [its] prior cases . . . resulted from the fact that the complaining speaker's own message was affected by the speech it was forced to accommodate." *FAIR*, 547 U.S. at 63.

Laws regulating platforms' ability to implement their content moderation policies, which is to say, exclude, label, or demote content that the platforms disfavor, clearly raise many of the same concerns raised in *Tornillo*, *PG&E*, *Hurley*, and subsequent cases. *See e.g.*, *Moody*, 603 U.S. at 738–39 (finding that much like the Florida right-of-reply statute in *Tornillo*, Texas's law targeted expressive choices because it forced major platforms to present and promote content on their feeds to which they objected). But it is difficult for the Court to see how the same First Amendment concerns exist when the challenged statute restricts the use of "information provided by the user, or otherwise associated with the user or the user's device," for generating personalized feeds. SB 976 does not require Plaintiffs to share a specific message on users' personalized feeds, nor does it impair their ability to exclude content that Plaintiffs find objectionable. For example, Plaintiffs Community Standards reflect their expressive judgment that certain content, such as content that encourages self-harm is bad. But Plaintiffs recommender systems may nonetheless promote this same content through their algorithmic processes. *See* Omnibus Opp'n 23.

Plaintiffs argue that their intended message is comparable to that in *Sorrell v. IMS Health, Inc.*, 564 U.S. 552 (2011). There, data miners and an association of brand-name drug manufacturers challenged a Vermont law providing that, without a prescriber's consent, prescriber-identifying information could not be sold by pharmacies, disclosed by pharmacies for marketing purposes, or used for marketing by pharmaceutical manufacturers. *Id.* at 557. One of the law's challenged provisions effectively barred pharmaceutical manufacturers and marketers from using prescriber-identifying information for marketing. *Id.* at 559. In adopting the challenged law, the Vermont legislature did not dispute that detailers (pharmaceutical sales representatives who meet with doctors to promote specific prescription medicines) were engaged

in "marketing activities." *See* 2007 Vt. Laws No. 80, § 1(3). The Court in *Sorrell* therefore only needed to look to established precedent holding that commercial speech is entitled to First Amendment protection before moving into its more substantive analysis regarding the law's content- and speaker-based restrictions. *See Sorrell*, 564 U.S. at 564 (concluding without significant analysis that the statute "disfavors marketing, that is, speech with a particular content"); *see also Rubin v. Coors Brewing Co.*, 514 U.S. 476, 481 (1995) (noting that the Court repudiated its previous position that commercial speech was not protected by the First Amendment in *Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748 (1976)). The Court agrees with Plaintiffs that consideration of users' online behavior may be helpful to make an otherwise expressive message more compelling. *See e.g.*, YouTube Mot. 19 (noting that in *Sorrell*, prescribing-identifying information permitted drug detailers to make their marketing messages more effective). But as Bonta points out, the issue of "whether a speaker can use information about its audience to tailor its message" is not what the Court is faced with here, where the feed personalization efforts do not reflect any particular expressive message. Omnibus Opp'n 47 (Plaintiffs' feed personalization efforts result in feeds that "can potentially encompass *anything*" and therefore do not have an expressive quality.).

A further examination of the characteristics that set content-moderation decisions apart from mere personalization underscores why the former are expressive and the latter is not. Content moderation decisions, implemented through Plaintiffs' Community Guidelines, carry with them a moral valence; the same is not true for personalization efforts based on users' data. For example, Meta's Community Standards are "organized into twenty-three separate policies restricting specific categories of content," accompanied by a policy rationale, explaining the intent for the specific category and what it restricts. *See* Kantor Decl. ¶ 9 n.8–27, No. 5:25-cv-09792-EJD, ECF No. 19-2. YouTube's Community Guidelines reflect YouTube's judgment that content that promotes voter suppression, for example, creates a serious risk of egregious harm and is not allowed on the platform. YouTube, Community Guidelines, https://perma.cc/LV7USCMD. Thus, YouTube's decision to remove or prohibit such content reflects a moral judgment that this content



United States District Court
Northern District of California

United States District Court
Northern District of California

is bad. The First Amendment clearly protects "moral judgments about art and literature." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 790 (2011). In adopting Community Guidelines, Plaintiffs have made value-laden judgments based on a "set of beliefs about which messages are appropriate and which are not." *Moody*, 603 U.S. at 738. By implementing its Community Guidelines and excluding from any user's feed third-party content that Meta categorizes as "hate speech," Meta relies upon its editorial judgment to convey a message that it does not support hate speech on its platform, and implicitly that hate speech is "bad." TikTok similarly proclaims that it is a "place for diverse communities to connect—not for spreading hate," and accordingly does not allow "hate speech" on its platform. TikTok Community Guidelines, Hate Speech and Hateful Behavior, https://www.tiktok.com/safety/en/policies-and-engagement/safety-civility. However, delivering a message to a particular user predicated on their demographic data and past watch history indicates that they are likely to find "blank" interesting is different. This message is not accompanied by any editorial judgment, but is a creation of an algorithm. By way of example, Plaintiffs do not decide to show a user a series of cat videos because their top-level decisionmakers think that cats are "good" animals or that something about the cats showcased makes the videos especially fun to watch. In fact, Plaintiffs' inclusion of this message has nothing to do with whether its boardroom believes cats are good or bad, or holds a view on cats at all for that matter. Rather, Plaintiff has decided, devoid of any expressive judgment, that regardless of the curated content itself, feeds should show content that "will be interesting" to users because they have previously watched and completed videos on a certain topic, typically watch videos of a certain length, or are in a certain location. Indeed, if Plaintiffs made an editorial decision about whether to prioritize cat videos in users' feeds, the decision would doubtlessly affect some faction of users' long-term satisfaction with the platform, thereby undercutting Plaintiffs' objectives.

Because Plaintiffs have not shown that their personalized feeds convey an expressive message or reflect human editorial judgment, their First Amendment challenge fails.[6]

---

[6] YouTube challenges §§ 27002(b)(4) and § 27002(b)(2), which it calls the "default restrictions,"

Accordingly, the Court **DENIES** Plaintiffs' motions on this basis.

**B. Users' Right to Receive Information**

In the alternative, Plaintiffs argue that the Act violates their users' rights under the First Amendment to receive information and ideas. *See* YouTube Mot. 19; TikTok Mot. 22. In support of this position, Plaintiffs rely on *Stanley v. Georgia*, where the Supreme Court assessed the constitutionality of a statute imposing criminal penalties on individuals for knowing possession of obscene matter. *Stanley v. Georgia*, 394 U.S. 557, 559 (1969). There, the Court underscored the well-established principle that the freedom of speech and press necessarily protects the right to receive information and ideas. *Id.* at 564. The Georgia statute contravened this principle by reaching into the privacy of an individual's home to control "what books he may read or what films he may watch." *Id.* at 565.

The Court also finds this position unpersuasive. There are clear differences between the speech at issue in *Stanley* and that asserted here. In *Stanley*, the speech at issue was obscenity, and so categorically unprotected by the First Amendment. *See Miller v. California*, 413 U.S. 15, 23 (1973). The Court did not engage in an analysis of the expressive nature of the speech. Here, by contrast, the crux of the issue is *whether* Plaintiffs are engaged in expressive activity by curating personalized feeds. Setting aside these differences, SB 976 does not require Plaintiffs to remove content from their platforms. In turn, minor users remain free to search for specific content, thereby receiving information and ideas. *See* Brief for the States of New York et al. as Amici

---

separately from § 27000.5. See YouTube Mot. 26–27. However, despite addressing the Sections separately, YouTube's argument necessarily relies on a finding that YouTube's personalized feeds reflect "expressive curation decisions." *Id.* at 27. Because the Court has found that personalized feeds do not reflect an expressive message insofar as they merely reflect to users their revealed preferences, YouTube's argument that the default restrictions impose "serious burdens" on the resulting "constitutionally protected speech" collapses on itself.



United States District Court
Northern District of California

Curiae in support of Defendant 12, ECF No. 52-1 (noting that the Act permits platforms to recommend any media that is responsive to a user's affirmative conduct).

Plaintiffs suggest that because of the mountainous amount of content on their platforms, relying strictly on the search function may not yield the results that a user is hoping for, and the Act therefore *burdens* minors' right to access the speech. *See* YouTube Mot. 21; TikTok Mot. 22. Plaintiffs rely heavily on *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803 (2000), where Playboy challenged the Telecommunications Act of 1966's requirement that television operators take affirmative action to "fully scramble or otherwise fully block" channels that were primarily dedicated to sexually explicit programming. *Id.* But there was no dispute in *Playboy* that the programming itself was protected by the First Amendment, and "[t]o comply with § 505, the majority of cable operators adopted the 'time channeling' approach, so that, for two-thirds of the day, no viewers in their service areas could receive the programming in question." *Id.* at 803. Whereas here, users can still access content that might otherwise appear in their personalized feed by manual search.

For these reasons, the Court finds Plaintiffs' alternative argument similarly unavailing.

**C. Right to Disseminate Fully Protected Speech**

Meta also independently argues that the Act burdens its right to disseminate fully protected speech, a variant of Plaintiffs' argument that the Act unlawfully restricts users' access to information and ideas. *See* Meta Mot. 17–20. Meta principally relies on case law affirming its First Amendment right "to use its platform to promote views it finds congenial and to refrain from promoting views it finds distasteful" or, otherwise stated, to engage in content moderation. *Children's Health Def. v. Meta Platforms, Inc.*, 112 F.4th 742, 759 (9th Cir. 2024); *see also* Meta Mot. 17 (citing *Children's Health Def.*; *Moody*, 603 U.S. 707 (2024); *NetChoice v. Bonta*, 152 F.4th 1002, 1015 (9th Cir. 2025)). For the reasons discussed above, the Court finds that content-moderation decisions, which are "expressive choices," are distinct from the user data-driven personalization components of Meta's feeds that are the subject of the challenged provisions of the Act in this Action. *See infra* Section III.A.2. Because personalization efforts that rely strictly on

user preferences to convey content that the user is likely to find "interesting" do not convey an expressive message, the Court finds that Meta's argument here fails as the resulting compilation is not "fully protected speech."

In a footnote, Meta argues that the *Moody* Court expressly held that its reservations as to the expressive nature of a feed whose algorithms respond solely to users' activity were inapplicable to Facebook's feed because of the content moderation at play. *See* Meta Mot. 18 n.2. But "activities that are expressive in one context are not necessarily expressive in all others," and courts must distinguish between speech and non-speech elements. *See NetChoice I*, 761 F.Supp.3d at 1219, 1223. Meta's interpretation is an overextension of the Court's position in *Moody* which, as discussed above, was careful to consider only the issue before it: content moderation. *See Moody*, 603 U.S. 727 n.3 ("So our explanation of why Facebook and YouTube are engaged in expression when they make *content-moderation choices* in their main feeds should inform the courts' further consideration of that issue." (emphasis added)); *NetChoice I*, 761 F. Supp.3d at 1221. While the Court carefully carved out from its analysis feeds that were devoid of content moderation decisions (*i.e.*, those that respond solely to how users act online), the Court's decision should not be read for the proposition that any time a content moderation decision is part of a feed's overall mix, the entire feed is itself expressive.

Because Plaintiffs have not shown that their personalized feeds constitute fully protected speech, the Court likewise finds Meta's argument that the Act impermissibly burdens its First Amendment right to disseminate fully protected speech is not likely to succeed on the merits.

### D. YouTube's Challenges to the Default Provisions

In addition to arguing that the default restrictions violate the First Amendment, YouTube also argues that these restrictions are void for vagueness because they do not provide fair notice of "conduct that is forbidden or required." YouTube Mot. 28 (citing *FCC v. Fox Television Stations*, 567 U.S. 239, 253 (2012)). Vagueness challenges based on a failure to provide a reasonable opportunity to know which conduct is forbidden by a statute are typically brought where criminal sanctions may be imposed, but the Supreme Court has also held that "[b]ecause First Amendment

freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *Hum. Life of Washington Inc. v. Brumsickle*, 624 F.3d 990, 1020 (9th Cir. 2010) (quoting *NAACP v. Button,* 371 U.S. 415, 433 (1963)). Because the Court finds that the challenged default provisions do not restrict YouTube's First Amendment rights based on the presented challenge, the Court examines the challenge "in light of the facts of the case at hand." *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 946 (9th Cir. 2013).

YouTube argues that the term "verified parent" is vague. YouTube Mot. 28. Section 27000.5 defines "Parent" as a "parent or guardian, including as defined in regulations promulgated pursuant to this chapter." "Verified" is not defined, which YouTube contends is fatal to the Act. YouTube Mot. 28.

"A statute is impermissibly vague if it 'fails to provide a reasonable opportunity to know what conduct is prohibited, or is so indefinite as to allow arbitrary and discriminatory enforcement.'" *Arce v. Douglas*, 793 F.3d 968, 988 (9th Cir. 2015) (citing *United States v. Mincoff*, 574 F.3d 1186, 1201 (9th Cir. 2009)). But "perfect clarity is not required even when a law regulates protected speech." *Hum. Life of Washington Inc.*, 624 F.3d at 1019. Courts look to the ordinary, contemporary, common meaning of a term undefined by statute as well as the word's surrounding context. *See Arce*, 793 F.3d at 1021 (first citing *United States v. Kilbride,* 584 F.3d 1240, 1257 (9th Cir. 2009), then citing *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972)).

The Court finds that, as used in the Act, "verified" is not impermissibly vague. In analyzing whether a phrase or word is susceptible to an ordinary meaning, courts often consider the dictionary definition of the word . *See e.g.*, *Matsumoto v. Labrador*, 122 F.4th 787, 807 n.15 (9th Cir. 2024) (considering the Oxford English Dictionary, Mirriam-Webster Dictionary, and Cambridge Dictionary's definitions of a term not defined in the statute). Where "parent" is a defined term within the Act, one can reasonably assume that "verified" modifies the word "parent." *See cf. Washington Educ. Ass'n v. Nat'l Right to Work Legal Def. Found., Inc.*, 187 F. App'x 681, 682 (9th Cir. 2006). Rather than consider the plain meaning of the word "verify," YouTube seems to skip a step and argue that "*verification* eludes a readily understood plain



United States District Court
Northern District of California

meaning." YouTube Mot. 28 (emphasis added). However, "verify" is readily understood and has a plain meaning. Indeed, Black's Law Dictionary, the dictionary which YouTube consulted to define "verification," defines "verify" in two ways: "(1) to prove to be true; to confirm or establish the truth or truthfulness of; to authenticate; (2) to confirm or substantiate by oath or affidavit; to swear to the truth of." Verify, Black's Law Dictionary (12th ed. 2024). Despite YouTube's concern that the term "verified" may encompass an array of different procedures, as in *Matsumoto*, the Court finds that the ordinary meaning is sufficiently clear, and provides notice to operators of the subject services or applications that they must verify a person's status as a minor's "parent" before modifying the default settings. *See Matsumoto*, 122 F.4th at 805–06. For this reason, the Court also finds YouTube's vagueness argument unlikely to succeed.

## IV. CONCLUSION

For the reasons above, the Court **DENIES** Plaintiffs' preliminary injunction motions. The Court notes that this is a *preliminary* injunction and further factual development could reveal that provisions not enjoined now are unconstitutional. For the time being, Bonta may enforce §§ 27001(a), 27002(b)(2), and 27002(b)(4).

**IT IS SO ORDERED.**

Dated: August 5, 2026

EDWARD J. DAVILA
United States District Judge

# Exhibit H

Isaac D. Chaput (Bar No. 326923)
**COVINGTON & BURLING LLP**
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
(415) 591-6000
ichaput@cov.com

Alexander L. Schultz (Bar No. 340212)
**COVINGTON & BURLING LLP**
1999 Avenue of the Stars
Los Angeles, California 90067-4643
(424) 332-4800
aschultz@cov.com

Mark W. Mosier (pro hac vice forthcoming)
Teena-Ann V. Sankoorikal (pro hac vice forthcoming)
Alexandra J. Widas (pro hac vice pending)
**COVINGTON & BURLING LLP**
850 Tenth Street, NW
Washington, D.C. 20001
(202) 662-6000
mmosier@cov.com
tsankoorikal@cov.com
awidas@cov.com

*Attorneys for Plaintiff Meta Platforms, Inc.*

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| META PLATFORMS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>ROB BONTA, in his official capacity as Attorney General of California,<br><br>Defendant. | Case No.: 5:25-cv-09792-EJD<br><br>**DECLARATION OF DR. MICHAEL BAIOCCHI IN SUPPORT OF PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:<br>Time:<br>Judge: Honorable Edward J. Davila<br>Dept.: Courtroom: 4 – 5th Floor |

# Contents

I. Introduction .... 4

a. Qualifications .... 4

b. Engagement .... 6

II. Summary of Opinions .... 7

III. The Opinions Offered in the Declarations of Professors Christakis, Hilbert, Radesky, Telzer, and Twenge Are Flawed and Inconsistent with the Existing Scientific Evidence. 8

a. The Causation Opinions Advanced by the State's Experts Give Insufficient Treatment to Findings from Systematic Reviews and Meta-Analyses, Particularly Those That Are Inconsistent with Their Causal Claims. .... 8

b. Correlational Studies, Which the State's Experts Rely Upon, Do Not Provide Evidence of Causation. .... 12

c. The States' Experts' Rely on Randomized Trials That (i) Do Not Inform the Questions at Stake in this Litigation, (ii) Have Fundamental Methodological Flaws, or (iii) Suffer From Both Issues. .... 19

d. The Experts' References to Documents Generated by Meta Employees Cannot Support Their Causal Claims. .... 21

i. General Principles for the Evaluation of Empirical Research .... 22

ii. Evaluation of the Meta Internal Documents Discussed in the Reports of State's Experts Do Not Report Sufficient Information to Evaluate The Validity of their Causal Claims. .... 32

e. Many of the Studies the State's Experts Rely on Employ Unreliable Measurements and Reflect Significant Biases. .... 33

f. The State's Experts Have Failed to Show a Scientific Basis for Their Claim that Personalized Feeds Can Be Harmful to Adolescent Mental Health. .... 36

IV. The "Time Series" Analyses Employed by Professor Twenge Are Methodologically Unsound and Seriously Misstate the Ability of Time Series Data to Empirically Achieve Causal Inferences. .... 44

V. The State's Experts Fail to Adequately Differentiate Content and Features in their Argumentation ........ 45

VI. The Claims that the States' Experts Make About the "Addictive" Nature of Social Media Use Are Inconsistent with Scientific Consensus and Fail to Support their Conclusions.. 48

a. There Is No Recognized Addiction or Medical Disorder Involving the Use of Social Media. ........ 48

b. The State's Experts' Attempts to Analogize Social Media Use to Recognized Addictions Are Empirically Unsound. ........ 52

c. Key Propositions in the State's Experts' Reports Are Undermined by Deficient Citations. ........ 55

d. The State's Experts Fail to Persuasively Reframe the Inquiry Beyond Addiction-Based Harm ........ 58

VII. The State's Experts Fail to Adequately Consider Plausible Alternative Causes for the Alleged Harms, Rendering Their Causal Opinions Unreliable. ........ 63

a. The Analysis of Alternative Causes Included in Professor Twenge's Declaration Is Flawed. ........ 63

b. The State's Experts Fail to Address or Account for Various Plausible Alternative Causes of Adolescent Mental Health Issues ........ 66

VIII. Conclusion ........ 69

I, Dr. Michael Baiocchi, declare under penalty of perjury that the following is true and correct:

## I. INTRODUCTION

### a. Qualifications

1. I am a tenured associate professor in the Department of Epidemiology & Population Health at Stanford University. I have additional appointments in the Department of Statistics and the Department of Medicine. My principal research areas are: (i) causal inference, particularly in estimation of causal effects from observational data, (ii) gender-based violence prevention, and (iii) health outcomes research (e.g., adolescent nicotine use prevention, cardiothoracic interventions).

2. A primary focus of my research is developing new, statistically rigorous methods for empirically estimating causal effects. I have designed methods appropriate for estimating causal effects from observational data,[1] from randomized controlled trials,[2] and data that merges both data from randomized trials and observational data.[3] I published a highly cited (>750 citations) manuscript on one of the most prominent "natural experiment" study designs.[4] I have also developed a novel framework for addressing differential measurement error.[5] I was the senior statistician on a team that discovered and

---

[1] For instance, by using natural experiments. Baiocchi M, Small DS, Lorch S, Rosenbaum PR. Building a Stronger Instrument in an Observational Study of Perinatal Care for Premature Infants. Journal of the American Statistical Association. 2010;105(492):1285-1296; Aikens RC, Greaves D, Baiocchi M. A pilot design for observational studies: Using abundant data thoughtfully. Stat Med. Dec 30 2020;39(30):4821-4840. doi:10.1002/sim.8754.

[2] Rigdon J, Baiocchi M, Basu S. Preventing false discovery of heterogeneous treatment effect subgroups in randomized trials. Trials. 2018 Jul 16;19(1):382., Rosenman ET, Friedberg R, Baiocchi M. Robust designs for prospective randomized trials surveying sensitive topics. American journal of epidemiology. 2023 May;192(5):812-20.

[3] Rosenman ET, Basse G, Owen AB, Baiocchi M. Combining observational and experimental datasets using shrinkage estimators. Biometrics. 2023 Dec;79(4):2961-73.

[4] Baiocchi M, Cheng J, Small DS. Instrumental variable methods for causal inference. Stat Med. Jun 15 2014;33(13):2297-340. doi:10.1002/sim.6128.

[5] Rosenman ET, Friedberg R, Baiocchi M. Robust designs for prospective randomized trials surveying sensitive topics. American journal of epidemiology. 2023 May;192(5):812-20.

mathematically described a new form of bias.[6] Additionally, I have proposed, developed, and published statistical software packages in the programming language R, which allow researchers to implement methods my research team and I have created.[7]

3. I am a statistician with particular expertise in causal inference, having developed methodologies for rigorously estimating causal effects from both observational data and randomized controlled trials (RCTs). In addition to developing statistical methods, I have published numerous peer-reviewed papers estimating causal effects from observational data sets. I have also designed and run randomized controlled trials of behavioral interventions.

4. A copy of my curriculum vitae, which provides further details of my research publications and professional activities, is provided as Exhibit C to this report. I have previously submitted reports and testified as an expert witness in the following matters:

- *Christina Arlington Smith et al., v. TikTok Inc. et al.*, Judicial Council Coordination Proceeding No. 5255, Case No. 22STCV21355 (Cal. Super. Ct. L.A. Cnty).
- *In re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation*, MDL No. 3047, Case No. 4:22-md-03047-YGR (N.D. Cal 2023).
- *State of Tennessee ex rel. Jonathan Skrmetti, Attorney General and Reporter v. Meta Platforms Inc. and Instagram LLC.*, Case No. 23-1364-IV (Tenn. Chancery Ct. 2023).
- *State of New Mexico, v. Meta Platforms, Inc. et al.*, Case No. 1:23-cv-01115-MIS-KK (D.N.M.).

---

6 Aikens RC, Chen JH, Baiocchi M, Simard JF. Feedback Loop Failure Modes in Medical Diagnosis: How Biases Can Emerge and Be Reinforced. Med Decis Making.Jul 2024;44(5):481-496. doi:10.1177/0272989X241248612.

7 Rigdon J, Baiocchi M, Basu S. Near-far matching in R: the nearfar package. Journal of statistical software. 2018 Sep 3;86:1-21., Aikens RC, Rigdon J, Lee J, et al. stratamatch: Prognostic Score Stratification Using a Pilot Design. R J. Jun 2021;13(1):614-630. doi:10.32614/RJ-2021-063.

- *Commonwealth of Massachusetts v. Meta Platforms, Inc. and Instagram, LLC*, Case No. 2384CV02397-BLS1 (Mass. Super. Ct. Suffolk Cty.).
- *Utah Division of Consumer Protection v. Meta Platforms, Inc., and Instagram, LLC*, Case No. 230908060 (Third Judicial Dist. Ct., Salt Lake Cty., Utah).

b. Engagement

5. I was engaged by counsel for Plaintiff Meta Platforms, Inc., who requested I apply my training, expertise, and experience to assess the state of scientific knowledge about whether social media service features—and, specifically, personalized feeds—cause (or are capable of causing) negative mental health outcomes in adolescents. In particular, I was asked to consider the opinions advanced in the declarations of the State's experts Professor Dimitri Christakis, Professor Martin Hilbert, Professor Jenny Radesky, Professor Eva Telzer, and Professor Jean Twenge in this litigation to evaluate the claims they advance. The focus in these declarations on specific features of Meta's services further informs the scope of my opinions: namely, I consider the extent to which the State's experts describe specific service features, as isolated from the content the features are being used to publish.

6. All materials considered in reaching my opinions are cited in Exhibit B to this declaration and in Appendices B–E. My opinions are based on my expertise, training, and professional experience in statistics and causal inference.

7. My compensation for my work on this matter is $1,100 per hour for general work and $1,600 per hour for deposition or trial testimony. My compensation is in no way related to the substance of my expert opinions, nor is it contingent on those opinions. During my work on this report, two research assistants worked under my direction and supervision to assist with my literature search and provide research support. All the opinions summarized below are my own.

## II. SUMMARY OF OPINIONS

8. None of the State's experts provides any opinion, backed by evidence, indicating that personalized feeds are intrinsically harmful or have any connection to adolescent mental health. Some argue that personalized feeds can include concerning content, but they do not suggest that such content is a necessary component of personalized feeds. The State's experts do not offer any evidence showing that Meta's personalized feeds on Instagram, Threads, and Facebook are causing any mental health epidemic or harming adolescent mental health.

9. The State's experts' declarations exhibit numerous problems. Some of these declarations claim to infer causal connections based on evidence of mere correlations. They also overlook or ignore the numerous studies that reach conclusions inconsistent with their own assessments and, at times, they misconstrue the studies they do rely on. They make unwarranted conclusions on the basis of Meta's internal documents, which do not rise to the level of reliable scientific evidence, and they also attempt to apply the term "addiction" to social media use, which is a medically unsupported, and inappropriately broad, characterization of that term. Finally, they also fail to properly account for alternative potential causes of adolescent mental health concerns.

10. Finally, in my own, independent review of the literature on social media and adolescent mental health, I have encountered no studies, individually or in the aggregate, that establish the claim that any causal relationship exists. Additionally, I have found no studies that attempt to analyze the effects, if any, of social media algorithms or personalization algorithms on adolescent mental health. For these reasons, I do not think the scientific evidence warrants any conclusions regarding the relationship between social media generally, or personalization algorithms specifically, and adolescent mental health.

11. I hold these opinions to a reasonable degree of scientific certainty. I reserve the right to supplement or expand on these opinions, including in response to any opinions offered by the State's experts or in response to any new facts or research.

## III. THE OPINIONS OFFERED IN THE DECLARATIONS OF PROFESSORS CHRISTAKIS, HILBERT, RADESKY, TELZER, AND TWENGE ARE FLAWED AND INCONSISTENT WITH THE EXISTING SCIENTIFIC EVIDENCE.

12. After reviewing the Declarations submitted by Professors Christakis, Radesky, Telzer, and Twenge in this litigation, I conclude that their opinions exhibit a number of key methodological flaws and a fundamental misreading of the scientific literature, undermining the validity of their conclusions.

a. <u>The Causation Opinions Advanced by the State's Experts Give Insufficient Treatment to Findings from Systematic Reviews and Meta-Analyses, Particularly Those That Are Inconsistent with Their Causal Claims.</u>

13. To ground my opinions in the empirical findings in the field, I conducted my own literature search for systematic reviews and meta-analyses of studies on social media use and mental health. In total, I identified 77 peer-reviewed manuscripts,[8] which are documented in Appendices B and C.[9] Of these 77 peer-reviewed manuscripts, only five manuscripts asserted some level of causality,[10]

---

[8] My methodology for this search is described below in Appendix A

[9] Importantly, systematic reviews and meta-analyses are limited in their value by the underlying studies they consider. There are some circumstances where systematic reviews and meta-analyses can identify biases in the articles being analyzed and then help produce better quality insights. However, (i) in my review of the systematic reviews and meta-analyses investigating the links between social media usage and adolescent mental health, I did not see any such methods implemented (and thus no increased ability to reliably estimate causal links), and (ii) there are no citations in Professor Twenge's report that use these methods for improved causal inference in systematic reviews and meta-analyses.

[10] McComb CA, Vanman EJ, Tobin SJ. A meta-analysis of the effects of social media exposure to upward comparison targets on self-evaluations and emotions. Media Psychology. 2023 Sep 3;26(5):612-35; Liu Y, Mohamad EM, Azlan AA, Tan Y. Am I Happier Without You? Social Media Detox and Well-Being: A Meta-Analysis of Randomized Controlled Trials. Behavioral Sciences. 2025;15(3). doi:10.3390/bs15030290; Ferguson CJ. Do social media experiments prove a link with mental health: A methodological and meta-analytic review. Psychology of Popular Media. 2025 Apr;14(2):201; Memon AM, Sharma SG, Mohite SS, Jain S. The role of online social networking on deliberate self-harm and suicidality in adolescents: A systematized review of

(continued…)

with 69 studies having explicit statements that causality was not established. The remaining 3 manuscripts[11] include statements from authors that suggest they believe their results are only "correlational" or only find "associations" but are not explicit about this belief.

14. I refreshed this search (using the same search criteria) in the summer of 2025 and identified five new systematic reviews or meta-analyses,[12] and one narrative review.[13] These six summative reviews are reported in Appendix D of this report. None of these summative reviews of the literature empirically establish causality. Pazdur et al. (2025), as an example, states the authors' presumption of a causal relationship, but does not empirically validate the claim, and then performs

---

literature. Indian journal of psychiatry. 2018 Oct 1;60(4):384-92; *see* Karim F, Oyewande AA, Abdalla LF, Ehsanullah RC, Khan S. Social media use and its connection to mental health: a systematic review. Cureus. 2020 Jun 15;12(6).

11 Cheng B, Lim CCW, Rutherford BN, Huang S, Ashley DP, Johnson B, Chung J, Chan GCK, Coates JM, Gullo MJ, Connor JP. A systematic review and meta-analysis of the relationship between youth drinking, self-posting of alcohol use and other social media engagement (2012-21). Addiction. 2024 Jan;119(1):28-46. doi: 10.1111/add.16304; Gioia F, Rega V, Boursier V. Problematic Internet Use and Emotional Dysregulation Among Young People: A Literature Review. Clin Neuropsychiatry. 2021 Feb;18(1):41-54. doi: 10.36131/cnfioritieditore20210104; Marciano L, Lin J, Sato T, Saboor S, Viswanath K, Does social media use make us happy? A meta-analysis on social media and positive well-being outcomes (2024). SSM – Mental Health, 6:100331, https://doi.org/10.1016/j.ssmmh.2024.100331.

12 Pazdur M, Tutus D & Haag AC. Risk Factors for Problematic Social Media Use in Youth: A Systematic Review of Longitudinal Studies. Adolescent Res Rev 10, 237–253 (2025). https://doi.org/10.1007/s40894-025-00264-4; Agyapong-Opoku N, Agyapong-Opoku F, Greenshaw AJ. Effects of Social Media Use on Youth and Adolescent Mental Health: A Scoping Review of Reviews. Behavioral Sciences. 2025; 15(5):574. https://doi.org/10.3390/bs15050574; Li Q, Yu Y, Wang X, Wong SY, Yang X. The relationship between parental affective disorders and digital addiction in children and adolescents: A systematic review and meta-analysis. Addict Behav. 2025 May; 164:108282. https://doi.org/10.1016/j.addbeh.2025.108282; Yusuf NA, Astuti RT. The impact of Facebook content on mental health status among Generation Z: A literature review. Innovation in Health for Society, 2025; 5(2): 70-78. https://doi.org/10.31603/ihs.13301; Rodríguez-Castaño A, Fernández-Sánchez J, Trujillo-Colmena D, Lavín-Pérez AM, García-Ortiz C, Collado-Mateo D. Is physical activity associated with lower risk of social network problematic use or addiction? A systematic review and meta-analysis. Complementary Therapies in Clinical Practice, 2025 Aug; 60:101995. https://doi.org/10.1016/j.ctcp.2025.101995.

13 Burgess K. The Decline in Adolescents' Mental Health with the Rise of Social Media: A Narrative Review. Creative Nursing. 2025; 31(2):119-126. doi:10.1177/10784535251328925.

analyses that are correlational (e.g., assessing predictive "risk factors").[14] The others do not appear to even attempt to establish causality.

15. I conducted yet another iteration of this search, following the same methods, in December of 2025. There, I identified 9 new systematic reviews or meta-analyses (Zhang et al. 2025, Bonfanti et al. 2025, Lemahieu et al. 2025, Pérez-Wiesner et al. 2025, Jing et al. 2025, Arana-Rodriguez et al. 2025, Thrul et al. 2025, Cabezas-Klinger et al. 2025, Cal-Herrera et al. 2025). These nine summative reviews are reported in Appendix E of this report. None of these summative reviews empirically prove causal effects about social media use and many are low quality. Arana-Rodriguez et al. (2025) attempted to find causal effects of education programs to prevent "social media addiction" but concluded that there is inadequate evidence. Lemahieu et al. (2025) concluded that social media abstinence interventions of weeks-long durations do not appear to have any effect on negative affect. The other reviews were largely non-causal in their conclusions and specify considerable limitations.[15]

16. Professors Hilbert, Radesky, Telzer, and Twenge failed to perform the same comprehensive analysis that I have conducted to ascertain the consensus in systematic reviews and meta-analyses of the literature on social media use and adolescent mental health. These sorts of analyses take into account many studies and produce synthesized understandings of the overall literature's empirical findings – so they are critical to evaluate if someone is genuinely attempting to get any consensus from the literature. Indeed, Professor Twenge gives substantial treatment to relatively few systematic reviews and meta-analyses,[16] despite there being many in this space. Similarly, Professor Radesky ostensibly cites only seven systematic reviews or meta-analyses (one of which, Brady & Van

[14] Pazdur M, Tutus D & Haag AC. Risk Factors for Problematic Social Media Use in Youth: A Systematic Review of Longitudinal Studies. Adolescent Res Rev 10, 237–253 (2025). https://doi.org/10.1007/s40894-025-00264-4.

[15] *See, e.g.*, Pérez-Wiesner et al. 2025 ("the overall certainty of the evidence remains very low.").

[16] *See* Declaration of Dr. Jean Twenge, ¶¶ 85, 96, 105, 116, 125, 133, 137, 140.

Bavel, is an analysis of the likelihood of Twitter messages being shared),[17] while Professor Telzer appears to cite only three systematic reviews or meta analyses that appear to have any relevance to social media.[18] Professor Hilbert does not appear to cite any systematic reviews or meta-analyses that engage with adolescents and mental health. In short, these experts fail to consider the majority of the existing review papers and systematic analyses on the topic of social media use and adolescent mental health.

17. Professor Christakis, to his credit, at least describes a framework for his review of the literature.[19] But while he describes the methodology of his literature review, he provides no summaries of what actually resulted from his search. Specifically, Professor Christakis has no analogue to Appendices B–E below. Therefore, unlike with my own search, there is no way to interrogate the conclusions and insights that Professor Christakis derived. The reader is required, instead, to conclude that Professor Christakis' insights are presumptively valid based on his credentials.

18. Through my review, I assessed that the vast majority of systematic reviews and meta-analyses that examine social media use and mental health report that cross-sectional and other studies in this literature show only weak and inconsistent associations.[20] As a consequence, the studies in this

---

[17] *See*, *e.g.*, Declaration of Dr. Jenny Radesky, ¶¶ 59, 69, 72, 102.

[18] *See*, *e.g.*, Declaration of Dr. Eva Telzer, ¶¶ 187, 191, 198.

[19] *See*, *e.g.*, Declaration of Dimitri Christakis, ¶ 29, *et seq*.

[20] Purba A K, Thomson R M, Henery P M, Pearce A, Henderson M, Katikireddi S V, Social media use and health risk behaviours in young people: systematic review and meta-analysis (2023). BMJ, 383:e073552, doi: 10.1136/bmj-2022-073552; Fassi L, Thomas K, Parry DA, Leyland-Craggs A, Ford TJ, Orben A. Social Media Use and Internalizing Symptoms in Clinical and Community Adolescent Samples: A Systematic Review and Meta-Analysis. JAMA Pediatr. 2024 Aug 1;178(8):814-822. doi: 10.1001/jamapediatrics.2024.2078; Ansari S, Iqbal N, Asif R, Hashim M, Farooqi SR, Alimoradi Z. Social media use and well-being: A systematic review and meta-analysis (2024). Cyberpsychology, Behavior, and Social Networking, 27 (10): 704-719; Plackett R, Blyth A, Schartau P. The impact of social media use interventions on mental well-being: systematic review (2023). Journal of Medical Internet Research, Aug 11:25: e44922, doi: 10.2196/44922; Valkenburg PM, Meier A, Beyens I. Social media use and its impact on adolescent mental health: An umbrella review of the evidence. Current opinion in psychology. 2022 Apr 1;44:58-68; Valkenburg PM. Social media use and well-being: What we know and what we need to know. Current opinion in psychology. 2022 Apr.; 44:58-68. Doi: 10.1016/j.copsyc.2021.09.017.

area fall well short of establishing causation. Similarly, the 2023 consensus report issued by an ad hoc committee of the National Academy of Sciences, Engineering, and Medicine reviewed the correlational, longitudinal, and experimental literature on social media and mental health outcomes in adolescents and concluded that the literature "did not support the conclusion that social media causes changes in adolescent health at the population level."[21]

b. Correlational Studies, Which the State's Experts Rely Upon, Do Not Provide Evidence of Causation.

19. The vast majority of studies in the existing literature on social media use and adolescent mental health are cross-sectional in design. Cross-sectional studies, except under unusual circumstances, can only identify associations or correlations between variables. Correlations are only loosely associated with causal relationships. The fact that one variable is correlated with another is not evidence that there is a causal relationship between the two variables. Two variables that are causally related may not be correlated (e.g., nonlinear relationship, selection bias, counteracting causal factors, confounding). Moreover, even if there is a causal relationship between two variables, and they are correlated, it is not necessarily clear which variable is the cause and which is the effect. The limitations of cross-sectional evidence are widely accepted, and even States' experts' acknowledge the limitations of studies that detect only correlations.[22]

20. Nonetheless, disregarding the weakness of correlational studies, some of the State's experts make assertions about correlational studies that give a misleading sense of their rigor:

---

21 National Academy of Sciences Report (2023), Social Media and Adolescent Mental Health, page 92.

22 See, for example, Declaration of Dimitri Christakis, ¶ 247 (observing that a "correlation in and of itself does not prove causation."); ¶ 277 (noting that "reverse causality once again cannot be excluded when studies are merely correlational.").

| State Expert's Assertion | Response |
|---|---|
| Professor Twenge: "[C]orrelation can point toward possible causation."[23] | The issue is not that correlational studies can point towards possible causation, it's that correlational studies indiscriminately point to many possible causes, one of which may be a real cause, but they may also fail to point to any real causal relationship. Correlational studies are not determinative of causal effects; they are only casually related to causality. |
| Professor Christakis: "The vast majority of the included studies [in a systematic review] are cross-sectional and while the association is plausibly causal based on the theoretical mechanisms discussed above, reverse causality once again cannot be excluded when studies are merely correlational."[24] | The fact that an association exists is not evidence of causality. By combining a description of the observed association with a claim that the association is "plausibly causal" – based on other mechanisms – this statement suggests that the association itself could say something about causality. But it just punts the hard work: the mechanism needs to be empirically established and verified and I do not see that in Professor Christakis's report. |

23 Declaration of Jean Twenge, ¶ 26.

24 Declaration of Dimitri Christakis, ¶ 277.

| State Expert's Assertion | Response |
|---|---|
| Professor Telzer: "It is well established in the field of neuroscience that environmental factors play a crucial role in shaping brain development and function. From experiences in the home and parenting, to peer environments, to school settings, the brain exhibits a remarkable degree of plasticity in response to environmental experiences."[25] | Multiple citations that Professor Telzer includes for this statement very clearly preclude strong causal conclusions. From Kolb and Whishaw (1998):<br>"The study of brain and behavioral correlations necessarily involves assumptions about methodology, and this review chapter is no exception. In particular we assume that changes in the structural properties of the brain will reflect changes in brain function. Furthermore, we assume that the most likely place to identify neural changes associated with behavior is at the synapse. In order to relate synaptic change to behavioral change, it also is assumed in the current review that synaptic changes can be measured by analysis of the postsynaptic structure of cells, either by light microscope or electron microscope techniques."[26]<br>In other words, Kolb and Whishaw simply assume causality. That is an unacceptable assumption to make in the effort of attempting to empirically establish causal attributions. |

[25] Declaration of Eva Telzer at ¶ 112 (internal footnote citations omitted).

[26] Kolb, B., & Whishaw, I. Q. (1998). *Brain plasticity and behavior*. Annual Review of Psychology, 49(1), 43 64. https://doi.org/10.1146/annurev.psych.49.1.43

| State Expert's Assertion | Response |
|---|---|
| | In a similar way, Rakesh et al. (2023) states quite clearly: "The goal of the present study was to examine associations between the school environment, brain structure and connectivity, and mental health."[27] The reference here to "associations" underscores that the study was not intended to study causality.<br><br>Merely reading the citations Professor Telzer includes should give pause about her claims. Indeed, her claims completely misrepresent what is established in the citations. Concerningly, the manuscripts themselves were quite clear that they do no such thing as establish causal connections. |
| Professor Twenge: "Correlational studies are a particularly important piece of evidence in assessing | This is not true. Well designed and implemented natural experiments, which are capable of bounding causal effects,[29] are important evidence in assessing causation when RCTs (randomized controlled trials) are infeasible or |

27 Rakesh, Divyangana et al. "The Role of School Environment in Brain Structure, Connectivity, and Mental Health in Children: A Multimodal Investigation." *Biological psychiatry. Cognitive neuroscience and neuroimaging* vol. 8,1 (2023): 32-41. doi:10.1016/j.bpsc.2022.01.006

29 "Bounding" is used in a technical sense here to mean: in observational studies it is often statistically hard to precisely estimate the effect researchers sometimes find "outer bounds" that will likely contain the targeted effect, even if there are challenges such as confounding.

| State Expert's Assertion | Response |
|---|---|
| causation when randomized controlled trials are infeasible or unethical."[28] | unethical. But correlational studies are notoriously unreliable for making causal claims, which is why they are considered low-quality evidence. |
| Professor Twenge: "Correlational studies also often include a much larger number of participants than randomized controlled trials, making them less vulnerable to random variation in results."[30] | While sample size can be an issue for some studies, it is rarely the key issue when making evidence-based decisions. The key issue is whether a study has bias. Sample sizes are important but given that correlational studies are assumed biased until proven otherwise (because they cannot control for extraneous factors), the sample size is usually only of academic interest. Correlational studies with large sample sizes can be misleading because they can have tight confidence intervals around incorrect causal estimates. |
| Professor Twenge: Correlational studies reveal a dose-response relationship.[31] | Professor Twenge is incorrect that correlational studies can reveal a dose-response relationship. Correlational studies are non-causal in their design. On the other hand, a dose-response relationship is a causal concept. Professor Twenge's claim is therefore akin to saying that the number four is red. Except under very unusual circumstances, |

[28] Declaration of Jean Twenge, ¶ 26.
[30] Declaration of Jean Twenge, ¶ 26.
[31] Declaration of Jean Twenge, ¶ 30.

| State Expert's Assertion | Response |
|---|---|
| | numbers and colors are two different types of things. Similarly, except under very unusual circumstances (e.g., a well-run experiment that randomizes participants to different doses), a correlational summary of data does not (and cannot) reveal a dose-response relationship. The types of correlational studies on social media use and mental health that Professor Twenge discusses in her declaration simply cannot reveal a dose-response relationship. |

21. Moreover, the State's experts rely on the findings of cross-sectional studies (or associational findings) in their declarations,[32] despite the significantly limited value of these studies and findings.

22. In contrast to correlational studies, RCTs are capable of establishing causal relationships because they generate data that can be used to estimate a causal relationship in an unbiased way.[33] Well-run RCTs are, by design, able to identify changes in the outcome and attribute these changes to a particular set of causes. Their ability to isolate and attribute, and to rule out other potential causes, is why RCTs are so prized in causal inference.[34]

23. However, common failure points that might affect internal validity in a behavioral RCT include: (i) failure of many participants to complete the study (a.k.a., "high dropout") so the study's

32 *See, e.g.*, Declaration of Dimitri Christakis, ¶¶ 267, 277, 341; Declaration of Eva Telzer at ¶¶ 142, 167, 173.

33 Cox DR, Reid N. The theory of the design of experiments. Chapman and Hall/CRC; 2000 Jun 6.

34 Imbens GW, Rubin DB. Causal Inference for Statistics, Social, and Biomedical Sciences. Cambridge University Press; 2015 Apr 6, Chapters 1-4 & 12.

conclusions are based only on the participants who remained in the study; (ii) "interference effects" where the study's conclusions have been "contaminated" by participants from the other randomized group;[35] and (iii) studies in which participants understand what the goals of the study are making the participants more likely to distort their responses to surveys to be consistent with the researchers' goals.

24. Further, three common issues that can make an RCT non-informative (e.g., external validity) include: (i) the RCT uses a sample of convenience versus an RCT using a random sample of participants from the population of interest; (ii) the RCT uses metrics that are not aligned with the broader question at hand; and (iii) the RCT might not be "ecologically valid" in the sense that the scenario the study puts participants through is artificial and dissimilar to the way people naturally act or interact.

25. Correlational studies are, at best, descriptions of what appears in the world and can be observed by researchers. But, in the complex real world, appearances are deceiving. Correlations invite creative people to engage in conjecture about the potential for causal connections between variables and generate hypotheses. But these conjectures are not reliable, and hypotheses generated from correlations need to be rigorously tested.

26. To demonstrate why correlational studies like those relied upon by the State's experts cannot show causation, I located a few examples of correlations of similar magnitude that are clearly non-causal, drawn from the Youth Risk Behavior Surveillance Survey (YRBSS), a data set cited by some of the State's experts.[36] I found that: (a) the rise in adolescents who report not eating breakfast correlates to rise in rates of adolescents who report depression; (b) decrease in the number of adolescents who report that they have had sex is negatively correlated with increases in depression; (c) there is a

---

[35] E.g., if individuals from the treatment group discuss their experiences with the control group while the test is ongoing.

[36] Declaration of Jean Twenge at ¶ 44; Declaration of Jenny Radesky at ¶ 68; Declaration of Dimitri Christakis at ¶ 246.

significant correlation between the average number of three-point attempts per team per game in the NBA and the rates of self-reported depression among adolescent girls.

c. <u>The States' Experts' Rely on Randomized Trials That (i) Do Not Inform the Questions at Stake in this Litigation, (ii) Have Fundamental Methodological Flaws, or (iii) Suffer From Both Issues.</u>

27. On page 11, paragraph 46 of Professor Telzer's declaration, she writes that:

> There are many empirical studies identifying the harms associated with the features of social media, including experimental studies that randomly assign participants to conditions with features of social media manipulated (e.g., beauty filters, likes)[8,9] allowing for strong causal conclusions to be drawn.

Telzer supports the above excerpt by citing to Tiggemann et al. (2018) and Kleemans et al. (2016). But a closer analysis of these articles reveals that neither adequately support Professor Telzer's propositions. In Tiggemann et al. (2018), for instance, the participants were shown images of women with the number of "likes" either artificially increased or decreased. The participants were primed by being asked to complete questions about their body dissatisfaction and facial dissatisfaction. The participants were then asked to view the images selected to be exemplary of different types of female bodies. The women in the study were then asked to reflect on their (post-exposure) body dissatisfaction and facial dissatisfaction. Notably, this article concludes that "the main effect of likes was not significant," "[t]he number of likes on viewed images did not result in greater body dissatisfaction." Further, "[v]iewing a high number of likes led to lower, rather than greater, facial dissatisfaction." These conclusions undermine Telzer's assertions.

28. Kleemans et al. (2016) also suffers from poor methodological design. In this study, participants were asked to look at manipulated pictures (that is, "content") and then asked to reflect on themselves and their self-perceptions. The authors found that participants reported differentially based on the type of content viewed. But this study was almost certainly hamstrung by what is called "attenuation effects," namely, when individuals adapt to repeated exposures in a manner that biases their responses to those exposures.

29. Further, Professor Telzer writes that fMRI studies show how social media features (e.g., likes, algorithms) affect neural processing of social media and mental health.[37] She cites Sherman et al. (2016) and Su et al. (2021), neither of which supports her claim that these studies identify causal effects of harm, let alone that they can attribute harm to social media use. Both of these studies have poor ecological validity, a known weakness of fMRI studies. Measuring participants inside of an fMRI is simply unable to adequately mimic real world media use. Indeed, Su et al. (2021) acknowledges this exact issue, noting that "[i]t is challenging to design an fMRI experiment that is highly close to real circumstances."

30. Further, neither of these fMRI studies can make *behavioral* claims. Instead, these studies look at approximate measures of brain activity, and there is currently no generally accepted theory that can connect certain patterns of brain activation to specific behaviors, nor to mental states. fMRI machines can generate novel correlations and can be useful in some contexts. But they cannot currently be utilized to support robust causal statements regarding whether or not the features of social media apps (e.g., personalized algorithms, likes) have any impact on the mental health of adolescents.

---

[37] Declaration of Eva Telzer at ¶ 46.

31. Likewise, the Allcott et al. (2020) study, cited by Professors Christakis, Hilbert, and Twenge,[38] is not generalizable to the question of whether social media causes adolescent mental health. This study was performed with adults (roughly 50% above age 30), where over 50% were college educated, a plurality were Democrats (13% Republican, 42% Democrat), and 57% were female. The authors themselves note that the sample is not fully representative as "[o]ur participants are relatively young, well-educated, and left-leaning compared to the average Facebook user." The context is also inapposite to our case, as the study was built around the 2018 US midterm election, where participants were randomly assigned to substantially reduce their use of Facebook.

32. Both of these issues, the sampling and the external context, affect the applicability to the relevant topic of social media and adolescent mental health, as they suggest other reasons that the outcomes might have been observed. It is entirely reasonable, for instance, to interpret the changes here as being largely about people avoiding the post-election discourse about their preferred candidate's outcome. Some of the effects could have been reversed, for instance, if the preferred candidate of study participants had won and they had missed out on their community celebrating and bonding.

d. The Experts' References to Documents Generated by Meta Employees Cannot Support Their Causal Claims.

33. Documents internal to Meta, generated by employees of the company, (of which only a subset can be reasonably characterized as "studies") generally provide only surface level information into their conclusions, methodologies, and hypotheses. This is fatal for their ability to meaningfully support any of the causal claims put forth by the State's Experts. The following section lays out this point by (1) describing the general principles for the evaluation of empirical research, why they are

---

[38] *See, e.g.*, Declaration of Dimitri Christakis at ¶¶ 64, 259; Declaration of Martin Hilbert at ¶ 64; Declaration of Jean Twenge at ¶¶ 126-127.

important, and why it is critical that such adequate reporting occur for such evaluation; and then, (2) demonstrating how documents authored by certain Meta employees fail these standards, which thus undermines any inferences that the State's Experts have drawn from them.

i. General Principles for the Evaluation of Empirical Research

34. First, it is critical to assess the study's internal validity and whether the study employs techniques appropriate for the research being undertaken (Richardson et al. 2014; chapter 2). The intent of the research – that is, the question the research is trying to answer – should be described with a clear statement of the scientific hypothesis (or hypotheses) being investigated. This step may not be trivial; studies may be complex and have many pieces, targeting different aspects of a multi-part hypothesis. Often, some work during the review process is devoted to clarifying how these different methods map to the various questions that are being addressed.

35. Next, a reviewer will evaluate the ability of the implemented methods to inform the hypothesis, which is also known as the "internal validity" of the research. More precisely, internal validity refers to the ability of the methods implemented to isolate (that is, provide an unbiased estimate of) the relationship of interest (technically, the target estimate). And this concept of internal validity, ultimately, gauges whether the results of the study are trustworthy (e.g., if the results are biased in some way that would distort our understanding of the relationship being studied).

36. In a randomized controlled trial (RCT) comparing a treated versus control group, one of the most common checks for internal validity is to evaluate if the treated group and control group "look similar" to each other (more technically, if they appear to be conditionally independent, or, in practice, if their marginal distributions do not diverge). We do this by requiring researchers to report a

Case: 26-5120, 08/24/2026, DktEntry: 6.2, Page 125 of 299

"Demographic Table," which is a demographic summary of the characteristics of the two groups at the time of randomization.[39] See the two exemplar tables below.[40]

| variable name | treated mean | control mean |
|---|---|---|
| age (years) | 27.3 | 27.2 |
| female (%) | 62% | 63% |
| college (%) | 17% | 17% |
| USA (%) | 84% | 86% |

**Table 1**

| variable name | treated mean | control mean |
|---|---|---|
| age (years) | 23.1 | 32.5 |
| female (%) | 47% | 79% |
| college (%) | 12% | 65% |
| USA (%) | 51% | 98% |

**Table 2**

37. In the tables, we are summarizing the post-randomization characteristics of the two groups by reporting the mean of each variable for each group. We then can see if the means between the two groups are substantially different.[41] In the first table (Table 1), the two groups have similar values, whereas in the second table (Table 2), the two groups depart quite a bit. For this reason, a reviewer would be likely not consider the study associated with the second table as having sufficiently high internal validity; the results may be quite biased and untrustworthy. The first demographic table, conversely, does not show any concerning patterns that could indicate biases.

---

39 These demographic tables are so central to the evaluation of the internal validity of a study that they are often casually referred to as "Table 1s" because they are – almost invariably – the very first table presented in a randomized trial.

40 Both tables are offered for explanation purposes and are not based on real data.

41 Note that there are statistical tools for assessing "substantially different" (e.g., the standardized mean difference), but the relevant example tables provide sufficient detail to make it clear for illustration purposes.

38. While the sample size of a study is informative of things like the precision of the estimate (e.g., the width of a confidence interval), it is the internal validity that is of primary importance because the precision of the estimate is not meaningful if it does not accurately measure what the hypothesis intends to test.[42] Having large sample sizes in correlational studies can be misleading because they can produce tight confidence intervals around incorrect estimates (i.e., not the intended causal effect).

39. Researchers often use confidence intervals to report both the estimate and how uncertain we are about the estimate. Below, I offer an idealized example of four confidence intervals produced under four different conditions: (i) small sample size, unbiased; (ii) small sample size, biased; (iii) large sample size, unbiased; (iv) large sample size, biased.




**Figure 01**

40. The dotted red line in Figure 01 indicates the "true value" that the study was targeting. The blue lines represent confidence intervals, with the blue dot indicating their associated point estimates. Tighter confidence intervals tend to come from studies with larger sample sizes. And it is often preferable to have a tight confidence interval (i.e., an interval that is shorter) because we can have

---

[42] Here, it is useful to note the difference between accuracy and precision in this context. To take a classic example, if you are playing darts, and you hit the bullseye three times in a row, then your throws are accurate *and* precise. But if you throw three times and hit the exact same spot with each dart, but that spot is far from the bullseye, then your throws are precise *but not accurate*. Accuracy is about hitting the intended targeted, and precision is about how consistently you can hit the same spot.

a more precise sense of the real value we are trying to estimate. But you can likely immediately intuit why a biased method is so deeply problematic for a study, as it produces estimates and confidence intervals that are not properly calibrated to the value it is targeting. Worse, studies with large sample sizes can produce confidence intervals that are tight, and thus give the impression that they are precise, but are in fact completely missing the targeted value (e.g., the fourth confidence interval (iv) in Figure **01** above). Having tighter confidence intervals around an inaccurate answer does not make the answer more accurate.

41. Reviewers also evaluate the external validity of the research—i.e., the extent to which it can be generalized to populations and circumstances other than those presented by the study conditions (Richardson et al. 2014; chapter 4). The internal validity of a study tracks whether the implemented methods can produce an unbiased estimate of the targeted relationship between variables. But, after evaluating the internal validity of a study, we then need to clarify the study's external validity – under what conditions the results of the study hold true. The external validity of a study tries to evaluate the extent to which a study's results can be generalized to other samples, under different conditions. For instance, the results of the study obviously apply to the people who participated in the study, but the key questions in assessing external validity are "Where else would we likely obtain similar results?" and "Under what conditions would we likely obtain similar results?"

42. If the external validity of a study is not assessed, then we have no way to assess how a study informs how the relationship holds across all people, across all times, across contexts. A study like that, with broad external validity, is rare. For example, studies like Sherman et al. (2016) and Sherman et al. (2018) that use fMRIs to study how "social media" impacts brain activity (technically: "regional energy expenditure") tend to have dubious external validity because (i) the use of "social media" during the study is not equivalent to how people normally use social media (because they are placed in an MRI machine), (ii) the people who sign up for such a study are not necessarily typical of the general

population, and (iii) the context in which they are measured (e.g., inside of a scientific facility, inside a big machine, inside a restricted space) differs from the normal context in which they might use social media.

43. There are basic standards for empirically evaluating external validity, and sophisticated and robust studies will include information to aid in that evaluation. Flow diagrams, for instance, report how data from participants were, or were not, used during the study.




**Figure 02**: An example CONSORT flow diagram from a randomized trial, which outlines reasons for loss to follow-up and provides count of participants for each step in the study. Taken from Meybohm et al. (2013).

44. A good flow diagram tracks the inclusion and exclusion of study participants from enrollment through to the analysis phase of the study, highlighting reasons for exclusions and dropouts along the way. These diagrams help reviewers understand who is and is not included in different parts of the analyses. In particular, reviewers look for patterns of exclusion that may bias the results or limit the study's generalizability.

45. Suppose a study has an ostensibly rigorous design (i.e., randomization into treatment and control groups, random sampling from a population, etc.). While the study might start off in a way that would give it the potential to be rigorous and to have high external validity, the study might suffer from issues like noncompliance with the randomization (e.g., a study participant refuses to take the treatment), dropout (e.g., researchers cannot collect information from someone who had a condition of interest), or missing data (e.g., researchers could collect some information from a person but not all types of information, or not accurate information). Each of these conditions could significantly affect a study's external validity – for example, they could yield data on a non-representative sample of the original study participants.

46. A flow diagram, or some other detailed notes, are required to understand if these dynamics are impacting the study, and the detailed counts and descriptions in a flow diagram are the way we usually communicate the information that is required to empirically assess these dynamics.

47. Careful review can change how we think about empirical evidence, as is shown by the below review of a pair of studies that examined the Theory of Reasoned Behavior.

48. The Theory of Reasoned Behavior links "upstream" beliefs held by an individual with their intentions, and ultimately, their behavior. The theory highlights the "upstream" components that determine intentions to act as evaluated beliefs (e.g., what are the perceived consequences of engaging in the behavior?), normative beliefs (e.g., what do my peers think about whether or not I should engage in this behavior?), attitude toward the behavior (e.g., what do I think about whether or not I should

engage in this behavior?), and subjective norms (e.g., how much do I care about how others will perceive me if they come to know I engage in the behavior?). Taken together, these beliefs and attitudes inform the intention to engage in the behavior.

49. This theory is reflected in the diagram below, where the arrows represent causal connections.




50. Through a series of studies, the progenitors of the theory, Ajzen & Fishbein, empirically evaluated their theory with experiments that looked at people's beliefs, attitudes, and intentions regarding several behaviors. Their studies were quite compelling, with the measured upstream components aligning with the theory.

51. But a careful review of their study design demonstrated a deep methodological flaw. In 1987 Richard Budd published a study interrogating how the measurements were being performed (Budd, 1987). Budd noticed that the survey questions being used started with the intended behavior (e.g., whether or not to smoke a cigarette) and then, subsequently, asked about the upstream components. Budd had a concern that the psychology of people, specifically that their drive to want to be consistent and coherent in their thinking and motivations, would have an impact on how they answered questions. So, for example, if a person answering the survey questions started off by saying that they intended to

quit smoking and then later they were asked about their attitudes toward smoking, their responses would tend to exhibit an intention to quit smoking more than if we had asked this person in the reverse order. To investigate this hypothesis, Budd ran a series of studies. One time, he ran study participants through a series of questions that started with the intended behavior first. For example, here is a mapping of the correlations he measured when he asked about quitting smoking and the associated upstream beliefs (note: not all connections were measured).




52. Notice the double stars on the correlations (i.e., the "**"); these are used to indicate highly statistically significant results.

53. Budd also ran a version of the measurements that merely changed the ordering of the questions (e.g., questions about the upstream components were asked first and only later in the survey were questions about the intended behavior asked). In this second way of measuring people, the significant correlations vanished. *See below*.




54. The results here, measured in a slightly different way, were fatal to the Theory of Reasoned Action.[43] The original correlations that looked so compatible with the theory turned out to be better explained by an entirely different psychological phenomenon—i.e., survey respondents attempting to keep their survey responses consistent and coherent.

55. I have discussed this line of research for two reasons. First, it is instructive to realize how people answering survey questions are modifying and adapting to the questions being asked. This is important because it should nuance how we interpret studies that rely on self-reported measures, as does much of the literature on social media. Second, this narrative helps to elucidate why adequate methodology reporting is critical for proper evaluation. Requiring proper documentation before rendering judgement can ostensibly seem pedantic, but it is in fact quite the opposite. There are many ways that studies can malfunction, or function quite differently than intended, and only by seeing what was actually implemented can we accurately interpret what the results mean.

[43] For a number of reasons, only a small portion of this research by Budd, the Theory of Reasoned Action, was later expanded and rebranded to the Theory of Planned Action.

Case: 26-5120, 08/24/2026, DktEntry: 6.2, Page 133 of 299

56. Reporting guidelines also play a crucial role in this scientific peer review and editorial process. Increasingly, journals require authors to submit completed reporting checklists, such as the Consolidated Standards of Reporting Trials (CONSORT) statement for randomized controlled trials, the Strengthening the Reporting of Observational Studies in Epidemiology (STROBE) statement for non-experimental research, and the Standards for Reporting Qualitative Research (SRQR) guidelines, alongside their manuscripts. Peer reviewers and editors are then encouraged – or even instructed – to evaluate the submissions with reference to these established standards. This systematic approach enables reviewers to identify omissions, unclear descriptions, or methodological weaknesses that could undermine the validity, reproducibility, or interpretability of a study.

57. By integrating reporting guidelines into the peer review process, journals foster higher-quality reporting, more rigorous (and consistent) editorial decisions, and ultimately, greater reliability and transparency in the published literature. The use of these checklists not only supports authors in preparing manuscripts but also upholds scientific integrity throughout the publication pipeline.

58. Unpublished literature and manuscripts posted on preprint archives are not peer-reviewed. As a result, non-peer-reviewed reports tend to have lower rigor, their reporting is more confusing, and they tend to be hard or impossible to evaluate because they do not provide the necessary empirical metrics to understand if the methods were properly implemented (e.g., demographic table, flow diagram).

59. Given the widespread adoption of these frameworks, it is important for both authors and reviewers to understand the specific reporting standards that apply to different study designs. CONSORT, STROBE, and SRQR were each developed to address the unique methodological

challenges of randomized trials, observational studies, and qualitative research, respectively.[44] Collectively, they facilitate critical appraisal and synthesis of scientific findings. To provide a comprehensive understanding of what needs to be reported for each type of study, I produced a table summarizing these three major guidelines, clarifying their specific requirements and areas of emphasis. The table is included in Exhibit A.

60. The table in Exhibit A makes it clear that there are many different considerations when reporting and evaluating research.

ii. Evaluation of the Meta Internal Documents Discussed in the Reports of State's Experts Do Not Report Sufficient Information to Evaluate The Validity of their Causal Claims

61. In my review of the Meta internal documents discussed by the Division's experts,[45] there is simply not enough evidence to sufficiently evaluate the robustness of a particular methodology for informing causal claims. Indeed, these documents all fall well short of meeting the standards necessary to properly evaluate research from a causation perspective.

62. Nearly all of these documents omit critical information, such as how they identified and enrolled participants, how they mitigated biases (if at all), how they selected questions to ask participants, and whether the studies suffered from significant attrition, amongst other considerations. Without this information, no outside expert can accurately evaluate any claims regarding the effects (if

---

44 Without standardization of reporting, it becomes very hard to perform aggregation and comparisons across studies. Meta-analyses and systematic reviews rely upon the ability to do detailed comparisons of methods across studies, measurements used across studies and then, if appropriate, combine results. Meta-analyses and systematic reviews play an important role in synthesizing the literature in an area and drawing conclusions about the overall conclusions emerging in the area of research.

45 Here, I note that an exhaustive description of every single document cited by the State's experts is not feasible. But my narrative review in this section adequately captures my analysis and understanding of those documents.

any) of social media use. Indeed, as a peer reviewer for high-quality academic journals, I can confidently conclude that none of these studies, as described, would pass muster – which is understandable, as they appear to be internal documents presumably intended for business purposes or market research, not rigorous academic endeavors.

63. The fact that internal documents generated by Meta employees do not contain this information is not surprising given that Meta's user experience and marketing research was presumably not intended or designed to assess scientific causation. I am not offering any opinion as to whether this user experience and marketing research was fit for other, non-causal purposes. But the State's experts' treatment of internal research done by Meta employees as fit for causal inference purposes is clearly unsupported and unreliable.

e. Many of the Studies the State's Experts Rely on Employ Unreliable Measurements and Reflect Significant Biases.

64. Having poor measurements of usage is extremely consequential because, if we do not have high-fidelity measurements of usage, then we do not have any real way of identifying a causal effect. Studies of social media use that merely ask how much time participants spent on social media exhibit this exact flaw—and Professor Twenge relies on such studies at length.[46]

65. For instance, one study that Twenge references,[47] Hunt et al. (2018),[48] possesses a critical design flaw. The researchers asked students about their mood, asked them to either decrease or not

[46] Twenge JM, Martin GN, Campbell WK. Decreases in psychological well-being among American adolescents after 2012 and links to screen time during the rise of smartphone technology. Emotion. 2018 Sep;18(6):765-80; Hisler GC, Hasler BP, Franzen PL, Clark DB, Twenge JM. Screen media use and sleep disturbance symptom severity in children. Sleep Health. 2020 Dec 1;6(6):731-42; Rothwell, J. (2023, October 13). Teens spend an average of 4.8 hours on social media per day. Gallup

[47] Declaration of Jean Twenge, ¶ 128.

[48] Hunt M, et al., No More FOMO: Limiting Social Media Decreases Loneliness and Depression, Journal of Social and Clinical Psychology, 2018, 37(10): 751-768.

change time on some (but not all) social media platforms, and then asked about their moods again. In this interviewing protocol, participants tended to confirm the study hypothesis as their experience (i.e., using social media less improved their mood).

66. However, the more accurate and objective measurement of their actual social media use (i.e., screenshots of usage, which was also included in the study) had no correlation with their well-being and thus defied the study's hypothesis. In this (more accurate) measurement plan, the researchers asked for contemporaneous screenshot reports of social media usage during the week (e.g., daily) and then asked the participants to report their mental health at the end of the week (e.g., the measurements were separated in time). In the Hunt et al. study, it was clear that merely changing how they measured social media usage changed the patterns of how usage correlated with self-reported mental health metrics.

67. Further, retrospective self-reports of social media use (e.g., "how many hours did you spend on social media last week") are what is typically measured in social media effects studies, but these measurements are demonstrably inaccurate. Therefore, these measures are not a valid way to look for effects. Hunt et al. (2018) demonstrates this inaccuracy. When individuals' actual usage of social media was considered (using an objective measure of their past 7-day use), the study found no correlation with depression, loneliness, anxiety, perceived social support, self-esteem, or well-being. However, when the researchers ran the same correlations with self-reported use, researchers found some marginal (but not significant) correlations.[49] The objective measurement found no correlation, while the self-reported measurement did. It is well-established that the effects of an exposure are properly measured based on the *actual exposure*, not a person's *self-report of their exposure*.

68. Self-reported time spent on social media also has several opportunities for bias. How, and where, the researcher asks the questions within a survey, in addition to the response options, highly

[49] Hunt M, et al., No More FOMO: Limiting Social Media Decreases Loneliness and Depression, Journal of Social and Clinical Psychology, 2018, 37(10): 751-768.

impact how participants respond to questions. First, in questions that require participants to recall and self-report a behavior (e.g., "How many hours did you use Facebook or Instagram"), it is hard to precisely aggregate the time spent doing the behavior when it is something that can happen sporadically throughout the day. For example, sedentary behavior, or sitting, is often not structured and purposive like exercise, which can make it even more difficult to remember the aggregate amount of time spent on sedentary activities.[50] Likewise, online behavior may happen in short, interstitial sessions that may be either overestimated or underestimated.

69. There is also social desirability bias, which is one of the most common biases found in survey research, where some people have a tendency to respond to questions in a manner that they believe will viewed more favorably, as opposed to providing their true opinions. Nederhof (1985) describes several ways of minimizing this in survey research, which rarely, if ever, appears to be deployed in either the correlational or experimental research Twenge reviewed.[51]

70. Order effects can also influence participants' responses, or even introduce demand characteristics.[52] If a participant has been asked about how much they think Instagram interferes with their life (a question that directs thoughts toward a negative valence to the Instagram behavior itself) and then, later, the participant is asked how much they think they use Instagram, the participant may underreport usage because they are aware that the survey researchers believe the use of the platform is

---

[50] Healy, G. N., Clark, B. K., Winkler, E. A. H., Gardiner, P. A., Brown, W. J., & Matthews, C. E. (2011). Measurement of adults' sedentary time in population based studies. American Journal of Preventive Medicine, 41, 216227.

[51] Nederhof, A. J. (1985). Methods of coping with social desirability bias: A review. European journal of social psychology, 15(3), 263-280.

[52] Strack, F. "Order Effects" in Survey Research: Activation and Information Functions of Preceding Questions. In Context Effects in Social and Psychological Research. 1992 Norbert Schwarz and Seymour Sudman (Eds.). Springer New York, New York, NY, 23–34.

bad, or the participant may overreport because they have been exposed to the idea that Instagram could negatively interfere with their life.

71. Other biases can come from illusory correlations, where the respondents already have an implicit belief about the association between two variables (e.g., they have heard social media can impact mood, and regardless of this being true or not, they respond accordingly).53 There is also the item-priming effect, which is when the positioning of a particular question (e.g., one question is asked first in the survey because the researchers believe it is a predictor variable) relative to another variable (e.g., another question is asked next because researchers believe it is an outcome variable) could imply a relationship to the respondent that does not exist between the constructs – and this relative ordering can produce artificial covariation.[54]

f. The State's Experts Have Failed to Show a Scientific Basis for Their Claim that Personalized Feeds Can Be Harmful to Adolescent Mental Health.

72. The State's experts advance the specific claim that personalized, recommendation-based social media feeds can be harmful to adolescent mental health. However, they offer minimal or no empirical evidence in support of this claim.

73. Professor Telzer, for example, concludes that "[r]epeated interaction with algorithmically curated feeds can reinforce maladaptive patterns of attention, comparison, and engagement, intensify existing vulnerabilities, and make it more difficult for adolescents to disengage," which in turn can cause further mental health issues.[55] The evidence she offers does not support this claim. For example,

[53] *See* Berman JS & Kenny DA. (1976). Correlational bias in observer ratings. Journal of Personality and Social Psychology, 34, 263–273, at 264.

[54] Salancik, G. R., & Pfeffer, J. (1977). An examination of the need-satisfaction models of job attitudes. Administrative Science Quarterly, 22, 427–456 (originally noted as "need-satisfaction" in job attitude assessments).

[55] Declaration of Eva Telzer, ¶¶ 301-302.

she discusses a study on "personalized recommended TikTok videos" that found that viewing such videos led to "significantly greater neural activation"[56]—but that study did not make findings supportive of Professor Telzer's broader claim. According to Professor Telzer,"[t]he fact that brain regions involved in salience detection … were more active during algorithmically curated content suggests that it is the algorithm's precision in selecting psychologically relevant stimuli that drives attention and engagement, not the content alone."[57] Part of her logic is that "[t]hey found that participants showed significantly greater neural activation when viewing TikTok videos that were targeted to them by the algorithm compared to generic, non-targeted videos even though both sets of videos came from the same platform and *could* feature similar content."[58]

74. But Professor Telzer conflates possibility with probability here. Even if these sets of videos "could" feature similar content, it is *highly* improbable that they did so. The entire purpose of the personalization algorithm is to provide content that a user is predicted to find relevant, interesting, etc. Taken further, this undermines the rest of Professor Telzer's logic. If a personalized algorithm and a general algorithm (i.e., an algorithm less directed to any individualized predictions) delivered the same content then there would be *no difference* in the user's experience. From the user's perspective, content delivery is the only differentiator; it is quite plausible that the underlying operation of the algorithm has no bearing on their experience outside of the content.

75. In the following paragraph Professor Telzer elaborates upon the findings from Su et al.'s TikTok study, saying:

> This [Su et al.'s findings] supports the argument that social media algorithms shape how the brain responds by

56 Declaration of Eva Telzer, ¶ 47.
57 Declaration of Eva Telzer, ¶ 47.
58 Declaration of Eva Telzer, ¶ 47.

> feeding users material that aligns with their emotional, social, and motivational states, reinforcing use through heightened neural activation. Thus, the brain is not responding merely to the intrinsic properties of a video, but to the way the algorithm selects and sequences that content, creating a tailored and neurobiologically engaging experience.[59]

However, the results of Su et al. do no such thing. The algorithm is conflated with the content in their study. There is no demonstration that there is a causal effect of the algorithm – that is, there is no support for Professor Telzer's claim that these algorithms "shape how the brain responds."[60] The correct interpretation of the Su et al. study is that it compared participants' reactions to the stimuli of content they wanted to see with their reactions to content they were less likely to want to see.

76. Professor Telzer also discusses the Kleemans et al. (2018) study, which she describes as studying "exposure to the effects of beauty and cosmetic surgery image filters – as recommended by the algorithms in the users' personalized feeds."[61] This description is misleading, as the article contains no discussion of such filters being recommended to users. While Telzer includes other discussions of studies relating to personalization of feeds,[62] none support the claims she makes that such feeds "reinforce maladaptive patterns of attention comparison, and engagement," let alone are responsible for adolescent mental health harms.

77. For instance, Kleemans et al. included a measure of social comparison tendency that used leading questions and employed a scale that promoted acquiescence bias (i.e., "strongly disagree" to

---

[59] Declaration of Eva Telzer, ¶ 48.

[60] Declaration of Eva Telzer, ¶ 48.

[61] Declaration of Eva Telzer, ¶ 58.

[62] *See, e.g.*, Declaration of Eva Telzer, ¶¶ 62, 64, 69, 99, 110, 135, 145, 149.

"strongly agree").[63] The Kleemans et al. study showed participants manipulated images that correlated with lower body image in those who were supposedly higher in social comparison tendencies. But it appears that the researchers conducted post hoc analyses to identify subgroups that might have larger correlations (i.e., they cobbled together hypotheses after looking at the data). And, importantly, the way the participants interacted with the study-manipulation was not equivalent to how adolescents naturally use social media (that is, this study does not have high generalizability).[64] Therefore, this study does not usefully inform how adolescents interact with social media.

78. Professor Twenge similarly claims that Facebook, Threads, and Instagram "use personalized feeds designed to maximize time spent," but she provides no citation or evidence for this claim.[65] She then asserts that personalized feeds can "serve up content that can directly contribute to anxiety, depression, self-harm, and eating disorders," offering in support only a single study by Griffiths et al. (2024) that reported that TikTok users with eating disorders were exposed to more exercise, diet, and "toxic eating disorder" videos than users without eating disorders.[66] Later, Professor Twenge asserts that "short-form video platforms" began "serving up content in a personalized feed," a "shift in format" that "may have impacted associations with depressive symptoms."[67] But again, the only evidence she offers for this claim is that in the five years from 2018-2023, social media use and video watching were

---

[63] *See, e.g.,* Kuru & Pasek 2016 ("These measures tend to conflate agreement with greater use of the social network site. Acquiescence bias could therefore be an important confound in studies of Facebook, potentially hindering researchers' attempts at understanding and situating the social experience and consequences of site use.")

[64] Observing a discrete set of still images and then immediately answering survey questions is not how social media is typically utilized. For example, it is possible to view images of others and, without intentional prodding from outsiders, not progress to a self-comparison (as participants were prompted to do).

[65] Declaration of Jean Twenge, ¶ 25; *see id* ¶ 46.

[66] Declaration of Jean Twenge, ¶ 47. Professor Twenge also says nothing to support equivalent claims about anxiety, depression, self-harm, or other social media services.

[67] Declaration of Jean Twenge, ¶ 97.

associated with depressive symptoms.[68] As discussed above, such associations are not evidence of any causal link or a valid basis for causal conclusions.

79. Professor Radesky also offers no empirical evidence of any connection between personalization algorithms and adolescent mental health. Her declaration contains various assertions about the fact that social media platforms employ personalized algorithms, which she says "can lead to minors being recommended accounts and posts that nudge them in new, unhealthy directions" and "include hazardous content."[69] She does not appear to cite any robust, *causally relevant* evidence in support of these assertions.[70] Finally, she asserts that the personalized feeds employed by social media platforms "contribute[] to extended and compulsive use,"[71] but she offers no evidence connecting personalized feeds – including those on Instagram, Threads, and Facebook – to adverse mental health outcomes in adolescents.

80. Professor Christakis asserts, without evidence, that the "capacity" of idealized images "to cause harm is greatly increased by the characteristics of social media, including personalized, algorithmically driven feeds."[72] He also offers the opinions that there is evidence of causal relationships between social media use and development of body dysmorphia, eating disorders, sleep disruption, and depressive symptoms, partly driven by personalized feeds but cites no studies or other evidence detailing any such relationship.[73] He also includes a section of his declaration devoted to discussing personalized algorithms but offers no robust empirical evidence in that section of a causal connection between these algorithms or personalized feeds and adolescent mental health concerns.[74]

---

68 Declaration of Jean Twenge, ¶ 97.
69 Declaration of Jenny Radesky, ¶ 95; *see also id.* ¶¶ 90, 94.
70 *See* Declaration of Jenny Radesky, ¶¶ 90, 94-97, 99.
71 Declaration of Jenny Radesky, ¶¶ 124, 127.
72 Declaration of Dimitri Christakis, ¶ 211.
73 Declaration of Dimitri Christakis, ¶¶ 215, 223, 233-234, 264.
74 Declaration of Dimitri Christakis, ¶¶ 174-175.

81. Professor Hilbert's declaration also does not offer evidence of any connection between personalized feeds and adolescent mental health. He cites one study, Guess et al. (2023), that compared what he refers to as "algorithmic feeds" (i.e., personalized feeds) with an alternative design – reverse chronological feeds – which found that those with personalized feeds spent 73% more time on Facebook compared to average US monthly users, whereas those with chronological feeds spent 37% more time compared to the average user (Guess et al., 2023).[75] But this study has limited relevance to the topic of personalized feeds and adolescent mental health. First, it was composed entirely of adult (over 18-years-old) participants, required informed consent (i.e., all participants knew that they were receiving the intervention), and those who provided consent were already, on average, more active than the average monthly user.[76] These factors reduce the study's reliability and relevance to the adolescent population. More importantly, the study made no findings about mental health.

82. Further, Guess et al. (2023) did not just analyze whether the intervention had any effects on engagement. It also evaluated, and found no effect on, political ideology, polarization, or political behavior (e.g. voting) as a result of the change in algorithm feed. Further, many participants provided with chronological feeds simply replaced their time on the platform with time on other platforms (e.g., those with chronological feeds replaced their Instagram time by increasing TikTok time by 36%, or 2.19 hours, and YouTube time by 20%, or 5.63 hours, and they substituted their Facebook visits by increasing visits to Reddit and YouTube during the study period.) Additionally, while participants who had access to an algorithmic feed did have elevated engagement levels compared to those with chronological feeds, the content they were exposed to was proportionally more from friends (57% friend content in algorithmic feed compared to 33% friend content in chronological feed). Therefore, while the

[75] Declaration of Martin Hilbert, ¶ 65.

[76] Guess et al., *How do social media feed algorithms affect attitudes and behavior in an election campaign?*, Science 381 (6656), DOI: 10.1126/science.abp9364.

study found that the algorithmic feed influenced engagement, it also appeared to lead to more friend-based content exposure. Importantly, this study does not provide any support for engagement time correlating with measured ideological or behavioral outcomes, a line that other experts have tried to draw. Finally, an errata was listed for the study in 2026, noting that participants in either condition could have been exposed to content from since-deleted accounts, but that views and engagement with those deleted, potentially untrustworthy, accounts were left out of the analysis. Therefore, it is impossible to determine if participants in either of the feed conditions shared more or less content from these sources.[77] This is a serious measurement error problem and foundational challenge to the study's validity.

83. Professor Hilbert also discusses Milli et al. (2025), stating:

> A more recent study became more specific and found that "relative to a reverse-chronological baseline, Twitter's engagement-based ranking algorithm amplifies emotionally charged, out-group hostile content that users say makes them feel worse about their political out-group. Furthermore, users do not prefer the political tweets selected by the algorithm, suggesting that the engagement-based algorithm underperforms in satisfying users' stated preferences."[78]

---

[77] Guess et al., *How do social media feed algorithms affect attitudes and behavior in an election campaign?*, Science 381 (6656), DOI: 10.1126/science.abp9364 (Erratum Statement posted March 19, 2026).

[78] Declaration of Martin Hilbert, ¶ 65. It is worth noting here that Instagram has already appeared to have incorporated the primary finding from Milli et al. that "greater integration of stated preferences into social media ranking algorithms could promote better online discourse." Milli, Smitha et al. "Engagement, user satisfaction, and the amplification of divisive content on social media." *PNAS nexus* vol. 4,3 pgaf062. 5 Mar. 2025, doi:10.1093/pnasnexus/pgaf062; *see, e.g.*, Introducing a new way to see and control your algorithm, Instagram

(continued…)

The relevance of this study to the topic of adolescent use of personalized feeds on Instagram or Facebook is substantially limited. First, this study involved Twitter, which is a different platform that has a different algorithm from any of Meta's services. Second, this study did not evaluate the effects of the algorithm on engagement, even though Hilbert purports to use this as a source supporting "engagement maximization." Third, this study did not compare the effects of algorithmic and chronological feeds on users' views and responses to content, as implied by Hilbert's description. The details of the article reveal the authors in fact scraped people's feeds and selected the top ten tweets in their algorithmic feeds, before querying Twitter's API for the concomitant top ten chronological tweets. The authors then shuffled the Tweets and asked participants about their reactions to the Tweets. This is not an ecologically valid comparison. Indeed, the authors themselves note this flaw, saying: "the effects of real-world social media use may not be accurately captured by averaging the impact of tweets shown to users. For instance, users may only be influenced by a few particularly notable tweets as they scroll through their timeline." Finally, the study involved *adult* Twitter users, and it is implausible that these people are representative of adolescents.[79]

84. In summary, none of the State's experts argue, with sufficient support, that there is any intrinsic problem with personalized feeds, nor do they offer any evidence of a link between personalized feeds and adverse outcomes. The State's experts may argue that certain personalized feeds may contain concerning content. However, the claim that feeds may sometimes contain concerning content is not an argument for why Meta's personalized feeds, as implemented on Facebook, Instagram, or Threads, are inherently harmful. The State's experts do not offer evidence that it would be impossible to structure

(December 10, 2025), https://about.instagram.com/blog/ announcements/reels-algorithm-control ("tell us which topics you want to see more or less of, and your recommendations will adapt.").

[79] Milli, Smitha et al. "Engagement, user satisfaction, and the amplification of divisive content on social media." *PNAS nexus* vol. 4,3 pgaf062. 5 Mar. 2025, doi:10.1093/pnasnexus/pgaf062.

personalized feeds so that they exclude or meaningfully limit concerning content. They instead rely on evidence, like the Su et al. study that Professor Telzer cites,[80] which does not distinguish content from the algorithm. This point is critical because if a personalized feed showed someone repeated pictures of cats, or to use an even more anodyne example, pictures of cardboard boxes, it is unlikely anyone would claim that the personalized feed was harmful. In my expert opinion, the State's experts offer no evidence that personalized feeds are, in themselves, harmful.

85. Independently of the assertions put forth by the State's experts, I have identified no study that attempts to isolate the effects, if any, of personalized feeds on mental health, much less any study that considers personalized feeds on Instagram, Threads, or Facebook in particular.

86. Nor do I think that studies about social media use in general (sometimes called a "black box" study because they do not look at the granular details of social media type, application, mode of usage, etc.) can tell us anything about the specific effects of personalized feeds, which are just one component of social media. But even supposing that analyses about "social media use" or time spent on social media *could* tell us anything about personalized feeds, my review of the literature does not show that social media use has any causal relationship to adolescent mental health.

## IV. THE "TIME SERIES" ANALYSES EMPLOYED BY PROFESSOR TWENGE ARE METHODOLOGICALLY UNSOUND AND SERIOUSLY MISSTATE THE ABILITY OF TIME SERIES DATA TO EMPIRICALLY ACHIEVE CAUSAL INFERENCES.

87. The misuse of time-series data by Professor Twenge in her declaration is worth mentioning. Professor Twenge writes that "[t]ime series studies are sometimes called 'natural experiments' as they can demonstrate the consequences of changes in the environment."[81] This is only

[80] Declaration of Eva Telzer, ¶¶ 47-49.

[81] Declaration of Jean Twenge, ¶ 21.

true in a very limited way. Natural experiments are observational studies that, in a technical sense, have properties that make the data behave almost as if it came from a randomized trial. Natural experiments are not everyday occurrences, but they do exist.

88. Professor Twenge also offers a misleading characterization of what is necessary for a time series analysis to achieve a rigorous causal inference when she says: "Time series studies can point toward causation if one factor occurs before another."[82] Here, Professor Twenge is citing a necessary condition for causal inference and leaving unsaid that there are many other conditions required.[83] If one variable temporally preceding another was sufficient to "cause" the variable that follows, then we could claim that Christmas cards cause Christmas.

## V. THE STATE'S EXPERTS FAIL TO ADEQUATELY DIFFERENTIATE CONTENT AND FEATURES IN THEIR ARGUMENTATION

89. Additionally, Professor Twenge does not offer reliable evidence that the alleged harms can be attributed to the design or features of social media apps, as differentiated from the content they deliver.

90. Because the studies Professor Twenge relies on fail to isolate the effects of features or content viewed by users, and consider only social media use as a whole, Professor Twenge's arguments do not inform the causal question at issue. Every empirical result Professor Twenge cites in her declaration is confounded with content. But there are critical differences between a social media platform itself, the features of that platform, and the content viewed on a social media platform (much of which is not produced or posted by the social media platform itself).

---

82 Declaration of Jean Twenge, ¶ 21.

83 A partial list of these assumptions: the stable unit treatment value assumption (including both the non-causal interference assumption and the unit identification property), a version of "ignorability" (e.g., strong "ignorability"), and the consistency assumption.

91. For example, in Twenge et al. (2018), the researchers asked, "how often do you . . . visit social networking sites?"[84] The study did not rigorously identify or measure the features (e.g., "likes," filters) and content viewed (e.g., penguins or politics). This makes it impossible to estimate, in isolation, the effects that (i) the features of a social media platform, or (ii) the content posted on a platform might have on adolescents. That is, without careful consideration, it is entirely reasonable to believe that any empirical conclusion reached about social media platforms is actually better attributed to the content being accessed on social media than to the features of social media.

92. Further, McComb's 2023 systematic review noted empirical findings that suggest content potentially moderated[85] the (small) correlation between social media and some psychological outcomes.[86] While this was not a causal finding (it was observational), the finding that content was a potential moderator of the effects means it is necessary to consider content as a confounder — or even a primary determinant of — users' experiences and reported mental health outcomes.

93. It is perhaps unsurprising that Professor Twenge cites relatively few studies that focused on specific features, as opposed to content on social media platforms. Very few empirical studies have attempted to analyze features, and those that do try to isolate the effects of features of social media services on mental health outcomes have to account for multiple dynamics that are in tension with each other.

---

[84] Twenge JM, Martin GN, Campbell WK. Decreases in psychological well-being among American adolescents after 2012 and links to screen time during the rise of smartphone technology. Emotion. 2018 Sep;18(6):765.

[85] The term "moderated" used in a technical sense here roughly meaning that the effect changed based on what content was being delivered.

[86] McComb CA, Vanman EJ, Tobin SJ. A meta-analysis of the effects of social media exposure to upward comparison targets on self-evaluations and emotions. Media Psychology. 2023 Sep 3;26(5):612-35.

94. Professor Christakis makes the same error in his reasoning about the empirical evidence. In his concept map of the hypothesized effects of social media on various outcomes,[87] there is no acknowledgement that *what* people are viewing on social media matters or has any effect on the outcomes. It is hard to imagine that viewing beauty products or "how-to" videos for fixing house appliances (both of which also occur on social media) would have the same impact on mental states.

95. Professor Christakis later contradicts his assertion that content is not part of the mental health argument. Professor Christakis notes how the platforms "utilize social contagion…a design aspect…that is related to problematic or addictive use."[88] But he references an internal Facebook study that showed positive *posts* induce more positive posting and vice versa. If this phenomenon of social contagion is indeed related to problematic use, which was not at all measured or implied by the Facebook study, then content – by Professor Christakis's reasoning –has a demonstrable effect on use and mental health.

96. My concern about content biasing results about the effect of the "medium of delivery" comes from prior research on the impact of television. Television research made the same mistake by initially conflating the medium of delivery with the content it delivered, but subsequent studies were able to isolate differential effects based on the content delivered. (These subsequent studies showed, for example, that having positive content can result in the "Sesame Street" effect, where children who watch the show demonstrate improved social reasoning and literacy and numeracy skills – Paulson 1974, Fisch et al. 1999, Mares & Pan 2013. Another example is the concept of "social modeling" – as described in Bandura et al. 1961 and Bandura et al. 1963 – where violence in cartoons can have substantially different effects depending on other content features such as: presence or absence of comedy, emotional

---

[87] Declaration of Dimitri Christakis, ¶ 22 (Figure 1)

[88] Declaration of Dimitri Christakis, ¶ 94.

priming, contextual elements of the story, perceived reality, perceived likeness, and graphicness – Kirsh 2006, Ellis & Sekyra 1972). Based on these empirical findings, studies which explore the effects of a media without separating and researcher-modifying the content viewed via the media are likely biased.

## VI. THE CLAIMS THAT THE STATES' EXPERTS MAKE ABOUT THE "ADDICTIVE" NATURE OF SOCIAL MEDIA USE ARE INCONSISTENT WITH SCIENTIFIC CONSENSUS AND FAIL TO SUPPORT THEIR CONCLUSIONS.

97. The State's experts' arguments about social media "addiction," of which Professor Telzer and Professor Christakis give the most extensive treatment, fail to support their claims. This is because (A) there is no recognized clinical disorder involving the use of social media, (B) the expert's attempts to analogize to known addictive disorders are empirically unsound, (C) the reports themselves are replete with deficient citations, and (D) their attempts to reframe the purported harm of "social media addiction," perhaps in recognition that no such clinical diagnosis exists, are incomplete, inconsistent, and rely on conclusory claims regarding time displacement harms.

### a. There Is No Recognized Addiction or Medical Disorder Involving the Use of Social Media.

98. The State's experts' reports repeatedly attempt to analogize social media use to other more empirically established pathways and vectors of addiction. But while all four experts emphasize how social media "addiction" is currently being interrogated as a concept in the academic literature, none fully acknowledge the salience of the fact that research on this topic *has not warranted inclusion as a diagnosis in any of the recent updates to the DSM-5*. The State's experts' attempts to circumvent this fact by referencing social media addiction as a "possible" pathology does not repair this fatal issue with their position.

99. In casual parlance, many people use the term "addiction" to label rather anodyne behaviors (e.g., "I am addicted to these brownies!"). But the formal clinical use of the term "addiction"

typically refers to diagnosable conditions that merit treatment in order to improve quality of life. This use of the term tracks how the DSM-5 organizes itself; by offering diagnostic criteria organized around observed symptoms in the population to identify and then offer treatment for people experiencing negative issues. The treatments are interventions, meant to bring about improvements, and thus require empirical investigations as well as careful definitions of who should be treated and then how those treatments would function, as well as measurements of the outcomes and how those are linked to improved quality of life. Therefore, we need to understand how to identify who to treat (and not treat), and then, we need to empirically investigate ways to positively intervene.

100. The technical definitions for what laypeople might call "addictions" can be sorted into "substance"-based (e.g., alcohol) and "behavior"-based (e.g., gambling). In the literature on substance-based addictions, there are references to biological bases, like specific receptors, that are activated by the use of a specific substance. Perhaps due to their grounding in discrete biological inputs, the debates around substance addictions are less pronounced. Behavioral addictions have, conversely, been subject to serious ontological conversations in the literature for decades (see, e.g., Lesieur & Blume 1993). The following, candidate behavioral conditions, from Grant et al. (2010), were roughly contemporaneous with the updates that gave rise to the DSM-5 (and were considered, to varying degrees, for inclusion):

- Excessive tanning (Kouroush et al. 2010)
- Love addiction (Reynaud 2010)
- Sex addiction (Garcia & Thibaut 2010)
- Pathologic skin picking (Odlaug & Grant 2010)

101. For these conditions, people noticed that some people were struggling psychologically in a manner that was correlated with particular behaviors. Researchers and clinicians then began a process to investigate if there were scientifically grounded causal pathways related to these psychological

struggles (see, e.g., Kouroush et al. 2010, which discusses how one proposed mechanism "addicting" people to tanning was through the effect of the particular light spectrum modifying brain chemistry).

102. When considering a disorder for inclusion in the DSM, experts review the following: (i) prevalence, which is the quantity of cases at a particular point in time , (ii) incidence, which is the number of new cases (often tabulated on an annual basis) of the pathology in the population, and (iii) whether there are causal relationships that have been identified and can be intervened upon to improve the mental health of affected individuals. (See First et al., 2023). The State's experts do not appear to systematically analyze social media as a candidate condition with respect to this framework. Nor, most importantly, does there appear to be any empirical evidence referenced to establish a causal relationship, which is required to purport the existence of the "addiction" that they describe. These experts are thoughtful and creative, so they articulate plausible theories for how causal relationships *might* exist. But they do not have the measured, rigorous, empirical evidence to assert that a tangible "social media addiction" exists, such that treatments could feasibly be developed and implemented.

103. The process by which conditions are entered into the DSM is thorough and evidence-driven, with multiple checkpoints to protect decisions from bias. The DSM-5-TR process (released in 2022) is comprehensive (First et al., 2023; APA, March 18, 2022) and includes a revision process overseen by the APA's Division of Research. The updates in the text revision, or "TR," were a results of the contribution of more than 200 content experts reviews of proposals and research since the previous DSM-IV. (APA, March 18, 2022). As noted, this comprehensive and thorough process did *not* yield a social media addiction diagnosis. The fact that no such disorder has appeared in the DSM-5-TR suggests that the evidence base is not strong enough and arguments for its inclusion would lead to rejection by experts in the field.

104. While I see a small discussion still occurring in the literature about excessive tanning,[89] the current version of the DSM does not list excessive tanning as a condition. I do not hold myself out to be an expert in the debate around excessive tanning and its classification as a behavioral addiction. But, as an expert in empirical causation (and how such causation informs treatment), I recognize that there are concerns about the causal relationship between the outcome we want to modify (that is, "mental distress") and the behavior (that is, excessive tanning). While clinicians and researchers may have noticed that some individuals who tan excessively experience mental distress, it could be that:

i. Those who are experiencing mental distress turn to tanning to attempt to relieve their distress (causal language for this: "reverse causality," in that the mental distress is causing people to tan, which is the opposite of the causal direction initially proposed).

ii. Those who are experiencing mental distress from another condition (e.g., body dysmorphia) are also prone to excessive tanning as another symptom of their other condition (e.g., body dysmorphia leads them to tan). [90]

iii. The mental distress is caused by the excessive tanning.

105. These are only a sampling of the underlying reasons why correlations might manifest (others include, but are not limited to, measurement error, selective measurement, censoring). Clinicians and researchers consider these dynamics when they try to determine if an observed correlation warrants inclusion in the DSM.

---

[89] When I used scholar.google.com to search, I see multiple papers investigating excessive tanning as a psychological condition since 2020. See, for example, Leip et al. 2025, McPherson et al. (2025), and LaMonte & Feldman (2025).

[90] The causal language for this is: "common cause," where both the outcome of mental distress and the proposed "treatment" of excessive tanning are actually both jointly caused by a third variable (e.g., body dysmorphia) and are not directly caused by each other.

Case: 26-5120, 08/24/2026, DktEntry: 6.2, Page 154 of 299

106. Identifying the direct causal pathway is critical because it facilitates effective treatment. Suppose that, after careful empirical research, it became clear that the mental distress is being caused by body dysmorphia, and the excessive tanning is also being caused by body dysmorphia. If that were the case, then the issue we should focus on, and intervene upon, is the body dysmorphia, because that would lead to improved mental health. In fact, under this hypothetical, it would be a distraction or wasted effort to "treat" the excessive tanning as if it were causing the mental distress because it is actually only correlated with the mental distress because it is being caused in parallel by the same dysmorphia.

107. I work through this hypothetical to help make it clear why the work done by the experts updating and revising the DSM hinges on *careful causal considerations*. And, at the same time, I use this example to help illustrate why it is reasonable to consider labeling a new condition for candidacy, but then ultimately to decide not to include that candidate condition in a published version of the DSM.

108. Even to the extent that the State's experts emphasize a potential for social media "addiction" to be established at a later time, such speculation is not meaningful. As I detailed above, the scientific community is always investigating possible conditions and new dynamics. Some of those conditions under consideration (e.g., excessive tanning) do not ever resolve into recognized mental health conditions, as they were originally proposed.

109. Even if some form of "social media addiction" were to be recognized in the future, the manner in which the State's experts discuss that concept still precludes proper causal analysis. This is because I did not see a single, coherent set of criteria for "social media addiction" that is agreed upon by the State's experts – indeed, my impression from reading these reports is that each expert, if asked, would provide different criteria for analyzing "social media addiction." Without precise criteria, causal analysis is not feasible.

b. <u>The State's Experts' Attempts to Analogize Social Media Use to Recognized Addictions Are Empirically Unsound.</u>

110. The State's experts attempt to circumvent the fact that "social media addiction" is not a recognized disorder by analogizing supposed properties of social media use to existing, more established pathologies.[91]

111. Efforts to conflate recognized disorders with social media use by emphasizing neurological correlations are not convincing. Although drugs of abuse and other natural rewards both affect the reward system, this does not mean their consequences are neurologically, psychiatrically, or behaviorally equivalent. Further, what is not referenced here is the intensity and speed (see, for example, Volkow & Blanco 2023; Schenk & Highgate 2021, Volkow & Morales 2015, Volkow et al. 1995) at which a drug increases dopamine in addition to other brain regions, which also is related to the strength of the connection between the drug and the reward. As explained by Volkow and Blanco (2023), "different classes of drugs increase dopamine via distinct molecular targets and mechanisms. . . with resultant differences in the magnitude and the speed of dopamine increase, which in turn are factors that contribute to a drug's addictive liability." (emphasis added). If the reward pathway itself was the only requirement for a diagnosable addiction to manifest, literally any dopamine inducing behavior (e.g., receiving a hug, watching the sun set, hanging out with a friend, playing with a puppy), could be addictive.

[91] See, for example, Declaration of Eva Telzer ¶ 66, ("Moreover, unpredictable rewards strengthen the habit, as the brain learns to anticipate that another rewarding post, notification, or streak might be just a few swipes away, mirroring the psychological mechanisms underlying behavioral addictions, such as gambling, where unpredictable rewards lead to compulsive behaviors via reward system activation in the brain); Declaration of Dimitri Christakis¶ 81 ("This explains in part why people with underlying mental health conditions, or particularly disturbing realities (e.g. challenging socioeconomic circumstances), are more susceptible to the allure of a flow state and at greater risk for becoming addicted to what provides it to them—whether this is alcohol, drugs, gambling, or social media."); Declaration of Jean Twenge ¶ 152 ("Analogy involves comparing two bodies of evidence, one of which has an established causal relationship, to infer causality in the other body of evidence. For social media, that might mean comparing social media addiction to drug or alcohol addiction.").

112. The State's experts obscure these issues by invoking sophisticated techniques, such as fMRI analysis. Telzer asserts, for instance, that, "[o]verall, fMRI evidence has indicated altered brain function among individuals addicted to social media, similar to that of individuals addicted to drugs."[92] But she fails to mention that fMRI scanning suffers from poor ecological validity. (And, even more foundationally, are merely correlational, a point I return to in the next paragraph.) Indeed, one of the studies that Telzer cites involves fMRI brain imaging while participants "completed an experimental task during which adolescents received social rewards and punishments."[93] Completing such activities in a loud, claustrophobic machine in an academic building is clearly not an environment that is generalizable to typical social media use. Professor Christakis similarly relies on such studies while failing to mention this deficiency.[94] This omission should necessarily call into question the reliability of any generalizable conclusions supported by such studies.

113. Further, fMRI brain scans comparing a region of interest activation for two different treatments reveals associations that are not obviously connected to any particularized human behaviors. One brain region, even multiple connected regions, can be "lit up" for many disparate things, both "good" and "bad." The so-called "reward center" could light up in response to seeing someone we care about, a negative trigger, or even falling.[95] There is no normative dataset (particularly one generalizable

---

[92] Declaration of Eva Telzer ¶ 173.

[93] Declaration of Eva Telzer ¶ 161.

[94] Declaration of Dimitri Christakis¶ 129 ("Moreover, a three-year longitudinal study of 6th and 7th grade students found changes in functional activation of the brain based on reported habitual checking of social media sites at baseline").

[95] Convergent Processing of Both Positive and Negative Motivational Signals by the VTA Dopamine Neuronal Populations, Wang DV, Tsien JZ (2011) Convergent Processing of Both Positive and Negative Motivational Signals by the VTA Dopamine Neuronal Populations. PLOS ONE 6(2): e17047. https://doi.org/10.1371/journal.pone.0017047

to the population level) mapping brain activation to tangible actions, so it is essentially impossible for studies to differentiate findings.

114. Perhaps implicitly acknowledging the weakness of their substance abuse analogies, the State's experts also repeatedly analogize to other behavioral disorders, like gambling addiction, to bolster their claims.[96]

115. But consider the criteria for Gambling Disorder, the only behavioral "addiction" (although this word is not used in the manual) in the DSM-5-TR and indeed the only disorder categorized by the substance itself. First, some of the criteria are obviously not relevant to social media use (e.g., chasing losses, committing illegal acts, or relying on others for financial bailouts). And further, social media use has not been empirically shown, for instance, to be something individuals lie to conceal or induce a "rush" in users. Gambling disorder, therefore, is not useful for analogizing to a supposed addiction to social media usage. This is because gambling disorders are (1) defined in a manner that makes them nonsensical as a template for social media addiction, and (2) have criteria that, as applied to social media use, have no empirical support.

c. Key Propositions in the State's Experts' Reports Are Undermined by Deficient Citations.

116. As an academic, I draw on my expertise to opine on issues and scholarship within my area of empirical causation. But adequately supporting any such propositions with quality citations, when appropriate, is a critical aspect of such discourse. In fact, deploying citations that are not supportive of the claim not only obscure the issues but also give false impressions of strength of argument where it does not exist. Close review of the reports submitted by State's Experts repeatedly demonstrate that adequate attention was not given to source quality, leading to numerous unsupported propositions.

---

[96] *See, e.g.,* Declaration of Dimitri Christakis ¶ 81; Declaration of Eva Telzer ¶ 66.

117. This lack of foundation appears in much of the research cited by the State's experts. For example, Professor Christakis argues that social media is an addiction, writing that:

> An essential feature of addiction is that it impedes activities of daily living such that one chooses to indulge in the activity or substance rather than other activities, for example working or socializing. Social media addiction can lead to diminished sleep and missed school. Attempts at reducing usage can cause anxiety, depression, and irritability and conflict when attempted by exogenous agents e.g. parents.[97]

But the referenced citation for the proposition about the negative effects of "reducing usage" is merely a descriptive study (titled, "Constant Companion: A Week in the Life of a Young Person's Smartphone Use").[98] The word "addiction" never appears in this non-peer-reviewed report outside of a few focus group responses.[99] Anxiety, depression, and irritability were not assessed in this report, and no intervention was made to reduce usage – which would be necessary for any causal assessment. However, Professor Christakis uses this (again, non-peer-reviewed) report to write about "social media addiction" and inappropriately extrapolates from this report, suggesting that reducing usage can cause anxiety and depression. Nowhere in that report is there an empirical foundation supporting that claim. This is an example of misleading assertions with non-empirical and sometimes only loosely connected citations that can give a reader the impression of evidence where there is none.

---

[97] Declaration of Dimitri Christakis, ¶ 148.

[98] Radesky J, Weeks HM, Schaller A, Robb M, Mann S, Lenhart, A: Common Sense. Constant Companion: A Week in the Life of a Young Person's Smartphone Use. 2023.

[99] In empirical research, quotes from focus groups are not considered as demonstrative of a rigorous causal effect.

118. Another claim from Professor Christakis is that:

> Infinite or Endless Scroll feature has also been linked to prolonging engagement at the cost of displacing children's developmental opportunities.[100]

This claim cites Munzer et al., 2022. But, as before, this study does not support the stated proposition. It does not mention infinite scroll or developmental opportunities. Instead, the researchers looked at child media use during COVID and the contextual and social-emotional factors that influenced their use. They found associations of child race/ethnicity, lower parenting stress, greater material hardship correlated with screen media use (not specific to social media) during the COVID-19 pandemic.

119. Later, Professor Christakis cites an undergraduate's senior thesis project for a class, which Professor Christakis mischaracterizes as "…test[ing] the effect that infinite scroll has on usage patterns."[101] He claims that the study "find[s] that infinite scroll increases usage of social media. And when considered in conjunction with the vast body of literature that shows increased usage of social media increases the risk of various harms, it provides support that infinite scroll is a feature that increases the risk of harm."[102] In fact, this undergraduate thesis project appears to have only tested the impact of a Chrome extension's effect on a (unclear and unspecified) number of subjects' ability to limit time on Facebook. Infinite scroll was never mentioned, tested, or studied in this undergraduate thesis project.

120. Similarly, Professor Radesky misrepresents findings from the National Academies of Sciences, Engineering, and Medicine (NASEM) Social Media and Adolescent Health report. Radesky writes that "[t]he adolescent health and wellbeing harms enumerated in th[e] [NASEM] . . . report

---

[100] Declaration of Dimitri Christakis, ¶ 186.

[101] Declaration of Dimitri Christakis, ¶ 188.

[102] Declaration of Dimitri Christakis, ¶ 188.

included: 1) negative social comparison, 2) displacement of healthy activities, 3) sleep disruption, 4) interference with attention and learning, and 5) overuse and problematic use, among others."[103] The NASEM report does no such thing. The report's only strong causal determination was that there is no evidence that population-level changes in mental health in adolescents are caused by social media use. When I read the NASEM report, I see that the statements about the five enumerated issues referenced in Professor Radesky's quotes are not causal determinations required to establish "harm." Instead, the NASEM report suggests that these are areas for future research – that there has not been sufficient evidence collected in these areas and they believe it is worth more resources to understand if there are connections. Agreeing that a dynamic is worth investigating is not equivalent to saying that dynamic is true and causal.

121. This non-exhaustive list illustrates the State's experts repeatedly support their propositions with citations are facially insufficient.

d. <u>The State's Experts Fail to Persuasively Reframe the Inquiry Beyond Addiction-Based Harm</u>

122. Professor Christakis, perhaps in acknowledgment that social media "addiction" does not have a viable clinical definition, attempts to move the goalposts as to the degree of use that can be characterized as harmful. He writes that "[o]ne need not meet criteria for a clinical diagnosis of addiction per se to be negatively impacted by a behavior,"[104] providing the below chart to illustrate his point.

---

[103] Declaration of Jenny Radesky, ¶ 44.

[104] Declaration of Dimitri Christakis, ¶ 150.




**Figure 03.**[105]

123. Referring to the chart in Figure 03, Professor Christakis writes "anything to the 'right' of casual usage (shown by red arrows) in the schema above increases the likelihood of untoward mental and physical health effects."[106] Disregarding that Professor Christakis does not elaborate on what he means here by "casual usage," he appears to be, essentially, reclassifying addiction as a specific harm (manifested through displacement of healthier behaviors) that is among a constellation of harms that are all caused by problematic use.[107]

124. But this reframing by Professor Christakis fails for a variety of reasons. First, Professor Christakis' own proposed model of harm is incomplete and internally inconsistent. He does not adequately define, for instance, what "healthy use," "habitual use," "problematic use," or "disordered use" would entail. He appears to dually propose that "addiction "is both on the extreme end of

105 Chart from Declaration of Dimitri Christakis, pg. 64.

106 Declaration of Dimitri Christakis ¶ 150.

107 See Declaration of Dimitri Christakis at ¶ 150 ("addiction is an identifiable harm resulting from the larger umbrella of problematic usage, which also causes anxiety, depression, and other mental health harms"); *id.* ¶ 149 ("[a]ddiction lies at one extreme of a usage and behavior continuum.").

"problematic" usage, which allegedly causes anxiety, depression, and other mental health harms, but then says that it is simultaneously a harm itself – conflating addiction as both a dependent and independent variable. If the definition of "problematic use" is that it causes harm then we are dealing with a tautology – the words themselves presuppose the thing that is to be proved. And if State's experts want to rely upon tautologies, then it is even more important for them to establish empirical counts of people who have experienced their claimed harm(s) and to empirically attribute this causally to social media use.

125. Additionally, his analogies to alcohol consumption (where even moderate drinking that does not constitute addiction is still harmful) are inapposite. Alcohol has well-documented physiological effects that are both severe and quantifiable, with an identified biological mechanism, not, as is the case with social media, mixed associational findings and no sufficient causal evidence. His model, further, still fails to address the fact that *there is no clinically recognized "social media addiction."*

126. More importantly, however, his (ostensible) primary mechanism of harm, time displacement, does not withstand scrutiny. Exercise studies aptly demonstrate why displacement theories are ineffective. Conceptually, if I exercise more this could be a positive thing – however if I exercise more instead of sleeping, this is not a positive thing for my health. This line of thinking implies that when measuring the impacts of decreasing social media use, you also must account for the benefits of what else they may be doing. We cannot automatically assume a net benefit or cost of the time spent on social media to health or well-being without accounting for how actively positive (or negative) the other behavior is. Professor Christakis elaborates on this later in his Report, noting that "time spent on digital devices comes at the expense of other activities (e.g. physical activity and sleep)."[108] But, as explained here, time on social media could just as easily be displacing more maladaptive behaviors.

---

[108] Declaration of Dimitri Christakis ¶ 290.

Without connecting the act of social media use, causally, to more explicit harm (e.g., depression), Professor Christakis' model is substantially weakened.

127. Finally, Professor Christakis later notes:

> "Addiction is a continuum that includes both habitual and problematic use of a substance or a display of behavior. While social media addiction, or digital addiction, not yet a formal psychiatric diagnosis in the American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders (APA DSM V), it is well-recognized within the scientific community, by multiple professional organizations, and by the industry itself that some individuals exhibit problematic use of social media sites.[109]

Professor Christakis does not show supportive empirical evidence of addiction of social media, instead relying upon rickety analogies and his proposed thresholds. Yet Professor Christakis conflates "problematic use" and "addiction" without any foundation. Notably, there are no validated metrics of either social media addiction or problematic use, as neither have expert consensus on the thresholds, operationalizations, or even empirical existence of such constructs. As a consequence, references by the State's experts to "validated metrics of problematic use" overstate the strength of the findings.

128. Professor Christakis attempts to address this oversight through the notion of "convergent validity":

> Validation of scales includes collecting normative data from a large and diverse sample of people and then

---

[109] Declaration of Dimitri Christakis, ¶ 13.

developing a clinical cutoff (the details of how that is done are beyond the scope of this declaration). One might rightly ask if this usage pattern constitutes pathology or simply enthusiastic usage. To test this, researchers assess "convergent validity." Specifically, how does the measured construct correlate with other outcomes we would expect it to predict. For example, we would predict that people with problematic social media usage would have increased risks of other mental health disorders (as is the case with other addictions). To that end, a recent metanalysis of 18 studies that assessed "problematic social media usage" with anxiety and depressive symptoms found a correlation of .348 for anxiety ("medium") and .273 for depressive symptoms (almost "medium").[110]

Respectfully, this is an incorrect description of convergent validity. Convergent validity is whether or not two measures designed to assess the same construct are correlated. For instance, if someone was trying to develop a new measurement for depression, convergent validity would entail comparing this to an existing (perhaps a gold-standard) metric, in order to test whether or not the new measurement is actually measuring depression (its intended target). It is not, as Professor Christakis ostensibly is claiming here, whether a new measure comports with hypothesized associations. Because problematic usage has no existing gold-standard metric (nor even a generally accepted definition or empirical construct), convergent validity is not useful. Here, this framing is therefore misleading because it

[110] Declaration of Dimitri Christakis, ¶ 126.

implies depression and this invented "social media problematic use" construct have a degree of equivalency, as if there is some established evidence of these constructs being synonymous.

129. For similar reasons, Professor Telzer's efforts to reframe the conversation fall short. Professor Telzer writes (citing no literature to support this proposition) that "[i]n the literature, problematic social media use (PSMU) is characterized by excessive, compulsive, and poorly regulated engagement with social media that interferes with daily functioning and well-being."[111] But again, if State's experts want to rely upon mere tautologies then empirical evidence (e.g., prevalence rates, incidence rates, causal attributions of harm) are the only thing that matters. In particular, arguments about time displacement need further elaboration. Even if someone is using social media at 2AM, social media is only displacing sleep if that individual would have been sleeping but-for social media. By merely assuming that "problematic social media use" is a thing in the real world it is quite possible, in my opinion it is likely that State's experts are pulling attention away from real causal factors that are bringing about harm to adolescents. The State's Experts' conclusory opinions about displacement do not appear to give adequate treatment to these nuances.

130. The State's Experts attempts to reframe the harm to circumvent the lack of clinical recognition of social media addiction, therefore, fails for numerous reasons.

## VII. THE STATE'S EXPERTS FAIL TO ADEQUATELY CONSIDER PLAUSIBLE ALTERNATIVE CAUSES FOR THE ALLEGED HARMS, RENDERING THEIR CAUSAL OPINIONS UNRELIABLE.

### a. The Analysis of Alternative Causes Included in Professor Twenge's Declaration Is Flawed.

---

[111] Declaration of Eva Telzer ¶ 157.

131. Three of the State's Experts make no effort to meaningfully engage in evaluating the validity of possible alternative causes for the increases in adolescent mental health issues. And while Professor Twenge (beginning at paragraph 61 of her declaration) does engage in this analysis, her reasoning is replete with errors that undermine her assessments. Below is a non-exhaustive list of such deficiencies.

132. *First*, Professor Twenge implies that individuals must have direct experiences in order for a causal relationship to exist,[112] which is in direct conflict with well-established tenets of social psychology.[113]

133. *Second*, Professor Twenge, when discussing how "willingness to admit to symptoms has steadily increased" but that such an increase "still cannot explain the trends" in adolescent mental health,[114] she employs the single cause fallacy. Her implication is that because this causal theory did not fit the curvilinear trend of adolescent depression over the past few decades, its explanatory usefulness for the relevant dependent variable (e.g., adolescent depression) is negligible. But for most outcomes of interest, there are many causes that bring about change in the outcome – not fitting the entire trendline does not completely preclude its salience.

134. *Third*, in paragraph 64 of her declaration, Professor Twenge asserts: "The evidence for the rise in adolescent depression presented . . . is from nationally representative surveys outside of health care settings. These surveys do not rely on physician diagnoses or physician screening. Thus, factors

---

112 *See*, *e.g.*, Declaration of Jean Twenge ¶ 61 ("a natural disaster affecting people in one area is unlikely to explain population-level changes in mental health.").

113 *See* Herrando C, Constantinides E. Emotional contagion: A brief overview and future directions. Frontiers in psychology. 2021 Jul 16;12:712606 (cites many, but not all, such theories); *see also* Bandura A. The self system in reciprocal determinism. American Psychologist, 1978: 33(4), 344–358. https://doi.org/10.1037/0003-066X.33.4.344; Bandura A. Social cognitive theory of self-regulation. Organizational Behavior and Human Decision Processes, 1991: 50(2), 248-287; Bandura A. Social cognitive theory: An agentic perspective. Annual Review of Psychology, 2001: 52(1), 1-26. 1

114 Declaration of Jean Twenge ¶ 63.

such as physicians' willingness to diagnose depression, greater physician screening for depression, or changes in diagnostic coding for depression cannot explain the increases in depression or depressive symptoms."[115]

135. This argument does not hold even under minimal scrutiny. Consider: (i) if an adolescent is diagnosed with depression by a physician then the adolescent is more likely to self-report depressive symptoms, (ii) if a physician screens an adolescent for depression then merely by asking them to recall and think about those symptoms will increases the chances the adolescent will notice, recall later, and be able to articulate these symptoms in a self-report, and (iii) even if an adolescent does not interact directly with a physician then in the adolescent's interactions with other people (peers, mentors, teachers) they may encounter people who have learned about depression and its symptoms from a physician and thus learn how to recognize and communicate about their own symptoms.

136. *Fourth,* much of Professor Twenge's analysis is premised on the assumption that alternative theories for the rise in mental health issues, if valid, would have similar degrees of explanatory value cross-nationally. Twenge repeatedly notes the commensurate increases in adolescent mental health harms in the UK and Australia, for instance, and claims that because plausible alternative causes do not exist in those comparison cases,[116] then they cannot explain the rise in reported adolescent mental health issues in the US.

137. But this argument (1) assumes a level of generalizability that may not exist, (2) does not consider confounding variables in comparators (i.e., Australia may have a unique reason for their increase in mental health harms that is completely independent of the US), and (3) does not explain whether (or why) *other* nations have or have been subject to these trends (i.e, the status of these cross-

[115] Declaration of Jean Twenge ¶ 64.
[116] Declaration of Jean Twenge ¶ 73 (opioids); *id*. ¶ 66 (school shootings).

national patterns in *all* applicable countries, not just her chosen comparators). Indeed, from a causal inference perspective, where isolation of the variable of interest is paramount to effective analysis, it is difficult to imagine a less helpful framing than this version of a cross-*national* comparison – typically, these kinds of analyses take great care and careful empirical analysis.

b. The State's Experts Fail to Address or Account for Various Plausible Alternative Causes of Adolescent Mental Health Issues

138. None of the State's experts (including Professor Twenge, whose analysis amounts to a perfunctory list of theories followed by summary dismissals) engage seriously with alternative theories for the rise in adolescent mental health issues — which undermines the validity of *their* preferred theory: social media.

139. *First*, the State's experts do not consider the Mental Health Parity and Addiction Equity Act of 2008 (MHPAEA), which was later reinforced by the Affordable Care Act (ACA) of 2010. These Acts constituted a landmark shift in U.S. health insurance law that required that mental health and substance use disorder treatment be covered, and they eliminated higher co-pays, visit limits, and coverage exclusions. Rigorous empirical studies (e.g., studies that use rigorous methods such as interrupted time series and difference-in-differences) show MHPAEA and the ACA significantly increased behavioral health service use and diagnoses, especially among adolescents — and especially those from low to middle income families.[117] It is plausible that, before these policies, diagnosis rates

[117] *See* Block EP, Xu H, Azocar F, Ettner SL. The Mental Health Parity and Addiction Equity Act evaluation study: child and adolescent behavioral health service expenditures and utilization. Health Economics. 2020 Dec;29(12):1533-48; Li X, Ma J. Does mental health parity encourage mental health utilization among children and adolescents? Evidence from the 2008 Mental Health Parity and Addiction Equity Act (MHPAEA). The Journal of Behavioral Health Services & Research. 2020 Jan;47(1):38-53; Breslau J, Han B, Lai J, Yu H. Impact of the Affordable Care Act Medicaid Expansion on Utilization of Mental Health Care. Med Care. Sep 2020;58(9):757-762. doi:10.1097/MLR.0000000000001373; Walter AW, Yuan Y, Cabral HJ. Mental Health Services Utilization and Expenditures Among Children Enrolled in Employer-Sponsored Health Plans. Pediatrics.

(continued…)

and care utilization may have been repressed, and these observed increases in adolescent mental health diagnoses and care utilization may reflect long-overdue access to treatment rather than deterioration in well-being. In fact, that line of reasoning was the contemporary justification for implementing these massive federal policy changes.[118]

140. *Second*, in 2013, the release of the DSM-5 introduced broader diagnostic criteria for Major Depressive Disorder, with changes such as recognizing "hopelessness" (even without sadness)[119] and including bereavement as possible reasons for depression. As a statistician, looking at the expansion criteria for a given diagnosis, I would expect a subsequent increase in diagnoses. Even without other changes in the rate of actual disorders, merely changing how we define and diagnose would change the prevalence of a disorder. Some scholars — notably people directly involved with establishing the new criteria — have noted the possibility of diagnostic inflation from the DSM-5 changes, noting potential overdiagnosis and medicalizing normal emotional responses.[120]

---

May 2017 May;139(Suppl 2):S127-S135. doi:10.1542/peds.2016-2786; Ali MM, Teich J, Woodward A, Han B. The Implications of the Affordable Care Act for Behavioral Health Services Utilization. Adm. Policy Ment Health. Jan 2016;43(1):11-22. doi:10.1007/s10488-014-0615-8; Frank RG, Beronio K, Glied SA. Behavioral health parity and the Affordable Care Act. Journal of social work in disability & rehabilitation. 2014 Apr 3;13(1-2):31-43. doi:10.1080/1536710X.2013.870512.

[118] Frommer F. (2008). After 12 years, Wellstone mental health parity act is law. MPR News. https://www.mprnews.org/story/2008/10/03/after-12-years-wellstone-mentalhealth-parity-act-is-law; Beronio K, Skopec L, Glied S. (2013). Affordable Care Act Expands Mental Health and Substance Use Disorder Benefits and Federal Parity Protections for 62 Million Americans. Office of the Assistant Secretary for Planning and Evaluation. https://aspe.hhs.gov/reports/affordable-care-act-expands-mental-health-substanceuse-disorder-benefits-federal-parity-protections-0; Frank RG, Beronio K, Glied SA. Behavioral health parity and the Affordable Care Act. Journal of social work in disability & rehabilitation. 2014 Apr 3;13(1-2):31-43. doi:10.1080/1536710X.2013.870512.

[119] Uher, R., Payne, J. L., Pavlova, B., & Perlis, R. H. Major depressive disorder in DSM-5: Implications for clinical practice and research of changes from DSM-IV. Depression and Anxiety, 2014; 31(6), 459–471.

[120] Dowrick, C., Frances, A., Medicalising unhappiness: new classification of depression risks more patients being put on drug treatment from which they will not benefit, BMJ 2013;347:f7140 doi: 10.1136/bmj.f7140.

(continued…)

141. *Third*, the State's experts fail to give adequate treatment to gun violence and school shootings as an alternative cause.

142. There is a clear increase in national, headline-grabbing school violence during the period we are considering. And it is not correct to think that an adolescent must be directly involved in a violent incident to be impacted; rather, such impacts likely also work indirectly, including through widespread media coverage, fear induced by school lockdown drills, and general exposure to gun violence in schools.[121] Studies such as Lowe & Galea (2017) found that mass shootings were associated with adverse psychological outcomes,[122] particularly in vulnerable groups, like girls and youths from low-socioeconomic backgrounds, *even when they were only indirectly exposed*. Additionally, by 2015–2016, 92% of schools had active shooter plans in place,[123] and even lockdown drills themselves can induce anxiety and depressive symptoms among students.[124]

---

Relatedly, two other contemporaneous changes impacted the landscape of adolescent mental health diagnoses and service access. First, in 2009, the United States Preventive Services Task Force (USPSTF) began recommending universal screening for Major Depressive Disorder in adolescents (12-18), citing evidence that early detection and treatment could be effective at preventing long term harms (Force USPST 2009). This was reinforced by the American Academy of Pediatrics, in addition to having a mandate for insurance coverage under the ACA (see Committee on Psychosocial Aspects Task Force 2009; National Research Council and Institute of Medicine 2009). These changes expanded access to mental health screening in both primary care and school settings, increasing opportunities for detection and diagnoses.

[121] Klemko R & Kaur A. Louisville bank shooter killed 5 people to highlight gun laws, police report shows. The Washington Post, Nov. 22, 2023; Rapa, L. J., Katsiyannis, A., Scott, S. N., & Durham, O. (2024). School shootings in the United States: 1997–2022. Pediatrics, 153(4), e2023064311; Schultz J, Cohen AM, Muschert GW, Flores de Apodaca R. Fatal school shootings and the epidemiological context of firearm mortality in the United States. Disaster Health. 2013; 1(2), 84–101. https://doi.org/10.4161/dish.26897. 3

[122] Lowe SR, & Galea S. The mental health consequences of mass shootings. Trauma, Violence, & Abuse, 2017; 18(1), 62-82.

[123] Musu, L., Zhang, A., Wang, K., Zhang, J., and Oudekerk, B.A. Indicators of School Crime and Safety: 2018 (NCES 2019-047/NCJ 252571). National Center for Education Statistics, U.S. Department of Education, and Bureau of Justice Statistics, Office of Justice Programs, U.S. Department of Justice. Washington, DC. Available at: https://nces.ed.gov/pubs2019/2019047.pdf

[124] Riggs A, Bergmann KR, Zagel AL. Self-reported anxiety and perception of safety following school lockdown drills among adolescent youth. J Sch Health. 2023 Dec.; 93: 1129- 1136. DOI: 10.1111/josh.13362; Moore-Petinak, N., Waselewski, M., Patterson, B. A., & Chang, T. Active shooter drills in the United States: A national study of youth experiences and perceptions. Journal of Adolescent Health, 2020; 67(4), 509-513.

143. Therefore, the direct, indirect, proximal, and distal impacts of school shooting incidents on adolescent mental health are a plausible argument for the increase in depression and mental health disorders. My assessment of the current empirical literature on the impact of school shootings on mental health in adolescents is that it is correlational and has not established definitive causal relationships. However, the literature on school shootings does have enough empirical evidence to warrant being addressed as a potential confounder in any serious analysis of national-level trends in mental health in adolescents.

## VIII. CONCLUSION

144. In summary, nothing in the State's expert declarations supports the claim that personalized feeds are, or can be, intrinsically harmful to adolescent mental health. None of the studies that they cite – or that I am otherwise aware of – rigorously address the effects of personalized feeds on adolescent mental health specifically. More broadly, the existing literature does not support even a higher-level conclusion that social media use, or time spent on social media, is a cause of adolescent mental health problems. No individual study supports that conclusion, nor does the literature as a whole. Further, the State's experts' declarations include other methodological flaws that limit their value—they overstate the ability of time series data to support causal conclusions, they refer to the "addictive" nature of social media without properly acknowledging that "social media addiction" is not a recognized phenomenon, and they fail to adequately account for alternative potential causes of adolescent mental health issues.

145. For all these reasons, the State's experts do not offer any evidence that personalized feeds are harmful to adolescents.



April 10, 2026

Michael Baiocchi, Ph.D.

Dated

**Appendix A**

Literature Review

I conducted a literature review to identify systematic reviews and meta-analyses of the empirical literature of social media service use and mental health in adolescents. The results of this literature review inform my opinions throughout this declaration. I summarize my key choices in constructing the review of the literature below.

**Systematic Reviews and Meta-Analysis**

*Eligibility Criteria*
Studies were eligible for inclusion if they meet the following criteria:
1. Included adolescent participants between (and including) age 10 and 19; and
1. Examined features of social media services
1. Were peer-reviewed systematic reviews or meta-analyses
2. Were published in 2019 or later

*Information Sources*
I conducted a preliminary search in PubMed. I conducted a secondary review in Google Scholar, as PubMed did not recognize some terms (e.g., "infinite scrolling").

*Search Strategy*
The search terms are listed below by category:

1. Population: "adolescent", "teen", "teenager", "youth", "minor", "young adult", "high school student", "middle school student"; "U.S." or "United States" to limit the scope
2. Social Media Platform: "social media", "Snap", "Snapchat", "social networking site", "Facebook", "Instagram", "TikTok"
    i. I removed YouTube and Twitter as the studies on these platforms did not appear to inform the litigation because the literature was using YouTube and Twitter as platforms to deliver intervention and not assessing the impact of YouTube and Twitter on people. Therefore, keeping these articles within the search would dilute the usefulness of the resulting set.
3. Features: "likes", "infinite scrolling", "photo enhancement"
4. Study design: "review" ("systematic review" or "meta-analysis")

To perform searches in the above-named databases, these terms were combined using Boolean operators (AND, OR). For instance, the combined search string used in PubMed was:

("adolescent" OR "teen" OR "teenager" OR "youth" OR "minor" OR "Young adult" OR "high school student" OR "middle school student") AND ("U.S." OR "United States") AND ("social media" OR "Facebook" OR "Instagram" OR "Snap" OR "Snapchat" OR "YouTube" OR "TikTok") AND ("likes" OR "infinite scrolling" OR "photo enhancement") AND (Review[Publication Type])

The results of this search can be seen in Appendix A, 54 citations.

**Manual Google Scholar Search**

To supplement the search for research specifically on features, I augmented the above search in two ways.

Because the PubMed search did not return some phrases (e.g., “infinite scrolling”) to ensure I was not missing any work on this feature, I conducted a manual search for infinite scrolling, social media, and adolescents using Google Scholar.

*Search Strategy*
The search terms were: adolescent AND infinite scrolling social media

I reviewed the first three pages (30 results) to identify the non-duplicate, primary sources on infinite scrolling. The results of this manual search are in Appendix C, 5 citations.

Second, I conducted a manual search for studies on features such as: likes, photo enhancements, social media, and adolescents, published any year, using Google Scholar.

*Search Strategy*
The search terms for these two searches were: 1) adolescent AND likes social media; 2) adolescent AND photo enhancement digital enhancement social media. The results from this manual search are also recorded in Appendix C, 18 citations.

**Renewed Search in Summer of 2025**

I refreshed this search in the summer of 2025 to ensure that I identified and analyzed any newly published materials in the preparation of this declaration. I employed the same steps outlined above in this Appendix A to identify any additional summative reviews. This renewed search led me to identify 5 additional systematic reviews and 1 additional narrative review. The results of this search are documented in Appendix D.

Case: 26-5120, 08/24/2026, DktEntry: 6.2, Page 174 of 299

**Appendix B**

Results of search for systematic reviews and meta-analyses.

| First Author | Title | Year |
|---|---|---|
| Alfredson QD | Systematic Review of Studies Measuring Social Media Use and Depression, Anxiety, and Psychological Distress in Adolescents: 2018-2020 | 2024 |
| Alonzo R | Interplay between social media use, sleep quality, and mental health in youth: A systematic review | 2021 |
| Arias-de la Torre J | Relationship Between Depression and the Use of Mobile Technologies and Social Media Among Adolescents: Umbrella Review | 2020 |
| Berger MN | Social Media Use and Health and Well-being of Lesbian, Gay, Bisexual, Transgender, and Queer Youth: Systematic Review | 2022 |
| Blake JA | Will restricting the age of access to social media reduce mental illness in Australian youth? | 2025 |
| Blanchard L | Associations between social media, adolescent mental health, and diet: A systematic review | 2023 |
| Chochol MD | Social Media and Anxiety in Youth: A Narrative Review and Clinical Update | 2023 |
| Choukas-Bradley S | The Perfect Storm: A Developmental-Sociocultural Framework for the Role of Social Media in Adolescent Girls' Body Image Concerns and Mental Health | 2022 |
| Course-Choi J | Social Media Use and Adolescent Well-Being: A Narrative Review of Longitudinal Studies | 2021 |
| Dibben GO | Adolescents' interactive electronic device use, sleep and mental health: a systematic review of prospective studies | 2023 |
| Dienlin T | The impact of digital technology use on adolescent well-being | 2020 |

| | | |
|---|---|---|
| Draženović M | Impact of Social Media Use on Mental Health within Adolescent and Student Populations during COVID-19 Pandemic: Review | 2023 |
| Fassi L | Social Media Use and Internalizing Symptoms in Clinical and Community Adolescent Samples: A Systematic Review and Meta-Analysis | 2024 |
| Ferguson CJ | Do social media experiments prove a link with mental health: A methodological and meta-analytic review. | 2025 |
| Ghai S | Lack of Sample Diversity in Research on Adolescent Depression and Social Media Use: A Scoping Review and Meta-Analysis | 2023 |
| Ghai S | Social media and adolescent well-being in the Global South | 2022 |
| Gioia F | Problematic Internet Use and Emotional Dysregulation Among Young People: A Literature Review | 2021 |
| Giumetti GW | Cyberbullying via social media and well-being | 2022 |
| Gupta C | Reviewing the Impact of Social Media on the Mental Health of Adolescents and Young Adults | 2022 |
| Hamilton JL | Reexamining Social Media and Socioemotional Well-Being Among Adolescents Through the Lens of the COVID-19 Pandemic: A Theoretical Review and Directions for Future Research | 2022 |
| Harness J | Social Media Use and Youth Mental Health: Intervention-Focused Future Directions | 2023 |
| Hossain MM | Global burden of mental health problems among children and adolescents during COVID-19 pandemic: An umbrella review | 2022 |
| Ivie EJ | A meta-analysis of the association between adolescent social media use and depressive symptoms | 2020 |
| Kerr B | Associations Between Social Media Use and Anxiety Among Adolescents: A Systematic Review Study | 2025 |
| Khalaf AM | The Impact of Social Media on the Mental Health of Adolescents and Young Adults: A Systematic Review | 2023 |

| | | |
|---|---|---|
| Kostyrka-Allchorne K | Review: Digital experiences and their impact on the lives of adolescents with pre-existing anxiety, depression, eating and nonsuicidal self-injury conditions - a systematic review | 2023 |
| Kruzan KP | Social media-based interventions for adolescent and young adult mental health: A scoping review | 2022 |
| Liu M | Time Spent on Social Media and Risk of Depression in Adolescents: A Dose-Response Meta-Analysis | 2022 |
| Liu Y | Digital intervention in improving the outcomes of mental health among LGBTQ+ youth: a systematic review | 2023 |
| Lund L | Electronic media use and sleep in children and adolescents in western countries: a systematic review | 2021 |
| Malloy J | Co-design of digital health interventions with young people: A scoping review | 2023 |
| Mazzeo SE | Mitigating Harms of Social Media for Adolescent Body Image and Eating Disorders: A Review | 2024 |
| McCashin D | Using TikTok for public and youth mental health - A systematic review and content analysis | 2023 |
| Moss C | Assessing the impact of Instagram use and deliberate self-harm in adolescents: A scoping review | 2023 |
| Odgers CL | Annual Research Review: Adolescent mental health in the digital age: facts, fears, and future directions | 2020 |
| Piteo EM | Review: Social networking sites and associations with depressive and anxiety symptoms in children and adolescents - a systematic review | 2020 |
| Popat A | Exploring adolescents' perspectives on social media and mental health and well-being - A qualitative literature review | 2023 |
| Prasad S | Anxiety and depression amongst youth as adverse effects of using social media : A Review | 2023 |

| | | |
|---|---|---|
| Pretorius C | Young People's Online Help-Seeking and Mental Health Difficulties: Systematic Narrative Review | 2019 |
| Rajkumar E | Prevalence of mental health problems among rural adolescents in India: A systematic review and meta-analysis | 2022 |
| Revranche M | Investigating the relationship between social media use and body image among adolescents: A systematic review | 2022 |
| Richards D | Impact of social media on the health of children and young people | 2015 |
| Ridout B | The Use of Social Networking Sites in Mental Health Interventions for Young People: Systematic Review | 2018 |
| Santos RMS | The associations between screen time and mental health in adolescents: a systematic review | 2023 |
| Saiphoo AN | A meta-analytic review of the relationship between social media use and body image disturbance. | 2019 |
| Shah J | New age technology and social media: adolescent psychosocial implications and the need for protective measures | 2019 |
| Shannon H | Problematic Social Media Use in Adolescents and Young Adults: Systematic Review and Meta-analysis | 2022 |
| Taquette SR | Causes and consequences of adolescent dating violence: a systematic review | 2019 |
| Throuvala MA | School-based Prevention for Adolescent Internet Addiction: Prevention is the Key. A Systematic Literature Review | 2019 |
| Valkenburg PM | Social media use and its impact on adolescent mental health: An umbrella review of the evidence | 2022 |
| Vidal C | Social media use and depression in adolescents: a scoping review | 2020 |
| Weigle PE | Social Media and Youth Mental Health | 2024 |
| Yu DJ | The Impact of Social Media Use on Sleep and Mental Health in Youth: a Scoping Review | 2024 |

Case: 26-5120, 08/24/2026, DktEntry: 6.2, Page 178 of 299

| | | |
|---|---|---|
| Zhou Z | Relationship between online social support and adolescents' mental health: A systematic review and meta-analysis | 2022 |

**Appendix C**

Expanded search for systematic reviews and meta-analysis.

| First Author | Title | Year |
|---|---|---|
| Ahmed | Social media use, mental health and sleep: A systematic review with meta-analyses. | 2024 |
| Ansari | Social media use and well-being: A systematic review and meta-analysis. | 2024 |
| Blanchard | Associations between social media, adolescent mental health, and diet: A systematic review. | 2023 |
| Brautsch | Digital media use and sleep in late adolescence and young adulthood: A systematic review. | 2023 |
| Casale | Has the prevalence of problematic social media use increased over the past seven years and since the start of the COVID-19 pandemic? A meta-analysis of the studies published since the development of the Bergen social media addiction scale. | 2023 |
| Cheng | A systematic review and meta-analysis of the relationship between youth drinking, self-posting of alcohol use and other social media engagement (2012–21). | 2024 |
| Fassi | Social media use and internalizing symptoms in clinical and community adolescent samples: A systematic review and meta-analysis. | 2024 |
| Ghai | Lack of sample diversity in research on adolescent depression and social media use: A scoping review and meta-analysis. | 2023 |
| Godard | Are active and passive social media use related to mental health, wellbeing, and social support outcomes? A meta-analysis of 141 studies. | 2024 |
| Khalaf | The impact of social media on the mental health of adolescents and young adults: a systematic review. | 2023 |

| | | |
|---|---|---|
| Khetawat | Examining the association between digital stress components and psychological wellbeing: a meta-analysis. | 2023 |
| Liu | Am I Happier Without You? Social Media Detox and Well-Being: A Meta-Analysis of Randomized Controlled Trials. | 2025 |
| Liu | The Impact of Social Media on Children's Mental Health: A Systematic Scoping Review. | 2024 |
| Marciano | Does social media use make us happy? A meta-analysis on social media and positive well-being outcomes. | 2024 |
| McGovern | The associations between photo-editing and body concerns among females: A systematic review. | 2022 |
| Meynadier | Lower mindfulness is associated with problematic social media use: A meta-analysis. | 2024 |
| Meynadier | Meta-analysis of associations between five-factor personality traits and problematic social media use. | 2024 |
| Plackett | The impact of social media use interventions on mental well-being: systematic review. | 2023 |
| Purba | Social media use and health risk behaviours in young people: systematic review and meta-analysis. | 2023 |
| Senekal | Social media and adolescent psychosocial development: a systematic review. | 2023 |
| Susi | Research review: Viewing self-harm images on the internet and social media platforms: Systematic review of the impact and associated psychological mechanisms. | 2023 |
| Wu | Social anxiety and problematic social media use: A systematic review and meta-analysis. | 2024 |
| Yigiter | The relationship between problematic social media use and depression: A meta-analysis study. | 2024 |

**Appendix D**

Updated literature search in July 2025.

| Author | Title | Year |
|---|---|---|
| Pazdur | Risk Factors for Problematic Social Media Use in Youth: A Systematic Review of Longitudinal Studies | 2025 |
| Agyapong-Opoku | Effects of social media use on youth and adolescent mental health: A scoping review of reviews | 2025 |
| Burgess | The Decline in Adolescents' Mental Health with the Rise of Social Media: A Narrative Review | 2025 |
| Li | The relationship between parental affective disorders and digital addiction in children and adolescents: A systematic review and meta-analysis | 2025 |
| Yusuf | The impact of Facebook content on mental health status among Generation Z: A literature review | 2025 |
| Rodríguez-Castaño | Is physical activity associated with lower risk of social network problematic use or addiction? A systematic review and meta-analysis. | 2025 |

**Appendix E**

Updated literature search from December 2025.

| First Author | Title | Year |
|---|---|---|
| Zhang | Social-Media-Based Mental Health Interventions: Meta-Analysis of Randomized Controlled Trials | 2025 |
| Bonfanti | The association between social comparison in social media, body image concerns and eating disorder symptoms: A systematic review and meta-analysis | 2025 |
| Lemahieu | The effects of social media abstinence on affective well-being and life satisfaction: a systematic review and meta-analysis | 2025 |
| Pérez-Wiesner | Effectiveness of Psychological Treatments for Problematic Use of Internet, Video Games, Social Media and Instant Messaging: A Systematic Review and Meta-Analysis | 2025 |
| Jing | Correlations between social media addiction and anxiety, depression, FoMO, loneliness and self-esteem among students: A systematic review and meta-analysis | 2025 |
| Arana-Rodriguez | Impact of health education on internet addiction, internet use time, and social media addiction in adolescents: a systematic review and meta-analysis | 2025 |
| Thrul | Social Media Reduction or Abstinence Interventions Are Providing Mental Health Benefits—Reanalysis of a Published Meta-Analysis | 2025 |
| Cabezas-Klinger | Associations Between Social Media Use and Mental Disorders in Adolescents and Young Adults: A Systematic Review and Meta-Analysis of Recent Evidence | 2025 |
| Cal-Herrera | The Impact of Social Media on Adolescents' Eating and Sleeping Habits: A Systematic Review and Meta-Analysis | 2025 |

# Exhibit A

**CONFIDENTIAL**

Summary table comparing three (CONSORT, STROBE, and SRQR) reporting standards.

| Reporting Criteria | | | |
|---|---|---|---|
| Section / Item | CONSORT 2025 | STROBE (Cross-sectional) | SRQR (Qualitative) |
| Title | 1a. Identification as a randomized trial | 1a. Study design in title or abstract | S1. Concise description of study topic/design; recommend stating qualitative approach/methods |
| Abstract | 1b. Structured summary of trial design, methods, results, conclusions | 1b. Balanced informative abstract | S2. Structured abstract: background, purpose, methods, results, conclusions |
| Trial Registration | 2. Name/number/URL/date of registry | - | - |
| Protocol & SAP Access | 3. Where trial protocol/statistical analysis plan can be accessed | - | - |
| Data Sharing / Open Science | 4. Where/how individual de-identified participant data, code, materials can be accessed | - | - |
| Funding | 5a. Sources of funding/support, role of funders | 22. Source of funding and role of funders | S21. Sources of funding and support; role of funders |
| Conflicts of Interest | 5b. Financial/other conflicts of interest of authors | - | S20. Potential sources of influence or perceived influence; management |

CONFIDENTIAL

| | | | |
|---|---|---|---|
| Background/ Rationale | 6. Scientific background and rationale | 2. Scientific background/rationale | S3. Description and significance of problem/phenomenon, review of relevant theory/empirical work, problem statement |
| Objectives / Research Question | 7. Specific objectives related to benefits/harms | 3. State specific objectives, any prespecified hypotheses | S4. Purpose of the study and specific objectives or questions |
| Patient/Public Involvement | 8. Details of patient or public involvement in design, conduct, reporting | - | - |
| Trial Design | 9. Description of trial design, type, allocation ratio, framework | 4. Present key elements of study design early | S5. Qualitative approach (e.g., ethnography, grounded theory, etc.), guiding theory, research paradigm, rationale |
| Changes to Protocol | 10. Important changes to trial after it commenced, incl. outcomes/analyses not prespecified | - | - |
| Setting/Context | 11. Settings and locations (countries, sites) | 5. Setting, locations, relevant dates | S7. Setting/site and salient contextual factors; rationale |
| Eligibility Criteria | 12a. Eligibility criteria for participants; 12b. (if applicable) for sites and individuals delivering interventions | 6a. Eligibility criteria, sources/methods of selection | S8. How/why participants, docs, events selected; saturation criteria; rationale |

**CONFIDENTIAL**

| | | | |
|---|---|---|---|
| Intervention & Comparator | 13. Sufficient details for replication, additional materials | 7. Define exposures, predictors, confounders, effect modifiers; 8. Data sources/methods | S10. Types of data collected, procedures (start/stop dates, iterative process, triangulation, adaptation), rationale |
| Outcomes | 14. Prespecified primary/secondary outcomes (measures, metrics, aggregation, timepoint) | 7. Clearly define all outcomes, exposures, predictors, confounders; give diagnostic criteria if applicable | S10. Types of data collected; S14. Data analysis process, paradigm/approach; rationale |
| Harms | 15. How harms/unintended effects were defined and assessed | Mentioned as applicable under variables | - |
| Sample Size | 16a. How determined, assumptions; 16b. Interim analyses, stopping guidelines | 10. Explain how study size was arrived at | S8. Sampling strategy, including rationale for saturation, why sampling ended |
| Randomization/ Sequence Gen. | 17a. Who generated random allocation sequence/method; 17b. Type of randomization, restrictions | - | - |
| Allocation Concealment | 18. Mechanism used, steps to conceal sequence | - | - |
| Implementation | 19. Who enrolled and assigned interventions, sequence access | | |
| Blinding | 20a. Who was blinded; 20b. How blinding achieved, similarity of interventions | - | - |

**CONFIDENTIAL**

| | | | |
|---|---|---|---|
| Statistical Methods/Analysis | 21a. Statistical methods for outcomes & harms; 21b. Definition of who is included in each analysis, group; 21c. Missing data; 21d. Other analyses | 11. How quantitative variables handled; 12. All statistical methods incl. confounding, subgroups/interactions, missing data, etc. | S14. Data analysis: process by which themes/inferences developed, researchers involved, approach; rationale |
| Techniques to Enhance Trustworthiness | - | - | S15. Techniques to enhance trustworthiness and credibility (e.g., member checking, audit trail, triangulation); rationale |
| Data Collection Instruments | - | - | S11. Description of data collection instruments (interview guides, questionnaires) and tech (recorders, etc.), how/if changed during study |
| Units of Study | - | - | S12. Number and relevant characteristics of participants, documents, events; level of participation |
| Data Processing | - | - | S13. Methods for processing data before/during analysis (transcription, management, security, coding, anonymization) |

CONFIDENTIAL

| | | | |
|---|---|---|---|
| Ethical Issues | - | - | S9. Documentation of IRB approval, participant consent, confidentiality and data security issues |
| Results—Participant Flow | 22a. Numbers randomized, received intended intervention, analyzed; 22b. Losses and exclusions after randomization with reasons | 13a. Numbers at each stage; 13b. Reasons for non-participation; 13c. Consider flow diagram | S12. Number/characteristics/participation level (could appear in results as well) |
| Recruitment | 23a. Dates for recruitment/follow-up; 23b. Why trial ended/stopped | 5. Dates for recruitment/exposure/follow-up/data collection | S10. Dates for data collection (start/stop) |
| Intervention Delivery | 24a. As actually administered (who delivered, adherence, fidelity); 24b. Concomitant care | - | S10. Data collection methods; S11. Instruments and tech |
| Baseline Data/Descriptive Data | 25. Baseline demographic and clinical characteristics for each group | 14a. Characteristics of participants (demographic, clinical, social, exposures, confounders); 14b. Missing data | S12. Number/relevant characteristics |
| Outcomes and Estimation | 26. For each outcome by group: n included, available data, result, effect size/CI, absolute/relative effects | 15. Outcome events or summary measures | S16. Main findings (interpretations, themes, models, integration with prior research or theory) |

CONFIDENTIAL

| | | | |
|---|---|---|---|
| Ancillary Analyses | 28. Other analyses performed (subgroup, sensitivity, pre/post-specified) | 17. Other analyses (subgroups, interactions, sensitivity) | S16. Synthesis and interpretation of results |
| Links to Empirical Data | - | - | S17. Evidence (e.g., quotes, field notes, excerpts, photos) to substantiate findings |
| Discussion / Interpretation | 29. Interpretation: consistent with results, balancing benefits/harms, considering other evidence | 18. Summarize key results vs. objectives; 20. Overall interpretation (with context) | S18. Integration with prior work, implications, transferability, contributions |
| Limitations | 30. Limitations: sources of bias, imprecision, generalizability, multiplicity of analyses | 19. Discuss limitations, potential bias/imprecision, direction/magnitude | S19. Trustworthiness and limitations of findings |
| Generalizability / Transferability | Now within limitations/discussion | 21. Discuss generalizability (external validity) | S18. Scope of application/transferability discussed |
| Researcher Characteristics & Reflexivity | - | - | S6. Researcher characteristics and reflexivity (attributes, experience, relationships, assumptions, effect on research and findings) |

# Exhibit B

**MICHAEL BAIOCCHI**
**April 10, 2026**

**List of Materials Considered**

Case Filings

1. Complaint, Meta Platforms, Inc. v. Rob Bonta, in his official capacity as Attorney General of California, Case No. 5:25-cv-09792 (Nov. 13, 2025).

2. Plaintiff Meta Platforms, Inc.'s Notice of Motion and Motion for Preliminary Injection, Meta Platforms, Inc. v. Rob Bonta, in his official capacity as Attorney General of California, Case No. 5:25-cv-09792 (Nov. 18, 2025).

3. Defendant's Omnibus Opposition to Plaintiffs' Motions for Preliminary Injunction, TikTok, Inc. v. Rob Bonta, in his official capacity as Attorney General of California, Case No. 5:25-cv-09789 (Feb. 20, 2026).

Expert Declarations

4. Declaration of Dr. Dimitri Christakis in Support of Defendants' Omnibus Opposition to Plaintiffs' Motions for Preliminary Injunction (Feb. 20, 2026), and materials cited therein.

5. Declaration of Dr. Martin Hilbert, PhD, in Support of Defendants' Omnibus Opposition to Plaintiffs' Motions for Preliminary Injunction (Feb. 20, 2026), and materials cited therein.

6. Declaration of Dr. Jenny S. Radesky, M.D. in Support of Defendants' Omnibus Opposition to Plaintiffs' Motions for Preliminary Injunction (Feb. 20, 2026), and materials cited therein.

7. Declaration of Dr. Eva H. Telzer, PhD in Support of Defendants' Omnibus Opposition to Plaintiffs' Motions for Preliminary Injunction (Feb. 20, 2026), and materials cited therein.

8. Declaration of Dr. Jean M. Twenge, PhD, in Support of Defendants' Omnibus Opposition to Plaintiffs' Motions for Preliminary Injunction (Feb. 20, 2026), and materials cited therein.

Fact Depositions

1. Transcript of Deposition of Kyle Andrews, dated November 19, 2024.

2. Transcript of Deposition of Kyle Andrews, dated November 20, 2024.

Case: 26-5120, 08/24/2026, DktEntry: 6.2, Page 192 of 299

3. Transcript of Deposition of Moira Burke, dated January 28, 2025.

4. Transcript of Deposition of Moira Burke, dated January 29, 2025.

5. Transcript of Deposition of Wendy Gross, dated January 28, 2025.

6. Transcript of Deposition of Kristin Hendrix, dated January 22, 2025.

7. Transcript of Deposition of Kristin Hendrix, dated January 23, 2025.

8. Transcript of Deposition of Kristin Hendrix, dated July 11, 2025.

9. Transcript of Deposition of Shilpa Mody, dated March 14, 2025.

Academic Articles


10. Agyapong-Opoku N, Agyapong-Opoku F, Greenshaw AJ. Effects of Social Media Use on Youth and Adolescent Mental Health: A Scoping Review of Reviews. Behavioral Sciences. 2025; 15(5):574. https://doi.org/10.3390/bs15050574.

11. Aikens RC, Chen JH, Baiocchi M, Simard JF. Feedback Loop Failure Modes in Medical Diagnosis: How Biases Can Emerge and Be Reinforced. Med Decis Making. Jul 2024;44(5):481-496. doi:10.1177/0272989X241248612.

12. Aikens RC, Greaves D, Baiocchi M. A pilot design for observational studies: Using abundant data thoughtfully. Stat Med. Dec 30 2020;39(30):4821-4840. doi:10.1002/sim.8754.

13. Aikens RC, Rigdon J, Lee J, et al. stratamatch: Prognostic Score Stratification Using a Pilot Design. R J. Jun 2021;13(1):614-630. doi:10.32614/RJ-2021-063.

14. Ajzen I & Fishbein M. The Influence of Attitudes on Behavior. In The Handbook Of Attitudes, Lawrence Erlbaum Associates, 2005; 173-221.

15. Ajzen, I. and Fishbein, M. (1980) Understanding Attitudes and Predicting Social Behavior. Prentice-Hall, Englewood Cliffs.

16. Ahmed O, Walsh EI, Dawel A, Alateeq, et al. Social media use, mental health and sleep: A systematic review with meta-analyses (2024). Journal of Affective Disorders 367: 701–712.

17. Alanazi, A. S., Alotaibi, Y. M., Alojan, J. S., & Zaidi, U. (2019). Effects of social media contents on the perception of body image. International Journal of Innovation, Creativity and Change, 9(7), 179–196.

18. Alfredson QD, Garimella A, Kerr B, Moreno MA. Systematic Review of Studies Measuring Social Media Use and Depression, Anxiety, and Psychological Distress in Adolescents: 2018-2020. WMJ. 2024;123(6):578-588.

19. Ali MM, Teich J, Woodward A, Han B. The Implications of the Affordable Care Act for Behavioral Health Services Utilization. Adm Policy Ment Health. Jan 2016;43(1):11-22. doi:10.1007/s10488-014-0615-8_.

20. Allcott H, Braghieri L, Eichmeyer S, Gentzkow M. The welfare effects of social media. American economic review. 2020 Mar 1;110(3):629-76.

21. Allcott H, Gentzkow M, Wittenbrink B, Cisneros JC, Crespo-Tenorio A, Dimmery D, Freelon D, González-Bailón S, Guess AM, Kim YM, Lazer D. The Effect of Deactivating Facebook and Instagram on Users' Emotional State. National Bureau of Economic Research; 2025 Apr 21.

22. Alonzo R, Hussain J, Stranges S, Anderson KK. Interplay between social media use, sleep quality, and mental health in youth: A systematic review. Sleep Med Rev. 2021 Apr;56:101414. doi: 10.1016/j.smrv.2020.101414.

23. American Academy of Pediatrics, Policy Statement—The Future of Pediatrics: Mental Health Competencies for Pediatric Primary Care, Pediatrics. 2009; doi:10.1542/peds.2009-1061.

24. American Psychiatric Association, APA Releases Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision (DSM-5-TR), Psychiatry (March 18, 2022), https://www.psychiatry.org/News-room/News-Releases/APA-Releases-Diagnostic-and-Statistical-Manual-of

25. Anderson IA & Wood W. Overestimates of social media addiction are common but costly. Scientific Reports, 2025; 15: 39388. https://doi.org/10.1038/s41598-025-27053-2

26. Andrews A, Killings X, Oddo E, Gastineau K, Hink A. Pediatric firearm injury mortality epidemiology. Pediatrics, 2022; 149(3).

27. Ansari S, Iqbal N, Asif R, Hashim M, Farooqi SR, Alimoradi Z. Social media use and well-being: A systematic review and meta-analysis (2024). Cyberpsychology, Behavior, and Social Networking, 27:10.

28. Arana-Rodríguez A, Garrido-Fernández A, Sánchez-Alcón M, Sánchez-Galloso J, Rodríguez-Domínguez ÁJ, García-Padilla FM. Impact of health education on internet addiction, internet use time, and social media addiction in adolescents: a systematic review and meta-analysis. BMC Public Health. 2025 Dec. doi: 10.1186/s12889-025-25793-4.

29. Arias-de la Torre J, Puigdomenech E, García X, Valderas JM, Eiroa-Orosa FJ, Fernández-Villa T, Molina AJ, Martín V, Serrano-Blanco A, Alonso J, Espallargues M. Relationship Between Depression and the Use of Mobile Technologies and Social Media Among Adolescents: Umbrella Review. J Med Internet Res. 2020 Aug 26;22(8):e16388. doi: 10.2196/16388.

30. Association AS. How to Stop Rape: Ground-Breaking Work by a Group of Stanford Statisticians Looks to Change the World. https://www.amstat.org/asa/files/pdfs/pressreleases/JSM2018-Baiocchi-Rape-Prevention.pdf.

31. Bailen NH, Green L, Thompson R. Understanding Emotion in Adolescents: A Review of Emotional Frequency, Intensity, Instability, and Clarity. Emotion Review, 2018; 11(1):63-73.

32. Baiocchi M, Cheng J, Small DS. Instrumental variable methods for causal inference. Stat Med. Jun 15 2014;33(13):2297-340. doi:10.1002/sim.6128.

33. Baiocchi M, Omondi B, Langat N, et al. A Behavior-Based Intervention That Prevents Sexual Assault: the Results of a Matched-Pairs, Cluster-Randomized Study in Nairobi, Kenya. Prev Sci. Oct 2017;18(7):818-827. doi:10.1007/s11121-016-0701-0.

34. Baiocchi M, Small DS, Lorch S, Rosenbaum PR. Building a Stronger Instrument in an Observational Study of Perinatal Care for Premature Infants. Journal of the American Statistical Association. 2010;105(492):1285-1296.

35. Bandura, A, Ross, D, & Ross, SA (1963). Imitation of film-mediated aggressive models. The Journal of Abnormal and Social Psychology, 66(1), 3.

36. Bandura A. The self system in reciprocal determinism. American Psychologist, 1978: 33(4), 344–358. https://doi.org/10.1037/0003-066X.33.4.344.

37. Bandura A. Social cognitive theory of self-regulation. Organizational Behavior and Human Decision Processes, 1991: 50(2), 248-287.

38. Bandura A. Social cognitive theory: An agentic perspective. Annual Review of Psychology, 2001: 52(1), 1-26.

39. Bandura, A, Ross, D & Ross, SA (1961). Transmission of aggression through imitation of aggressive models. Journal of Abnormal and Social Psychology, 63, 575-82.

40. Barayani G, Di Marco MH, Russ T, Didden C, Pearce J. The impact of neighbourhood crime on mental health: A systematic review and meta-analysis. Social Science & Medicine, 2021; 282:114106.

41. Barrett LF. Feelings or words? Understanding the content in self-report ratings of experienced emotion. J Pers Soc Psychol. 2004 Aug;87(2):266-81. doi: 10.1037/0022-3514.87.2.266

42. Beck A, et al. Screening for depression in children and adolescents: a protocol for a systematic review update. Systematic Review, 2021; 10:24.

43. Berger MN, Melody T, Marino JL, Lim MSC, Skinner SR. Social Media Use and Health and Well-being of Lesbian, Gay, Bisexual, Transgender, and Queer Youth: Systematic Review (2022). J Med Internet Res 2022;24(9):e38449. doi: 10.2196/38449.

44. Berman JS & Kenny DA. (1976). Correlational bias in observer ratings. Journal of Personality and Social Psychology, 34, 263–273.

45. Beronio K, Skopec L, Glied S. (2013). Affordable Care Act Expands Mental Health and Substance Use Disorder Benefits and Federal Parity Protections for 62 Million Americans. Office of Assistant Secrretary for Planning and Evaluation. https://aspe.hhs.gov/reports/affordable-care-act-expands-mental-health-substance-use-disorder-benefits-federal-parity-protections-0.

46. Bhui K, et al. Air quality and mental health: evidence, challenges and future directions. BJPsych Open, 2023; 9:e120, 1-12.

47. Biller AM, Meissner K, Winnebeck E, Zerbini G. School start times and academic achievement - A systematic review on grades and test scores. Sleep Medicine Reviews, 2022; 61.

48. Blake JA, Sourander A, Kato A, Scott JG. Will restricting the age of access to social media reduce mental illness in Australian youth? Aust N Z J Psychiatry. 2025 Mar;59(3):202-208. doi: 10.1177/00048674241308692.

49. Blanchard L, Conway-Moore K, Aguiar A, Önal F, Rutter H, Helleve A, Nwosu E, Falcone J, Savona N, Boyland E, Knai C. Associations between social media, adolescent mental health, and diet: A systematic review. Obes Rev. 2023 Sep;24 Suppl 2:e13631. doi: 10.1111/obr.13631.

50. Block EP, Xu H, Azocar F, Ettner SL. The mental health parity and addiction equity act evaluation study: child and adolescent behavioral health service expenditures and utilization. Health Economics. 2020 Dec;29(12):1533-48.

51. Boer M, Cosma A, Twenge JM, Inchley J, Jeriček Klanšček H, Stevens GWJM. National-Level Schoolwork Pressure, Family Structure, Internet Use, and Obesity as Drivers of Time Trends in Adolescent Psychological Complaints Between 2002 and 2018. J Youth Adolesc. 2023;52(10):2061-2077. doi:10.1007/s10964-023-01800-y.

52. Boer M, Stevens GWJM, Finkenauer C, de Looze, ME, van den Eijnden R. Social media use intensity, social media use problems, and mental health among adolescents: Investigating directionality and mediating processes, Computers in Human Behavior, 2021; 116: 106645.

53. Boers E, Afzali MH, Newton N, Conrod P. Association of Screen Time and Depression in Adolescence. JAMA Pediatr. 2019;173(9):853-859.

54. Bommersbach TJ, Olfson M, Rhee TG. Insufficient Sleep Among US Adolescents Across Behavioral Risk Groups. JAMA. Published online March 02, 2026. doi:10.1001/jama.2026.1417.

55. Bonfanti RC, Melchiori F, Teti A, Albano G, Raffard S, Rodgers R, Lo Coco G. The association between social comparison in social media, body image concerns and eating disorder symptoms: A systematic review and meta-analysis. Body Image. 2025 Mar;52:101841. doi: 10.1016/j.bodyim.2024.101841.

56. Bowers JM, Geller AC, Schofield E, Li Y, Hay JL. Indoor tanning trends among US adults, 2007–2018. American Journal of Public Health. 2020 Jun;110(6):823-8.

57. Bradburn N. "Question-Wording Effects in Surveys." In Question Framing and Response Consistency, ed. R. Hogarth, 65-76. San Francisco: Jossey-Bass. 1982.

58. Braghieri L, Levy, R, & Makarin, A. Social Media and Mental Health. American Economic Review, 2022; 112, 3660–3693.

59. Braghieri L, Levy R, Makarin A. Social Media and Mental Health - Online Appendix. pgs. 44-101. https://assets.aeaweb.org/asset-server/files/17593.pdf (last accessed June 21, 2025).

60. Brailovskaia J, Ströse F, Schillack H, Margraf J. Less Facebook use – More well-being and a healthier lifestyle? An experimental intervention study. Computers in Human Behavior, 2020; 108:106332.

61. Brailovskaia J, Delveaux J, John J, Wicker V, Noveski A, Kim S, Schillack H, Margraf J. Finding the "sweet spot" of smartphone use: Reduction or abstinence to increase wellbeing and healthy lifestyle?! An experimental intervention study. Journal of Experimental Psychology: Applied, 2023;29(1), 149–161.

62. Brailovskaia J, Swarlik VJ, Grethe GA, Schillack H, Margraf J. Experimental longitudinal evidence for causal role of social media use and physical activity in COVID-19 burden and mental health. Journal of Public Health, 2023;31(11), Article 11.

63. Brautsch L, Lund L, Andersen MM, Jennum PJ, Folker A, Andersen S. Digital media use and sleep in late adolescence and young adulthood: A systematic review (2023). Sleep Medicine Reviews, 2023;68: 101742.

64. Breslau J, Han B, Lai J, Yu H. Impact of the Affordable Care Act Medicaid Expansion on Utilization of Mental Health Care. Med Care. Sep 2020;58(9):757-762. doi:10.1097/MLR.0000000000001373.

65. Brown M, et al., After the Fort McMurray wildfire there are significant increases in mental health symptoms in grade 7–12 students compared to controls, BMC Psychiatry 2019; 19:18, https://doi.org/10.1186/s12888-018-2007-1.

66. Brown T, At Long Last, Mental Health Parity Bill Passes House & Senate!, Stanford Law School, Law and Biosciences Blog,Oct. 4, 2008.

67. Brown Z, Tiggemann M. A picture is worth a thousand words: The effect of viewing celebrity Instagram images with disclaimer and body positive captions on women's body image. Body image. 2020 Jun 1;33:190-8.

68. Budd, R. J. (1987). Response bias and the theory of reasoned action. Social Cognition, 5(2), 95–107. https://doi.org/10.1521/soco.1987.5.2.95.

69. Burgess K. The Decline in Adolescents' Mental Health with the Rise of Social Media: A Narrative Review. Creative Nursing. 2025; 31(2):119-126. doi:10.1177/10784535251328925

70. Burnell et al. Adolescents' social comparison on social media: Links with momentary self-evaluations. Affect Sci, 2024; 30;5(4), 295-299.

71. Burrow AL & Rainone N. How many likes did I get?: Purpose moderates links between positive social media feedback and self-esteem. Journal of Experimental Social Psychology, 2017; 69, 232-236.

72. Burstein B, Agostino H, Greenfield B. Suicidal Attempts and Ideation Among Children and Adolescents in US Emergency Departments, 2007-2015. JAMA Pediatr. 2019;173(6):598-600. doi:10.1001/jamapediatrics.2019.0464.

73. Cabezas-Klinger H, Fernandez-Daza HH, Mina-Paz Y. Associations Between Social Media Use and Mental Disorders in Adolescents and Young Adults: A Systematic Review and Meta-Analysis of Recent Evidence, Behav. Sci., 2025; 15(11): 1450; https://doi.org/10.3390/bs15111450.

74. Cairns R, Karanges EA, Wong A, et al. Trends in self-poisoning and psychotropic drug use in people aged 5-19 years: a population-based retrospective cohort study in Australia. BMJ Open. 2019;9(2):e026001. Published 2019 Feb 20. doi:10.1136/bmjopen-2018-026001.

75. Cal-Herrera A, Corbella-González A, Climent-Llinares S, Fernández-Rodríguez OI. The Impact of Social Media on Adolescents' Eating and Sleeping Habits: A Systematic Review and Meta-Analysis. Healthcare (Basel). 2025 Nov 8;13(22):2962. doi: 10.3390/healthcare13222962.

76. Capraro V, Globig L, Rausch Z, Rathje S, Wormley A, Olson J, Ross R, Aşçı S, Bouguettaya A, Burnell K, Choukas-Bradley S. A consensus statement on potential negative impacts of smartphone and social media use on adolescent mental health.

77. Canto J, Goldberg R, Hand M, Bonow R, Sopko G, Pepine C, Long T, Symptom Presentation of Women With Acute Conronary Syndromes, Arch Intern Med. 2007;167(22):2405-2413.

78. Casale S, Akbari M, Seydavi M, Bocci Benucci S, Fioravanti G. Has the prevalence of problematic social media use increased over the past seven years and since the start of the COVID-19 pandemic? A meta-analysis of the studies published since the development of the Bergen social media addiction scale (2023). Addictive Behaviors, 147: 107838.

79. Centers for Disease Control and Prevention, Youth Risk Behavior Survey, Data Summary & Trends Report: 2011-2021, US Department of Health and Human Services, 2023.

80. Charmaraman L, Lynch A, Richer A, Zhai E, Examining Early Adolescent Positive and Negative Social Technology Behaviors and Well-Being During the COVID-19 Pandemic, Technology, Mind, and Behavior, 2022.

81. Cheng B, Lim CCW, Rutherford BN, Huang S, Ashley DP, Johnson B, Chung J, Chan GCK, Coates JM, Gullo MJ, Connor JP. A systematic review and meta-analysis of the relationship between youth drinking, self-posting of alcohol use and other social media engagement (2012-21). Addiction. 2024 Jan; 119(1): 28-46. doi: 10.1111/add.16304.

82. Cheng, Q., Panayiotou, M., Reiten Finserås, T. Olesen Andersen, A.I., & Humphrey, N. (2025). How do social media use, gaming frequency, and internalizing symptoms predict each other over time in early-to-middle adolescence? Journal of Public Health: 1-11. https://doi.org/10.1093/pubmed/fdaf150

83. Chochol MD, Gandhi K, Croarkin PE. Social Media and Anxiety in Youth: A Narrative Review and Clinical Update. Child Adolesc Psychiatr Clin N Am. 2023 Jul;32(3):613-630. doi: 10.1016/j.chc.2023.02.004.

84. Choukas-Bradley S, Roberts SR, Maheux AJ, Nesi J. The Perfect Storm: A Developmental-Sociocultural Framework for the Role of Social Media in Adolescent Girls' Body Image Concerns and Mental Health. Clin Child Fam Psychol Rev. 2022 Dec;25(4):681-701. doi: 10.1007/s10567-022-00404-5.

85. Chu J, Ganson KT, Testa A, Al-Shoaibi AA, Jackson DB, Rodgers RF, He J, Baker FC, Nagata JM. Screen time, problematic screen use, and eating disorder symptoms among early adolescents: findings from the Adolescent Brain Cognitive Development (ABCD) Study. Eating and Weight Disorders-Studies on Anorexia, Bulimia and Obesity. 2024 Sep 4;29(1):57.

86. Cole DA, Peeke L, Dolezal S, Murray N, Canzoniero A., A longitudinal study of negative affect and self-perceived competence in young adolescents. J Pers Soc Psychol. 1999, Oct; 77(4):851-62. doi:10.1037//0022-3514.77.4.851.

87. Coley R, Sims J, Dearing E, Spielvogel B, Locating Economic Risks for Adolescent Mental and Behavioral Health: Poverty and Affluence in Families, Neighborhoods, and Schools, Child Development, March/April 2018; 89(2):360–369.

88. Collis A, & Eggers F. Effects of restricting social media usage on wellbeing and performance: A randomized control trial among students. PloS one, 2022; 17(8), e0272416.

89. Corneille, O., & Lush, P. Sixty years after Orne's American psychologist article: A conceptual framework for subjective experiences elicited by demand characteristics. Personality and Social Psychology Review, 27(1), 83-101. 2023.

90. Corredor-Waldron A, Currie J. To What Extent Are Trends in Teen Mental Health Driven by Changes in Reporting? The Example of Suicide-Related Hospital Visits. J of Human Resources. 2024;59(2):S14-S40. doi:10.3368/jhr.0423-12854R1.

91. Cosgrove L, Morrill Z, Yusif M, Vaswani A, Cathcart S, Troeger R and Karter JM. Drivers of and Solutions for the Overuse of Antidepressant Medication in Pediatric Populations. Front. Psychiatry 2020; 11:17. doi: 10.3389/fpsyt.2020.00017.

92. Cox DR, Reid N. The theory of the design of experiments. Chapman and Hall/CRC; 2000 Jun 6.

93. Coyne MS, Hurst LJ, Dyer JW, Hunt Q, Schvanaveldt E, Brown S, & Jones G. Suicide risk in emerging adulthood: Associations with screen time over 10 years. Journal of Youth and Adolescence, 2021; 50(12), 2324–2338.

94. Course-Choi J, Hammond L. Social Media Use and Adolescent Well-Being: A Narrative Review of Longitudinal Studies (2021). Cyberpsychology, Behavior, and Social Networking (2020) DOI: 10.1089/cyber.2020.0020.

95. Crowley SJ, Acebo C, Fallone G, & Carskadon M. Estimating dim light melatonin onset (DLMO) phase in adolescents using summer or school-year sleep/wake schedules. Sleep. 2006; 29(12):1632-41.

96. Crowley S, Wolfson A, Tarokh L, & Carskadon M. An Update on Adolescent Sleep: New Evidence Informing the Perfect Storm Model. J. Adolescent, 2018;67: 55-65.

97. Cybulski L, Ashcroft DM, Carr MJ, et al. Temporal trends in annual incidence rates for psychiatric disorders and self-harm among children and adolescents in the UK, 2003-2018. BMC Psychiatry. 2021;21(1):229. Published 2021 May 3. doi:10.1186/s12888-021-03235-w.

98. Davis CG, Goldfield GS. Limiting social media use decreases depression, anxiety, and fear of missing out in youth with emotional distress: A randomized controlled trial. Psychology of Popular Media. 2024 Apr 22.

99. Deters FG & Mehl MR. Does Posting Facebook Status Updates Increase or Decrease Loneliness? An Online Social Networking Experiment. Social Psychological & Personality Science, 2013; 4:579–586

100. Díaz Y, Hessel P, Avendano M, & Evans-Lacko S. Multidimensional poverty and adolescent mental health: Unpacking the relationship. Social Science & Medicine, 2022; 311, 115324.

101. Dibben GO, Martin A, Shore CB, Johnstone A, McMellon C, Palmer V, Pugmire J, Riddell J, Skivington K, Wells V, McDaid L, Simpson SA. Adolescents' interactive electronic device use, sleep and mental health: a systematic review of prospective studies. J Sleep Res. 2023 Oct;32(5):e13899. doi: 10.1111/jsr.13899.

102. Diener, Ed et al. "Personality, culture, and subjective well-being: emotional and cognitive evaluations of life." Annual review of psychology vol. 54 (2003): 403-25. doi:10.1146/annurev.psych.54.101601.145056.

103. Dienlin T, Johannes N. The impact of digital technology use on adolescent well-being. Dialogues Clin Neurosci. 2020 Jun;22(2):135-142. doi: 10.31887/DCNS.2020.22.2/tdienlin.

104. Dierckens M, et al. National-Level Wealth Inequality and Socioeconomic Inequality in Adolescent Mental Well-Being: A Time Series Analysis of 17 Countries. Journal of Adolescent Health, 2020; S21-S28.

105. Dowrick, C., Frances, A., Medicalising unhappiness: new classification of depression risks more patients being put on drug treatment from which they will not benefit, BMJ 2013;347:f7140 doi: 10.1136/bmj.f7140.

106. Draženović M, Vukušić Rukavina T, Machala Poplašen L. Impact of Social Media Use on Mental Health within Adolescent and Student Populations during COVID-19 Pandemic: Review. Int J Environ Res Public Health. 2023 Feb 15;20(4):3392. doi: 10.3390/ijerph20043392.

Case: 26-5120, 08/24/2026, DktEntry: 6.2, Page 201 of 299


107. Dreier, M. J., Horne, S. J., Kleiman, E. M., & Hamilton, J. L. (2025). Social Media as a Behavioral Activation Tool, Conferring Possible Protection Against Suicidal Thoughts Among Adolescents. Journal of Clinical Child & Adolescent Psychology, 1-15.

108. Droutman, Vita et al. Revisiting the role of the insula in addiction. Trends in cognitive sciences, 2015; 19(7): 414-20. doi:10.1016/j.tics.2015.05.005

109. Ellis GT, Sekyra III F. The effect of aggressive cartoons on the behavior of first grade children. The Journal of Psychology. 1972 May 1;81(1):37-43.

110. Fassi L, Thomas K, Parry DA, Leyland-Craggs A, Ford TJ, Orben A. Social Media Use and Internalizing Symptoms in Clinical and Community Adolescent Samples: A Systematic Review and Meta-Analysis. JAMA Pediatr. 2024 Aug 1;178(8):814-822. doi: 10.1001/jamapediatrics.2024.2078.

111. Faulhaber, M., Lee, J., Gentile, D., The Effect of Self-Monitoring Limited Social Media Use on Psychological Well-Being, Technology, Mind and Behavior, 2023; 4(2).

112. Faverio M & Sidoti O. (2024). Teens, social media and technology 2024. Pew Research Center.

113. Ferguson CJ. Do social media experiments prove a link with mental health: A methodological and meta-analytic review. Psychology of Popular Media. 2025 Apr;14(2):201.

114. Ferguson CJ. Links between social media use and mental wellness in youth are an artifact of other factors: implications for public policy and meta-analysis. Current Psychology, 2026; 45: 573. https://doi.org/10.1007/s12144-026-09205-3.

115. Fioravanti G, Benucci SB, Ceragioli G, Casale S. How the Exposure to Beauty Ideals on Social Networking Sites Influences Body Image: A Systematic Review of Experimental Studies. Adolescent Research Review, 2022; 7(7). DOI:10.1007/s40894-022-00179-4.

116. First MB, Clarke DE, Yousif L, Eng AM, Gogtay N, Appelbaum PS. DSM-5-TR: Rationale, Process, and Overview of Changes, Psychiatric Services, 2022; 74(8). https://doi.org/10.1176/appi.ps.20220334.

117. Fisch SM, Truglio RT, Cole CF. The impact of Sesame Street on preschool children: A review and synthesis of 30 years' research. Media Psychology. 1999 Jun 1;1(2):165-90.

118. Force USPST. Screening and treatment for major depressive disorder in children and adolescents: US Preventive Services Task Force Recommendation Statement. Pediatrics. Apr 2009;123(4):1223-8. doi:10.1542/peds.2008-2381_.

119. Frank RG, Beronio K, Glied SA. Behavioral health parity and the Affordable Care Act. Journal of social work in disability & rehabilitation. 2014 Apr 3;13(1-2):31-43. doi:10.1080/1536710X.2013.870512.

120. Frances AJ, Widiger T. Psychiatric diagnosis: lessons from the DSM-IV past and cautions for the DSM-5 future. Annu Rev Clin Psychol. 2012;8:109-30. doi:10.1146/annurev-clinpsy-032511-143102.

121. Freedman M, Burke M. Social Media and Sleep Duration--There Is a Connection!, Contemporary Pediatrics, 2018.

122. French MT, Maclean J, & Popovici I. Health Insurance Mandates and Traffic Fatalities: Evidence from State Substance Use Disorder Parity Laws. American Journal of Health Economics, 2024; 10(3).

123. Friedman S, Xu H, Harwood JM, Azocar F, Hurley B, & Ettner S. The Mental Health Parity and Addiction Equity Act evaluation study: Impact on specialty behavioral healthcare utilization and spending among enrollees with substance use disorders. J. Subst. Abuse Treat, 2017; 80: 67-78.

124. Frommer F. (2008). After 12 years, Wellstone mental health parity act is law. MPR News. https://www.mprnews.org/story/2008/10/03/after-12-years-wellstone-mental-health-parity-act-is-law.

125. Fuligni AJ, Bai S, Krull J, & Gonzales N. Individual Differences in Optimum Sleep for Daily Mood During Adolescence. J. Clin. Child Adolesc. Psychol., 2019; 48(3), 469-479.

126. Fulton S, Décarie-Spain L, Fioramonti X, Guiard B, & Nakajima S. The menace of obesity to depression and anxiety prevalence. Trends in Endocrinology & Metabolism, 2021; 33(1).

127. Gabrielle T, Sonne M, Indolo N, The Impact of Social Media on Adolescent Mental Health: A Meta-Analysis, Scientia Psychiatrica, Jul. 2024.

128. Gajdics J & Jagodics B. Mobile Phones in Schools: With or Without you? Comparison of Students' Anxiety Level and Class Engagement After Regular and Mobile-Free School Days. Technology, Knowledge and Learning, 2021; 27:1095-1113.

129. Galea S, Buckley GJ. Social media and adolescent mental health: A consensus report of the National Academies of Sciences, Engineering, and Medicine. PNAS nexus. 2024 Feb;3(2):pgae037.

130. Ganson KT, Testa A, Rodgers R, & Nagata J. Use of photo filters is associated with muscle dysmorphia symptomatology among adolescents and young adults. Body Image, 2024; 50, 101750.

131. Garcia F & Thibaut F. Sexual Addictions. The American Journal of Drug and Alcohol Abuse. 2010; 36: 254–260. DOI:10.3109/00952990.2010.503823.

132. Gelman A, Park D, Shor B, Cortina J. Red State, Blue State, Rich State, Poor State: Why Americans Vote the Way They Do (Expanded Edition). Princeton University Press, 2010.

133. Ghai S, Fassi L, Awadh F, Orben A. Lack of Sample Diversity in Research on Adolescent Depression and Social Media Use: A Scoping Review and Meta-Analysis. Clin Psychol Sci. 2023 Sep;11(5):759-772. doi: 10.1177/21677026221114859.

134. Ghai S, Magis-Weinberg L, Stoilova M, Livingstone S, Orben A. Social media and adolescent well-being in the Global South. Curr Opin Psychol. 2022 Aug;46:101318. doi: 10.1016/j.copsyc.2022.101318.

135. Gioia F, Rega V, Boursier V. Problematic Internet Use and Emotional Dysregulation Among Young People: A Literature Review. Clin Neuropsychiatry. 2021 Feb; 18(1): 41-54. doi: 10.36131/cnfioritieditore20210104.

136. Giumetti GW, Kowalski RM. Cyberbullying via social media and well-being. Curr Opin Psychol. 2022 Jun;45:101314. doi: 10.1016/j.copsyc.2022.101314.

137. Godard R, Holtzman. Are active and passive social media use related to mental health, wellbeing, and social support outcomes? A meta-analysis of 141 studies (2024). Journal of Computer-Mediated Communication.

138. Goldfield GS, Lopes MVV, Mahboob W, Perry S, Davis CG, Reducing social media use decreases loneliness regardless of gender or level of social comparisons in youth with anxiety and depression: A randomized controlled trial. Journal of Affective Disorders, 2026: 403:121331, https://doi.org/10.1016/j.jad.2026.121331.

139. Goldstone AB, Chiu P, Baiocchi M, et al. Mechanical or Biologic Prostheses for Aortic-Valve and Mitral-Valve Replacement. N Engl J Med. Nov 9 2017;377(19):1847-1857. doi:10.1056/NEJMoa1613792.

140. Gradisar, M., Gardner, G., & Dohnt, H. Recent worldwide sleep patterns and problems during adolescence: A review and meta-analysis of age, region, and sleep. Sleep Medicine, 12, 2011; 110-118.

141. Gradisar, M., Kahn, M., Micic, G., Short, M., Reynolds, C., Orchard, F., Bauducco, S., Bartel, K. & Richardson, C. Sleep's role in the development and resolution of adolescent depression. Reviews, 2022; 1.

142. Granger CW, Newbold P. Forecasting economic time series. Academic press; 1986, second edition: 2014 May 10.

143. Grant JE, Potenza MN, Weinstein A, Gorelick DA. Introduction to behavioral addictions. Am J Drug Alcohol Abuse. 2010 Sep;36(5):233-41. doi: 10.3109/00952990.2010.491884.

144. Grant JE, Chamberlain SR. Expanding the definition of addiction: DSM-5 vs. ICD-11. CNS spectrums. 2016 Aug;21(4):300-3

145. Gray P, Lancy DF, Bjorklund DF. Decline in Independent Activity as a Cause of Decline in Children's Mental Well-being: Summary of the Evidence. J Pediatr. 2023;260:113352. doi:10.1016/j.jpeds.2023.02.004.

146. Greenhow C, Glavin S, Brandon D, & Askari E. A Decade of Research on K–12 Teaching and Teacher Learning With Social Media: Insights on the State of the Field. Teachers College Record, 122, 06032.

147. Griffiths, MD. Adolescent social networking: How do social media operators facilitate habitual use?, Education and Health, 2018; 36(3).

148. Gudka M, Gardiner K, & Lomas T. Towards a framework for flourishing through social media: a systematic review of 118 research studies, The Journal of Positive Psychology, 2023; 18:1, 86-105.

149. Guess A. et al. How do social media feed algorithms affect attitudes and behavior in an election campaign?, Science 381 (6656), DOI: 10.1126/science.abp9364.

150. Gumas E. U.S. Overdose Deaths Remain Higher Than in Other Countries — How Harm Reduction Programs Could Help. Commonwealth Fund. 2025. https://www.commonwealthfund.org/blog/2025/us-overdose-deaths-remain-higher-other-countries-trend-tracking-and-harm-reduction.

151. Gupta C, Jogdand DS, Kumar M. Reviewing the Impact of Social Media on the Mental Health of Adolescents and Young Adults. Cureus. 2022 Oct 10;14(10):e30143. doi: 10.7759/cureus.30143.

152. Gutierrez CM, Prickett KC, Hollowell C, Teiko P, Caton L. Type of household firearm ownership and firearm suicide among adolescents, 1976–2018. Preventive Medicine, 2022; 165: 107244.

153. Hafsad GS, Sætren SS, Wentzel-Larsen T, & Augusti E. Changes in Adolescent Mental and Somatic Health Complaints Throughout the COVID-19 Pandemic: A Three-Wave Prospective Longitudinal Study. Journal of Adolescent Health, 2022; 71, 406-413.

154. Hall JA, Xing C, Ross EM, & Johnson RM. Experimentally manipulating social media abstinence: results of a four-week diary study. Media Psychology, 2021; 24(2), 259-275.

155. Hamersma S & Maclean JC. Do expansions in adolescent access to public insurance affect the decisions of substance use disorder treatment providers?, Journal of Health Economics, 2021; 76, 102434.

156. Hamilton JL, Nesi J, Choukas-Bradley S. Reexamining Social Media and Socioemotional Well-Being Among Adolescents Through the Lens of the COVID-19 Pandemic: A Theoretical Review and Directions for Future Research. Perspect Psychol Sci. 2022 May;17(3):662-679. doi: 10.1177/17456916211014189.

157. Han X, Zhou E, Liu D. Electronic media use and sleep quality: updated systematic review and meta-analysis. Journal of Medical Internet Research. 2024 Apr 23;26:e48356.

158. Han, J. W., Han, D. H., Bolo, N., Kim, B., Kim, B. N., & Renshaw, P. F. (2015). Differences in functional connectivity between alcohol dependence and internet gaming disorder. Addictive behaviors, 41, 12-19.

159. Hansen J. Stanford Researchers Awarded Grand Challenges Grant. https://globalhealth.stanford.edu/vulnerable-populations/stanford-researchers-awarded-grand-challenges-grant-to-address-intersection-of.html/.

160. Hansen, M, Janssen, I, Schiff, A, Zee, PC, & Dubocovich, M. The Impact of School Daily Schedule on Adolescent Sleep. Pediatrics. 2005; 115, 1555.

161. Hardy, BW & Castonguay, J., The moderating role of age in the relationship between social media use and mental wellbeing: An analysis of the 2016 General Social Survey. 2018.

162. Harness J, Domoff SE, Rollings H. Social Media Use and Youth Mental Health: Intervention-Focused Future Directions. Curr Psychiatry Rep. 2023 Dec;25(12):865-871. doi: 10.1007/s11920-023-01476-y.

163. Harsh A. (2017, April 22). Are digital devices the modern cocaine infecting our kids' lives—literally? Huffington Post . https://www.huffpost.com/entry/are-digital-devices-the-modern-cocaine-infecting-our_b_58fad72de4b0f02c3870ea56.

164. Hartogsohn I, Vudka A. Technology and addiction: what drugs can teach us about digital media. Transcultural Psychiatry. 2023 Aug;60(4):651-61.

165. Hawlirenko, M, Kroshus, E, Tandon, P, & Christakis, D. The Association Between School Closures and Child Mental Health During COVID-19. JAMA Network Open, 2021; 4(9).

166. Haynes, T. Dopamine, Smartphones & You: A battle for your time. Harvard University, The Graduate School of Arts and Sciences (May 1, 2018).

167. Healy, GN, Clark, BK, Winkler, EAH, Gardiner, PA, Brown, WJ, & Matthews, CE. Measurement of adults' sedentary time in population based studies. American Journal of Preventive Medicine. 2011; 41, 216227.

168. Heffer T, Good M, Willoughy T, Daly O, MacDonell E. The Longitudinal Association Between Social-Media Use and Depressive Symptoms Among Adolescents and Young Adults: An Empirical Reply to Twenge et al. (2018). Clinical Psycholo. Science. 2019;7(3). doi:10.1177/2167702618812727.

169. Heide, Morten, and Kjell Grøhaug. "Respondents' Moods as a Biasing Factor in Surveys: An Experimental Study." Advances in Consumer Research 18, no. 1. 1991.

170. Heinrich, C, Colomer, A, & Hieronimus, M. Minding the gap: Evidence, implementation and funding gaps in mental health services delivery for school-aged children. Children and Youth Services Review, 2023; 150: 107023.

171. Herrando C, Constantinides E. Emotional contagion: A brief overview and future directions. Frontiers in psychology. 2021 Jul 16; 12:712606.

172. Hertz, MF, Kilmer, G, Verlenden, J, Liddon, N, Rasberry, C, Barrios, L, & Ethier, K. Adolescent Mental Health, Connectedness, and Mode of School Instruction During COVID-19, Journal of Adolescent Health, 70, 57-63.

173. Hill AB. The Environment and Disease: Association or Causation? Proc R Soc Med. 1965;58(5):295-300. doi:10.1177/003591576505800503.

174. Hisler GC, Hasler BP, Franzen PL, Clark DB, Twenge JM. Screen media use and sleep disturbance symptom severity in children. Sleep Health. 2020 Dec 1;6(6):731-42.

175. Hlynsson JI, Sjöberg A, Ström L, Carlbring P. Evaluating the reliability and validity of the Questionnaire on Well-Being: a validation study for a clinically informed measurement of subjective well-being. Cognitive Behaviour Therapy. 2025 Mar 4;54(2):208-30.

176. Holland PW. Statistics and causal inference. Journal of the American statistical Association. 1986 Dec 1;81(396):945-60.

177. Hokby, S, Hadlaczky, G, Westerlund, J, Wasserman, D, Balazs, J, Germanavicius, A, Machin, N, Meszaros, G, Sarchiapone, M, Varnik, A, Varnik, P, Westerlund, M, Carli, V. Are Mental Health Effects of Internet Use Attributable to the Web-Based Content

or Perceived Consequences of Usage? A Longitudinal Study of European Adolescents, JMIR Ment. Heath; 2016.

178. Hossain MM, Nesa F, Das J, Aggad R, Tasnim S, Bairwa M, Ma P, Ramirez G. Global burden of mental health problems among children and adolescents during COVID-19 pandemic: An umbrella review. Psychiatry Res. 2022 Nov; 317:114814. doi: 10.1016/j.psychres.2022.114814.

179. Hrabok M, Delorme A, Agyapong V, Threats to Mental Health and Well-Being Associated with Climate Change, Journal of Anxiety Disorders. 2020; 76:102295, https://doi.org/10.1016/j.janxdis.2020.102295.

180. Huddleston B. (2016). Digital cocaine: A journey toward iBalance.

181. Hughes N & Burke J. Sleeping with the frenemy: How restricting 'bedroom use' of smartphones impacts happiness and wellbeing. Computers in Human Behavior. 2018; 85: 236-244.

182. Hunt M, All K, Burns B, & Li K. Too much of a good thing: Who we follow, what we do, and how much time we spend on social media affects wellbeing. Journal of Social and Clinical Psychology. 2021; 40(1), 46-68.

183. Hunt M, et al., No More FOMO: Limiting Social Media Decreases Loneliness and Depression, Journal of Social and Clinical Psychology. 2018, 37(1): 751-768.

184. Huppatz K. LibGuides: Evidence based practice: Evidence based practice. 2020 https://guides.mclibrary.duke.edu/ebm/studydesign.

185. Hussain I, Dsouza C, Yip SWL, Flynn M, Rashid MA. #Anatomynotes: A temporal content analysis of anatomy education posts on Instagram. Anat Sci Educ. 2024;17:227–238. https://doi.org/10.1002/ase.2356.

186. Irmer A. & Schmiedek F. Associations between youth's daily social media use and well-being are mediated by upward comparisons, Commun Psychol. 2023 Aug 22;1(1):12. doi: 10.1038/s44271-023-00013-0.

187. Ivie EJ, Pettitt A, Moses LJ, Allen NB. A meta-analysis of the association between adolescent social media use and depressive symptoms. J Affect Disord. 2020 Oct 1; 275:165-174. doi: 10.1016/j.jad.2020.06.014.

188. Imai K, Keele L, Tingley D. A general approach to causal mediation analysis. Psychological methods. 2010 Dec;15(4):309

189. Imbens GW, Rubin DB. Causal inference in statistics, social, and biomedical sciences. Cambridge university press. 2015 Apr 6.

190. Ingersoll RM & Tran H. Teacher Shortages and Turnover in Rural Schools in the US: An Organizational Analysis† Educational Administration Quarterly. 2023; 59(2), 396-431. https://doi.org/10.1177/0013161X231159922.

191. Introducing a new way to see and control your algorithm, Instagram (December 10, 2025), https://about.instagram.com/blog/announcements/reels-algorithm-control.

192. Jaidka K. Cross-platform- and subgroup-differences in the well-being effects of Twitter, Instagram, and Facebook in the United States. Sci Rep. 2022; 12(1), 3271.

193. Jenkins B, Ong L, Ong A, Lee HY, Boehm J, Mean Affect Moderates the Association between Affect Variability and Mental Health, Affective Science. 2024; 5:99–114, https://doi.org/10.1007/s42761-024-00238-0.

194. Jenni OG, Achermann P, Carskadon MA. Homeostatic sleep regulation in adolescents. Sleep. 2005; 28(11), 1446–1454. https://doi.org/10.1093/sleep/28.11.1446.

195. Jing Z, Yang W, Lei Z, Junmei W, Hui L, Tianmin Z. Correlations between social media addiction and anxiety, depression, FoMO, loneliness and self-esteem among students: A systematic review and meta-analysis. PLoS One. 2025 Sep; 20(9): e0329466. doi: 10.1371/journal.pone.0329466.

196. Kannan VD, Veazie PJ. US trends in social isolation, social engagement, and companionship – nationally and by age, sex, race/ethnicity, family income, and work hours, 2003-2020. SSM Popul Health. 2022;21:101331. Published 2022 Dec 25. doi:10.1016/j.ssmph.2022.101331.

197. Kaplan RM, Chambers DA, Glasgow RE. Big data and large sample size: a cautionary note on the potential for bias. Clinical and translational science. 2014 Aug;7(4):342-6.

198. Kardaras N. (2017). Glow kids: How screen addiction is hijacking our kids - and how to break the trance (Reprint ed.). St. Martin's Griffin.

199. Karim F, Oyewande AA, Abdalla LF, Ehsanullah RC, Khan S. Social media use and its connection to mental health: a systematic review. Cureus. 2020 Jun 15;12(6).

200. Karnick, A. T., Bauer, B. W., & Capron, D. W. Negative mood and optimism bias: An experimental investigation of sadness and belief updating. Journal of Behavior Therapy and Experimental Psychiatry, 82, 101910. 2024.

201. Kelley, P, Lockley, S, Kelley, J, Evans, M. Is 8:30 a.m. Still Too Early to Start School? A 10:00 a.m. School Start Time Improves Health and Performance of Students Aged 13–16, Front. Human Neuroscience. 2017; Vol. 11, https://doi.org/10.3389/fnhum.2017.00588.

Case: 26-5120, 08/24/2026, DktEntry: 6.2, Page 209 of 299


202. Kelly Y, Zilanawala A, Booker C, Sacker A. Social media use and adolescent mental health: Findings from the UK millennium cohort study. EClinicalMedicine. 2018; 6(nan), 59–68.

203. Kent DM, Paulus JK, van Klaveren D, D'Agostino R, Goodman S, Hayward R, Ioannidis JPA, Patrick-Lake B, Morton S, Pencina M, Raman G, Ross JS, Selker HP, Varadhan R, Vickers A, Wong JB, Steyerberg EW. The Predictive Approaches to Treatment effect Heterogeneity (PATH) Statement. Annals of internal medicine. 2020; 172(1), 35–45. https://doi.org/10.7326/M18-3667 .

204. Kerr B, Garimella A, Pillarisetti L, Charlly N, Sullivan K, Moreno MA. Associations Between Social Media Use and Anxiety Among Adolescents: A Systematic Review Study. J Adolesc Health. 2025 Jan;76(1):18-28. doi: 10.1016/j.jadohealth.2024.09.003.

205. Keyes, K & Kreski, N. Is There an Association Between Social Media Use and Mental Health? The Timing of Confounding Measurement Matters. JAMA Psychiatry. 2020; 77(4).

206. Khalaf AM, Alubied AA, Khalaf AM, Rifaey AA. The Impact of Social Media on the Mental Health of Adolescents and Young Adults: A Systematic Review. Cureus. 2023 Aug 5; 15(8):e42990. doi: 10.7759/cureus.42990.

207. Khan NA, Daskalopoulou SS, Karp I, et al. Sex differences in acute coronary syndrome symptom presentation in young patients. JAMA Intern Med. Nov 11 2013;173(20):1863-71. doi:10.1001/jamainternmed.2013.10149.

208. Khetawat D, Steele RG. Examining the Association Between Digital Stress Components and Psychological Wellbeing: A Meta-Analysis. Clin Child Fam Psychol Rev. 2023 Dec;26(4):957-974. doi: 10.1007/s10567-023-00440-9.

209. Kincaid E. Finland Publication Forum will downgrade hundreds of Frontiers and MDPI journals, Retraction Watch (Dec. 24, 2024), https://retractionwatch.com/2024/12/24/finland-publication-forum-will-downgrade-hundreds-of-frontiers-and-mdpi-journals/.

210. Kirsh SJ. Cartoon violence and aggression in youth. Aggression and violent behavior. 2006 Nov 1;11(6):547-57.

211. Kiviniemi, MT, Ellis, EM, Orom, H, Waters, EA, & Hay, JL. ‘Don’t know’responding and estimates of perceived risk: failing to provide a ‘don’t know’response systematically biases laypeople’s perceived risk estimates. Health, Risk & Society. 2020; 22(1), 69-85.

212. Kleefield P. Social Media Use On Smartphones And Relations To Symptoms Of Depression And Anxiety, Self-Esteem, Sleep, And Social Comparison: A Tool For Intervention. Aug 2021.

Case: 26-5120, 08/24/2026, DktEntry: 6.2, Page 210 of 299


213. Kleemans, M., Daalmans, S., Carbaat, I., & Anschütz, D. (2018). Picture Perfect: The Direct Effect of Manipulated Instagram Photos on Body Image in Adolescent Girls. Media Psychology, 21(1), 93–110. https://doi.org/10.1080/15213269.2016.1257392.

214. Klemko R & Kaur A. Louisville bank shooter killed 5 people to highlight gun laws, police report shows. The Washington Post. Nov 22, 2023.

215. Klerman GL & Weissman MM. Increasing rates of depression. JAMA. 1989; 261: 2229- 2235.

216. Knipe D, Padmanathan P, Newton-Howes G, Chan LF, Kapur N. Suicide and self-harm. The Lancet. 2022 May 14;399(10338):1903-16.

217. Knox L. Rankled by Rankings. 2023 September 22. https://www.insidehighered.com/news/admissions/traditional-age/2023/09/22/us-news-rankings-changes-spur-complaints-and-apologies.

218. Kostyrka-Allchorne K, Stoilova M, Bourgaize J, Rahali M, Livingstone S, Sonuga-Barke E. Review: Digital experiences and their impact on the lives of adolescents with pre-existing anxiety, depression, eating and nonsuicidal self-injury conditions - a systematic review. Child Adolesc Ment Health. 2023 Feb;28(1):22-32. doi: 10.1111/camh.12619.

219. Kourosh AS, Harrington CR, Adinoff B. Tanning as a Behavioral Addiction. The American Journal of Drug and Alcohol Abuse, 36(5), 284–290. https://doi.org/10.3109/00952990.2010.491883

220. Kreski N, Platt J, Rutherford C, Olfson M, Odgers C, Schulenberg J, Keyes, KM. Social media use and depressive symptoms among United States adolescents. Journal of Adolescent Health, 2021; 68(3), 572–579.

221. Krokstad S, Weiss DA, Krokstad MA, et al. Divergent decennial trends in mental health according to age reveal poorer mental health for young people: repeated cross-sectional population-based surveys from the HUNT Study, Norway. BMJ Open. 2022;12(5):e057654. Published 2022 May 18. doi:10.1136/bmjopen-2021-057654.

222. Krosnick, J. A. Questionnaire design. In The Palgrave handbook of survey research (pp. 439-455). Cham: Springer International Publishing. 2017.

223. Kross E, Verduyn P, Demiralp E, et al. Facebook use predicts declines in subjective well-being in young adults. PLoS One. 2013;8(8):e69841. Published 2013 Aug 14. doi:10.1371/journal.pone.0069841.

224. Kruzan KP, Williams KDA, Meyerhoff J, Yoo DW, O'Dwyer LC, De Choudhury M, Mohr DC. Social media-based interventions for adolescent and young adult mental

health: A scoping review. Internet Interv. 2022 Sep 28;30:100578. doi: 10.1016/j.invent.2022.100578.

225. Kuru O & Pasek J. (2016). Improving social media measurement in surveys: Avoiding acquiescence bias in Facebook research. Computers in Human Behavior, 57, 82-92.

226. Kwong A, Manley D, Timpson N, Pearson R, Heron J, Sallis H, Stergiakouli E, Davis O, Leckie G. Identifying Critical Points of Trajectories of Depressive Symptoms from Childhood to Young Adulthood, J. of Youth and Adolescence, 2019.

227. Lasker J, Social Scientists Are Lazy, Cremieux Recueil (Mar. 24, 2026), https://www.cremieux.xyz/p/social-scientists-are-lazy.

228. LaMonte OC, Feldman SR. Indoor Tanning Addiction: Biological Mechanisms and Association with Other Disorders. Journal of Cutaneous Medicine and Surgery. 2025 May;29(3):282-9.

229. Lambert J, Barnstable G, Minter E, Cooper J, & McEwan D. Taking a one- week break from social media improves well-being, depression, and anxiety: a randomized controlled trial. Cyberpsychology, Behavior, and Social Networking. 2022; 25(5), 287-293.

230. Larson R, Moneta G, Richards M, Wilson, S., Continuity, Stability, and Change in Daily Emotional Experience across Adolescence, Child Development. Jul/Aug 2002; 73, 4.

231. Lee AY & Hancock JT. Social media mindsets: A new approach to understanding social media use and psychological well-being. Journal of Computer- Mediated Communication. 2023; 29(1), zmad048.

232. Lee HY, Jamieson J, Reis H, Beevers C, Josephs R, Mullarkey M, O'Brien J, Yeager D, Getting Fewer “Likes” Than Others on Social Media Elicits Emotional Distress Among Victimized Adolescents, Child Development; 2020.

233. Le Cam L. The central limit theorem around 1935. Statistical science. 1986 Feb 1:78-91.

234. Leip A, Heckman CJ, Stapleton JL. Building evidence for indoor tanning as a behavioral addiction: concerns, problems, and change perceptions are associated with addictive symptoms. BMC Psychol, 2025; 13(104). https://doi.org/10.1186/s40359-025-02430-8.

235. Lemahieu L, Vander Zwalmen Y, Mennes M, et al. The effects of social media abstinence on affective well-being and life satisfaction: a systematic review and meta-analysis. Sci Rep 15, 7581 (2025). https://doi.org/10.1038/s41598-025-90984-3.

236. Lenhart A. Teens, Social Media & Technology Overview 2015. Pew Research Center. 2015. https://www.pewresearch.org/internet/2015/04/09/teens-social-media-technology-2015/.

237. Lepp A, & Barkley JE. The experimental effect of social media use, treadmill walking, studying, and a control condition on positive and negative affect in college students. Current Psychology, 2022; 1–10. https://doi.org/10.1007/s12144-022-03747-y.

238. Lesieur HR, Blume SB. Pathological gambling, eating disorders, and the psychoactive substance use disorders. J Addict Dis. 1993; 12(3): 89-102. doi: 10.1300/J069v12n03_08.

239. Lewinsohn P, Rohde P, Seeley J, & Fischer S. Age-cohort changes in the lifetime occurrence of depression and other mental disorders. Journal of Abnormal Psychology, 1993; 102: 110-120.

240. Li Q, Yu Y, Wang X, Wong SY, Yang X. The relationship between parental affective disorders and digital addiction in children and adolescents: A systematic review and meta-analysis. Addict Behav. 2025 May; 164:108282. https://doi.org/10.1016/j.addbeh.2025.108282.

241. Li X, Ma J. Does mental health parity encourage mental health utilization among children and adolescents? Evidence from the 2008 Mental Health Parity and Addiction Equity Act (MHPAEA). The Journal of Behavioral Health Services & Research. 2020 Jan;47(1):38-53.

242. Liang L, Ren H, Cao R, Hu Y, Qin Z, Li C, Mei S. The Effect of COVID-19 on Youth Mental Health. Psychiatr Q. 2020 Sep;91(3):841-852. doi: 10.1007/s11126-020-09744-3. PMID: 32319041; PMCID: PMC7173777.

243. Liu Y, Mohamad EM, Azlan AA, Tan Y. Am I Happier Without You? Social Media Detox and Well-Being: A Meta-Analysis of Randomized Controlled Trials. Behavioral Sciences. 2025; 15(3). doi:10.3390/bs15030290.

244. Liu Y, Wu YC, Fu H, Guo WY, Wang X. Digital intervention in improving the outcomes of mental health among LGBTQ+ youth: a systematic review. Front Psychol. 2023 Sep 22; 14: 1242928. doi: 10.3389/fpsyg.2023.1242928.

245. Liu X, Gui Z, Chen ZM, Feng Y, Wu XD, Su Z, Cheung T, Ungvari GS, Liu XC, Yan YR, Ng CH, Xiang YT. Global prevalence of internet addiction among university students: a systematic review and meta-analysis. Curr Opin Psychiatry. 2025 May; 38(3): 182-199. doi: 10.1097/YCO.0000000000000994.

246. Liu T, Cheng Y, Luo Y, Wang Z, Pang PC, Xia Y, Lau Y. The Impact of Social Media on Children's Mental Health: A Systematic Scoping Review. Healthcare (Basel). 2024 Nov 28; 12(23): 2391. doi: 10.3390/healthcare12232391.

247. Liu M, Kamper-DeMarco KE, Zhang J, Xiao J, Dong D, Xue P. Time spent on social media and risk of depression in adolescents: a dose–response meta-analysis. International journal of environmental research and public health. 2022 Apr 24;19(9):5164.

248. Lonergan, A, Bussey, K, Fardouly, J, Griffiths, S, Murray, S, Hay, P, Mond, J, Trompeter, N, Mitchison, D. Protect Me from My Selfie: Examining the Association Between Photo-Based Social Media Behaviors and Self-Reported Eating Disorders in Adolescence, Int'l J. of Eating Disorders, 2020.

249. Lonergan, A. R, Bussey, K, Mond, J, Brown, O, Griffiths, S, Murray, SB, Mitchison, D. Me, my selfie, and I: The relationship between editing and posting selfies and body dissatisfaction in men and women. Body Image. 2019; 28, 39–43. https://doi.org/10.1016/j.bodyim.2018.12.001.

250. Lowe SR, & Galea S. The mental health consequences of mass shootings. Trauma, Violence, & Abuse, 2017; 18(1), 62-82.

251. Lu, H, Ren, Z, Zhen, P, Su, Z, Wu, Y. The longitudinal association between family functioning and problematic social media use among Chinese university students: Mediation via loneliness and a subgroup analysis by sex, Addictive Behaviors, 2025; 166: 108337, https://doi.org/10.1016/j.addbeh.2025.108337.

252. Lund L, Sølvhøj IN, Danielsen D, Andersen S. Electronic media use and sleep in children and adolescents in western countries: a systematic review. BMC Public Health. 2021 Sep 30;21(1):1598. doi: 10.1186/s12889-021-11640-9.

253. Luthar SS & Kumar NL High-Achieving Schools Connote Risks for Adolescents: Problems Documented, Processes Implicated, and Directions for Interventions. American Psychological Association, 2019: 75(7), 983-995.

254. Madden M, Lenhart A, Duggan M, Cortesi S, Gasser U. Teens and Technology 2013. Pew Research Center. 2013. https://www.pewresearch.org/internet/2013/03/13/teens-and-technology-2013/.

255. Madigan DJ & Kim LE. Does Teacher Burnout Affect Students? A Systematic Review of its Association with Academic Achievement and Student-Reported Outcomes. International Journal of Educational Research, 2020; 105: 101714. http://ray.yorksj.ac.uk/id/eprint/4814/.

256. Magson, N, Freeman, J, Rapee, R, Richardson, C, Oar, E, Fardouly, J. Risk and Protective Factors for Prospective Changes in Adolescent Mental Health during the

COVID-19 Pandemic, Journal of Youth and Adolescence, 2021; 50:44–57 https://doi.org/10.1007/s10964-020-01332-9.

257. Mahalingham T, Howell J & Clarke PJF. Assessing the effects of acute reductions in mobile device social media use on anxiety and sleep. Journal of Behavior Therapy and Experimental Psychiatry, 2023; 78, 101791.

258. Maheux, A, Burnell, K, Maza, M, Fox, KA. Telzer, EH, Prinstein, M. Annual Research Review: Adolescent social media use is not a monolith: toward the study of specific social media components and individual differences, J. of Child Psychology and Psychiatry; 2025.

259. Malloy J, Partridge SR, Kemper JA, Braakhuis A, Roy R. Co-design of digital health interventions with young people: A scoping review. Digit Health. 2023 Dec 11;9:20552076231219117. doi: 10.1177/20552076231219117.

260. Marafino BJ, Escobar GJ, Baiocchi MT, Liu VX, Plimier CC, Schuler A. Evaluation of an intervention targeted with predictive analytics to prevent readmissions in an integrated health system: observational study. BMJ. Aug 11 2021;374:n1747. doi:10.1136/bmj.n1747.

261. Mares ML, Pan Z. Effects of Sesame Street: A meta-analysis of children's learning in 15 countries. Journal of Applied Developmental Psychology. 2013 May 1;34(3):140-51.

262. Marciano L, Ostroumova M, Schulz PJ, Camerini AL. Digital media use and adolescents' mental health during the covid-19 pandemic: A systematic review and meta-analysis. Frontiers in Public Health. 2022; 9, 793868.

263. Marciano L, Lin J, Sato T, Saboor S, Viswanath K, Does social media use make us happy? A meta-analysis on social media and positive well-being outcomes (2024). SSM – Mental Health, 6:100331, https://doi.org/10.1016/j.ssmmh.2024.100331.

264. Marx, R, Tanner-Smith, EE, Davison, CM, Ufholz, LA, Freeman, J, Shankar, R, Newton, L, Brown, RS, Parpia, AS, Cozma, I, Hendrikx, S. Later school start times for supporting the education, health, and well-being of high school students. The Cochrane database of systematic reviews, 2017; 7(7), CD009467. https://doi.org/10.1002/14651858.CD009467.pub2.

265. Maza MT, Fox KA, Kwon SJ, et al. Association of Habitual Checking Behaviors on Social Media With Longitudinal Functional Brain Development. JAMA Pediatr. 2023;177(2):160-167. doi:10.1001/jamapediatrics.2022.4924.

266. Mazzeo SE, Weinstock M, Vashro TN, Henning T, Derrigo K. Mitigating Harms of Social Media for Adolescent Body Image and Eating Disorders: A Review. Psychol Res Behav Manag. 2024 Jul 4;17:2587-2601. doi: 10.2147/PRBM.S410600.

267. McCarthy PA & Morina N. Exploring the association of social comparison with depression and anxiety: A systematic review and meta-analysis. Clin Psychol Psychother. 2020 Sep;27(5):640-671. doi: 10.1002/cpp.2452.

268. McCashin D, Murphy CM. Using TikTok for public and youth mental health - A systematic review and content analysis. Clin Child Psychol Psychiatry. 2023 Jan;28(1):279-306. doi: 10.1177/13591045221106608.

269. McComb CA, Vanman EJ, Tobin SJ. A meta-analysis of the effects of social media exposure to upward comparison targets on self-evaluations and emotions. Media Psychology. 2023 Sep 3;26(5):612-35.

270. McCrae N, Gettings S, Purssell E. Social Media and Depressive Symptoms in Childhood and Adolescence: A Systematic Review. Adolescent Res Rev 2017; 2, 315–330. https://doi.org/10.1007/s40894-017-0053-4.

271. McGovern O, Collins R, Dunne S, The associations between photo-editing and body concerns among females: A systematic review (2022). Body Image, 43: 504–517, https://doi.org/10.1016/j.bodyim.2022.10.013.

272. McKelvey K, Baiocchi M, Halpern-Felsher B. Adolescents' and Young Adults' Use and Perceptions of Pod-Based Electronic Cigarettes. JAMA Netw Open. Oct 5 2018;1(6):e183535. doi:10.1001/.

273. McLachlan C, Shelton R & Li L. Obesity, inflammation, and depression in adolescents. Frontiers in psychiatry, 2023; 14, 1221709. https://doi.org/10.3389/fpsyt.2023.1221709.

274. McPherson G, Lovell KK, Duong JQ, Feldman SR. Addiction to Indoor Tanning. InPsychoNeuroImmunology: Volume 2: Interdisciplinary Approaches to Diseases 2025 Jan 10 (pp. 917-931). Cham: Springer Nature Switzerland.

275. Meerkerk GJ, Van Den Eijnden RJ, Vermulst AA, Garretsen HF. The Compulsive Internet Use Scale (CIUS): some psychometric properties. Cyberpsychol Behav. 2009 Feb; 12(1): 1-6. doi: 10.1089/cpb.2008.0181.

276. Memon AM, Sharma SG, Mohite SS, Jain S. The role of online social networking on deliberate self-harm and suicidality in adolescents: A systematized review of literature. Indian journal of psychiatry. 2018 Oct 1;60(4):384-92.

277. Meshi D, Morawetz C, Heekeren HR. Nucleus accumbens response to gains in reputation for the self relative to gains for others predicts social media use. Front Hum Neurosci. 2013;7:439. Published 2013 Aug 29. doi:10.3389/fnhum.2013.00439

278. Meybohm P, Renner J, Broch O, Caliebe D, Albrecht M, Cremer J, Haake N, Scholz J, Zacharowski K, Bein B. Postoperative neurocognitive dysfunction in patients undergoing cardiac surgery after remote ischemic preconditioning: a double-blind randomized controlled pilot study. PloS one. 2013 May 31;8(5):e64743.

279. Meynadier J, Malouff JM, Loi NM et al. Lower Mindfulness is Associated with Problematic Social Media Use: A Meta-Analysis. Curr Psychol 43, 3395–3404 (2024). https://doi.org/10.1007/s12144-023-04587-0.

280. Meynadier J, Malouff JM, Schutte NS et al. Meta-analysis of associations between five-factor personality traits and problematic social media use. Curr Psychol 43, 23016–23035 (2024). https://doi.org/10.1007/s12144-024-06052-y.

281. Micic G, Lovat N, Ferguson SA, Burgess HJ, Lack L. Circadian tau differences and rhythm associations in delayed sleep–wake phase disorder and sighted non-24-hour sleep–wake rhythm disorder. Sleep, 2020; 44(1), https://doi.org/10.1093/sleep/zsaa132.

282. Midgley C, Thai S, Lockood P, Kovacheff C, Page-Gould E. When every day is a high school reunion: Social media comparisons and self-esteem, J Pers Soc Psychol. 2021 Aug;121(2):285-307. doi: 10.1037/pspi0000336.

283. Miech RA, Johnston LD, Patrick ME, & O'Malley PM. Monitoring the Future: National survey results on drug use, 1975-2023: Overview and detailed results for secondary school students. University of Michigan Institute for Social Research. 2024.

284. Milaneschi Y, Simmons WK, van Rossum EFC, Penninx, BW. Depression and obesity: evidence of shared biological mechanisms. Molecular psychiatry, 2019; 24(1), 18–33. https://doi.org/10.1038/s41380-018-0017-5.

285. Milli, Smitha et al. "Engagement, user satisfaction, and the amplification of divisive content on social media." PNAS nexus vol. 4,3 pgaf062. 5 Mar. 2025, doi:10.1093/pnasnexus/pgaf062

286. Mills J, Musto S, Williams L, Tiggemann M. "Selfie" harm: Effects on mood and body image in young women, Body Image, Volume 27, December 2018, Pages 86-92, https://doi.org/10.1016/j.bodyim.2018.08.007.

287. Minges KE & Redeker NS. Delayed school start times and adolescent sleep: A systematic review of the experimental evidence. Sleep medicine reviews, 2016; 28, 86–95. https://doi.org/10.1016/j.smrv.2015.06.002.

288. MIT Sloan Office of Communications, Academic study reveals new evidence of Facebook's negative impact on the mental health of college students, Press (Sept. 27, 2022).

289. Mitev K, Weinstein N, Karabeliova S, Nguyen T, Law W, Przybylski A. Social media use only helps, and does not harm, daily interactions and well- being. Technology, Mind, and Behavior, 2021; 2(1).

290. Mojtabai R, Olfson M, Han B. National Trends in the Prevalence and Treatment of Depression in Adolescents and Young Adults. Pediatrics. 2016;138(6):e20161878. doi:10.1542/peds.2016-1878

291. Moore-Petinak N, Waselewski M, Patterson BA, Chang, T. Active shooter drills in the United States: A national study of youth experiences and perceptions. Journal of Adolescent Health, 2020; 67(4), 509-513.

292. Moreno M, Jolliff A, Depression and Anxiety in the Context of Digital Media, Handbook of Adolescent Digital Media Use and Mental Health, Cambridge University Press, 2022; 217-241.

293. Moss C, Wibberley C, Witham G. Assessing the impact of Instagram use and deliberate self-harm in adolescents: A scoping review. Int J Ment Health Nurs. 2023 Feb;32(1):14-29. doi: 10.1111/inm.13055.

294. Munzer T, Torres C, Domoff SE, et al. Child Media Use During COVID-19: Associations with Contextual and Social-Emotional Factors. J Dev Behav Pediatr. Dec 1 2022;43(9):e573-e580. doi:10.1097/DBP.0000000000001125.

295. Murad MH, Montori VM, Ioannidis JP, Jaeschke R, Devereaux PJ, Prasad K, Neumann I, Carrasco-Labra A, Agoritsas T, Hatala R, Meade MO. How to read a systematic review and meta-analysis and apply the results to patient care: users' guides to the medical literature. Jama. 2014 Jul 9;312(2):171-9.

296. Musu L, Zhang A, Wang K, Zhang J, Oudekerk BA. Indicators of School Crime and Safety: 2018 (NCES 2019-047/NCJ 252571). National Center for Education Statistics, U.S. Department of Education, and Bureau of Justice Statistics, Office of Justice Programs, U.S. Department of Justice. Washington, DC. Available at: https://nces.ed.gov/pubs2019/2019047.pdf.

297. Myers D & Twenge J. Social Psychology, 14th Edition. McGraw Hill. 2021.

298. Nagata JM, Otmar CD, Shim J, Balasubramanian P, Cheng CM, Li EJ, Baker, F. C. Social Media Use and Depressive Symptoms During Early Adolescence. JAMA Network Open. 2025; 8(5), e2511704-e2511704.

299. National Academies of Sciences, Engineering, and Medicine. Assessment of the Impact of Social Media on the Health and Wellbeing of Adolescents and Children [Internet]. 2024.

300. National Research Council and Institute of Medicine. (2009). Preventing Mental, Emotional, and Behavioral Disorders Among Young People: Progress and Possibilities. Committee on Prevention of Mental Disorders and Substance Abuse Among Children, Youth and Young Adults: Research Advances and Promising Interventions. Mary Ellen O'Connell, Thomas Boat, and Kenneth E. Warner, Editors. Board on Children, Youth, and Families, Division of Behavioral and Social Sciences and Education. Washington, DC: The National Academies Press.

301. Nederhof AJ. Methods of coping with social desirability bias: A review. European journal of social psychology. 1985; 15(3), 263-280.

302. Nesi J, Prinstein JM. Using social media for social comparison and feedback-seeking: Gender and popularity moderate associations with depressive symptoms. Journal of Abnormal Child Psychology, 2015; 43(8), 1427–1438.

303. Newsom CR, Archer RP, Trumbetta S, & Gottesman II. Changes in adolescent response patterns on the MMPI/MMPI-A across four decades. Journal of Personality Assessment, 2003; 81, 74–84.

304. Nichols AL & Maner JK. (2008). The good-subject effect: Investigating participant demand characteristics. The Journal of general psychology, 135(2), 151-166.

305. Nisbett, R. E., & Wilson, T. D. (1977). The halo effect: Evidence for unconscious alteration of judgments. Journal of Personality and Social Psychology, 35(4), 250–256. https://doi.org/10.1037/0022-3514.35.4.250.

306. Noël X, Brevers D, Bechara A. A neurocognitive approach to understanding the neurobiology of addiction. Current opinion in neurobiology. 2013 Aug 1;23(4):632-8.

307. Nurden H. An Ongoing Mental Health Epidemic: The Need For Stronger Mental Health Parity Laws in the U.S. American Bar Association. https://www.americanbar.org/groups/labor_law/publications/ebc_news_archive/2024-fall/ongoing-mental-health-epidemic/#:~:text=In%202008%2C%20Congress%20passed%20MHPAEA,does%20not%20achieve%20true%20parity.

308. Odgers CL, Jensen MR. Annual Research Review: Adolescent mental health in the digital age: facts, fears, and future directions. J Child Psychol Psychiatry. 2020 Mar;61(3):336-348. doi: 10.1111/jcpp.13190.

309. Odlaug BL, Chamberlain SR, Grant JE. Motor inhibition and cognitive flexibility in pathologic skin picking, Prog Neuropsychopharmacol Biol Psychiatry. 2010 Feb 1;34(1):208-11. doi: 10.1016/j.pnpbp.2009.11.008.

310. O'Grady C, Social media consensus paper causes social media uproar, Science (May 22, 2025). https://www.science.org/content/article/social-media-consensus-paper-causes-social-media-uproar.

311. Orben A, Przybylski AK, Blakemore SJ, Kievit RA. Windows of developmental sensitivity to social media. Nat Commun. 2022;13(1):1649. Published 2022 Mar 28. doi:10.1038/s41467-022-29296-3.

312. Orben A, Przybylski AK. The association between adolescent well-being and digital technology use. Nat Hum Behav. 2019;3(2):173-182. doi:10.1038/s41562-018-0506-1.

313. Orben A. Teenagers, screens and social media: a narrative review of reviews and key studies. Social psychiatry and psychiatric epidemiology. 2020 Apr;55(4):407-14.

314. Orne, MT (1962). On the social psychology of the psychological experiment: With particular reference to demand characteristics and their implications. American Psychologist, 17(11), 776–783. https://doi.org/10.1037/h0043424.

315. Orne, MT (2017). On the social psychology of the psychological experiment: With particular reference to demand characteristics and their implications. In Sociological Methods (pp. 279-299). Routledge.

316. Otto CM, Nishimura RA, Bonow RO, Carabello BA, Erwin III JP, Gentile F, Jneid H, Krieger EV, Mack M, McLeod C, O'Gara PT. 2020 ACC/AHA guideline for the management of patients with valvular heart disease: executive summary: a report of the American College of Cardiology/American Heart Association Joint Committee on Clinical Practice Guidelines. Journal of the American College of Cardiology. 2021 Feb 2;77(4):450-500.

317. Oviedo-García MÁ. Journal citation reports and the definition of a predatory journal: The case of the Multidisciplinary Digital Publishing Institute (MDPI). Research Evaluation. 2021;30(3):405- 419a. doi:10.1093/reseval/rvab020.

318. Ozimek P & Bierhoff HW. All my online-friends are better than me – three studies about ability-based comparative social media use, self-esteem, and depressive tendencies. Behaviour & Information Technology, 2020; 39(10), 1110–1123. https://doi.org/10.1080/0144929X.2019.1642385.

319. Page MJ, McKenzie JE, Bossuyt PM, Boutron I, Hoffmann TC, Mulrow CD, Shamseer L, Tetzlaff JM, Akl EA, Brennan SE, Chou R. The PRISMA 2020 statement: an updated guideline for reporting systematic reviews. bmj. 2021 Mar 29;372.

320. Panayiotou M, Black L, Carmichael-Murphy P, Qualter P, Humphrey N. Time spent on social media among the least influential factors in adolescent mental health:

Case: 26-5120, 08/24/2026, DktEntry: 6.2, Page 220 of 299

Preliminary results from a panel network analysis. Nature Mental Health, 2020; 1(5), 316–326.

321. Park SC, Kim JM, Jun TY, Lee MS, Kim JB, Yim HW, Park YC. How many different symptom combinations fulfil the diagnostic criteria for major depressive disorder? Results from the CRESCEND study. Nordic Journal of Psychiatry, 2017; 71(3), 217–222. https://doi.org/10.1080/08039488.2016.1265584.

322. Park SC, Kim D. The Centrality of Depression and Anxiety Symptoms in Major Depressive Disorder Determined Using a Network Analysis. J Affect Disord. 2020; 271:19-26. doi:10.1016/j.jad.2020.03.078.

323. Patalay P, Gage SH. Changes in millennial adolescent mental health and health-related behaviours over 10 years: a population cohort comparison study. Int J Epidemiol. 2019;48(5):1650-1664. doi:10.1093/ije/dyz006.

324. "Patient Health Questionnaire (PHQ-9 & PHQ-2)," American Psychological Association, accessed June 3, 2025, https://www.apa.org/pi/about/publications/caregivers/practice-settings/assessment/tools/patient-health.

325. Paulson FL. Teaching cooperation on television: An evaluation of Sesame Street social goals programs. AV Communication Review. 1974 Sep;22(3):229-46.

326. Pazdur M, Tutus D, Haag AC. Risk Factors for Problematic Social Media Use in Youth: A Systematic Review of Longitudinal Studies. Adolescent Res Rev 10, 237–253 (2025). https://doi.org/10.1007/s40894-025-00264-4.

327. Pekmic A. (2023). https://www.sportskeeda.com/basketball/what-average-points-per-game-ppg-nba-year-looking-last-decade-evolution-scoring.

328. Pera, A. Psychopathological processes involved in social comparison, depression, and envy on Facebook. Front. Psychol., 2018; 9: 1–5.

329. Pérez-Wiesner M, Bühler K-M, López-Moreno JA, López-Salmerón MD. Effectiveness of Psychological Treatments for Problematic Use of Internet, Video Games, Social Media and Instant Messaging: A Systematic Review and Meta-Analysis. Int. J. Environ. Res. Public Health, 2025; 22(10), 1598; https://doi.org/10.3390/ijerph22101598

330. Phillips T. (2017, August 28). "Electronic heroin": China's boot camps get tough on internet addicts. The Guardian. Now found: https://www.theguardian.com/world/2017/aug/28/electronic-heroin-china-boot-camps-internet-addicts.

331. Pignone MP, Gaynes BN, Rushton JL, Burchell CM, Orleans CT, Mulrow CD, Lohr KN. Screening for depression in adults: A summary of the evidence for the U.S. preventive services task force. Annals of Internal Medicine, 2002; 136(10), 765–776.

332. Piteo EM, Ward K. Review: Social networking sites and associations with depressive and anxiety symptoms in children and adolescents - a systematic review. Child Adolesc Ment Health. 2020 Nov;25(4):201-216. doi: 10.1111/camh.12373.

333. Plackett R, Blyth A, Schartau P. The impact of social media use interventions on mental well-being: systematic review (2023). Journal of Medical Internet Research, 25:e44922, doi: 10.2196/44922.

334. Plemmons G, Hall M, Doupnik S, et al. Hospitalization for Suicide Ideation or Attempt: 2008-2015. Pediatrics. 2018;141(6):e20172426. doi:10.1542/peds.2017-2426.

335. Podsakoff P, MacKenzie S, Lee J, and Podsakoff N. 2003. Common Method Biases in Behavioral Research: A Critical Review of the Literature and Recommended Remedies. Journal of Applied Psychology 88, 5 (2003), 879–903.

336. Polack RG, Sened H, Aube S, Zhang A, Joormann J, Kober H. Connections during Crisis: Adolescents' social dynamics and mental health during COVID-19, Dev Psychol. 2021 October; 57(10): 1633–1647. doi:10.1037/dev0001211.

337. Popat A, Tarrant C. Exploring adolescents' perspectives on social media and mental health and well-being - A qualitative literature review. Clin Child Psychol Psychiatry. 2023 Jan;28(1):323-337. doi: 10.1177/13591045221092884.

338. Prasad S, Ait Souabni S, Anugwom G, Aneni K, Anand A, Urhi A, Obi-Azuike C, Gibson T, Khan A, Oladunjoye F. Anxiety and depression amongst youth as adverse effects of using social media: A Review. Ann Med Surg (Lond). 2023 Jul 7;85(8):3974-3981. doi: 10.1097/MS9.0000000000001066.

339. Pretorius C, Chambers D, Coyle D. Young People's Online Help-Seeking and Mental Health Difficulties: Systematic Narrative Review. J Med Internet Res. 2019 Nov 19;21(11):e13873. doi: 10.2196/13873.

340. Price DD, Finniss DG, Benedetti F. A comprehensive review of the placebo effect: recent advances and current thought. Annual Review of Psychology. 2008 59, 565–590. https://doi.org/10.1146/annurev.psych.59.113006.095941

341. Przybylski AK, Nguyen TT, Law W, Weinstein N. Does taking a short break from social media have a positive effect on well-being? Evidence from three preregistered field experiments. Journal of Technology in Behavioral Science, 2021; 6(3), 507–514.

342. Puhl RM, Luedicke J, Heuer C. Weight-based victimization toward overweight adolescents: observations and reactions of peers. J Sch Health. Nov 2011;81(11):696-703. doi:10.1111/j.1746-1561.2011.00646.x

343. Purba AK, Thomson RM, Henery PM, Pearce A, Henderson M, Katikireddi SV, Social media use and health risk behaviours in young people: systematic review and meta-analysis (2023). BMJ, 383:e073552, doi: 10.1136/bmj-2022-073552.

344. Puukko K, Hietajarvi L, Maksniemi E, Alho K, Salmela'Aro K. Social Media Use and Depressive Symptoms – A Longitudinal Study from Early to Late Adolescence, International J. of Environmental Research and Public Health, 2020; 17: 5921. doi:10.3390/ijerph17165921.

345. Quek, Y. H., Tam, W. W. S., Zhang, M. W. B., & Ho, R. C. M. Exploring the association between childhood and adolescent obesity and depression: a meta- analysis. Obesity reviews: An official journal of the International Association for the Study of Obesity, 2017; 18(7), 742–754. https://doi.org/10.1111/obr.12535.

346. Rackin, H. M., Gemmill, A., & Hartnett, C. S. Environmental attitudes and fertility desires among US adolescents from 2005-2019. Journal of Marriage and the Family, 2023; 85(2), 631–644. https://doi.org/10.1111/jomf.12885.

347. Radesky J, Weeks HM, Schaller A, Robb M, Mann S, Lenhart ACCAWitLoaYPsSUSF, CA: Common Sense. Constant Companion: A Week in the Life of a Young Person's Smartphone Use. 2023.

348. Rajanala S, Maymone M, Vashi N. Selfies--Living in the Era of Filtered Photographs, JAMA Facial Plastic Surgery (Nov. 2018).

349. Rajkumar E, Julia GJ, Sri Lakshmi K NV, Ranjana PK, Manjima M, Devi RR, Rukmini D, Christina G, Romate J, Allen JG, Abraham J, Jacob AM. Prevalence of mental health problems among rural adolescents in India: A systematic review and meta-analysis. Sci Rep. 2022 Oct 4;12(1):16573. doi: 10.1038/s41598-022-19731-2.

350. Rakesh, Divyangana et al. "The Role of School Environment in Brain Structure, Connectivity, and Mental Health in Children: A Multimodal Investigation." *Biological psychiatry. Cognitive neuroscience and neuroimaging* vol. 8,1 (2023): 32-41. doi:10.1016/j.bpsc.2022.01.006

351. Rapa LJ, Katsiyannis A, Scott SN, Durham, O. School shootings in the United States: 1997–2022. Pediatrics. 2024; 153(4), e2023064311.

352. Reiss F. Socioeconomic inequalities and mental health problems in children and adolescents: A systematic review, Social Science & Medicine, 2013; 90:24e31, http://dx.doi.org/10.1016/j.socscimed.2013.04.026.

353. Retraction Watch. 2024. Finland Publication Forum will downgrade hundreds of Frontiers and MDPI journals. https://retractionwatch.com/2024/12/24/finland-publication-forum-will-downgrade-hundreds-of-frontiers-and-mdpi-journals/.

354. Reuben A, Caspi A, Belsky DW, et al. Association of Childhood Blood Lead Levels With Cognitive Function and Socioeconomic Status at Age 38 Years and With IQ Change and Socioeconomic Mobility Between Childhood and Adulthood. JAMA. 2017;317(12):1244-1251. doi:10.1001/jama.2017.1712.

355. Revranche M, Biscond M, Husky MM. Investigating the relationship between social media use and body image among adolescents: A systematic review (2022). L'Encéphale Volume 48, Issue 2, April 2022, Pages 206-218. https://doi.org/10.1016/j.encep.2021.08.006.

356. Reynaud M, Karila L, Blecha L, Benyamina A. Is love passion an addictive disorder? Am J Drug Alcohol Abuse. 2010 Sep; 36(5): 261-7. doi: 10.3109/00952990.2010.495183.

357. Richards D, Caldwell P HY, Go H. Impact of social media on the health of children and young people (2015). J Paediatr Chil Health 2015 Dec;51(12):1152-7. doi: 10.1111/jpc.13023.

358. Richardson MJ, Dale R, Marsh KL, Reis HT, Judd CM. Handbook of research methods in social and personality psychology (2014), Chapters 2 and 4.

359. Rideout V. Digital Health Practices, Social Media Use, and Mental Well-Being Among Teens and Young Adults in the U.S., Hopelab & Well Being Trust, 2018.

360. Ridout B, Campbell A. The Use of Social Networking Sites in Mental Health Interventions for Young People: Systematic Review (2018). J Med Internet Res 2018;20(12):e12244. doi: 10.2196/12244.

361. Riehm KE, Feder KA, Tormohlen KN, Crum RM, Young AS, Green KM, Pacek LR, La Flair LN, Mojtabai R. Associations between time spent using social media and internalizing and externalizing problems among US youth. JAMA psychiatry. 2019 Dec 1;76(12):1266-73.

362. Rigdon J, Baiocchi M, Basu S. Near-Far Matching in R: The nearfar Package. J Stat Softw. 2018;86(CS-5)doi:10.18637/jss.v086.c0510.

363. Rigdon J, Baiocchi M, Basu S. Preventing false discovery of heterogeneous treatment effect subgroups in randomized trials. Trials. Jul 16 2018;19(1):382. doi:10.1186/s13063-018-2774-5__Rosenman ETR, Friedberg R, Baiocchi M. Robust Designs for Prospective Randomized Trials Surveying Sensitive Topics. Am J Epidemiol. May 5 2023;192(5):812-820. doi:10.1093/aje/kwad027.

364. Riggs A, Bergmann KR, Zagel AL. Self-reported anxiety and perception of safety following school lockdown drills among adolescent youth. J Sch Health. 2023; 93: 1129- 1136. DOI: 10.1111/josh.13362.

365. Roberts SR, Maheux AJ, Hunt RA, Ladd BA, Choukas-Bradley S. Incorporating social media and muscular ideal internalization into the tripartite influence model of body image: Towards a modern understanding of adolescent girls' body dissatisfaction. Body image. 2022 Jun 1; 41: 239-47.

366. Rodman AM, Powers KE, Somerville LH. Development of self-protective biases in response to social evaluative feedback, Proc. Natl. Acad. Sci. U.S.A. 2017 114;(50):13158-13163, doi:10.1073/pnas.1712398114

367. Rodríguez-Castaño A, Fernández-Sánchez J, Trujillo-Colmena D, Lavín-Pérez AM, García-Ortiz C, Collado-Mateo D. Is physical activity associated with lower risk of social network problematic use or addiction? A systematic review and meta-analysis. Complementary Therapies in Clinical Practice, 2025 Aug; 60:101995. https://doi.org/10.1016/j.ctcp.2025.101995.

368. Roenneberg T, Kuehnle T, Pramstaller P, Ricken J, Havel M, Guth A, Merrow M, A marker for the end of adolescence, Current Biology, 2004; 14(24).

369. Rohrer JM. Thinking clearly about correlations and causation: Graphical causal models for observational data. Advances in methods and practices in psychological science. 2018 Mar;1(1):27-42.

370. Romanowicz M, Vande Voort J, Shekunov J, Oesterle T, Thusius N, Rummans T, Croarkin P, Karpyak V, Lynch B, Schak K. The effects of parental opioid use on the parent–child relationship and children's developmental and behavioral outcomes: a systematic review of published reports, Child Adolesc Psychiatry Ment Health, 2019; 13:5, https://doi.org/10.1186/s13034-019-0266-3.

371. Roseman M, Saadat N, Riehm K, Kloda L, Boruff J, Ickowicz A, Baltzer F, Katz L, Patten S, Rousseau C, Thombs B. Depression Screening and Health Outcomes in Children and Adolescents: A Systematic Review, The Canadian Journal of Psychiatry / La Revue Canadienne de Psychiatrie, 2017; 62(12) 813-817, DOI: 10.1177/0706743717727243.

372. Rosen NA. Demand characteristics in a field experiment. Journal of Applied Psychology. 1970; 54(2), 163–168. https://doi.org/10.1037/h0029053

373. Rosenman ETR, Basse G, Owen AB, Baiocchi M. Combining observational and experimental datasets using shrinkage estimators. Biometrics. Dec 2023;79(4):2961-2973. doi:10.1111/biom.13827.

374. Rosenman ETR, Friedberg R, Baiocchi M. Robust Designs for Prospective Randomized Trials Surveying Sensitive Topics. Am J Epidemiol. May 5 2023;192(5):812-820. doi:10.1093/aje/kwad027.

375. Ross JS, Gross CP, Desai MM, Hong Y, Grant AO, Daniels SR, Hachinski VC, Gibbons RJ, Gardner TJ, Krumholz HM. Effect of blinded peer review on abstract acceptance. Jama. 2006 Apr 12;295(14):1675-80.

376. Rothwell, J. Teens spend average of 4.8 hours on social media per day. Gallup. 2023, October 13.

377. Rousseau, A., Eggermont, S. & Frison, E. The reciprocal and indirect relationships between passive Facebook use, comparison on Facebook, and adolescents' body dissatisfaction. Comput. Hum. Behav, 2017; 73, 336–344.

378. Roy & Lloyd, Epidemiology of depression and diabetes: A systematic review, Journal of Affective Disorders, 2012; 142S1:S8–S21.

379. Rubino et al., Joint international consensus statement for ending stigma of obesity, Nature Medicine, Apr. 2020; vol. 26. https://doi.org/10.1038/s41591-020-0803-x.

380. Sadikova E, Widome R, Robinson E, Aris IM, Tiemeier H., Delaying high school start times impacts depressed mood among students: evidence from a natural experiment. Soc Psychiatry Psychiatr Epidemiol. Nov 2024;59(11):2073-2082., doi:10.1007/s00127-024-02694-2.

381. Sagioglou C, Greitemeyer T. Facebook's emotional consequences: Why Facebook causes a decrease in mood and why people still use it, Computers in Human Behavior, 2014; 35: 359–363.

382. Saiphoo AN, Vahedi Z. A meta-analytic review of the relationship between social media use and body image disturbance. Computers in human behavior. 2019 Dec 1;101:259-75.

383. Salancik GR & Pfeffer J. An examination of the need-satisfaction models of job attitudes. Administrative Science Quarterly. 1977; 22, 427–456.

384. Sampasa-Kanyinga H, Hamilton H, Chaput J. Use of Social Media is Associated with Short Sleep Duration in a Dose-Response Manner in Students Aged 11 to 20 Years, Acta Paediatrics, 2017.

385. Santos RMS, Mendes CG, Sen Bressani GY, de Alcantara Ventura S, de Almeida Nogueira YJ, de Miranda DM, Romano-Silva MA. The associations between screen time and mental health in adolescents: a systematic review. BMC Psychol. 2023 Apr 20;11(1):127. doi: 10.1186/s40359-023-01166-7.

386. Sarnquist C, Friedberg R, Rosenman ETR, Amuyunzu-Nyamongo M, Nyairo G, Baiocchi M. Sexual Assault Among Young Adolescents in Informal Settlements in Nairobi, Kenya: Findings from the IMPower and SOS Cluster-Randomized Controlled Trial. Prev Sci. May 2024;25(4):578-589. doi:10.1007/s11121-023-01595-1.

387. Satici B, Kayis AR, Griffiths M. Exploring the Association Between Social Media Addiction and Relationship Satisfaction: Psychological Distress as a Mediator, International Journal of Mental Health and Addiction, 2023; 21:2037–2051, https://doi.org/10.1007/s11469-021-00658-0.

388. Schandelmaier S, Briel M, Varadhan R, Schmid C, Devasenapathy N, Hayward R, Gagnier J, Borenstein M, van der Heijden G, Dahabreh I, Sun X, Sauerbrei W, Walsh M, Ioannidis J, Thabane L, Guyatt G. Development of the Instrument to assess the Credibility of Effect Modification Analyses (ICEMAN) in randomized controlled trials and meta-analyses, CMAJ, 2020 August 10;192:E901-6. doi: 10.1503/cmaj.200077.

389. Schenk S, Highgate Q. Methylenedioxymethamphetamine (MDMA): Serotonergic and dopaminergic mechanisms related to its use and misuse. J Neurochem. 2021 Jun; 157(5): 1714-1724. doi: 10.1111/jnc.15348.

390. Schisterman EF, Cole SR, Platt RW. Overadjustment bias and unnecessary adjustment in epidemiologic studies. Epidemiology. 2009;20(4):488-495. doi:10.1097/EDE.0b013e3181a819a1.

391. Schmidt-Persson J, Rasmussen MGB, Sørensen SO, et al. Screen Media Use and Mental Health of Children and Adolescents: A Secondary Analysis of a Randomized Clinical Trial. JAMA Netw Open. 2024;7(7):e2419881. Published 2024 Jul 1. doi:10.1001/jamanetworkopen.2024.19881.

392. Schrijvers K, Cosma A, Potrebny T, et al. Three Decades of Adolescent Health: Unveiling Global Trends Across 41 Countries in Psychological and Somatic Complaints (1994-2022). Int J Public Health. 2024;69:1607774. Published 2024 Dec 2. doi:10.3389/ijph.2024.1607774.

393. Schultz J, Cohen AM, Muschert GW, Flores de Apodaca R. Fatal school shootings and the epidemiological context of firearm mortality in the United States. Disaster Health. 2013; 1(2), 84–101. https://doi.org/10.4161/dish.26897.

394. Schuman, H., Presser, S., & Ludwig, J. Context effects on survey responses to questions about abortion. Public Opinion Quarterly, 45(2), 216-223. 1981.

395. Schuman, H., & Presser, S. Questions and answers in attitude surveys: Experiments on question form, wording, and context. Sage. 1996.

396. Schwimmer JB, Burwinkle TM, Varni JW. Health-related quality of life of severely obese children and adolescents. JAMA, 2003; 289(14):1813-9. Doi.10.1001/jama.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.

397. Scissors L, Burke M, Wengrovitz S. What's in a Like? Attitudes and behaviors around receiving Likes on Facebook, CSCW '16 (Feb. 27-Mar. 2, 2016).

398. Scott H, Biello S, Woods HC. Social Media Use and Adolescent Sleep Patterns: Cross-Sectional Findings from the UK Millennium Cohort Study, BJM Open, 2019.

399. Schreurs L & Vandenbosch L. Different interactions with appearance-focused social media content and adolescents' body dissatisfaction: A within-person perspective. Computers in Human Behavior, 2022; 135: 107364.

400. Segal J, Vaaradhan R, Groenwold R, Henderson N, Li X, Nomura K, Kaplan S, Ardeshirrouhanifard S, Heyward J, Nyberg F. Assessing Heterogeneity of Treatment Effect in Real-World Data, Ann Intern Med. 2023 April ; 176(4): 536–544. doi:10.7326/M22-1510.

401. Semken C, Rossell D. Specification Analysis for Technology Use and Teenager Well-Being: Statistical Validity and a Bayesian Proposal. Journal of the Royal Statistical Society. 2022;71(5):1330-1355. doi:10.1111/rssc.12578.

402. Senekal JS, Groenewald GR, Wolfaardt L, Jansen C, Williams K. Social media and adolescent psychosocial development: a systematic review (2023). South African Journal of Psychology 2023, Vol. 53(2) 157–171. DOI: 10.1177/00812463221119302.

403. Shah J, Das P, Muthiah N, Milanaik R. New age technology and social media: adolescent psychosocial implications and the need for protective measures. Curr Opin Pediatr. 2019 Feb;31(1):148-156. doi: 10.1097/MOP.0000000000000714.

404. Shannon H, Bush K, Villeneuve PJ, Hellemans KG, Guimond S. Problematic Social Media Use in Adolescents and Young Adults: Systematic Review and Meta-analysis. JMIR Ment Health. 2022 Apr 14;9(4):e33450. doi: 10.2196/33450.

405. Shannon H, Montgomerg M, Cassidy C, Lemiuex M, Yee JA, Brunier L-S, Hellemans K & Guimond S. Testing dopaminergic markers of problematic social media use using neuromelanin-sensitive MRI. Psychiatry Research: Neuroimaging, 2026; 357: 112144. https://doi.org/10.1016/j.pscychresns.2026.112144.

406. Shaw J, Mitchell C, Welch A, Williamson M. Social media used as a health intervention in adolescent health: A systematic review of the literature, Digital Health, 2015; 1: 1–10, DOI: 10.1177/2055207615588395.

407. Shen L, Wiley JF, Bei B. Perceived daily sleep need and sleep debt in adolescents: associations with daily affect over school and vacation periods, SLEEPJ, 2021; 1–9, https://doi.org/10.1093/sleep/zsab190.

408. Sheehan RG, Grieves R. Sunspots and cycles: A test of causation. Southern Economic Journal. 1982 Jan 1:775-7.

409. Sherman LE, Greenfield PM, Hernandez LM. Dapretto, M., Peer Influence Via Instagram: Effects on Brain and Behavior in Adolescence and Young Adulthood, Child Dev. (Jan. 2018).

410. Sherman LE, Payton AA, Hernandez LM, Greenfield PM, Dapretto M. The Power of the Like in Adolescence: Effects of Peer Influence on Neural and Behavioral Responses to Social Media. Psychol Sci. Jul 2016;27(7):1027-35. doi:10.1177/0956797616645673

411. Sherman LE, Hernandez LM, Greenfield PM, Dapretto M. What the brain 'Likes': neural correlates of providing feedback on social media. Soc Cogn Affect Neurosci. Sep 4 2018;13(7):699-707. doi:10.1093/scan/nsy051.

412. Shojaie A, Fox EB. Granger causality: A review and recent advances. Annual Review of Statistics and Its Application. 2022 Mar 7;9(1):289-319.

413. Shultz JM, Cohen AM, Muschert GW, de Apodaca RF. Fatal school shootings and the epidemiological context of firearm mortality in the United States, Disaster Health, 2013; 1:2, 84-101.

414. Siemieniecka DA & Jarczyńska J. Relationship between social media use and adolescent mental health—A systematic review. International Journal of Pedagogy, Innovation and New Technologies (IJPINT), 2023; 10(1), 42–63.

415. Singh, B. Zhou, M. Curtis, R., Maher, C., Dumuid. D. (2026). Social Media Use and Well-Being Across Adolescent Development. JAMA Pediatrics. doi:10.1001/jamapediatrics.2025.5619.

416. Skinner AC, Ravanbakht SN, Skelton JA, Perrin EM, Armstrong SC. Prevalence of Obesity and Severe Obesity in US Children, 1999–2016, Pediatrics, 2018.

417. So B & Kwon KH. The Impact of Thin-Ideal Internalization, Appearance Comparison, Social Media Use on Body Image and Eating Disorders: A Literature Review. Journal of Evidence-Based Social Work, 2023; 20(1), 55–71. https://doi.org/10.1080/26408066.2022.2117582

418. Spiegel K, Rey A, Cheylus A, Taylor D, Irwin M, Van Cauter E. A Meta Analysis of the Associations Between Insufficient Sleep Duration and Antibody Response to Vaccination, Current Biology, 2023.

419. Spiller HA, Ackerman JP, Spiller NE, Casavant MJ. Sex- and Age-specific Increases in Suicide Attempts by Self-Poisoning in the United States among Youth and Young Adults from 2000 to 2018. J Pediatr. 2019;210:201-208. doi:10.1016/j.jpeds.2019.02.045.

420. Steinsbekk S, Nesi J, Wichstrom L. Social media behaviors and symptoms of anxiety and depression. A four-wave cohort study from age 10-16 years. Comput Human Behav, 2023; 147.

421. Sterne JA, Egger M, Smith GD. Investigating and dealing with publication and other biases in meta-analysis. Bmj. 2001 Jul 14;323(7304):101-5.

422. Strack, F. “Order Effects” in Survey Research: Activation and Information Functions of Preceding Questions. In Context Effects in Social and Psychological Research. 1992 Norbert Schwarz and Seymour Sudman (Eds.). Springer New York, New York, NY, 23–34.

423. Su, C., Zhou, H., Gong, L., Teng, B., Geng, F., & Hu, Y. (2021). Viewing personalized video clips recommended by TikTok activates default mode network and ventral tegmental area. NeuroImage, 237, 118136. https://doi.org/10.1016/j.neuroimage.2021.118136

424. Substance Abuse and Mental Health Services Administration. (2020). Key substance use and mental health indicators in the United States: Results from the 2019 National Survey on Drug Use and Health (HHS Publication No. PEP20-07-01-001, NSDUH Series H-55). Rockville, MD: Center for Behavioral Health Statistics and Quality, Substance Abuse and Mental Health Services Administration. Retrieved from https://www.samhsa.gov/data/.

425. Susi K, Glover-Ford F, Stewart A, Knowles Bevis R, Hawton K. Research review: Viewing self-harm images on the internet and social media platforms: Systematic review of the impact and associated psychological mechanisms (2023). Journal of Child Psychology and Psychiatry 64:8, 115–1139, doi:10.1111/jcpp.13754.

426. Swanson SA, Eyllon M, Sheu YH, Miller M. Firearm access and adolescent suicide risk: Toward a clearer understanding of effect size. Injury Prevention, 2021; 27, 264–270.

427. Tandron et al., Sleepless due to social media? Investigating problematic sleep due to social media and social media sleep hygiene, Computers in Human Behavior, 2020; 113(1):106487, DOI:10.1016/j.chb.2020.106487.

428. Taquette SR, Monteiro DLM. Causes and consequences of adolescent dating violence: a systematic review. J Inj Violence Res. 2019 Jul;11(2):137-147. doi: 10.5249/jivr.v11i2.1061.

429. Tartaglia S & Bergagna E. Social networking sites passive use and its effects on sad-happy mood. Psihologija, 2022; 55(2), 137–148. https://doi.org/10.2298/PSI201002008T.

430. Temple JR, Baumler E, Wood L, Guillot-Wright S, Torres E, Thiel, M. The Impact of the COVID-19 Pandemic on Adolescent Mental Health and Substance Use. The Journal of adolescent health : official publication of the Society for Adolescent Medicine, 2022; 71(3), 277–284. https://doi.org/10.1016/j.jadohealth.2022.05.025.

431. Thai H, Davis CG, Stewart N, Gunnell KE, Goldfield GS. The effects of reducing social media use on body esteem among transitional-aged youth. Journal of Social and Clinical Psychology, 2021; 40(6), 481- 507. https://doi.org/10.1521/jscp.2021.40.6.481

432. Thai et al., Reducing Social Media Use Improves Appearance and Weight Esteem in Youth With Emotional Distress, Psychology of Popular Media, February 2023; 13(1):162-169, DOI:10.1037/ppm0000460.

433. Throuvala MA, Griffiths MD, Rennoldson M, Kuss DJ. School-based Prevention for Adolescent Internet Addiction: Prevention is the Key. A Systematic Literature Review. Curr Neuropharmacol. 2019;17(6):507-525. doi: 10.2174/1570159X16666180813153806.

434. Thrul J, Devkota J, AlJuboori D, Regan T, Alomairah S, Vidal C. Social media reduction or abstinence interventions are providing mental health benefits—Reanalysis of a published meta-analysis. Psychology of Popular Media. 2025;14(2):207–209. doi:10.1037/ppm0000574.

435. Tiggemann M, Zinoviev K. The Effect of #Enhancement-Free Instagram Images and Hashtags on Women’s Body Image, Body Image, 2019.

436. Tiggemann M, Hayden S, Brown Z, Veldhuis J, The Effect of Instagram "Likes" on Women's Social Comparison and Body Dissatisfaction, Body Image, 2018.

437. Timlin MT, Pereira MA, Story M, Neumark-Sztainer D. Breakfast eating and weight change in a 5-year prospective analysis of adolescents: Project EAT (Eating Among Teens). Pediatrics, 2008; 121(3), e638–e645. https://doi.org/10.1542/peds.2007-1035.

438. Tourangeau, R., Rasinski, K. A., & Bradburn, N. Measuring happiness in surveys: A test of the subtraction hypothesis. Public Opinion Quarterly, 55(2), 255-266. 1991.

439. Tromholt M. The Facebook Experiment: Quitting Facebook Leads to Higher Levels of Well-Being, Cyberpsychology, Behavior, and Social Networking, 2016.

440. Turel O & Bechara A. A Triple-System Neural Model of Maladaptive Consumption. J. of the Association for Consumer Research, 2021, 6(3): 324–333. https://doi.org/10.1086/714366.

441. Turel O, He Q, Xue G, Xiao L, Bechara A. Examination of neural systems sub-serving facebook "addiction". Psychol Rep. 2014 Dec;115(3):675-95. doi: 10.2466/18.PR0.115c31z8.

442. Turner, C. F. Surveys of subjective phenomena. In Measurement of Subjective Phenomena. Washington, DC: Bureau of the Census, US Dept. of Commerce. 1981.

443. Twenge JM. Have some teens benefited in the era of social media? Generation Tech Substack. 2024

444. Twenge JM. Increases in depression, self-harm, and suicide among U.S. adolescents after 2012 and links to technology use: Possible mechanisms. Psychiatric Research and Clinical Practice, 2020; 2(1), 19–25.

445. Twenge JM. The age of anxiety? Birth cohort change in anxiety and neuroticism, 1952-1993. Journal of Personality and Social Psychology, 2000; 79(6), 1007-1021.

446. Twenge JM. Time period and birth cohort differences in depressive symptoms in the US, 1982–2013. Social Indicators Research. 2015 Apr; 121:437-54.

447. Twenge JM, Campbell WK. Media Use Is Linked to Lower Psychological Well-Being: Evidence from Three Datasets. Psychiatr Q. Jun 2019;90(2):311-331. doi:10.1007/s11126-019-09630-7.

448. Twenge JM, Cooper AB, Joiner TE, Duffy ME, Binau SG. Age, period, and cohort trends in mood disorder indicators and suicide-related outcomes in a nationally representative dataset, 2005-2017. J Abnorm Psychol. 2019;128(3):185-199. doi:10.1037/abn0000410.

449. Twenge JM, Farley E. Not all screen time is created equal: associations with mental health vary by activity and gender. Soc Psychiatry Psychiatr Epidemiol. 2021;56(2):207-217. doi:10.1007/s00127-020-01906-9.

450. Twenge JM, Haidt J, Blake AB, McAllister C, Lemon H, Le Roy A. Worldwide increases in adolescent loneliness. J Adolesc. 2021;93:257-269. doi:10.1016/j.adolescence.2021.06.006.

451. Twenge JM, Haidt J, Joiner TE, Campbell WK. Underestimating digital media harm. Nat Hum Behav. 2020;4(4):346-348. doi:10.1038/s41562-020-0839-4.

452. Twenge JM, Haidt J, Lozano J, Cummins KM. Specification curve analysis shows that social media use is linked to poor mental health, especially among girls. Acta Psychologica. 2022;224(1):103512. doi:10.1016/j.actpsy.2022.103512.

453. Twenge JM, Hamilton JL. Linear correlation is insufficient as the sole measure of associations: The case of technology use and mental health. Acta Psychol (Amst). 2022;229:103696. doi:10.1016/j.actpsy.2022.103696.

454. Twenge JM, Joiner TE, Rogers ML, Martin GN. Increases in Depressive Symptoms, Suicide-Related Outcomes, and Suicide Rates Among U.S. Adolescents After 2010 and Links to Increased New Media Screen Time. Clinical Psychological Science. 2017;6(1):3-17. doi:10.1177/2167702617723376.

455. Twenge JM, Krizan Z, Hisler G. Decreases in self-reported sleep duration among US adolescents 2009–2015 and association with new media screen time. Sleep medicine. 2017 Nov 1;39:47-53.

456. Twenge JM, Martin GN, Campbell WK. Decreases in psychological well-being among American adolescents after 2012 and links to screen time during the rise of smartphone technology. Emotion. 2018 Sep;18(6):765.

457. Twenge JM, Martin GN. Gender differences in associations between digital media use and psychological well-being: Evidence from three large datasets. J Adolesc. 2020;79:91-102. doi:10.1016/j.adolescence.2019.12.018.

458. Twenge JM, Martin GN, Spitzberg BH. Trends in U.S. Adolescents' media use, 1976–2016: The rise of digital media, the decline of TV, and the (near) demise of print. Psychology of Popular Media Culture. 2019;8(4):329–345. doi:10.1037/ppm0000203.

459. Twenge JM, Park H. The Decline in Adult Activities Among U.S. Adolescents, 1976-2016. Child Dev. 2019;90(2):638-654. doi:10.1111/cdev.12930.

460. Twenge JM, Spitzberg BH, Campbell WK. Less in-person social interaction with peers among US adolescents in the 21st century and links to loneliness. Journal of social and personal relationships. 2019 Jun;36(6):1892-913.

461. Uher R, Payne JL, Pavlova B, Perlis RH. Major depressive disorder in DSM-5: Implications for clinical practice and research of changes from DSM-IV. Depression and Anxiety, 2014; 31(6), 459–471.

462. Ul-Haq Z, Smith DJ, Nicholl BI, et al. Gender differences in the association between adiposity and probable major depression: a cross-sectional study of 140,564 UK Biobank participants. BMC Psychiatry 2014; 14, 153. https://doi.org/10.1186/1471-244X-14-153

463. US Preventive Services Task Force. Screening and Treatment for Major Depressive Disorder in Children and Adolescents: US Preventive Services Task Force Recommendation Statement. PEDIATRICS, 2009; 123:4.

464. US Preventive Services Task Force (2017). Procedure Manual Appendix I. Congressional Mandate Establishing the U.S. Preventive Services Task Force, https://www.uspreventiveservicestaskforce.org/uspstf/about-uspstf/methods-and-processes/procedure-manual/procedure-manual-appendix-i.

465. U.S. Surgeon General's Advisory, Social Media and Youth Mental Health (2023).

466. Valkenburg PM. Social media use and well-being: What we know and what we need to know. Current opinion in psychology. 2022 Apr.; 44:58-68. Doi: 10.1016/j.copsyc.2021.09.017.

467. Valkenburg PM, et al., Social Media Browsing and Adolescent Well-Being: Challenging the "Passive Social Media Use Hypothesis," Journal of Computer-Mediated Communication, 2022; 27(1): zmab015, https://doi.org/10.1093/jcmc/zmab015.

468. Valkenburg PM, Meier A, Beyens I. Social media use and its impact on adolescent mental health: An umbrella review of the evidence. Current opinion in psychology. 2022 Apr 1;44:58-68.

469. Valkenburg PM, Beyens I, Loes Pouwels J, van Driel I, Keijsers L. Social Media Use and Adolescents' Self-Esteem: Heading for a Person-Specific Media Effects Paradigm, Journal of Communication, 2021; 71(1): 56–78, https://doi.org/10.1093/joc/jqaa039

470. Vall-Roqué H, Andrés A, González-Pacheco H, Saldaña C. Women's body dissatisfaction, physical appearance comparisons, and Instagram use throughout the COVID-19 pandemic: A longitudinal study. Int J Eat Disord. 2023 Jan; 56(1):118-131. doi: 10.1002/eat.23827.

471. Vall-Roqué H., et al. Women's body dissatisfaction, physical appearance comparisons, and Instagram use throughout the COVID-19 pandemic: A longitudinal study." The International Journal of Eating Disorders, 2023, 56(1): 118-131. doi:10.1002/eat.23827.

472. Vally Z & D'Souza CG Abstinence from social media use, subjective well-being, stress, and loneliness. Perspectives in Psychiatric Care, 2019; 55(4), 752-759.

473. Van Den Beemt A, Thurlings M, Willems M. Towards an understanding of social media use in the classroom: a literature review, Technology, Pedagogy and Education, 2020; 29:1, 35-55, DOI: 10.1080/1475939X.2019.1695657.

474. van den Eijnden, R., Geurts, S., ter Bogt, T., van der Rijst, V., Koning, I., Social Media Use and Adolescents' Sleep: A Longitudinal Study on the Protective Role of Parental Rules Regarding Internet Use Before Sleep, International J. of Environmental Research and Public Health, 2021.

475. van der Wal A, Beyens I, Janssen LHC, Valkenburg PM. Diverse Platforms, Diverse Effects: Evidence From a 100-Day Study on Social Media and Adolescent Mental Health. Amsterdam School of Communication Research. doi:10.31234/osf.io/qe9rn.

476. van Nieuwenhuizen A, Hudson K, Chen X, Hwong AR. The Effects of Climate Change on Child and Adolescent Mental Health: Clinical Considerations. Current psychiatry reports, 2021; 23(12), 88. https://doi.org/10.1007/s11920-021-01296-y.

477. Van Rooij AJ, Schoenmakers TM, Vermulst AA, Van den Eijnden RJ, Van de Mheen D. Online video game addiction: identification of addicted adolescent gamers. Addiction. 2011 Jan; 106(1): 205-12. doi: 10.1111/j.1360-0443.2010.03104.x.

478. van Wezel MMC, Abrahamse EL, Vanden Abeele MMP. Does a 7-day restriction on the use of social media improve cognitive functioning and emotional well-being? Results from a randomized controlled trial. Addictive Behaviors Reports, 2021; 14, 100365. https://doi.org/10.1016/j.abrep.2021.100365

479. Vanman EJ, Baker R, Tobin S J. The burden of online friends: the effects of giving up Facebook on stress and well-being. The Journal of Social Psychology, 2018;158(4), 496–507. https://doi.org/10.1080/00224545.2018.1453467.

480. Vasan et al., Association of Neighborhood Gun Violence With Mental Health– Related Pediatric Emergency Department Utilization, JAMA Pediatr. 2021;175(12):1244-1251. doi:10.1001/jamapediatrics.2021.3512.

481. Vázquez-Vázquez A, Smith A, Gibson F, Roberts H, Mathews G, Ward JL, Viner RM, Nicholls D, Cornaglia F, Roland D, Phillips K. Admissions to pediatric medical wards with a primary mental health diagnosis: a systematic review of the literature. Archives of Disease in Childhood. 2024 Sep 1;109(9):707-16.

482. Veldhuis J, Konijn EA, Seidell JC. Negotiated media effects. Peer feedback modifies effects of media's thin-body ideal on adolescent girls. Appetite. 2014 Feb:73:172-82. doi: 10.1016/j.appet.2013.10.023.

483. Vendemia MA, DeAndrea DC. The effects of viewing thin, sexualized selfies on Instagram: Investigating the role of image source and awareness of photo editing practices, Body Image, 2018; 27.

484. Verduyn P, Lee DS, Park J, et al. Passive Facebook usage undermines affective well-being: Experimental and longitudinal evidence. J Exp Psychol Gen. 2015;144(2):480-488. doi:10.1037/xge0000057.

485. Verduyn P, Gugushvili N, Massar K, Täht K, Kross E. Social comparison on social networking sites. Current Opinion in Psychology, 2020; 36:32-37, https://doi.org/10.1016/j.copsyc.2020.04.002.

486. Vidal C, Lhaksampa T, Miller L, Platt R. Social media use and depression in adolescents: a scoping review. Int Rev Psychiatry. 2020 May;32(3):235-253. doi: 10.1080/09540261.2020.1720623.

487. Viner RM, Gireesh A, Stiglic N, et al. Roles of cyberbullying, sleep, and physical activity in mediating the effects of social media use on mental health and wellbeing among young people in England: a secondary analysis of longitudinal data. Lancet Child Adolesc Health. 2019;3(10):685-696. doi:10.1016/S2352-4642(19)30186-5.

488. Voggenreiter A, Brandt S, Putterer F, Frings A, Pfeffer J. The role of likes: How online feedback impacts users' mental health. Proceedings of the 16th ACM Web Science Conference, 2024; 302–310.

489. Volkow ND, Ding YS, Fowler JS, Wang GJ, Logan J, Gatley JS, Dewey S, Ashby C, Liebermann J, Hitzemann R, et al. Is methylphenidate like cocaine? Studies on their pharmacokinetics and distribution in the human brain. Arch Gen Psychiatry. 1995 Jun; 52(6): 456-63. doi: 10.1001/archpsyc.1995.03950180042006.

490. Volkow ND, Blanco C. Substance use disorders: a comprehensive update of classification, epidemiology, neurobiology, clinical aspects, treatment and prevention. World Psychiatry. 2023 Jun; 22(2): 203-229. doi: 10.1002/wps.21073.

491. Volkow ND, Morales M. The Brain on Drugs: From Reward to Addiction. Cell. 2015 Aug 13; 162(4): 712-25. doi: 10.1016/j.cell.2015.07.046.

492. Vuorre M, Przybylski AK. A multiverse analysis of the associations between internet use and well-being. Technology, Mind, and Behavior. 2024;5(2). doi:10.1037/tmb0000127.

493. Vuorre M, Przybylski AK. Estimating the association between Facebook adoption and well-being in 72 countries. R Soc Open Sci. 2023;10(8):221451. Published 2023 Aug 9. doi:10.1098/rsos.221451.

494. Vuorre M, Przybylski AK. Global Well-Being and Mental Health in the Internet Age. Clinical Psychological Science. 2023;12(5):917-935. doi:10.1177/21677026231207791.

495. Walter AW, Yuan Y, Cabral HJ. Mental Health Services Utilization and Expenditures Among Children Enrolled in Employer-Sponsored Health Plans. Pediatrics. May 2017;139(Suppl 2):S127-S135. doi:10.1542/peds.2016-2786.

496. Yu SC, Sheldon KM, Lan WP, Chen JH. Using Social Network Sites to Boost Savoring: Positive Effects on Positive Emotions. Int J Environ Res Public Health. 2020 Sep 2;17(17):6407. doi: 10.3390/ijerph17176407. PMID: 32887521; PMCID: PMC7503456.

497. Wang, F., Wang, S., Zong, Q. Q., Zhang, Q., Ng, C., Ungvari, G., & Xiang, Y. Systematic Review or Meta-analysis Prevalence of comorbid major depressive disorder in Type 2 diabetes: a meta-analysis of comparative and epidemiological studies. Diabetic Medicine. 2019; 36, 961-969.

498. Ward K. The Impact of Social Media Use on Adolescent Mental Health and Social Participation. 2017.

499. Ward JL, Vázquez-Vázquez A, Phillips K, et al. Admission to acute medical wards for mental health concerns among children and young people in England from 2012 to 2022: a cohort study. Lancet Child Adolesc Health. 2025;9(2):112-120. doi:10.1016/S2352-4642(24)00333-X.

500. Warnick JL, Darling KE, West CE, Jones L, Jelalian E. Weight Stigma and Mental Health in Youth: A Systematic Review and Meta-Analysis. Journal of Pediatric Psychology, 2022; 47(3), 237–255. https://doi.org/10.1093/jpepsy/jsab110.

501. Watson et al. Delaying Middle School and High School Start Times Promotes Student Health and Performance: An American Academy of Sleep Medicine Position Statement. Journal of Clinical Sleep Medicine, 2017; 13(4), 623–625. https://doi.org/10.5664/jcsm.6558.

502. Weigle PE, Shafi RMA. Social Media and Youth Mental Health. Curr Psychiatry Rep. 2024 Jan;26(1):1-8. doi: 10.1007/s11920-023-01478-w.

503. Weinstein E. Adolescents' differential responses to social media browsing: Exploring causes and consequences for intervention. Computers in Human Behavior, 2017; 76, 396–405.

504. Wilkins NJ, Clayton H, Jones CM, Brown M. Current Prescription Opioid Misuse and Suicide Risk Behaviors Among High School Students. Pediatrics, 2021; 147(4), e2020030601. https://doi.org/10.1542/peds.2020-030601.

505. Wilksch S, O'Shea A, Ho P, Byrne S, Wade T. The Relationship Between Social Media Use and Disordered Eating in Young Adolescents, International J. of Eating Disorders, 2019.

506. Williams RT. An Exploration into the Pedagogical Benefits of Using Social Media: Can Educators Incorporate Social Media into Pedagogy Successfully?: A work in progress. ABC Journal of Advanced Research, 2020; 9(2).

507. Williams SB, O'Connor EA, Eder M, Whitlock EP. Screening for child and adolescent depression in primary care settings: a systematic evidence review for the US Preventive Services Task Force. Pediatrics, 2009; 123(4), e716–e735. https://doi.org/10.1542/peds.2008-2415.

508. Williams S. (2014, August 25). "Electronic heroin" spawns Chinese internet addiction camps. VOA. https://www.voanews.com/a/electronic-heroin-spawns-chinese-internet-addiction-camps/2427495.html

509. Winstone L, Mars B, Haworth CMA, Heron J, Kidger J. Adolescent social media user types and their mental health and well-being: Results from a longitudinal survey of 13-14-year-olds in the United Kingdom. JCPP advances, 2022; 2(2), e12071. https://doi.org/10.1002/jcv2.12071.

510. Wissow et al. Universal Mental Health Screening in Pediatric Primary Care: A Systematic Review. J Am Acad Child Adolesc Psychiatry, 2013; 52(11): 1134–1147.e23. doi:10.1016/j.jaac. 2013.08.013.

511. Wu W, Huang L, Yang F. Social anxiety and problematic social media use: A systematic review and meta-analysis. Addictive Behaviors. 2024; 153, 107995, https://doi.org/10.1016/j.addbeh.2024.107995.

512. Xiao et al. Addictive Screen Use Trajectories and Suicidal Behaviors, Suicidal Ideation, and Mental Health in US Youths. JAMA. 2025

513. Yigiter MS, Demir S Dogan N. The Relationship Between Problematic Social Media Use and Depression: A Meta-Analysis Study. Curr Psychol 43, 7936–7951 (2024). https://doi.org/10.1007/s12144-023-04972-9.

514. Yu DJ, Wing YK, Li TMH, Chan NY. The Impact of Social Media Use on Sleep and Mental Health in Youth: a Scoping Review. Curr Psychiatry Rep. 2024 Mar;26(3):104-119. doi: 10.1007/s11920-024-01481-9.

515. Yu SC, Sheldon KM, Lan WP, Chen JH. Using Social Network Sites to Boost Savoring: Positive Effects on Positive Emotions. Int J Environ Res Public Health. 2020 Sep 2;17(17):6407. doi: 10.3390/ijerph17176407. PMID: 32887521; PMCID: PMC7503456.

516. Yu Y, Dykxoorn J, Plackett R. The Impact of Different Types of Social Media Use on the Mental Health of UK Adults: Longitudinal Observational Study, J. of Medical Internet Research (2024).

517. Yuen et al. The Effects of Facebook on Mood in Emerging Adults. Psychology of Popular Media Culture,.2018. http://dx.doi.org/10.1037/ppm0000178.

518. Yusuf NA, Astuti RT. The impact of Facebook content on mental health status among Generation Z: A literature review. Innovation in Health for Society, 2025; 5(2): 70-78. https://doi.org/10.31603/ihs.13301.

519. Zhang Q, Huang Z, Sui Y, Lin FH, Guan H, Li L, Wang K, Neitzel A. Social-Media-Based Mental Health Interventions: Meta-Analysis of Randomized Controlled Trials. J Med Internet Res. 2025 Aug 14; 27: e67953. doi: 10.2196/67953.

520. Zhao Y, Paulus M, Bagot KS, et al. Brain structural covariation linked to screen media activity and externalizing behaviors in children. J Behav Addict. 2022;11(2):417-426. Published 2022 Jun 30. doi:10.1556/2006.2022.00044.

521. Zhao Y, Paulus MP, Potenza MN. Brain structural co-development is associated with internalizing symptoms two years later in the ABCD cohort. J Behav Addict. 2023;12(1):80-93. Published 2023 Mar 20. doi:10.1556/2006.2023.00006

522. Zhou Z, Cheng Q. Relationship between online social support and adolescents' mental health: A systematic review and meta-analysis. J Adolesc. 2022 Apr;94(3):281-292. doi: 10.1002/jad.12031.

523. Zimmerman M, Ellison W, Young D, Chelminski I, Dalrymple K. How many different ways do patients meet the diagnostic criteria for major depressive disorder?. Comprehensive psychiatry. 2015 Jan 1;56:29-34.

Produced Documents

524. META_BONTA-00000560
525. META_BONTA-00000001
526. META_BONTA-00000003
527. META_BONTA-00000192
528. META_BONTA-00000197
529. META_BONTA-00000282
530. META_BONTA-00000531
531. META_BONTA-00000568
532. META_BONTA-00000677
533. META_BONTA-00000833
534. META_BONTA-00000882
535. META_BONTA-00000896

# Exhibit C

# Michael Baiocchi, PhD

## Curriculum Vitae

April, 2026

**I. Personal Information**

Michael Baiocchi, Ph.D.
Associate Professor, Department of Epidemiology and Population Health (tenured in 2022) and (by courtesy) Statistics Department, and the Stanford Prevention Research Center, Department of Medicine
baiocchi@stanford.edu
415-517-3892

**II. Educational History**

**Colleges and Universities Attended**

2003 B.A., Williams College, Williamstown (Mathematics)
Advisor: Thomas Garrity

2011 Ph.D., University of Pennsylvania, Philadelphia (Statistics)
Advisor: Dylan Small

**Fellowships and Postdoctoral training**

2011 – 2014 Stein Fellow, Stanford University (Statistics Department)

**III. Professional Appointments**

2014 –2019 Assistant Professor, Stanford Prevention Research Center
Department of Medicine
(by courtesy: Department of Statistics, Department of Health Research Policy)
Stanford University

2020 – 2022 Assistant Professor, Department of Epidemiology & Population Health
(by courtesy: Department of Statistics, SPRC/Department of Medicine)
Stanford University

2022 – Currently Associate Professor, Department of Epidemiology & Population Health
(by courtesy: Department of Statistics, SPRC/Department of Medicine)
Stanford University

**IV. Honors and Awards**

2003 Frank Morgan Teaching Award for aptitude in teaching

2007 Inaugural Most Valuable Teaching Assistant Award for teaching MBAs

2007 Donald S. Murray Award for excellence in teaching

2009 Graduate Student Travel Award from Statistics in Epidemiology for student paper competition JSM

2009 Parker Bursk Prize for excellence in research

2010 Art of Research Presentation Award Winner

---

| | |
|---|---|
| 2010 | Graduate Student Travel Award from the Health Policy Statistics Section for student paper competition – JSM. |
| 2010 | Deming Student Scholar Award to encourage, foster and recognize an outstanding graduate student – Deming Conference on Applied Statistics |
| 2010 | Most Valuable Teaching Assistant Award for teaching MBAs |
| 2011 | The President's & Provost's Citation for Exceptional Commitment to Graduate & Professional Student Life for "having been a catalyst for transformative and lasting new developments that have enhanced graduate and professional student life at Penn" |
| 2016 | Stanford Center at Peking University Faculty Fellowship |
| 2016 | SPECTRUM Award |
| 2017 | Clayman Institute Faculty Fellow for Gender Research |
| 2017 | Rosenkranz Prize for Healthcare Research<br>Stanford Center for Health Policy |
| 2017 | Department of Medicine Teaching Award |
| 2019 | Stanford Impact Lab Fellowship |
| 2020 | Stanford Faculty Leadership Bootcamp |
| 2020 | Best of Annual Research Meeting, Academy Health |
| 2024 | Cochran Award (Observational Studies) |
| 2024 | Global Grand Challenges Award (Bill & Melinda Gates Foundation) |

**V. Scholarly Publications**
**Peer-reviewed, original research journal articles** – (18 first or senior author)

1. Lorch SA, **Baiocchi M**, Silber JH, Even-Shoshan O, Escobar GJ, Small DS. The role of outpatient facilities in explaining variations in risk-adjusted readmission rates between hospitals. *Health Services Research*. 2010 Feb;45(1):24-41. doi: 10.1111/j.1475-6773.2009.01043.x. Epub 2009 Sep 24. PMID: 19780853 PMCID: PMC2813435.
   - I created the analysis plan and the visual summaries.

2. **Baiocchi M**, Small DS, Lorch S, Rosenbaum PR. Building a stronger instrument in an observational study of perinatal care for premature infants. *Journal of the American Statistical Association.* 2010 105(492), 1285-1296. Chicago

3. Lorch SA, **Baiocchi M**, Ahlberg CE, Small DS. The differential impact of delivery hospital on the outcomes of premature infants. *Pediatrics*. 2012 Aug;130(2):270-8. doi: 10.1542/peds.2011-2820. Epub 2012 Jul 9. PMID: 22778301 PMCID: PMC4074612.
   - At the time, this analysis was the largest matched analysis (several million babies) and was made possible by the instrumental variable method I created "near-far matching."

4. **Baiocchi M**, Small DS, Yang L, Polsky D, Groeneveld PW. Near/far matching: a study design approach to instrumental variables. *Health Services and Outcomes Research Methodology*. 2012 Dec;12(4):237-253. Epub 2012 Jun 9. DOI: 10.1007/s10742-012-0091-0 PMID: 27087781 PMCID: PMC4831129.

5. **Baiocchi M**, Cheng J, Small DS. Instrumental variable methods for causal inference. *Statistics in Medicine*. 2014 Jun 15;33(13):2297-340. doi: 10.1002/sim.6128. Epub 2014 Mar 6. PMID: 24599889 PMCID: PMC4201653.

6. Sun DL, Harris N, Walther G, **Baiocchi M.** Peer Assessment Enhances Student Learning: The Results of a Matched Randomized Crossover Experiment in a College Statistics Class. *PLoS One*. 2015 Dec 18;10(12):e0143177. doi: 10.1371/journal.pone.0143177. eCollection 2015. PMID: 26683053 PMCID: PMC4684290.

7. Prochaska JJ, Michalek AK, Brown-Johnson C, Daza EJ, **Baiocchi M**, Anzai N, Rogers A, Grigg M, Chieng A. Likelihood of unemployed smokers vs nonsmokers attaining reemployment in a one-year observational study. *JAMA Internal Medicine*. 2016 May 1;176(5):662-70. doi: 10.1001/jamainternmed.2016.0772. PMID: 27065044 PMCID: PMC5111825.
   - I co-designed the inverse probability weighting design and mentored my postdoc who led and wrote up the statistical analysis.

8. Oppezzo MA, Michalek AK, Delucchi K, **Baiocchi M,** Barnett PG, Prochaska JJ. Health-related quality of life among veterans in addictions treatment: identifying behavioral targets for future intervention. *Quality of Life Research*. 2016 Aug;25(8):1949-57. doi: 10.1007/s11136-016-1236-3. Epub 2016 Feb 17. PMID: 26886926 PMCID: PMC4987154.
   - I contributed to the analysis plan and wrote portions of the methods section.

9. Cullen MR, **Baiocchi M**, Eggleston K, Loftus P, Fuchs V. The weaker sex? Vulnerable men and women's resilience to socio-economic disadvantage. *SSM-Population Health.* 2016 Aug 3;2:512-524. doi: 10.1016/j.ssmph.2016.06.006. eCollection 2016 Dec. PMID: 29349167 PMCID: PMC5757782.
   - I found the foundational, empirical insight of this paper: that the area-level difference between male and female survival in the USA was very highly linearly correlated with economic indicators.

10. Sanquini AM, Thapaliya SM, Wood MM, **Baiocchi M**, Hilley GE. Encouraging Earthquake-Resistant Construction: A Randomized Controlled Trial in Nepal. *Earthquake Spectra.* 2016 November 1:32(4):1975-1988. https://doi.org/10.1193/102015EQS156M
    - I designed the randomized trial design and the analysis plan.

11. Sarnquist C, Sinclair J., Omondi Mboya, B., Langat, N., Paiva, L., Halpern-Felsher, B., Golden, N.H., Maldonado, Y.A. and **Baiocchi, M.** Evidence that classroom-based behavioral interventions reduce pregnancy-related school dropout among Nairobi adolescents. *Health Education & Behavior.* 2017 Apr;44(2):297-303. doi: 10.1177/1090198116657777. Epub 2016 Jul 11. PMID:

---

27486178.

12. Deshpande SK, Hasegawa RB, Rabinowitz AR, Whyte J, Roan CL, Tabatabaei A, **Baiocchi M**, Karlawish JH, Master CL, Small DS. Association of playing high school football with cognition and mental health later in life. *JAMA Neurology*. 2017 Aug 1;74(8):909-918. doi: 10.1001/jamaneurol.2017.1317. PMID: 28672325 PMCID: PMC5710329.
    - Reviewed and modified the study design during pre-registration; reviewed the analysis and manuscript.

13. **Baiocchi, M.**, Omondi, B., Langat, N., Boothroyd, D.B., Sinclair, J., Pavia, L., Mulinge, M., Githua, O., Golden, N.H. and Sarnquist, C. A behavior-based intervention that prevents sexual assault: The results of a matched-pairs, cluster-randomized study in Nairobi, Kenya. *Prevention Science.* 2017 Oct;18(7):818-827. doi: 10.1007/s11121-016-0701-0. PMID: 27562036 PMCID: PMC5326602.

14. Goldstone A, Chiu P, **Baiocchi M**, Lingala B, Patrick B, Fischbein M, Woo J. Comparative Effectiveness of Mechanical versus Biological Prostheses for Aortic Valve and Mitral Valve Replacement in California. New England Journal of Medicine. 2017 Nov 9;377(19):1847-1857. doi: 10.1056/NEJMoa1613792. PMID: 29117490.
    *** I designed the study's analytic plan and implemented the analysis. When we were challenged by the in-house statistical reviewer at NEJM, I implemented several sensitivity analyses to "shore up" the observational study. Results of this paper used by the AHA to update the valve replacement guidelines.

15. Chiu P, Sailer A-M, **Baiocchi M**, Goldstone AB, Schaffer JM, Trojan J, Fleischmann D, Miller DC, Mitchell RS, Dake MD, Woo YJ, Lee JT, Fischbein MP. Discordant Surgeon Views in the Management of Descending Thoracic Aortic Aneurysm. *Seminars in Thoracic and Cardiovascular Surgery*. 2017 Autumn;29(3):283-291. doi: 10.1053/j.semtcvs.2017.05.009. Epub 2017 May 29. PMID: 29195571.
    - Co-developed the analysis plan and reviewed the manuscript's methods and conclusions.

16. Lum, K., Ma, E., **Baiocchi, M**. The causal impact of bail on case outcomes for indigent defendants in New York City. Observational Studies. University of Pennsylvania Press, Volume 3, issue 1, 2017. 10.1353/obs.2017.0007.

17. Rigdon J, **Baiocchi M**, Basu S. Preventing false discovery of heterogeneous treatment effect subgroups in randomized trials. *Trials*. 2018 Dec;19(1):382. doi: 10.1186/s13063-018-2774-5. PMID: 30012181 PMCID: PMC6048878.
    - I proposed the core insight of this method: that the randomization in an RCT justifies many of the core assumptions needed to warrant observational techniques, and therefore can be used to assess and improve subgroup analyses.

18. Goldstone AB, Chiu P, **Baiocchi M**, Wang H, Lingala B, Boyd JH, Woo YJ. Second arterial versus venous conduits for multivessel coronary artery bypass surgery in California. *Circulation*. 2018

---

Apr 17;137(16):1698-1707. doi: 10.1161/CIRCULATIONAHA.117.030959. Epub 2017 Dec 14. PMID: 29242351.
*** I designed the analysis plan and used my method, near-far matching, to augment the primary analysis. The accompanying editorial asserted that "In summary, the body of evidence based on large and well-designed observational studies such as this one cannot be ignored."

19. Sarnquist CC, Ouma L, Lang'at N, Lubanga C, Sinclair J, **Baiocchi M**, Cornfield DN. The effect of combining business training, microfinance, and support group participation on economic status and intimate partner violence in an unplanned settlement of Nairobi, Kenya. *Journal of interpersonal violence*. 2018 Jun 1:0886260518779067. doi: 10.1177/0886260518779067. [Epub ahead of print] PMID: 29862883.
    - I developed an analysis plan to improve the rigor of a challenging field study that had serious issues with confounding from baseline imbalances.

20. Rigdon J, **Baiocchi M**, Basu S. Near-far matching in R: The nearfar package. *Journal of Statistical Software.* 2018;86(CS-5). doi: 10.18637/jss.v086.c05. Epub 2018 Sep 3. PMID: 30386186 PMCID: PMC6207198.
    - I wrote the software to implement near-far matching, which was generalized for this package, co-developed the tutorial examples.

21. McKelvey K, **Baiocchi M**, Halpern-Felsher B. Juul-Style Pod-based Electronic Cigarettes: Adolescents' and Young Adults' Use and Perceptions. *JAMA Open Network*. 2018 Oct 5;1(6):e183535. doi: 10.1001/jamanetworkopen.2018.3535. PMID: 30646249 PMCID: PMC6324423.
    - I designed the analysis plan and visualizations, wrote portions of the methods and conclusions.

22. Wang JK, Hom J, Balasubramanian S, Schuler A, Shah NH, Goldstein MK, **Baiocchi M**, Chen JH. An Evaluation of Clinical Order Patterns Machine-Learned from Clinician Cohorts Stratified by Patient Mortality Outcomes. *Journal of Biomedical Informatics*. 2018 Oct;86:109-119. doi: 10.1016/j.jbi.2018.09.005. Epub 2018 Sep 7. PMID: 31325524 PMID: 30195660 PMCID: PMC6250126.
    - I reviewed and modified the analysis plan and manuscript.

23. McKelvey K, **Baiocchi M**, Lazaro A, Ramamurthi D, Halpern-Felsher B. A cigarette pack by any other color: Youth perceptions mostly align with tobacco industry-ascribed meanings. *Preventive Medicine Reports*. 2019 Feb 8;14:100830. doi: 10.1016/j.pmedr.2019.100830. eCollection 2019 Jun. PMID: 30815339 PMCID: PMC6378849.
    - I designed the analysis plan and visualizations, wrote portions of the methods and conclusions.

24. McKelvey K, **Baiocchi M**, Ramamurthi D, McLaughlin S, Halpern-Felsher B. Youth say ads for flavored e-liquids are for them. *Addictive Behaviors*. 2019 Apr;91:164-170. doi: 10.1016/j.addbeh.2018.08.029. Epub 2018 Aug 29. PMID: 30314868 PMCID: PMC6663555.

- I designed the analysis plan and visualizations, wrote portions of the methods and conclusions.

25. McKelvey K, **Baiocchi M**, McLaughlin S, Ramamurthi D, Halpern-Felsher B. Youth say ads for flavored e-liquids are for them. *Addictive Behaviors*. 2019 Apr;91:164-170. doi: 10.1016/j.addbeh.2018.08.029. Epub 2018 Aug 29. PMID: 30314868 PMCID: PMC6663555.
    - I designed the analysis plan and visualizations, wrote portions of the methods and conclusions.

26. Sarnquist C, Kang JL, Amuyunzu-Nyamongo M, Oguda G, Otieno D, Mboya B, Omondi N, Kipkirui D, **Baiocchi M**. A protocol for a cluster-randomized controlled trial testing an empowerment intervention to prevent sexual assault in upper primary school adolescents in the informal settlements of Nairobi, Kenya. *BMC Public Health*. 2019 Jun 27;19(1):834. doi: 10.1186/s12889-019-7154-x. PMID: 31248392 PMCID: PMC6598352.

27. Min Y, Ma X, Sankaran K, Ru Y, Chen L, **Baiocchi M**, Zhu S. Sex-specific association between gut microbiome and fat distribution. Nature communications. 2019 Jun 3;10(1):1-9.
    - I supervised all of the projects and provided constructive analytical suggestions.

28. **Baiocchi M**, Friedberg R, Rosenman E, Amuyunzu-Nyamongo M, Oguda G, Otieno D, Sarnquist C. Prevalence and risk factors for sexual assault among class 6 female students in unplanned settlements of Nairobi, Kenya: Baseline analysis from the IMPower & Sources of Strength cluster randomized controlled trial. PLoS one. 2019 Jun 6;14(6):e0213359. oi: 10.1371/journal.pone.0213359. eCollection 2019. PMID: 31170151 PMCID: PMC6553848.
    - I proposed the study design and wrote the manuscript.

29. Epperson AE, Lambin EF, Henriksen L, **Baiocchi M**, Flora JA, Prochaska JJ. Natural American Spirit's pro-environment packaging and perceptions of reduced-harm cigarettes. *Preventive Medicine*. 2019 Sep;126:105782. doi: 10.1016/j.ypmed.2019.105782. Epub 2019 Jul 17. PMID: 31325524.
    - I changed the study design to an online randomized control trial. Reviewer commented: “Thus, this study is not only clever in design but undeniably important.”

30. Goldstone AB, Chiu P, **Baiocchi M**, Lingala B, Lee J, Rigdon J, Fischbein MP, Woo YJ. Interfacility Transfer of Medicare Beneficiaries with Acute Type A Aortic Dissection and Regionalization of Care in the United States. *Circulation*. 2019 Oct 8;140(15):1239-1250. doi: 10.1161/CIRCULATIONAHA.118.038867. Epub 2019 Oct 7. PMID: 31589488.
    *** I am co-first author on this manuscript. I carefully developed the instrumental variable study design (see supplement). I developed formal sensitivity analyses for this study.

31. Rosenman E, Sarnquist C, Friedberg R, Amuyunzu-Nyamongo M, Oguda G, Otieno D, **Baiocchi M**. Empirical Insights for Improving Sexual Assault Prevention: Early Evidence from a Cluster-Randomized Trial of IMPower and Sources of Strength. *Violence Against Women*. 2019 Nov

---

26:1077801219886380. doi: 10.1177/1077801219886380. [Epub ahead of print] PMID: 31766987.

32. Goldstone AB, **Baiocchi M**, Wypij D, Stopp C, Andropoulos DB, Atallah J, Atz AM, Beca J, Donofrio MT, Duncan K, Ghanayem NS, Goldberg CS, Hövels-Gürich H, Ichida F, Jacobs JP, Justo R, Latal B, Li JS, Mahle WT, McQuillen PS, Menon SC, Pike NA, Pizarro C, Shekerdemian LS, Synnes A, Williams IA, Bellinger DC, Newburger J, Gaynor JW. The Bayley-III Scale May Underestimate Neurodevelopmental Disability After Cardiac Surgery in Infants. *Eur J Cardiothorac Surg.* 2020 Jan 1;57(1):63-71. doi: 10.1093/ejcts/ezz123. PMID: 31006006.
    - I co-developed study design and visualizations. I also contributed to the methods and conclusions sections of the manuscript.

33. Li R, Marafino, B, Nielsen D, **Baiocchi M**, Shieh L. Assessment of a real time locator system to identify physician and nurse work locations. *JAMA Network Open.* 2020 Feb 5;3(2):e1920352. doi: 10.1001/jamanetworkopen.2019.20352 PMID: 32022876.
    - I reviewed and modified the analysis plan and manuscript.

34. McKelvey K, **Baiocchi M**, Halpern-Felsher B. PMI's heated tobacco products marketing claims of reduced risk and reduced exposure may entice youth to try and continue using these products. *Tobacco Control*. 2020 Feb 6. pii: tobaccocontrol-2019-055318. doi: 10.1136/tobaccocontrol-2019-055318. [Epub ahead of print] PMID: 32029537.
    - I designed the analysis plan.

35. Cerna-Turoff I, Kane JC, Devries K, Mercy J, Massetti G, **Baiocchi M**. Did internal displacement from the 2010 earthquake in Haiti lead to long-term violence against children? A matched pairs study design. *Child Abuse Neglect*. 2020 Apr;102:104393. doi: 10.1016/j.chiabu.2020.104393. Epub 2020 Feb 12. PMID: 32062165.

36. **Baiocchi M**, Woo YJ, Chiu P, Goldstone AB. The Role and Significance of Sensitivity Analyses in Enhancing the Statistical Validity of Clinical Studies. *JTCVS*. October 2020. DOI: 10.1016/j.jtcvs.2020.09.134, PMID: 33229182.

37. Prochaska JJ, Brown-Johnson C, **Baiocchi M**, Lazaro AS, Chieng A, Stinson S, Anzai N. Treating tobacco dependence to aid re-employment among job-seekers: A randomized controlled trial. *Preventive Medicine*. 2020 Oct 3:106259. DOI: 10.1016/j.ypmed.2020.106259. PMID: 33022318.
    - I co-designed the study design. I reviewed the methods and conclusions of the manuscript.

38. Kumar A, Aikens RC, Hom J, Shieh L, Chiang J, Morales D, Saini D, Musen M, **Baiocchi M**, Altman R, Goldstein MK. OrderRex clinical user testing: a randomized trial of recommender system decision support on simulated cases. *Journal of the American Medical Informatics Association*. 2020 Oct 27, doi: 10.1093/jamia/ocaa190, PMID: 33106874.
    - I reviewed and modified the analysis plan and manuscript.

---

39. Oppezzo M, Tremmel J, Desai M, **Baiocchi M**, Ramo D, Cullen M, Prochaska JJ. Twitter-based social support added to Fitbit self-monitoring for decreasing sedentary behavior: protocol for a randomized controlled pilot trial with female patients from a Women's heart clinic. JMIR Research Protocols. 2020 Dec 4;9(12):e20926.

40. Paulsen MJ, Imbrie-Moore AM, Baiocchi M, Wang H, Hironaka CE, Lucian HJ, Farry JM, Thakore AD, Zhu Y, Ma M, MacArthur Jr JW. Comprehensive ex vivo comparison of 5 clinically used conduit configurations for valve-sparing aortic root replacement using a 3-dimensional–printed heart simulator. Circulation. 2020 Oct 6;142(14):1361-73. doi.org/10.1161/CIRCULATIONAHA.120.046612

41. Oppezzo M.A., Tremmel J.A., Kapphahn K., Desai M., **Baiocchi M.**, Sanders M., Prochaska J.J. Feasibility, preliminary efficacy, and accessibility of a Twitter-based social support group vs Fitbit only to decrease sedentary behavior in women. November 2020, doi: 10.2196/20926, PMID: 33275104.
    - I reviewed and modified the analysis plan and manuscript.

42. Marafino BJ, Schuler A, Liu VX, Escobar GJ, **Baiocchi M**. Predicting preventable hospital readmissions with causal machine learning. Health Services Research. 2020 Dec;55(6):993-1002. https://doi.org/10.1111/1475-6773.13586
    *** Selected one of the "Best of the Annual Research Meeting Academy Health 2020"

43. Aikens R.C., Greaves D., **Baiocchi M**. A pilot design for observational studies: Using abundant data thoughtfully. Statistics in Medicine. 2020 Dec 30;39(30):4821-40, DOI:10.1002/sim.8754.

44. King AC, Odunitan-Wayas FA, Chaudhury M, Rubio MA, **Baiocchi M**, Kolbe-Alexander T, Montes F, Banchoff A, Sarmiento OL, Bälter K, Hinckson E. Community-based approaches to reducing health inequities and fostering environmental justice through global youth-engaged citizen science. International Journal of Environmental Research and Public Health. 2021 Jan;18(3):892. PMID: 33494135, DOI: 10.3390/ijerph18030892
    - I designed one of the sub-studies, developing a different use-case of the "Our Voice" model, and wrote sections of the manuscript.

45. Danchev V., Min Y., Borghi J., **Baiocchi M.**, P. A. Ioannidis J. Evaluation of Data Sharing After Implementation of the International Committee of Medical Journal Editors Data Sharing Statement Requirement. 2021 Jan 4 ;4(1):e2033972. doi:10.1001/jamanetworkopen.2020.33972. PMID: 33507256
    - I reviewed and modified the analysis plan and manuscript.

46. Graham S., Zha C.C., King A.C., Banchoff A.W., Sarnquist C., Dauber M., **Baiocchi M**. A Novel Model for Generating Creative, Community-Responsive Interventions to Reduce Gender-Based Violence on College Campuses. *International Journal of Environmental Research and Public Health.* 2021 Jan;18(15):7933. https://doi.org/10.3390/ijerph18157933.

47. Choi J., Gupta A., Kaghazchi A., Htwe T.S, **Baiocchi M.**, Spain D.A. Citation Inaccuracies in Influential Surgical Journals May 25 2021. *JAMA Surgery*, DOI: 10.1001/jamasurg.2021.1445, PMID: 34037684
    - I co-developed the analysis plan and reviewed and modified the manuscript.

48. Min Y, Zhao X, Stafford RS, Ma X, Chen SH, Gan D, Wei C, Huang C, Chen L, Gao P, Yang F, Winter S, Wu Y, Heaney C, **Baiocchi M**, Ioannidis J, Hsing A Zhu S. Cohort Profile: WELL Living Laboratory in China (WELL-China). *International Journal of Epidemiology*. 2021 Mar 13. https://doi.org/10.1093/ije/dyaa283
    - I co-designed the statistical sampling and survey design. I traveled to the site in China to help train the local team. I also wrote sections of the methods.

49. Prochaska J.J., Vogel E.A., Chieng A., Kendra M., **Baiocchi M.**, Pajarito S., Robinson A. A therapeutic relational agent for reducing problematic substance use: Development and usability study. *Journal Medical Internet Research*, 2021. 23(3): e24850, doi: 10.2196/24850, PMID: 33755028
    - I reviewed and modified the analysis plan and manuscript.

50. Nguyen M, Jankovic I, Kalesinskas L, **Baiocchi M**, Chen JH. Machine learning for initial insulin estimation in hospitalized patients. *Journal of the American Medical Informatics Association*. 2021 Jul 19. PMID: 34279615 DOI: 10.1093/jamia/ocab099
    - I mentored my PhD student – Minh Nguyen – as she proposed, implemented, and wrote the manuscript for this study. I also contributed to the study and analysis plan, revising and reviewing the final manuscript.

51. Marafino BJ, Escobar GJ, **Baiocchi M**, Liu VX, Plimier CC, Schuler A. Evaluation of an intervention targeted with predictive analytics to prevent readmissions in an integrated health system: observational study. *British Medical Journal*. 2021 Aug 11;374 doi: https://doi.org/10.1136/bmj.n1747
    - I co-designed the study and reviewed the analysis and manuscript. I mentored my PhD, Ben Marafino, as he implemented the analysis and wrote the manuscript.

52. Nguyen M, Corbin C, Eulalio T, Ostberg N, Machiraju G, Marafino B, **Baiocchi M**, Rose C, Chen J. Developing Machine Learning Models to Personalize Care Levels among Emergency Room Patients for Hospital Admission. *Journal of the American Medical Informatics Association*. 2021 Aug 17; https://doi.org/10.1093/jamia/ocab118
    - I co-developed the study. I mentored my PhD student – Minh Nguyen – as she proposed, implemented, and wrote the manuscript for this study. I also contributed to revising and reviewing the final manuscript.

53. Choi J, Marafino BJ, Vendrow EB, Tennakoon L, **Baiocchi M**, Spain DA, Forrester JD. Rib Fracture Frailty Index: A risk stratification tool for geriatric patients with multiple rib fractures. *Journal of trauma and acute care surgery*. 2021 Dec 1;91(6):932-9. DOI: 10.1097/TA.0000000000003390

---

- I co-designed the analysis plan and developed visualizations. I reviewed the methods and conclusions of the manuscript.

54. Jake-Schoffman DE, Brown SD, **Baiocchi M**, Bibeau JL, Daubenmier J, Ferrara A, Galarce MN, Hartogensis W, Hecht FM, Hedderson MM, Moran PJ. Methods-Motivational Interviewing Approach for Enhanced Retention and Attendance. *American Journal of Preventive Medicine*. 2021 Oct 1;61(4):606-17. DOI: 10.1016/j.amepre.2021.04.005
    - I solved an analytical challenge in the multi-study design.

55. Prochaska JJ, Vogel EA, Chieng A, **Baiocchi M**, Maglalang DD, Pajarito S, Weingardt KR, Darcy A, Robinson A. A randomized controlled trial of a therapeutic relational agent for reducing substance misuse during the COVID-19 pandemic. *Drug & Alcohol Dependence*. [in press]
    - I reviewed and modified the analysis plan and manuscript.

56. Rosenman E, Owen AB, **Baiocchi M**, Banack H. Propensity score methods for merging observational and experimental datasets. *Statistics In Medicine*. 2021 Oct. https://doi.org/10.1002/sim.9223
    - I co-developed the methodology, procured the data set, developed the applied example, and reviewed and modified the manuscript.

57. Sherris AR, Begum BA, **Baiocchi M**, Goswami D, Hopke PK, Brooks WA, Luby SP. Associations between ambient fine particulate matter and child respiratory infection: The role of particulate matter source composition in Dhaka, Bangladesh. *Environmental Pollution*. 2021 Dec 1;290:118073.
    - I co-developed the study. I proposed a new study design for isolating the impact of a source-specific pollution that varies through time. I wrote portions of the Methods section and reviewed and modified the manuscript.

58. Doyle JM, **Baiocchi M**, Kiernan M. Downstream funding success of early career researchers for resubmitted versus new applications: A matched cohort. *PloS one*. 2021 Nov 18;16(11):e0257559.
    - We are co-first authors on this manuscript. I designed this study, and partnered with an analyst inside of NIH to get access to restricted data, to empirically answer an NIH special committee's question about how to improve the diversity of researchers in NIH funding.

59. Kumar V, Kumar A, Mishra S, Kan P, Ashraf S, Singh S, Blanks KJ, **Baiocchi M**, Limcaoco M, Ghosh AK, Kumar A. Effects of emollient therapy with sunflower seed oil on neonatal growth and morbidity in Uttar Pradesh, India: a cluster-randomized, open-label, controlled trial. *The American journal of clinical nutrition*. 2022 Jan 4.
    - I proposed a novel analysis of an important intermediate effect for the intervention, and mentored the master's student who implemented the principle stratification analysis. I wrote portions of the Methods section and reviewed and modified the manuscript.

---

60. Gonzalez D, Francis C, Shaw G, Cullen M, **Baiocchi M**, Burke M. Upstream oil and gas production and ambient air pollution in California. *Science of The Total Environment*. 2022 Feb; 806: 150298 DOI: 10.1016/j.scitotenv.2021.150298
    - I co-developed the study. I reviewed and modified the manuscript.

61. Kiernan M, **Baiocchi M**. Casting new light on a pernicious problem: The futility of underpowered trials and strategies to avoid them. *American Journal of Epidemiology*. [in press]
    - I co-developed a new analogy for statistical power (for pedagogical purposes), and paired the analogy with evidence-based study designs to improve statistical power in randomized controlled trials.

62. Cullen M, **Baiocchi M**, O'Hara A, Horwitz R, Chu I, Chamberlain L, Mello M, Roosz S. Population Health Science as a Unifying Foundation for Translational Clinical and Public Health Research. *SSM - Population Health*. [in press]
    - I proposed several of the data, and algorithmic arguments in the paper. Reviewed and modified the manuscript in sections of the paper.

63. Aikens RC, **Baiocchi M**. Assignment-Control Plots: A Visual Companion for Causal Inference Study Design. The American Statistician. 2023 Jan 2;77(1):72-84.
64. Corbin CK, Sung L, Chattopadhyay A, Noshad M, Chang A, Deresinksi S, Baiocchi M, Chen JH. Personalized antibiograms for machine learning driven antibiotic selection. Communications medicine. 2022 Apr 8;2(1):1-4.
65. Cerna-Turoff I, Maurer K, **Baiocchi M**. Pre-processing data to reduce biases: full matching incorporating an instrumental variable in population-based studies. International Journal of Epidemiology. 2022 May 13.
66. Dalal AR, Pedroza AJ, Krishnan A, Min Y, Tognozzi E, Yokoyama N, Nakamura K, Mitchel OR, **Baiocchi M**, Woo YJ, MacArthur JW. Blood transfusion in aortic root surgery impairs midterm survival. JTCVS open. 2023 Mar 1;13:9-19.
67. Zhang B, Mackay EJ, **Baiocchi M**. Statistical matching and subclassification with a continuous dose: Characterization, algorithm, and application to a health outcomes study. The Annals of Applied Statistics. 2023 Mar;17(1):454-75.
68. Mphamba D, Solomon FR, Nyairo G, Kim CJ, Krishnamoorthi M, Edem B, Amuyunzu-Nyamongo M, Kang J, **Baiocchi M**, Sarnquist CC. Youth voices from an informal settlement of Nairobi, Kenya: Engaging adolescent perspectives on violence to inform prevention. *Global Public Health*. 2022 May 17:1-4.
69. Burton É, Flores B, Jerome B, **Baiocchi M**, Min Y, Maldonado YA, Fassiotto M. Assessment of bias in patient safety reporting systems categorized by physician gender, race and ethnicity, and faculty rank: a qualitative study. JAMA Network Open. 2022 May 2;5(5):e2213234-.
70. Timmerhuis HC, Ngongoni RF, Jensen C, **Baiocchi M**, DeLong JC, Dua MM, Norton JA, Poultsides GA, Worth PJ, Visser BC. Comparison of Spleen-Preservation vs Splenectomy in Minimally Invasive Distal Pancreatectomy: A Propensity-Matched Analysis. Journal of the American College of Surgeons. 2022 Nov 1;235(5):S52.
71. Rosas LG, Chen S, Xiao L, Emmert-Aronson BO, Chen WT, Ng E, Martinez E, **Baiocchi M**, Thompson-Lastad A, Markle EA, Tester J. Addressing food insecurity and chronic conditions in

---

community health centres: protocol of a quasi-experimental evaluation of Recipe4Health. BMJ open. 2023 Apr 1;13(4):e068585.

72. Klein SA, **Baiocchi M**, Rodu J, Baker H, Rosemond E, Doyle JM. An analysis of the Clinical and Translational Science Award pilot project portfolio using data from Research Performance Progress Reports. Journal of Clinical and Translational Science. 2022;6(1):e113.
73. Pedroza AJ, Dalal AR, Shad R, Yokoyama N, Nakamura K, Cheng P, Wirka RC, Mitchel O, **Baiocchi M**, Hiesinger W, Quertermous T. Embryologic origin influences smooth muscle cell phenotypic modulation signatures in murine Marfan syndrome aortic aneurysm. Arteriosclerosis, Thrombosis, and Vascular Biology. 2022 Sep;42(9):1154-68.
74. Zahrt OH, Evans K, Murnane E, Santoro E, **Baiocchi M**, Landay J, Delp S, Crum A. Effects of wearable fitness trackers and activity adequacy mindsets on affect, behavior, and health: longitudinal randomized controlled trial. Journal of Medical Internet Research. 2023 Jan 25;25:e40529.
    ***Uses my method – criteria-based randomization – to implement its experimental design.
75. Corbin CK, Sung L, Chattopadhyay A, Noshad M, Chang A, Deresinksi S, **Baiocchi M**, Chen JH. Personalized antibiograms for machine learning driven antibiotic selection. Communications medicine. 2022 Apr 8;2(1):38.
76. Cheng XS, Liu S, Han J, Stedman MR, **Baiocchi M**, Tan JC, Chertow GM, Fearon WF. Association of pretransplant coronary heart disease testing with early kidney transplant outcomes. JAMA Internal Medicine. 2023 Feb 1;183(2):134-41.
77. Zhu Y, Shudo Y, Lingala B, **Baiocchi M**, Oyer PE, Woo YJ. Outcomes after heart retransplantation: A 50-year single-center experience. The Journal of Thoracic and Cardiovascular Surgery. 2022 Feb 1;163(2):712-20.
78. Rosenman ET, Friedberg R, **Baiocchi M**. Robust Designs for Prospective Randomized Trials Surveying Sensitive Topics. American Journal of Epidemiology. 2023 May;192(5):812-20.
    - New framework for measurement error, developed out of the sexual assault prevention randomized trial.
79. Corbin CK, **Baiocchi M**, Chen JH. Avoiding Biased Clinical Machine Learning Model Performance Estimates in the Presence of Label Selection. AMIA Summits on Translational Science Proceedings. 2023;2023:81.
80. Rodu J, **Baiocchi M**. When black box algorithms are (not) appropriate. Observational Studies. 2023;9(2):79-101.
81. Friedberg R, **Baiocchi M**, Rosenman E, Amuyunzu-Nyamongo M, Nyairo G, Sarnquist C. Mental health and gender-based violence: An exploration of depression, PTSD, and anxiety among adolescents in Kenyan informal settlements participating in an empowerment intervention. PLoS one. 2023 Mar 29;18(3):e0281800.
82. Kumar V, Kumar A, Mishra S, Kan P, Ashraf S, Singh S, Blanks KJ, **Baiocchi M**, Limcaoco M, Ghosh AK, Kumar A. Effects of emollient therapy with sunflower seed oil on neonatal growth and morbidity in Uttar Pradesh, India: a cluster-randomized, open-label, controlled trial. The American Journal of Clinical Nutrition. 2022 Apr;115(4):1092-104.
83. McCauley DM, **Baiocchi M**, Cruse S, Halpern-Felsher B. Effects of a short school-based vaping prevention program for high school students. Preventive Medicine Reports. 2023 Jun 1;33:102184.

84. Min Y, Dalal AR, Pedroza AJ, Pham TD, Panigrahi AK, Goldstone AB, MacArthur JW, Woo YJ, **Baiocchi M**, Fischbein MP. Blood transfusion in cardiac surgeries–Toward a personalized protocol. The American Journal of Surgery. 2023 Aug 1.
85. Altamirano J, Odero IA, Omollo M, Awuonda E, Ondeng'e K, Kang JL, Behl R, Ndivo R, **Baiocchi M**, Barsosio HC, Sarnquist CC. Understanding ART adherence among adolescent girls and young women in western Kenya: a cross-sectional study of barriers and facilitators. International journal of environmental research and public health. 2023 Oct 14;20(20):6922.
86. Sarnquist C, Friedberg R, Rosenman ET, Amuyunzu-Nyamongo M, Nyairo G, **Baiocchi M**. Sexual assault among young adolescents in informal settlements in Nairobi, Kenya: findings from the IMPower and SOS cluster-randomized controlled trial. Prevention science. 2023 Nov 15:1-2.
87. Elde S, He H, Lingala B, **Baiocchi M**, Wang H, Hiesinger W, MacArthur JW, Shudo Y, Woo YJ. Analysis of the revised heart allocation policy and the influence of increased mechanical circulatory support on survival. The Journal of Thoracic and Cardiovascular Surgery. 2023 Jun 1;165(6):2090-103.
88. Rosenman ET, Basse G, Owen AB, **Baiocchi M**. Combining observational and experimental datasets using shrinkage estimators. Biometrics. 2023 Dec;79(4):2961-73.
89. Behl R, Umunna I, Edem B, Mphamba D, **Baiocchi M**, Sarnquist C. Acceptability and feasibility of implementing the Enhanced Assess, Acknowledge, Act (EAAA) sexual assault prevention intervention on a US university campus: Themes from qualitative interviews and written reflections. Journal of American college health. 2024 May 2:1-8. https://doi-org.stanford.idm.oclc.org/10.1080/07448481.2024.2351411
90. Aikens RC, Chen JH, **Baiocchi M**, Simard JF. Feedback Loop Failure Modes in Medical Diagnosis: How Biases Can Emerge and Be Reinforced. Medical Decision Making. 2024 May 13:0272989X241248612.
91. Rosas LG, Chen S, Xiao L, Emmert-Aronson BO, Chen WT, Ng E, Martinez E, **Baiocchi M**, Thompson-Lastad A, Markle EA, Tester J. Addressing food insecurity and chronic conditions in community health centres: protocol of a quasi-experimental evaluation of Recipe4Health. BMJ open. 2023 Apr 1;13(4):e068585.
92. Gaiha SM, Wang M, **Baiocchi M**, Halpern-Felsher B. Depression screening outcomes among adolescents, young adults, and adults reporting past 30-day tobacco and cannabis use. Addictive behaviors. 2024 May 28:108076.
93. Nguyen M, Eulalio T, Marafino BJ, Rose C, Chen JH, **Baiocchi M**. Thick Data Analytics (TDA): An Iterative and Inductive Framework for Algorithmic Improvement. The American Statistician. 2024 Apr 13:1-9.
94. Gallo RJ, **Baiocchi M**, Savage TR, Chen JH. Establishing best practices in large language model research: an application to repeat prompting. Journal of the American Medical Informatics Association. 2024 Dec 4:ocae294.
95. McCauley DM, **Baiocchi M**, Gaiha SM, Halpern-Felsher B. Sociodemographic differences in use of nicotine, cannabis, and non-nicotine E-cigarette devices. Drug and Alcohol Dependence. 2024 Feb 1;255:111061.
96. Kim JL, **Baiocchi M**, Leipzig M, Duda M, Aranda-Michel E, Tognozzi E, Higa K, Zhu Y, MacArthur JW, Woo YJ, Fischbein MP. Type A intramural hematoma over 21 years: A single center's experience. JTCVS Open. 2024 Oct 26.

---

97. Timmerhuis HC, Jensen CW, Ngongoni RF, **Baiocchi M**, DeLong JC, Ohkuma R, Dua MM, Norton JA, Poultsides GA, Worth PJ, Visser BC. Postoperative outcomes and costs of laparoscopic versus robotic distal pancreatectomy: a propensity-matched analysis. Surgical endoscopy. 2024 Apr;38(4):2095-105.
98. Gaudino M, Rong LQ, **Baiocchi M**, Dimagli A, Doenst T, Fremes SE, Gelijins AC, Kurlansky P, Sandner S, Weinsaft JW, Di Franco A. Research Concepts and Opportunities for Early-Career Investigators in Cardiac Surgery. The Annals of Thoracic Surgery. 2024 Apr 1;117(4):704-13.
99. Gaiha SM, Wang M, **Baiocchi M**, Halpern-Felsher B. Depression screening outcomes among adolescents, young adults, and adults reporting past 30-day tobacco and cannabis use. Addictive behaviors. 2024 Sep 1;156:108076.
100. Behl R, Umunna I, Edem B, Mphamba D, **Baiocchi M**, Sarnquist C. Acceptability and feasibility of implementing the Enhanced Assess, Acknowledge, Act (EAAA) sexual assault prevention intervention on a US university campus: Themes from qualitative interviews and written reflections. Journal of American college health. 2024 Nov 21;72(9):3583-90.
101. Rosas LG, Chen S, Xiao L, **Baiocchi M**, Ng E, Emmert-Aronson BO, Chen WT, Thompson-Lastad A, Martinez E, Perez J, Melendez E. The effectiveness of Recipe4Health: a quasi-experimental evaluation. American Journal of Preventive Medicine. 2025 Feb 1;68(2):377-90.
102. Kim GY, Corbin CK, Grolleau F, **Baiocchi M**, Chen JH. Monitoring strategies for continuous evaluation of deployed clinical prediction models. Journal of Biomedical Informatics. 2025 Jun 5:104854.
103. Jung M, Li M, Choo E, Lee S, Spiegel D, **Baiocchi M**, Deng Z, Li J, Langston ME, Bondy ML, Chung BI. Incidence of depression and anxiety in kidney cancer survivors: A nationwide population-based cohort study. Cancer Epidemiology, Biomarkers & Prevention. 2025 Jun 3;34(6):1027-35.
104. Wang M, Kizilcec RF, **Baiocchi M**. Inspection-Guided Randomization: A Flexible and Transparent Restricted Randomization Framework for Better Experimental Design. Journal of Educational and Behavioral Statistics. 2025 Jul 18:10769986251342292.
105. Monteiro A, Moore J, Aikens R, Gross JJ, Schwartz D, **Baiocchi M**, Prochaska JJ, Oppezzo M. A Work-Based, Fully Remote, and Peer-Supported Exercise Snack Behavior Change Intervention (MOV'D): Protocol for a Randomized Controlled Pilot Trial. JMIR Research Protocols. 2025 Aug 7;14(1):e64455.
106. Morrison T, Nguyen M, Chen J, **Baiocchi M**, Owen AB. Constrained design of a binary instrument in a partially linear model. Observational Studies. 2025;11(3):213-48.
107. Oppezzo M, Schwartz DL, Aikens R, Moore JB, Langford J, Baiocchi M, Gross JJ, Dohmen I. Sit still or move more? The impact of fidgeting on creativity. Journal of educational psychology. 2025 Nov 17.
108. McCauley D, Lung H, Baiocchi M, Gerbert S, Halpern-Felsher B. Reach and impact of you and me, together vape-free: a school-based E-cigarette prevention curriculum for elementary, middle, and high school students. Preventive Medicine Reports. 2026 Mar 18:103453.
109. Altamirano J, Omollo M, Odero I, Awuonda E, Kang J, Behl R, Okoth V, Ndivo R, Baiocchi M, Barsosio H, Sarnquist C. Intimate Partner Violence and Antiretroviral Therapy Adherence Among Adolescent Girls and Young Women Living with HIV in Kenya. Journal of Adolescent Health. 2026 Mar 1;78(3):S88-9.

110. Burton É, Marafino B, Pines KC, Morrison T, Groeneveld MC, Baiocchi M. Trends in Open Aortic Valve Surgery in the United States: Descriptive Analysis of Sociodemographic Factors in Patient Selection. BMC surgery. 2026 Feb 25.
111. McCauley DM, Baiocchi M, Lempert LK, Halpern-Felsher B. Adolescents' and adults' perceptions and intentions to use e-cigarettes following FDA authorization: insights from two survey experiments. Addictive Behaviors. 2026 Feb 7:108636.

**Invited journal articles, reviews, and editorials**

1. Goodman SN, Schneeweiss S, **Baiocchi M**. Using design thinking to differentiate useful from misleading evidence in observational research. *JAMA*. 2017 Feb 21;317(7):705-707. doi: 10.1001/jama.2016.19970. PMID: 28241335.

2. Jopling JK, **Baiocchi M**, Milstein A. Using ICU Congestion as a Natural Experiment. *Critical Care Medicine*. 2016 Oct;44(10):1936-1937. doi: 10.1097/CCM.0000000000001932. PMID: 27635484.

3. **Baiocchi M**. Which Deteriorating Ward Patients Benefit From Transfer to the Intensive Care Unit: Critically Engaging Methods in a Well-Designed Natural Experiment. *JAMA Network Open*. 2019 Feb 1;2(2):e187698. doi: 10.1001/jamanetworkopen.2018.7698. PMID: 30768187.

4. **Baiocchi M**. Commentaries on Bradford Hill: Following Bradford Hill. *Observational Studies*. 2020 Jan 11-16. DOI: 10.1353/obs.2020.0002

5. **Baiocchi M**, Rodu J. Reasoning Using Data: Two Old Ways and One New. *Observational Studies*. 2021;7(1):3-12. DOI: 10.1353/obs.2021.0016

6. **Baiocchi M**. Statistical Considerations When Building upon an Existing Randomized Trial. NEJM evidence. 2024 May 28;3(6):EVIDe2400115.

**Book chapters**

1. Polsky, D., & **Baiocchi, M.** "Observational Studies in Economic Evaluation" in Encyclopedia of health economics (2014). http://dx.doi.org/10.1016/B978-0-12-375678-7.01417-6

2. **Baiocchi, M.**, Cheng, J., & Small, D. S. "Instrumental Variables Methods for Comparative Effectiveness Studies" in Methods in Comparative Effectiveness Research (2017). ISBN 9781466511965

3. **Baiocchi M**, Kang H. Matching with Instrumental Variables. In Handbook of Matching and Weighting Adjustments for Causal Inference 2023 Apr 11 (pp. 135-152). Chapman and Hall/CRC.

**Resources created**

1. Software package to implement a matching based, instrumental variable design in R:
Rigdon, J., Baiocchi, M., Basu, S. (2017). nearfar: Near-Far Matching. R package version 1.1.

2. Software package to implement an efficient, distributed matching optimal network-flow matching design in R: Aikens, R., Rigdon, J., Lee, J., Baiocchi, M., Chen, J. (2020). stratamatch: Stratification and Matching for Large Observational Data Sets. R package version 0.1.5
3. Software package to implement the binary expansion test in R:
Zhang W, Zhao Z, Baiocchi M, Zhang K. (2021). BET. R package version 0.3.8
4. United States patent for binary expansion test algorithm (Stanford Ref: S18-003):
Patent No. 10,296,555 on May 21, 2019
5. The Stanford WELL-China study data set. This is a prospective longitudinal study for the investigation of well-being. The cohort aims to assess multidimensional well-being in a large sample and provides a platform for future intervention studies to help promote well-being at individual and community levels. A total of 10,268 participants aged between 18 and 80 years were recruited from the City of Hangzhou, China between 2016 and 2019; ~40% of the cohort are men. Follow-up will take place every 2 years; the nested-omics sub-cohort will be followed every 6 months. My PhD student and I designed the sampling strategy for this study.

## VI. Teaching

### Classroom instructional activities

*Introductory Statistics*, Stats 111. Approximately 30 students per class. Taught: once, 2010
Course instructor for summer quarter. Tailored course plan, delivered lectures, evaluated students.
University of Pennsylvania.

*Introduction to Statistical Methods*, STATS 60. Approximately 80 students per quarter. Taught: six times, 2011-2019
Course instructor. Designed course plan, moved large portions of the grading and evaluation online to free up teaching assistants to interact with students more, designed and evaluated several interventions to improve learning. My slide decks and course materials have been used by five instructors.
Stanford University

*Biostatistics*, STATS 141. Approximately 40 students per quarter. Taught: twice, 2011-2013
Course instructor. Designed and implemented a major overhaul to a course-long project to teach students how to do statistical analyses, write about the analyses, and defend the analyses.
Stanford University

*Observational Studies*, STATS 355. Approximately 5 PhD students. Taught: once, 2013
Course instructor. Created a new PhD level class for the theory of observational studies.
Stanford University

*Advanced Stats Methods for Obs Studies*, EPH 292. Approximately 10 PhD students. Taught five times, 2016-2020
Co-instructor. Co-designed and co-implemented an applied observational study design class.
Stanford University

*Sexual Assault Prevention*, SOMGEN 160. Approximately 10 students per quarter. Taught: five times, 2018-2019

---

Co-instructor. Co-designed and co-implemented a class introducing students to the theory and practice of campus-based sexual assault prevention programs.
Stanford University

*Foundations of statistics and reproducible research*, BIOS 217. Approximately 50 students per quarter. Taught: two times 2022-2023
Co-instructor. Introduction to foundations of rigorous, reproducible research in experimental biology and clinical research. Provides conceptual framework for linking hypotheses to experimental design, quantitative measurement, statistical analysis and assessment of uncertainty. Brief discussion of social, legal, and ethical issues with reproducibility in scientific practice, along with NIH grant requirements. Examples drawn from multiple areas of experimental biology and clinical research.
Stanford University

*Intermediate Biostatistics: Analysis of Discrete Data*, EPI 261 (BIOMEDIN 233, STATS 261). Approximately 30 students. Taught once 2025.
Course Instructor. Methods for analyzing data from case-control and cross-sectional studies: the 2x2 table, chi-square test, Fisher's exact test, odds ratios, Mantel-Haenzel methods, stratification, tests for matched data, logistic regression, conditional logistic regression. Emphasis on data analysis in R.
Stanford University

**Other didactic teaching activities**
*Guest lectures*

- *BIOMEDIN 215*: I teach a guest lecture in the core survey class in the bioinformatics PhD program. I teach the foundations of causal inference and study design. Years: 2015-2025
- *FEMGEN 143*: I co-lecture on sexual violence prevention/reduction interventions. Discuss empirical findings, and theory of interventions. Focus on campus-based interventions. Years: 2017-2021
- *MED 247*: Lecture on empirically evaluating sexual violence prevention/reduction interventions. Discuss empirical findings, and theory of interventions, and how to link them. Taught five times.

**Mentoring**
I have served as a research mentor more than 29 graduate students and undergraduates on research projects involving clinical epidemiology, statistical methodology, and environmental epidemiology. In the past 6 years, I have advised 7 MS students, 17 PhD students (including 1 at the London School of Hygiene and Tropical Medicine), 3 undergraduates, and 3 postdoctoral fellows, all of whom I have been delighted to develop and support in their research careers.

**VII. Editorial Service**
**A. Ad hoc peer review**
*American Journal of Public Health*
*American Statistician*
*Annals of Applied Statistics*
*Annals of Surgery*
*Biometrics*

---

*Biometrika*
*Circulation*
*Epidemiology*
*EuroHeart*
*EVIDENCE – New England Journal of Medicine*
*Harvard Data Science Review*
*Health Services and Outcome Research Methodology*
*Health Services Research*
*Journal of the American Medical Association (JAMA)*
*Journal of the American Statistical Association*
*Pediatrics*
*Prevention Science*
*Proceedings of the National Academy of Sciences*
*Statistics in Medicine*
*Youth & Society*

## IX. University Administrative Service

### A. Major Committee Assignments

| | |
|---|---|
| 2013 – present | Stanford Statistics Department, master's program committee |
| 2014 – 2015 | SPECTRUM bootcamp, statistical advisor |
| 2014 – present | Stanford Prevention Research Center, Center Leadership Group |
| 2015 – 2017 | Stanford Prevention Research Center, education programs committee |
| 2016 – 2017 | Stanford Medical School, Teaching and Mentoring Academy Grants Reviewer |
| 2017 – 2018 | Provost's Committee on Campus Climate Survey |
| 2022 – present | Stanford Department of Epidemiology & Population Health Department, master's program committee |
| 2024 – present | Stanford Medical School Faculty Senate, departmental representative |
| 2025 | Stanford Faculty Senate, ad hoc committee on senate powers |

### B. Leadership roles

| | |
|---|---|
| 2013 – 2019 | Co-founded the Stanford Gender-Based Violence Prevention Collaborative |
| 2020 summer | Co-directed Stanford's Data Science for Social Good summer program |

## X. Professional Organizations

### A. Memberships

| | |
|---|---|
| 2008 – present | American Statistical Association (ASA) |
| 2009 – present | Health Policy Statistics Section of ASA |
| 2009 – present | Epidemiology Section of ASA |
| 2023 – present | Society of Causal Inference |

### B. Leadership roles

| | |
|---|---|
| 2020 – 2023 | Co-chair the Health Policy Statistics Section's biannual conference the International Conference on Health Policy Statistics |

### C. Committee service

2010 – 2016 Health Policy Statistics of ASA, Executive Committee (publications officer)
2014 – present Statistics in Epidemiology of ASA, Executive Committee (council of sections)
2024 – present Scientific and Public Affairs Advisory Committee (American Statistical Association)

### D. Service as grant reviewer

2018 Reviewer for NIH's Health Services Organization and Delivery Study Section
2020 Reviewer for NSF's Methodology, Measurement, and Statistics Program
2021 Reviewer for NIH's Post-Acute Sequelae of SARS-CoV-2 Infection (PASC) proposals
2023 Reviewer for NIH's NHLBI Single-Site and Pilot Clinical Trials Study Section (SSPT)

## XI. Presentations

### A. Local (Stanford)

2014 "*A program to eliminate rape in Kenya*", Center for Innovation in Global Health, Stanford University
2016 "Dr Strange MOOC, or: how I learned to stop worrying and love online education", Lytics Lab, Stanford
2016 "Targeted error correction: how to make cheap data into useful data", Biostatistics workshop, Stanford Biostatistics
2016 "Interference manipulating permutations: study designs to prevent a mess", Stanford Biostatistics Workshop
2017 "Breaking the culture of sexual assault: Developing effective sexual assault prevention interventions", Clayman Institute, Stanford
2023 Anti-labor trafficking in the Amazon: some early wins from the Stanford Human Trafficking Data Lab, Epidemiology and Population Health Department Seminar
2023 Anti-labor trafficking in the Amazon: some early wins from the Stanford Human Trafficking Data Lab, School of Medicine Research Spotlight
2025 "How to tell the difference between machine learning and (bio)statistics," Stanford Statistics Department Seminar

### B. National and regional

*Invited talks*

2012 "*Near-far Matching: Designing observational studies to be more like randomized trials*", U.S. Army Conference on Applied Statistics, Monterey
2013 "*Clinical Studies of Dynamic Treatment Strategies*", Joint Statistical Meeting
2014 "*An Adaptive Design Approach for Studying Dynamic Treatment Regimes in Pragmatic Trials Settings*", International Chinese Statistical Association & Korean International Statistical Society, Seattle
2015 "My experience as a statistician", AHRQ Research Conference: PCOR Training, Washington DC
2015 "An interesting use for all that extra data", Mathematica Research and Policy, Online

| | |
|---|---|
| 2016 | "Interference minimizing permutation: two studies and some intuition", Johns Hopkins Biostatistics – Causal Inference Working Group, Baltimore |
| 2016 | Causal Inference Methods for PCOR using Observational Data<br>Day 1 – "Fundamental Issues: Understanding differences between observed and unobserved confounding", Washington DC<br>Day 2 – "Study design vs. inference: a source of confusion", Washington DC |
| 2018 | "Several major wins in the fight against sexual assault statistical insights from the front lines", PENN Biostatistics Seminar, University of Pennsylvania, Philadelphia |
| 2018 | "Interference manipulating permutations", Joint Statistical Meeting, Vancouver |
| 2018 | Interactive session: "Developing effective sexual assault prevention interventions", Society for Adolescent Health, Seattle, WA |
| 2018 | Hot topic featured session: "Empowering adolescents to prevent rape and sexual assault: rigorous results from randomized trials", Society for Adolescent Health, Seattle, WA |
| 2019 | "Several major wins in the fight against sexual assault statistical insights from the front lines", UNC Statistics Seminar, Chapel Hill, NC |
| 2019 | Late breaking session: "Several major wing in the fight against sexual assault", Joint Statistical Meeting, Denver |
| 2019 | "When black box algorithms are (not) appropriate", RAND Statistics Group (online) |
| 2020 | "When black box algorithms are (not) appropriate", Harvard Workshop in Applied Statistics, Harvard University, Cambridge (online) |
| 2020 | Featured speaker: "Natural experiments and observational studies", Colorado Pragmatic Research in Health, Denver (online) |
| 2020 | "Causal Inference with Free-Text in Both Randomized and Observational Settings", Joint Statistical Meeting, Online |
| 2020 | Late breaking session: "The Stanford Human Trafficking Lab", Joint Statistical Meeting, Online |
| 2021 | "When black boxes are (not) appropriate", Wake Forest Biostatistics Seminar, Winston-Salem (Online) |
| 2021 | "Causal inference with free-text", Joint Statistical Meeting, Online |
| 2021 | Late breaking session, discussant: "Human Trafficking", Joint Statistical Meeting, Online |
| 2023 | How to tell the difference between (bio)statistics and machine learning, Stanford Quantitative Sciences Unit seminar |
| 2023 | How to tell the difference between (bio)statistics and machine learning, University of California Davis |
| 2023 | Anti-labor trafficking in the Amazon: some early wins from the Stanford Human Trafficking Data Lab, Department of State, United States |
| 2023 | Outcome Reasoning: the under-discussed engine powering black box algorithms, Johns Hopkins Causal Inference Seminar (Joint: Baiocchi & Rodu) |
| 2023 | A messy story about measurement error: how we got into a fight with the British government and then did some useful math, Stuart Lab (Hopkins) |

---

2023 Anti-labor trafficking in the Amazon: some early wins from the Stanford Human Trafficking Data Lab, University of Virginia Statistics Department Seminar

2023 Outcome Reasoning: the under-discussed engine powering black box algorithms, University of Pennsylvania Statistics Department Seminar (Joint: Baiocchi & Rodu)

2023 Outcome Reasoning: the under-discussed engine powering black box algorithms, Williams College Special Joint Seminar Computer Science and Statistics (Joint: Baiocchi & Rodu)

2023 How to tell the difference between (bio)statistics and machine learning, Harvard Causal Inference Seminar (Joint: Baiocchi & Rodu)

2023 Anti-labor trafficking in the Amazon: some early wins from the Stanford Human Trafficking Data Lab, Dominici Lab (Harvard Data Science)

2023 Panel Discussant on AI in Labor Trafficking, Tech Against Trafficking (NYC)

2023 How to tell the difference between (bio)statistics and machine learning, Fred Hutch Biostatistics Seminar (Joint: Baiocchi & Rodu)

2023 How to tell the difference between (bio)statistics and machine learning, University of Washington Seattle (Joint: Baiocchi & Rodu)

2024 "What it's like to be an interventional statistician" Memorial Sloan Kettering, summer biostatistics program

2025 "How to tell the difference between machine learning and (bio)statistics," Berkeley Causal Inference Seminar

2025 "What it's like to be an interventional statistician" Memorial Sloan Kettering, summer biostatistics program

**C. International**

*Invited talks*

2016 What Works to Prevent Violence, Capacity Building Sessions, Dubai, UAE "Advanced quantitative analysis"

2016 What Works to Prevent Violence – Annual Meeting, Dubai, UAE "Understanding the distribution of sexual assault burden"

2017 "Prevalence and risk factors for gender-based violence among class 6 learners in the informal settlements of Nairobi, Kenya: baseline analysis from the IMpower & SoS cluster randomized controlled trial", Sexual Violence Research Initiative, Rio de Janeiro, Brazil

2017 "Prevalence, prediction, and pathways: insights from the baseline", What Works to Prevent Violence, Annual Meeting, Pretoria, South Africa

2018 "We need better tools to solve these problems" London School of Hygiene and Tropical Medicine / London, UK

2019 "Using multiple natural experimental designs to triangulate the impact of a policy change," Beijing Hospital, China

2019 "Estimating HTEs in the presence of unobserved confounding," International Chinese Statistical Association, Tianjin China

| | |
|---|---|
| 2019 | "A Principled Prediction Problem Ontology," IMS-China International Conference on Statistics and Probability, Dalian, China |
| 2020 | "Regionalizing care for acute type A aortic dissections", Decision Analysis Group, University of Bonn, Bonn, Germany (online) |
| 2023 | How to tell the difference between (bio)statistics and machine learning, European Union's RISE NeEDS project (Joint: Baiocchi & Rodu) (online) |
| 2023 | BERLIN CFE-CMSatistics |

*General talks*

| | |
|---|---|
| 2015 | What Works to Prevent Violence – Annual Meeting Africa "Introduction to Stanford and the What Works Initiative", Cape Town, South Africa |
| 2016 | "Near-far matching: a study design approach to instrumental variables", Peking University – Statistics Seminar, Beijing, China |
| 2016 | "How to become the top country in health research: it's about the data" Stanford Center at Peking University, Beijing, China |

# Exhibit I

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| META PLATFORMS, INC.<br><br>Plaintiff,<br><br>v.<br><br>ROB BONTA, in his official capacity as Attorney General of California,<br><br>Defendant | Civil Case No.: 5:25-cv-09792-EJD<br><br>**DECLARATION OF LARS BACKSTROM IN SUPPORT OF META'S MOTION FOR INJUNCTION PENDING APPEAL** |

I, Lars Backstrom, declare as follows based on personal knowledge:

1. I am the Vice President of Engineering at Meta Platforms, Inc. ("Meta"). I have been employed in that position since January 2017 and have been employed at Meta (formerly "Facebook") since September 2009. I am over the age of 18 years and maintain an office at 1 Meta Way, Building 20 in Menlo Park, California. I make this Declaration in support of Meta's Motion for Injunction Pending Appeal in the above-captioned matter. I have personal knowledge of the matters set forth in this Declaration, and if called as a witness, I could and would testify under oath as follows.

2. To comply with the SB976 personalization restrictions, Meta will have to radically alter the nature of the products Meta offers to many California-based users, edit the interface of many Meta products to eliminate user-facing references to personalization, inform many users that their experience on Meta's platforms will abruptly change, and deal with any technical glitches that may arise due to sudden changes to its source code—a host of burdens that would be for naught if the SB976 personalization restrictions are later found impermissible.

3. Implementing the SB976 personalization restrictions will require Meta engineers, data scientists, and support teams to launch, monitor, and maintain pervasive changes to the design and operation of Meta's Facebook, Instagram, and Threads services——creating a California-specific version of those services that Meta would have to maintain in parallel to its general services.

4. To start, personalized feeds are woven deeply into Meta's Facebook, Instagram, and Threads services. The services are designed to provide users with the most relevant "connected" content from friends, pages, groups, or accounts they already follow, while also suggesting relevant "unconnected" or "suggested" public content from other sources that Meta determines users may find interesting, informative, or entertaining. Within this ecosystem, users share and interact with curated content where their interactions serve as critical signals, but not the only signals, for refining what content each user is shown and in what order.

5. Regarding the SB976 personalization restrictions, the required changes themselves, as I previously attested, will severely restrict Meta's ability to present affected users with content that they might find valuable, and noticeably diminish the user experience for affected users, in some cases potentially rendering Meta's services unrecognizable to those users.

6. Requiring Meta to comply with personalization restrictions that may later be found unconstitutional risks creating a whipsaw effect, which in turn can affect the quality of Meta's services. The work and risks involved in launching and maintaining—and potentially later reversing—such broad product changes is not trivial. If legal developments render implementation of the required changes premature, the effort required to reverse required changes will not only necessitate additional effort from Meta personnel but more importantly, entail additional risk to the operability of its services for all users.

**A. Pervasive Product Changes Required**

7. The SB976 personalization restrictions require Meta to launch and maintain an alternate user experience for California teens that diverges from many of the foundational aspects of the Facebook, Instagram, and Threads services.

8. Meta displays personalized content across its products. Upon launching the Facebook, Instagram, or Threads apps, users are currently shown a "Home" tab that provides personalized content in the Feed (Facebook and Instagram), Stories (Facebook and Instagram) and For You feed (Threads) product surfaces. Beyond their main landing surfaces, the Facebook, Instagram, and Threads services currently provide numerous additional tailored experiences across various surfaces, including the Facebook and Instagram Reels tabs' personalized short videos.

9. Regarding Facebook, Instagram, and Threads, SB976 requires removing relevant suggested (unconnected) content from the main feeds of each; sorting the remaining connected content by, for example, recency, not relevance; disabling and hiding numerous personalization-specific controls or options; hiding and disabling some entire product surfaces; changing visual aspects of a service's user interface to be consistent with its reduced functionality, and ensuring consistent implementation of these changes across each service's iOS mobile app, Android mobile app, and web interface.

10. Apart from changes to how these feeds organize content and how suggested content is selected on each of Facebook, Instagram and Threads, other less obvious, but still important, changes to the settings, visual design, and explanatory text of the services would be required. Even subtle user interface elements suggesting personalization must be relabeled for affected users. For example, where a feed provides users two sorting options and one is personalized, the personalized option would be hidden too to avoid inadvertently presenting the user with a non-existent option.

11. The following list describes in more detail some of the types of changes Meta will most likely need to launch to comply with the SB976 personalization restrictions. This list is not exhaustive:

a. In Facebook Feed, remove posts suggesting relevant content from accounts, pages, and groups a user is not connected to, and order the remaining content by, for example, recency, not relevance.

b. In the Instagram Reels tab, replace the personalized chain of recommended short-form videos with a generic chain of non-personalized short-form videos and hide personalization-related controls.

c. In the Threads Following feed, default to sorting posts by, for example, recency rather than relevance and hide the personalized "Top" sort option.

12. Transparently signaling the nature of required product changes to affected users further requires that Meta add notices to affected surfaces, linking the affected users to an explanation of SB976's restrictions on how Meta is allowed to present content to users and the steps an affected covered user can take to request parental consent to view personalized feeds. Moreover, Meta must launch a personalization-specific consent flow that enables affected users to request and receive permission to view personalized content and allows parents to receive and act on such requests.

**B. Risks of Implementing and Reversing Changes**

13. The breadth of the required changes to Meta's Facebook, Instagram, and Threads services enhances the risk of unanticipated technical issues or "bugs" resulting from the required changes to both affected and unaffected users. Meta would be required to launch changes to its core services and many smaller personalized features across Facebook, Instagram, and Threads, each of which would require changes across its iOS, Android, and web interfaces. Discovering and resolving any bugs would require further work from Meta support teams, data scientists, and software engineers to plan, code, test, and launch appropriate fixes.

14. Although significant product changes often involve substantial engineering effort and a risk of unintended consequences, those risks are typically justified by expected long-term improvements to the product and user experience. Here, however, Meta would be required to undertake comparable work and assume comparable risks to remove existing functionality, with no corresponding long-term

product benefit and the possibility that the challenged requirements could later be stayed or overturned on appeal. If that should happen, rolling back the changes could not be accomplished without further work and risks, as if by pressing an "undo" change button. Interdependent parts of Meta's code base will inevitably have changed by the time a higher court's decision is issued. And new notices may be needed to explain to users what might otherwise be a potentially jarring change back. So reversing the changes required by SB976 will likely require some amount of further testing, monitoring, and remediation of bugs.

**Conclusion**

15. Significant changes to Meta's services, such as those necessitated by SB976, require substantial technical effort to launch and maintain, and accompanying bugs risk the operability of Meta's services for all users. If further legal developments render premature Meta's compliance with the SB976 personalization requirements, reversing the changes will involve additional effort and risk to the operability of Meta's services.

* * *

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated: August 10, 2026

By: Signed by: Lars Backstrom
AF88A24E0D5F4C7...

Lars Backstrom

# Exhibit J

Isaac D. Chaput (Bar No. 326923)
**COVINGTON & BURLING LLP**
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
(415) 591-6000
ichaput@cov.com

Alexander L. Schultz (Bar No. 340212)
Max A. Cherman (Bar No. 353565)
**COVINGTON & BURLING LLP**
1999 Avenue of the Stars
Los Angeles, California 90067-4643
(424) 332-4800
aschultz@cov.com

Mark W. Mosier (pro hac vice)
Teena-Ann V. Sankoorikal (pro hac vice)
Jeffrey E. Sandberg (pro hac vice)
Kuntal V. Cholera (pro hac vice)
Alexandra J. Widas (pro hac vice)
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, D.C. 20001
(202) 662-6000
mmosier@cov.com
tsankoorikal@cov.com
jsandberg@cov.com
kcholera@cov.com
awidas@cov.com

*Attorneys for Plaintiff Meta Platforms, Inc.*

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| META PLATFORMS, INC.,<br>Plaintiff,<br>v.<br>ROB BONTA, in his official capacity as Attorney General of California,<br>Defendant. | Case No.: 5:25-cv-09792-EJD<br>**PLAINTIFF META PLATFORMS, INC.'S NOTICE OF APPEAL**<br>**PRELIMINARY INJUNCTION APPEAL** |

**PLEASE TAKE NOTICE** that Plaintiff Meta Platforms, Inc. hereby appeals to the United States Court of Appeals for the Ninth Circuit from this Court's Order Denying Plaintiff's Motion for Preliminary Injunction, issued on August 5, 2026. ECF No. 126.

DATED: August 11, 2026

Respectfully submitted,

By: */s/ Isaac D. Chaput*

Isaac D. Chaput (Bar No. 326923)
**COVINGTON & BURLING LLP**
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
(415) 591-6000
ichaput@cov.com

Alexander L. Schultz (Bar No. 340212)
Max A. Cherman (Bar No. 353565)
**COVINGTON & BURLING LLP**
1999 Avenue of the Stars
Los Angeles, California 90067-4643
(424) 332-4800
aschultz@cov.com
mcherman@cov.com

Mark W. Mosier (pro hac vice)
Teena-Ann V. Sankoorikal (pro hac vice)
Jeffrey E. Sandberg (pro hac vice)
Kuntal V. Cholera (pro hac vice)
Alexandra J. Widas (pro hac vice)
**COVINGTON & BURLING LLP**
850 Tenth Street, NW
Washington, D.C. 20001
(202) 662-6000
mmosier@cov.com
tsankoorikal@cov.com
jsandberg@cov.com
kcholera@cov.com
awidas@cov.com

*Attorneys for Plaintiff Meta Platforms, Inc.*

# UNITED STATES DISTRICT COURT

**FOR THE DISTRICT OF** **NORTHERN DISTRICT OF CALIFORNIA**

## Form 1. Notice of Appeal from a Judgment or Order of a United States District Court

U.S. District Court case number: 5:25-cv-09792-EJD

Notice is hereby given that the appellant(s) listed below hereby appeal(s) to the United States Court of Appeals for the Ninth Circuit.

Date case was first filed in U.S. District Court: November 13, 2025

Date of judgment or order you are appealing: August 5, 2026

Docket entry number of judgment or order you are appealing: 126

Fee paid for appeal? *(appeal fees are paid at the U.S. District Court)*

(●) Yes ( ) No ( ) IFP was granted by U.S. District Court

**List all Appellants** *(List **each** party filing the appeal. Do not use "et al." or other abbreviations.)*

Meta Platforms, Inc.

Is this a cross-appeal? ( ) Yes (●) No

If yes, what is the first appeal case number?

Was there a previous appeal in this case? ( ) Yes (●) No

If yes, what is the prior appeal case number?

Your mailing address (if pro se):

City: State: Zip Code:

Prisoner Inmate or A Number (if applicable):

**Signature** /s/ Mark W. Mosier **Date** August 11, 2026

*Complete and file with the attached representation statement in the U.S. District Court*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 6. Representation Statement

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form06instructions.pdf*

**Appellant(s)** *(List **each** party filing the appeal, do not use "et al." or other abbreviations.)*

Name(s) of party/parties:

Meta Platforms, Inc.

Name(s) of counsel (if any):

Mark W. Mosier, Isaac D. Chaput, Teena-Ann V. Sankoorikal, Jeffrey E. Sandberg, Alexander L. Schultz, Kuntal V. Cholera, Alexandra J. Widas, Max A. Cherman

Address: 850 Tenth Street, NW, Washington, D.C. 20001

Telephone number(s): (202) 662-6000

Email(s): mmosier@cov.com

Is counsel registered for Electronic Filing in the 9th Circuit? ◉ Yes ○ No

---

**Appellee(s)** *(List only the names of parties and counsel who will oppose you on appeal. List separately represented parties separately.)*

Name(s) of party/parties:

Rob Bonta, in his official capacity as Attorney General of California

Name(s) of counsel (if any):

Shiwon Choe, Asha Albuquerque, Christopher Kissel, Lara Haddad, Meghan Strong, Samuel E. Sokolsky, Todd Grabarsky, William Bellamy, Zelda Rose Vassar

Address: 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102

Telephone number(s): 415-510-3835

Email(s): shiwon.choe@doj.ca.gov

*To list additional parties and/or counsel, use next page.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

# Exhibit K

Query Reports Utilities Help Log Out

ADRMOP,APPEAL,REFDIS,RELATE

# U.S. District Court
# California Northern District (San Jose)
# CIVIL DOCKET FOR CASE #: 5:25-cv-09792-EJD

Meta Platforms, Inc. v. Bonta
Assigned to: Judge Edward J. Davila
Referred to: Magistrate Judge Nathanael M. Cousins
Relate Case Case: 5:24-cv-07885-EJD
Case in other court: Ninth Circuit, 26-05120
Cause: 28:2201 Constitutionality of State Statutes

Date Filed: 11/13/2025
Jury Demand: None
Nature of Suit: 950 Constitutional - State Statute
Jurisdiction: Federal Question

**Plaintiff**

**Meta Platforms, Inc.** represented by

**Isaac Daniel Chaput**
Covington & Burling LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
415-591-6000
Fax: 415-591-7200
Email: ichaput@cov.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Lawrenson Schultz**
Covington & Burling LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
(303) 503-2263
Email: aschultz@cov.com
*ATTORNEY TO BE NOTICED*

**Alexandra Widas**
Covington & Burling LLP
850 10th St. NW
Washington, DC 20001
202-662-5770
Email: awidas@cov.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ashley Margaret Simonsen**
Covington and Burling LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067
(424) 332-4800
Fax: (424) 332-4749
Email: asimonsen@cov.com

*ATTORNEY TO BE NOTICED*

**Daniel A. Rios**
Covington & Burling LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
415-591-6000
Fax: 415-591-6091
Email: drios@cov.com
*TERMINATED: 02/06/2026*

**Jeffrey Eric Sandberg**
Covington & Burling LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
202-662-5158
Email: jsandberg@cov.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kuntal Cholera**
Covington & Burling LLP
850 Tenth Street, NW
Washington, DC 20001
202-662-5134
Email: kcholera@cov.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mark W. Mosier**
Covington & Burling LLP
One CityCenter
850 Tenth St NW
Washington, DC 20001
202-662-5435
Email: mmosier@cov.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Max Alan Cherman**
Covington & Burling LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
818-437-7465
Email: mcherman@cov.com
*ATTORNEY TO BE NOTICED*

**Teena-Ann Sankoorikal**
Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018
212-841-1162

Email: tsankoorikal@cov.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Rob Bonta**
*in his official capacity as Attorney General of California*

represented by

**Shiwon Choe**
California Attorney General's Office
Government Law Section
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102
415-510-3835
Email: shiwon.choe@doj.ca.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Asha Albuquerque**
California Department of Justice
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102-7004
415-510-3625
Email: asha.albuquerque@doj.ca.gov
*ATTORNEY TO BE NOTICED*

**Christopher Kissel**
California Attorney General's Office
300 S. Spring Street, Suite 1702
Los Angeles, CA 90013
213-269-6388
Email: christopher.kissel@doj.ca.gov
*ATTORNEY TO BE NOTICED*

**Lara Haddad**
California Department of Justice
Government Law Section
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6250
Email: lara.haddad@doj.ca.gov
*ATTORNEY TO BE NOTICED*

**Meghan Strong**
California Department of Justice
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102
415-510-3877
Fax: 415-703-5480
Email: meghan.strong@doj.ca.gov
*ATTORNEY TO BE NOTICED*

**Samuel E. Sokolsky**
Office of the Attorney General
455 Golden Gate Avenue
Ste 11000
San Francisco, CA 94102
415-510-3584
Email: samuel.sokolsky@doj.ca.gov
*ATTORNEY TO BE NOTICED*

**Todd Grabarsky**
California Department of Justice
Office of the Attorney General
California Department of Justice
300 S. Spring St.
Ste 1702
Los Angeles, CA 90013
213-269-6044
Fax: 213-897-7604
Email: todd.grabarsky@doj.ca.gov
*ATTORNEY TO BE NOTICED*

**William Bellamy**
California Office of the Attorney General
Civil Division/Government Law Section
1300 I Street
Sacramento, CA 95814
916-210-6086
Email: william.bellamy@doj.ca.gov
*ATTORNEY TO BE NOTICED*

**Zelda Rose Vassar**
Attorney General's Office
California Department of Justice
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102
415-510-3875
Email: zelda.vassar@doj.ca.gov
*ATTORNEY TO BE NOTICED*

**Amicus**

**State of New York** represented by **Blair Greenwald**
NYS Office of The Attorney General
Appeals & Opinions
28 Liberty St.
New York, NY 10005
212-416-6102
Email: blair.greenwald@ag.ny.gov
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

| | | |
|---|---|---|
| **Children's Advocacy Institute** | represented by | **Ed P. Howard**<br>Children's Advocacy Institute<br>5998 Alcala Park<br>San Diego, CA 92110<br>916-844-5646<br>Email: eh4@sbcglobal.net<br>*ATTORNEY TO BE NOTICED* |
| **Amicus** | | |
| **Fairplay for Kids** | represented by | **Ed P. Howard**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| **Amicus** | | |
| **The Organization for Social Media Safety** | represented by | **Ed P. Howard**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| **Amicus** | | |
| **American Academy of Pediatrics California** | represented by | **Anne Marie Murphy**<br>Cotchett, Pitre & McCarthy, LLP<br>840 Malcolm Road, Suite 200<br>Burlingame, CA 94010<br>(650) 697-6000<br>Fax: (650) 692-3606<br>Email: amurphy@cpmlegal.com<br>*ATTORNEY TO BE NOTICED*<br><br>**Blair V. Kittle**<br>Cotchett, Pitre & McCarthy, LLP<br>840 Malcolm Road, Suite 200<br>Burlingame, CA 94010<br>(650) 697-6000<br>Email: bkittle@cpmlegal.com<br>*ATTORNEY TO BE NOTICED*<br><br>**Jacqueline Grace Seifert**<br>Cotchett, Pitre & McCarthy, LLP<br>840 Malcolm Road, Suite 200<br>Burlingame, CA 94010<br>(650) 697-6000<br>Fax: (650) 697-0577<br>Email: gseifert@cpmlegal.com<br>*ATTORNEY TO BE NOTICED*<br><br>**Karin Bornstein Swope**<br>Cotchett, Pitre & McCarthy, LLP<br>WA<br>1809 7th Avenue<br>Suite 1610<br>Seattle, WA 98101<br>206-970-8180<br>Email: kswope@cpmlegal.com |

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Valerie T McGinty**
Law Office of Valerie T. McGinty
P.O. Box 1914
San Mateo, CA 94401
415-305-8253
Email: valerie@plaintiffsappeals.com
*ATTORNEY TO BE NOTICED*

**Amicus**

**Childrens Specialty Care Coalition** represented by **Anne Marie Murphy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Blair V. Kittle**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jacqueline Grace Seifert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karin Bornstein Swope**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Valerie T McGinty**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**California Psychological Association** represented by **Anne Marie Murphy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Blair V. Kittle**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jacqueline Grace Seifert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karin Bornstein Swope**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Valerie T McGinty**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

| | | |
|---|---|---|
| **California Academy of Child and Adolescent Psychiatry** | represented by | **Anne Marie Murphy**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Blair V. Kittle**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Jacqueline Grace Seifert**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Karin Bornstein Swope**<br>(See above for address)<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Valerie T McGinty**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **Association of California School Administrators** | represented by | **Michael Joseph Davis**<br>Atkinson, Andelson, Loya, Ruud & Romo<br>4160 Dublin Blvd.<br>Ste 210<br>Dublin, CA 94568<br>925-227-9200<br>Email: mdavis@aalrr.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **The American Federation of Teachers** | represented by | **Dean Noburu Kawamoto**<br>Keller Rohrback LLP<br>1201 3rd Avenue, Suite 3400<br>Seattle, WA 98101<br>(206) 442-1563<br>Email: dkawamoto@kellerrohrback.com<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **The California Federation of Teachers** | represented by | **Dean Noburu Kawamoto**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **Electronic Privacy Information Center** | represented by | **Alan Jay Butler**<br>Electronic Privacy Information Center<br>200<br>1718 Connecticut Ave. NW<br>Washington, DC 20009 |

(202) 483-1140
Fax: 202-483-1248
Email: butler@epic.org
*ATTORNEY TO BE NOTICED*

**Amicus**

**:Law & Technology Scholars** represented by **Alan Jay Butler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Protection of the Educational Rights of Kids** represented by **Anthony Lee Francois**
Briscoe Ivester & Bazel LLP
235 Montgomery Street, Suite 935
San Francisco, CA 94104
415-402-2700
Fax: 415-398-5630
Email: tfrancois@briscoefirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/13/2025 | 1 | COMPLAINT *for Declaratory and Injunctive Relief* against Rob Bonta ( Filing fee $ 405, receipt number ACANDC-21346814.). Filed by Meta Platforms, Inc.. (Chaput, Isaac) (Filed on 11/13/2025) (Entered: 11/13/2025) |
| 11/13/2025 | 2 | Proposed Summons. (Chaput, Isaac) (Filed on 11/13/2025) (Entered: 11/13/2025) |
| 11/13/2025 | 3 | Certificate of Interested Entities by Meta Platforms, Inc. (Chaput, Isaac) (Filed on 11/13/2025) (Entered: 11/13/2025) |
| 11/13/2025 | 4 | Corporate Disclosure Statement by Meta Platforms, Inc. (Chaput, Isaac) (Filed on 11/13/2025) (Entered: 11/13/2025) |
| 11/13/2025 | 5 | NOTICE of Filing in No. 5:24-CV-07885-EJD of Administrative Motion to Consider Whether Cases Should be Related Pursuant to Local Civil Rule 3-12(b) by Meta Platforms, Inc. (Attachments: # 1 Exhibit 1)(Chaput, Isaac) (Filed on 11/13/2025) Modified on 11/17/2025 (kmm2, COURT STAFF). (Entered: 11/13/2025) |
| 11/14/2025 | 6 | NOTICE of Appearance filed by Alexander Lawrenson Schultz on behalf of Meta Platforms, Inc. (Schultz, Alexander) (Filed on 11/14/2025) (Entered: 11/14/2025) |
| 11/14/2025 | 7 | Case assigned to Magistrate Judge Kandis A. Westmore.<br><br>Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit *E-Filing A New Civil Case* at http://cand.uscourts.gov/ecf/caseopening.<br><br>Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. Consent/Declination due by 11/28/2025. (amf, COURT STAFF) (Filed on 11/14/2025) (Entered: 11/14/2025) |

| | | |
|---|---|---|
| 11/14/2025 | 8 | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by Meta Platforms, Inc... (Chaput, Isaac) (Filed on 11/14/2025) (Entered: 11/14/2025) |
| 11/14/2025 | 9 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-21347885.) filed by Meta Platforms, Inc.. (Attachments: # 1 Exhibit Certificate of Good Standing)(Widas, Alexandra) (Filed on 11/14/2025) (Entered: 11/14/2025) |
| 11/14/2025 | 10 | **ORDER RELATING CASES. Signed by Judge Edward J. Davila on 11/14/2025. (crr, COURT STAFF) (Filed on 11/14/2025) (Entered: 11/14/2025)** |
| 11/17/2025 | 11 | **Initial Case Management Scheduling Order with ADR Deadlines: Case Management Statement due by 2/10/2026. Initial Case Management Conference set for 2/17/2026, 1:30 PM in Oakland - via Zoom. (kmm2, COURT STAFF) (Filed on 11/17/2025) (Entered: 11/17/2025)** |
| 11/17/2025 | 12 | **ORDER REASSIGNING CASE**<br><br>IT IS ORDERED that this case is directly assigned to Judge Edward J. Davila. Magistrate Judge Kandis A. Westmore no longer assigned to the case.<br><br>Counsel are instructed that all future filings shall bear the updated judicial initials immediately after the case number. Counsel are reminded to verify the location of the judge on the court website. All hearing and trial dates presently scheduled are vacated. However, existing briefing schedules for motions remain unchanged. Motions must be renoticed for hearing before the judge to whom the case has been reassigned, but the renoticing of the hearing does not affect the prior briefing schedule. Other deadlines such as those for ADR compliance and discovery cutoff also remain unchanged.<br><br>Mark B. Busby<br>Clerk, United States District Court<br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)*<br><br>(amf, COURT STAFF) (Filed on 11/17/2025) (Entered: 11/17/2025) |
| 11/17/2025 | 13 | Summons Issued as to Rob Bonta. (kmm2, COURT STAFF) (Filed on 11/17/2025) (Entered: 11/17/2025) |
| 11/17/2025 | | CASE REFERRED to Magistrate Judge Nathanael M. Cousins for Discovery. (jnk, COURT STAFF) (Filed on 11/17/2025) (Entered: 11/17/2025) |
| 11/17/2025 | 14 | **CLERKS NOTICE RESETTING CASE MANAGEMENT CONFERENCE FOLLOWING REASSIGNMENT.**<br><br>Joint Case Management Statement due by 1/23/2026. Initial Case Management Conference set for 2/5/2026 at 10:00 AM in San Jose, Courtroom 4, 5th Floor before Judge Edward J. Davila.<br><br>*See* Standing Order for All Judges of the Northern District of California: Contents of Case Management Statement, available at https://www.cand.uscourts.gov/rules/judges-standing-orders/<br><br>The Court does not issue a revised Initial Case Management Scheduling Order with ADR Deadlines. Standing orders can be downloaded from the court's web page at https://www.cand.uscourts.gov/judges/ejd/davila-edward-j/. |

| | | |
|---|---|---|
| | | *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (crr, COURT STAFF) (Filed on 11/17/2025) (Entered: 11/17/2025) |
| 11/18/2025 | 15 | NOTICE of Appearance filed by Shiwon Choe on behalf of Rob Bonta (Choe, Shiwon) (Filed on 11/18/2025) (Entered: 11/18/2025) |
| 11/18/2025 | 16 | STIPULATION WITH PROPOSED ORDER *to Set Briefing Schedule and Hearing Date on Motions and Deadline to Respond to Complaints* filed by Meta Platforms, Inc.. (Chaput, Isaac) (Filed on 11/18/2025) (Entered: 11/18/2025) |
| 11/18/2025 | 17 | NOTICE of Appearance filed by Christopher Kissel on behalf of Rob Bonta (Kissel, Christopher) (Filed on 11/18/2025) (Entered: 11/18/2025) |
| 11/18/2025 | 18 | ***DUPLICATIVE ENTRY- Correct entry at DKT 19 *** *See* 19 MOTION for Preliminary Injunction filed by Meta Platforms, Inc. (Chaput, Isaac) (Filed on 11/18/2025) Modified on 11/19/2025 (crr, COURT STAFF). Modified text on 11/19/2025 (kxo, COURT STAFF). (Entered: 11/18/2025) |
| 11/18/2025 | 19 | MOTION for Preliminary Injunction filed by Meta Platforms, Inc.. Motion Hearing set for 2/5/2026 09:00 AM in San Jose, Courtroom 4, 5th Floor before Judge Edward J. Davila. Responses due by 12/18/2025. Replies due by 1/20/2026. (Attachments: # 1 Declaration of Lars Backstrom, # 2 Declaration of Arcadiy Kantor, # 3 Declaration of Sayed Otaru, # 4 Declaration of Alexander L. Schultz, # 5 Exhibit 1, # 6 Exhibit 2, # 7 Exhibit 3, # 8 Exhibit 4, # 9 Exhibit 5, # 10 Exhibit 6, # 11 Exhibit 7, # 12 Exhibit 8, # 13 Exhibit 9, # 14 Exhibit 10, # 15 Exhibit 11, # 16 Exhibit 12, # 17 Exhibit 13, # 18 Exhibit 14, # 19 Exhibit 15, # 20 Exhibit 16, # 21 Exhibit 17, # 22 Proposed Order)(Chaput, Isaac) (Filed on 11/18/2025) (Entered: 11/18/2025) |
| 11/19/2025 | 20 | SUMMONS Returned Executed by Meta Platforms, Inc.. Rob Bonta served on 11/17/2025, answer due 12/8/2025. (Chaput, Isaac) (Filed on 11/19/2025) (Entered: 11/19/2025) |
| 11/19/2025 | 21 | **ORDER GRANTING *AS MODIFIED* STIPULATIONS TO SET BRIEFING SCHEDULE RE MOTIONS FOR PRELIMINARY INJUNCTION; CONTINUING MOTION HEARING AND INITIAL CASE MANAGEMENT CONFERENCE. Signed by Judge Edward J. Davila on 11/19/2025.**<br><br>Motion Hearing on Motions for Preliminary Injunction set for 2/5/2026 is CONTINUED to 2/12/2026 at 9:00 AM in San Jose, Courtroom 4, 5th Floor.<br><br>Initial Case Management Conference set for 2/5/2026 is CONTINUED to 2/12/2026 at 10:00 AM.<br><br>(crr, COURT STAFF) (Filed on 11/19/2025) (Entered: 11/19/2025) |
| 11/20/2025 | 22 | **ORDER Granting 9 Motion for Pro Hac Vice as to Alexandra Widas. Signed by Judge Edward J. Davila on 11/20/2025. (crr, COURT STAFF) (Filed on 11/20/2025) (Entered: 11/20/2025)** |
| 11/21/2025 | 23 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number BCANDC-21377258.) filed by Meta Platforms, Inc.. (Attachments: # 1 Certificate of Good Standing)(Sankoorikal, Teena-Ann) (Filed on 11/21/2025) (Entered: 11/21/2025) |
| 11/21/2025 | 24 | **ORDER Granting 23 Motion for Pro Hac Vice as to Teena-Ann Sankoorikal. Signed by Judge Edward J. Davila on 11/21/2025. (crr, COURT STAFF) (Filed on 11/21/2025) (Entered: 11/21/2025)** |

| | | |
|---|---|---|
| 11/21/2025 | 25 | NOTICE of Appearance filed by Zelda Rose Vassar on behalf of Rob Bonta (Vassar, Zelda) (Filed on 11/21/2025) (Entered: 11/21/2025) |
| 11/24/2025 | 26 | NOTICE of Appearance filed by Todd Grabarsky on behalf of Rob Bonta (Grabarsky, Todd) (Filed on 11/24/2025) (Entered: 11/24/2025) |
| 11/24/2025 | 27 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-21382574.) filed by Meta Platforms, Inc.. (Attachments: # 1 Certificate of Good Standing)(Mosier, Mark) (Filed on 11/24/2025) (Entered: 11/24/2025) |
| 11/24/2025 | 28 | **ORDER Granting 27 Motion for Pro Hac Vice as to Mark Mosier. Signed by Judge Edward J. Davila on 11/24/2025. (crr, COURT STAFF) (Filed on 11/24/2025) (Entered: 11/24/2025)** |
| 12/03/2025 | 29 | STIPULATION WITH PROPOSED ORDER to Modify Briefing Schedule, Extend Hearing Date, Permit a Consolidated Opposition Brief, and Extend Page Limits filed by Rob Bonta. Responses due by 12/8/2025. (Attachments: # 1 Stipulation, # 2 Proposed Order)(Kissel, Christopher) (Filed on 12/3/2025) Modified on 12/3/2025 (crr, COURT STAFF). (Entered: 12/03/2025) |
| 12/03/2025 | 30 | **ORDER GRANTING *AS MODIFIED* STIPULATION TO MODIFY BRIEFING SCHEDULE, EXTEND PAGE LIMITS, AND CONTINUE HEARING RE MOTION FOR PRELIMINARY INJUNCTION. Signed by Judge Edward J. Davila on 12/3/2025. (crr, COURT STAFF) (Filed on 12/3/2025) (Entered: 12/03/2025)** |
| 12/04/2025 | 31 | NOTICE of Appearance filed by William Bellamy on behalf of Rob Bonta (Bellamy, William) (Filed on 12/4/2025) (Entered: 12/04/2025) |
| 12/05/2025 | 32 | NOTICE of Appearance filed by Asha Albuquerque on behalf of Rob Bonta (Albuquerque, Asha) (Filed on 12/5/2025) (Entered: 12/05/2025) |
| 12/09/2025 | 33 | **ORDER SETTING COMPLIANCE DEADLINE re 32 Notice of Appearance by Asha Albuquerque. Signed by Judge Edward J. Davila on 12/9/2025. (crr, COURT STAFF) (Filed on 12/9/2025) (Entered: 12/09/2025)** |
| 12/11/2025 | 34 | RESPONSE re 33 Order, Set Deadlines/Hearings by Rob Bonta. (Attachments: # 1 Declaration of Asha Albuquerque (with Exhibit A - N.D. Cal. Certificate of Good Standing))(Albuquerque, Asha) (Filed on 12/11/2025) (Entered: 12/11/2025) |
| 12/12/2025 | 35 | ADMINISTRATIVE MOTION for Limited Expedited Discovery Regarding Plaintiff's Motion for Preliminary Injunction filed by Rob Bonta. Responses due by 12/16/2025. (Attachments: # 1 Declaration of Shiwon Choe and Exs. 1-3, # 2 Proposed Requests for Production, # 3 Proposed Order)(Choe, Shiwon) (Filed on 12/12/2025) (Entered: 12/12/2025) |
| 12/12/2025 | 36 | CLERK'S NOTICE Setting Hearing. Motion Hearing as to 35 Motion for Limited Expedited Discovery Regarding Plaintiff's Motion for Preliminary Injunction set for 12/17/2025 at 9:00 AM via Videoconference Only before Judge Edward J. Davila. *(This is a text-only entry generated by the court. There is no document associated with this entry.)*(crr, COURT STAFF) (Filed on 12/12/2025) (Entered: 12/12/2025) |
| 12/16/2025 | 37 | OPPOSITION/RESPONSE (re 35 ADMINISTRATIVE MOTION for Limited Expedited Discovery Regarding Plaintiff's Motion for Preliminary Injunction ) filed byMeta Platforms, Inc.. (Attachments: # 1 Proposed Order)(Chaput, Isaac) (Filed on 12/16/2025) (Entered: 12/16/2025) |
| 12/17/2025 | 38 | **Minute Entry for proceedings held before Judge Edward J. Davila: Motion Hearing held on 12/17/2025 re 35 Defendant's Motion for Limited Expedited Discovery.** |

| | | |
|---|---|---|
| | | **Counsel reports the Parties have met and conferred and are working on resolution regarding this motion.**<br><br>**The Court directs the Parties continue to meet and confer. Any discovery-related disputes should be scheduled before the assigned magistrate judge.**<br><br>**The Court will not disturb the current briefing schedule or hearing date related to 19 Motion for Preliminary Injunction at this time. The Parties shall reach out to the Court if any schedule changes are needed.**<br><br>**Total Time in Court: 14 min (9:01-9:15 AM).**<br>**Court Reporter: Kendra Steppler (remote).**<br><br>**Plaintiff Attorney: Isaac Chaput.**<br>**Defendant Attorney: Shiwon Choe, Todd Grabarsky.**<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* (crr, COURT STAFF) (Date Filed: 12/17/2025) (Entered: 12/17/2025) |
| 12/17/2025 | 39 | **ORDER DEFERRING 35 MOTION FOR LIMITED EXPEDITED DISCOVERY. Signed by Judge Edward J. Davila on 12/17/2025. (ejdlc3, COURT STAFF) (Filed on 12/17/2025) (Entered: 12/17/2025)** |
| 12/17/2025 | 40 | NOTICE of Appearance filed by Samuel E. Sokolsky on behalf of Rob Bonta (Sokolsky, Samuel) (Filed on 12/17/2025) (Entered: 12/17/2025) |
| 12/19/2025 | 41 | NOTICE of Appearance filed by Lara Haddad on behalf of Rob Bonta *, in his official capacity as California Attorney General* (Haddad, Lara) (Filed on 12/19/2025) (Entered: 12/19/2025) |
| 01/06/2026 | 42 | TRANSCRIPT ORDER for proceedings held on 12/17/2025 before Judge Edward J. Davila by Rob Bonta, for Court Reporter Kendra Steppler. (Choe, Shiwon) (Filed on 1/6/2026) (Entered: 01/06/2026) |
| 01/06/2026 | 43 | TRANSCRIPT ORDER for proceedings held on 12/17/2025 before Judge Edward J. Davila by Meta Platforms, Inc., for Court Reporter Kendra Steppler. (Widas, Alexandra) (Filed on 1/6/2026) (Entered: 01/06/2026) |
| 01/07/2026 | 44 | Transcript of Proceedings held on December 17, 2025, before Judge Edward J. Davila. Court Reporter Kendra Steppler, email at kendra_steppler@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction. After that date, it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re 42 Transcript Order ) Release of Transcript Restriction set for 4/7/2026. (Related documents(s) 42 ) (Steppler, Kendra) (Filed on 1/7/2026) (Entered: 01/07/2026) |
| 01/08/2026 | 45 | STIPULATION WITH PROPOSED ORDER *re Briefing Schedule on Motions for Preliminary Injunction* filed by Rob Bonta. (Attachments: # 1 Declaration)(Choe, Shiwon) (Filed on 1/8/2026) (Entered: 01/08/2026) |
| 01/09/2026 | 46 | **ORDER GRANTING ( 33 in 5:25-cv-09789-EJD, 45 in 5:25-cv-09792-EJD, 37 in 5:25-cv-09795-EJD) STIPULATION TO EXTEND BRIEFING SCHEDULE re Motions for Preliminary Injunction. Signed by Judge Edward J. Davila on 1/9/2026.**<br><br>Opposition due by 2/20/2026. Reply due by 4/10/2026. |

| | | |
|---|---|---|
| | | (crr, COURT STAFF) (Filed on 1/9/2026) (Entered: 01/09/2026) |
| 01/13/2026 | 47 | STIPULATION WITH PROPOSED ORDER *[Proposed] Stipulated Protective Order* filed by Meta Platforms, Inc.. (Chaput, Isaac) (Filed on 1/13/2026) (Entered: 01/13/2026) |
| 01/16/2026 | 48 | STIPULATION WITH PROPOSED ORDER *TO RESCHEDULE INITIAL CASE MANAGEMENT CONFERENCE* filed by Meta Platforms, Inc.. (Chaput, Isaac) (Filed on 1/16/2026) (Entered: 01/16/2026) |
| 01/20/2026 | 49 | CLERK'S NOTICE CONTINUING HEARING. Initial Case Management Conference set for 2/12/2026 is CONTINUED to 5/21/2026 at 10:00 AM in San Jose, Courtroom 4, 5th Floor. Joint Case Management Statement due by 5/8/2026.<br><br>Stipulation to Continue CMC is TERMINATED as Moot.<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* (crr, COURT STAFF) (Filed on 1/20/2026) (Entered: 01/20/2026) |
| 01/21/2026 | 50 | **STIPULATED PROTECTIVE ORDER. Signed by Judge Nathanael M. Cousins on 1/21/2026.** (lmh, COURT STAFF) (Filed on 1/21/2026) (Entered: 01/21/2026) |
| 01/29/2026 | 51 | NOTICE of Appearance filed by Ashley Margaret Simonsen on behalf of Meta Platforms, Inc. (Simonsen, Ashley) (Filed on 1/29/2026) (Entered: 01/29/2026) |
| 01/30/2026 | 52 | NOTICE of Appearance filed by Meghan Strong on behalf of Rob Bonta (Strong, Meghan) (Filed on 1/30/2026) (Entered: 01/30/2026) |
| 02/06/2026 | 53 | NOTICE of Withdrawal filed by Daniel A. Rios, no longer appearing on behalf of Meta Platforms, Inc. in this case (Rios, Daniel) (Filed on 2/6/2026) (Entered: 02/06/2026) |
| 02/18/2026 | 54 | STIPULATION WITH PROPOSED ORDER */ Joint Stipulation and [Proposed] Order Re Briefing Schedule on Motions to Seal Related to Defendant's Opposition to Plaintiffs' Motions for Preliminary Injunction* filed by Meta Platforms, Inc.. (Schultz, Alexander) (Filed on 2/18/2026) (Entered: 02/18/2026) |
| 02/19/2026 | 55 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-21670188.) filed by Meta Platforms, Inc.. (Attachments: # 1 Exhibit)(Cholera, Kuntal) (Filed on 2/19/2026) (Entered: 02/19/2026) |
| 02/19/2026 | 56 | **ORDER Granting 55 Motion for Pro Hac Vice as to Kuntal Cholera. Signed by Judge Edward J. Davila on 2/19/2026. (crr, COURT STAFF) (Filed on 2/19/2026) (Entered: 02/19/2026)** |
| 02/19/2026 | 57 | CLERK'S NOTICE CONTINUING MOTION HEARING. Motion Hearing re Motion for Preliminary Injunction ( 20 in 5:25-cv-09789-EJD; 19 in 5:25-cv-09792-EJD; 23 in 5:25-cv-09795-EJD) set for 4/30/2026 is CONTINUED to 5/7/2026 at 9:00 AM in San Jose, Courtroom 4, 5th Floor before Judge Edward J. Davila. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (crr, COURT STAFF) (Filed on 2/19/2026) (Entered: 02/19/2026) |
| 02/19/2026 | 58 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-21671250.) filed by Meta Platforms, Inc.. (Attachments: # 1 Exhibit Certificate of good standing)(Sandberg, Jeffrey) (Filed on 2/19/2026) (Entered: 02/19/2026) |
| 02/19/2026 | 59 | **ORDER Granting 58 Motion for Pro Hac Vice as to Jeffrey Sandberg. Signed by Judge Edward J. Davila on 2/19/2026. (crr, COURT STAFF) (Filed on 2/19/2026) (Entered: 02/19/2026)** |

| | | |
|---|---|---|
| 02/20/2026 | 60 | MOTION for leave to appear in Pro Hac Vice *for amicus State of New York* ( Filing fee $ 328, receipt number ACANDC-21674263.) filed by State of New York. (Greenwald, Blair) (Filed on 2/20/2026) (Entered: 02/20/2026) |
| 02/20/2026 | 61 | **ORDER GRANTING STIPULATION RE BRIEFING SCHEDULE ON MOTIONS TO SEAL RELATED TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION. Signed by Judge Edward J. Davila on 2/20/2026.**<br><br>Related Documents: (39) in case 5:25-cv-09789-EJD; (54) in case 5:25-cv-09792-EJD; (42) in case 5:25-cv-09795-EJD. (ejdlc3, COURT STAFF) (Filed on 2/20/2026) (Entered: 02/20/2026) |
| 02/20/2026 | 62 | **ORDER Granting 60 Motion for Pro Hac Vice as to Blair Greenwald (waiving local co-counsel requirement). Signed by Judge Edward J. Davila on 2/20/2026. (crr, COURT STAFF) (Filed on 2/20/2026) (Entered: 02/20/2026)** |
| 02/20/2026 | 63 | OPPOSITION/RESPONSE (re 19 MOTION for Preliminary Injunction ) -- *Defendant's Omnibus Opposition to Plaintiffs' Motions for Preliminary Injunction (REDACTED)* filed byRob Bonta. (Attachments: # 1 Declaration of Dr. Dimitri Christakis (REDACTED), # 2 Declaration of Dr. Serge Egelman, Ph.D., # 3 Declaration of Dr. Jennifer Golbeck, Ph.D. (REDACTED), # 4 Declaration of Dr. Martin Hilbert, Ph.D. (REDACTED), # 5 Declaration of Dr. Jenny S. Radesky, M.D. (REDACTED), # 6 Declaration of Dr. Eva H. Telzer, Ph.D. (REDACTED), # 7 Declaration of Dr. Jean M. Twenge, Ph.D. (REDACTED), # 8 Declaration of Meghan H. Strong (with Exhibits 1-10), # 9 Declaration of Shiwon Choe (with Appendix A and Placeholder for All Exhibits to Choe Decl.))(Choe, Shiwon) (Filed on 2/20/2026) (Entered: 02/20/2026) |
| 02/20/2026 | 64 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *in Support of Defendant's Omnibus Opposition to Plaintiff's Motion for Preliminary Injunction* filed by Rob Bonta. (Attachments: # 1 Defendant's Omnibus Opposition to Plaintiffs' Motions for Preliminary Injunction (UNREDACTED), # 2 Declaration of Dr. Dimitri Christakis (UNREDACTED), # 3 Declaration of Dr. Jennifer Golbeck, Ph.D. (UNREDACTED), # 4 Declaration of Dr. Martin Hilbert, Ph.D. (UNREDACTED), # 5 Declaration of Dr. Jenny S. Radesky, M.D. (UNREDACTED), # 6 Declaration of Dr. Eva H. Telzer, Ph.D. (UNREDACTED), # 7 Declaration of Dr. Jean M. Twenge, Ph.D. (UNREDACTED), # 8 Declaration of Shiwon Choe (with Appendix A), # 9 Exhibit M2A (UNDER SEAL), # 10 Exhibit M2B (UNDER SEAL), # 11 Exhibit M2C (UNDER SEAL), # 12 Exhibit M3 (UNDER SEAL), # 13 Exhibit M6A (UNDER SEAL), # 14 Exhibit M6B (UNDER SEAL), # 15 Exhibit M6C (UNDER SEAL), # 16 Exhibit M8 (UNDER SEAL), # 17 Exhibit M10A (UNDER SEAL), # 18 Exhibit M10B (UNDER SEAL), # 19 Exhibit M11A (UNDER SEAL), # 20 Exhibit M11B (UNDER SEAL), # 21 Exhibit M11C (UNDER SEAL), # 22 Exhibit M11D (UNDER SEAL), # 23 Exhibit M12 (UNDER SEAL), # 24 Exhibit M13 (UNDER SEAL), # 25 Exhibit M14 (UNDER SEAL), # 26 Exhibit M19A (UNDER SEAL), # 27 Exhibit M19B (UNDER SEAL), # 28 Exhibit M20A (UNDER SEAL), # 29 Exhibit M20B (UNDER SEAL), # 30 Exhibit M20C (UNDER SEAL), # 31 Exhibit M23 (UNDER SEAL), # 32 Exhibit M74 (UNDER SEAL), # 33 Exhibit M75 (UNDER SEAL), # 34 Exhibit M76 (UNDER SEAL), # 35 Exhibit M77 (UNDER SEAL), # 36 Exhibit M78 (UNDER SEAL), # 37 Exhibit M79 (UNDER SEAL), # 38 Exhibit M80 (UNDER SEAL), # 39 Exhibit M81 (UNDER SEAL), # 40 Exhibit M82 (UNDER SEAL), # 41 Exhibit M83 (UNDER SEAL), # 42 Exhibit M84 (UNDER SEAL), # 43 Exhibit M85 (UNDER SEAL), # 44 Exhibit M86 (UNDER SEAL), # 45 Exhibit M87 (UNDER SEAL), # 46 Exhibit M88 (UNDER SEAL), # 47 Exhibit M89 (UNDER SEAL), # 48 Exhibit M90 (UNDER SEAL), # 49 Exhibit M91 (UNDER SEAL), # 50 Exhibit M92 (UNDER SEAL), # 51 Exhibit M93 |

| | | |
|---|---|---|
| | | (UNDER SEAL), # 52 Exhibit M94 (UNDER SEAL), # 53 Exhibit M95 (UNDER SEAL), # 54 Exhibit M96 (UNDER SEAL), # 55 Exhibit M98 (UNDER SEAL), # 56 Exhibit M100 (UNDER SEAL), # 57 Exhibit M101 (UNDER SEAL), # 58 Exhibit M102A (UNDER SEAL), # 59 Exhibit M102B (UNDER SEAL), # 60 Exhibit M103 (UNDER SEAL), # 61 Exhibit M104 (UNDER SEAL), # 62 Exhibit M105 (UNDER SEAL), # 63 Exhibit M107 (UNDER SEAL), # 64 Exhibit M108 (UNDER SEAL), # 65 Exhibit M109 (UNDER SEAL), # 66 Exhibit M110 (UNDER SEAL), # 67 Exhibit M111 (UNDER SEAL), # 68 Exhibit M112 (UNDER SEAL), # 69 Exhibit M113A (UNDER SEAL), # 70 Exhibit M113B (UNDER SEAL), # 71 Exhibit M114 (UNDER SEAL), # 72 Exhibit M115 (UNDER SEAL), # 73 Exhibit M116 (UNDER SEAL), # 74 Exhibit M117 (UNDER SEAL), # 75 Exhibit M118 (UNDER SEAL), # 76 Exhibit M119 (UNDER SEAL), # 77 Exhibit M120 (UNDER SEAL), # 78 Exhibit M121 (UNDER SEAL), # 79 Exhibit M122A (UNDER SEAL), # 80 Exhibit M122B (UNDER SEAL), # 81 Exhibit M123 (UNDER SEAL), # 82 Exhibit M124 (UNDER SEAL), # 83 Exhibit M125 (UNDER SEAL), # 84 Exhibit M126 (UNDER SEAL), # 85 Exhibit M127 (UNDER SEAL), # 86 Exhibit M128 (UNDER SEAL), # 87 Exhibit M129 (UNDER SEAL), # 88 Exhibit M130A (UNDER SEAL), # 89 Exhibit M130B (UNDER SEAL), # 90 Exhibit M130C (UNDER SEAL), # 91 Exhibit M131 (UNDER SEAL), # 92 Exhibit M132 (UNDER SEAL), # 93 Exhibit M133 (UNDER SEAL), # 94 Exhibit M138 (UNDER SEAL), # 95 Exhibit M148 (UNDER SEAL), # 96 Exhibit M168A (UNDER SEAL), # 97 Exhibit M168B (UNDER SEAL), # 98 Exhibit M168C (UNDER SEAL), # 99 Exhibit M169 (UNDER SEAL), # 100 Exhibit M170 (UNDER SEAL), # 101 Exhibit M172 (UNDER SEAL), # 102 Exhibit M173 (UNDER SEAL), # 103 Exhibit M177 (UNDER SEAL), # 104 Exhibit M208 (UNDER SEAL), # 105 Exhibit M209 (UNDER SEAL), # 106 Exhibit M211 (UNDER SEAL), # 107 Exhibit M212 (UNDER SEAL), # 108 Exhibit M213 (UNDER SEAL), # 109 Exhibit M214 (UNDER SEAL), # 110 Exhibit M215 (UNDER SEAL), # 111 Exhibit M216 (UNDER SEAL), # 112 Exhibit M217 (UNDER SEAL), # 113 Exhibit M218 (UNDER SEAL), # 114 Exhibit M219 (UNDER SEAL), # 115 Exhibit M220A (UNDER SEAL), # 116 Exhibit M220B (UNDER SEAL), # 117 Exhibit M222 (UNDER SEAL), # 118 Exhibit M224 (UNDER SEAL), # 119 Exhibit M225 (UNDER SEAL), # 120 Exhibit M227 (UNDER SEAL), # 121 Exhibit M228 (UNDER SEAL), # 122 Exhibit M229 (UNDER SEAL), # 123 Exhibit M230 (UNDER SEAL), # 124 Exhibit M231 (UNDER SEAL), # 125 Exhibit M233 (UNDER SEAL), # 126 Exhibit M235 (UNDER SEAL), # 127 Exhibit M236 (UNDER SEAL), # 128 Exhibit M237 (UNDER SEAL), # 129 Exhibit M239 (UNDER SEAL), # 130 Exhibit M240 (UNDER SEAL), # 131 Exhibit M241 (UNDER SEAL), # 132 Exhibit M242 (UNDER SEAL), # 133 Exhibit M243 (UNDER SEAL), # 134 Exhibit M246 (UNDER SEAL), # 135 Exhibit M247 (UNDER SEAL), # 136 Exhibit M248 (UNDER SEAL), # 137 Exhibit M249 (UNDER SEAL), # 138 Exhibit M253 (UNDER SEAL), # 139 Exhibit M255 (UNDER SEAL), # 140 Exhibit M256A (UNDER SEAL), # 141 Exhibit M256B (UNDER SEAL), # 142 Exhibit M257 (UNDER SEAL), # 143 Exhibit M260 (UNDER SEAL), # 144 Exhibit M261 (UNDER SEAL), # 145 Exhibit M262 (UNDER SEAL), # 146 Exhibit M263 (UNDER SEAL), # 147 Exhibit M264 (UNDER SEAL), # 148 Exhibit M265 (UNDER SEAL), # 149 Exhibit M266 (UNDER SEAL), # 150 Exhibit M267 (UNDER SEAL), # 151 Exhibit M280 (UNDER SEAL), # 152 Exhibit M281 (UNDER SEAL), # 153 Exhibit M298 (UNDER SEAL), # 154 Exhibit M318 (UNDER SEAL), # 155 Exhibit M324 (UNDER SEAL), # 156 Exhibit M325 (UNDER SEAL), # 157 Exhibit M326 (UNDER SEAL), # 158 Exhibit M392 (UNDER SEAL), # 159 Exhibit M1182 (UNDER SEAL))(Choe, Shiwon) (Filed on 2/20/2026) (Entered: 02/20/2026) |
| 02/26/2026 | 65 | MOTION for Leave to File *a Brief as Amici Curiae in Support of Defendant* filed by Children's Advocacy Institute, Fairplay for Kids, The Organization for Social Media Safety. (Attachments: # 1 Exhibit Brief of Childrens Advocacy Institute, Fairplay For Kids, and The Organization for Social Media Safety As Amici Curiae in Support of |

| | | |
|---|---|---|
| | | Defendant, # 2 Proposed Order Granting Motion Of Childrens Advocacy Institute, Fairplay For Kids, And The Organization For Social Media Safety Leave To File A Brief As Amici Curiae In Support Of Defendant)(Howard, Ed) (Filed on 2/26/2026) (Entered: 02/26/2026) |
| 02/27/2026 | 66 | MOTION for Leave to File *The American Academy Of Pediatrics California, Childrens Specialty Care Coalition, California Psychological Association, And The California Academy Of Child And Adolescent Psychiatrys Motion For Leave To File Amici Curiae Brief* filed by American Academy of Pediatrics California, Childrens Specialty Care Coalition, California Psychological Association, California Academy of Child and Adolescent Psychiatry. (Attachments: # 1 Exhibit A- Amicus Curiae Brief Of The American Academy Of Pediatrics California, Childrens Specialty Care Coalition, California Psychological Association, And The California Academy Of Child And Adolescent Psychiatry Supporting Appellants, # 2 Proposed Order Granting Motion For Leave To File A Brief As Amici Curiae In Support Of Defendant)(Murphy, Anne Marie) (Filed on 2/27/2026) (Entered: 02/27/2026) |
| 02/27/2026 | 67 | MOTION for Leave to File *to File Omnibus Brief of Amicus Curiae Association of California School Administrators* filed by Association of California School Administrators. (Attachments: # 1 [Proposed] Omnibus Brief of Amicus Curiae Association of California School Administrators, # 2 Declaration of Dorothy Johnson in Support of Proposed Omnibus Brief of Amicus Curiae Association of California School Administrators, # 3 Proposed Order, # 4 Certificate/Proof of Service)(Davis, Michael) (Filed on 2/27/2026) (Entered: 02/27/2026) |
| 02/27/2026 | 68 | MOTION for Leave to File *Brief for Amici States of New York et al.* filed by State of New York. (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Proposed Order)(Greenwald, Blair) (Filed on 2/27/2026) (Entered: 02/27/2026) |
| 02/27/2026 | 69 | MOTION for leave to appear in Pro Hac Vice *for Karin B. Swope* ( Filing fee $ 328, receipt number ACANDC-21703393.) filed by American Academy of Pediatrics California, California Academy of Child and Adolescent Psychiatry, California Psychological Association, Childrens Specialty Care Coalition. (Attachments: # 1 Exhibit Certificate of Good Standing WA)(Swope, Karin) (Filed on 2/27/2026) (Entered: 02/27/2026) |
| 02/27/2026 | 70 | MOTION for Leave to File *Motion of the American Federation of Teachers and The California Federation of Teachers for Leave to Submit Amici Curiae In Support of Defendant's Opposition to Plaintiffs' Motions for Preliminary Injunction* filed by The American Federation of Teachers, The California Federation of Teachers. (Attachments: # 1 Exhibit A - Brief of Amici Curiae In Support of Defendant's Opposition to Plaintiffs' Motions for Preliminary Injunction)(Kawamoto, Dean) (Filed on 2/27/2026) (Entered: 02/27/2026) |
| 02/27/2026 | 71 | MOTION to File Amicus Curiae Brief filed by Electronic Privacy Information Center, :Law & Technology Scholars. Motion Hearing set for 5/7/2026 09:00 AM in San Jose, Courtroom 4, 5th Floor before Judge Edward J. Davila. Responses due by 3/13/2026. Replies due by 3/20/2026. (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Proposed Order)(Butler, Alan) (Filed on 2/27/2026) (Entered: 02/27/2026) |
| 03/02/2026 | 72 | First MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-21706146.) filed by American Academy of Pediatrics California, California Academy of Child and Adolescent Psychiatry, California Psychological Association, Childrens Specialty Care Coalition. (McGinty, Valerie) (Filed on 3/2/2026) (Entered: 03/02/2026) |

| | | |
|---|---|---|
| 03/06/2026 | 73 | STIPULATION WITH PROPOSED ORDER *for Extension re Sealing Motions* filed by Meta Platforms, Inc.. (Chaput, Isaac) (Filed on 3/6/2026) Modified on 3/9/2026 (crr, COURT STAFF). (Entered: 03/06/2026) |
| 03/09/2026 | 74 | **ORDER GRANTING STIPULATION TO EXTEND DEADLINE FOR SEALING MOTIONS. Signed by Judge Edward J. Davila on 3/9/2026.**<br><br>**Related Documents: (55) in case 5:25-cv-09789-EJD; (73) in case 5:25-cv-09792-EJD; (55) in case 5:25-cv-09795-EJD (ejdlc3, COURT STAFF) (Filed on 3/9/2026) (Entered: 03/09/2026)** |
| 03/18/2026 | 75 | **ORDER GRANTING MOTIONS FOR LEAVE TO FILE AMICUS CURIAE BRIEFS. Signed by Judge Edward J. Davila on 3/18/2026.**<br><br>**Related documents: (48), (49), (50), (51), (52), (53), (54) in case 5:25-cv-09789-EJD; (65), (66), (67), (68), (70), (71) in case 5:25-cv-09792-EJD; (49), (50), (51), (52), (53), (54) in case 5:25-cv-09795-EJD. (ejdlc3, COURT STAFF) (Filed on 3/18/2026) (Entered: 03/18/2026)** |
| 03/19/2026 | | Remark: 72 Motion for Admission Pro Hac Vice by Valerie McGinty will not be processed. Valerie McGinty is an active member of the california bar in good standing and a member of the bar of this court. No pro hac vice application is necessary. Counsel notified separately via email. (crr, COURT STAFF) (Filed on 3/19/2026) (Entered: 03/19/2026) |
| 03/23/2026 | 76 | MOTION for Leave to File *Amicus Brief and Proposed Amicus Brief* filed by Protection of the Educational Rights of Kids. (Francois, Anthony) (Filed on 3/23/2026) (Entered: 03/23/2026) |
| 03/23/2026 | 77 | STIPULATION WITH PROPOSED ORDER *filed Jointly with Defendant* filed by Meta Platforms, Inc.. (Chaput, Isaac) (Filed on 3/23/2026) (Entered: 03/23/2026) |
| 03/24/2026 | 78 | **ORDER GRANTING STIPULATIONS TO EXTEND DEADLINES FOR SEALING MOTIONS. Signed by Judge Edward J. Davila on 3/24/2026.**<br><br>**Related documents: (62) in case 5:25-cv-09789-EJD; (77) in case 5:25-cv-09792-EJD; (59) in case 5:25-cv-09795-EJD. (ejdlc3, COURT STAFF) (Filed on 3/24/2026) (Entered: 03/24/2026)** |
| 03/24/2026 | 79 | **ORDER Denying as Moot 72 Motion Motion for Pro Hac Vice as to Valerie McGinty. Signed by Judge Edward J. Davila on 3/24/2026. (crr, COURT STAFF) (Filed on 3/24/2026) (Entered: 03/24/2026)** |
| 03/25/2026 | 80 | NOTICE by Rob Bonta re 63 Opposition/Response to Motion,,, -- *Defendant's Notice of Refiling Excerpted Exhibits in Support of Defendant's Omnibus Opposition to Plaintiffs' Motions for Preliminary Injunction* (Attachments: # 1 Declaration of Shiwon Choe (with Appendix A and Placeholder for All Exhibits to Choe Decl.))(Choe, Shiwon) (Filed on 3/25/2026) (Entered: 03/25/2026) |
| 03/25/2026 | 81 | NOTICE of Appearance filed by Anne Marie Murphy on behalf of American Academy of Pediatrics California, California Academy of Child and Adolescent Psychiatry, California Psychological Association, Childrens Specialty Care Coalition (Murphy, Anne Marie) (Filed on 3/25/2026) (Entered: 03/25/2026) |
| 03/25/2026 | 82 | NOTICE of Appearance filed by Blair V. Kittle on behalf of American Academy of Pediatrics California, California Academy of Child and Adolescent Psychiatry, California Psychological Association, Childrens Specialty Care Coalition (Kittle, Blair) (Filed on 3/25/2026) (Entered: 03/25/2026) |

| | | |
|---|---|---|
| 03/25/2026 | 83 | NOTICE of Appearance filed by Jacqueline Grace Seifert on behalf of American Academy of Pediatrics California, California Academy of Child and Adolescent Psychiatry, California Psychological Association, Childrens Specialty Care Coalition (Seifert, Jacqueline) (Filed on 3/25/2026) (Entered: 03/25/2026) |
| 03/25/2026 | 84 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed -- *Defendant's Administrative Motion to Consider Whether Another Party's Material Should Be Sealed in Support of Defendant's Omnibus Opposition to Plaintiff's Motion for Preliminary Injunction* filed by Rob Bonta. (Attachments: # 1 Declaration of Shiwon Choe (with Appendix A), # 2 Amended Exhibit M2 (UNDER SEAL), # 3 Amended Exhibit M3 (UNDER SEAL), # 4 Amended Exhibit M6 (UNDER SEAL), # 5 Amended Exhibit M8 (UNDER SEAL), # 6 Amended Exhibit M10 (UNDER SEAL), # 7 Amended Exhibit M11 (UNDER SEAL), # 8 Amended Exhibit M12 (UNDER SEAL), # 9 Amended Exhibit M13 (UNDER SEAL), # 10 Amended Exhibit M14 (UNDER SEAL), # 11 Amended Exhibit M19 (UNDER SEAL), # 12 Amended Exhibit M20 (UNDER SEAL), # 13 Amended Exhibit M23 (UNDER SEAL), # 14 Exhibit M74 (UNDER SEAL), # 15 Amended Exhibit M75 (UNDER SEAL), # 16 Amended Exhibit M76 (UNDER SEAL), # 17 Amended Exhibit M77 (UNDER SEAL), # 18 Exhibit M78 (UNDER SEAL), # 19 Exhibit M79 (UNDER SEAL), # 20 Exhibit M80 (UNDER SEAL), # 21 Exhibit M81 (UNDER SEAL), # 22 Exhibit M82 (UNDER SEAL), # 23 Exhibit M83 (UNDER SEAL), # 24 Exhibit M84 (UNDER SEAL), # 25 Exhibit M85 (UNDER SEAL), # 26 Exhibit M86 (UNDER SEAL), # 27 Exhibit M87 (UNDER SEAL), # 28 Exhibit M88 (UNDER SEAL), # 29 Exhibit M89 (UNDER SEAL), # 30 Exhibit M90 (UNDER SEAL), # 31 Exhibit M91 (UNDER SEAL), # 32 Exhibit M92 (UNDER SEAL), # 33 Exhibit M93 (UNDER SEAL), # 34 Exhibit M94 (UNDER SEAL), # 35 Exhibit M95 (UNDER SEAL), # 36 Exhibit M96 (UNDER SEAL), # 37 Exhibit M98 (UNDER SEAL), # 38 Exhibit M100 (UNDER SEAL), # 39 Exhibit M101 (UNDER SEAL), # 40 Amended Exhibit M102 (UNDER SEAL), # 41 Exhibit M103 (UNDER SEAL), # 42 Exhibit M104 (UNDER SEAL), # 43 Exhibit M105 (UNDER SEAL), # 44 Amended Exhibit M107 (UNDER SEAL), # 45 Exhibit M108 (UNDER SEAL), # 46 Amended Exhibit M109 (UNDER SEAL), # 47 Amended Exhibit M110 (UNDER SEAL), # 48 Exhibit M111 (UNDER SEAL), # 49 Exhibit M112 (UNDER SEAL), # 50 Amended Exhibit M113 (UNDER SEAL), # 51 Exhibit M114 (UNDER SEAL), # 52 Exhibit M115 (UNDER SEAL), # 53 Exhibit M116 (UNDER SEAL), # 54 Exhibit M117 (UNDER SEAL), # 55 Exhibit M118 (UNDER SEAL), # 56 Exhibit M119 (UNDER SEAL), # 57 Exhibit M120 (UNDER SEAL), # 58 Exhibit M121 (UNDER SEAL), # 59 Amended Exhibit M122 (UNDER SEAL), # 60 Exhibit M123 (UNDER SEAL), # 61 Exhibit M124 (UNDER SEAL), # 62 Exhibit M125 (UNDER SEAL), # 63 Exhibit M126 (UNDER SEAL), # 64 Amended Exhibit M127 (UNDER SEAL), # 65 Amended Exhibit M128 (UNDER SEAL), # 66 Exhibit M129 (UNDER SEAL), # 67 Amended Exhibit M130 (UNDER SEAL), # 68 Exhibit M131 (UNDER SEAL), # 69 Amended Exhibit M132 (UNDER SEAL), # 70 Amended Exhibit M133 (UNDER SEAL), # 71 Exhibit M138 (UNDER SEAL), # 72 Exhibit M148 (UNDER SEAL), # 73 Amended Exhibit M168 (UNDER SEAL), # 74 Amended Exhibit M169 (UNDER SEAL), # 75 Exhibit M170 (UNDER SEAL), # 76 Amended Exhibit M172 (UNDER SEAL), # 77 Amended Exhibit M173 (UNDER SEAL), # 78 Exhibit M177 (UNDER SEAL), # 79 Exhibit M208 (UNDER SEAL), # 80 Exhibit M209 (UNDER SEAL), # 81 Exhibit M211 (UNDER SEAL), # 82 Exhibit M212 (UNDER SEAL), # 83 Amended Exhibit M213 (UNDER SEAL), # 84 Exhibit M214 (UNDER SEAL), # 85 Exhibit M215 (UNDER SEAL), # 86 Exhibit M216 (UNDER SEAL), # 87 Exhibit M217 (UNDER SEAL), # 88 Exhibit M218 (UNDER SEAL), # 89 Amended Exhibit M219 (UNDER SEAL), # 90 Amended Exhibit M220 (UNDER SEAL), # 91 Exhibit M222 (UNDER SEAL), # 92 Exhibit M224 (UNDER SEAL), # 93 Amended Exhibit M225 (UNDER SEAL), # 94 Exhibit M227 (UNDER SEAL), # 95 Exhibit M228 (UNDER SEAL), # 96 |

| | | |
|---|---|---|
| | | Exhibit M229 (UNDER SEAL), # 97 Exhibit M230 (UNDER SEAL), # 98 Amended Exhibit M231 (UNDER SEAL), # 99 Amended Exhibit M233 (UNDER SEAL), # 100 Exhibit M235 (UNDER SEAL), # 101 Exhibit M236 (UNDER SEAL), # 102 Exhibit M238 (UNDER SEAL), # 103 Exhibit M239 (UNDER SEAL), # 104 Exhibit M240 (UNDER SEAL), # 105 Exhibit M241 (UNDER SEAL), # 106 Exhibit M242 (UNDER SEAL), # 107 Exhibit M243 (UNDER SEAL), # 108 Exhibit M246 (UNDER SEAL), # 109 Exhibit M247 (UNDER SEAL), # 110 Exhibit M248 (UNDER SEAL), # 111 Exhibit M249 (UNDER SEAL), # 112 Exhibit M253 (UNDER SEAL), # 113 Amended Exhibit M255 (UNDER SEAL), # 114 Amended Exhibit M256 (UNDER SEAL), # 115 Amended Exhibit M257 (UNDER SEAL), # 116 Exhibit M260 (UNDER SEAL), # 117 Exhibit M261 (UNDER SEAL), # 118 Exhibit M262 (UNDER SEAL), # 119 Exhibit M263 (UNDER SEAL), # 120 Exhibit M264 (UNDER SEAL), # 121 Exhibit M265 (UNDER SEAL), # 122 Amended Exhibit M266 (UNDER SEAL), # 123 Exhibit M267 (UNDER SEAL), # 124 Exhibit M280 (UNDER SEAL), # 125 Exhibit M281 (UNDER SEAL), # 126 Exhibit M298 (UNDER SEAL), # 127 Exhibit M318 (UNDER SEAL), # 128 Exhibit M324 (UNDER SEAL), # 129 Exhibit M325 (UNDER SEAL), # 130 Amended Exhibit M326 (UNDER SEAL), # 131 Exhibit M392 (UNDER SEAL), # 132 Exhibit M1182 (UNDER SEAL))(Choe, Shiwon) (Filed on 3/25/2026) (Entered: 03/25/2026) |
| 03/25/2026 | 85 | ERRATA re 63 Opposition/Response to Motion,,, -- *Defendant's Notice of Errata Re: Declaration of Dr. Eva H. Telzer, Ph.D. in Support of Defendant's Omnibus Opposition to Plaintiffs' Motions for Preliminary Injunction* by Rob Bonta. (Choe, Shiwon) (Filed on 3/25/2026) (Entered: 03/25/2026) |
| 03/26/2026 | 86 | Amended MOTION for leave to appear in Pro Hac Vice *for Karin B. Swope* ( Filing fee $ 328, receipt number ACANDC-21703393.) Filing fee previously paid on 02/27/2026 filed by American Academy of Pediatrics California, California Academy of Child and Adolescent Psychiatry, California Psychological Association, Childrens Specialty Care Coalition. (Attachments: # 1 Exhibit Certificate of Good Standing WA)(Swope, Karin) (Filed on 3/26/2026) (Entered: 03/26/2026) |
| 03/26/2026 | 87 | **ORDER Granting 86 Motion for Pro Hac Vice as to Karin Swope. Signed by Judge Edward J. Davila on 3/26/2026. (crr, COURT STAFF) (Filed on 3/26/2026) (Entered: 03/26/2026)** |
| 04/03/2026 | 88 | ERRATA re 63 Opposition/Response to Motion,,, -- *Defendant's Notice of Errata Re: Declaration of Dr. Dimitri Christakis, Ph.D. in Support of Defendant's Omnibus Opposition to Plaintiffs' Motions for Preliminary Injunction* by Rob Bonta. (Choe, Shiwon) (Filed on 4/3/2026) (Entered: 04/03/2026) |
| 04/10/2026 | 89 | REPLY (re 19 MOTION for Preliminary Injunction ) filed byMeta Platforms, Inc.. (Attachments: # 1 Declaration of Dr. Mobasher, # 2 Declaration of Dr. Baiocchi, # 3 Declaration of Dr. Birnholtz)(Chaput, Isaac) (Filed on 4/10/2026) (Entered: 04/10/2026) |
| 04/10/2026 | 90 | Administrative Motion to File Under Seal *Declaration of Dr. Mobasher* filed by Meta Platforms, Inc.. (Attachments: # 1 Exhibit A (UNDER SEAL))(Chaput, Isaac) (Filed on 4/10/2026) (Entered: 04/10/2026) |
| 04/16/2026 | 91 | NOTICE by Rob Bonta re 63 Opposition/Response to Motion,,, -- *Defendant's Notice of Refiling of Exhibits M2 and M8 in Support of Defendant's Omnibus Opposition to Plaintiffs' Motions for Preliminary Injunction* (Attachments: # 1 Declaration of Shiwon Choe (with Placeholders for Exhibits M2 and M8 to Choe Decl. Filed Under Seal))(Choe, Shiwon) (Filed on 4/16/2026) (Entered: 04/16/2026) |
| 04/16/2026 | 92 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed -- *Defendant's Administrative Motion to Consider Whether Another Party's Material Should Be Sealed in Support of Defendant's Omnibus Opposition to Plaintiff's Motion for* |

| | | |
|---|---|---|
| | | *Preliminary Injunction* filed by Rob Bonta. (Attachments: # 1 Declaration of Shiwon Choe, # 2 Amended Exhibit M2 (UNDER SEAL), # 3 Amended Exhibit M8 (UNDER SEAL))(Choe, Shiwon) (Filed on 4/16/2026) (Entered: 04/16/2026) |
| 04/17/2026 | 93 | OBJECTIONS to *Reply Evidence* by Rob Bonta. (Strong, Meghan) (Filed on 4/17/2026) (Entered: 04/17/2026) |
| 04/24/2026 | 94 | **ORDER FOR RESPONSE TO OBJECTIONS (93) in 5:25-cv-09792-EJD; (68) in 5:25-cv-09795-EJD; (69) in 5:25-cv-09789-EJD. Responses due by 4/28/2026 at 4:00 p.m. Signed by Judge Edward J. Davila on 4/24/2026. (ejdlc3, COURT STAFF) (Filed on 4/24/2026) (Entered: 04/24/2026)** |
| 04/24/2026 | 95 | **ORDER GRANTING MOTIONS FOR LEAVE TO FILE AMICUS CURIAE BRIEF. Signed by Judge Edward J. Davila on 4/24/2026.**<br><br>**Related Documents: (61) in case 5:25-cv-09789-EJD; (76) in case 5:25-cv-09792-EJD; (58) in case 5:25-cv-09795-EJD. (ejdlc3, COURT STAFF) (Filed on 4/24/2026) (Entered: 04/24/2026)** |
| 04/24/2026 | 96 | Response re 94 Order, Set Deadlines, 93 Objection / *Plaintiff Meta Platforms, Inc.'s Response to Defendant's Objection to Reply Evidence* by Meta Platforms, Inc.. (Chaput, Isaac) (Filed on 4/24/2026) (Entered: 04/24/2026) |
| 04/24/2026 | 97 | Administrative Motion to File Under Seal / *Plaintiff Meta Platforms, Inc.'s Motion to Seal Defendant's Preliminary Injunction Opposition Exhibits* filed by Meta Platforms, Inc.. (Attachments: # 1 Declaration of K. Cholera, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Declaration of S. Hyder, # 7 Proposed Order)(Cholera, Kuntal) (Filed on 4/24/2026) (Entered: 04/24/2026) |
| 04/27/2026 | 98 | CLERKS NOTICE SETTING ZOOM HEARING. Status Conference set for 4/29/2026 at 2:00 PM via Zoom Videoconference Only before Judge Edward J. Davila.<br><br>**Court Appearances:** Advanced notice is required of any counsel or party who wishes to appear remotely and be identified by the court as making an appearance at the hearing. A list of names and emails, *and indicating main speaker and party represented*, must be sent to the Courtroom Deputy no later than 12:00 PM on 4/28/2026.<br><br>A link to the zoom conference can be found at the Judge's web page at https://www.cand.uscourts.gov/judges/ejd/davila-edward-j/. Only Counsel who have emailed the Courtroom Deputy indicating their desire to appear remotely will be admitted into the Zoom meeting.<br><br>Members of the public and the media may view the proceedings in-person, in San Jose, Courtroom 4, 5th Floor.<br><br>**General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>**Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/.<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* (crr, COURT STAFF) (Filed on 4/27/2026) (Entered: 04/27/2026) |
| 04/28/2026 | 99 | Administrative Motion to File Under Seal *PORTIONS OF THE DECLARATION OF DR. BAMSHAD MOBASHER, Ph.D. IN SUPPORT OF METAS REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION* filed by Meta Platforms, Inc.. |

| | | |
|---|---|---|
| | | (Attachments: # 1 Declaration of Max Eulenstein, # 2 Declaration of Kuntal Cholera, # 3 Proposed Order)(Cholera, Kuntal) (Filed on 4/28/2026) (Entered: 04/28/2026) |
| 04/29/2026 | 100 | **Minute Entry for proceedings held before Judge Edward J. Davila: Status Conference held on 4/29/2026.**<br><br>**Motion Hearing re Motions for Preliminary Injunction set for May 7, 2026, is CONTINUED to 6/10/2026, at 9:00 AM in San Jose, Courtroom 4, 5th Floor before Judge Edward J. Davila. Sur-Reply by Defendant due by 5/22/2026 - limited to 22 pages. Response by individual Plaintiffs due by 6/2/2026 - limited to 8 pages. Written Order to Issue.**<br><br>**Total Time in Court: 1 hr, 8 min (2:07-3:15 PM).**<br>**Court Reporter: Tiffany Salinas-Harwell.**<br><br>**Plaintiff Attorney: Dan Petrocelli, Jonathan Hacker (for TikTok Inc.); Observing Only: Kelsey Fraser, Hana Stodder (assoc. counsel) and Will Grosswendt (TikTok Rep).**<br>**Mark Mosier, Isaac Chaput, Kuntal Cholera (for Meta Platforms, Inc.); Observing Only: Leslie Vigen and Ariel Ruiz (Meta Reps).**<br>**Benedict Hur, Elizabeth Prelogar, Michael Rome (for Google and YouTube).**<br><br>**Defendant Attorney: Choe Shiwon, Todd Grabarsky, Meghan Strong (for Rob Bonta) Observing Only: Asha Alburquerque, Wm. Bellamy, Lara Haddad, Samuel Sokolsky (doj.ca attys).**<br><br>**Also Present: Anthony Francois - observing only (for proposed Amici).**<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* (crr, COURT STAFF) (Date Filed: 4/29/2026) Modified on 4/30/2026 (crr, COURT STAFF). (Entered: 04/29/2026) |
| 04/30/2026 | 101 | **ORDER REGARDING SUPPLEMENTAL BRIEFING. Signed by Judge Edward J. Davila on 4/30/2026.**<br><br>(Related Filings: 19 in 5:25-cv-09792-EJD, 23 in 5:25-cv-09795-EJD, 20 in 5:25-cv-09789-EJD - Motions for Preliminary Injunction) (crr, COURT STAFF) (Filed on 4/30/2026) (Entered: 04/30/2026) |
| 05/08/2026 | 102 | STIPULATION WITH PROPOSED ORDER *TO RESCHEDULE INITIAL CASE MANAGEMENT CONFERENCE FILED JOINTLY* filed by Meta Platforms, Inc.. (Chaput, Isaac) (Filed on 5/8/2026) (Entered: 05/08/2026) |
| 05/11/2026 | 103 | CLERK'S NOTICE CONTINUING HEARING. Initial Case Management Conference set for 5/21/2026 is CONTINUED to 6/10/2026 at 9:00 AM in San Jose, Courtroom 4, 5th Floor before Judge Edward J. Davila. Updated Joint Case Management Statement due by 5/28/2026.<br><br>Stipulation to Continue Hearing is TERMINATED as Moot.<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* (crr, COURT STAFF) (Filed on 5/11/2026) (Entered: 05/11/2026) |
| 05/15/2026 | 104 | STIPULATION WITH PROPOSED ORDER */ Joint Stipulation and [Proposed] Order to Extend Deadline for Sealing Motions* filed by Meta Platforms, Inc.. (Chaput, Isaac) (Filed on 5/15/2026) (Entered: 05/15/2026) |

| | | |
|---|---|---|
| 05/15/2026 | 105 | OPPOSITION/RESPONSE (re 99 Administrative Motion to File Under Seal *PORTIONS OF THE DECLARATION OF DR. BAMSHAD MOBASHER, Ph.D. IN SUPPORT OF METAS REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION* ) filed byRob Bonta. (Strong, Meghan) (Filed on 5/15/2026) (Entered: 05/15/2026) |
| 05/15/2026 | 106 | OPPOSITION/RESPONSE (re 97 Administrative Motion to File Under Seal / *Plaintiff Meta Platforms, Inc.'s Motion to Seal Defendant's Preliminary Injunction Opposition Exhibits* ) *Defendant's Notice of Non-Opposition to Meta's Motion to Seal Defendant's Preliminary Injunction Opposition Exhibits* filed byRob Bonta. (Strong, Meghan) (Filed on 5/15/2026) (Entered: 05/15/2026) |
| 05/18/2026 | 107 | **ORDER TO MEET AND CONFER REGARDING SEALING DEADLINES STIPULATION.**<br><br>Related Filings: (104) in 5:25-cv-09792-EJD, (83) in 5:25-cv-09795-EJD, (84) in 5:25-cv-09789-EJD. (ejdlc3, COURT STAFF) (Filed on 5/18/2026) (Entered: 05/18/2026) |
| 05/20/2026 | 108 | CLERK'S NOTICE CONTINUING CASE MANAGEMENT CONFERENCE. Initial Case Management Conference set for 6/10/2026 is CONTINUED to 8/13/2026 at 10:00 AM in San Jose, Courtroom 4, 5th Floor before Judge Edward J. Davila. Joint Case Management Statement due by 7/31/2026. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (crr, COURT STAFF) (Filed on 5/20/2026) (Entered: 05/20/2026) |
| 05/20/2026 | 109 | STIPULATION WITH PROPOSED ORDER *to modify deadlines for sealing motions filed jointly* filed by Meta Platforms, Inc.. (Chaput, Isaac) (Filed on 5/20/2026) (Entered: 05/20/2026) |
| 05/21/2026 | 110 | **ORDER GRANTING STIPULATION TO MODIFY DEADLINES FOR SEALING MOTIONS. Signed by Judge Edward J. Davila on 5/21/2026.**<br><br>**Related Documents: (88) in case 5:25-cv-09789-EJD; (109) in case 5:25-cv-09792-EJD; (87) in case 5:25-cv-09795-EJD (ejdlc1, COURT STAFF) (Filed on 5/21/2026) (Entered: 05/21/2026)** |
| 05/22/2026 | 111 | RESPONSE re 19 MOTION for Preliminary Injunction -- *Defendant's Omnibus Sur-Reply in Opposition to Plaintiffs' Motions for Preliminary Injunction (REDACTED)* by Rob Bonta. (Attachments: # 1 Rebuttal Declaration of Dr. Dimitri Christakis, Ph.D., # 2 Rebuttal Declaration of Serge Egelman, Ph.D. (REDACTED), # 3 Rebuttal Declaration of Dr. Jennifer Golbeck, Ph.D., # 4 Rebuttal Declaration of Dr. Martin Hilbert, Ph.D. (REDACTED), # 5 Rebuttal Declaration of Dr. Jenny Radesky, M.D., # 6 Rebuttal Declaration of Dr. Eva H. Telzer, Ph.D., # 7 Rebuttal Declaration of Dr. Jean M. Twenge, Ph.D., # 8 Declaration of Meghan H. Strong (with Exhibits 11-14), # 9 Declaration of Shiwon Choe (with Placeholder for Exhibits to Choe Decl. Filed Under Seal))(Choe, Shiwon) (Filed on 5/22/2026) (Entered: 05/22/2026) |
| 05/22/2026 | 112 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *in Support of Defendant's Omnibus Sur-Reply in Opposition to Plaintiffs' Motion for Preliminary Injunction* filed by Rob Bonta. (Attachments: # 1 Defendant's Omnibus Sur-Reply in Opposition to Plaintiffs' Motions for Preliminary Injunction (UNDER SEAL), # 2 Rebuttal Declaration of Serge Egelman, Ph.D. (UNDER SEAL), # 3 Rebuttal Declaration of Dr. Martin Hilbert, Ph.D. (UNDER SEAL), # 4 Declaration of Shiwon Choe with Exhibits M13-A, M14-A, M985-A, M985-B (UNDER SEAL))(Choe, Shiwon) (Filed on 5/22/2026) (Entered: 05/22/2026) |
| 05/29/2026 | 113 | OBJECTIONS to re 111 Response ( Non Motion ),,, *Surreply Evidence* by Meta Platforms, Inc.. (Chaput, Isaac) (Filed on 5/29/2026) (Entered: 05/29/2026) |

| | | |
|---|---|---|
| 06/02/2026 | 114 | ADMINISTRATIVE MOTION for Leave to File Response to Objection to Surreply Evidence re 113 Objection filed by Rob Bonta. Responses due by 6/8/2026. (Attachments: # 1 Joint Stipulation, # 2 Response to Objection to Surreply Evidence) (Strong, Meghan) (Filed on 6/2/2026) (Entered: 06/02/2026) |
| 06/02/2026 | 115 | NOTICE of Appearance filed by Max Alan Cherman on behalf of Meta Platforms, Inc. (Cherman, Max) (Filed on 6/2/2026) (Entered: 06/02/2026) |
| 06/02/2026 | 116 | REPLY (re 19 MOTION for Preliminary Injunction ) *Sur-Sur-Reply in Support* filed byMeta Platforms, Inc.. (Attachments: # 1 Declaration of Lars Backstrom, # 2 Declaration of Dr. Bamshad Mobasher, Ph.D)(Chaput, Isaac) (Filed on 6/2/2026) (Entered: 06/02/2026) |
| 06/02/2026 | 117 | **ORDER GRANTING MOTION FOR LEAVE TO FILE RESPONSE TO OBJECTION. Signed by Judge Edward J. Davila on 6/2/2026.**<br><br>**Related Filings: (93) in 5:25-cv-09789-EJD, (114) in 5:25-cv-09792-EJD, (94) in 5:25-cv-09795-EJD. (ejdlc1, COURT STAFF) (Filed on 6/2/2026) (Entered: 06/02/2026)** |
| 06/02/2026 | 118 | **ORDER REGARDING SUPPLEMENTAL BRIEFING. Signed by Judge Edward J. Davila on 6/2/2026.**<br><br>**Related Filings: (92) in 5:25-cv-09789-EJD, (113) in 5:25-cv-09792-EJD, (91) in 5:25-cv-09795-EJD. (ejdlc1, COURT STAFF) (Filed on 6/2/2026) (Entered: 06/02/2026)** |
| 06/02/2026 | 119 | Administrative Motion to File Under Seal *Portions of Exhibits Accompanying Defendant's Preliminary Injunction Sur-Reply* filed by Meta Platforms, Inc.. (Attachments: # 1 Declaration of Kuntal Cholera, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Proposed Order)(Cholera, Kuntal) (Filed on 6/2/2026) (Entered: 06/02/2026) |
| 06/03/2026 | | **Set Deadlines: Supplemental briefs by individual Plaintiffs due by 6/12/2026 - limited to 7 pages (re: Motions for Preliminary Injunction).**<br><br>**Related Filings: (19) in 5:25-cv-09792-EJD, (23) in 5:25-cv-09795-EJD, (20) in 5:25-cv-09789-EJD. (ejdlc1, COURT STAFF) (Filed on 6/3/2026) (Entered: 06/03/2026)** |
| 06/05/2026 | 120 | NOTICE of Non-Opposition to Meta's Motion to Seal Portions of Exhibits Accompanying Defendant's Preliminary Injunction Surreply< (re 119 Administrative Motion to File Under Seal Portions of Exhibits Accompanying Defendant's Preliminary Injunction Sur-Reply) filed byRob Bonta. (Strong, Meghan) (Filed on 6/5/2026) (Entered: 06/05/2026) |
| 06/11/2026 | 121 | **Minute Entry for proceedings held before Judge Edward J. Davila: Motion Hearing held on 6/10/2026.**<br><br>**Court to Issue order.**<br><br>**Total Time in Court: 5 hours and 40 Minutes. 9:04-11:40 am and 12:30-2:32 pm. Court Reporter: Irene Rodriguez.**<br><br>**Plaintiff's Attorney: Isaac Chaput, Kuntal Cholera, Mark Mosier, Mark Cherman. Defendant's Attorney: Shiwon Choe; Asha Albuqueque; William Bellamy; Todd Grabarsky; Chris Kissel; Samuel Sokolsky; Meghan Strong.**<br><br>***(This is a text-only entry generated by the court. There is no document associated with this entry.)* (rap, COURT STAFF) (Date Filed: 6/11/2026). (Entered: 06/11/2026)** |

| | | |
|---|---|---|
| 06/12/2026 | 122 | Supplemental Brief re 19 MOTION for Preliminary Injunction filed byMeta Platforms, Inc.. (Attachments: # 1 Declaration of Michael Baiocchi)(Related document(s) 19 ) (Chaput, Isaac) (Filed on 6/12/2026) (Entered: 06/12/2026) |
| 06/15/2026 | 123 | Transcript of Proceedings held on 06/10/2026, before Judge Davila. Court Reporter Irene L. Rodriguez, email address Irene_Rodriguez@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 9/14/2026. (Rodriguez, Irene) (Filed on 6/15/2026) (Entered: 06/15/2026) |
| 07/23/2026 | 124 | STIPULATION WITH PROPOSED ORDER *to Reschedule Initial Case Management Conference* filed by Meta Platforms, Inc.. (Chaput, Isaac) (Filed on 7/23/2026) (Entered: 07/23/2026) |
| 07/27/2026 | 125 | **ORDER GRANTING STIPULATIONS RE RESCHEDULING INITIAL CASE MANAGEMENT CONFERENCE. Signed by Judge Edward J. Davila on 7/27/2026.**<br><br>**Initial Case Management Conference set for 10/1/2026 at 10:00 AM in San Jose, Courtroom 4, 5th Floor. Joint Case Management Statement due by 9/17/2026.**<br><br>Related documents: (104) in case 5:25-cv-09789-EJD; (124) in case 5:25-cv-09792-EJD; (103) in case 5:25-cv-09795-EJD. (ejdlc1, COURT STAFF) (Filed on 7/27/2026) (Entered: 07/27/2026) |
| 08/05/2026 | 126 | **ORDER DENYING MOTIONS FOR PRELIMINARY INJUNCTION. Signed by Judge Edward J. Davila on 8/5/2026.**<br><br>Related Motions: (20) Motion for Preliminary Injunction in case 5:25-cv-09789-EJD; (19) Motion for Preliminary Injunction in case 5:25-cv-09792-EJD;(23) Motion for Preliminary Injunction in case 5:25-cv-09795-EJD. (ejdlc1, COURT STAFF) (Filed on 8/5/2026) (Entered: 08/05/2026) |
| 08/06/2026 | 127 | **ORDER REGARDING SEALING MOTIONS 64 84 92 97 ; GRANTING PLAINTIFF'S MOTION TO SEAL OPPOSITION EXHIBITS. Signed by Judge Edward J. Davila on 8/6/2026. (ejdlc1, COURT STAFF) (Filed on 8/6/2026) (Entered: 08/06/2026)** |
| 08/06/2026 | 128 | **ORDER GRANTING IN PART AND DENYING IN PART 90 99 ADMINISTRATIVE MOTION TO FILE PORTIONS OF DECLARATION UNDER SEAL. Signed by Judge Edward J. Davila on 8/6/2026. (ejdlc1, COURT STAFF) (Filed on 8/6/2026) (Entered: 08/06/2026)** |
| 08/06/2026 | 129 | **ORDER REGARDING SEALING MOTIONS 112 119 ; GRANTING PLAINTIFF'S MOTION TO SEAL PORTIONS OF DEFENDANT'S SUR-REPLY EXHIBITS. Signed by Judge Edward J. Davila on 8/6/2026. (ejdlc1, COURT STAFF) (Filed on 8/6/2026) (Entered: 08/06/2026)** |
| 08/11/2026 | 130 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Meta Platforms, Inc.. Appeal of Order on Motion for Preliminary Injunction, 126 (Appeal fee of $605 receipt number ACANDC-22322103 paid.) *Preliminary Injunction Appeal* **(USCA Case Number 26-5120)** (Attachments: # 1 Exhibit Ninth Circuit Notice of Appeal)(Chaput, Isaac) (Filed on 8/11/2026) Modified to add USCA case number on 8/11/2026 (jnk, COURT STAFF). (Entered: 08/11/2026) |

| | | |
|---|---|---|
| 08/11/2026 | 131 | MOTION for Preliminary Injunction *for Injunction Pending Appeal - Ruling Requested by August 18, 2026* filed by Meta Platforms, Inc.. Responses due by 8/25/2026. Replies due by 9/1/2026. (Attachments: # 1 Declaration of Lars Backstrom in Support of Meta's Motion for Injunction Pending Appeal, # 2 Proposed Order Granting Plaintiff Meta Platforms, Inc.'s Motion for Injunction Pending Appeal)(Chaput, Isaac) (Filed on 8/11/2026) (Entered: 08/11/2026) |
| 08/11/2026 | 132 | **ORDER DIRECTING DEFENDANT TO FILE RESPONSE TO MOTION FOR INJUNCTION PENDING APPEAL. Signed by Judge Edward J. Davila on 8/11/2026.**<br><br>Response due by 8/14/2026.<br><br>(Related Document: 109 in 5:25-cv-09795-EJD; 111 in 5:25-cv-09789-EJD; 131 in 5:25-cv-09792-EJD) (crr, COURT STAFF) (Filed on 8/11/2026) (Entered: 08/11/2026) |
| 08/11/2026 | 133 | USCA Case Number 26-5120 for Ninth Circuit for 130 Notice of Appeal to the Ninth Circuit, filed by Meta Platforms, Inc. (jnk, COURT STAFF) (Filed on 8/11/2026) (Entered: 08/11/2026) |
| 08/14/2026 | 134 | OPPOSITION/RESPONSE (re 131 MOTION for Preliminary Injunction *for Injunction Pending Appeal - Ruling Requested by August 18, 2026* ) *Defendant's Omnibus Opposition to Plaintiffs' Motions for an Injunction Pending Appeal* filed byRob Bonta. (Attachments: # 1 Declaration of Samuel Sokolsky (with Exhibit 15))(Sokolsky, Samuel) (Filed on 8/14/2026) (Entered: 08/14/2026) |
| 08/18/2026 | 135 | Transcript Designation Form for proceedings held on April 29, 2026; June 10, 2026 before Judge Edward J. Davila, (Chaput, Isaac) (Filed on 8/18/2026) (Entered: 08/18/2026) |
| 08/18/2026 | 136 | TRANSCRIPT ORDER for proceedings held on 6/10/2026 before Judge Edward J. Davila by Meta Platforms, Inc., for Court Reporter Irene Rodriguez. (Chaput, Isaac) (Filed on 8/18/2026) (Entered: 08/18/2026) |
| 08/18/2026 | 137 | TRANSCRIPT ORDER for proceedings held on 4/29/2026 before Judge Edward J. Davila by Meta Platforms, Inc., for Court Reporter Tiffany Salinas-Harwell. (Chaput, Isaac) (Filed on 8/18/2026) (Entered: 08/18/2026) |
| 08/20/2026 | 138 | STIPULATION WITH PROPOSED ORDER *RE AMENDED SEALING OF DEFENDANTS PRELIMINARY INJUNCTION OPPOSITION EXHIBITS* filed by Meta Platforms, Inc.. (Chaput, Isaac) (Filed on 8/20/2026) (Entered: 08/20/2026) |
| 08/20/2026 | 139 | Declaration of DR. BAMSHAD MOBASHER, Ph.D. in Support of 89 Reply to Opposition/Response, filed byMeta Platforms, Inc.. (Related document(s) 89 ) (Chaput, Isaac) (Filed on 8/20/2026) (Entered: 08/20/2026) |
| 08/20/2026 | 140 | NOTICE by Rob Bonta re 111 Response ( Non Motion ),,, 80 Notice (Other), 63 Opposition/Response to Motion,,, 129 Order on Administrative Motion to Consider Whether Another Partys Material Should Be Sealed, Order on Administrative Motion to File Under Seal, 127 Order on Administrative Motion to Consider Whether Another Partys Material Should Be Sealed,,, Order on Administrative Motion to File Under Seal -- *Defendant's Notice of Re-Filing Lesser Redacted and Unredacted Exhibits in Support of Defendant's Omnibus Opposition and Sur-Reply to Plaintiffs' Motions for Preliminary Injunction* (Attachments: # 1 Declaration of Asha Albuquerque, # 2 Defendant's Omnibus Opposition to Plaintiffs' Motions for Preliminary Injunction (UNREDACTED), # 3 Declaration of Dr. Dimitri Christakis, Ph.D. (LESSER REDACTED), # 4 Declaration of Dr. Jennifer Golbeck, Ph.D. (UNREDACTED), # 5 Declaration of Dr. Martin Hilbert, |

| | | |
|---|---|---|
| | | Ph.D. (UNREDACTED), # 6 Declaration of Dr. Jenny Radesky, M.D. (LESSER REDACTED), # 7 Declaration of Dr. Eva H. Telzer, Ph.D. (LESSER REDACTED), # 8 Declaration of Dr. Jean M. Twenge, Ph.D. (LESSER REDACTED), # 9 Ex. M2, # 10 Ex. M3, # 11 Ex. M6, # 12 Ex. M8, # 13 Ex. M10, # 14 Ex. M11, # 15 Ex. M12, # 16 Ex. M13, # 17 Ex. M14, # 18 Ex. M19, # 19 Ex. M20, # 20 Ex. M23, # 21 Ex. M74, # 22 Ex. M75, # 23 Ex. M76, # 24 Ex. M77, # 25 Ex. M78, # 26 Ex. M79, # 27 Ex. M80, # 28 Ex. M81, # 29 Ex. M82, # 30 Ex. M83, # 31 Ex. M84, # 32 Ex. M85, # 33 Ex. M86, # 34 Ex. M87, # 35 Ex. M88, # 36 Ex. M89, # 37 Ex. M90, # 38 Ex. M91, # 39 Ex. M92, # 40 Ex. M93, # 41 Ex. M94, # 42 Ex. M95, # 43 Ex. M96, # 44 Ex. M98, # 45 Ex. M100, # 46 Ex. M101, # 47 Ex. M102, # 48 Ex. M103, # 49 Ex. M104, # 50 Ex. M105, # 51 Ex. M107, # 52 Ex. M108, # 53 Ex. M109, # 54 Ex. M110, # 55 Ex. M111, # 56 Ex. M112, # 57 Ex. M113, # 58 Ex. M114, # 59 Ex. M115, # 60 Ex. M116, # 61 Ex. M117, # 62 Ex. M118, # 63 Ex. M119, # 64 Ex. M120, # 65 Ex. M121, # 66 Ex. M122, # 67 Ex. M123, # 68 Ex. M124, # 69 Ex. M125, # 70 Ex. M126, # 71 Ex. M127, # 72 Ex. M128, # 73 Ex. M129, # 74 Ex. M130, # 75 Ex. M131, # 76 Ex. M132, # 77 Ex. M133, # 78 Ex. M138, # 79 Ex. M148, # 80 Ex. M168, # 81 Ex. M169, # 82 Ex. M170, # 83 Ex. M172, # 84 Ex. M173, # 85 Ex. M177, # 86 Ex. M208, # 87 Ex. M209, # 88 Ex. M211, # 89 Ex. M212, # 90 Ex. M213, # 91 Ex. M214, # 92 Ex. M215, # 93 Ex. M216, # 94 Ex. M217, # 95 Ex. M218, # 96 Ex. M219, # 97 Ex. M220, # 98 Ex. M222, # 99 Ex. M224, # 100 Ex. M225, # 101 Ex. M227, # 102 Ex. M228, # 103 Ex. M229, # 104 Ex. M230, # 105 Ex. M231, # 106 Ex. M233, # 107 Ex. M235, # 108 Ex. M236, # 109 Ex. M238, # 110 Ex. M239, # 111 Ex. M240, # 112 Ex. M241, # 113 Ex. M242, # 114 Ex. M243, # 115 Ex. M246, # 116 Ex. M247, # 117 Ex. M248, # 118 Ex. M249, # 119 Ex. M253, # 120 Ex. M255, # 121 Ex. M256, # 122 Ex. M257, # 123 Ex. M260, # 124 Ex. M261, # 125 Ex. M262, # 126 Ex. M263, # 127 Ex. M264, # 128 Ex. M265, # 129 Ex. M266, # 130 Ex. M267, # 131 Ex. M280, # 132 Ex. M281, # 133 Ex. M298, # 134 Ex. M318, # 135 Ex. M324, # 136 Ex. M325, # 137 Ex. M326, # 138 Ex. M392, # 139 Ex. M1182, # 140 Defendant's Omnibus Sur-Reply in Opposition to Plaintiffs' Motions for Preliminary Injunction (LESSER REDACTED, # 141 Rebuttal Declaration of Dr. Serge Egelman, Ph.D. (LESSER REDACTED), # 142 Rebuttal Declaration of Dr. Martin Hilbert, Ph.D. (LESSER REDACTED), # 143 Ex. M13-A, # 144 Ex. M14-A, # 145 Ex. M985-A, # 146 Ex. M985-B)(Albuquerque, Asha) (Filed on 8/20/2026) (Entered: 08/20/2026) |
| 08/21/2026 | 141 | **ORDER DENYING MOTIONS FOR PRELIMINARY INJUNCTION PENDING APPEAL. Signed by Judge Edward J. Davila on 8/21/2026.**<br><br>Related Motions (111) in 5:25-cv-09789-EJD; (131) in 5:25-cv-09792-EJD; (109) in 5:25-cv-09795-EJD. (ejdlc1, COURT STAFF) (Filed on 8/21/2026) (Entered: 08/21/2026) |



| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 08/24/2026 05:07:28 | | | |
| **PACER Login:** | [redacted] | **Client Code:** | [redacted] |
| **Description:** | Docket Report | **Search Criteria:** | 5:25-cv-09792-EJD |
| **Billable Pages:** | 23 | **Cost:** | 2.30 |