**Nos. 26-5120, 26-5121, 26-5132**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

GOOGLE LLC AND YOUTUBE, LLC,

*Plaintiffs-Appellants,*

*v.*

ROB BONTA, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF CALIFORNIA,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of California
Nos. 5:25-cv-09792-EJD, 5:25-cv-09789-EJD, 5:25-cv-09795-EJD

# OPENING BRIEF OF PLAINTIFFS-APPELLANTS GOOGLE LLC AND YOUTUBE, LLC

Benedict Hur
Jonathan Patchen
Michael Rome
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
(415) 693-2000

Elizabeth B. Prelogar
Raymond P. Tolentino
Ephraim A. McDowell
COOLEY LLP
1299 Pennsylvania Ave., NW,
Suite 700
Washington, DC 20004
(202) 842-7800
eprelogar@cooley.com

*Counsel for Plaintiffs-Appellants Google LLC and YouTube, LLC*

# TABLE OF CONTENTS


Page

INTRODUCTION ........................................................................................1

STATEMENT OF JURISDICTION.............................................................3

STATEMENT OF ADDENDUM ..................................................................3

ISSUE PRESENTED ....................................................................................3

STATEMENT OF THE CASE......................................................................3

A. The YouTube Platform and Personalization on YouTube...................3

B. YouTube's Parental Controls and Safeguards for Minor Users ..........7

C. SB 976's Restrictions on Personalized Feeds ....................................10

D. NetChoice's Challenge to SB 976....................................................11

E. YouTube's Challenge to SB 976......................................................12

SUMMARY OF THE ARGUMENT ..........................................................13

STANDARD OF REVIEW .........................................................................16

ARGUMENT ..............................................................................................16

I. YOUTUBE IS LIKELY TO SUCCEED ON THE MERITS .......................17

A. The Personalized-Feed Provisions Violate the First Amendment .....18

1. The personalized-feed provisions burden YouTube and its minor users' speech rights.........................................................18

a. YouTube's personalized feeds are protected expression ...........................................................................18

b. The district court erroneously held that YouTube's personalized feeds are not expressive.................................28

c. The personalized-feed provisions burden minor users' First Amendment rights ...................................................42

2. The personalized-feed provisions are content-based restrictions that fail any form of heightened scrutiny ...................43

a. The personalized-feed provisions are content-based..........44

**TABLE OF CONTENTS**
(continued)

**Page**

b. The personalized-feed provisions fail any form of heightened scrutiny ..... 47

B. The Act's Default Restrictions Are Void for Vagueness ..... 56

II. YOUTUBE AND ITS MINOR USERS FACE IRREPARABLE INJURY WITHOUT AN INJUNCTION ..... 58

III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST SUPPORT AN INJUNCTION ..... 60

CONCLUSION ..... 61

STATEMENT OF RELATED CASES ..... 62

CERTIFICATE OF COMPLIANCE ..... 63

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ala. Ass'n of Realtors v. HHS*,
594 U.S. 758 (2021) (per curiam)....................59

*Am. Broad. Cos. v. Aereo, Inc.*,
573 U.S. 431 (2014).................... 34-35

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998)....................21

*Ashcroft v. Am. Civ. Liberties Union*,
542 U.S. 656 (2004)....................56

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011)....................*passim*

*Bursey v. United States*,
466 F.2d 1059 (9th Cir. 1972) ....................39

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*,
29 F.4th 468 (9th Cir. 2022) ....................16

*Cinevision Corp. v. City of Burbank*,
745 F.2d 560 (9th Cir. 1984) ....................33

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
596 U.S. 61 (2022).................... 46-47

*Cmty. House, Inc. v. City of Boise*,
490 F.3d 1041 (9th Cir. 2007) ....................60

*Consol. Edison Co. v. Pub. Serv. Comm'n*,
447 U.S. 530 (1980)....................45

*Cuviello v. City of Vallejo*,
944 F.3d 816 (9th Cir. 2019) ....................59

*Doe v. Harris*,
772 F.3d 563 (9th Cir. 2014) .................... 16, 49, 58, 60-61

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) ....... 56

*Free Speech Coal., Inc. v. Paxton*,
606 U.S. 461 (2025) ....... 44

*Grand River Enters. Six Nations, Ltd. v. Knudsen*,
No. 23-35494, 2024 WL 2992503 (9th Cir. June 14, 2024) ....... 60

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*,
515 U.S. 557 (1995) ....... 23

*Imperial Sovereign Ct. of Mont. v. Knudsen*,
170 F.4th 820 (9th Cir. 2026) ....... 47

*Kolender v. Lawson*,
461 U.S. 352 (1983) ....... 56-57

*Labrador v. Poe*,
144 S. Ct. 921 (2024) ....... 58-59

*Mahmoud v. Taylor*,
606 U.S. 522 (2025) ....... 44

*Matal v. Tam*,
582 U.S. 218 (2017) ....... 45

*Meinecke v. City of Seattle*,
99 F.4th 514 (9th Cir. 2024) ....... 16-17, 43

*Miami Herald Publ'g Co. v. Tornillo*,
418 U.S. 241 (1974) ....... 40

*Minority Television Project, Inc. v. FCC*,
736 F.3d 1192 (9th Cir. 2013) (en banc) ....... 52, 55

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ....... *passim*

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*NetChoice v. Bonta*,
761 F. Supp. 3d 1202 (N.D. Cal. 2024) .......... 11

*NetChoice v. Griffin*,
812 F. Supp. 3d 905 (W.D. Ark. 2025) .......... 54

*NetChoice v. Jones*,
822 F. Supp. 3d 656 (E.D. Va. 2026) .......... 55

*NetChoice v. Murrill*,
812 F. Supp. 3d 594 (M.D. La. 2025) .......... 49

*NetChoice, LLC v. Bonta*,
113 F.4th 1101 (9th Cir. 2024) .......... 55-56

*NetChoice, LLC v. Bonta*,
152 F.4th 1002 (9th Cir. 2025) .......... *passim*

*NetChoice, LLC v. Bonta*,
170 F.4th 744 (9th Cir. 2026) .......... 57

*NetChoice, LLC v. Reyes*,
748 F. Supp. 3d 1105 (D. Utah 2024) .......... 49-50

*NetChoice, LLC v. Skrmetti*,
No. 25-5660, 2026 WL 2546423 (6th Cir. Aug. 28, 2026) .......... 60

*Packingham v. North Carolina*,
582 U.S. 98 (2017) .......... 61

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992) .......... 47

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) .......... 44-45, 47

*Reuber v. Food Chem. News, Inc.*,
925 F.2d 703 (4th Cir. 1991) (en banc) .......... 21

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) ........ *passim*

*Stanley v. Georgia*,
394 U.S. 557 (1969) ........ 42

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
240 F.3d 832 (9th Cir. 2001) ........ 60

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994) ........ 21, 40, 49

*Turner Broad. Sys., Inc. v. FCC*,
520 U.S. 180 (1997) ........ 47

*United States v. Playboy Ent. Grp., Inc.*,
529 U.S. 803 (2000) ........ 43, 56

*Virginia v. Am. Booksellers Ass'n, Inc.*,
484 U.S. 383 (1988) ........ 54

**Statutes**

28 U.S.C.
§ 1292(a)(1) ........ 3
§ 1331 ........ 3
§ 1343(a) ........ 3

Cal. Health & Safety Code
§ 27000.5(a) ........ 10
§ 27000.5(a)(3) ........ 37
§ 27001(a) ........ 10-11
§ 27002(b) ........ 56
§ 27002(b)(2) ........ 10-11
§ 27002(b)(4) ........ 10-11

**Other Authorities**

Verification, Black's Law Dictionary (12th ed. 2024) ........ 57

# INTRODUCTION

This case presents the question whether California can force a speaker to change its expressive product because the State deems that expression too compelling. YouTube is home to a collection of over 20 billion videos, with 500 hours of new video uploaded every minute. To help users find high-quality content that is interesting, relevant, and valuable to them personally, YouTube provides carefully curated and "individualized list[s] of video recommendations." *Moody v. NetChoice, LLC*, 603 U.S. 707, 734 (2024). California, however, thinks those personalized feeds are too interesting. So it passed Senate Bill 976 (SB 976) to prohibit platforms from providing personalized recommendations to minor users without parental consent. This speech-suppressive motivation—and the resulting impact on YouTube's expression—"is incompatible with the First Amendment." *Sorrell v. IMS Health Inc.,* 564 U.S. 552, 577 (2011).

Nonetheless, the district court denied Google and YouTube (collectively, "YouTube") a preliminary injunction against SB 976's enforcement, holding that the State may dictate how YouTube "order[s] and organize[s]" speech on its platform without confronting the First Amendment at all. *Moody*, 603 U.S. at 740. The court concluded that YouTube's personalized feeds are devoid of expression and do not reflect any human editorial judgments because YouTube uses an algorithm to implement personalization at scale.

The district court's decision defies *Moody*, which held that YouTube's curated feeds are expressive while explicitly recognizing that they are "achieved through the use of algorithms" and are "most often based on a user's expressed interests and past activities." *Id.* at 734-35. The court also ignored record evidence establishing that human editorial judgment pervades YouTube's recommendation process and drew an artificial distinction between content moderation and personalization. The decision marks an unprecedented expansion of governmental power to control online speech. Under the court's logic, a State could *ban* personalized feeds—not just for minors, but also adults, and not just on social-media platforms, but also on websites ranging from Spotify to the New York Times. That concern is not just theoretical: The California legislature recently passed a bill that would ban personalization for all users under 16. *See* California Assembly Bill 1709 (2026) (AB 1709).

Ultimately, SB 976's purpose and effect are clear: to change the speech of platforms like YouTube. Restricting personalized feeds would fundamentally alter YouTube's expressive product. Without personalization, minor users would face an ocean of irrelevant content, and YouTube could not connect them with videos that are most likely to lead to age-appropriate, safe, and enriching experiences on the platform. The Constitution does not permit that result. This Court should therefore reverse the district court's order denying YouTube a preliminary injunction.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). The district court denied YouTube's motion for a preliminary injunction on August 5, 2026, and YouTube timely appealed on August 11. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ADDENDUM

SB 976, codified at Cal. Health and Safety Code §§ 27000-27007, is attached as an addendum.

## ISSUE PRESENTED

Whether YouTube is entitled to a preliminary injunction on its claims that SB 976's personalized-feed provisions violate the First and Fourteenth Amendments.

## STATEMENT OF THE CASE

### A. The YouTube Platform and Personalization on YouTube

YouTube, which is owned and operated by Google, is an "online platform that allows users to view, create, upload, and share videos with others around the world." 7-ER-1333 ¶ 3; 7-ER-1350 ¶ 6. With a collection of over 20 billion videos, YouTube is home to the world's largest online video library. 7-ER-1333–34 ¶¶ 3, 6. And more than 500 hours of new video are uploaded every minute. 7-ER-1334 ¶ 6. The videos on YouTube cover "an array of topics as diverse as its user base," 7-ER-1350 ¶ 3—from "how-to videos [and] network broadcasts" to "science

lectures [and] historical sporting events," among countless other categories, 7-ER-1333 ¶ 3. YouTube is also the primary source of television for millions of households, playing a role akin to streaming platforms like Netflix. 7-ER-1333 ¶ 4. And millions of people rely on YouTube to discover and listen to music and podcasts. 7-ER-1333 ¶ 5. YouTube also "provides a vibrant platform for millions of content creators," spanning more than 100 countries and 80 languages. 7-ER-1362, 1367 ¶¶ 36, 48. Through YouTube, those creators "share their unique expressive messages," while earning revenue and even making a full-time living. 7-ER-1367 ¶ 48.

To connect users with content that will be interesting to them among its vast library and to enable creators to find their target audiences, YouTube plays an active role "in selecting, arranging, and curating the videos presented to users." 7-ER-1334 ¶ 6. When a user opens YouTube, she "does not see" the videos posted "in reverse-chronological order." *Moody*, 603 U.S. at 719. Instead, YouTube's Recommender System provides users with "an individualized list of video recommendations." *Id.* at 734. For example, a Golden State Warriors fan might see Steph Curry highlights on her homepage, while a teen interested in robotics might find videos about mechanical engineering. 7-ER-1337 ¶ 14. In short, YouTube "arranges and prioritizes videos to ensure that [users] can find videos that are relevant, trustworthy, and valuable to them personally." 7-ER-1334 ¶ 6.

