**Nos. 26-5120, 26-5121 AND 26-5132**

# United States Court of Appeals for the Ninth Circuit

TIKTOK INC.; TIKTOK USDS JOINT VENTURE, LLC,

*Plaintiffs-Appellants,*

*v.*

ROB BONTA, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF CALIFORNIA,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of California
Case No. 5:25-cv-09789-EJD
Honorable Edward J. Davila, District Judge

## APPELLANTS' OPENING BRIEF

JONATHAN HACKER
O'MELVENY & MYERS, LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300

DANIEL M. PETROCELLI
O'MELVENY & MYERS, LLP
1999 Avenue of the Stars, 8th Floor
Los Angeles, California 90067
(310) 246-6850

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..... 1
JURISDICTIONAL STATEMENT ..... 6
ISSUES PRESENTED ..... 7
STATUTORY AUTHORITIES ..... 7
STATEMENT OF THE CASE ..... 8
A. General Overview Of TikTok's Personalized Feeds ..... 8
B. TikTok's Algorithmic Recommendation System ..... 11
1. Content Moderation ..... 11
2. Recommendation System ..... 13
3. Video Promotion ..... 15
C. TikTok's Recommendation System Reflects Human Editorial Values ..... 16
D. Tools To Help Parents Monitor And Manage Minors' Experience On The TikTok Platform ..... 19
E. Enactment Of SB976 ..... 20
F. The *NetChoice* Litigation ..... 23
G. TikTok's Follow-On As-Applied Challenge ..... 24
SUMMARY OF THE ARGUMENT ..... 26
STANDARD OF REVIEW ..... 28
ARGUMENT ..... 29
I. TIKTOK IS LIKELY TO SUCCEED IN ESTABLISHING THAT PERSONALIZED-FEED PROVISIONS VIOLATE THE SPEECH RIGHTS OF TIKTOK AND ITS USERS ..... 29
A. TikTok's Speech Compilations Are Subject To The Same First Amendment Protections As Traditional Speech Compilations ..... 29
1. TikTok's Algorithmic Recommendations Implement TikTok's Own Content-Based Editorial Judgments ..... 29
2. The District Court's Contrary Ruling Ignores TikTok's Platform-Specific Facts And Misconstrues Controlling Legal Precedents ..... 36

# TABLE OF CONTENTS
**(continued)**

**Page**


B. TikTok's Feeds Also Implicate The Expressive Rights Of Creators And Users ....................44

C. SB976's Historically Unprecedented, Content-Based Restrictions On The Speech Rights Of TikTok And Its Users Cannot Survive Any Level Of Heightened Scrutiny ....................46

1. SB976's Personalized-Feeds Restrictions Trigger Strict Scrutiny ....................46

2. The Personalized-Feed Provisions Fail Any Level of First Amendment Scrutiny ....................50

II. TIKTOK AND ITS USERS WILL FACE IRREPARABLE INJURY ABSENT AN INJUNCTION....................59

III. THE OTHER FACTORS FAVOR AN INJUNCTION PENDING APPEAL ....................60

CONCLUSION ....................62

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023) ....................................................................................34

*Am. Broad. Cos. v. Aereo, Inc.*,
573 U.S. 431 (2014) ............................................................................. 38, 43

*Ams. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) ....................................................................................50

*Anderson v. City of Hermosa Beach*,
621 F.3d 1051 (9th Cir. 2010) ......................................................................34

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998) ....................................................................................29

*Baird v. Bonta*,
81 F.4th 1036 (9th Cir. 2023) ......................................................................61

*Bay Area Peace Navy v. United States*,
914 F.2d 1224 (9th Cir. 1990) ......................................................................58

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) ............................................................................ passim

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*,
29 F.4th 468 (9th Cir. 2022) ........................................................................59

*Chiles v. Salazar*,
146 S. Ct. 1010 (2026) ........................................................................ 48, 50

*Cinevision Corp. v. City of Burbank*,
745 F.2d 560 (9th Cir. 1984)............................................................... passim

*Citizens United v. FEC*,
558 U.S. 310 (2010) ....................................................................................47

*Doe v. Harris*,
772 F.3d 563 (9th Cir. 2014).........................................................................60

*Free Speech Coal., Inc. v. Paxton*,
606 U.S. 461 (2025) ............................................................................. 48, 51

*Google LLC v. Bonta*,
No. 5:25-cv-09795 (N.D. Cal.) .....................................................................24

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Hernandez v. Sessions*,
872 F.3d 976 (9th Cir. 2017)....................................................................59

*Hou. Cmty. Coll. Sys. v. Wilson*,
595 U.S. 468 (2022)..................................................................................48

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group*,
515 U.S. 557 (1995)............................................................................ passim

*Kleindienst v. Mandel*,
408 U.S. 753 (1972).............................................................................. 44, 45

*M.P. ex rel. Pinckney v. Meta Platforms Inc.*,
127 F.4th 516 (4th Cir. 2025) ..................................................................33

*Meinecke v. City of Seattle*,
99 F.4th 514 (9th Cir. 2024) ............................................................ 29, 39

*Menotti v. City of Seattle*,
409 F.3d 1113 (9th Cir. 2005) ..................................................................57

*Meta Platforms Inc. v. Bonta*,
No. 5:25-cv-09792 (N.D. Cal.) ...............................................................24

*Miami Herald Publ'g Co. v. Tornillo*,
418 U.S. 241 (1974)..................................................................................29

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)............................................................................ passim

*Nat'l Ass'n of Wheat Growers v. Bonta*,
85 F.4th 1263 (9th Cir. 2023) ..................................................................53

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
585 U.S. 755 (2018)..................................................................................47

*NetChoice v. Bonta*,
761 F. Supp. 3d 1202 (N.D. Cal. 2024).....................................................23

*NetChoice, LLC v. Bonta*,
113 F.4th 1101 (9th Cir. 2024) ................................................................55

*NetChoice, LLC v. Bonta*,
152 F.4th 1002 (9th Cir. 2025) ......................................................... 22, 24

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*NetChoice, LLC v. Skrmetti*,
__ F.4th __, 2026 WL 2546423 (6th Cir. Aug. 28, 2026) .................................60

*Nken v. Holder*,
556 U.S. 418 (2009) .........................................................................................60

*Packingham v. North Carolina*,
582 U.S. 98 (2017) ...........................................................................................44

*Patterson v. Meta Platforms*,
239 N.Y.S.3d 726 (N.Y. App. Div. 2025) .......................................................32

*Porter v. Martinez*,
68 F.4th 429 (9th Cir. 2023) .............................................................................53

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) ................................................................................ 46, 47, 50

*Riley's Am. Heritage Farms v. Elsasser*,
32 F.4th 707 (9th Cir. 2022) .............................................................................60

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) ...................................................................................... 34, 40

*Stanley v. Georgia*,
394 U.S. 557 (1969) .........................................................................................44

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994) ............................................................................ 3, 29, 43, 46

*United States v. California*,
921 F.3d 865 (9th Cir. 2019).............................................................................29

*United States v. Playboy Ent. Grp., Inc.*,
529 U.S. 803 (2000) ...................................................................................... 54, 55

*United States v. Stevens*,
559 U.S. 460 (2010) ...................................................................................... 41, 49

*Vidal v. Elster*,
602 U.S. 286 (2024) .........................................................................................48

*Williams-Yulee v. Fla. Bar*,
575 U.S. 433 (2015) .........................................................................................59

## TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Wollschlaeger v. Governor, Fla.*,
848 F.3d 1293 (11th Cir. 2017) ....................53

*X Corp. v. Bonta*,
116 F.4th 888 (9th Cir. 2024) ....................46

**Statutes**

Cal. Health & Safety Code § 27000.5(a) .................... 21, 23, 58

Cal. Health & Safety Code § 27000.5(b).................... 22, 23, 48, 58

Cal. Health & Safety Code § 27000.5(e) ....................21

Cal. Health & Safety Code § 27000.5(f) ....................22

Cal. Health & Safety Code § 27001(a) .................... 21, 22, 48

Cal. Health & Safety Code § 27002(b)....................22

Cal. Health & Safety Code §§ 27000-07 .................... 1, 7, 21

**Other Authorities**

2024 Cal. Stats. ch. 321, SB 976, 2023-24 Reg. Sess. (Cal. 2024) ....................1

Consent Judgment, *In re Social Media Adolescent Addiction/Personal Injury Products Liability Litigation*, No. 4:22-md-03047-YGR (N.D. Cal. Aug. 26, 2026)....................53

**Rules**

Fed. R. App. P. 4(a)(1)(A) ....................7

## INTRODUCTION

Senate Bill 976 ("SB976") represents an unprecedented effort by government to exert control over expressive speech on the Internet. As SB976 itself recognizes, online platforms are "important" spaces for "communication and information sharing" in the modern age. 2024 Cal. Stats. ch. 321, SB 976, 2023-24 Reg. Sess. (Cal. 2024) (codified at Cal. Health & Safety Code §§ 27000-07), § 1(a). To make those connections, online platforms of all kinds use automated tools—like algorithms—to help curate the functionally infinite universe of online content and introduce users to new information, ideas, and artistic expression that they will likely find interesting, but would never otherwise find on their own. As the Supreme Court recently held, such "personalized feeds" are the "product of a wealth of choices about whether … to convey posts having a certain content," and those choices "in the aggregate … give the feed a particular expressive quality." *Moody v. NetChoice, LLC*, 603 U.S. 707, 738 (2024). SB976, however, would ban online platforms from providing personalized feeds to teen users absent verifiable parental consent. Despite the law's blatant restriction on the expressive choices platforms make in deciding how best to connect users with new content and new creators, the district court refused to enjoin SB976's personalized-feed restrictions on the remarkable ground that personalized feeds actually are *not expressive at all*. On the district court's logic, the government could regulate not just teen users'

feeds, but personalized feeds of all kinds for users of any age—it could ban Spotify from building playlists from listeners' past, fine the New York Times for recommending stories based on readers' expressed interests, or even prohibit a magazine from publishing an issue with its most popular essays. Such sweeping government control over speech should be unthinkable, but the district court's ruling contemplates no less.

For plaintiffs-appellants TikTok Inc. and TikTok USDS Joint Venture LLC[1] (collectively, "TikTok"), personalized feeds are especially crucial to their mission to "inspire creativity and bring joy." 4-ER-642. To achieve that objective, TikTok compiles its feeds in part through algorithms that not only identify content likely to be informative and/or entertaining to each user, but also implement a litany of editorial judgments about the kind of content TikTok *wants* to recommend. The judgments embedded in TikTok's algorithms include editorial preferences favoring, for example, content and creators new to the user, content that does not repeat subject matter the user recently viewed, content that is age-appropriate, and content TikTok chooses to promote for various reasons.

[1] On December 19, 2025, TikTok U.S. Data Security Inc., a subsidiary of TikTok Inc., filed certificates of conversion and formation with the Delaware Secretary of State, reflecting that it had converted to a limited liability company titled TikTok USDS Joint Venture LLC. This brief refers to TikTok U.S. Data Security Inc. and TikTok USDS Joint Venture LLC collectively as "TikTok USDS."

TikTok's feeds thus do *not* "respond solely to how users act online," merely "giving them the content they appear to want." *Moody*, 603 U.S. at 736 n.5. Such hypothetical feeds, too, would be expressive, but they are not *TikTok's* feeds. To the contrary, the record—which this Court must examine independently—conclusively establishes that TikTok's algorithms embody editorial judgments that may exclude or disfavor content a user is *most* likely to want. As TikTok expressly advises its users, "you may come across content in your For You and LIVE feeds that doesn't appear to be relevant to your expressed interests [because] we'll encourage you to explore different categories of content and creators through recommendations." 5-ER-955.