YouTube's recommendations are the product of a multi-step process. At the outset, YouTube establishes high-level goals for its Recommender System based on its values as a company. 2-ER-0247 ¶ 5. YouTube's "mission [is] to give everyone a voice and show them the world." 7-ER-1334 ¶ 7. And its core objectives are to recommend "interesting," "relevant," and "high-quality" content for "a particular user at a particular moment," and to "optimize[] for long-term user satisfaction." 7-ER-1336–37, 1339 ¶¶ 11, 13-14, 18.

Next, YouTube engineers build and train the Recommender System to accomplish those objectives, including by selecting inputs and deciding how to translate those inputs into recommendations. 2-ER-0248–50 ¶¶ 7-13. Overall, the system is similar to a librarian who "may recommend a book to a visitor based on the prior books that individual has read, books that are popular with similar readers, and the librarian's own views of the quality of the books." 7-ER-1335 ¶ 8.

Some inputs relate to individual users, like the user's age, language, location, watch and search history, and videos enjoyed by similar users. 7-ER-1336, 1347 ¶¶ 11, 39. Others include user survey responses and preferences expressed through "likes," "dislikes," the "not interested" button, and channel subscriptions. 7-ER-1340 ¶ 20; 2-ER-0248 ¶ 8. The Recommender System also incorporates YouTube's independent standards about what constitutes appropriate, high-quality, and trustworthy content. As YouTube's publicly available Community Guidelines

explain, it does not allow certain harmful, offensive, and/or unlawful material on the platform, such as spam, bullying and harassment, and deceptive content. 7-ER-1341 ¶ 24; *Moody*, 603 U.S. at 735.

But not all content that complies with the Community Guidelines is equally worthy of recommendation in YouTube's judgment. YouTube deprioritizes low-quality content, like clickbait or videos with low ratings, and raises the prominence of what it considers high-quality content, like videos from trustworthy sources or recent videos on newsworthy topics. 7-ER-1341–42 ¶¶ 26-30. As described further below, YouTube also has specific content-moderation policies for children and teens to ensure they receive content that is high-quality and appropriate for their specific age groups. 7-ER-1338–39, 1343–44 ¶¶ 17, 31, 35.

YouTube further adjusts its recommendations to advance its priorities as a platform, like promoting novelty and discovery. 7-ER-1338–40 ¶¶ 15-21; 2-ER-0250 ¶ 13. Showing a user "more familiar content similar to what [she] viewed in the past tends to deliver more" short-term value. 7-ER-1338 ¶ 15. But YouTube has determined that exposing users to "novel, unfamiliar content could generate greater value in the long term as it allows users to discover more of what they might enjoy on the platform." *Id.* Therefore, "YouTube employees have designed the Recommendation System to ensure that the recommendations include novel content and a diversity of content, even when these systems predict that the user would prefer

familiar content." 2-ER-0250 ¶ 13. In doing so, those employees make subjective judgments like whether "physics and math [are] sufficiently different so that they count as diverse" or should be grouped together as "STEM topics." *Id.*

Importantly, YouTube does not just build the Recommender System and leave it to run without further human involvement. Rather, YouTube engineers continually monitor and refine the system "to ensure it is functioning as intended" by "deliver[ing] high-quality recommendations to users consistent with YouTube's own values." 7-ER-1334 ¶ 7. That involves ongoing work by hundreds of employees who set metrics for success and evaluate the system against those metrics; test multiple versions of the system to determine which one best furthers YouTube's goals; and adjust the system when it is not producing recommendations consistent with those goals. 2-ER-0250, 0252–53 ¶¶ 14, 19-20, 22.

### B. YouTube's Parental Controls and Safeguards for Minor Users

YouTube recognizes the importance of safeguarding the "privacy, physical safety, mental health, and wellbeing" of minors who use its platform. 7-ER-1352 ¶ 9. To that end, YouTube has adopted a variety of policies and measures to help ensure that minor users have positive and age-appropriate experiences.

YouTube's Recommender System is central to "maintain[ing] a responsible and enriching platform for younger users." 7-ER-1357 ¶ 21. As an initial matter, YouTube has determined that certain content that does not violate its Community

Guidelines is nonetheless inappropriate for minors, such as sexually suggestive content or vulgar language. 7-ER-1360 ¶ 30. Such content is age-gated and not recommended to users under 18. *Id.*

YouTube has also adopted content-moderation standards tailored to minors in different age categories. For teens age 13-17, for example, YouTube avoids repeatedly recommending content that, while innocuous as a single video, "could be problematic" if viewed in high quantities, 7-ER-1357–58 ¶ 21—such as content that "displays aggression" or "idealizes some body types ... over others," 7-ER-1338–39 ¶ 17. And YouTube has "worked with outside experts to identify high-quality, age-appropriate content" specifically for children under 13, such as "learning-related content [and] content that encourages children to use their imagination." 7-ER-1342 ¶ 29. YouTube prioritizes that content in its recommendations for under-13 users. 7-ER-1344 ¶ 35. Correspondingly, it deprioritizes content it deems "low quality"—like sensational or misleading videos—for that group. *Id.*

Because YouTube believes that "[p]arents and caregivers play an important role in setting the rules for their family's online experiences," it also offers technological tools and features that empower parents to customize their children's experiences on YouTube. 7-ER-1352 ¶ 9.

To start, users under 13 cannot create accounts on their own. 7-ER-1354–55 ¶ 18. Their parents must do so for them, which involves linking the parent's account

to the child's. *Id.* Parents have the option of providing their child with access to only YouTube Kids or setting up a Supervised Experience. *Id.* YouTube Kids is a special version of the platform that was built specifically for children under 13 and "features a carefully curated selection" of age-appropriate content. 7-ER-1355–56 ¶ 19. YouTube Kids also provides built-in tools like adjustable privacy settings and a timer that "display[s] a friendly alert and stop[s] the app" after a set amount of time. *Id.*

A "Supervised Experience" gives minor users access to the standard YouTube platform while still enabling parents to control their children's experience. 7-ER-1356–57 ¶ 20. Parents can choose among age-differentiated content settings, including "Explore" (for users 9 and older), "Explore More" (for users 13 and older), and "Most of YouTube" (all videos except those marked as inappropriate for minors). *Id.* Supervised Experiences further enable parents to block specific channels, disable the ability to post videos, and set screentime limits. *Id.* Parents can also review, pause, and clear their child's watch history, effectively turning off personalized recommendations. *Id.* In addition, YouTube offers "Supervised Experiences for Teens," through which parents can view their teen's number of uploads, subscriptions, and comments and receive notifications when their teen uploads a video or starts a livestream. 7-ER-1354 ¶¶ 16-17.

YouTube also offers a variety of "digital wellbeing tools" that "encourage

[minors] to be mindful of their screen time." 7-ER-1358–59 ¶¶ 22-25. For all users under 18, YouTube turns off autoplay by default (with a parental option to disable autoplay altogether), reminds the user to "take a break" after a certain interval (set by default to one hour), and prompts the user to stop watching YouTube and go to bed at a certain time (set by default to 10pm). *Id.*

### C. SB 976's Restrictions on Personalized Feeds

In September 2024, California enacted SB 976, also known as the Protecting Our Kids from Social Media Addiction Act. The Act regulates social-media platforms that offer personalized feeds—pejoratively (and erroneously) described throughout the Act as "addictive feeds." The Act defines an "[a]ddictive feed" as "an internet website ... in which multiple pieces of media generated or shared by users are ... recommended, selected, or prioritized for display to a user based ... on information provided by the user, or otherwise associated with the user or the user's device," with narrow exceptions. Cal. Health & Safety Code § 27000.5(a).

Sections 27001(a), 27002(b)(2), and 27002(b)(4) (the "personalized-feed provisions") impose onerous restrictions on covered platforms' ability to provide minor users with personalized feeds. The Act's central provision, Section 27001(a), prohibits minors from accessing personalized feeds without parental consent. It states that it "shall be unlawful for the operator of" a covered platform "to provide an addictive feed to" a minor "user unless ... [t]he operator has obtained verifiable

parental consent." § 27001(a). Covered platforms must also implement default settings that further restrict minors' access to personalized feeds. Section 27002(b)(2) mandates that minors' access to personalized feeds be limited to one hour per day "unless modified by the verified parent." And Section 27002(b)(4) requires covered platforms to allow a "verified parent" to set the "default feed" to be non-personalized. The statute does not define the term "verified parent."

### D. NetChoice's Challenge to SB 976

In November 2024, NetChoice—an internet trade association of which Google is a member—sought an injunction against SB 976 on First Amendment grounds. The district court denied a preliminary injunction as to the personalized-feed provisions, reasoning that NetChoice lacked associational standing to raise as-applied challenges to those provisions for its members. *NetChoice v. Bonta*, 761 F. Supp. 3d 1202, 1231 (N.D. Cal. 2024).

In September 2025, this Court affirmed the district court's associational-standing holding, explaining that "the unique design of each platform and its algorithm affects whether the algorithm at issue is expressive." *NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1014, 1025 (9th Cir. 2025). The Court observed that "the more an algorithm implements human editorial directions, the more likely it is to be expressive," and that "[a]n algorithm that promotes a platform's own message to users is likely to be protected speech." *Id.* at 1014. So the Court concluded that

"more information about members' algorithms and feeds" and "the participation of individual members" was necessary to undertake the "fact intensive" First Amendment analysis. *Id.*

### E. YouTube's Challenge to SB 976

In November 2025, YouTube filed its own as-applied First Amendment challenge to SB 976's personalized-feed provisions and sought a preliminary injunction. YouTube also raised a Fourteenth Amendment claim, arguing that the undefined term "verified parent" renders the default provisions unconstitutionally vague. Across several rounds of briefing, numerous fact and expert declarations, and a lengthy hearing, YouTube provided the district court with extensive evidence establishing the expressive nature of its algorithm and feeds.

On August 5, 2026, the district court denied YouTube's preliminary-injunction motion. The court held that YouTube was unlikely to succeed on the merits of its First Amendment claim because YouTube had failed to show "that [its] personalized feeds are 'expressive'" or "reflect human editorial judgment." 1-ER-0010, 0018. The court acknowledged that by providing personalized feeds, YouTube seeks to convey a message that "the user will likely find the displayed content interesting and enriching." 1-ER-0009 (citation omitted). But it reasoned that because YouTube "rel[ies] on predictive algorithms that incorporate users' past watch history and other data" to "make the determination of what is 'interesting'" to

individual users, the resulting feeds do not reflect YouTube's expression. 1-ER-0009-10. The court also rejected YouTube's argument that the personalized-feed provisions burden its minor users' First Amendment rights, reasoning that "minor users remain free to search for specific content." 1-ER-0019. Having concluded that the personalized-feed provisions do not implicate the First Amendment at all, the court did not address whether those provisions are content-based or survive heightened scrutiny.

The district court further concluded that YouTube was unlikely to succeed on its vagueness challenge, reasoning that the statute provides notice that platforms "must verify a person's status as a minor's 'parent' before modifying the default settings," and that the "ordinary meaning" of "verify" is "sufficiently clear." 1-ER-0022–23.

On August 11, YouTube appealed and moved for an injunction pending appeal in the district court, which the court denied on August 21. On August 24, YouTube moved for an injunction pending appeal in this Court, for which briefing is ongoing.

## SUMMARY OF THE ARGUMENT

I. YouTube is likely to succeed on its argument that SB 976's personalized-feed provisions violate the First Amendment. Those provisions burden YouTube's First Amendment right to make editorial judgments about how to

"order[] and organize[]" third-party speech and require YouTube to fundamentally alter its "distinctive compilations of expression." *Moody*, 603 U.S. at 716, 740. YouTube's Recommender System "promotes [YouTube's] *own* message" that users are likely to find the recommended compilations of content interesting, relevant, and valuable. *NetChoice*, 152 F.4th at 1014 (emphasis added). And it "implements" a multitude of "human editorial directions," such as YouTube's choices to expose users to new and diverse content and to recommend tailored, age-appropriate content to users under 13. *Id.* SB 976 also interferes with minor users' First Amendment right to access YouTube's personalized recommendations "without their parents' consent." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011).