TikTok's choices about how it compiles speech are no less expressive than the same choices made by traditional publishers of speech compilations, such as parade organizers, *see Hurley v. Irish-American Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557 (1995), cable operators, *see Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994) (quotation omitted), and concert promoters, *see Cinevision Corp. v. City of Burbank*, 745 F.2d 560 (9th Cir. 1984). The only distinction is that TikTok uses algorithms to implement its editorial preferences at scale, rather than having individual human editors select each individual piece of content for each individual user. But that factual distinction makes no legal difference. As the Supreme Court held in *Moody*, online platforms' content-moderation decisions

were expressive even though they were implemented at scale by "algorithms" making "millions of … decisions each day" about how to apply content-moderation decisions in selecting specific content for specific users. 603 U.S. at 716. Likewise in *Cinevision*, this Court held that a concert promoter made expressive choices in staging a concert, even though the promoter did not even know, let alone personally select, the specific songs each performer would sing. 745 F.2d at 568.

As these and other precedents show, the First Amendment does not simply protect each of the individual messages a publisher chooses to include in a speech compilation. Those messages are already protected in themselves. Rather, the First Amendment protects the compilation *as a compilation*, meaning that the publisher's choices about what to include are as protected as each individual author's choices about what to say—in neither case can the government question the speaker's or publisher's reasons for their choices. *See infra* at 29-44. And that "principle does not change because the curated compilation has gone from the physical to the virtual world." *Moody*, 603 U.S. at 717. For both traditional media and online platforms, "government efforts to alter an edited compilation of third-party expression are subject to judicial review for compliance with the First Amendment." *Id.*

Because the district court wrongly refused to subject SB976 to such review, it did not consider whether the State can justify SB976's speech restrictions under the heightened First Amendment scrutiny they trigger. It cannot—either under the strict scrutiny that clearly applies, or under the intermediate scrutiny that the State incorrectly urges. TikTok agrees that there is a strong interest in protecting teen mental health, which is why TikTok provides extensive tools to teens and parents to help manage their use of the platform. The State, however, has shown no connection whatsoever between asserted teen health harms and personalized feeds. The evidence cited by the State to justify SB976 purports to show—at most—only that *social-media use in general* may be connected to teen mental health issues, not that *personalized feeds in particular* have anything to do with that asserted connection. And the personalized-feeds provisions are, in any event, nowhere close to the least restrictive alternative the State could employ to address alleged harms from social-media usage, as shown by the ready availability of numerous alternative, less-restrictive approaches to addressing such harms.

Given TikTok's clear likelihood of success in showing that SB976's personalized-feed restrictions violate its First Amendment right to compile its expressive feeds in the manner TikTok itself sees fit, TikTok, its users, and the broader public would suffer irreparable harm from enforcement of those restrictions. TikTok itself would suffer nonrecoverable tangible and intangible

costs to comply with SB976, but the harms to the public would be even greater. Any speech restriction is harmful to the public interest in itself, and here that harm would be especially acute, given the universally acknowledged importance of online platforms to facilitating the free flow of information and ideas. And platform users, in particular, would suffer, because the personalized feeds restricted by SB976 are critical to helping users avoid content they might find objectionable, offensive, and even painful. A feed generated only chronologically or by popularity, for example, may subject a minor who hates sports to an endless stream of NFL early-season highlights, or a teen rejected from their top choice college to Ivy Day surprise reaction videos, or a minor victimized by family abuse to constant news reports about the Clancy murder case. Enjoining SB976 while this challenge proceeds would avoid such harms.

The district court's order denying TikTok's motion for a preliminary injunction against SB976's enforcement should be reversed.

## JURISDICTIONAL STATEMENT

The district court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a) and the authority to grant legal and equitable relief under 42 U.S.C. § 1983, injunctive relief under 28 U.S.C. § 1651, and declaratory relief under 28 U.S.C. § 2201(a). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) over this appeal from an order denying a preliminary injunction. The

district court denied the preliminary injunction on August 5, 2026. 1-ER-12. TikTok timely appealed on August 11, 2026. 5-ER-991-994; *see* Fed. R. App. P. 4(a)(1)(A).

## ISSUES PRESENTED

1. Whether TikTok is likely to succeed in establishing that SB976 violates TikTok and its users' First Amendment rights, where

a. TikTok's personalized feeds, which reflect TikTok's content-based editorial preferences as well as user interests, are expressive and hence entitled to First Amendment protection;

b. SB976's speech restrictions trigger strict scrutiny because they are content-based, speaker-based, and historically unprecedented; and

c. SB976 cannot survive any level of heightened judicial scrutiny.

2. Whether the other preliminary injunction factors favor an injunction enjoining SB976.

## STATUTORY AUTHORITIES

Pursuant to 9th Cir. R. 28-2.7, the final version of California Senate Bill 976 (2024) (codified at Cal. Health & Safety Code §§ 27000-07), appears in the Addendum to this brief. *See infra* at A-1.

## STATEMENT OF THE CASE

TikTok is an online publisher of third-party content whose mission is "to inspire creativity and bring joy." 4-ER-642. TikTok pursues that mission by giving users a means for cultivating skills, pursuing passions, finding digital communities, and engaging with new ideas. 4-ER-609-610. TikTok's personalized feeds are a key aspect of how TikTok pursues its mission. 4-ER-610-612. TikTok's feeds are the product of a multiplicity of layered expressive judgments by TikTok about the kind of speech and expressive experience it wants to present.

### A. General Overview Of TikTok's Personalized Feeds

The TikTok experience centers on the "For You" feed, which is a dynamic compilation of third-party content assembled by the platform for each individual user. In this regard, TikTok differs materially from many other platforms. Instead of focusing on individuals' interactions with friends and family, TikTok focuses on promoting content made by creators with whom a user may not have a pre-existing relationship. 4-ER-610-611. This is the center of TikTok's intentional editorial curation, which fosters discovery and growth through a combination of user's personal preferences and its own editorial judgments favoring new connections with new content and creators, non-repetitive content, age-appropriate content, and the like. *See infra* at 16-19. TikTok's curation process may, for example,

introduce a teenager with expressed interest in scientific topics to previously unfamiliar creators like Chem Teacher Phil, an educational creator who teaches basic chemistry concepts. 4-ER-740-757. Or it may help people with particular backgrounds or identities find welcoming and supportive communities. *See* 4-ER-758-764. Users can also be connected with politicians, from Representative Brandon Gill of Texas to Senator Bernie Sanders of Vermont, and keep informed on the latest political news. In the 2024 U.S. presidential election, both major presidential tickets used TikTok as an important avenue to communicate their messages to the public. 4-ER-666-738.

Underlying all of the new and diverse connections TikTok seeks to establish is an understanding that each user has her own unique collection of diverse interests. TikTok's personalized recommendation system not only seeks to identify those interests to select content users will find informative and/or entertaining, but also applies TikTok's own content preferences and values in seeking to identify content appropriate for that user. *See infra* at 16-19. The system thus implements TikTok's core editorial objectives of connecting individuals, creating communities, and inspiring creativity among content creators and bringing joy to those who discover and benefit from their content. 4-ER-610-612.

In TikTok's view, personalizing each user's feed is essential to providing a coherent and valuable viewing experience on the platform. TikTok serves more than 170 million monthly U.S. users and roughly one billion users worldwide. 4-ER-610. In 2025 alone, users in the United States uploaded more than 7 billion videos, which were viewed more than 17 trillion times in the United States and abroad. *Id*. TikTok's personalized feeds allow TikTok to sift through content on a scale many times larger than any individual humans could manage on their own, and to recommend videos that are consistent with the user's own particular diverse interests and with TikTok's editorial preferences, which include avoiding content a user may find highly objectionable. *See infra* at 11-19.

Several other TikTok feeds similarly account for both TikTok's expressive choices and user-expressed interests, including the Following feed, Friends feed, Stories Skylight, LIVE feed, Search feed, STEM feed, Explore feed, and Comment feed. 4-ER-611-612. Personalization enhances the user experience and allows TikTok to better assist individuals to connect with new friends, creators, and content that matches their intentions and preferences. For instance, if an individual asks the Search feed for "Mercury" videos, that could mean clips about new discoveries about the planet, the mythology underlying the Roman messenger god, experiments using the element, or singer Freddie Mercury. In deciding what would be responsive, TikTok considers, among other things, whether the

individual has previously expressed greater interest in one of those things compared to the others. 4-ER-611-613. Similarly, the personalized STEM feed, which displays content related to science, technology, engineering, and math for individuals of all ages, might recommend videos about physics instead of coding tutorials to a given user, based on the preferences that user has expressed through prior interactions. 4-ER-611-612.

### B. TikTok's Algorithmic Recommendation System

To implement its personalized curation and recommendations at the massive scale necessitated by the volume of available content, TikTok uses a closely-integrated system comprising (1) content-moderation; (2) recommendation; and (3) promotion and filtering. 4-ER-612; 4-ER-620-623. At each step, TikTok engineers, product managers, policy experts, and data scientists make decisions about the kind of content and expressive experience TikTok wants to share. 2-ER-53-58; 2-ER-73; 4-ER-620-623.

#### 1. *Content Moderation*

TikTok's Community Guidelines, which are written and revised by TikTok employees in consultation with outside experts, define both what content is permitted on the platform and what narrower subset is eligible for recommendation in the For You feed. 4-ER-620-622; *see* 4-ER-765-818. These Guidelines express TikTok's desire to encourage kindness and respect, honor local cultures, and

support free expression. 4-ER-621. To that end, the Guidelines prohibit, among other things, (i) threats, (ii) hate speech, hateful behavior, or promotion of hateful ideologies; (iii) certain types of body exposure and sexualized behavior, like nudity; and (iv) trading, marketing, or providing access to regulated, prohibited, or high-risk goods and services, like firearms and regulated substances. *Id*.

Content moderation is "founded on value-based judgments," with "employees deciding what content-moderation processes to adopt and maintain," and then "implementing them through processes that include both human and automated review." 4-ER-605-606. This content moderation directly influences what is eligible for recommendation within the For You feed; if a video is deemed to be in violation of TikTok's Community Guidelines by a human moderator, the video can be removed outright or deemed ineligible for the personalized recommendation system. 2-ER-70-71.

TikTok's content moderation is not a simple threshold "yes" or "no" to inclusion on the platform. To the contrary, content moderation plays an essential downstream role within the algorithms that compile specific feeds. During the content-moderation process, a video may be tagged in a way that affects how it is ranked in the recommendation system. 2-ER-71-72; 2-ER-58.

This integrated process enables the algorithms to identify content a user may want to see, but also enables algorithms to *avoid* selecting content a user likely will

not want to see—or in TikTok's view, should not see. For example, a highly newsworthy incident involving violent events can become the subject of millions of videos, which may be tagged so that the algorithms disfavor them for certain users' feeds, such as users whose prior interactions show primary interest in lighthearted entertainment, or who exhibit a particular aversion to violence, or who TikTok considers too young for such content, or any number of other user-specific factors. Absent personalization, TikTok's recommendation system could not identify users for which such content should be excluded or disfavored. 6-ER-1020, 1022; *see* 2-ER-71-72. In this respect, algorithmic recommendations are directly influenced by and intertwined with TikTok's content moderation decisions to implement TikTok's editorial judgments about whether and how to avoid subjecting users to content they affirmatively do not want to see. 2-ER-58.

2. *Recommendation System*

Humans design, revise, and control TikTok's recommendation system to select from among content approved by the content moderation system, including tags applied by that system. 2-ER-53-56. The purpose of the recommendation system is to identify content for each user that is consistent with TikTok's values and likely to be informative and/or entertaining to that user. 4-ER-612. The system does not merely route videos from one point to another with no exercise of discretion over what videos to recommend. Nor does it operate merely through a

single rigid criterion of likely user interest. Rather, the system employs a multiplicity of factors, including *but not limited to* a person's previous interactions with content on the platform. *Id*.

The factors considered by TikTok include not only actions taken by a user (e.g., liking, commenting, or searching for content), but also characteristics of the users and the videos themselves. 4-ER-612-614. Of course, if a user "likes" or comments on a video, TikTok will consider the user's reaction to the video. 4-ER-612-613. But TikTok will also consider more complex aspects of a user's information, including certain account and device signals. If, for instance, a country setting is updated to France and an individual starts watching French-language videos about restaurants near the Champs-Élysées, TikTok could present the person with videos about upcoming events in Paris. 4-ER-613. Finally, TikTok affirmatively evaluates characteristics about a video, including its quality, subject matter, creator, captions, soundtrack, and hashtags, to ensure that the content presented to a user is high quality, promotes TikTok's values, and aligns with the user's interests. 4-ER-612-613.