The district court's conclusion that the personalized-feed provisions do not implicate the First Amendment at all conflicts with *Moody*, which recognized that curated online feeds—including YouTube's specifically—are protected even if they rely on algorithms and incorporate user interests. 603 U.S. at 734-35. The district court offered no principled distinction between content moderation and personalization. And it ignored extensive record evidence showing that YouTube's personalized feeds reflect not only user information but also YouTube's own expressive judgments.

SB 976 imposes content-based restrictions on YouTube's and its minor users' First Amendment rights by targeting speech with a particular quality related to its

communicative effect on the listener. It must therefore satisfy strict scrutiny. But under any level of heightened scrutiny, the law cannot survive. The State's interest is directly related to the suppression of speech: Its express goal is to change YouTube's compilations so users are less interested in and spend less time accessing that content. And the State seeks to suppress personalized feeds even though their experts cannot point to a single peer-reviewed or published study showing that personalization causes or is correlated with harm to minors. The law is also vastly over- and under-inclusive and substitutes government control for parental supervision by default while ignoring alternatives (including many already implemented by YouTube) that are more effective in protecting minors' wellbeing and less restrictive of speech.

YouTube is also likely to succeed on its Fourteenth Amendment claim that the default provisions are void for vagueness. The undefined term "verified parent" fails to provide constitutionally sufficient notice of what regulated platforms must do to "verify" parental status.

II. YouTube and its minor users will suffer irreparable injury without an injunction. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *NetChoice*, 152 F.4th at 1024 (citation omitted). And if forced to comply with SB 976, YouTube would incur unrecoverable compliance costs and an irreversible loss of goodwill.

III. Finally, the equities and public interest favor an injunction. There is a "significant public interest" in requiring the State to satisfy the Constitution before it may radically alter the speech environment on the preeminent online platform for sharing and discovering video content. *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) (citation omitted).

## **STANDARD OF REVIEW**

This Court "review[s] the denial of a preliminary injunction for abuse of discretion," but it "review[s] *de novo* the underlying issues of law." *Meinecke v. City of Seattle*, 99 F.4th 514, 520 (9th Cir. 2024). A "district court abuses its discretion when it makes an error of law." *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 475 (9th Cir. 2022). "In First Amendment cases," the Court must "make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *Meinecke*, 99 F.4th at 521 (citation omitted).

## **ARGUMENT**

YouTube is entitled to a preliminary injunction because (1) YouTube "is likely to succeed on the merits" of its First and Fourteenth Amendment claims; (2) YouTube and its minor users are "likely to suffer irreparable harm" without an injunction; and (3) maintaining the free flow of speech while SB 976's

constitutionality is being litigated "is both equitable and in the public interest." *NetChoice*, 152 F.4th at 1012.

## I. YOUTUBE IS LIKELY TO SUCCEED ON THE MERITS.

Under the "unique likelihood-of-success standard in First Amendment cases," a plaintiff need only make "a colorable claim that its First Amendment rights have been infringed" before "the burden shifts to the government to justify the restriction on speech." *Meinecke*, 99 F.4th at 521 (citation omitted). YouTube has raised a more than colorable claim that its personalized feeds are expressive compilations protected by the First Amendment. And under any level of heightened scrutiny, the State cannot justify its content-based restrictions on YouTube's expression and its minor users' right to access that expression. The district court held that YouTube was unlikely to succeed on the merits of its First Amendment claim on a single ground: that YouTube does not engage in expression *at all* by providing personalized feeds. That conclusion contradicts Supreme Court precedent, ignores the YouTube-specific record evidence, and threatens vast swaths of online speech. YouTube is also likely to succeed on the merits of its vagueness claim because the law provides no guidance to covered companies on what is required to "verify" parental status.

### A. The Personalized-Feed Provisions Violate the First Amendment.

#### 1. The personalized-feed provisions burden YouTube and its minor users' speech rights.

YouTube's personalized feeds are entitled to First Amendment protection because they are the product of myriad editorial judgments. Correspondingly, minors have a First Amendment right to access those feeds without parental consent. The district court's contrary holdings misunderstand fundamental First Amendment principles and jeopardize the right to speak and listen on the internet.

##### a. YouTube's personalized feeds are protected expression.

The First Amendment protects YouTube's personalized feeds because they are the product of YouTube's editorial judgments about how to curate third-party content in a manner that best serves users' interests while advancing YouTube's values. That conclusion follows directly from the Supreme Court's decision in *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024).

In *Moody*, the Supreme Court held that curated online feeds are expressive, reaffirming that an entity "'exercis[ing] editorial discretion in the selection and presentation' of content is 'engage[d] in speech activity.'" *Id.* at 731 (citation omitted). The Court explained that when online platforms "make choices about" how to "organize and prioritize" third-party speech, they produce "distinctive compilations" that constitute "expressive activity." *Id.* at 716, 731. And when "the government interferes with such editorial choices," it must "confront[] the First

Amendment." *Id.* at 731-32. Those "settled principles about freedom of expression" originated with print or analog forms of media. *Id.* at 733. But "government efforts to alter an edited compilation of third-party expression are subject to judicial review for compliance with the First Amendment" regardless of whether the compilation exists in the "physical" or "virtual world." *Id.* at 717-18.

YouTube has exercised its editorial judgment to "select" and "present" content to individual users based on what they are likely to find "relevant, trustworthy, and valuable" and will "optimize[] for [their] long-term user satisfaction." 7-ER-1334, 1337 ¶¶ 6, 13. The First Amendment protects that expressive choice about how to "order[] and organize[]" third-party content and the "distinctive compilations of expression"—personalized feeds—that result from it. *Moody*, 603 U.S. at 716, 740. By barring YouTube from displaying personalized feeds to minors without parental consent, California seeks to restrict YouTube's ability to "compil[e] the third-party speech it wants in the way it wants," and to "offer[] the expressive product that most reflects its own views and priorities." *Id.* at 718. *Moody* makes clear that California cannot impose such restrictions without satisfying the First Amendment.

*Moody* also establishes that YouTube's use of an algorithm to implement its editorial objectives at scale does not strip its feeds of First Amendment protection. The Court recognized that social-media platforms must make "millions

of ... decisions each day" about how to "organize and prioritize" "the billions of posts or videos ... that could wind up on a user's customized feed or recommendations list." *Id.* at 716, 734. The Court was under no illusion that humans make those millions of decisions or manually sort through billions of posts. Rather, in explaining how social-media platforms work, the Court observed that "[t]he key to the scheme is prioritization of content, achieved through the use of algorithms." *Id.* at 734. That was no impediment to the Court's conclusion that the First Amendment protects curated online feeds. As Justice Barrett explained, if humans "create an algorithm to help them identify and delete" content, "the First Amendment protects their exercise of editorial judgment—even if the algorithm does most of the deleting without a person in the loop." *Id.* at 745-46 (Barrett, J., concurring).

*Moody* did not stop at articulating general First Amendment principles applicable to online platforms. It went on to apply those principles to "paradigmatic" examples, including YouTube itself. *Id.* at 717-18. The Court specifically held that "the editorial judgments influencing the content of" "YouTube's homepage" are "protected expressive activity." *Id.* at 744. Indeed, the Court held that the First Amendment protects YouTube's feeds while explicitly recognizing that personalization implemented using algorithms is a defining characteristic of those feeds: The Court explained that "[t]he selection and ranking" of videos on YouTube

"is most often based on a user's expressed interests and past activities," and that YouTube "use[s] ... algorithms" to produce "individualized list[s] of video recommendations." *Id.* at 734-35.

In recognizing that the First Amendment protects YouTube's personalized feeds, *Moody* followed bedrock free-speech principles. Determining what speech to include in a compilation based on what will "generate[] ... interest" with one's audience is a classic "exercise of journalistic discretion" protected by the First Amendment. *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 682 (1998). YouTube's choice to curate content based on users' interests is "not unlike" the choice made by curators of "traditional media" to tailor their compilations to readers' or viewers' interests. *NetChoice*, 152 F.4th at 1014; *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 716 (4th Cir. 1991) (en banc) ("[I]t is hardly unusual for publications to print matter that will please their subscribers."). A cable operator's decision about which channels to carry—which the Supreme Court has deemed protected—is "largely dictated by the preferences of [its] viewers." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 684 (1994) (*Turner I*) (O'Connor, J., concurring in part); *see id.* at 636-37 (majority opinion). Bookstores often choose which books to display based on what will interest their customers. And newspapers commonly place articles on the front page based on what they think their subscribers will find most compelling. The government could not order those publishers to select

different channels, display different books, or emphasize different articles without confronting the First Amendment.

YouTube's editorial judgments do not lose protection simply because they are based on each *individual* user's interests. A newspaper may include different articles in its local editions than in its national edition out of recognition that local audiences care about local issues—that choice to cater to the interests of a narrower audience remains expressive. To be sure, personalization algorithms allow for a degree of individual tailoring never before possible. But "'whatever the challenges of applying the Constitution to ever-advancing technology, the basic principles' of the First Amendment 'do not vary.'" *Moody*, 603 U.S. at 733 (citation omitted).

When this Court considered NetChoice's challenge to SB 976, it drew on *Moody* to explain that "[a]n algorithm that promotes a platform's own message to users is likely to be protected speech." *NetChoice*, 152 F.4th at 1014. That is precisely what YouTube's Recommender System does. YouTube's feeds may be made up of "individual messages" that "originate with third parties," but the "larger offering" conveys YouTube's *own* message: that users are likely to find the recommended content interesting, relevant, and valuable. *Moody*, 603 U.S. at 738. For example, when YouTube recommends a video of an actor speaking at an awards ceremony, it sends a message—distinct from the actor's message—that YouTube thinks the user will find that video interesting. YouTube's message is no different

from the one a newspaper conveys when it features certain editorials more prominently than others or the one a radio station conveys when it plays some songs more than others. In each case, the curator creates an "overall message" "distilled from the individual presentations along the way." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 577 (1995). And a "speaker does not forfeit constitutional protection" just because its message relies on "combining multifarious voices" rather than "isolat[ing] an ... exclusive subject matter." *Id.* at 569-70.

YouTube could choose to fill its homepage with only the most viewed or liked videos, thus "promot[ing] ... [a] message to users" that YouTube is a forum for the most generically "popular" content. *NetChoice*, 152 F.4th at 1014. Or YouTube could display only compilations of news clips, sending the message that all users should be educated about current events. But YouTube has made a different editorial judgment based on its belief that personalized feeds best serve users by helping them find content that is relevant and enriching for them. 7-ER-1334 ¶¶ 6-7. That decision to tailor a compilation of content to each user's interests is no less expressive than a blanket choice to show the same content to all users.

The Supreme Court's decision in *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011), confirms that a "restriction[]" on the "use of" individualized "information" to tailor one's message to a particular recipient constitutes a "burden on protected expression." *Id.* at 571. There, Vermont sought to bar pharmaceutical companies

from using information about doctors to "'tailor[]' their 'presentations to individual prescriber styles, preferences, and attitudes.'" *Id.* at 561 (citation omitted); *see id.* at 578. The Court held that Vermont's law violated the First Amendment, explaining that "[a]n individual's right to speak is implicated when information he or she possesses is subjected to 'restraints on the way in which the information might be used.'" *Id.* at 568 (citations omitted). SB 976 suffers from the same defect: It restricts YouTube's ability to use individualized information to "'tailor[]' [its] 'presentations'" to each user's unique interests, needs, and preferences. *Id.* at 561 (citation omitted).

In *NetChoice*, this Court identified the degree of human involvement as another marker of expressiveness, observing that "the more an algorithm implements human editorial directions, the more likely it is to be expressive for First Amendment purposes." 152 F.4th at 1014. YouTube's algorithm implements a multitude of human editorial directions at every stage of the recommendation process.

At the outset, YouTube employees decide "what editorial goals should be built into the ... [s]ystem," like the overarching goal to "recommend[] interesting and valuable content" to each user or the more specific goal to deliver to under-13 users content tailored to their maturity level and educational needs. 2-ER-0247-49 ¶¶ 5-6, 10. YouTube engineers then build the system to accomplish those goals, including by selecting and designing "signals" that align with YouTube's expressive

objectives (like considering the user's age in order to recommend age-appropriate content or a user's watch history to avoid repetitive recommendations), as well as "training material[s]" that teach the algorithm what "values they want to encourage or discourage." 2-ER-0248–49 ¶¶ 7-10. Next, the engineers establish systems to "translate those signals into recommendations." 2-ER-0249 ¶ 11. That involves testing variations on the algorithm to assess "which version best furthers YouTube's goals" and determining how to resolve conflicting signals about users' interests. 2-ER-0249–50, 0252–53 ¶¶ 11-12, 22. Finally, employees continually "monitor" and "refine" the algorithm to ensure its recommendations promote YouTube's goals and values: Using an iterative process, a team of engineers repeatedly measures the algorithm's outputs against "metrics of success" and makes "thousands of changes to the Recommendation System each year" to better align those outputs with YouTube's expressive objectives. 2-ER-0250, 0252 ¶¶ 14, 19-21.