All of these human-determined factors influence the algorithmic recommendations, which implement TikTok's editorial decisions at scale. For example, if a user does not show positive engagement with sports, instead preferring to engage with educational creators, that user is unlikely to see a video

from an FC Barcelona player, notwithstanding that player's global popularity. 4-ER-613. This is no different from a cable channel deciding to promote certain shows because of their popularity and engagement among its audience and deciding to relegate other shows to odd hours. Popularity and audience preferences are always very important factors, but they are by no means the only factors. Equally significant is the exercise of editorial judgment about how to respond to those factors.

As discussed in more detail below, the recommendation system also incorporates various of TikTok's own editorial preferences in selecting from among the many possible videos a user might find interesting. *See infra* at 16-19.

3. *Video Promotion*

TikTok's feeds also include content TikTok employees have hand-selected for promotion. 4-ER-622-623. TikTok employees may choose to promote certain videos associated with notable events—for example, a Super Bowl clip on Super Bowl Sunday, or a Taylor Swift video around an album release. 4-ER-622-623. Or they may choose to promote a video or videos on a particular subject matter in pursuit of an effort to grow a viewership base interested in that subject—TikTok employees may choose to promote content popular in a demographic TikTok wants to expand, for example. 2-ER-47-48. Every U.S. promotion campaign is reviewed and approved or rejected by a U.S.-based reviewer at TikTok USDS. 4-ER-622-

623. Those reviewers assess whether a campaign advances the platform's editorial objectives, including emphasizing quality, safeguarding an authentic experience, and protecting brand safety, and they seek to elevate content that is original, educational, trustworthy, current, positive, and high quality. 4-ER-622-623.

But video promotion remains sensitive to the identified interests of users: TikTok might choose to promote videos about a significant mixed-martial arts event, but it would do so primarily to users who have shown interest in such events, and would avoid recommending to users who would find MMA objectionable. *See* 4-ER-623. In this way, TikTok's content moderation system, recommendation system, and video promotion all work together to create an individual's TikTok feeds.

### C. TikTok's Recommendation System Reflects Human Editorial Values

TikTok's personalized feeds primarily comprise two components, and humans govern the creation and implementation of both. One component is "models," which use machine-learning techniques to make predictions based on human-selected objectives. 2-ER-53. The other is "rules," which are explicit, human-written instructions that fill gaps in the models. *Id.*; *see* 2-ER-73.

TikTok employees not only write the rules, they also decide what objectives the models optimize for, which signals the system considers, how the models prioritize each factor, what safeguards and filters to apply, and how those factors

interact with safety and quality objectives. 2-ER-53-54. Engineers physically write the code that tells a model what to optimize for, then monitor and retrain the model to test whether the chosen parameters achieved the intended objective. *Id.*

Crucially, TikTok employees program and manage the algorithms to recommend content that is much more than solely the product of individual preferences. 2-ER-79-86. The system considers not only the user's own viewing activity to identify content the user likely will find interesting, it also implements numerous other content-based editorial judgments in evaluating and selecting videos. *Id*. These judgments—which apply independently of, and sometimes conflict with, users' preferences—include:

- excluding or disfavoring certain content identified as inappropriate for teen users and creators, 6-ER-1022;
- seeking to introduce users to new content and new creators they have not previously engaged with, 2-ER-54;
- favoring "dispersal" by rejecting content with subject matter similar to content recently viewed by the user, 2-ER-55;
- favoring content selected by TikTok for promotion, *see supra* at 15-16, while ensuring such promoted content is consistent with users' likely interests, 2-ER-47-48; 4-ER-623;

- favoring content with higher-quality production value over lower-quality content, 4-ER-614; and
- favoring recent content over older content, 2-ER-54-55.

To ensure adherence to TikTok's objectives, the engineering team constantly monitors the system and its outputs, making adjustments where the outputs do not align with TikTok's goals. 4-ER-615; 2-ER-55-57. As just one example, the recommendation system was updated more than *900 times* in January 2026 alone. 2-ER-55.

The record in this case includes one especially illustrative example of the editorial judgments continuously applied in managing the algorithms. In 2021, TikTok began receiving feedback that some users were experiencing "rabbit holes," i.e., seeing repeated content on a single topic in which they had expressed interest. 2-ER-56-57. TikTok managers determined that even though users may very much want to see such content, the dynamic was inconsistent with TikTok's editorial objectives, so engineers adjusted—and continue to monitor—the algorithm to ensure that videos on any one topic are "dispersed." 2-ER-55-57. This experience exemplifies TikTok's use of its algorithms to implement its longstanding editorial judgment that connecting users to new content and previously-unfamiliar creators is superior to woodenly parroting back "content similar to posts with which the user previously engaged." *Moody*, 603 U.S. at 746

(Barrett, J., concurring). That judgment applies even when users very much want to see content on that particular topic.

To this day, TikTok advises users that "[o]ur recommendation system is built to help people discover and enjoy a wide range of content—not just the same kinds of videos over and over." 4-ER-809. TikTok likewise makes clear to users that "you may come across content in your For You and LIVE feeds that doesn't appear to be relevant to your expressed interests [because] we'll encourage you to explore different categories of content and creators through recommendations." 5-ER-955.

### D. Tools To Help Parents Monitor And Manage Minors' Experience On The TikTok Platform

TikTok has created a suite of features to enable teens to control, and their parents to supervise, their experience on TikTok. 4-ER-625-634. For example, parents can link their account to their teen's account, allowing the parents to limit daily screen time on the platform; see summaries of their teen's screen time; decide who can see or comment on their teen's videos; and determine whether their teen's account can be recommended to others. 4-ER-625-626. TikTok also requires certain mandatory settings for teenagers (which can be enabled by adult individuals if desired): accounts are private for those who register as under the age of 16, daily screen time is limited for those who register as under 18, and push notifications are disabled for certain time periods (push notifications are muted by system default

from 9 p.m. to 8 a.m. for registrants ages 13 to 15 and from 10 p.m. to 8 a.m. for registrants ages 16 to 17). 4-ER-625-629. TikTok also provides a Well-Being Guide that encourages people to assess how their digital habits impact their physical and mental health, and includes resources and prompts to help them do so, as well as Safety Centers that include information on topics like tragic event support and countering hate speech and behavior. 4-ER-633-634.

Parents can also use any of the many other parental control tools offered by cellular and broadband providers, internet browsers, third-party software developers, and others that enable parents to ensure their teens use social media or other platforms safely and consistent with each individual family's preferences. 4-ER-819-843; 5-ER-845-860. For example, Samsung phones and tablets allow parents to set limits on app usage, restrict access to certain content, and lock their child's device during certain hours. 5-ER-862-863. And third-party software programs like Aura allow parents to set screen time limits, schedule downtime, block certain apps, and receive reports on their teens' social behavior patterns online (e.g., their "engagement style" and the "volume and tone" of online interactions). 5-ER-869-871.

### E. Enactment Of SB976

California's Protecting Our Kids from Social Media Addiction Act ("SB976" or the "Act") recognizes that "[s]ocial media provides an important tool

for communication and information sharing." 2024 Cal. Stats. ch. 321, SB 976, 2023-24 Reg. Sess. (Cal. 2024) (codified at Cal. Health & Safety Code §§ 27000-07), § 1(a). The Act nonetheless deems any digital feed that takes into account information provided by an individual—including information about their content preferences and certain information about their devices— automatically "addictive," regardless of actual usage. The Act defines an "addictive feed" as an "online service, online application, or mobile application, or a portion thereof, in which multiple pieces of media generated or shared by users are, either concurrently or sequentially, recommended, selected, or prioritized for display to a user based, in whole or in part, on information provided by the user, or otherwise associated with the user or the user's device." § 27000.5(a).[2] Based on that assumption, the Act restricts online platforms' freedom to provide personalized feeds to minors in three ways.

First, SB976 categorically forbids covered internet-based services or applications from "provid[ing]" a personalized feed to any minor "unless … [t]he

[2] Feeds are exempt from that definition when at least one of seven conditions is met, including that information is not persistently associated with a user or their device and does not concern the user's previous interactions with media; the user expressly and unambiguously requested the specific media; or the recommended media is exclusively the next in a preexisting sequence and not automatically played. *Id.* § 27000.5(a)(1)-(7).

operator has obtained verifiable parental consent." § 27001(a).[3] Second, it requires covered online services to limit minors' access to personalized feeds to "one hour per day unless modified by a parent." § 27002(b)(2). Third, the Act requires that a covered online service provide a mechanism for a parent to set the "default feed" shown to a minor to "one in which pieces of media are not recommended, selected, or prioritized for display based on information provided by the user, or otherwise associated with the user or the user's device, other than the user's age or status as a minor." § 27002(b)(4). Together, these "personalized-feed provisions" prohibit TikTok from displaying any personalized feeds to any teens absent parental consent. And even when parents do consent, the provisions limit the time each day a teen may access personalized feeds, unless that, too, is modified by a parent.

Notably, SB976 does not apply to all entities that offer a personalized feed—certain entities can provide personalized feeds without fear of sanction. The Act does not apply to any "online service, online application, or mobile application,

[3] The Act defines an "Operator" as "a person who operates or provides an internet website, an online service, an online application, or a mobile application," § 27000.5(e); a "Minor" as "an individual under 18 years of age who is located in the State of California," § 27000.5(d); and "Parent" as a "parent or guardian," § 27000.5(f). Until January 1, 2027, this requirement applies only to users the operator knows are minors. *See* § 27001(a)(1). But after that date, the Act requires Operators to "reasonably determine[]" that a user is not a minor. *Id.* Doing so will require verifying users' age, which will affect *all* users, not just minors. *See NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1018-19 (9th Cir. 2025) (age verification challenges not yet ripe).

including, but not limited to, a 'social media platform'" that does not offer a personalized feed "as a significant part of the service provided by that internet website." § 27000.5(b). It does not apply to personalized feeds that do not involve user-generated content. §27000.5(a). And it does not apply to websites or applications on which "interactions between users are limited to commercial transactions or to consumer reviews." § 27000.5(b)(2). The only evident justification for this differential treatment is that the content provided by the exempt personalized feeds is less likely to be as engaging or "addictive" as the personalized feeds TikTok provides.

### F. The *NetChoice* Litigation

After SB976's enactment, NetChoice sued to enjoin the Act's enforcement and sought a preliminary injunction, which was granted in part and denied in part. *See NetChoice v. Bonta* ("*NetChoice I*"), 761 F. Supp. 3d 1202, 1232 (N.D. Cal. 2024). As to the personalized-feed provisions, the district court held that NetChoice lacked associational standing to bring its as-applied challenge because every member's feed differed. *Id.* at 1219-23, 1230-31. This Court agreed that NetChoice lacked associational standing because each of NetChoice's members' "unique" feeds was different, and thus a First Amendment challenge to SB976 required platform-specific evidence to determine whether a particular feed

implements "expressive" choices. *NetChoice, LLC v. Bonta* ("*NetChoice III*"), 152 F.4th 1002, 1014 (9th Cir. 2025).

### G. TikTok's Follow-On As-Applied Challenge

In recognition of this Court's ruling, TikTok and two other platforms filed suit after *NetChoice III* in the same district court, asserting platform-specific First Amendment challenges to SB976's personalized-feed provisions. ECF No. 1; *see Google LLC v. Bonta*, No. 5:25-cv-09795 (N.D. Cal.); *Meta Platforms Inc. v. Bonta*, No. 5:25-cv-09792 (N.D. Cal.). Shortly thereafter, TikTok (like the other platforms) moved for a preliminary injunction. ECF No. 20. Pursuant to the instruction in *NetChoice III* to develop the facts concerning its own "unique" feed, TikTok introduced multiple declarations from TikTok's senior engineers and managers explaining exactly how TikTok develops its feeds, including a detailed recitation of the content-based editorial judgments TikTok implements through its recommendation algorithms, and how TikTok engineers constantly supervise and adjust the algorithms to ensure that the content of users' feeds reflect those judgments. *See supra* at 11-19. The State in response did not contest *any* of the facts set forth in TikTok's employee declarations.