For example, YouTube strives to promote long-term satisfaction over short-term engagement. 7-ER-1337 ¶ 13. And YouTube has determined that values like "discovery and novelty" advance that goal. 2-ER-0250 ¶ 13. Therefore, YouTube has designed its algorithm to recommend to users content that is *different* from what they have viewed before, so they can discover new content and "new areas of interest [they] did not even know [they] had." 7-ER-1338 ¶ 15. That requires YouTube employees to make "subjective decision[s]," such as whether topics like "physics

and math [are] sufficiently different so that they count as diverse," to "handpick training examples" that teach the algorithm what qualifies as "diverse," and to monitor the system to ensure it is correctly balancing new versus familiar content. 2-ER-0248–50, 0252 ¶¶ 10, 13, 21. In that way, YouTube's algorithm acts as a tool for "implement[ing] human beings' inherently expressive choice[]" to promote novelty and diversity. *Moody*, 603 U.S. at 746 (Barrett, J., concurring). Of course, YouTube cannot determine what will be novel and diverse to a user without considering what she has viewed before—precisely what SB 976 prohibits.

To be sure, *Moody* did not hold that *every* algorithmic feed constitutes protected expression. In footnote 5, the Court stated that it was not addressing algorithms that "respond *solely* to how users act online," merely "giving them the content they appear to want." 603 U.S. at 736 n.5 (emphasis added). And this Court previously suggested, without deciding, that such an algorithm "probably is not expressive." *NetChoice*, 152 F.4th at 1014 (citing *Moody*, 603 U.S. at 736 n.5); *id.* at 1021 (noting that this Court was "careful not to decide more than necessary" given the "novel question" and "thin record"). That tentative suggestion does not control here for two independent reasons.

First, YouTube's algorithm does not "respond solely to how users act online," *Moody*, 603 U.S. at 736 n.5, and is "not designed solely to give users the content they appear to want," 7-ER-1335 ¶ 8. Indeed, the Supreme Court recognized as

much in *Moody*, specifically distinguishing the hypothetical algorithm on which it reserved judgment from "YouTube's main feed[]." 603 U.S. at 736 n.5. YouTube's algorithm incorporates not only information about how users act online but also YouTube's value-laden judgments about which content is enriching and appropriate for each user. For example, as explained above, based on its judgment that novelty and discovery foster positive long-term experiences, YouTube has designed its algorithm to "take[] a chance" by recommending content that users may *not* appear to want based solely on their past behavior but that they may find enjoyable. 2-ER-0250–51 ¶¶ 13, 15. Likewise, YouTube has trained its algorithm to avoid repeatedly recommending videos "comparing physical features" to a teen even if that is what the teen most appears to want. 7-ER-1343 ¶ 31. Since the only question here is whether SB 976 violates the First Amendment as applied to YouTube, it is not "necessary" for this Court to "decide" whether the hypothetical algorithm *Moody* referenced is expressive. *NetChoice*, 152 F.4th at 1021.

Second, even an algorithm designed solely to give users the "content they appear to want" based on how they "act online" would reflect a protected editorial judgment. As discussed above, traditional publishers and curators commonly feature content their readers "appear to want." And determining what readers "appear to want" is often based on what they have enjoyed in the past. As California admitted, if "Fox News ... want[s] to convey an editorial criticizing Kamala Harris because

they think that's what their audience would like," that is protected. 2-ER-0146 (114:7-16). That holds true even if Fox News bases that judgment solely on the fact that its audience liked previous articles critical of Kamala Harris.

Moreover, a user's viewing history does not yield just one answer to the question of what that user wants to see next. If a teen user watched numerous videos featuring science experiments posted by a particular creator, she may want to see more videos from that creator. Or she may want to see more science-experiment videos from a different creator. Or she may want to see videos on a different but related topic like astronomy. Any of those could be correct answers to the question of what the user "appear[s] to want" based on how she "act[s] online." *Moody*, 603 U.S. at 736 n.5. YouTube has made the editorial judgment to *avoid* recommending "videos from the same creator channel again and again" and to diversify the "topic of the video[s]" it recommends, so it would likely train its algorithm to show the more diverse option of astronomy videos. 2-ER-0250 ¶ 13. But the critical point is that such an answer would not be straightforward—and would require editorial judgments—even if YouTube's only goal were (counterfactually) to give users what they appear to want based on how they act online.

#### b. The district court erroneously held that YouTube's personalized feeds are not expressive.

The district court erred in holding that YouTube's personalized feeds are not protected by the First Amendment. It concluded that YouTube's editorial choice to

show users content they are likely to find personally interesting, relevant, and valuable does not render its feeds expressive because YouTube uses an algorithm to implement that choice at the level of individual users and videos. The court adopted the State's argument that when YouTube decides to "convey to users _____ because … [it] is interesting, relevant or trustworthy," only the granular decision to "fill[] in the blank" with, for example, a cat video is expressive. 1-ER-0010–11. Under that theory, YouTube's personalized feeds would only be protected if humans handpicked individual videos or topics for each user's feed. The court's conclusion conflicts with *Moody*, ignores the record evidence about how YouTube's system works, and threatens to subject vast amounts of online speech to government interference.

To begin, the district court overlooked that YouTube's overarching choice to "organiz[e]" and "present[]" videos on its platform based on what is likely interesting, relevant, and valuable to each user is itself "expressive," regardless of how it implements that choice. *Moody*, 603 U.S. at 731. As explained above, a curator's decision to tailor a compilation to its audience's preferences is a protected editorial judgment. First Amendment scrutiny would apply if the government told the New York Times to stop placing articles on the front page that it thinks will be interesting to readers. That would not change if the government instead ordered the Times to stop featuring articles in its app that it thinks will be interesting to

individual readers, even though the Times app relies on an algorithm to decide what to recommend to each individual. 2-ER-0267–68 ¶ 21.

The district court also ignored *Sorrell*'s holding that a restriction on using individualized information to tailor speech to one's audience is a "burden on protected expression." 564 U.S. at 571. The court dismissed *Sorrell* as irrelevant, reasoning that Vermont's law burdened protected expression solely because the pharmaceutical companies were engaged in commercial speech. 1-ER-0016–17. But the law did not stop pharmaceutical companies from marketing their drugs to doctors; it only barred them from using information about individual doctors to tailor their speech. So *Sorrell* teaches that restricting the use of individualized information to personalize speech is an independent First Amendment burden. That same logic applies here because SB 976 restricts YouTube's ability to use individualized information to personalize its feeds.

*Moody* forecloses the district court's conclusion that YouTube's personalized feeds are not expressive because YouTube uses an algorithm to recommend specific content to each user. Indeed, in *Moody*, Florida advanced the same theory as the district court: It argued that the platforms' algorithms were non-expressive because they recommended content based on mere "comput[ations]" of what "similar users often liked" and were "designed to implement user choice about what content they wish to view." Brief for Petitioners at 31, *Moody v. NetChoice, LLC*, No. 22-277

(2024). The Court rejected that argument, holding that feeds reflecting YouTube's content-moderation policies are protected because YouTube sets out overarching principles in its Community Guidelines. *Moody*, 603 U.S. at 734-35, 744. The Court found it immaterial that YouTube relies on algorithms to identify specific content that violates those principles "without a person in the loop." *Id.* at 745-46 (Barrett, J., concurring); *see also id.* at 743-45; *see* Order Denying Summary Judgment at 6, 9, *NetChoice, LLC v. Uthmeier*, No. 4:21-cv-220 (N.D. Fla. June 18, 2026), Dkt. No. 335 (holding, on remand from *Moody*, that Florida's assertion that the platforms' feeds are unprotected because they use algorithms to "decide which content to show any given user primarily based on the user's viewing habits" is "inconsistent with *Moody* ... and any coherent view of the First Amendment").

Attempting to reconcile its decision with *Moody*, the district court posited that content moderation is different because humans at YouTube decide "we don't want _____ on our platforms" and also fill in the blank with, for example, nudity. 1-ER-0014. But that distinction is not dispositive: *Moody* establishes that so long as a platform makes a first-order editorial judgment, the First Amendment does not fall away simply because the platform uses an algorithm to implement that judgment. As California conceded, "algorithms can be used to review posts [at] scale" while still implementing "a human editorial decision." 2-ER-0162–63 (130:25-131:2). And if the automated removal of content that violates YouTube's Community

Guidelines is protected because it is the direct product of expressive human choices, the same must be true of the automated generation of personalized feeds—which likewise derives directly from expressive human choices, such as the choice to recommend age-appropriate content to children under 13 or the judgment that a user who has watched physics videos should be exposed to sports or music rather than a similar topic like math. 2-ER-0248–50 ¶¶ 10, 13.

In any event, the district court misunderstood YouTube's Community Guidelines. While some of those Guidelines prohibit discrete topics or types of content (like nudity), others identify disfavored content based on more abstract qualities, like "deceptive" content. *Moody*, 603 U.S. at 735. Under the court's reasoning, feeds reflecting YouTube's policy against deceptive content would not be protected because humans at YouTube decide "users should not be shown _____ because it is deceptive," but they do not "fill in the blank" with, for example, videos advertising pyramid schemes. *See* 4-ER-0831–33 ¶ 48 ("[B]oth [machine-learning] moderation and recommendation systems can result in outputs that a system designer may not be able to predict exactly in advance."). Indeed, the State's expert opined that content moderation and personalization "*both* lack the certainty required for constitutionally protected expression." 3-ER-0332 ¶ 38 (emphasis added). But that conflicts with *Moody*'s holding that the First Amendment protects YouTube's use of algorithms to implement its Community Guidelines, including its policy against

deceptive content. Therefore, under *Moody*, YouTube's choice to recommend content that is individually interesting, relevant, and valuable is protected even if YouTube does not handpick specific videos or topics for each user. *See Cinevision Corp. v. City of Burbank*, 745 F.2d 560, 568 (9th Cir. 1984) (holding that concert organizer was engaged in protected expression even if it "did not know specifically what songs each performer would sing").

The district court's conclusion that YouTube's personalized feeds are not expressive also rested on a faulty factual premise: that YouTube relies solely on algorithms "to make the determination of what is 'interesting.'" 1-ER-0009–10. In fact, humans at YouTube make numerous subjective and value-laden decisions about what content should qualify as "interesting, relevant, and valuable" that are then embedded into the algorithm. When the algorithm determines that a sports video—rather than a math video—will be "interesting" to a user who has watched videos about physics, that is because YouTube engineers decided that physics and math are not sufficiently diverse topics and trained the algorithm accordingly. 2-ER-0250 ¶ 13. When the algorithm recommends a video "encourag[ing] children to use their imagination" to an 11-year-old, that is because humans at YouTube decided that type of content is "valuable" for a user of that age. 7-ER-1342 ¶ 29. YouTube employees are constantly training the algorithm on what they mean by interesting, relevant, and valuable content and adjusting it when it does not achieve the goals

they have set. 2-ER-0252 ¶ 19.

Relatedly, the district court treated personalized feeds as a monolith, assuming that all such feeds are "merely ... mirror[s] that reflect[] back to users their own perceived interests," like the hypothetical feeds described in *Moody* footnote 5. 1-ER-0009, 0013 (citing *Moody*, 603 U.S. at 736 n.5). But, as explained above, *Moody* expressly distinguished "YouTube's ... feeds" from that hypothetical algorithm. *Moody*, 603 U.S. at 736 n.5. And it was correct to do so. *See supra* at 26-27.