On August 5, 2026, the district court denied the motions. Like the State, the court did not contest any of the platform-specific evidence showing how TikTok's feeds are compiled or how they implement multiple editorial preferences in

selecting content for each user. The court nevertheless held that TikTok and the other platforms' personalized feeds are inherently non-expressive and hence entitled to no First Amendment protection at all. 1-ER-16-27.

In the district court's view, a feed comprising content that is likely to be "interesting" to users lacks expressive value. TikTok does not make its own "decisions about what content will be 'interesting.'" 1-ER-17. Rather, TikTok "merely rel[ies] on predictive modelling to assess what users' characteristics and history on the platform suggest will keep these same users engaged." *Id.* In other words, TikTok employees "themselves are not making any determination of what is 'interesting' when they rely on this predictive modelling," but instead "are relying on an algorithmic function to make the determination of what is 'interesting,' divorced from any understanding of the underlying content." 1-ER-18. "This decision is not an 'expressive' message," the court held, but is instead "merely a mirror that reflects back to users their own perceived interests." 1-ER-17.

As the court clarified in its order denying an injunction pending appeal, its holding was categorical: *any* platform's "decision to rely on users' characteristics and history on platforms to reflect back to them their own perceived interests is not an expressive message." 1-ER-6; *see id.* ("personalized feeds merely reflect back to users their revealed preferences and are therefore not expressive"). The court's

analysis is thus not limited to the particular restrictions imposed by SB976, the particular platforms challenging it in this case, or the record before it. The reasoning instead is universal: any publisher's decision to compile speech based on audience preferences is a non-expressive mirror of the *audience's* values, not an expressive statement by the publisher of its *own* judgment about the value of the speech. Merely offering a personalized feed of any kind thus can be subject to regulation and punishment by the government, with no judicial scrutiny under the First Amendment whatsoever.

TikTok promptly appealed the order and moved for an injunction pending appeal, which remains pending before this Court as of this filing. *See TikTok Inc. v. Bonta*, No. 26-5121 (9th Cir.), ECF No. 6.

## SUMMARY OF THE ARGUMENT

I. A. TikTok's personalized feeds unquestionably are expressive and hence entitled to full First Amendment protection. At this stage, of course, TikTok need only show that it is likely to establish that premise, which it easily will. Under a longstanding line of Supreme Court and Ninth Circuit precedent, speech compilations in general—anthologies, parades, concerts, theaters—constitute their own distinctive speech products because they embody the compiler's own protected choices about what content to include in the compilations, and why. The same is true for online speech compilations, which differ only in that publishers

use automated tools to help make the same decisions at massive scale. The fact that online publishers must make many such decisions—millions or billions—and provide many feeds rather than a single edition, does not make them any less expressive.

While any such compilation constitutes protected speech, even if they make publication decisions only or mainly in response to user preferences, TikTok's personalized feeds do not operate that way. They instead implement multiple human-determined editorial preferences favoring certain types of content over others. No matter what standard is applied to determine when a speech compilation is "expressive," TikTok's personalized feeds qualify.

The district court's contrary conclusion rests on the premise that TikTok's feeds are merely a "mirror" of users' own expressed interests, and implement no editorial judgments of TikTok's own. That premise is unambiguously false: the court's decision inexplicably ignores the undisputed evidence showing that TikTok's algorithms implement multiple editorial judgments about the kind of content TikTok wants to convey. The court also misconstrues or ignores the key precedents applicable to First Amendment protection for speech compilations, including *Moody*, *Hurley*, *Cinevision*, and others.

B. Because TikTok's personalized feeds are expressive, they trigger First Amendment protection. And because SB976's restriction of those feeds is content-

based, speaker-based, and historically unprecedented, it triggers strict scrutiny. But no matter what level of scrutiny is applied, SB976's personalized-feed restrictions fail. The State has a strong interest in protecting minors' mental health, but it has not shown that personalized feeds in particular have any connection to that asserted problem, let alone a constitutionally sufficient connection. SB976's personalized-feed restrictions also are not narrowly tailored to serving that interest, and instead burden much more speech than is necessary to achieve the State's goal, as shown by the many alternative means available to the State to avoid or reduce alleged mental health harms from social-media overuse.

II. Given TikTok's likelihood of success in establishing that SB976 violates its First Amendment rights, irreparable harm to TikTok follows inexorably.

III. The same is true for the remaining injunctive factors: it is strongly in the interest of the public (including the State itself) to enjoin SB976's likely unlawful restriction on the free flow of expressive ideas, information, and entertainment to and from California residents.

## STANDARD OF REVIEW

The Court reviews the denial of a preliminary injunction for abuse of discretion, but a "district court's interpretation of the underlying legal principles … is subject to de novo review and a district court abuses its discretion when it makes an error of law." *United States v. California*, 921 F.3d 865, 877-78 (9th Cir.

2019). Further, in "First Amendment cases," this Court "make[s] an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024) (quotation omitted).

## ARGUMENT

## I. TIKTOK IS LIKELY TO SUCCEED IN ESTABLISHING THAT PERSONALIZED-FEED PROVISIONS VIOLATE THE SPEECH RIGHTS OF TIKTOK AND ITS USERS

### A. TikTok's Speech Compilations Are Subject To The Same First Amendment Protections As Traditional Speech Compilations

#### 1. *TikTok's Algorithmic Recommendations Implement TikTok's Own Content-Based Editorial Judgments*

The Supreme Court and this Court have long recognized that First Amendment protections apply not only to first-party speech, but also to the "exercise of editorial control and judgment" in compiling third-party speech for publication. *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974). Television programmers and cable operators thus are entitled to First Amendment protection because they "engage in and transmit speech" in "exercising editorial discretion over which stations or programs to include." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636-37 (1994) (quotation omitted); *see Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998). Concert promoters are entitled to First Amendment protection when they make choices about who will perform. *See*

*Cinevision Corp. v. City of Burbank*, 745 F.2d 560, 568 (9th Cir. 1984). And the First Amendment protects parade organizers in deciding who may participate and speak in their parades. *See Hurley v. Irish-American Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 569 (1995).

As the Supreme Court explained in *Hurley*, a party responsible for "combining multifarious voices" is entitled to First Amendment protection from laws that seek to regulate how the party chooses *which* voices to include. *Id.* at 569. That protection derives from the "fundamental rule" of the First Amendment that the "speaker has the autonomy to choose the content of his own message." *Id.* at 573. Applied in the context of a speech compilation, the rule of "speaker's autonomy" protects the compiler's right to choose what speech to include, without regard to whether the choices collectively convey any "narrow, succinctly articulable message." *Id.* at 569.

The compiler's choices are also protected without regard to whether the compiler endorses—or is even aware of—each particular message conveyed within the compilation. In *Cinevision*, for example, this Court held that a concert promoter engaged in expressive conduct in staging a concert with multiple performers, even though the promoter "did not know specifically what songs each performer would sing." 745 F.2d at 568. It "would be anomalous to require a promoter to know exactly what songs an entertainer will sing before any first

amendment rights attach," the Court emphasized, "just as it would be to require a bookseller to read all of the books he plans to sell or a theater owner to view all of the movies he intends to show." *Id.*

Under the rule of speaker's autonomy, the speech compiler itself—the bookseller, theater owner, parade organizer, television programmer—is solely responsible for choosing which speech to select, why, and how. And the government cannot second guess those choices any more than it can second guess an author's story choices or a painter's color choices. *See infra* at 30-33.

The same principles necessarily apply to online expression. As the Supreme Court explained in *Moody*, online platforms "are in the business, when curating their feeds, of combining multifarious voices to create a distinctive expressive offering." 603 U.S. at 738 (cleaned up). Like a traditional speech compilation, an online platform's feed is a "product of a wealth of choices about whether … to convey posts having a certain content," and those choices "in the aggregate … give the feed a particular expressive quality." *Id.* In other words, "[d]eciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own" that "results in a distinctive expressive product." *Id.* at 731. The distinctiveness in expression is self-evident from the differences among different

platforms—a user's Facebook feed will have very different content from her Bluesky feed, which will have very different content from her X feed, and so on.

The expressive nature of online feeds is not undermined by their use of algorithms to curate the many millions of videos, pictures, and messages posted every day. In *Moody*, the Supreme Court held that online platforms' content-moderation decisions were expressive even though they were implemented at scale by "algorithms" making "millions of … decisions each day" about how to apply content-moderation decisions in selecting specific content for specific users. 603 U.S. at 716. The same is true for "content-recommendation algorithms," which "are simply tools used by [online platforms] to accomplish a traditional publishing function, made necessary by the scale at which providers operate." *Patterson v. Meta Platforms*, 239 N.Y.S.3d 726, 733-34 (N.Y. App. Div. 2025). "Given the immense volume of content on the Internet, it is virtually impossible to display content without ranking it in some fashion," and the ranking executed through an algorithm "represents an editorial judgment of which content a user may wish to see first." *Id.* As the Fourth Circuit has explained, "a newspaper company does not cease to be a publisher simply because it prioritizes engagement in sorting its content," and the same is true for an online platform: the "fact that Facebook uses an algorithm to achieve the same result of engagement does not change the underlying nature of the act that it is performing." *M.P. ex rel. Pinckney v. Meta*

*Platforms Inc.*, 127 F.4th 516, 526 (4th Cir. 2025). *M.P.* construed § 230 of the Communications Decency Act, but the same principle applies here: "Decisions about whether and how to display certain information provided by third parties are traditional editorial functions of publishers, notwithstanding the various methods they use in performing that task," including automated methods like algorithms. *Id.*

To be sure, *Moody* left open the narrow question whether this analysis applies to *one particular type* of algorithmic feed, i.e., "feeds whose algorithms respond *solely* to how users act online—giving them the content they appear to want, without any regard to independent content standards," *id.* at 736 n.5 (emphasis added), such as "content similar to posts with which the user previously engaged," *id.* at 746 (Barrett, J., concurring). Although that question is not actually presented here, *see infra* at 34-35, it is easily answered: a hypothetical algorithm programmed solely to respond to perceived user preferences would still be subject to First Amendment protection, because it would reflect the platform's own "choices about what third-party speech to display." *Moody*, 603 U.S. at 716. And as this Court and the Supreme Court have recognized, the First Amendment protects editorial judgments about how to respond to a customer's expressive preferences—otherwise, the First Amendment would not "protect painting by commission, such as Michelangelo's painting of the Sistine Chapel." *Anderson v.*

*City of Hermosa Beach*, 621 F.3d 1051, 1062 (9th Cir. 2010) (First Amendment protects tattoo artist's designs responding to customer requests); *see 303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) (First Amendment protects website designer's decisions about how to address customer preferences); *see also infra* at 49-50. Indeed, speech "can be more effective" when the speaker "know[s] the background and... preferences" of their audience, which will influence "how best to present a particular … message." *Sorrell v. IMS Health Inc*., 564 U.S. 552, 558 (2011). In short, a speaker's right to consider audience preference in developing her speech is just as protected as her right to consider any other factor in deciding what to say.

Although the question *Moody* nominally left open should all but answer itself, that question is not actually presented here, because TikTok's algorithms do *not* solely respond to user interests. As explained above, the algorithms indisputably apply many "independent content standards" (*Moody*, 603 U.S. at 736 n.5) *other than* merely selecting videos a user will want to see. *See supra* at 16-19. Indeed, the algorithms will exclude or disfavor even videos a user might *most* want to see—if they are, for example, age-inappropriate, too repetitive, or too familiar for a given user, and so on. *See id.* A TikTok algorithm thus is decidedly *not* one that "just presents automatically to each user whatever the algorithm thinks the user will like." *Moody*, 603 U.S. at 746 (Barrett, J., concurring). To the contrary, as illustrated by the "rabbit holes" experience, TikTok continually manages its

algorithms to ensure they implement its editorial judgments, which extend far beyond—and sometimes conflict with—a particular user's immediate gratification. *See supra* at 18-19.