Rather than follow the *Moody* majority, the district court relied on Justice Alito's minority concurrence, dismissing YouTube's feeds as "'dumb pipes' that merely emit what they are fed." 1-ER-0010–11 (quoting 603 U.S. at 782 (Alito, J., concurring)). But applying the "dumb pipes" construct only confirms that YouTube's Recommender System is expressive. Justice Scalia originally used the phrase to describe old cable systems that merely "routed signals from point A to point B," "captur[ing] the full range of broadcast signals and forward[ing] them to all subscribers." *Am. Broad. Cos. v. Aereo, Inc.*, 573 U.S. 431, 458 (2014) (Scalia, J., dissenting). He contrasted those "dumb pipes" with modern cable companies that "deliberately select[] and import[] ... signals," "making them curators of content ... akin to video-on-demand services" like "Netflix." *Id.* at 455, 458-59. Thus, YouTube's feeds would only be "dumb pipes" if they indiscriminately conveyed all third-party content posted to the platform. But YouTube instead acts as a "curator[]

of content." *Id.* at 458-59. Like Netflix, YouTube exercises its editorial discretion to "select[] and arrange[]," *id.* at 455, videos into compilations that YouTube believes each user will "find relevant, trustworthy, and valuable," 7-ER-1334 ¶ 7. By assuming that all personalized feeds, including YouTube's, are "dumb pipes," the district court ignored this Court's instruction that "the unique design of each platform and its algorithm affects whether the algorithm at issue is expressive." *NetChoice*, 152 F.4th at 1014.

The district court also erroneously asserted that YouTube's "objective [is] to maximize user engagement by algorithmic manipulation." 1-ER-0010. Even if that were true, YouTube's feeds would still be protected because choosing to publish interesting third-party content in an engaging way is a quintessential editorial judgment. *See supra* at 21-22. But YouTube's objective is not to maximize user engagement: It is to "optimize[] for long-term user satisfaction" over "short-term engagement or maximizing the amount of time users spend on the platform." 7-ER-1337 ¶ 13. For example, YouTube has designed its system to recommend to under-13 users "learning-related content" and "content that promotes critical thinking," even if those users might find videos of the latest dance trend more immediately engaging. 7-ER-1342 ¶ 29. YouTube's focus on the quality of users' long-term experiences over sheer engagement is also evident in its success metrics. By measuring "capped valued watchtime," which counts only the first hour users spend

watching videos they "rate[] as four or five stars," YouTube "avoid[s] recommending items that are engaging but ultimately not valuable to a viewer" and "prioritize[s] helping new users find a first hour of valuable content" over total hours spent on YouTube. 7-ER-1343 ¶ 32; 2-ER-0251 ¶¶ 16-17.

The district court's conclusion that SB 976 does not burden YouTube's protected expression was untethered from the record in another way. The court recognized that, given *Moody*, if SB 976 limits YouTube's ability to implement its content-moderation policies, the law necessarily burdens YouTube's speech. But the court concluded that content moderation and personalization are entirely distinct, such that prohibiting personalization would not affect platforms' ability to engage in content moderation. Even if that could be true of some generic recommendation system, it is not true of YouTube's Recommender System. YouTube recognizes that the most effective content moderation is personalized precisely because some content may be appropriate for certain individuals and not others.

Consider YouTube's policy against repeatedly recommending to teens certain content that, while not problematic as a single video, could be harmful if viewed in high quantities, like content that "displays aggression." 7-ER-1343 ¶ 31. YouTube cannot effectively implement that policy without considering whether the user is a teen and what videos that user has previously watched. Or consider YouTube's policy of providing age-appropriate content to minors in different age groups. SB

976 prevents YouTube from recommending content that it has determined, in consultation with child-development experts, is particularly well-suited to the developmental needs of children under 13 to only users in that age group. 7-ER-1342 ¶ 29. The law thus prohibits YouTube from implementing an expressive judgment that necessarily relies on combining a content standard (providing age-appropriate content) with personalization (the user's age), in contravention of *Moody*.

The district court suggested that SB 976 would not interfere with YouTube's ability to make age-appropriate recommendations because "Section 2700[0].5[a](3) appears to exempt from this section feeds in which the media generated is based on 'device communications or signals concerning whether the user is a minor.'" 1-ER-0014 n.5. But Section 27000.5(a)(3) permits YouTube to consider only "*whether* the user is a minor," *i.e.*, whether the user is under 18 or not. It does not permit YouTube to distinguish between older and younger minors. So SB 976 prevents YouTube from implementing its value judgment that the "developmental needs of children differ greatly from those of teenagers and should be reflected in their online experiences," 7-ER-1352 ¶ 9, instead requiring it to treat all minors as an undifferentiated mass. Importantly, the California legislature has acknowledged that age differences among minors are significant, passing legislation that would ban personalized feeds for users under 16 (even with parental consent), but not 16 to 18

year olds. *See* AB 1709. If distinctions between minors of different ages matter for policymaking, then surely they matter for curating content. But SB 976 restricts YouTube's ability to make curation decisions that account for those distinctions.

The close link between content moderation and personalization is also illustrated by YouTube's content-quality standards. One of YouTube's core content-moderation principles is to avoid recommending low-quality content. And whether content is high or low quality depends on both user-agnostic characteristics of the content *and* the user's characteristics. For example, YouTube might determine that a news clip about a House primary in Michigan is high quality because it is recent and from a reputable source. *See* 7-ER-1341 ¶ 28. But if YouTube recommends that video to a user living in California with no interest in politics, that user would get no value from the recommendation—thus making the video low quality for that user. Worse yet, a chronological feed would recommend content that is even less relevant and therefore even lower quality for the user, like content in a language she does not speak. 7-ER-1344–45, 1347 ¶¶ 36, 39. Given the sheer volume of content on YouTube, personalization is critical to ensuring that users receive content that is high quality for them. After all, even content that is "high quality" in the abstract will be irrelevant and uninteresting to most users. 7-ER-1339, 1344–46 ¶¶ 19, 36. Therefore, YouTube cannot maintain its content-quality standards without personalization.

Even assuming YouTube's content-moderation and personalization functions could be neatly disaggregated, the district court offered no valid basis for why content moderation is protected but personalization is not. The court suggested two distinctions: (1) that content moderation serves as an "initial gating mechanism" for deciding what content to include or exclude, whereas personalization involves organizing what remains, and (2) that content-moderation decisions have a "moral valence" that personalization decisions do not. 1-ER-0013–14, 0017–18. Neither purported distinction justifies different treatment under the First Amendment.

First, the district court posited that "[u]nlike the later personalization phases ..., the Community [Guidelines] serve as an initial gating mechanism" for deciding what to "exclud[e] ... from the platform." 1-ER-0013–14. But *Moody* held that the First Amendment protects "editorial choices" not only about what to "include and exclude" but also about how to "organize and prioritize" content. 603 U.S. at 716-17; *id.* at 731 ("Deciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity."); *see Bursey v. United States*, 466 F.2d 1059, 1087 (9th Cir. 1972) (Both a newspaper's "decisions about what should be published initially" and "the placement of a story on the front page or in the obituary section" reflect "editorial judgments."). YouTube "ensures the overall mix of speech that appears" on users' homepages "reflects [its] expressive views and priorities" by *both*

"removing content inconsistent with YouTube's content-moderation policies and organizing other content in the manner [it] prefers." 7-ER-1361–62 ¶ 34. The First Amendment "unequivocally" protects both kinds of "editorial judgment." *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 255 (1974) (citation omitted).

Second, the district court reasoned that "implementation of Plaintiffs' content moderation decisions, unlike personalization, carries with it a moral valence." 1-ER-0013, 0017–18. But the Supreme Court has never hinted at a "moral valence" test for First Amendment protection. In *Turner*, for instance, the Court held that cable operators have a First Amendment right to select which channels to carry—but never suggested that its holding turned on whether cable operators have a moral view on the content of those channels. 512 U.S. at 636-37. Likewise, the First Amendment protects YouTube's editorial judgment to show users compilations of content they will likely find interesting, relevant, and valuable regardless of whether YouTube believes the content is "good" or "bad." And while the district court relied on *Brown*'s statement that the First Amendment protects "moral judgments about art and literature," 1-ER-0018 (quoting 564 U.S. at 790), the Court was not holding that *only* such moral judgments are protected. That would have conflicted with *Turner* and numerous other precedents—reinforcing that the district court's "moral valence" test is foreign to First Amendment jurisprudence.

At any rate, YouTube's decision to offer personalized feeds is no less "moral" than its content-moderation decisions. The district court reasoned that content-moderation policies are protected because they reflect content that the platforms "disfavor" or "find objectionable." 1-ER-0016. Similarly, YouTube's decision to use personalized feeds reflects its view that showing users content that is uninteresting, irrelevant, and not valuable to them is "objectionable" and should be "disfavored."

Finally, the district court's holding is unprecedented and has serious ramifications for the scope of First Amendment protection on the internet. The court broke new ground by holding that personalized feeds are likely not protected by the First Amendment. Under the court's logic, the State could categorically ban personalized feeds for *adults*—not just on social-media platforms but on any website or app. Thus, the State could prohibit Spotify from providing users with song recommendations based on their listening history, LinkedIn from highlighting job postings similar to those a user has previously viewed, or the New York Times from showing users articles tailored to their unique reading habits—and the First Amendment would be wholly inapplicable. What is more, the court's rationale could allow the State to ban or regulate any algorithmically-produced compilations, not just personalized recommendations. Taken to its logical conclusion, the decision threatens vast quantities of online expression. *See* 2-ER-0241–42.

### c. The personalized-feed provisions burden minor users' First Amendment rights.

The personalized-feed provisions also restrict YouTube's minor users' First Amendment "right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). In *Brown*, the Supreme Court invalidated a California law requiring parental approval to sell or rent violent video games to minors, reasoning that the State may not "prevent children from" accessing expression "*without their parents' prior consent*." 564 U.S. at 795 n.3. By restricting minors' access to compilations of videos best suited to their age, interests, and developmental needs, SB 976 inflicts a substantial First Amendment harm. YouTube is "full of valuable and enriching content for minors," from "step-by-step instructions on how to solve calculus problems" to "clips of the latest Broadway plays." 7-ER-1353 ¶ 11. But without personalization, much of that content will be buried beneath an endless stream of irrelevant, low-quality, or age-inappropriate videos. "[L]egislatively mandating parental consent" to access personalized feeds would therefore "unnecessarily preclude" many minors from "accessing the basic benefits of the online world," and may have "unintended effects on vulnerable youth," including those whose parents are "incapacitated, abusive, not proficient in English, not technologically savvy, or otherwise not available." 7-ER-1366 ¶ 46 (citation omitted).

The district court reasoned that SB 976 does not violate minor users' right to

access speech without parental consent because they "can still access content that might otherwise appear in their personalized feed by manual search." 1-ER-0020. But that statement ignores that the law limits minors' access to YouTube's "larger offering": its curated compilations of third-party speech. *Moody*, 603 U.S. at 738. More fundamentally, personalization on YouTube is designed to help users *discover* content that interests them, which they "may not have known to specifically search for." 7-ER-1334, 1346–47 ¶¶ 6, 37. In any case, SB 976 would also impede YouTube's search function, which depends on personalization. Absent personalization, for instance, an aspiring young artist who searches for "painting tips" might receive only videos about home renovation. 7-ER-1345 ¶ 36B. Therefore, restricting minors' access to personalized feeds and forcing them to rely on a degraded search function to filter through "mountainous amount[s] of content," 1-ER-0020, still meaningfully *burdens* their speech rights, *see United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000) ("distinction between laws burdening and laws banning speech is but a matter of degree").

**2. The personalized-feed provisions are content-based restrictions that fail any form of heightened scrutiny.**

Because YouTube has made "a colorable claim" that SB 976 infringes its First Amendment rights, "the burden shifts to the government to justify the restriction on speech." *Meinecke*, 99 F.4th at 521 (citation omitted). California cannot do so

because the personalized-feed provisions are content-based restrictions that fail any level of heightened scrutiny.

This Court should resolve these issues even though the district court did not address them because it erroneously found the First Amendment wholly inapplicable. In First Amendment cases, the Supreme Court has repeatedly decided whether policies satisfy the applicable level of scrutiny even when the lower courts did not. *See, e.g.*, *Mahmoud v. Taylor*, 606 U.S. 522, 565-69 (2025) (holding that policy against religious opt-outs failed strict scrutiny despite respondents urging the Court to remand if it determined that a First Amendment burden existed); *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 495-96 (2025) (applying intermediate scrutiny to speech law in the first instance). And when this Court considered NetChoice's challenge to SB 976, it held that the Act's restriction on displaying like counts was likely to fail strict scrutiny rather than remanding to the district court to conduct that analysis. *NetChoice*, 152 F.4th at 1016. The same course is warranted here because, as in *NetChoice*, "on-point authority compels a single result," *id.* at 1017—that the personalized-feed provisions trigger and fail heightened scrutiny.