On this record, this Court's decision in *NetChoice III* makes TikTok's success in this appeal all but inevitable. Reiterating the narrow question left open in *Moody*, the Court in *NetChoice III* observed that "the unique design of each platform and its algorithm affects whether the algorithm at issue is expressive," and it suggested a factual basis for distinguishing between expressive and non-expressive algorithms. 152 F.4th at 1014. On the one hand, the Court explained, "the more an algorithm implements human editorial directions, the more likely it is to be expressive for First Amendment purposes," because such an algorithm "is not unlike traditional media curated by human editors." *Id.* "On the other hand," the Court continued, "an algorithm that responds *solely* to how users act online, *merely* giving them the content they appear to want, probably is not expressive." *Id.* (quotations and alterations omitted; emphasis added). The Court accordingly held that individual as-applied challenges were required to develop platform-specific facts as to the "unique design" of each platform's algorithm, and specifically whether it solely responds to user preferences. *Id.*

The platform-specific record developed here conclusively answers that question: TikTok's algorithms do *not* merely give its users content they appear to

want, but instead implement multiple independent editorial judgments in determining *how* to address those preferences. *See supra* at 11-19. As a result, TikTok's feeds are expressive under the standard suggested in *NetChoice III*. And they are certainly expressive under the rule of speaker's autonomy enunciated in *Hurley* and applied in cases like *Moody*, *Tornillo*, and *Cinevision*. TikTok is thus very likely to succeed in showing on appeal that it makes expressive choices in deciding how to personalize its speech compilations for each user.

2. *The District Court's Contrary Ruling Ignores TikTok's Platform-Specific Facts And Misconstrues Controlling Legal Precedents*

The district court did not dispute the foregoing facts about the "unique design" (*NetChoice III*, 152 F.4th at 1014) of TikTok's algorithms. It simply ignored them. As the court clarified in its order denying an injunction pending appeal, its holding was categorical: any platform's "decision to rely on users' characteristics and history on platforms to reflect back to them their own perceived interests is not an expressive message." 1-ER-6; *see id.* ("personalized feeds merely reflect back to users their revealed preferences and are therefore not expressive").

According to the district court, TikTok and the other platforms make no "expressive judgment" when they compile speech using "predictive algorithms," because an algorithm "is merely a mirror that reflects back to users their own perceived interests." 1-ER-17. In the court's view, the supposed "mirror" is non-

expressive because the platforms themselves do not decide what *they* think is "interesting," but instead leave that determination to algorithm-based predictions of what *users* think is "interesting." 1-ER-16-17; *see supra* at 24-26 (summarizing district court's Order).

To illustrate the point, the court tried to distinguish the platforms' algorithmic feeds from their content-moderation systems, which in the court's view do involve decisions with "a moral valence" determined by the platform itself. 1-ER-25-26. By contrast, the court asserted, no such "moral valence" is involved in "personalization efforts based on users' data." *Id*. As an "example," the court observed that online platforms "do not decide to show a user a series of cat videos because their top-level decisionmakers think that cats are 'good' animals or that something about the cats showcased makes the videos especially fun to watch." 1-ER-26. "In fact," the court emphasized, a platform's "inclusion of this message has nothing to do with whether its boardroom believes cats are good or bad, or holds a view on cats at all for that matter." *Id.* Rather, the algorithms recommend cat videos (or any other content) because they supposedly compile only "content that 'will be interesting' *to users*," rather than to the platforms themselves. *Id*. Because the feeds supposedly "merely reflect back to users their revealed preferences"—rather than a platform's *own* content preferences—they are "not expressive." 1-ER-6. They instead "serve as 'passive receptacle[s]' of third-party

speech or as 'dumb pipes' that merely emit what they are fed." 1-ER-19 (quoting *Moody*, 603 U.S. at 782 (Alito, J. concurring) (citing *Am. Broad. Cos. v. Aereo, Inc.*, 573 U.S. 431, 458 (2014) (Scalia, J., dissenting)).

Every step in that analysis is contrary to the undisputed factual record, the controlling legal precedents, or both.

*First*, the court's entire discussion rests on the categorically false premise that TikTok's feeds act as a "mirror" that does nothing more than "reflect back" users' own preferences, without implementing any independent editorial judgments by TikTok. The record shows exactly the opposite: TikTok's algorithms do *not* select content based solely on a user's perceived interest, but implement multiple content-based editorial standards to identify content *TikTok* wants to select for that user, including content by creators that are new to the users, content that is age-appropriate for the user, content with subject matter not recently viewed by the user, and content that advances other editorial objectives, such as expanding viewership among particular demographics. *See supra* at 11-19. Indeed, the algorithms will actively *exclude or disfavor* content the user may very much want to see, if that content is inconsistent with the foregoing editorial standards. *Id.*

Those platform-specific facts about TikTok's algorithms developed in response to *NetChoice III* should be dispositive under that decision, as well as under *Moody* and other precedents, as shown above. *See supra* at 29-36. The

district court did not disagree with any of those facts, but simply omitted mention of them. This Court, however, has its own duty to conduct "an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *Meinecke*, 99 F.4th at 521 (quotation omitted). That independent examination will confirm the many editorial judgments embedded in TikTok's algorithms and hence the fundamentally expressive character of its personalized feeds.

*Second*, the district court's demand for a "moral valence" in TikTok's particular publication choices likewise misunderstands TikTok's algorithms. More tellingly, it misunderstands the First Amendment itself.

As a threshold matter, the algorithms absolutely do embody a "moral valence" about the contents of the speech it recommends. It is true that, as a general matter, the algorithms do not implement a particular preference for cats or cat videos—though they sometimes *do* implement a preference for certain content selected for promotion. *See supra* at 15-16. But even apart from specific promoted content, the algorithms also implement TikTok's numerous other content-based editorial preferences, including favoring content that is age-appropriate, new to the user, non-repetitive, and so on. *See supra* at 16-19.

The district court's insistence on a "moral valence" in any event presupposes exactly what Supreme Court and Ninth Circuit precedents consistently reject, *viz.*,

that First Amendment protection applies only to publication choices that convey the publisher's own "articulable message," *Hurley*, 515 U.S. at 569, such as "we think cats are good animals." That premise cannot be reconciled with *Cinevision*, which held that the concert promoter was entitled to First Amendment protection even though he did not know what songs would be sung, 745 F.2d at 568, and thus could not have known whether or how to endorse the "moral valence" of any particular song.

Nor can the court's "moral valence" premise be reconciled with *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786 (2011), which invalidated a California statute regulating minors' access to violent video games. The Supreme Court held that the games were protected by the First Amendment, even though they allowed users to create and control the game content themselves, much like "young readers of choose-your-own-adventure stories," who could "make decisions that determine the plot by following instructions about which page to turn to." 564 U.S. at 798. In other words, the specific content was ultimately determined almost entirely by user preferences, not by the purported "moral valence" of specific content decisions made by the developer itself. Yet the Court did not hesitate to conclude that the games were protected as the developer's own expressive speech.

As these precedents show, the district court's suggestion that only speech with a "moral valence" is expressive and protected contravenes the very

foundations of the First Amendment. After all, "[m]ost of what we say to one another lacks 'religious, political, scientific, educational, journalistic, historical, or artistic value' (let alone serious value), but it is still sheltered from government regulation." *United States v. Stevens*, 559 U.S. 460, 479 (2010). Accordingly, the First Amendment does not generally "permit the Government to imprison any speaker so long as his speech is deemed valueless or unnecessary, or so long as an ad hoc calculus of costs and benefits tilts in a statute's favor." *Id.* at 471. The district court's premise that the First Amendment protects only speech with a satisfactory "moral valence" is not just wrong, but frankly chilling.

*Third*, while the district court did not address *Brown* at all, it did try to distinguish *Hurley* and *Cinevision*, but its efforts only underscore its doctrinal errors. According to the court, *Hurley* applies *only* to laws that would force a speech compiler to "*include*" a message it does "not wish to convey." 1-ER-23 (emphasis in original). That supposedly narrow rule does not apply here, the district court held, because SB976 does not force the platforms to include "content that [they] find objectionable." 1-ER-24. But *Hurley*'s "speaker's autonomy" rule is not so cramped: it invalidates any law that intrudes on the speaker's broad autonomy to "choose the content of his own message," and to make *all* "choices of content" for *himself*, even if the government considers those choices "misguided, or even hurtful." 515 U.S. at 573-74.

SB976 plainly violates that principle. Even though the law does not force TikTok to include specific content in its feeds, it does force TikTok to make different *choices* about which content to include in its feeds. *Hurley* expressly forbids the government from regulating those compilation choices.

The district court's effort to distinguish *Cinevision* is even more illuminating. According to the court, *Cinevision* "stands for the proposition that 'theater owners and booksellers, even if they are not 'expressing' themselves, further a first amendment interest in making protected materials available to the public' and act as a type of clearinghouse for expression." 1-ER-6 (quoting *Cinevision*, 745 F.2d at 568). Exactly right. Speech compilers have their *own* distinct First Amendment interest—confirmed as a clear right in *Hurley* and *Moody*—in gathering and disseminating protected speech to the public, which is precisely what online platforms do. And that right means *they* decide what speech to "make available to the public" and why, not the government. A bookseller, for example, may choose to recommend books to a reader based on his past selections of schlock horror or trashy romance, even if the bookseller herself deems such material valueless or even objectionable. According to the district court, however, a bookseller's recommendations would be protected only if they reflected her own personal knowledge and endorsement of the specific content. *Cinevision* holds squarely the opposite.

*Fourth*, the district court also misconstrued the only support it affirmatively invoked for treating TikTok's algorithmic feeds as non-expressive: Justice Alito's minority concurrence in *Moody*, which asserted that online speech compilations are non-expressive *if* they merely "serve as 'passive receptacle[s]' of third-party speech or as 'dumb pipes' that merely emit what they are fed." *Moody*, 603 U.S. at 782 (Alito, J., concurring) (quoting *Am. Broad. Cos.*, 573 U.S. at 458 (Scalia, J., dissenting)). The quoted observation from Justice Scalia about "passive receptacles" and "dumb pipes" was addressing cable companies, which originally did operate "essentially as dumb pipes" because they merely "routed signals from point A to point B," with no exercise of discretion over what signals to carry. *Am. Broad.*, 573 U.S. at 458 (Scalia, J., dissenting). When they later began "deliberately selecting and importing distant signals," however, Justice Scalia himself saw them as protected "curators of content," *id.*, as did the Court itself, *see Turner Broad.*, 512 U.S. at 636-37 (cable operators are entitled to First Amendment protection because they "engage in and transmit speech" simply by "exercising editorial discretion over which stations or programs to include").

As explained by Justice Scalia, the "dumb pipe" standard actually shows why TikTok's algorithmic feeds are expressive: a communications channel may be a non-expressive "dumb pipe" when its operator exercises *no control* over what content to convey, but when the operator *does* "deliberately select[]" the content to

carry, it is a "curator[] of content" and the channel is expressive in itself. TikTok's feed indisputably falls into the latter category: it applies multiple editorial standards to determine what content to select for publication in each user's feed. Such "choices of content" are inherently expressive decisions protected from state regulation. *Hurley*, 515 U.S. at 574.

### B. TikTok's Feeds Also Implicate The Expressive Rights Of Creators And Users

The First Amendment protects not just the right of individuals to speak and to compile speech, but also "the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences." *Kleindienst v. Mandel*, 408 U.S. 753, 763 (1972) (quotation omitted). This long-recognized "right to receive information and ideas," *Stanley v. Georgia*, 394 U.S. 557, 564 (1969), has special force in the digital era, now that online platforms have become for many "the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge," *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017).