**a. The personalized-feed provisions are content-based.**

The personalized-feed provisions are content-based because they restrict speech with a particular kind of "communicative content," *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015): speech that is likely to be interesting, relevant, and

valuable to an individual user. Some content-based restrictions are "obvious, defining regulated speech by particular subject matter." *Id.* at 163. But the government cannot circumvent heightened scrutiny by using a more "subtle" device, like identifying restricted speech based on certain qualities of that speech rather than specific subject matters. *Id.* In *Consolidated Edison Company v. Public Service Commission*, 447 U.S. 530 (1980), for example, the Supreme Court deemed content-based a bar on including electric-bill inserts "discussing controversial issues of public policy"—even though many subjects could qualify as "controversial." *Id.* at 532, 537. And in *Matal v. Tam*, 582 U.S. 218 (2017), the Court deemed viewpoint-based a bar on registering "disparag[ing]" trademarks—even though the provision "evenhandedly prohibit[ed] disparagement of all groups." *Id.* at 231, 243. Those precedents establish that a law is content-based if it regulates speech based on an underlying quality related to its communicative effect on the listener.

Under that standard, the restriction here is content-based. There is no principled distinction between a restriction on speech that is "interesting" to particular users and a restriction on speech that is "controversial" or "disparaging." And the content-based nature of the personalized-feed provisions is especially clear when one considers how they operate at the level of an individual user. For example, if a teen user's viewing history demonstrated an interest in robotics, YouTube might recommend videos about mechanical engineering. 7-ER-1337–38 ¶¶ 14-15. A law

prohibiting YouTube from showing that user mechanical-engineering videos would plainly be content-based. But by restricting personalization, SB 976 has precisely the same effect—and it does so across *all* minor users. The entire point of the personalized-feed provisions is to change the content of minor users' feeds.

The law restricts personalization not only to suppress content that is interesting or compelling to minor users, but also to target particular "subject matter[s]" that the State considers objectionable. *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 71 (2022). Tellingly, whenever California and its experts have attempted to explain why personalized feeds are harmful, they have focused on specific topics like self-harm, disordered eating, body image, and substance use. 5-ER-0889 ("harmful content" about "suicide, self-harm, or highly depressive content"); 5-ER-0890 ("depression-related content"); 5-ER-0898 ("body-image and disordered-eating content; alcohol-, steroid-, and supplement-related content"); *see* 6-ER-1141 ¶ 259 (YouTube's "[a]lgorithms concentrate large amounts of problematic content"); 7-ER-1233 ¶ 47 (similar); 5-ER-0974 ¶ 103 (similar). The legislative findings supporting SB 976 focus on the same harms. SB 976 § 1 ("disordered eating," "depressive symptoms," "self-harm behaviors," "suicide[]"). And a committee report on the bill asserted that personalized feeds "too often send[] minors down rabbit holes of harmful content." Assembly Comm. on Privacy & Consumer Prot., Analysis of SB 976, at 9-10 (July 2, 2024). So the

State's efforts to justify SB 976 reveal that the law restricts speech based on its "function or purpose" of providing personalized content as a "proxy" for speech on topics the State deems harmful to minors. *City of Austin*, 596 U.S. at 71, 74. As this Court recently explained, a "restriction is content based" where, as here, its "overriding justification ... is concern for the effect of the subject matter on young viewers." *Imperial Sovereign Ct. of Mont. v. Knudsen*, 170 F.4th 820, 856 (9th Cir. 2026) (quoting *Playboy*, 529 U.S. at 811).

#### b. The personalized-feed provisions fail any form of heightened scrutiny.

Because the personalized-feed provisions are content-based, they are "presumptively invalid," *R.A.V. v. City of St. Paul,* 505 U.S. 377, 382 (1992), and can be justified only if "they are narrowly tailored to serve compelling state interests," *Reed*, 576 U.S. at 163. And even content-neutral speech restrictions must "advance[] important governmental interests unrelated to the suppression of free speech" and must "not burden substantially more speech than necessary." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997). The personalized-feed provisions fail either form of heightened scrutiny. They further only speech-suppressive interests, fail to advance the State's purported objective, are seriously underinclusive and overinclusive, and disregard less speech-restrictive alternatives.

1. Far from advancing an interest "unrelated to the suppression of free speech," SB 976's core objective is to suppress protected speech that California

regards as "addictive" for minors. Below and in its legislative findings, the State made clear that SB 976 seeks to reduce the amount of time minors spend accessing speech on social-media platforms by forcing platforms to organize or display that speech in a less interesting way. SB 976 § 1(a)-(c); 2-ER-0165 (133:11-14). The law's objective is thus *directly* "[]related to the suppression of free speech"—just like a law seeking to reduce the time minors spend reading library books by forcing libraries to mix them up on shelves so young readers cannot find ones that interest them. Accordingly, the premise underlying SB 976 "is that the force of speech can justify the government's attempts to stifle it." *Sorrell*, 564 U.S. at 577. That "reasoning is incompatible with the First Amendment." *Id.*

The State claims that personalized feeds harm minors, but "[t]hose who seek to ... burden free expression often assert that disfavored speech has adverse effects." *Id.* SB 976's "express purpose and practical effect are to diminish the effectiveness" of YouTube's speech—and suppressing speech is not a "permissible" means of "advanc[ing]" the State's policy goals, whether under intermediate or strict scrutiny. *Id.* at 565, 577; *Moody*, 603 U.S. at 740 (a law that pursues an interest "related to the suppression of free expression" cannot pass even "the less stringent form of ... review").

2. Even assuming the State has a valid interest, the personalized-feed provisions are not sufficiently tailored to that interest. Under strict scrutiny, the

State must "show a direct causal link" between personalized feeds and "harm to minors." *Brown*, 564 U.S. at 799. Even under intermediate scrutiny, the State must "demonstrate that the recited harms are real ... and that the regulation will in fact alleviate [those] harms in a direct and material way." *Doe*, 772 F.3d at 577 (quoting *Turner I*, 512 U.S. at 664). The State cannot satisfy either standard because it has failed to show any link—whether causal or correlative—between personalization and harm to minors.

In over 500 pages of expert materials, the State has not identified a single peer-reviewed or published study showing that personalization causes or is correlated with negative health outcomes in minors. 3-ER-0455–60 ¶¶ 26-34; 3-ER-0544–46 ¶¶ 58-62; 4-ER-0628–29 ¶ 82; 2-ER-0280–81 ¶ 14. Instead, the State's studies address social media as a whole, smartphone use generally, or features other than personalization. 3-ER-0460–64 ¶¶ 35-39; 3-ER-0544–46 ¶¶ 57-61. Other courts have found similar evidence deficient and declined to rely on the same expert the State engaged here. *See NetChoice v. Murrill*, 812 F. Supp. 3d 594, 651, 654 (M.D. La. 2025) (finding "troubling" flaws with a report by Dr. Twenge and concluding that purported "causal relationship between use of social media (writ large) and harms to minors" was insufficient to justify "narrower restriction"); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1125 (D. Utah 2024) (observing that Dr. Twenge's sources "show[ed] only a correlative relationship between social

media use and negative mental health impacts"). The personalized-feed provisions restrict only personalized feeds, not all of social media. So the State must establish that personalization in particular harms minors. It has failed to do so. 3-ER-0454–56 ¶¶ 23-27; 3-ER-0544 ¶¶ 57-58.

The State cites two studies that gesture at personalization, but neither establishes a link between personalized feeds and harm to minors, and both suffer from serious methodological flaws. The first only speculates that personalization *may* affect adolescents' brains. 4-ER-0629–30 ¶¶ 84, 86. Speculation does not amount to causation or correlation. In any event, the study is AI-generated and appears in a journal of questionable legitimacy that has only ever published that one article. 4-ER-0629–32 ¶¶ 84-89. After being notified of the study's questionable nature, Dr. Telzer abandoned her reliance on it. The second is a working paper that has not been peer reviewed and concluded that any mental-health effects could not be attributed to "algorithmic curation." 2-ER-0282–86 ¶¶ 16-17, 20. Notably, when that study examined YouTube specifically, it found that personalization had *no* relationship with poor mental-health outcomes. 2-ER-0284–86 ¶ 20.

Lacking evidence that personalization causes harm, the State's experts instead attempt to show that personalization increases time spent on social media, and that time spent on social media harms minors. But the State cannot sustain either link in that supposed causal chain. First, the State's studies "refute[] [their] experts' prior

assumption that personalization increases time spent on social media." 2-ER-0286 ¶ 21. One such study showed that *removing* personalization from the YouTube homepage increased time on the platform, likely because users had to spend more time scrolling or manually searching for videos. 2-ER-0296–97 ¶ 39; 7-ER-1335 ¶ 8. Second, the State has failed to establish that more time on social media harms minors. California's own studies show that restricting or abstaining from social-media use does not improve wellbeing. 2-ER-0293–94 ¶ 34. The latest comprehensive literature reviews are in accord, finding no "clinically-relevant link between time spent on social media and mental health issues in youth." 3-ER-0474–77 ¶¶ 51-54; 2-ER-0302 ¶ 49.

The State's remaining studies are likewise plagued by methodological flaws or otherwise fail to shed light on whether personalization harms minors. Some studied only adults, not minors. 2-ER-0287–88, 0295 ¶¶ 24, 36. Others rely on only anecdotes or self-reports. 2-ER-0286–87, 0290–91, 0293, 0299–301 ¶¶ 22, 28, 33, 45-46. Several evaluated only subjects with preexisting mental health problems. 2-ER-0293, 0295 ¶¶ 33, 36. One found only heightened emotions, including happiness, in response to being shown personalized content—not mental or physical harm. 2-ER-0287–89 ¶¶ 24-25. Others are non-peer-reviewed articles published in popular media or downloaded from advocacy group websites, including one organization that is explicitly "Against Big Tech." 2-ER-0281–82, 0290–93 ¶¶ 15,

28, 32. None of them assesses whether minors would be better off with non-personalized feeds (such as the State's proposed alternative of chronological feeds). 5-ER-0881. In fact, the State ignores research showing that chronological feeds give greater prominence to spam and low-quality content and allow bad actors to manipulate the system by frequently uploading harmful content. 4-ER-0821 ¶ 35; 2-ER-0304–05 ¶ 53. As in *Brown*, the State has offered at best "ambiguous proof" that its chosen means will advance its objectives—which "will not suffice." 564 U.S. at 799-800.

3. SB 976 is simultaneously underinclusive and overinclusive, and either flaw "is alone enough to defeat it." *Brown*, 564 U.S. at 802-04; *Minority Television Project, Inc. v. FCC*, 736 F.3d 1192, 1204-05 (9th Cir. 2013) (en banc).

In *Brown*, the Supreme Court held that a parental-consent law for violent video games was "seriously underinclusive" because the State was "perfectly willing to leave" allegedly "dangerous, mind-altering material in the hands of children so long as one parent ... says it's OK." 564 U.S. at 802. Here, the State asserts that personalized feeds "pose a significant risk of harm to the mental health and well-being" of minors, citing concerns such as "disordered eating," "depressi[on]," and "self-harm." SB 976 § 1. But if that were true, parental consent would not be a rational way to "address[]" such an allegedly "serious social problem." *Brown*, 564 U.S. at 802. Notably, the State's experts do not contend that parental consent would

alleviate the psychological effects they attribute to "addictive feed[s]"; instead, they treat SB 976 as if it completely bans personalization. 3-ER-0560–61 ¶¶ 92-95.*

The law is also underinclusive because it "single[s] out" certain platforms (like YouTube) "for disfavored treatment," while leaving untouched other platforms (like Netflix and Hulu) that likewise provide personalized recommendations. *Brown*, 564 U.S. at 802. That distinction is especially arbitrary because minors also use those other platforms to watch videos, and many households use YouTube as a substitute for television streaming services. 3-ER-0479–86 ¶¶ 59-72; 7-ER-1333 ¶ 4. The State has "given no persuasive reason why" regulating YouTube's personalized recommendations is more critical to protecting minors' health than regulating Netflix's. *Brown*, 564 U.S. at 802; *see* Original Petition at 4, *State of Texas v. Netflix, Inc.*, No. 219-03228-2026 (Dist. Ct., 219th Jud. Dist., Collin Cnty., Tex. May 11, 2026) (alleging that Netflix has "design[ed] its platform to be addictive" to children).