Restricting personalized feeds violates users' rights to view and discover informative and entertaining content in a coherent and manageable way. *Billions* of videos are uploaded onto TikTok's platform every year—many millions *per day*. The State has identified no means of curating that overwhelming morass of

content and delivering it to users in a manner that comes anywhere near the efficiency and efficacy of personalization.

The district court nevertheless asserted that users' rights to receive "information and ideas" are unaffected by SB976 because they "remain free to search for specific content." 1-ER-16. The district court, like the State, cited no evidence showing that searching among *billions* of videos provides meaningful access to information and ideas most likely to be useful to them. What is more, the district court again ignored the *way* TikTok personalizes its feeds: the editorial standards applied by TikTok's algorithms favor *new* creators and *unfamiliar* content, i.e., content users would not even know to search for.

In short, while users would still have "access" to content in a purely notional sense, restricting personalized feeds would clearly deny users "*suitable* access" to useful content in any practical sense. *Kleindienst*, 408 U.S. at 763 (emphasis added). Again, if the district court were right, a state could prohibit booksellers from recommending books based on readers' past selections, because a reader could still wander the shelves searching aimlessly for interesting content among books he knows nothing about. Or a state could bar a magazine from publishing an anthology of essays based on reader popularity, so long as the essays could be found elsewhere. That analysis is as wrong as it sounds.

### C. SB976's Historically Unprecedented, Content-Based Restrictions On The Speech Rights Of TikTok And Its Users Cannot Survive Any Level Of Heightened Scrutiny

Because the district court held that SB976's personalized-feed provisions do not restrict expressive publishing decisions at all, the court did not address what level of scrutiny would apply or whether SB976 would survive it. But there should not be any serious question: SB976 triggers strict scrutiny, and in any event does not survive any level of heightened scrutiny.

#### 1. *SB976's Personalized-Feeds Restrictions Trigger Strict Scrutiny*

SB976's personalized-feed restrictions trigger strict scrutiny for three reasons.

*First*, they treat feeds with personalized content differently from other feeds, and laws that "suppress, disadvantage, or impose differential burdens upon speech because of its content" are subject to "the most exacting scrutiny." *Turner Broad.*, 512 U.S. at 641-42; *see Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015); *X Corp. v. Bonta*, 116 F.4th 888, 899-900 (9th Cir. 2024). That standard applies because SB976's personalized-feed restrictions require verified parental consent *only* for minor users' feeds whose content is personalized to the user. Feeds with other types of content—i.e., feeds that compile content chronologically, or based on general popularity—are not subject to that regulatory burden. And nobody disputes that the content of personalized feeds differs *dramatically* from the

content of chronologically-compiled or popularity-based feeds. Indeed, the difference in content is the whole point of SB976—personalized feeds are supposedly "addictive" *because their content is personalized*, as opposed to feeds with content compiled some other way, which are supposedly not "addictive" and hence not subject to the restriction. Lest there be any doubt from the face of the statute that its regulation is content-based, SB976's co-sponsor and Defendant Bonta drove the point home, explicitly justifying the need to regulate personalized feeds—and not other feeds—in part because he thought the former resulted in too much "harmful content." 5-ER-891.[4]

*Second*, SB976's personalized-feed restrictions trigger strict scrutiny because they distinguish among *speakers*, and the First Amendment is "deeply skeptical of laws that 'distinguish[] among different speakers, allowing speech by some but not others.'" *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 777-78 (2018) (quoting *Citizens United v. FEC*, 558 U.S. 310, 340 (2010)); *see Reed*, 576 U.S. at 170. The restrictions apply only to entities that compile *third-party* speech, not by entities that compile their own (or their employees') *first-party* speech. And even as third-party speech compilations, the Act regulates

---

[4] This Court did not address this content-based distinction in *NetChoice III*. The Court held only that SB976 did not draw a content-based distinction by targeting only "social media" platforms while excepting *commercial* websites. 152 F.4th at 1015-16. TikTok is not raising that distinction here.

platforms whose personalized feeds comprise "a significant part of the service," but not platforms whose personalized feeds are a secondary offering. §§ 27000.5(b)(1), 27001(a). Consequently, the Act does not cover websites such as Apple News, streamers like Netflix and Hulu, or music platforms like Spotify, all of which compile speech based on a person's past interactions. And SB976's "speaker preference" clearly "reflects a content preference," *NetChoice III*, 152 F.4th at 1017: platforms that compile personalized feeds in narrower content categories (news, music, movies) are deemed less problematic than platforms that offer discovery of new information and ideas of all kinds.

*Third*, SB976's personalized-feed restrictions trigger strict scrutiny because they have no historical precedent. "[L]ong settled and established practice is a consideration of great weight" when applying the First Amendment. *Hou. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474-77 (2022) (citation omitted); *see Vidal v. Elster*, 602 U.S. 286, 301 (2024). The Supreme Court just last Term forcefully reaffirmed the need to identify a strong "historical pedigree" to justify a speech regulation. *Chiles v. Salazar*, 146 S. Ct. 1010, 1021 (2026). Accordingly, while strict scrutiny does not apply to a state law that fits within a "widespread" "tradition[]" of regulation, *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 485 (2025), the converse is equally true: "new categories of unprotected speech" cannot be created "by a legislature that concludes certain speech is too harmful to

be tolerated," absent "persuasive evidence that a novel restriction on content is part of a long (if heretofore unrecognized) tradition of proscription." *Brown*, 564 U.S. at 791-92.

The Supreme Court has emphasized that regulation of speech content has been historically allowed only "in a few limited areas" that are "well-defined" and "long familiar to the bar," including obscenity, defamation, fraud, incitement, and speech integral to criminal conduct." *Stevens*, 559 U.S. at 468 (quotations omitted). SB976's speech restrictions obviously fit in none of those categories. Nor is there an implicit, unrecognized tradition of barring speakers and publishers from considering audience interests in crafting their own speech or in choosing how to curate and compile the protected speech of others. To the contrary, ever since humans began speaking and vying for the attention of other humans, speakers have considered the interests of their audience. And they have been criticized for doing so for centuries. In 100 AD, Roman poet Juvenal expressed alarm that the ruling class was "consistently distracting the citizens of Rome with frivolous entertainment, misinformation and a steady program of frivolity to make sure they remained ignorant masses." 5-ER-903. For decades, local newsrooms have been condemned for prioritizing attention-grabbing crime stories over potentially less-engaging topics like local politics or public safety policies. 5-ER-912-913. And Hollywood's consistent production of sequels, typically based on prior audience

engagement, is routinely disparaged for being insufficiently creative. *See, e.g.,* 5-ER-922-926.

Despite the long history both of publishers' catering to audience interests and critics decrying the practice, the State here has cited no statute from any period of U.S. history that restricted a media outlet's ability to consider user-expressed preference in making editorial and publication decisions. Certainly no court has ever upheld such a legislative restriction. This absence of legislative or judicial precedent for restricting consideration of audience preferences shows how alien such regulation is to the First Amendment. Given the complete absence of any "historical pedigree" for SB976's effort to regulate TikTok's publication choices, *Chiles*, 146 S. Ct. at 1021, that regulation must be subject to the most exacting judicial scrutiny.

2. *The Personalized-Feed Provisions Fail Any Level of First Amendment Scrutiny*

To survive strict scrutiny, the State must establish that the personalized-feed restrictions are "narrowly tailored" to further a "compelling" government interest. *Reed*, 576 U.S. at 171. A statute is narrowly tailored only if it is the "least restrictive means" by which the government can achieve its objective. *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021). And even if the personalized-speech restrictions were deemed content-neutral, the State still would have to establish that they "advance[] important governmental interests unrelated

to the suppression of free speech and do[] not burden substantially more speech than necessary to further those interests." *Free Speech Coal.*, 606 U.S. at 471 (quotation omitted). The State has not satisfied any of those standards.

*a. The State Fails To Show A Connection Between Personalized Feeds And Its Interest In Avoiding Alleged Teen Health Harms*

TikTok fully agrees that protecting minors is a compelling state interest, as reflected in the tools it provides to manage minors' use of the platform. *See supra* at 19-20. But "[e]ven where the protection of children is the object, the constitutional limits on governmental action apply." *Brown*, 564 U.S. at 804-05. And those limits require the State to demonstrate more than a generalized interest in teen welfare—it must show a sufficient connection between the specific conduct regulated and the particular harm it seeks to prevent. *Id.* at 799-801.

The evidence cited by the State to justify SB976's personalized-feeds restrictions does not make that connection at all. Its evidence instead shows only—at most—that alleged mental-health harms may be connected to social-media usage *generally*, not to *personalized feeds* in particular. SB976 itself cites the U.S. Surgeon General's report discussing (not establishing) harms from general social-media usage, without drawing any connection to personalized feeds. *See* § 1 (Cal. 2024) (California Legislature's description of Surgeon General report and related evidence). The State's expert opinions were to the same effect—no expert cited any studies showing that *personalized feeds* cause the teen mental-health

harms ostensibly targeted by the personalized-feed restrictions. As TikTok's experts showed, assertions that personalized feeds "negatively impact adolescents are not supported by existing scientific data," and no "studies exist that examine the impact that personalized feeds have on brain development in adolescents." 2-ER-244, 255-262; *see* 3-ER-373-377 (available scientific literature does not establish a causal relationship between social media use, including features of apps, and negative mental health outcomes). The only supposed study cited by a State expert even *purporting* to draw a connection between personalized feeds and adverse teen health effects was published in a journal of highly dubious origins. 2-ER-261.[5]

While the State's evidence on its face does not establish a connection between personalized feeds and the State's asserted interest in regulating those

[5] The recent settlement California and 45 other states entered into with Meta underscores the disconnect between the alleged harms from "social media" and SB976's focus on personalized feeds. *See* Consent Judgment, *In re Social Media Adolescent Addiction/Personal Injury Products Liability Litigation*, No. 4:22-md-03047-YGR (N.D. Cal. Aug. 26, 2026) ("Meta Settlement"). That settlement addresses various *other* elements of social-media usage—apart from personalized feeds—that the states claim to be responsible for alleged teen mental health harms, including cumulative time-limits and periodic pauses during daytime access, night-time blocks on access and push-notifications, blocks on notifications during school hours, and periodic reviews for harmful content. *See id.* at ¶¶ II.B-II.F. Most significantly for present purposes, the consent judgment does *not* ban personalized feeds for minors or condition them on verifiable parental consent. It instead merely ensures that minors can choose to use a non-personalized feed, *id.* at § II.C.1-2—a choice minors (and all users) *already have* on TikTok's platform.

feeds, the State's evidence is also irrelevant for other independent reasons. For one, its expert opinions were generated only after SB976 was enacted, and when defending a statute subject to strict scrutiny, a state cannot rely on rationales and evidence the legislature itself did not consider. *See Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1314 (11th Cir. 2017). For another, even "commercial speech" cannot be "regulate[d] … on the back of controverted evidence," *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1282 (9th Cir. 2023)—a rule that applies a fortiori to the content-based restriction here, where the State's justifications for restricting personalized feeds are highly controverted. *See* 2-ER-244-245, 251-262, 272-280 (discussing lack of research on connection between personalized feeds and mental health, and limitations of evidence on causal impact of social media use generally); 3-ER-392-426 (highlighting State experts' reliance on self-reported symptom screening tools with low predictive power and discussing studies finding no causal association between social media use and established psychiatric conditions). Where a movant makes a "showing of [its] own to cast doubt on the State's justifications," a state must provide "a more extensive evidentiary documentation" justifying a speech restriction. *Porter v. Martinez*, 68 F.4th 429, 446 (9th Cir. 2023) (quotation omitted). And as shown, the State here has provided *no* evidentiary documentation showing that personalized feeds are what cause the harms SB976 is supposed to address.

#### b. *The State Cannot Show That SB976 Is The Least Restrictive Means Of Avoiding Alleged Teen Health Harms*

Because SB976 targets personalized feeds based on their personalized content, the State must prove that its regulations are the least restrictive means for achieving its objective of protecting teen mental health. *See supra* at 50-53. "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000). Even a content-neutral speech restriction cannot burden more speech than is necessary to achieve its objective. *See supra* at 50-51. The State cannot satisfy any of those standards.