At the same time, SB 976 is "vastly overinclusive." *Brown*, 564 U.S. at 804. It restricts access to personalized recommendations for *all* minors—even though the State's experts admit that only a small number suffer from purported "[s]ocial media addiction." 5-ER-0948–49 ¶ 50. The law therefore denies many users access to

* While a ban might help resolve this particular underinclusivity defect, it would exacerbate the constitutional problem in other respects.

YouTube's expressive product "because of the threat of addiction in any subset of users, no matter how small." *NetChoice v. Griffin*, 812 F. Supp. 3d 905, 926 (W.D. Ark. 2025); 4-ER-0654 ¶ 145. Similarly, SB 976 restricts personalization for *all* recommendations—regardless of whether those recommendations consist of videos about disordered eating or videos about math. Thus, to prevent exposure to a small subset of videos the State deems harmful, SB 976 would limit minors' access to a wide range of educational and enriching content.

The personalized-feed provisions are also overinclusive because they treat all minors the same—whether they are 7 or 17 years old. Children and teenagers obviously differ in their developmental maturity, capacity for self-regulation, and need for parental oversight. YouTube's age-differentiated recommendations and parental-control features account for those differences, but SB 976 does not. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 396, 398 (1988) (indicating that what is "harmful to juveniles" should account for "juveniles' differing ages and levels of maturity").

SB 976 is also overinclusive as to YouTube. The State cites no study showing that YouTube, as opposed to other social-media platforms, causes harm to minors. 3-ER-0489–90 ¶ 79; 2-ER-0280–81 ¶ 14. Indeed, its only study that specifically considers YouTube found *no link* between personalization on YouTube and harm to minors. 2-ER-0283–86 ¶¶ 18, 20. And as Dr. Hall explains, studies about other

platforms cannot be generalized to YouTube because YouTube is fundamentally different from traditional social media: It is more like television because users' main activity is viewing videos, and most high-quality social-media research does not even consider YouTube as part of the category. 3-ER-0488–91 ¶¶ 76-80; 2-ER-0279–80, 0295 ¶¶ 12, 36. Because the State's theory—and the research it depends on—has no application to YouTube, SB 976 cannot be constitutionally applied to it.

4. Finally, SB 976 fails to account for obvious less restrictive alternatives. *See Minority Television Project*, 736 F.3d at 1205. Rather than restricting personalized feeds, the State could "incentiviz[e] companies to offer voluntary" parental controls, *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024)—which would effectively advance the State's interest without forcing YouTube to alter its speech or "requiring ... parents to veto the [S]tate's prohibition," *NetChoice v. Jones*, 822 F. Supp. 3d 656, 675 (E.D. Va. 2026). YouTube already offers a wide range of opt-in parental-control features like linked accounts, built-in timers, and options to clear or disable watch history. *See supra* at 8-10. The State has also failed to explain why widely available technologies enabling parents to oversee their children's online activity across multiple platforms—such as device-level options to set time limits on certain apps or web-browser settings that restrict access to certain sites—would be ineffective.

If the State believes voluntary parental controls have not been widely enough

adopted, it can "provide parents the information needed to engage in active supervision" over their children online, *Playboy*, 529 U.S. at 826, and "educat[e] ... parents on the importance of using such tools," *NetChoice*, 113 F.4th at 1121; *see Ashcroft v. Am. Civ. Liberties Union*, 542 U.S. 656, 669 (2004) (less restrictive alternatives included "promot[ing]" use of tools "by parents"). In NetChoice's appeal, this Court held that another provision of SB 976 requiring platforms to disable like counts by default was insufficiently tailored because California could "encourage" parents to use "'voluntary content filters' related to like counts." *NetChoice*, 152 F.4th at 1017 (citation omitted). The same logic applies here. The State "should not presume parents, given full information, will fail to act," *Playboy*, 529 U.S. at 824, or impose on parents what it thinks they "*ought* to want," *Brown*, 564 U.S. at 804.

### B. The Act's Default Restrictions Are Void for Vagueness.

The Act's default restrictions also violate the Fourteenth Amendment because they turn on a vague "verified parent" standard and fail to provide YouTube with "fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). SB 976 requires YouTube to ensure that only a "verified parent" has the ability alter certain default settings. Cal. Health & Safety Code § 27002(b). But the law does not define the term "verified parent" or provide a "standard for determining what a [party] has to do" to verify parental

status. *Kolender v. Lawson*, 461 U.S. 352, 358 (1983). And verification eludes a readily understood plain meaning in this context. Verification may encompass procedures as strict as "[a] formal declaration made in the presence of an authorized officer" or as relaxed as a mere "acknowledgment." Verification, Black's Law Dictionary (12th ed. 2024). Accordingly, the "range of" actions "that could plausibly qualify" as "verifying" parental status "is vast," *NetChoice, LLC v. Bonta*, 170 F.4th 744, 767 (9th Cir. 2026), from checking a box to uploading a birth certificate.

The district court concluded that the default restrictions are not impermissibly vague because they "provide[] notice to" covered platforms "that they must verify a person's status as a minor's 'parent' before modifying the default settings." 1-ER-0023. But the question remains: *How* must a platform "verify a person's status as a minor's 'parent'"? Tellingly, the State has no answer. And the dictionary definition cited by the district court merely underscores that the requisite procedure could be anything from pressing a button "to confirm" that one is a parent to submitting a formal "oath or affidavit." *Id.* (citation omitted). Because "[b]usinesses of ordinary intelligence cannot reliably determine what compliance" with the default restrictions "requires," those restrictions are unconstitutionally vague. *NetChoice*, 170 F.4th at 767.

## II. YOUTUBE AND ITS MINOR USERS FACE IRREPARABLE INJURY WITHOUT AN INJUNCTION.

Absent an injunction, YouTube and its minor users will be irreparably harmed by the loss of their First Amendment rights and substantial compliance burdens.

As this Court reaffirmed in NetChoice's appeal, the "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *NetChoice*, 152 F.4th at 1024 (citation omitted). Compelling YouTube "to alter [its] editorial policies and posting practices to comply with [a] new speech law ... while its constitutionality under the First Amendment is being litigated" inflicts "irreparable harm." *Labrador v. Poe*, 144 S. Ct. 921, 929 (2024) (Kavanaugh, J., concurring). The law also harms the First Amendment interests of the larger YouTube community, including content creators who will struggle to reach their intended audiences and, most relevant here, minor users who will lose access to personalized compilations of content. Many minor users will instead open YouTube to find a homepage filled with videos in foreign languages, intended for audiences of different ages, or on subjects of no interest to them. This Court explained in *NetChoice* that "a colorable First Amendment claim" is all that is needed to "raise[] the specter of irreparable injury." 152 F.4th at 1024 (citation omitted). YouTube has at a minimum cleared that low threshold and thus shown "irreparable injury sufficient to merit the grant of relief." *Doe*, 772 F.3d at 583 (citation omitted).

That California has not yet enforced the law against YouTube does not negate that injury. A law "need not be enforced against a speaker to pose a threat to his free speech rights." *Cuviello v. City of Vallejo*, 944 F.3d 816, 832-33 (9th Cir. 2019). A "threat of enforcement rather than actual enforcement" is sufficient to "chill" those rights and therefore "constitutes irreparable harm." *Id.* at 833. YouTube faces a credible and imminent threat of enforcement: The State has affirmatively refused to stay enforcement, even during this appeal. And while the State previously agreed to provide 30 days' notice of an enforcement action while the preliminary-injunction motion was pending, the State has refused to extend that agreement. Absent an injunction, YouTube will risk crushing liability if it continues to provide compilations conveying its expressive message to minors.

YouTube will also face substantial compliance burdens without an injunction. Personalized feeds are a central building block of the YouTube platform. To comply with SB 976, YouTube would need to overhaul its engineering infrastructure and practical operations, "invest[ing]" significant "resources to develop new systems," 7-ER-1368 ¶ 51, "with no guarantee of eventual recovery," *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021) (per curiam); *Labrador*, 144 S. Ct. at 929 (Kavanaugh, J., concurring) (company forced to "restructure [its] operations" or "build new facilities" suffers irreparable harm). The district court discounted those compliance costs on the ground that "monetary injury is not normally considered

irreparable." 2-ER-0030. But the court overlooked that monetary injury "*is* irreparable when the plaintiff cannot sue the defendant to recover money damages" because the defendant is a State. *Grand River Enters. Six Nations, Ltd. v. Knudsen*, No. 23-35494, 2024 WL 2992503, at *2 (9th Cir. June 14, 2024); *see NetChoice, LLC v. Skrmetti*, No. 25-5660, 2026 WL 2546423, at *5-6 (6th Cir. Aug. 28, 2026) (vacating denial of preliminary injunction where district court gave inadequate weight to "irreparable harm" of "unrecoverable compliance costs").

Moreover, being forced to navigate YouTube's massive library without personalization "will negatively affect users' experiences" or may lead them to abandon the platform altogether. 7-ER-1366, 1369 ¶¶ 46, 53. As this Court has held, the "threatened loss of ... customers or goodwill" constitutes "irreparable harm." *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001). YouTube should not be required to undertake such costly and radical changes to its platform, expending resources and sacrificing goodwill that cannot be recovered, while the law's constitutionality is under review.

## III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST SUPPORT AN INJUNCTION.

YouTube has "raised 'serious First Amendment questions,'" which "compels a finding that ... 'the balance of hardships tips sharply in [its] favor.'" *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007) (citation omitted). And this Court has "consistently recognized the significant public interest in upholding

First Amendment principles." *Doe*, 772 F.3d at 583 (citation omitted). YouTube is a centerpiece of the "modern public square," serving as the preeminent online platform for sharing and discovering video content for billions of users. *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017). As the district court acknowledged, YouTube is one of "the most prominent places for people to connect with each other, exchange views, learn, and much more." 1-ER-0002. The State seeks to fundamentally alter the speech environment on YouTube for millions of users without any evidence that doing so will have a positive impact. The equities and public interest therefore favor preliminarily enjoining the challenged provisions—which will still allow the State to "pursue" its purported "interest in less intrusive ways" in the interim. *NetChoice*, 152 F.4th at 1025.

## CONCLUSION

This Court should reverse the district court's order denying YouTube's preliminary-injunction motion.

Dated: September 8, 2026

Respectfully submitted,

*/s/ Elizabeth B. Prelogar*
Elizabeth B. Prelogar

*Counsel for Plaintiffs-Appellants*
*Google LLC and YouTube, LLC*

# STATEMENT OF RELATED CASES

Plaintiffs-Appellants Google LLC and YouTube, LLC identify *Meta Platforms, Inc. v. Bonta*, No. 26-5120, and *TikTok, Inc., et al. v. Bonta*, No. 26-5121, as related cases pending in this Court that were coordinated in the district court, raise the same or closely related issues, and have been consolidated in this Court. *See* 9th Cir. R. 28-2.6.

Dated: September 8, 2026

*/s/ Elizabeth B. Prelogar*
Elizabeth B. Prelogar

*Counsel for Plaintiffs-Appellants*
*Google LLC and YouTube, LLC*

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-5132

I am the attorney or self-represented party.

**This brief contains 14,000 words,** excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
- [ ] it is a joint brief submitted by separately represented parties.
- [ ] a party or parties are filing a single brief in response to multiple briefs.
- [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated ______________.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Elizabeth B. Prelogar* **Date** September 8, 2026
*(use "*s/[typed name]*" to sign electronically-filed documents)*

# STATUTORY ADDENDUM

# TABLE OF CONTENTS

**Page**

Senate Bill 976 (“SB 976”), codified at Cal. Health & Safety Code §§ 27000-27007 .......... Add. 1

**Senate Bill No. 976**

**CHAPTER 321**

An act to add Chapter 24 (commencing with Section 27000) to Division 20 of the Health and Safety Code, relating to youth addiction.

[Approved by Governor September 20, 2024. Filed with Secretary of State September 20, 2024.]

LEGISLATIVE COUNSEL'S DIGEST

SB 976, Skinner. Protecting Our Kids from Social Media Addiction Act.