*First*, the values of private autonomy underlying the First Amendment favor private options over governmental mandates for avoiding or addressing potential harms from protected expression. *Playboy*, 529 U.S. at 826. To that end, TikTok and third parties provide extensive tools that enable parents to supervise and limit teens' access to the platform. For example, parents may link their account to their teen's account, cap daily screen time, review screen-time summaries, control who may view or comment on their teen's videos, and determine whether their teen's account may be recommended to others. *See supra* at 19-20. TikTok also imposes mandatory teen defaults, including private accounts for registrants under 16, daily screen-time limits for all registrants under 18, and muted overnight push notifications. *Id.* Third parties supply still more, including device-level and

network-level controls. *Id.* If the State believes parents are not adequately utilizing these tools to manage their teens' social-media use, it can "educat[e] children and parents" about the purported dangers of unrestricted social media use and encourage parents to be more involved in their kids' digital engagement. *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024). And if any "modest gap" remains in parents' ability to control their teens' use of personalized feeds, "[f]illing" that gap "can hardly be a compelling state interest." *Brown*, 564 U.S. at 802.

The State argued below that these private, parental-control alternatives are actually *more* restrictive than SB976, because they allow parents "only to block access altogether" and thus "address only platform usage generally," not personalized feeds specifically. *See TikTok Inc. v. Bonta*, No. 5:25-cv-09789-EJD (N.D. Cal.), ECF No. 45 at 47. But the available tools do not limit parents to a permanent ban on access; among other things, they allow parents to control their teens' *time spent* on the platform, which is precisely the problem that the State describes as the problem it wants to address. *Id.* at 25. The parental tools thus allow teens to benefit from the vast and varied array of content TikTok can recommend to them on a tailored basis—which the State would deny them—but subject to limits on how much of such content they can consume.

*Second*, SB 976's personalized-feed restrictions are also not narrowly tailored—or, in the language of intermediate scrutiny, they burden more speech than is necessary—because they deny teens ready access to the enormous wealth of educational, political, and newsworthy material that TikTok identifies for them, as well as the online support communities that TikTok similarly can connect them with. *See*, *e.g.*, 5-ER-944 (concerns of Chamber of Progress, LGBT Tech, the Trevor Project, and Woodhull Freedom Foundation). For example, SB976 would restrict teens' access to their TikTok STEM feed, which displays personalized content related to science, technology, engineering, and mathematics. 4-ER-611-612. On the flip side, SB976 would diminish TikTok's ability to help teens *avoid* content they would find objectionable. For instance, a user who recently lost a pet may not want to view cat videos. Or a vegetarian may not want to see cooking videos involving meat. LGBTQ+ teens may prefer to avoid videos denouncing same-sex marriage. But by treating all speech as equally dangerous merely because it is displayed on a personalized feed, SB976 bars TikTok from considering such individual preferences and denies users the indisputable *benefits* personalization can provide. *See*, *e.g.*, 2-ER-88-90 (discussing personalized feeds' benefits for teens, including allowing teens to "discover interesting, educational, and helpful content" that non-personalized feeds would not expose them to, and enabling TikTok's key minor-safety features, which "rely on personalization"); 2-

ER-202-209 (comparing value of personalized and non-personalized feeds); 2-ER-281 ("A key developmental need during adolescence is establishing connections and shared interests with peers, and learning new information and skills. Personalized feeds enable both of those processes.").

It is no answer to SB976's demonstrable overinclusiveness to say, as the State did below, that teens still have "ample alternative channels for communication" merely because they can still search for content on their own or engage in their own first-party speech. *TikTok Inc. v. Bonta*, No. 5:25-cv-09789-EJD (N.D. Cal.), ECF No. 45 at 46. SB 976 restricts TikTok from providing, and teens from accessing, "an entire medium of public expression," *Menotti v. City of Seattle*, 409 F.3d 1113, 1138 (9th Cir. 2005), i.e., a compilation of speech curated to meet a user's interests and reflective of and as mediated by TikTok's own values. A feed stripped of all personalization is not an alternative channel for the same expression; it is a fundamentally *different* "medium of expression," one that buries the content a teen likely wants to see, and TikTok wants to provide, beneath billions of videos the teen has no interest in seeing and TikTok has no interest in displaying. At a bare minimum, forcing TikTok and its users to rely on manual search will indisputably undermine their "ability to communicate *effectively*," which is enough to show that this "alternative mode of communication" is

"constitutionally inadequate." *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1229 (9th Cir. 1990) (quotation omitted) (emphasis added).

*Third*, SB976's personalized-feed restrictions are also *under*inclusive, a mismatch that itself demonstrates inadequate tailoring. The Act does nothing to prevent a teen from scrolling indefinitely through personalized recommendations on a service that offers first-party rather than user-generated content, § 27000.5(a), on a service that offers personalized feeds as a secondary rather than a "significant" part of its business, § 27000.5(b)(1), or on a service whose user interactions are limited to commercial transactions or consumer reviews, § 27000.5(b)(2)(A). A teen may therefore receive an unlimited personalized feed from Netflix, from a news publisher, or from an e-commerce platform, while TikTok's delivery of comparable content is presumptively unlawful. If the asserted justification for SB976 is that personalization itself causes overconsumption of video content, it makes no sense to target TikTok's personalized feeds of general, user-generated content while leaving other personalized feeds untouched. Indeed, users have found themselves in "rabbit holes" on Etsy and the like, 5-ER-891, but the State targets only online platforms whose feeds comprise general-interest content generated by third parties.

It is true that a state "need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns." *Williams-Yulee*

*v. Fla. Bar*, 575 U.S. 433, 449 (2015). But the State here has not even attempted to show why other personalized speech compilations create less "pressing concerns" or otherwise could not be included within SB 976's ambit. The underinclusiveness thus does not reflect permissible legislative prioritization, but instead "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring" particular content compiled by particular speakers. *Brown*, 564 U.S. at 802.

## II. TIKTOK AND ITS USERS WILL FACE IRREPARABLE INJURY ABSENT AN INJUNCTION

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *NetChoice III*, 152 F.4th at 1024. Indeed, irreparable harm "is relatively easy to establish in a First Amendment case" because a "plaintiff need only demonstrate the existence of a colorable First Amendment claim." *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022). Because TikTok has shown not just that its claim is colorable, but is likely to prevail outright, the existence of irreparable harm "follows inexorably." *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017).

In addition to its loss of speech rights, TikTok will also suffer intangible harms to its goodwill and customer relationships, and will incur nonrecoverable costs to comply with SB976 unless it is enjoined. *See TikTok Inc. v. Bonta*, No.

5:25-cv-09789-EJD (N.D. Cal.), ECF No. 6 at 22-23. Those irreparable harms, too, justify a preliminary injunction. *See NetChoice, LLC v. Skrmetti*, __ F.4th __, 2026 WL 2546423 (6th Cir. Aug. 28, 2026) (vacating denial of preliminary injunction in First Amendment challenge for failure to recognize irreparable harms of lost speech rights and nonrecoverable compliance costs).[6]

## III. THE OTHER FACTORS FAVOR AN INJUNCTION PENDING APPEAL

The final two factors, the balance of equities and the public interest, merge when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). And they weigh heavily in TikTok's favor. Again, because TikTok has shown a strong likelihood of establishing that SB976 infringes its speech rights, the interest in enjoining the statute extends beyond TikTok itself, because there is "significant *public* interest in upholding First Amendment principles." *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) (emphasis added). It "is always in the public interest to prevent the violation of a party's constitutional rights." *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022). For this reason, a "plaintiff who can show that a statute likely violates the Constitution will also usually show

[6] Because the district court pronounced TikTok unlikely to prevail, it did not consider irreparable harm, but it did deny that such harms would occur in rejecting TikTok's motion for an injunction pending appeal. 1-ER-6-8. TikTok's motion to this Court for an injunction pending this appeal addresses the court's cursory reasoning. *See TikTok Inc. v. Bonta*, No. 26-5121 (9th Cir.), ECF No. 6 at 22-23.

that both the public interest and the balance of the equities favor a preliminary injunction." *Baird v. Bonta*, 81 F.4th 1036, 1044 (9th Cir. 2023) (cleaned up).

The broad public interest in avoiding illegitimate speech restrictions is magnified in the context of online expression. As the district court itself recognized, platforms like TikTok are "among the most prominent places for people to connect with each other, exchange views, learn, and much more." 1-ER-10. Those platforms "have generated positive societal impacts," including "providing a way for people to connect and communicate" and "democratiz[ing] the type of information shared through [the] content creation process, allowing people from all walks of life to share their talents with the world." 1-ER-11. And as explained above, the positive effects of personalized feeds include helping users avoid content they do not want to see, including content that may be generally appropriate, but objectionable or even painful to particular users. *See supra* at 6, 15-16, 56.

A preliminary injunction against enforcement of SB976's personalized-feed restrictions is necessary to avoid those harms, and more generally to ensure the continued free flow of online expression, while the constitutionality of those restrictions is fully and finally adjudicated.

## CONCLUSION

For the foregoing reasons, the district court's order should be reversed and a preliminary injunction entered.

Dated: September 8, 2026

Respectfully submitted,

*/s/ Daniel M. Petrocelli*

DANIEL M. PETROCELLI
JONATHAN D. HACKER
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, Suite 800
Los Angeles, California 90067
Tel: (213) 430-6700
Fax: (213) 430-6407
dpetrocelli@omm.com
jhacker@omm.com

*Counsel for Plaintiffs-Appellants TikTok Inc. and TikTok USDS Joint Venture LLC*

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

- *Google LLC, et al. v. Bonta*, Case No. 26-05132 (consolidated with this case, *see* Docket Entry No. 7)
- *Meta Platforms, Inc. v. Bonta*, Case No. 26-05120 (consolidated with this case, *see* Docket Entry No. 7)

Dated: September 8, 2026

*/s/ Daniel M. Petrocelli*
Daniel M. Petrocelli

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Circuit Rule 32-1 and Fed. R. App. P. 32(a)(7) because it contains 13,835 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated: September 8, 2026

*/s/ Daniel M. Petrocelli*
Daniel M. Petrocelli

*Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 8, 2026, I electronically filed this Brief with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit using the Court's CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished using that system.

Dated: September 8, 2026

*/s/ Daniel M. Petrocelli*
Daniel M. Petrocelli

*Counsel for Plaintiffs-Appellants*

**Nos. 26-5120, 26-5121 AND 26-5132**

# United States Court of Appeals for the Ninth Circuit

TIKTOK INC.; TIKTOK USDS JOINT VENTURE, LLC,

*Plaintiffs-Appellants,*

*v.*

ROB BONTA, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF CALIFORNIA,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of California
Case No. 5:25-cv-09789-EJD
Honorable Edward J. Davila, District Judge

## STATUTORY ADDENDUM OF PLAINTIFFS-APPELLANTS TIKTOK INC. AND TIKTOK USDS JOINT VENTURE, LLC

JONATHAN HACKER
O'MELVENY & MYERS, LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300

DANIEL M. PETROCELLI
O'MELVENY & MYERS, LLP
1999 Avenue of the Stars, 8th Floor
Los Angeles, California 90067
(310) 246-6850

*Attorneys for Plaintiffs-Appellants*

## Table of Contents for Statutory Addendum

California Senate Bill 976 (2024) .............................................................. A-1

**Senate Bill No. 976**

CHAPTER 321

An act to add Chapter 24 (commencing with Section 27000) to Division 20 of the Health and Safety Code, relating to youth addiction.

[Approved by Governor September 20, 2024. Filed with Secretary of State September 20, 2024.]

LEGISLATIVE COUNSEL'S DIGEST

SB 976, Skinner. Protecting Our Kids from Social Media Addiction Act.

Existing law, the California Age-Appropriate Design Code Act, requires, beginning July 1, 2024, a business that provides an online service, product, or feature likely to be accessed by children to comply with certain requirements. The act requires the business to complete a data protection impact assessment addressing, among other things, whether the design could harm children and whether and how the online product, service, or feature uses system design features to increase, sustain, or extend use of the online product, service, or feature by children, including the automatic playing of media, rewards for time spent, and notifications. Existing law prohibits the business from using the personal information of any child in a way that the business knows, or has reason to know, is materially detrimental to the physical health, mental health, or well-being of a child.