Existing law, the California Age-Appropriate Design Code Act, requires, beginning July 1, 2024, a business that provides an online service, product, or feature likely to be accessed by children to comply with certain requirements. The act requires the business to complete a data protection impact assessment addressing, among other things, whether the design could harm children and whether and how the online product, service, or feature uses system design features to increase, sustain, or extend use of the online product, service, or feature by children, including the automatic playing of media, rewards for time spent, and notifications. Existing law prohibits the business from using the personal information of any child in a way that the business knows, or has reason to know, is materially detrimental to the physical health, mental health, or well-being of a child.

Existing law, the Privacy Rights for California Minors in the Digital World, prohibits an operator of an internet website, online service, online application, or mobile application from specified conduct when minors are involved, including the marketing or advertising of alcoholic beverages, firearms, or certain other products or services. Existing law sets forth other related protections for minors, including under the California Consumer Privacy Act of 2018 and the California Privacy Rights Act of 2020.

This bill, the Protecting Our Kids from Social Media Addiction Act, would make it unlawful for the operator of an addictive internet-based service or application, as defined, to provide an addictive feed to a user, unless the operator

does not have actual knowledge that the user is a minor; commencing January 1, 2027, has reasonably determined that the user is not a minor; or has obtained verifiable parental consent to provide an addictive feed to the user who is a minor.

The bill would define "addictive feed" as an internet website, online service, online application, or mobile application, in which multiple pieces of media generated or shared by users are recommended, selected, or prioritized for display to a user based on information provided by the user, or otherwise associated with the user or the user's device, as specified, unless any of certain conditions are met.

The bill would make it unlawful for the operator of an addictive internet-based service or application, between the hours of 12 a.m. and 6 a.m., in the user's local time zone, and between the hours of 8 a.m. and 3 p.m., Monday through Friday from September through May in the user's local time zone, to send notifications to a user if the operator has actual knowledge that the user is a minor or, commencing January 1, 2027, has not reasonably determined that the user is not a minor, unless the operator has obtained verifiable parental consent to send those notifications, as specified. The bill would set forth related provisions for certain access controls determined by the verified parent through a mechanism provided by the operator.

Under the bill, a parent's provision of consent or use of a mechanism, as described above, would not waive, release, otherwise limit, or serve as a defense to, any claim that the parent, or that the user who is a minor or was a minor at the time of using the internet-based service or application, might have against the operator regarding any harm to the mental health or well-being of the user.

The bill would require an operator to annually disclose the number of minor users of its addictive internet-based service or application, and of that total the number for whom the operator has received verifiable parental consent to provide an addictive feed, and the number of minor users as to whom the access controls are or are not enabled.

Under the bill, these provisions would only be enforced in a civil action brought in the name of the people of the State of California by the Attorney General. The bill would require the Attorney General to adopt regulations to further the purposes of these provisions, including regulations regarding age assurance and

parental consent by January 1, 2027. The bill would authorize the Attorney General to adopt regulations that provide for exceptions to these provisions, but only if those exceptions further the purpose of protecting minors. The bill would require the Attorney General, in promulgating regulations, to solicit public comment regarding the impact that any regulation might have based on certain nondiscrimination characteristics set forth in existing law.

The bill would make these provisions severable.

*The people of the State of California do enact as follows:*

**SECTION 1.** The Legislature finds and declares the following:

**(a)** Social media provides an important tool for communication and information sharing. Approximately 95 percent of 13- to 17-year-olds, inclusive, say that they use at least one social media platform, and more than one-third report using social media almost constantly.

**(b)** However, some social media platforms have evolved to include addictive features, including the algorithmic delivery of content and other design features, that pose a significant risk of harm to the mental health and well-being of children and adolescents.

**(c)** As the United States Surgeon General has reported, recent evidence has identified "reasons for concern" about social media usage by children and adolescents. This evidence includes a study concluding that the risk of poor mental health outcomes doubles for children and adolescents who use social media at least three hours a day and research finding that social media usage is linked to a variety of negative health outcomes, including low self-esteem and disordered eating, for adolescent girls.

**(d)** Heavier usage of social media also leads to less healthy sleep patterns and sleep quality, which can in turn exacerbate both physical and mental health problems.

**(e)** Further, social media usage is more strongly associated with negative mental health outcomes, including depressive symptoms and self-harm behaviors,

than is consumption of other forms of media such as television or electronic games.

**(f)** Both California and the country as a whole are facing an ongoing youth mental health crisis, with rates of adolescent suicides, depressive episodes, and feelings of sadness and hopelessness on the rise in recent years.

**(g)** For these reasons, it is essential that California act to ensure that social media platforms obtain parental consent before exposing children and adolescents to harmful and addictive social media features.

**SECTION 2.** Chapter 24 (commencing with Section 27000) is added to Division 20 of the Health and Safety Code, to read:

CHAPTER 24. PROTECTING OUR KIDS FROM SOCIAL MEDIA ADDICTION ACT

27000. This chapter shall be known, and may be cited, as the Protecting Our Kids from Social Media Addiction Act.

27000.5. For purposes of this chapter, the following terms have the following meanings:

**(a)** "Addictive feed" means an internet website, online service, online application, or mobile application, or a portion thereof, in which multiple pieces of media generated or shared by users are, either concurrently or sequentially, recommended, selected, or prioritized for display to a user based, in whole or in part, on information provided by the user, or otherwise associated with the user or the user's device, unless any of the following conditions are met, alone or in combination with one another:

**(1)** The information is not persistently associated with the user or user's device, and does not concern the user's previous interactions with media generated or shared by others.

**(2)** The information consists of search terms that are not persistently associated with the user or user's device.

**(3)** The information consists of user-selected privacy or accessibility settings, technical information concerning the user's device, or device communications or signals concerning whether the user is a minor.

**(4)** The user expressly and unambiguously requested the specific media or media by the author, creator, or poster of the media, or the blocking, prioritization, or deprioritization of such media, provided that the media is not recommended, selected, or prioritized for display based, in whole or in part, on other information associated with the user or the user's device, except as otherwise permitted by this chapter and, in the case of audio or video content, is not automatically played.

**(5)** The media consists of direct, private communications between users.

**(6)** The media recommended, selected, or prioritized for display is exclusively the next media in a preexisting sequence from the same author, creator, poster, or source and, in the case of audio or video content, is not automatically played.

**(7)** The recommendation, selection, or prioritization of the media is necessary to comply with this chapter or any regulations promulgated pursuant to this chapter.

**(b)** (1) "Addictive internet-based service or application" means an internet website, online service, online application, or mobile application, including, but not limited to, a "social media platform" as defined in Section 22675 of the Business and Professions Code, that offers users or provides users with an addictive feed as a significant part of the service provided by that internet website, online service, online application, or mobile application.

**(2)** "Addictive internet-based service or application" does not apply to either of the following:

**(A)** An internet website, online service, online application, or mobile application for which interactions between users are limited to commercial transactions or to consumer reviews of products, sellers, services, events, or places, or any combination thereof.

**(B)** An internet website, online service, online application, or mobile application that operates a feed for the primary purpose of cloud storage.

**(c)** "Media" means text, audio, an image, or a video.

**(d)** "Minor" means an individual under 18 years of age who is located in the State of California.

**(e)** "Operator" means a person who operates or provides an internet website, an online service, an online application, or a mobile application.

**(f)** "Parent" means a parent or guardian, including as defined in regulations promulgated pursuant to this chapter.

**(g)** "User" means a person who uses an internet website, online service, online application, or mobile application. "User" does not include the operator or a person acting as an agent of the operator.

27001. **(a)** It shall be unlawful for the operator of an addictive internet-based service or application to provide an addictive feed to a user unless either of the following is met:

**(1)** **(A)** Except as provided in subparagraph (B), the operator does not have actual knowledge that the user is a minor.

**(B)** Commencing January 1, 2027, the operator has reasonably determined that the user is not a minor, including pursuant to regulations promulgated by the Attorney General.

**(2)** The operator has obtained verifiable parental consent to provide an addictive feed to the user who is a minor.

**(b)** Information collected for the purpose of determining a user's age or verifying parental consent pursuant to this chapter shall not be used for any purpose other than compliance with this chapter or with another applicable law. The information collected shall be deleted immediately after it is used to determine

a user's age or to verify parental consent, except as necessary to comply with state or federal law.

27002. **(a) (1)** Except as provided in paragraph (2), it shall be unlawful for the operator of an addictive internet-based service or application, between the hours of 12 a.m. and 6 a.m., in the user's local time zone, and between the hours of 8 a.m. and 3 p.m., from Monday through Friday from September through May in the user's local time zone, to send notifications to a user if the operator has actual knowledge that the user is a minor unless the operator has obtained verifiable parental consent to send those notifications.

**(2)** Commencing January 1, 2027, it shall be unlawful for the operator of an addictive internet-based service or application, between the hours of 12 a.m. and 6 a.m., in the user's local time zone, and between the hours of 8 a.m. and 3 p.m., from Monday through Friday from September through May in the user's local time zone, to send notifications to a user whom the operator has not reasonably determined is not a minor, including pursuant to regulations promulgated by the Attorney General, unless the operator has obtained verifiable parental consent to send those notifications.

**(b)** The operator of an addictive internet-based service or application shall provide a mechanism through which the verified parent of a user who is a minor may do any of the following:

**(1)** Prevent their child from accessing or receiving notifications from the addictive internet-based service or application between specific hours chosen by the parent. This setting shall be set by the operator as on by default, in a manner in which the child's access is limited between the hours of 12 a.m. and 6 a.m., in the user's local time zone.

**(2)** Limit their child's access to any addictive feed from the addictive internet-based service or application to a length of time per day specified by the verified parent. This setting shall be set by the operator as on by default, in a manner in which the child's access is limited to one hour per day unless modified by the verified parent.

**(3)** Limit their child's ability to view the number of likes or other forms of feedback to pieces of media within an addictive feed. This setting shall be set by the operator as on by default.

**(4)** Require that the default feed provided to the child when entering the internet-based service or application be one in which pieces of media are not recommended, selected, or prioritized for display based on information provided by the user, or otherwise associated with the user or the user's device, other than the user's age or status as a minor.

**(5)** Set their child's account to private mode, in a manner in which only users to whom the child is connected on the addictive internet-based service or application may view or respond to content posted by the child. This setting shall be set by the operator as on by default.

27003. (a) This chapter shall not be construed as requiring the operator of an addictive internet-based service or application to give a parent any additional or special access to, or control over, the data or accounts of their child.

**(b)** This chapter shall not be construed as preventing any action taken in good faith to restrict access to, or availability of, media.

27004. (a) An operator may choose not to provide services to minors. However, the operator of an addictive internet-based service or application shall not withhold, degrade, lower the quality of, or increase the price of, any product, service, or feature, other than as required by this chapter, due to a user or parent availing themselves of the rights provided by this chapter, or due to the protections required by this chapter.

**(b)** A parent's provision of consent as described in Section 27001 or 27002, or the use by a parent of a mechanism as described in Section 27002, does not waive, release, otherwise limit, or serve as a defense to, any claim that the parent, or that the user who is a minor or was a minor at the time of using the internet-based service or application, might have against the operator of an addictive internet-based service or application regarding any harm to the mental health or well-being of the user.

**(c)** The protections provided by this chapter are in addition to those provided by any other applicable law, including, but not limited to, the California Age-Appropriate Design Code Act (Title 1.81.47 (commencing with Section 1798.99.28) of Part 4 of Division 3 of the Civil Code).

27005. An operator of an addictive internet-based service or application shall publicly disclose, on an annual basis, the number of minor users of its addictive internet-based service or application, and of that total the number for whom the operator has received verifiable parental consent to provide an addictive feed, and the number of minor users as to whom the controls set forth in Section 27002 are or are not enabled.

27006. (a) This chapter may only be enforced in a civil action brought in the name of the people of the State of California by the Attorney General.

**(b)** The Attorney General shall adopt regulations to further the purposes of this chapter, including regulations regarding age assurance and parental consent by January 1, 2027. The Attorney General may adopt regulations that provide for exceptions to this chapter, but only if those exceptions further the purpose of protecting minors.

**(c)** In promulgating the regulations described in subdivision (b), the Attorney General shall solicit public comment regarding the impact that any regulation might have based on the nondiscrimination characteristics set forth in Section 51 of the Civil Code or in any other applicable law.

27007. If any provision of this chapter, or application thereof, to any person or circumstance is held invalid, that invalidity shall not affect other provisions or applications of this chapter that can be given effect without the invalid provision or application, and to this end the provisions of this chapter are declared to be severable.