Existing law, the Privacy Rights for California Minors in the Digital World, prohibits an operator of an internet website, online service, online application, or mobile application from specified conduct when minors are involved, including the marketing or advertising of alcoholic beverages, firearms, or certain other products or services. Existing law sets forth other related protections for minors, including under the California Consumer Privacy Act of 2018 and the California Privacy Rights Act of 2020.

This bill, the Protecting Our Kids from Social Media Addiction Act, would make it unlawful for the operator of an addictive internet-based service or application, as defined, to provide an addictive feed to a user, unless the operator does not have actual knowledge that the user is a minor; commencing January 1, 2027, has reasonably determined that the user is not a minor; or has obtained verifiable parental consent to provide an addictive feed to the user who is a minor.

The bill would define "addictive feed" as an internet website, online service, online application, or mobile application, in which multiple pieces of media generated or shared by users are recommended, selected, or prioritized for display to a user based on information provided by the user, or otherwise associated with the user or the user's device, as specified, unless any of certain conditions are met.

The bill would make it unlawful for the operator of an addictive internet-based service or application, between the hours of 12 a.m. and 6 a.m., in the user's local time zone, and between the hours of 8 a.m. and 3 p.m., Monday through Friday from September through May in the user's local time zone, to send notifications to a user if the operator has actual knowledge that the user is a minor or, commencing January 1, 2027, has not reasonably determined that the user is not a minor, unless the operator has obtained verifiable parental consent to send those notifications, as specified. The bill would set forth related provisions for certain access controls determined by the verified parent through a mechanism provided by the operator.

Under the bill, a parent's provision of consent or use of a mechanism, as described above, would not waive, release, otherwise limit, or serve as a defense to, any claim that the parent, or that the user who is a minor or was a minor at the time of using the internet-based service or application, might have against the operator regarding any harm to the mental health or well-being of the user.

The bill would require an operator to annually disclose the number of minor users of its addictive internet-based service or application, and of that total the number for whom the operator has received verifiable parental consent to provide an addictive feed, and the number of minor users as to whom the access controls are or are not enabled.

Under the bill, these provisions would only be enforced in a civil action brought in the name of the people of the State of California by the Attorney General. The bill would require the Attorney General to adopt regulations to further the purposes of these provisions, including regulations regarding age assurance and parental consent by January 1, 2027. The bill would authorize the Attorney General to adopt regulations that provide for exceptions to these provisions, but only if those exceptions further the purpose of protecting minors. The bill would require the Attorney General, in promulgating regulations, to solicit public comment regarding the impact that any regulation might have based on certain nondiscrimination characteristics set forth in existing law.

The bill would make these provisions severable.

*The people of the State of California do enact as follows:*

SECTION 1. The Legislature finds and declares the following:

(a) Social media provides an important tool for communication and information sharing. Approximately 95 percent of 13- to 17-year-olds, inclusive, say that they use at least one social media platform, and more than one-third report using social media almost constantly.

(b) However, some social media platforms have evolved to include addictive features, including the algorithmic delivery of content and other design features, that pose a significant risk of harm to the mental health and well-being of children and adolescents.

(c) As the United States Surgeon General has reported, recent evidence has identified “reasons for concern” about social media usage by children and adolescents. This evidence includes a study concluding that the risk of poor mental health outcomes doubles for children and adolescents who use social media at least three hours a day and research finding that social media usage is linked to a variety of negative health outcomes, including low self-esteem and disordered eating, for adolescent girls.

(d) Heavier usage of social media also leads to less healthy sleep patterns and sleep quality, which can in turn exacerbate both physical and mental health problems.

(e) Further, social media usage is more strongly associated with negative mental health outcomes, including depressive symptoms and self-harm behaviors, than is consumption of other forms of media such as television or electronic games.

(f) Both California and the country as a whole are facing an ongoing youth mental health crisis, with rates of adolescent suicides, depressive episodes, and feelings of sadness and hopelessness on the rise in recent years.

(g) For these reasons, it is essential that California act to ensure that social media platforms obtain parental consent before exposing children and adolescents to harmful and addictive social media features.

SEC. 2. Chapter 24 (commencing with Section 27000) is added to Division 20 of the Health and Safety Code, to read:

## Chapter 24. Protecting Our Kids from Social Media Addiction Act

27000. This chapter shall be known, and may be cited, as the Protecting Our Kids from Social Media Addiction Act.

27000.5. For purposes of this chapter, the following terms have the following meanings:

(a) “Addictive feed” means an internet website, online service, online application, or mobile application, or a portion thereof, in which multiple pieces of media generated or shared by users are, either concurrently or sequentially, recommended, selected, or prioritized for display to a user based, in whole or in part, on information provided by the user, or otherwise associated with the user or the user’s device, unless any of the following conditions are met, alone or in combination with one another:

(1) The information is not persistently associated with the user or user’s device, and does not concern the user’s previous interactions with media generated or shared by others.

(2) The information consists of search terms that are not persistently associated with the user or user’s device.

(3) The information consists of user-selected privacy or accessibility settings, technical information concerning the user’s device, or device communications or signals concerning whether the user is a minor.

(4) The user expressly and unambiguously requested the specific media or media by the author, creator, or poster of the media, or the blocking, prioritization, or deprioritization of such media, provided that the media is not recommended, selected, or prioritized for display based, in whole or in part, on other information associated with the user or the user's device, except as otherwise permitted by this chapter and, in the case of audio or video content, is not automatically played.

(5) The media consists of direct, private communications between users.

(6) The media recommended, selected, or prioritized for display is exclusively the next media in a preexisting sequence from the same author, creator, poster, or source and, in the case of audio or video content, is not automatically played.

(7) The recommendation, selection, or prioritization of the media is necessary to comply with this chapter or any regulations promulgated pursuant to this chapter.

(b) (1) "Addictive internet-based service or application" means an internet website, online service, online application, or mobile application, including, but not limited to, a "social media platform" as defined in Section 22675 of the Business and Professions Code, that offers users or provides users with an addictive feed as a significant part of the service provided by that internet website, online service, online application, or mobile application.

(2) "Addictive internet-based service or application" does not apply to either of the following:

(A) An internet website, online service, online application, or mobile application for which interactions between users are limited to commercial transactions or to consumer reviews of products, sellers, services, events, or places, or any combination thereof.

(B) An internet website, online service, online application, or mobile application that operates a feed for the primary purpose of cloud storage.

(c) "Media" means text, audio, an image, or a video.

(d) "Minor" means an individual under 18 years of age who is located in the State of California.

(e) "Operator" means a person who operates or provides an internet website, an online service, an online application, or a mobile application.

(f) "Parent" means a parent or guardian, including as defined in regulations promulgated pursuant to this chapter.

(g) "User" means a person who uses an internet website, online service, online application, or mobile application. "User" does not include the operator or a person acting as an agent of the operator.

27001. (a) It shall be unlawful for the operator of an addictive internet-based service or application to provide an addictive feed to a user unless either of the following is met:

(1) (A) Except as provided in subparagraph (B), the operator does not have actual knowledge that the user is a minor.

(B) Commencing January 1, 2027, the operator has reasonably determined that the user is not a minor, including pursuant to regulations promulgated by the Attorney General.

(2) The operator has obtained verifiable parental consent to provide an addictive feed to the user who is a minor.

(b) Information collected for the purpose of determining a user's age or verifying parental consent pursuant to this chapter shall not be used for any purpose other than compliance with this chapter or with another applicable law. The information collected shall be deleted immediately after it is used to determine a user's age or to verify parental consent, except as necessary to comply with state or federal law.

27002. (a) (1) Except as provided in paragraph (2), it shall be unlawful for the operator of an addictive internet-based service or application, between the hours of 12 a.m. and 6 a.m., in the user's local time zone, and between the hours of 8 a.m. and 3 p.m., from Monday through Friday from September through May in the user's local time zone, to send notifications to a user if the operator has actual knowledge that the user is a minor unless the operator has obtained verifiable parental consent to send those notifications.

(2) Commencing January 1, 2027, it shall be unlawful for the operator of an addictive internet-based service or application, between the hours of 12 a.m. and 6 a.m., in the user's local time zone, and between the hours of 8 a.m. and 3 p.m., from Monday through Friday from September through May in the user's local time zone, to send notifications to a user whom the operator has not reasonably determined is not a minor, including pursuant to regulations promulgated by the Attorney General, unless the operator has obtained verifiable parental consent to send those notifications.

(b) The operator of an addictive internet-based service or application shall provide a mechanism through which the verified parent of a user who is a minor may do any of the following:

(1) Prevent their child from accessing or receiving notifications from the addictive internet-based service or application between specific hours chosen by the parent. This setting shall be set by the operator as on by default, in a manner in which the child's access is limited between the hours of 12 a.m. and 6 a.m., in the user's local time zone.

(2) Limit their child's access to any addictive feed from the addictive internet-based service or application to a length of time per day specified by the verified parent. This setting shall be set by the operator as on by default, in a manner in which the child's access is limited to one hour per day unless modified by the verified parent.

(3) Limit their child's ability to view the number of likes or other forms of feedback to pieces of media within an addictive feed. This setting shall be set by the operator as on by default.

(4) Require that the default feed provided to the child when entering the internet-based service or application be one in which pieces of media are not recommended, selected, or prioritized for display based on information provided by the user, or otherwise associated with the user or the user's device, other than the user's age or status as a minor.

(5) Set their child's account to private mode, in a manner in which only users to whom the child is connected on the addictive internet-based service

or application may view or respond to content posted by the child. This setting shall be set by the operator as on by default.

27003. (a) This chapter shall not be construed as requiring the operator of an addictive internet-based service or application to give a parent any additional or special access to, or control over, the data or accounts of their child.

(b) This chapter shall not be construed as preventing any action taken in good faith to restrict access to, or availability of, media.

27004. (a) An operator may choose not to provide services to minors. However, the operator of an addictive internet-based service or application shall not withhold, degrade, lower the quality of, or increase the price of, any product, service, or feature, other than as required by this chapter, due to a user or parent availing themselves of the rights provided by this chapter, or due to the protections required by this chapter.

(b) A parent's provision of consent as described in Section 27001 or 27002, or the use by a parent of a mechanism as described in Section 27002, does not waive, release, otherwise limit, or serve as a defense to, any claim that the parent, or that the user who is a minor or was a minor at the time of using the internet-based service or application, might have against the operator of an addictive internet-based service or application regarding any harm to the mental health or well-being of the user.

(c) The protections provided by this chapter are in addition to those provided by any other applicable law, including, but not limited to, the California Age-Appropriate Design Code Act (Title 1.81.47 (commencing with Section 1798.99.28) of Part 4 of Division 3 of the Civil Code).

27005. An operator of an addictive internet-based service or application shall publicly disclose, on an annual basis, the number of minor users of its addictive internet-based service or application, and of that total the number for whom the operator has received verifiable parental consent to provide an addictive feed, and the number of minor users as to whom the controls set forth in Section 27002 are or are not enabled.

27006. (a) This chapter may only be enforced in a civil action brought in the name of the people of the State of California by the Attorney General.

(b) The Attorney General shall adopt regulations to further the purposes of this chapter, including regulations regarding age assurance and parental consent by January 1, 2027. The Attorney General may adopt regulations that provide for exceptions to this chapter, but only if those exceptions further the purpose of protecting minors.

(c) In promulgating the regulations described in subdivision (b), the Attorney General shall solicit public comment regarding the impact that any regulation might have based on the nondiscrimination characteristics set forth in Section 51 of the Civil Code or in any other applicable law.

27007. If any provision of this chapter, or application thereof, to any person or circumstance is held invalid, that invalidity shall not affect other provisions or applications of this chapter that can be given effect without

the invalid provision or application, and to this end the provisions of this chapter are declared to be severable.

O