**No. 26-5120**

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

META PLATFORMS, INC.,
*Plaintiff-Appellant*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF CALIFORNIA,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of California
Case No. 5:25-cv-09792-EJD (Davila, J.)

**PLAINTIFF-APPELLANT'S OPENING BRIEF**

Isaac D. Chaput
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
(415) 591-6000

Alexander L. Schultz
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
(424) 332-4800

Mark W. Mosier
Teena-Ann V. Sankoorikal
Jeffrey E. Sandberg
Kuntal V. Cholera
Alexandra J. Widas
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000

*Counsel for Plaintiff-Appellant Meta Platforms, Inc.*

## DISCLOSURE STATEMENT

Pursuant to Circuit Rule 26.1-1 and Rule 26.1 of the Federal Rules of Appellate Procedure, Plaintiff-Appellant, by and through its undersigned counsel, hereby certifies that Meta Platforms, Inc. is a publicly traded corporation with no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Dated: September 8, 2026

Respectfully submitted,

*/s/ Mark Mosier*

Mark W. Mosier
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000

*Counsel for Plaintiff-Appellant Meta Platforms, Inc.*

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant Meta Platforms, Inc. respectfully requests oral argument. This appeal concerns the constitutionality of Sections 27001, 27002(b)(2), and 27002(b)(4) of California Senate Bill 976 ("SB 976") (together, the "personalized-feed restrictions"), which restrict how social media services may organize and curate the content they display to users and impose limits on minors' access to those feeds of content. In denying a preliminary injunction, the district court relied solely on its view that SB 976's personalized-feed restrictions, despite regulating the curation and dissemination of protected third-party expression, do not even implicate the First Amendment. Meta respectfully submits that oral argument will be of assistance to the Court in reviewing that unprecedented ruling and deciding whether a preliminary injunction is warranted.

Dated: September 8, 2026

Respectfully submitted,

*/s/ Mark Mosier*

Mark W. Mosier
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000

*Counsel for Plaintiff-Appellant Meta Platforms, Inc.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........ 1

JURISDICTIONAL STATEMENT ........ 4

ISSUES PRESENTED ........ 5

STATUTORY PROVISIONS INVOLVED ........ 5

STATEMENT OF THE CASE ........ 5

A. Meta Organizes, Curates, and Disseminates Personalized Feeds of User-Generated Content to Users of Its Services. ........ 5

B. SB 976 Restricts Meta's Creation and Dissemination of Curated, Personalized Feeds. ........ 8

C. NetChoice Challenges SB 976, Including Its Personalized-Feed Provisions. ........ 11

D. After Meta Challenges SB 976's Personalized-Feed Restrictions, the District Court Denies a Preliminary Injunction. ........ 14

SUMMARY OF ARGUMENT ........ 18

STANDARD OF REVIEW ........ 23

ARGUMENT ........ 23

I. SB 976's Personalized-Feed Restrictions Implicate Meta's First Amendment Rights. ........ 24

A. The Personalized-Feed Restrictions Burden Meta's Exercise of Editorial Judgment. ........ 25

B. The Personalized-Feed Restrictions Burden Meta's Dissemination of Protected Speech. ........ 32

C. The District Court's Contrary Analysis Is Fundamentally Flawed. ........ 35

1. The District Court Disregarded *Moody* In Holding that Meta's Feeds Are Not Expressive. .......... 35

2. The District Court Did Not Meaningfully Address Whether the First Amendment Protects the Dissemination of Third-Party Speech. .......... 43

II. SB 976's Personalized-Feed Restrictions Violate the First Amendment. .......... 46

A. The Personalized-Feed Restrictions Are Subject to Strict Scrutiny. .......... 47

B. The Personalized-Feed Restrictions Fail Under Either Strict or Intermediate Scrutiny. .......... 50

III. The Other Preliminary Injunction Factors Are Satisfied. .......... 59

CONCLUSION .......... 61

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

ADDENDUM

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. City of Hermosa Beach*,
621 F.3d 1051 (9th Cir. 2010) ....................39, 40, 43, 46

*Angelilli v. Activision Blizzard, Inc.*,
781 F. Supp. 3d 691 (N.D. Ill. 2025)....................43

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998)....................25

*Ashcroft v. Free Speech Coal.*,
535 U.S. 234 (2002)....................52

*Baird v. Bonta*,
81 F.4th 1036 (9th Cir. 2023) ....................23, 61

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011)....................27, 34, 51, 53, 56

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*,
29 F.4th 468 (9th Cir. 2022) ....................59

*Children's Health Def. v. Meta Platforms, Inc.*,
112 F.4th 742 (9th Cir. 2024) ....................34, 43

*Cinevision Corp. v. City of Burbank*,
745 F.2d 560 (9th Cir. 1984) ....................32, 33, 41, 44, 45

*City of Los Angeles v. Preferred Commc'ns, Inc.*,
476 U.S. 488 (1986)....................26

*Doe 1 v. Meta Platforms, Inc.*,
174 F.4th 1159 (9th Cir. 2026) ....................42

*Doe v. Harris*,
772 F.3d 563 (9th Cir. 2014) ....................45, 51, 52, 55

*First Nat'l Bank of Bos. v. Bellotti*,
435 U.S. 765 (1978)....................33

*Free Speech Coal., Inc. v. Paxton*,
606 U.S. 461 (2025)....................34, 47, 51, 57

*Green v. Miss U.S. of Am., LLC*,
52 F.4th 773 (9th Cir. 2022)....................40, 41

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
515 U.S. 557 (1995)....................26, 36, 40

*Iancu v. Brunetti*,
588 U.S. 388 (2019)....................49

*Imperial Sovereign Ct. of Mont. v. Knudsen*,
170 F.4th 820 (9th Cir. 2026)....................52, 55, 57, 58, 60

*Keeton v. Hustler Mag., Inc.*,
465 U.S. 770 (1984)....................25

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022)....................54

*Mapother v. Dep't of Justice*,
3 F.3d 1533 (D.C. Cir. 1993)....................37

*Martin v. City of Struthers*,
319 U.S. 141 (1943)....................32

*McDermott v. Ampersand Publ'g, LLC*,
593 F.3d 950 (9th Cir. 2010)....................43

*Meinecke v. City of Seattle*,
99 F.4th 514 (9th Cir. 2024)....................23, 24, 46

*Miami Herald Publ'g Co. v. Tornillo*,
418 U.S. 241 (1974)....................25, 48

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024).............. 1–3, 6, 7, 16, 18, 25, 27, 28, 32, 36–40, 43, 48, 50

*NetChoice, LLC v. Att'y Gen., Fla.*,
34 F.4th 1196 (11th Cir. 2022)....................38

*NetChoice, LLC v. Bonta*,
761 F. Supp. 3d 1202 (N.D. Cal. 2024) ("*Bonta I*")................................3, 12, 13

*NetChoice, LLC v. Bonta*,
761 F. Supp. 3d 1232 (N.D. Cal. 2025) ("*Bonta II*") ..................................13, 60

*NetChoice, LLC v. Bonta*,
113 F.4th 1101 (9th Cir. 2024) ............................................................46, 55, 57

*NetChoice, LLC v. Bonta*,
152 F.4th 1002 (9th Cir. 2025) ("*Bonta III*") 3, 12, 13, 14, 33, 34, 57, 58, 59, 60

*NetChoice, LLC v. Carr*,
789 F. Supp. 3d 1200 (N.D. Ga. 2025).....................................35, 39, 48, 56, 58

*NetChoice, LLC v. Griffin*,
831 F. Supp. 3d 816 (W.D. Ark. 2026) .....................................................32, 57

*NetChoice, LLC v. Jones*,
822 F. Supp. 3d 656 (E.D. Va. 2026) ...................................................48, 56, 58

*NetChoice, LLC v. Moody*,
546 F. Supp. 3d 1082 (N.D. Fla. 2021) .........................................................38

*NetChoice, LLC v. Murrill*,
812 F. Supp. 3d 598 (M.D. La. 2025)...................................................53, 56, 58

*NetChoice, LLC v. Reyes*,
748 F. Supp. 3d 1105 (D. Utah 2024)........................... 39, 49, 53, 55, 56, 57, 58

*NetChoice, LLC v. Skrmetti*,
__F.4th__, 2026 WL 2546423 (6th Cir. Aug. 28, 2026)...................................60

*NetChoice, LLC v. Yost*,
180 F.4th 268 (6th Cir. 2026) ......................................................................48

*NetChoice, LLC v. Yost*,
778 F. Supp. 3d 923 (S.D. Ohio 2025) ..........................................................48

*Pac. Coast Horseshoeing Sch. v. Kirchmeyer*,
961 F.3d 1062 (9th Cir. 2020) .....................................................................23

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*,
475 U.S. 1 (1986)....................48

*Packingham v. North Carolina*,
582 U.S. 98 (2017)....................34, 39, 52

*People for the Ethical Treatment of Animals, Inc. (PETA) v. N.C. Farm Bureau Fed'n, Inc.*,
60 F.4th 815 (4th Cir. 2023)....................54

*M.P. ex rel. Pinckney v. Meta Platforms Inc.*,
127 F.4th 516 (4th Cir. 2025)....................42

*Preferred Commc'ns, Inc. v. City of Los Angeles*,
754 F.2d 1396 (9th Cir. 1985)....................25, 34

*Recycle for Change v. City of Oakland*,
856 F.3d 666 (9th Cir. 2017)....................24

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015)....................47, 49

*Reuber v. Food Chem. News, Inc.*,
925 F.2d 703 (4th Cir. 1991)....................41

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011).................... 12, 27, 32, 33, 42, 45, 49, 50, 52

*Tschida v. Motl*,
924 F.3d 1297 (9th Cir. 2019)....................49

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994)....................26, 47

*Turner Broad. Sys., Inc. v. FCC*,
520 U.S. 180 (1997)....................26, 53

*United States v. California*,
173 F.4th 1060 (9th Cir. 2026)....................60

*United States v. Playboy Ent. Grp., Inc.*,
529 U.S. 803 (2000)....................45

*United States v. Stevens*,
559 U.S. 460 (2011) .......... 61

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976) .......... 41, 45

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 23

*Yim v. City of Seattle*,
63 F.4th 783 (9th Cir. 2023) .......... 55

**Statutes**

28 U.S.C.
§ 1292(a)(1) .......... 4
§ 1331 .......... 4

Cal. Health & Safety Code
§ 27000.5 .......... 37
§ 27000.5(a) .......... 9, 10, 30, 38, 47, 56
§ 27000.5(a)(1) .......... 11
§ 27000.5(a)(2) .......... 11
§ 27000.5(a)(3) .......... 11
§ 27000.5(a)(4) .......... 11
§ 27000.5(a)(5) .......... 11
§ 27000.5(a)(6) .......... 11
§ 27000.5(a)(7) .......... 11
§ 27000.5(b)(1) .......... 9, 56
§ 27000.5(b)(2) .......... 49
§ 27000.5(b)(2)(A) .......... 56
§ 27001(a) .......... 5, 45
§ 27001(a)(1) .......... 30, 38
§ 27001(a)(1)(B) .......... 9
§ 27002(a)(2) .......... 9, 10, 56
§ 27002(b)(2) .......... 5, 10
§ 27002(b)(4) .......... 5, 10
§ 27006(b) .......... 9

**Legislative Materials**

S.B. 976, 2023-2024 Reg. Sess. (Cal. 2024) .......... 5, 53

**Other Authorities**

Order, *NetChoice, LLC v. Bonta*, No. 25-146 (9th Cir. Jan. 28, 2025),
Dkt. 11 .......................................................................................................13

# INTRODUCTION

The First Amendment protects the editorial judgments of those who curate and disseminate speech—whether newspapers, parade organizers, or social media platforms. The Supreme Court recently held that Facebook's Feed (previously News Feed) is entitled to First Amendment protection because Meta exercises editorial judgment in deciding what content to display and how to display it. *See Moody v. NetChoice, LLC*, 603 U.S. 707 (2024). The district court nevertheless declined to enter a preliminary injunction against enforcement of the California law at issue here, concluding that Meta's feeds—including the same Facebook Feed held protected in *Moody*—are not sufficiently expressive to implicate the First Amendment at all. Because that ruling rested on a fundamental misreading of binding First Amendment precedent, this Court should reverse.

The implications of the district court's ruling cannot be overstated. The California law at issue, SB 976, would regulate all of Meta's feeds by prohibiting Meta from considering minor users' personal interests when organizing billions of posts, and by declaring it unlawful for Meta to disseminate its existing personalized feeds to minors without parental consent. Despite *Moody*, the district court concluded that the First Amendment has nothing to say about SB 976's personalized-feed restrictions. The rationale was not limited to minors or social media. Under the district court's logic, the State could ban news sites and streaming services from

offering personalized content to *any* subscriber. It could insist that Meta organize user posts randomly, or prioritize posts *least* likely to interest users. And the First Amendment would provide no protection at all.

That is not the law. The First Amendment "does not go on leave when social media are involved." *Moody*, 603 U.S. at 719. As *Moody* makes clear, "government efforts to alter an edited compilation of third-party expression are subject to judicial review for compliance with the First Amendment." *Id.* at 717. Laws like SB 976 that dictate how Meta may "organize, prioritize, or disclaim posts in its" feeds burden "exactly the kind of editorial judgments [that] receive First Amendment protection." *Id.* at 718. And even apart from its interference with editorial discretion, SB 976 implicates the First Amendment because it burdens Meta's right to disseminate third-party speech on its services. The feeds' contents are undisputedly protected third-party speech, and SB 976 regulates how Meta may disseminate that speech.

The district court's contrary conclusion focused solely on personalization—a single input in Meta's editorial process. According to the court, Meta's feeds do not reflect "an expressive judgment" protected by the First Amendment because Meta creates those feeds using algorithms that select content in part based on what the user may find interesting or engaging. But the editorial act of selecting and presenting content based on what readers or viewers might find interesting or

engaging has always been at the core of the First Amendment's protections. So even the sole aspect of Meta's feeds that the court found unprotected—the selection of content based on users' preferences—was squarely within the scope of the First Amendment. In any event, the First Amendment protects Meta's feeds, whether or not every input to their creation is deemed expressive. It is the resulting feeds published by Meta that matters. As *Moody* makes clear, Meta's feeds "as a whole" are protected because they are the product of Meta's exercise of editorial judgment. 603 U.S. at 739.

In addition to conflicting with binding precedent, the district court's ruling also led to an anomalous result. Several other provisions of SB 976 have already been the subject of litigation. All of those provisions implicated the First Amendment, and numerous provisions were enjoined as likely unconstitutional on First Amendment grounds. *See NetChoice, LLC v. Bonta*, 152 F.4th 1002 (9th Cir. 2025) ("*Bonta III*"), *aff'g in part, rev'g in part and remanding*, *NetChoice v. Bonta*, 761 F. Supp. 3d 1202 (N.D. Cal. 2024) ("*Bonta I*"). Yet, under the district court's reasoning, SB 976's personalized-feed restrictions—which this Court called the statute's "pièce de résistance," *Bonta III*, 152 F.4th at 1010—could be the only provisions that do not implicate the First Amendment.

Once properly subject to First Amendment review, the personalized-feed restrictions cannot survive. Strict scrutiny applies because SB 976 imposes both

content-based and speaker-based restrictions on speech. But the law would fail intermediate scrutiny too. The State cannot articulate any interest in controlling Meta's editorial judgments unrelated to the suppression of speech. The restrictions are overinclusive, applying to all minors regardless of their circumstances. And they are not tailored to their stated purpose—addressing alleged harms from excessive time online—because they target an editorial process with no demonstrated connection to those harms while leaving minors free to spend unlimited time elsewhere on the internet, including on other services that present personalized feeds of content.

SB 976's personalized-feed restrictions are in effect now. The State recently declined Meta's request for a stay of enforcement—and refused to provide even 30 days' notice before any enforcement action. Absent a preliminary injunction, Meta faces imminent enforcement risk and irreparable harm to its First Amendment rights as both a curator and disseminator of protected speech. The district court's order should be reversed.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. § 1331. 3-ER-528. The district court denied Meta's motion for preliminary injunction on August 5, 2026. 1-ER-10–31. Meta timely filed a notice of appeal on August 11, 2026. 3-ER-552–53. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## ISSUES PRESENTED

1. Whether SB 976's personalized-feed restrictions are subject to First Amendment review, where those restrictions burden both Meta's exercise of editorial discretion regarding the composition of its feeds and its dissemination of protected third-party speech.

2. Whether the personalized-feed restrictions fail strict scrutiny, or alternatively intermediate scrutiny, because they do not advance important governmental interests independent of the suppression of free speech and are not tailored to the alleged harms the State seeks to redress.

3. Whether, absent relief, Meta will suffer irreparable harm and the other equitable factors weigh in Meta's favor.

## STATUTORY PROVISIONS INVOLVED

Relevant statutory provisions are codified at California Health & Safety Code §§ 27001(a), 27002(b)(2), (b)(4) (the "personalized-feed restrictions"). The full text of S.B. 976, 2023–2024 Reg. Sess. (Cal. 2024) is included in the attached statutory addendum.

## STATEMENT OF THE CASE

### A. Meta Organizes, Curates, and Disseminates Personalized Feeds of User-Generated Content to Users of Its Services.

Meta's Facebook, Instagram, and Threads services connect billions of people worldwide, allowing them to share content with friends, family, and other users on

a virtually infinite variety of topics, guided by Meta's Community Standards. *See* 2-ER-39, ¶ 3 (Suppl. Decl. of Lars Backstrom ("Backstrom II Decl.")). On these services, each user is shown a "feed," or a page containing a compilation of content posted by other users and assembled by Meta. 2-ER-39–40, ¶¶ 3–7 (Backstrom II Decl.). Because users of Meta's services post billions of new posts per day, Meta must exercise editorial judgment in determining which posts will end up in each user's feed and in what order. 3-ER-449, ¶ 5 (Decl. of Lars Backstrom ("Backstrom I Decl.")); *see Moody*, 603 U.S. at 734–35 (noting that "only the tiniest fraction" of possible posts "wind up on a user's customized feed").

The feeds on Meta's services are the product of multiple, intertwined processes, in which Meta's editorial judgment takes numerous forms. For example, Meta has developed and published Community Standards identifying the types of content that are not allowed on its services, and it employs both human and automated reviewers to identify, deprioritize, or delete offending content. *See Moody*, 603 U.S. at 735 (Facebook "proscribe[s] posts" in various "categories and subcategories"); 3-ER-450, ¶ 7 (Backstrom I Decl.). Those Standards restrict, among other things, categories of content related to "bullying and harassment," "suicide, self-injury, and eating disorders," "hateful conduct," and "violent and graphic content." 3-ER-456–58, ¶¶ 9–10 (Decl. of Arcadiy Kantor ("Kantor Decl.")); *see Moody*, 603 U.S. at 735–36 (noting additional examples).

In addition, Meta as editor seeks to prioritize content that, in Meta's view, each user will find relevant and valuable. 3-ER-450–51, ¶¶ 7–8 (Backstrom I Decl.). Because it is impossible for humans working unassisted to generate feeds for billions of Meta's users in real time, Meta's prioritization efforts include the use of algorithms designed and maintained by Meta employees. 2-ER-39–41, ¶¶ 3–10 (Backstrom II Decl.); *see Moody*, 603 U.S. at 734 (describing "the use of algorithms" as "key"). Meta's algorithmic "prediction" model assesses the likelihood that each candidate piece of content will elicit a particular reaction from the relevant user, such as a "like" or comment. 3-ER-450, ¶ 7 (Backstrom I Decl.); 2-ER-69–71, ¶¶ 73, 77 (Decl. of Bamshad Mobasher ("Mobasher Decl."); 2-ER-82, ¶ 107 (Mobasher Decl.). Employing this prediction model helps to communicate Meta's message to users that, subject to the Community Standards, Meta wants users to feel inspired to engage with or talk openly about the issues that matter most to them. 3-ER-462, ¶ 23 (Kantor Decl.).

Meta does not prioritize content solely by considering what will be most engaging to a particular user. 3-ER-451, ¶ 9 (Backstrom I Decl.); 2-ER-74, ¶ 87 (Mobasher Decl.). Rather, Meta encourages users to post only content that complies with its Community Standards, and Meta deprioritizes or deletes content in accordance with those Standards. 3-ER-454–62, ¶¶ 3–23 (Kantor Decl.). Meta seeks to advance other objectives as well, such as promoting up-and-coming

creators, elevating lesser-known voices, and showing users content from a diverse set of creators and on a diversity of topics. 3-ER-451, ¶¶ 10–11 (Backstrom I Decl.); 2-ER-40, ¶¶ 6–7 (Backstrom II Decl.); 2-ER-75, ¶¶ 90–91 (Mobasher Decl.).

To reconcile these (often competing) objectives, Meta uses algorithmic value models through which it assigns weights to the various factors it has elected to consider when deciding how to populate the user feeds. 3-ER-450–51, ¶ 8 (Backstrom I Decl.); 2-ER-69, ¶¶ 73–74 (Mobasher Decl.); 2-ER-73–74, ¶ 85 (Mobasher Decl.). These value models, which are designed and maintained by human Meta employees, ultimately rank the content candidates for any particular user's feed to ensure that the feed is populated in a manner consistent with Meta's editorial goals. 3-ER-450–51, ¶ 8 (Backstrom I Decl.); 2-ER-69, ¶¶ 73–74 (Mobasher Decl.); 2-ER-73–74, ¶ 85 (Mobasher Decl.); 2-ER-39–41, ¶¶ 4–5, 8 (Backstrom II Decl.). Meta continuously monitors the operation of, and refines, its recommendation systems to ensure that their outputs "align[] with Meta's intended goals and policies." 2-ER-40, ¶ 5 (Backstrom II Decl.); *see also* 2-ER-39, ¶ 3 (Backstrom II Decl.).

### B. SB 976 Restricts Meta's Creation and Dissemination of Curated, Personalized Feeds.

SB 976 is a multi-part statutory scheme governing websites that recommend user-generated content to minors based on users' interests. Specifically, it applies to "internet website[s], internet-based service[s], or application[s]" that "offer[]

users or provide[] users with a[ personalized] feed as a significant part of the service." CHSC § 27000.5(b)(1).[1] Personalized feeds are defined to include online services in which "multiple pieces of media generated or shared by users are … recommended, selected, or prioritized for display to a user based, *in whole or in part*, on information provided by the user." *Id.* § 27000.5(a) (emphasis added).

SB 976 imposes several requirements on these services, many of which have since been preliminarily enjoined on First Amendment grounds. *See infra* at 11-13. Among SB 976's other provisions are requirements related to the timing of notifications and compelled disclosures (§§ 27002(a), 27002(b)(1), 27005); restrictions on sharing with minors "the number of likes or other forms of feedback" on posts (§ 27002(b)(3)); and requirements to set minor accounts to "private mode" so that only users connected to the accounts can "view or respond to content" posted by the minor (§ 27002(b)(5)). Starting January 1, 2027, SB 976 will also require covered websites to perform "age assurance" on all users to "reasonably determine[]" whether they are minors. CHSC §§ 27001(a)(1)(B), 27002(a)(2), 27006(b); *see also id.* § 27001(a)(1)(B) (directing the Attorney General to promulgate age assurance regulations by the same date).

[1] Meta uses the term "personalized feed" herein rather than SB 976's pejorative phrase, "addictive feed." Unless otherwise noted, statutory citations are to the California Health & Safety Code ("CHSC").

Another set of SB 976's restrictions, the personalized-feed restrictions, are at issue here. Those restrictions make it "unlawful" for online services to disseminate personalized feeds to California minors unless the service (1) secures "verifiable parental consent," *id.* § 27001(a)(2); (2) implements a default setting limiting a minor's access to the covered feeds to "one hour per day unless modified by the verified parent," *id.* § 27002(b)(2); and (3) curates the default feed on each service so that it is not personalized, *id.* § 27002(b)(4). The personalized-feed restrictions thus expressly limit the manner in which an online service may curate, organize, and disseminate the speech presented on its feeds. Put differently, the online service must *change the content it would otherwise display* if it wants to continue serving minors.

SB 976 covers Meta's services—Facebook, Instagram, and Threads—all of which offer personalized feeds of user-generated content to adults and minors age 13 or older. 3-ER-472, ¶ 21 (Decl. of Sayed Otaru ("Otaru Decl.")). But the statute does not target all content feeds on the Internet, even if they are personalized. Because its definition covers only feeds containing "multiple pieces of media *generated or shared by users*," CHSC § 27000.5(a) (emphasis added), SB 976 does not bar the provision of personalized feeds of content on many other online services—such as news, entertainment, or sports websites—that do not consist of user-generated content.

Even as to feeds of user-generated content, SB 976 expressly exempts certain feeds that are organized and curated in accordance with the State's prescribed editorial standards. *See id.* § 27000.5(a)(1)–(7) (outlining exceptions). For example, a feed is exempt if its contents are based on information that is "not persistently associated with the user or user's device, and does not concern the user's previous interactions with media generated or shared by others," or if the feed "consists of search terms that are not persistently associated with the user or user's device." *Id.* § 27000.5(a)(1)–(2). Other exempted feeds include those containing only content that a user has "expressly and unambiguously requested" (*i.e.*, feeds excluding any and all recommendations) as well as feeds where the content displayed is "exclusively the next media in a preexisting sequence from the same author" and "is not automatically played." *Id.* § 27000.5(a)(4), (6).

### C. NetChoice Challenges SB 976, Including Its Personalized-Feed Provisions.

Following enactment of SB 976, the trade association NetChoice, LLC, of which Meta is a member, filed an action challenging several of its provisions under the First Amendment, including the personalized-feed restrictions. Aside from the personalized-feed restrictions (for which, as discussed below, the courts did not reach the merits), the courts in the *NetChoice* action recognized that First Amendment scrutiny would apply to each of the challenged SB 976 provisions.

**Timing of notifications (§ 27002(a)).** The district court preliminarily enjoined SB 976's timing of notifications restrictions, holding that "notifications are expressive" and that the notification restrictions did not survive intermediate scrutiny, a ruling that the State did not appeal. *Bonta I*, 761 F. Supp. 3d at 1227.

**Compelled disclosures (§ 27005).** The district court preliminarily enjoined SB 976's disclosure requirements, holding that they compelled non-commercial speech and could not survive strict scrutiny under the First Amendment, a ruling that the State also did not appeal. *See id.* at 1229–30.

**Restriction on number of likes (§ 27002(b)(3))**. The district court declined to enjoin SB 976's "like count" restrictions after stating that "[i]t is far from obvious that this setting implicates the First Amendment at all." *Id.* at 1227. This Court reversed, holding that the First Amendment applies because "[l]ike counts are 'speech,'" *Bonta III*, 152 F.4th at 1016 (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011)), and also holding that the provision was subject to, and failed, strict scrutiny as incentivizing websites to offer "voluntary content filters" was a less restrictive alternative, *id.* at 1016–17.

**Private-mode setting (§ 27002(b)(5))**. The district court determined that the private-mode setting provision "obviously regulates speech because it limits the ability of users to speak with minors on social media platforms," but declined to preliminarily enjoin that provision, concluding that it survived intermediate scrutiny.

*Bonta I*, 761 F. Supp. 3d at 1228. This Court affirmed that ruling. *Bonta III*, 152 F.4th at 1018.

**Age assurance (§§ 27001(a)(1)(B), 27002(a)(2)).** The district court recognized that "the[re are] free speech issues surrounding age assurance," *Bonta I*, 761 F. Supp. 3d at 1214, but held that NetChoice's challenge was not prudentially ripe as that aspect of the statute was not in effect and the Attorney General's underlying regulations had yet to be promulgated, *id.* at 1217. This Court affirmed that ruling. *Bonta III*, 152 F.4th at 1018–19.

**Personalized-Feed Restrictions (§§ 27001(a), 27002(b)(2), (b)(4)).** The district court held that NetChoice likely lacked associational standing to challenge the personalized-feed restrictions. *See Bonta I*, 761 F. Supp. 3d at 1231. Recognizing the potential strength of NetChoice's merits arguments, the district court nonetheless preliminarily enjoined those restrictions pending appeal for a period of 30 days, *see NetChoice v. Bonta*, 761 F. Supp. 3d 1232 (N.D. Cal. 2025) ("*Bonta II*"), and this Court extended that injunction throughout the pendency of NetChoice's appeal, Order at 1, *NetChoice, LLC v. Bonta*, No. 25-146 (9th Cir. Jan. 28, 2025), Dkt. 11.

On appeal, this Court did not reach the merits of whether SB 976's personalized-feed restrictions are likely unconstitutional as applied to Meta or any other NetChoice member. It instead concluded that NetChoice lacked associational

standing to challenge those restrictions and clarified that the constitutionality of the personalized-feed restrictions must instead be addressed in suits by individual members. *See Bonta III*, 152 F.4th at 1013.

### D. After Meta Challenges SB 976's Personalized-Feed Restrictions, the District Court Denies a Preliminary Injunction.

Meta then brought this suit before this Court's mandate issued and the preliminary injunction expired, challenging the same personalized-feed restrictions. *See* 3-ER-522–51 (Complaint). TikTok and Google also filed separate challenges to the same restrictions. *See* 1-ER-12.

Shortly after filing their complaints, Meta, TikTok, and Google each moved for a preliminary injunction to halt enforcement of SB 976's personalized-feed restrictions. 1-ER-12, 1-ER-15. They argued that these restrictions triggered First Amendment review for multiple reasons, including that the restrictions burdened both their right to disseminate protected third-party speech and their right to produce their own expressive compilations of third-party content. They also argued that the personalized-feed restrictions could not survive any level of First Amendment review.

While the preliminary injunction motions were pending, the parties engaged in expedited discovery. Over the following months, at the district court's direction, the parties engaged in three rounds of briefing (principal briefs, sur-replies, and

supplemental briefs) and filed nearly 20 expert reports, multiple fact declarations, and over a hundred exhibits. 3-ER-554–70 (Docket Sheet).

On August 5, 2026, the district court denied the motions for preliminary injunction. 1-ER-10–31. Without reaching the rest of the merits analysis or the other equitable factors, the court ruled broadly that none of the social media plaintiffs' personalized feeds—even the Facebook Feed at issue in *Moody*—is eligible for First Amendment protection because, in the court's view, those feeds are not protected speech. 1-ER-16–18.

At the outset, the district court's decision appeared to recognize the vast amount of expressive activity presented by and through Meta's services. The court acknowledged that "[c]yberspace and social media have undoubtedly become among the most prominent places for people to connect with each other, exchange views, learn, and much more." 1-ER-10. It recognized that Meta's Facebook service, in particular, "allow[s] users to engage in debates about an array of topics ranging from politics to favored vacation destinations." 1-ER-10–11. And it acknowledged the "positive societal impacts" of Meta's services, including Meta's "democratiz[ation]" of the "content creation process, allowing people from all walks of life to share their talents with the world." 1-ER-11.

The district court nonetheless concluded that all of that expressive activity was beside the point. Citing the views of a three-justice concurrence from *Moody*,

the court concluded that "a compilation of third-party speech … is protected [by the First Amendment] only to the extent that the compilation is 'inherently expressive' in its own right." 1-ER-16 (quoting *Moody*, 603 U.S. at 781 (Alito, J., concurring in the judgment)). And despite *Moody*'s holding that Facebook's Feed constitutes "a distinctive expressive product" with First Amendment protection, even when using algorithms through which "[t]he selection and ranking is most often based on a user's expressed interests and past activities," *Moody*, 603 U.S. at 710, 731, the court concluded that Meta had failed to show that its "personalized feeds are 'expressive,'" 1-ER-17. The court noted that, in curating its feeds, Meta relies in part on "predictive algorithms that incorporate users' past watch history and other data and then suggest content that the algorithms anticipate will be engaging, or 'interesting' to users." 1-ER-17. And it declared that Meta's "decision to rely on these algorithms[] … is not an expressive judgment." 1-ER-17.

The district court dismissed Meta's showing that its personalization algorithms are one of many editorial processes that shape its feeds and help convey Meta's invitation to users to engage on the issues that matter most to *them*, within the bounds of the Community Standards. 1-ER-17. Instead, the court concluded that, to count as expressive, a feed must be the product of *Meta employees*' (*not* the user's) "determination[s] of what is 'interesting.'" 1-ER-18. The court further suggested that, to receive First Amendment protection, Meta's decisions as to what

content to present must "carr[y] with it a moral valence." 1-ER-21. For instance, the court opined that state laws restricting a service's decision "to show a user a series of cat videos" would trigger First Amendment review if the service's "decisionmakers think that cats are 'good' animals," but that such restrictive laws would *not* trigger review if the service had shown those videos to users because it believes they "will be interesting" to the user. 1-ER-26.

The district court also rejected Meta's separate argument that SB 976 "burdens its right to disseminate fully protected speech." 1-ER-28. In the court's view, this argument was resolved by its prior conclusion that "personalization efforts that rely strictly on user preferences … do not convey an expressive message." 1-ER-28–29. The court also reasoned that SB 976 should not trigger First Amendment review because, despite expressly making it unlawful for Meta to disseminate its covered feeds of content to minors with limited exceptions, "minor users remain free to search for specific content" even if Meta itself cannot recommend it. 1-ER-27.

The district court declined to address whether SB 976's provisions could survive First Amendment review, under either strict or intermediate scrutiny. Rather, the court stated that it might later conclude "that [the] provisions not enjoined now are unconstitutional." 1-ER-31. Nevertheless, it declared that "[f]or the time being," the State "may enforce §§ 27001(a), 27002(b)(2), and 27002(b)(4)."

1-ER-31. Meta then promptly noticed this appeal and sought an injunction pending appeal.

## SUMMARY OF ARGUMENT

Meta displays personalized feeds of content to billions of users on Facebook, Instagram, and Threads, combining "multifarious voices to create a distinctive expressive offering." *Moody*, 603 U.S. at 711 (cleaned up). Disapproving of these and similar editorial decisions, California enacted SB 976 to ban feeds for minors if they are curated "in whole or in part" based on a user's expressed interests and activities, unless they first secure parental consent. That law implicates—and violates—the First Amendment. It should be preliminarily enjoined pending trial on the merits of Meta's constitutional challenge.

**I.** Contrary to the district court's ruling, SB 976 implicates the First Amendment in at least two distinct ways. The personalized-feed restrictions interfere with Meta's exercise of editorial judgment in organizing and curating personalized feeds of third-party content. They also burden Meta's right to disseminate protected third-party speech.

**A.** SB 976's restrictions burden Meta's editorial expression. The Supreme Court held in *Moody* that Facebook's "personalized" News Feed, which prioritizes content algorithmically, is a "distinctive expressive product" protected by the First Amendment because it reflects Meta's editorial judgments about which third-party

content the feed will display and how that display will be ordered and organized. That holding controls here. It is undisputed that Meta continues to use algorithms to exclude, include, prioritize, and de-prioritize content in line with its Community Standards and other editorial directives. SB 976 directly interferes with these editorial judgments. The law makes it unlawful for Meta to disseminate its feeds except as authorized by statute, and the personalization restrictions would replace Meta's individualized curation with a largely non-personalized feed of whatever content is most popular for the majority of users. Because SB 976 prevents Meta from compiling the content it wants in the way it wants, those restrictions are subject to First Amendment scrutiny.

**B.** The First Amendment also applies because Meta's feeds disseminate protected third-party speech. The First Amendment protects the right to distribute speech by others, and making protected materials available to the public is protected even if the disseminators contribute no independent expression beyond the content they share. Meta's services function as clearinghouses for protected third-party expression—the user-generated content on Meta's feeds—and by prohibiting Meta from disseminating its feeds except as authorized by statute, SB 976 burdens that right. That the speech is presented to minors does not change the analysis. Only in relatively narrow and well-defined circumstances may government bar public

dissemination of protected materials to minors, and SB 976 is not limited to constitutionally unprotected categories of speech such as obscenity.

**C.** The district court's analysis was fundamentally flawed. The court's premise that the selection of content for a feed receives no First Amendment protection to the extent it is based on what "will be interesting" to the user, 1-ER-26, is wrong as a matter of law. The First Amendment has long protected the editorial process of selecting and presenting speech based on what will be of interest to the relevant audience. And the court further erred by evaluating the personalization step of creating the feeds in isolation rather than assessing whether Meta's feeds as a whole qualify for First Amendment protection. As the Supreme Court majority made clear in *Moody*, the First Amendment protects Meta's feeds as a whole. And in any event, the process of creating an expressive product cannot be disaggregated from the product itself. To the extent the district court relied on a nonbinding concurrence in the judgment in *Moody* to reach its contrary conclusions, that was further error, as the binding *Moody* majority made clear that First Amendment protection is not limited to a narrow, succinctly articulable message.

The district court also failed to meaningfully address Meta's alternative argument that SB 976 burdens its dissemination of protected third-party speech. The court offered no meaningful response to this independent basis for First Amendment protection, instead only reiterating its prior conclusion about *Moody*. The Court also

disregarded that the right to disseminate content includes more than just the right to share content in some manner approved by the government. Even if SB 976 permits Meta to display billions of user posts, it restricts the means by which that speech may be disseminated—and a law that burdens speech, even if it stops short of prohibiting it, still implicates the First Amendment.

**II.** Because the First Amendment applies, the burden shifts to the State to justify the restriction. The State cannot do so.

**A.** Strict scrutiny applies to SB 976's personalized-feed restrictions because they are both content-based and speaker-based. By regulating only feeds containing user-generated speech, SB 976 explicitly favors provider-generated content, reflecting an aversion to what disfavored speakers (users) have to say. Its restrictions, in turn, apply only to feeds that offer recommendations personalized to individual users but not to feeds that offer recommendations of broadly popular content generally. Moreover, the restrictions cannot be justified without reference to the communicative content they target—the State's own justification is that personalized feeds allegedly amplify extreme views and contain harmful material.

**B.** The personalized-feed restrictions fail both strict and intermediate scrutiny. The State's interest is not unrelated to the suppression of free speech—the central purpose of the restrictions is to alter the speech presented to minors based on the State's view that personalized content is harmful. The State has not

demonstrated that the restrictions will in fact alleviate any alleged harms in a direct and material way. The Surgeon General report the legislature relied upon does not even reference personalized content recommendations as a possible cause of harm. The restrictions are also not tailored to their stated purpose: they purport to address harms from excessive time online by regulating an editorial process, while leaving minors free to spend unlimited hours on exempted platforms, even if they offer personalized feeds, and even on covered services such as Meta's. And the restrictions burden substantially more speech than necessary, restricting personalized feeds for all minors regardless of individual circumstances when the State could instead incentivize voluntary parental tools—tools Meta already offers and is expanding.

**III.** The remaining preliminary injunction factors also favor relief. The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. That harm is particularly stark here because SB 976 is in effect, the State has refused any stay of enforcement, and Meta faces immediate pressure to fundamentally transform its services to comport with the State's editorial dictates. The balance of equities and public interest likewise favor injunctive relief. When a plaintiff is likely to succeed on a First Amendment claim, the equities and public interest favor an injunction because it is always in the public interest to prevent the violation of a party's constitutional rights. The State's asserted interest

in protecting children does not change that calculus. The State has offered no meaningful evidence that the restrictions will abate any alleged harm to minors, and the First Amendment reflects a judgment by the American people that the benefits of free expression outweigh the costs.

## STANDARD OF REVIEW

This Court "review[s] the denial of a preliminary injunction for abuse of discretion," but it "review[s] de novo the underlying issues of law." *Meinecke v. City of Seattle*, 99 F.4th 514, 520 (9th Cir. 2024) (cleaned up). "In First Amendment cases," the Court must "make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *Id.* at 521 (cleaned up).[2] Whether a statute implicates protected expression, and in turn can survive First Amendment scrutiny, are questions of law reviewed de novo. *See, e.g.*, *Pac. Coast Horseshoeing Sch. v. Kirchmeyer*, 961 F.3d 1062, 1067 n.3 (9th Cir. 2020).

## ARGUMENT

To obtain a preliminary injunction, Meta must show that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm absent relief; (3) the balance of equities tips in its favor; and (4) a preliminary injunction is in the public interest. *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (citing *Winter v. Nat.*

[2] Internal citations and quotations marks are omitted throughout this brief unless otherwise stated.

*Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Meta has made each of these showings.

## I. SB 976's Personalized-Feed Restrictions Implicate Meta's First Amendment Rights.

The "first step of First Amendment analysis is to determine whether" the personalized-feed restrictions "implicate[] protected expression." *Recycle for Change v. City of Oakland*, 856 F.3d 666, 669 (9th Cir. 2017). At that initial step, a plaintiff need only "mak[e] a colorable claim that its First Amendment rights … are threatened with infringement." *Meinecke*, 99 F.4th at 521. Once a plaintiff makes that showing, the burden shifts to the government to show that its law complies with the First Amendment. *Id.*

SB 976's personalized-feed restrictions implicate Meta's First Amendment rights for two independent reasons. *First*, the restrictions expressly limit Meta's exercise of editorial judgment in creating curated compilations of third-party content. *Second*, even if Meta were not exercising editorial judgment, the restrictions would implicate the First Amendment because they burden Meta's dissemination of protected third-party speech. Either reason alone is sufficient to "shift[] … to the government" the burden of "justify[ing] the restriction on speech." *Id.* at 521.

### A. The Personalized-Feed Restrictions Burden Meta's Exercise of Editorial Judgment.

The Supreme Court has already held that Meta engages in expression protected by the First Amendment when it curates and displays feeds of third-party speech on Facebook's Feed. *Moody*, 603 U.S. at 715. The fully developed record here confirms the same for all of Meta's services.

Traditional publishers have long exercised editorial judgment to decide how to organize and arrange the content they publish. A newspaper's decisions about which stories deserve the front page, and how to arrange and promote related content to encourage a person to keep reading, are core editorial judgments that the First Amendment protects. *See, e.g.*, *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 255 (1974) ("reaffirm[ing] unequivocally the protection afforded to editorial judgment" in preparing compilations of others' speech, whether that judgment goes to "content or layout"). Publishers have also traditionally selected their target audience and tailored their publications to them, including through selection of what particular audiences will find interesting or engaging. *See, e.g.*, *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 781 (1984). When a person "exercises editorial discretion in the selection and presentation" of content, that person is "engage[d] in speech activity." *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998); *see also Preferred Commc'ns, Inc. v. City of Los Angeles*, 754 F.2d 1396, 1410 n.10 (9th

Cir. 1985) ("Editorial judgment is entitled to First Amendment protection" (collecting cases)), *aff'd*, 476 U.S. 488 (1986).

First Amendment protection does not require the compiler of third-party speech to dictate the precise content within the compilation. In *Turner Broadcasting System, Inc. v. FCC*, the Supreme Court held that a cable programmer engages in expressive activity when it "exercise[s] editorial discretion over which stations or programs to include in its repertoire"—even without controlling or knowing the content on each channel. 512 U.S. 622, 636 (1994).

Nor must the compilation convey a "narrow, succinctly articulable message." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995). In *Hurley*, the Supreme Court held that a parade was an "expressive" compilation of "multifarious voices" even though the organizer was "rather lenient in admitting participants" and did not dictate their speech. *Id.* It was enough that the organizer "exclud[ed] some applicants" and thus shaped the parade's overall composition. *Id.*

Importantly, too, the First Amendment has never required that the message reflect the interests of the speaker rather than the audience. Speech remains constitutionally protected even if the speaker is primarily making judgments about what an audience wants to hear. An editor can select the newspaper's front page based on what stories readers will find most interesting; a cable channel can rerun the shows that viewers enjoy most; and radio stations can offer different music for

the late-night crowd than for morning commuters. Those compilations are driven by audience interest yet remain indisputably protected. *See Sorrell*, 564 U.S. at 578 (2011) (personalized information "allows [speakers] to shape their messages" to their audience, thus making the ensuing messages more effective and "helpful").

In *Moody*, the Supreme Court confirmed that these principles apply with equal force to social media. As the Court explained, "'[w]hatever the challenges of applying the Constitution to ever-advancing technology, the basic principles' of the First Amendment 'do not vary.'" 603 U.S. at 733 (quoting *Brown*, 564 U.S. at 790). Just as the First Amendment protects "[t]raditional publishers and editors" when they "select and shape other parties' expression into their own curated speech products," it protects social media services when they "produce their own distinctive compilations of expression" by "mak[ing] choices about what third-party speech to display and how to display it." *Id.* at 716–17.

The Supreme Court then expressly held that Facebook's Feed qualifies as an expressive compilation.[3] It explained that a "key" feature of Facebook's Feed was the "prioritization of content, achieved through the use of algorithms," and that the "selection and ranking is most often based on a user's expressed interests and past

[3] For simplicity, this brief primarily refers to Facebook's Feed, but the same points apply equally to the feeds on Instagram and Threads, which are curated and organized using similar editorial judgments. *See generally* 2-ER-39–41, ¶¶ 3–10 (Backstrom II Decl.), 3-ER-449–52, ¶¶ 2–12 (Backstrom I Decl.).

activities." *Id.* at 734–35. The Court also observed that other processes shaped Facebook's Feed, such as Meta's content-moderation activities, including its enforcement of its "Community Standards," and found that it was not addressing "feeds whose algorithms respond *solely* to how users act online." *Id.* at 734–36 & n.5 (emphasis added). Rather, Meta "unabashedly control[s] the content that will appear to users, exercising authority to remove … or demote messages" it disfavors. *Id.* at 736.

For those reasons, the Supreme Court concluded that the First Amendment protects Meta's editorial choices in creating Facebook Feed:

> The individual messages may originate with third parties, but the larger offering is the platform's. It is the product of a wealth of choices about whether—and, if so, how—to convey posts having a certain content or viewpoint. Those choices rest on a set of beliefs about which messages are appropriate and which are not (or which are more appropriate and which less so). And in the aggregate they give the feed a particular expressive quality.

*Id.* at 738. When Meta "decide[s] which third-party content those feeds will display, or how the display will be ordered and organized," it is "making expressive choices." *Id.* at 740.

The Court's conclusions in *Moody* apply directly here. There is no meaningful difference between how Meta used algorithms to create the Facebook Feed in 2024—when the Supreme Court concluded that Meta was engaged in protected expression—and how Meta uses algorithms now. If anything, the current

evidentiary record provides even stronger evidence of how Meta's editorial judgments shape the feeds it displays to users.

Meta continues to use algorithms to exclude, include, prioritize, and de-prioritize content in line with Meta's content-moderation policies. 2-ER-39–41, ¶¶ 3-10 (Backstrom II Decl.). For example, Meta removes content that violates its Community Standards—including content promoting suicide, self-injury, eating disorders, or violence—and demotes content that is likely to be viewed as clickbait or otherwise low value. 2-ER-40–41, ¶ 8 (Backstrom II Decl.); 3-ER-456–58, ¶¶ 9–10 (Kantor Decl.); 2-ER-74–75, ¶¶ 87–89 (Mobasher Decl.). Meta also uses integrity-related prediction models to filter out or downrank potentially problematic content at multiple stages of the recommendation process. 2-ER-84–85, ¶¶ 112–14 (Mobasher Decl.).

Beyond content moderation, Meta uses algorithms to effectuate additional editorial directives. Meta implements "diversity rules" to re-rank content and ensure users encounter a broad range of subject matter, content types, authors, and audio. 3-ER-451, ¶ 10 (Backstrom I Decl.); 2-ER-75, ¶ 90 (Mobasher Decl.). Meta also uses "gap rules" to ensure that recommended content is interspersed with posts from users' friends and connections. 3-ER-451, ¶ 10 (Backstrom I Decl.); 2-ER-75, ¶ 90 (Mobasher Decl.). Meta promotes new content from smaller creators to progressively larger audiences—applying rules that disproportionately advantage

budding creators through increased distribution. 3-ER-451, ¶ 11 (Backstrom I Decl.); 2-ER-75, ¶ 90 (Mobasher Decl.). And, of course, Meta has made the editorial judgment to tailor its feeds to users' individual interests. These editorial choices are collectively implemented through Meta's "value models," which are designed and maintained by human employees who assign weights to the various factors Meta has elected to consider, and who continuously monitor and refine the systems to ensure their outputs align with Meta's intended goals and policies. 2-ER-39–41, ¶¶ 4–8 (Backstrom II Decl.); 2-ER-73–74, ¶¶ 82–86 (Mobasher Decl.).

SB 976 interferes with Meta's exercise of this editorial judgment. The law generally makes it "unlawful" for Meta to disseminate these distinctive expressive products—its "feeds"—simply because those feeds "in part" reflect a user's own past activity. CHSC §§ 27000.5(a), 27001(a)(1). And that prohibition necessarily alters the content of Meta's feeds. For example, under SB 976, if a teen has affirmatively demonstrated an interest in science experiments or local scholarships, Meta could not recommend additional content about those subjects unless the teen repeatedly searches for "science experiments" or "local scholarships" each time. Similarly, Meta could not recommend content about California trade schools, colleges and universities, military recruitment, local volunteer opportunities, the San Francisco Chronicle, the Golden State Warriors or Valkyries, or California political officials to teens based on their prior experiences with Meta's services. And if a

teen had already viewed a particular breaking-news story or a sound clip from a debate, Meta could not use that prior interaction even to avoid showing the teen that same content again.

The personalized-feed restrictions also affect Meta's independent editorial judgments about relevance, diversity, and teen safety. As explained above, Meta seeks to show each user content from people and communities that matter to that user while also promoting new creators, varying topics and authors, and avoiding repeated or low-value recommendations. By precluding Meta's ability to rely on prior knowledge of its users, SB 976 would replace individualized curation with generic recommendations, such as whatever content is most popular for the majority of users. SB 976 would likewise restrict Meta's ability to implement individualized safety choices. For example, Meta's ability to de-prioritize certain recommended content based on a teen's content-preference setting—including the most restrictive "Limited Content" setting on Instagram—would apparently be restricted even when the content does not violate Meta's Community Standards. *Cf.* 3-ER-470–72, ¶¶ 16–17, 23 (Otaru Decl.).

SB 976 thus seeks to fundamentally transform Meta's services. The law restricts the inputs Meta may consider, the editorial judgments Meta may make, and the content Meta may present to minors—directly burdening Meta's protected decisions about how to organize, prioritize, and disseminate speech. Because SB

976's personalized-feed restrictions prevent Meta "from compiling the third-party speech it wants in the way it wants"—and from sharing the ensuing expressive products with its users—those restrictions are subject to "First Amendment scrutiny." *Moody*, 603 U.S. at 718.

### B. The Personalized-Feed Restrictions Burden Meta's Dissemination of Protected Speech.

Even if Meta were not exercising editorial judgment protected by the First Amendment in creating personalized feeds, SB 976's personalized-feed provisions would still trigger First Amendment review. At a minimum, SB 976 regulates Meta's dissemination of third-party content, and that alone implicates the First Amendment.

"[D]issemination of information [is] speech within the meaning of the First Amendment." *Sorrell*, 564 U.S. at 570. The "right of freedom of speech … embraces the right to distribute" speech, *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943), and to "promote protected expression" by others, *Cinevision Corp. v. City of Burbank*, 745 F.2d 560, 568 (9th Cir. 1984). Thus, statutory "restrict[ions on social media] platforms' ability … to disseminate speech to minors … implicate the First Amendment." *NetChoice v. Griffin*, 831 F. Supp. 3d 816, 832 (W.D. Ark. 2026). That includes SB 976's restrictions on social media services' ability to disseminate "Like counts" to minors, which "are 'speech.'" *Bonta III*, 152 F.4th at 1016 (quoting *Sorrell*, 564 U.S. at 570).

This Court's decision in *Cinevision* is instructive. There, the Court held that a concert promoter had a protected First Amendment interest in presenting its chosen concerts even though it "did not know specifically what songs" would be played and "was not engaging in 'expression'" of its own. 745 F.2d at 568. As the Court explained, the First Amendment protects intermediaries who disseminate speech "even if they are not 'expressing' themselves" because they still "further a first amendment interest in making protected materials available to the public." *Id.* It "would be anomalous," for example, to "require a bookseller to read all of the books he plans to sell" before "any first amendment rights attach." *Id.* The activities of a "bookseller," "theater owner," and "concert promoter" are each protected because each serves as "a type of 'clearinghouse' for expression" by third parties. *Id.*; *see also First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1978) (the First Amendment protects "affording the public access to discussion, debate, and the dissemination of information and ideas").

Meta's services function as precisely such "clearinghouse[s]" for third-party expression. *Id.* As the district court acknowledged, "[c]yberspace and social media have undoubtedly become among the most prominent places for people to connect with each other, exchange views, learn, and much more." 1-ER-10. The user-generated content on Meta's feeds is "protected First Amendment activity." *Packingham v. North Carolina*, 582 U.S. 98, 105 (2017). By prohibiting Meta from

disseminating its feeds of third-party speech except as authorized by statute, SB 976 burdens Meta's ability to disseminate speech and thus triggers First Amendment scrutiny. *See Bonta III*, 152 F.4th at 1015; *see also, e.g.*, *Children's Health Def. v. Meta Platforms, Inc.*, 112 F.4th 742, 759 (9th Cir. 2024) ("Meta has a First Amendment right to use its platform to … convey posts"); *Preferred Commc'ns, Inc.*, 754 F.2d at 1410 n.10 (a disseminator's "First Amendment protection is not diminished because they distribute or present works created by others").

That the speech here is disseminated to minors does not change the analysis. "[O]nly in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to" minors. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011) (cleaned up). Those circumstances are not present here; the Act is not limited to constitutionally *unprotected* categories of speech, such as "obscenity for minors." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 494 (2025).[4] Courts across the country have held that laws restricting the ability of social media services to disseminate speech to users are subject to First Amendment scrutiny. *NetChoice v. Carr*, 789 F. Supp. 3d 1200, 1222 (N.D. Ga. 2025) (collecting cases).

[4] Nor does Meta authorize users to post sexually explicit material. 3-ER-456–58, ¶¶ 9–10 (Kantor Decl.).

Accordingly, even if the State could show that its personalized-feed restrictions do not run afoul of *Moody*, the restriction still triggers First Amendment review because it burdens Meta's separate right to disseminate third-party speech.

### C. The District Court's Contrary Analysis Is Fundamentally Flawed.

The district court's conclusion that the personalized-feed provisions do not even implicate the First Amendment rests on two fundamental errors. *First*, the court incorrectly held that the First Amendment does not protect a provider's presentation of content to the extent the provider's choices are based on a user's preferences—a proposition that conflicts with longstanding First Amendment law, including the *Moody* majority. And in applying that incorrect rule, the court also disregarded *Moody* by disaggregating Meta's editorial processes from the expressive products they create, holding that personalization algorithms are not "expressive" even though the feeds they shape as a whole indisputably are. *Second*, the court never meaningfully addressed Meta's independent argument that SB 976 burdens the right to disseminate third-party speech—a right that exists regardless of whether Meta conveys any message of its own. Both errors warrant reversal.

#### 1. The District Court Disregarded *Moody* In Holding that Meta's Feeds Are Not Expressive.

The district court's conclusion—that SB 976's restrictions are not subject to First Amendment review because the personalization inputs into Facebook's and

Meta's other feeds are not sufficiently "expressive," 1-ER-17—cannot be squared with *Moody*, and is wrong as a matter of law for several reasons.

*First*, the district court's view that the First Amendment does not protect the presentation of speech based on a provider's view of what will be of interest to the reader or viewer is wrong as a matter of law. The First Amendment has long applied to a provider's choices as to what content will be of interest to a particular audience, and there is no requirement that a given message either express solely the preferences of the speaker or achieve some defined level of specificity in order to warrant protection.

As the majority made clear in *Moody*, a "narrow, succinctly articulable message is not a condition of constitutional protection." 603 U.S. at 732 (quoting *Hurley*, 515 U.S. at 569). And *Moody* follows a long line of Supreme Court precedent deeming compilations protected even when their creators make only high-level editorial judgments and do not dictate the precise content within the compilations. *See supra* at 26 (discussing *Turner* and *Hurley*). Nothing more is required for the First Amendment to apply in this case.

The district court erred in discarding this clear precedent in favor of Justice Alito's nonbinding concurrence in the judgment (effectively, a partial dissent) in *Moody*, as well as a separate decision that nowhere mentions the First Amendment (*Mapother v. Department of Justice*, 3 F.3d 1533, 1540 (D.C. Cir. 1993)), to suggest

that a compilation is expressive only if the compiler deliberately conveys its own clear message on the topic, rather than selecting content based on what others will find engaging or interesting. 1-ER-16–18. As the *Moody* Court made clear, that is not the law. 603 U.S. at 732.

The district court likewise erred in relying upon Justice Barrett's reservation as to whether a feed that "just presents automatically to each user whatever the algorithm thinks the user will like" would be sufficiently expressive. 1-ER-21 (quoting *Moody*, 603 U.S. at 746 (Barrett, J., concurring)). That scenario is not present here. The Supreme Court majority (which included Justice Barrett) concluded that Facebook Feed does *not* "respond solely to how users act online," *Moody*, 603 U.S. at 736 n.5, and the factual record confirms that to be true for all of Meta's feeds. *See supra* at 5–8. And SB 976 sweeps much more broadly than Justice Barrett's hypothetical: it purports to regulate even "feeds" whose recommendations rest only "in part" on a user's inputs, CHSC § 27000.5, and thus expressly targets even feeds that all would agree are expressive.

*Second*, contrary to the district court's analysis, the First Amendment protects expressive products—the "feeds"—as a whole. *Moody*, 603 U.S. at 731–32. Ignoring this aspect of *Moody*, the district court severed what it viewed as "content-moderation inputs" (which it conceded yielded an expressive product) from "personalization" inputs, and evaluated only the latter in isolation. 1-ER-19–27. But

under *Moody*, the relevant unit for First Amendment analysis is the "*expressive product*": Meta's "feeds as a whole," which indisputably "receive First Amendment protection." 603 U.S. at 739–40 (emphasis added). And SB 976 makes it unlawful to disseminate these "feed[s]," as a whole, to certain audiences, even if the feeds are only "in part" shaped by personalization. CHSC §§ 27000.5(a), 27001(a)(1). There is no real delta here between the inputs and the outputs; changing the inputs changes the content that users see.

Nor does *Moody* provide any other basis for distinguishing content moderation from prioritization. *Moody* concerned a Florida statute that not only regulated the deletion or deprioritizing of content, but also required social media services to give users the option of "opt[ing] out of post-prioritization," so that content on their feeds would be "shown in chronological order—not in [an] order … the social media platform believes would be most preferred by or useful to the recipient." *NetChoice, LLC v. Moody*, 546 F. Supp. 3d 1082, 1088 (N.D. Fla. 2021), *aff'd in part, vacated in part, remanded sub nom. NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196 (11th Cir. 2022), *vacated and remanded sub nom. Moody v. NetChoice, LLC*, 603 U.S. 707 (2024). In holding that that statute required First Amendment review, the Supreme Court explained that Facebook's protected "editorial choices" include not only decisions to remove content but also decisions

about "prioritization of content, achieved through the use of algorithms," based on "a user's expressed interests and past activities." *Moody*, 603 U.S. at 734.

SB 976 is therefore subject to First Amendment review, under which the court then considers whether the particular regulation at issue is one that comports with First Amendment standards. *See, e.g.*, *Packingham*, 582 U.S. at 108 (laws restricting "access to social media" trigger the "First Amendment"); *see also, e.g.*, *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1120 (D. Utah 2024) (holding that a law regulating how "social media companies … make decisions about how to construct and operate their platforms" "implicates social media companies' First Amendment rights"); *Carr*, 789 F. Supp. 3d at 1222 (collecting cases holding that laws restricting the ability of "social media" services, like Meta, to disseminate "speech" to users are subject to First Amendment scrutiny).

This Court's precedents also foreclose the district court's view that the threshold step of First Amendment analysis allows it to dissect the process of how Meta creates its "distinctive expressive product[s]." *Moody*, 603 U.S. at 731. As this Court made clear in *Anderson v. City of Hermosa Beach*, "neither the Supreme Court nor our [C]ourt has ever drawn a distinction between the process of creating a form of pure speech … and the product of these processes … in terms of the First Amendment protection afforded." 621 F.3d 1051, 1061 (9th Cir. 2010); *see id.* at 1062 ("The process of expression through a medium has never been thought so

distinct from the expression itself that we could disaggregate [them]."). That is precisely why, for example, "the process involved in producing a parade … cannot be meaningfully separated from the parade's expressive product in terms of the constitutional protection afforded." *Id.* (discussing *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995)); *see Green v. Miss U.S. of Am., LLC*, 52 F.4th 773, 780 (9th Cir. 2022) ("[T]he Pageant's message cannot be divorced from the Pageant's selection and evaluation of contestants.").

So too here: in determining whether the First Amendment is implicated by this case, the processes that Meta uses to create its "expressive products"—including the "key" feature of personalized "prioritization of content, achieved through the use of algorithms"—are part and parcel of the protected "expressive product" itself. *Moody*, 603 U.S. at 716, 731, 734; *see Anderson*, 621 F.3d at 1062. The district court's attempt to "disaggregate" the underlying processes to try to afford *zero* "First Amendment protection" for Meta's feeds because of the use of personalization algorithms was contrary to binding precedent. *Anderson*, 621 F.3d at 1062.

*Third*, the district court further erred in holding that the First Amendment protects only messages with a "moral valence" but not messages containing "some approximation of 'we think you will find this content interesting.'" 1-ER-17; 1-ER-25. No authority supports this "moral valence" requirement. To the contrary, this Court has routinely concluded that "entertainment and visual expression [are] purely

expressive activities" protected by the First Amendment, *Green*, 52 F.4th at 780, without pausing to ask if the entertainment has "moral valence." Similarly, "constitutional safeguards are not applicable only to musical expression that implicates some sort of ideological content." *Cinevision*, 745 F.2d at 569. And the Supreme Court has held, for example, that advertisements are generally protected by the First Amendment even when the "advertiser's interest is a purely economic one" and it "does not wish to editorialize on any subject, cultural, philosophical, or political." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 761–62 (1976).

Nor does a publisher's desire to serve its audience divest the publisher of First Amendment protection. "[I]t is hardly unusual for publications to print matter that will please their subscribers." *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 716 (4th Cir. 1991). Newspaper editors, cable operators, parade organizers, and other curators of information have for decades selected third-party content with an eye towards presenting more interesting, engaging, and relevant content to their specific audiences, all within the editorial protection of the First Amendment. *See Sorrell*, 564 U.S. at 578 (personalized information "allows [speakers] to shape their messages" to their audience, thus making the ensuing messages more effective and "helpful"). Depriving them of that ability means hiding wanted speech within a

deluge of unwanted speech—a distortion of the market that the First Amendment does not allow.

In more recent years, online publications have done the same: sports websites may present content focused on the particular sports teams or leagues a user is most interested in; news aggregators or publications may offer customized lists of stories based on users' previous reading habits; and music streaming services may create custom playlists for a user based on their previous listening habits. And "Facebook's [own] promotion of engagement-driven content through [a] recommendation algorithm … is [also] the work of publishers." *Doe 1 v. Meta Platforms, Inc.*, 174 F.4th 1159, 1169 (9th Cir. 2026). Put otherwise, a "newspaper company does not cease to be a publisher simply because it prioritizes engagement in sorting its content. And the fact that Facebook uses an algorithm to achieve the same result of engagement does not change the underlying nature of the act that it is performing." *M.P. ex rel. Pinckney v. Meta Platforms Inc.*, 127 F.4th 516, 526 (4th Cir. 2025).

Meta's decision to publish content that it believes will be of interest to its users remains protected, just as the First Amendment protects a newspaper's decision to hire writers whose work will be of interest to its readers, even if the editor does not dictate, and does not preclear, the precise contents of the articles they write. *See McDermott v. Ampersand Publ'g, LLC*, 593 F.3d 950, 962 (9th Cir. 2010) ("To the extent [a] publisher's choice of writers affects the expressive content of its

newspaper, the First Amendment protects that choice."); *see also Anderson*, 621 F.3d at 1062 (tattoo artist engages in "expressive activity" even though the customer dictates "which design she wants tattooed on her skin"); *Angelilli v. Activision Blizzard, Inc.*, 781 F. Supp. 3d 691, 702 (N.D. Ill. 2025) (the First Amendment would not tolerate a "mandate that authors not end chapters on cliffhangers"). And "Meta" has the same "First Amendment right" to decide "how[] to convey posts" as do newspaper "editors." *Children's Health Def.*, 112 F.4th at 759 (quoting *Moody*, 603 U.S. at 738). The First Amendment therefore protects Meta's exercises of "editorial control and judgment" when exercised on "social media," *Moody*, 603 U.S. at 736 n.5, as "the First Amendment … does not go on leave when social media are involved," *id.* at 719.

#### 2. The District Court Did Not Meaningfully Address Whether the First Amendment Protects the Dissemination of Third-Party Speech.

The district court acknowledged Meta's argument that SB 976 implicated the First Amendment for a second, "independent" reason: That it burdens its dissemination of protected speech. 1-ER-28–29. The court nevertheless failed to meaningfully address that argument, much less provide any reason why SB 976 does not burden Meta's First Amendment right to disseminate speech.

In denying the motion for a preliminary injunction, the district court did not offer any response to Meta's argument on this point. It instead only reiterated its

prior conclusion, "[f]or the reasons discussed above," that Meta is not entitled to First Amendment protection under *Moody*. 1-ER-28–29. That response is a non sequitur. The point of Meta's alternative argument is that SB 976 implicates the First Amendment even if *Moody* does not provide any First Amendment protection here.

In denying an injunction pending appeal, the district court explained that *Cinevision* was inapplicable because SB 976 purportedly "does not impair platforms' ability to *host* third-party content." 1-ER-6 n.2 (emphasis added). But the right to disseminate content includes more than just the right to share content in *some* manner approved by the government. *Cinevision* did not suggest that a law permitting concert promoters to host rock concerts in an empty stadium, or allowing booksellers to stock books but prescribing the specific manner of their organization on the shelves, would adequately respect the right to disseminate content. To the contrary, the Court explained that the "central concern of the First Amendment in this area is that there be a *free flow* from creator to audience of whatever message [the creator's] film or a book might convey." *Cinevision*, 745 F.2d at 568 (emphasis added). And there is "no general principle that freedom of speech may be abridged when the speaker's listeners could come by his message by some other means." *Va. State Bd.*, 425 U.S. at 757 n.15.

Even if SB 976 arguably permits Meta to "host" its billions of posts, it unquestionably still restricts the means by which that speech may be shared. *Cinevision*, 745 F.2d at 568. The statute prohibits Meta from disseminating its current feeds of third-party content, which include personalized content recommendations, to a sizable portion of the California population. CHSC § 27001(a). Unless Meta compiles its feeds to avoid personalized content recommendation—thereby making them less "helpful" to particular users, *Sorrell*, 564 U.S. at 578—Meta is not legally authorized to disseminate them. That alone means the First Amendment is implicated. *See id.* at 568 ("an individual's right to speak is implicated when information he or she possesses is subjected to restraints on the way in which the information might be used or disseminated"); *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000) ("It is of no moment that the statute does not impose a complete prohibition. The distinction between laws burdening and laws banning speech is but a matter of degree."); *Doe v. Harris*, 772 F.3d 563, 572 (9th Cir. 2014) ("a law may burden speech—and thereby regulate it—even if it stops short of prohibiting it").

* * *

SB 976's personalized-feed restrictions implicate the First Amendment for two independent reasons. *First*, they directly burden Meta's exercise of editorial judgment in curating its distinctive expressive products. *Second*, they restrict Meta's

right to disseminate protected third-party speech. The district court's contrary conclusion rests on fundamental legal errors that this Court should correct.

## II. SB 976's Personalized-Feed Restrictions Violate the First Amendment.

The district court did not address whether SB 976 could survive heightened First Amendment scrutiny. This Court can and should decide the issue. Whether the personalized-feed restrictions are constitutional is a question of law, the relevant record is fully developed, and further delay would seriously harm speech interests. *See*, *e.g.*, *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1119 (9th Cir. 2024) (applying strict scrutiny in the first instance on appeal to affirm entry of preliminary injunction, even though the district court below did not apply that framework); *Anderson*, 621 F.3d 1051 (reversing district court decision erroneously holding that First Amendment was not implicated, concluding that the act of tattooing is expressive, and then applying the appropriate level of scrutiny in the first instance).

Because SB 976's personalized-feed restrictions burden protected First Amendment activity several times over, the burden "shifts to the government to justify the restriction on speech." *Meinecke*, 99 F.4th at 521. The State cannot carry that burden. SB 976's personalized-feed restrictions are properly subject to strict scrutiny—but they cannot survive even intermediate scrutiny.

**A. The Personalized-Feed Restrictions Are Subject to Strict Scrutiny.**

Strict scrutiny is "the standard for reviewing the direct targeting of fully protected speech." *Free Speech Coal.*, 606 U.S. at 484. That exacting standard applies here for three independent reasons: SB 976's personalized-feed restrictions are content-based, speaker-based, and justified only by reference to the communicative impact of the speech they target. *See Reed v. Town of Gilbert*, 576 U.S. 155, 163–66 (2015) (strict scrutiny applies to "[c]ontent-based laws—those that target speech based on its communicative content"—and to laws that "cannot be justified without reference to" the "communicative content" they regulate); *Turner I*, 512 U.S. at 658 (laws targeting "disfavored speakers" "demand strict scrutiny" when based on "aversion to what … [they] have to say").

*First*, the personalized-feed restrictions are both content-based and speaker-based in a way that reflects "aversion to what … disfavored speakers have to say." *Turner I*, 512 U.S. at 658. SB 976 explicitly favors provider-generated content—news articles, sports results, and other website-authored materials—over content "generated or shared by users" themselves. CHSC § 27000.5(a). Only feeds displaying the latter are subject to restrictions.

The Supreme Court has never approved such regulation of the editorial process. *See Tornillo*, 418 U.S. at 258 ("It has yet to be demonstrated how governmental regulation of [the editorial] process"—including the "choice of

material to go into" a compilation—"can be exercised consistent with First Amendment guarantees."). And previous government attempts to directly interfere with editorial curation have uniformly triggered strict scrutiny. *See id.*; *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 21 (1986) (applying strict scrutiny to regulatory order compelling private utility to include opponent's message in its billing envelope). Indeed, even the *Moody* Court applied intermediate scrutiny only *arguendo*, because the legislation failed that more lenient standard. 603 U.S. at 740. SB 976's restrictions are at least as intrusive.

Courts nationwide have reached the same conclusion. *See, e.g.*, *NetChoice v. Jones*, 822 F. Supp. 3d 656, 673 (E.D. Va. 2026) (strict scrutiny applies to law that "regulate[s] user-generated content, but not provider-selected content" because it is "content-based"), *appeal docketed*, No. 26-1252 (4th Cir. Mar. 6, 2026); *Carr*, 789 F. Supp. 3d at 1222 (same); *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923, 953–54 (S.D. Ohio 2025) (same), *rev'd on other grounds*, 180 F.4th 268 (6th Cir. 2026); *Reyes*, 748 F. Supp. 3d at 1121–23 (same). This Court should follow suit.[5]

---

[5] Meta maintains and preserves the argument that SB 976's central coverage definition is itself content-based because it exempts websites "limited to commercial transactions or to consumer reviews of products." CHSC § 27000.5(b)(2); *see Sorrell*, 564 U.S. at 559, 564–65 (statute prohibiting use of information "for marketing purposes" was content-based). That makes all of SB 976's speech restrictions content-based, including the personalized-feed restrictions.

*Second*, the personalized-feed restrictions "cannot be justified without reference to" the "communicative content" of the speech they target. *Reed*, 576 U.S. at 163–66. The State's own justifications prove the point. SB 976's sponsors urged that personalized social media feeds should be regulated because some "user-created content" contains "harmful material to youth." 3-ER-488 (Assembly Report). The State doubled down below, arguing that "personalized feeds amplify extreme views and lead users down rabbit holes of increasingly extreme content." Bonta PI Opp'n at 23 (D. Ct. ECF No. 63). Because the State's justifications "stem from the direct communicative impact of speech," the statute "regulates speech on the basis of its content" and strict scrutiny applies. *Tschida v. Motl*, 924 F.3d 1297 (9th Cir. 2019).

*Third*, the personalized-feed restrictions are facially content-based because they target *personalized* content recommendations while leaving *popular* recommendations untouched. A restriction is content-based not only when it targets a specific topic—political or religious speech, for example—but also when it targets content bearing a particular quality. *See Iancu v. Brunetti*, 588 U.S. 388, 394 (2019) (bar on "immoral or scandalous" trademarks was content-based). Here, SB 976 suppresses speech bearing a particular quality—content reflecting a user's individual interests, hobbies, and goals—while doing nothing to regulate content that is popular among a generic majority of users. The First Amendment does not permit such selective suppression.

In sum, the personalized-feed restrictions facially discriminate based on content, reflect a preference that disfavors user-generated speech, can be justified only by reference to the communicative impact of the targeted speech, and single out certain websites based on the kinds of content they host. Any one of these features is enough to trigger strict scrutiny. Together, they demonstrate the clear need to apply that heightened standard for review.

### B. The Personalized-Feed Restrictions Fail Under Either Strict or Intermediate Scrutiny.

At minimum, SB 976's personalized-feed restrictions are subject to at least intermediate scrutiny. *See Moody*, 603 U.S. at 741 (statute interfering with Meta's curation on Facebook's Feed subject to heightened scrutiny); *Sorrell*, 564 U.S. at 563–66 (2011) (statute restricting ability of "pharmaceutical drug manufacturers" to personalize commercial speech was subject to heightened scrutiny). And SB 976's personalized-feed restrictions fail both strict and intermediate scrutiny.

A law survives strict scrutiny only if the government shows it "is justified by a compelling government interest and is narrowly drawn to serve that interest." *Brown*, 564 U.S. at 799. But even when strict scrutiny does not apply, a law burdening protected speech remains unconstitutional under intermediate scrutiny unless it both "advances important governmental interests unrelated to the suppression of free speech" and "does not burden substantially more speech than necessary to further those interests." *Free Speech Coal.*, 606 U.S. at 471 (cleaned

up). The government must not only "demonstrate that the recited harms are real," but also that its regulation "will in fact alleviate these harms in a direct and material way." *Doe*, 772 F.3d at 576–77. For multiple independent reasons, SB 976's personalized-feed restrictions cannot survive even intermediate scrutiny, and thus necessarily fail the proper standard (strict scrutiny) as well.

*First*, to survive any form of First Amendment review, an asserted governmental interest must be "unrelated to the suppression of free speech." *Free Speech Coal.*, 606 U.S. at 471. Here, the central purpose of the personalized-feed restrictions is to alter, and ultimately limit, the speech presented to minor users: as discussed, SB 976's sponsors urged that some "user-created content" contains "harmful material," 3-ER-488 (Assembly Report), and the State has echoed that rationale in its briefing. *See supra* at 49. Although the protection of children is an important governmental interest—an interest that Meta shares, given the many safety tools it has developed for kids, *see* 3-ER-303–60, ¶¶ 67–200 (Decl. of Dr. Jeremy Birnholtz ("Birnholtz Decl."))—SB 976 seeks to advance that interest only by restricting the nature and amount of speech that minors consume.

"It is well established that, as a general rule, the government 'may not suppress lawful speech as the means to suppress unlawful speech.'" *Packingham*, 582 U.S. at 109 (*quoting Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002)). But SB 976's personalized-feed restrictions do not even do that—instead, they aim

to suppress *lawful* speech (all feeds containing any content recommendations that include personalization as one input) in order to suppress other *lawful* speech (what defendant characterizes as "rabbit holes of harmful content"). There is no dispute that the user-generated speech on Meta's services reflects "a wide array of protected First Amendment activity." *Id.* at 105. And the fact "[t]hat the State finds [this] expression too persuasive"—or too attractive or engaging—"does not permit it to quiet the speech or to burden its messengers." *Sorrell*, 564 U.S. at 577–78.

*Second*, the State has not demonstrated that the personalized-feed restrictions "will in fact alleviate" the alleged harms in "a direct and material way." *Doe*, 772 F.3d at 577. "The standard for demonstrating a direct ausal link is a demanding one," *Imperial Sovereign Ct. of Mont. v. Knudsen*, 170 F.4th 820, 865 (9th Cir. 2026). The State must come forward with "substantial evidence" proving that personalized content recommendations on social media feeds—not social media use in general—are the source of the problem that SB 976 seeks to solve. *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997).

The State does not come close to carrying that "demanding" burden. The legislature found that the Act's personalized-feed restrictions were justified by a 2023 report by the U.S. Surgeon General. S.B. 976 § 1(c). But that report does not even reference personalized content recommendations as a possible cause of harm. In fact, the report does not reach a conclusive determination about the purported

harms of social media more generally, noting instead that "[m]ore research is needed to fully understand the impact of social media," and that, "[a]t this time, we do not yet have enough evidence to determine if social media is sufficiently safe for children and adolescents." 3-ER-500 (U.S. Surgeon General Report). To the extent the U.S. Surgeon General's report considered content personalization, it implied that personalization may be one of social media's strengths: "Social media can provide benefits for some youth by providing positive community and connection with others who share identities, abilities, and interests." 3-ER-502.

Given the equivocal nature of this report, "[t]he record [the State] has assembled here" is even weaker than "the deficient record in *Brown*, where 'nearly all of the research' showing any harmful effects 'is based on correlation, not evidence of causation.'" *NetChoice v. Murrill*, 812 F. Supp. 3d 598, 651 (M.D. La. 2025) (quoting *Brown*, 564 U.S. at 800); *see also Reyes*, 748 F. Supp. 3d at 1124–25 (similar). Recognizing the insufficient evidence before the Legislature, the State attempted to develop a belated record in the district court by commissioning several expert reports to oppose Meta's preliminary injunction motion. But the State cannot rely on those new sources because the government's "justification[s] for interfering with First Amendment rights" cannot be "invented post hoc in response to litigation." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 (2022); *see also, e.g.*, *People for the Ethical Treatment of Animals, Inc. (PETA) v. N.C. Farm Bureau*

*Fed'n, Inc.*, 60 F.4th 815, 830 (4th Cir. 2023) (emphasizing that laws may not "chill an alarming amount of speech without any 'actual evidence' in the legislative record" (cleaned up)).

Meta's own expert has explained in detail that none of the State's reports offer any credible evidence that the alleged harms from social media use are "specifically" the product of feeds displaying personalized content recommendations, much less that those harms will be alleviated if minors continue to use social media services presenting feeds containing no user-based recommended content. 2-ER-127, ¶ 10 (Decl. of Dr. Michael Baiocchi ("Baiocchi Decl."); 2-ER-189, ¶¶ 144–45 (Baiocchi Decl.). The State's declarations do not "support[] the claim that *personalized feeds* are, or can be, intrinsically harmful to adolescent mental health." 2-ER-189, ¶ 144 (Baiocchi Decl.) (emphasis added). Yet personalized feeds are all that SB 976 seeks to address. The State has failed to establish that the personalized-feed restrictions will serve its asserted interests "in a direct and material way." *Doe*, 772 F.3d at 577; *see also*, *e.g.*, *Imperial Sovereign*, 170 F.4th at 865–66 (preliminarily enjoining law where the state offered "no evidence of a [direct] causal link between drag story hours and harm to the physical and psychological well-being of children"); *Bonta*, 113 F.4th at 1121 (although state asserted statutory "requirement protects children's safety," the challenged provision was "unnecessary" to achieve that end); *Reyes*, 748 F. Supp. 3d at 1128 (statute failed heightened scrutiny as "Defendants [do not] offer

any evidence that *these specific measures*" will improve "mental health outcomes" (emphasis added)).

Third, SB 976's personalized-feed restrictions "cannot meaningfully advance the government's stated interests," including because they "contain[] exceptions that undermine and counteract [their] goals." *Yim v. City of Seattle*, 63 F.4th 783, 794 (9th Cir. 2023). To the extent the State believes that excessive social media use can be problematic, the way to address that problem is by addressing excessive use—not by regulating only personalized content recommendations while leaving minors free to spend as many hours as they want online. Thus, "[l]ike *Brown*, [SB 976] appears underinclusive when judged against the State's interests in protecting minors from the harms associated with social media use because the Act ultimately preserves minors' ability to spend as much time as they want on social media services." *Reyes*, 748 F. Supp. 3d at 1128.

SB 976 is also ineffective in that it "preserves minors' access to the [allegedly] addictive features … on [numerous other] internet platforms." *Id.* If the State were correct that making content recommendations informed by users' data is inherently harmful, then there would be no basis for exempting (1) all other sites providing personalized recommendations, such as music, television, and movie-streaming sites, *cf.* CHSC § 27000.5(a) (regulating only sites with user-generated content); (2) sites whose personalized feeds are not "a significant part of the service provided by

that [site]," *id.* § 27000.5(b)(1), or (3) sites facilitating commercial transactions, *id.* § 27000.5(b)(2)(A)). Moreover, despite assuming that feeds presenting personalized content recommendations are affirmatively harmful, the State nonetheless allows them "so long as one parent … says it's OK." *Brown*, 564 U.S. at 802; *cf.* CHSC § 27001(a)(2) (preserving services' ability to provide personalized recommendations upon parental consent).

Courts have regularly held that similar exclusions render the law insufficiently tailored. *See, e.g.*, *Carr*, 789 F. Supp. 3d at 1228 (social media law fatally underinclusive because it exempted "'interactive gaming' and 'virtual gaming' platforms from regulation," even though "such platforms represent massive online communities with, presumably, significant young populations"); *Jones*, 822 F. Supp. 3d at 673 (same, as statutory exemptions left "digital gaming" unrestricted); *Murrill*, 812 F. Supp. 3d at 652 ("the Act [is underinclusive as it] does not regulate identical speech on [other online] platforms"); *Griffin*, 831 F. Supp. 3d at 831–33 (same, where parents or children were "free to depart from the protective default"). In short, the State's failure to "account for the wider universe of platforms that utilize the features they take issue with … raises serious doubts about whether the Act actually advances the State's purported interests." *Reyes*, 748 F. Supp. 3d at 1129 (cleaned up).

Finally, the personalized-feed restrictions "burden substantially more speech than necessary." *Free Speech Coal.*, 606 U.S. at 471. SB 976 restricts personalized feeds for all minors across the board, regardless of whether individual minors are allegedly harmed by personalized feeds or whether they benefit from them. But "the Supreme Court has strongly suggested that the government does not have a broad and undifferentiated interest in shielding all minors from any non-obscene protected speech" deemed harmful. *Imperial Sovereign*, 170 F.4th at 860.

Moreover, "here, as in [*Bonta III*], California could encourage websites 'to offer voluntary content filters' related to [personalized feeds] or educate children and parents on such filters." *Bonta III*, 152 F.4th at 1017 (quoting *Bonta*, 113 F.4th at 1121). Indeed, on top of the many existing safety tools already offered by Meta, including daily time limits and time-of-day restrictions, *see* 3-ER-465, ¶ 4 (Otaru Decl.); 3-ER-471, ¶ 19 (Otaru Decl.); 3-ER-340–47, ¶¶ 151–59 (Birnholtz Decl.); 3-ER-353–54, ¶¶ 176–77 (Birnholtz Decl.), Meta recently committed to offering California minors and their parents voluntary tools to restrict access to personalized feeds, and Meta will also be limiting the amount of time minors can spend on its services to two hours per day absent parental consent. These are all "alternatives that would be both less restrictive of speech and more respectful of parental authority." *Imperial Sovereign*, 170 F.4th at 864; *see also Carr*, 789 F. Supp. 3d at

1230 (tools that "limit how long children can use" online services are better tailored to goal of limiting excessive use).

The State "could have easily employed less restrictive means to accomplish its protective goals, such as by [] incentivizing companies to offer voluntary content filters" or other parental tools like those offered by Meta. *Bonta III*, 152 F.4th at 1017. Certainly, the State "has not shown existing parental controls are an inadequate alternative to the Act." *Reyes*, 748 F. Supp. 3d at 1127; *see also, e.g.*, *Jones*, 822 F. Supp. 3d at 676 ("parents have ample tools to limit minors' access to social media," which are "less restrictive means to achieve the government's goals"); *Murrill*, 812 F. Supp. 3d at 650 (similar). "Given this simultaneous over- and under-inclusivity, [the State] has failed to demonstrate that the Act's … requirements satisfy intermediate scrutiny, much less strict scrutiny." *Murrill*, 812 F. Supp. 3d at 652.

In sum, the personalized-feed restrictions are unconstitutional. They are subject to strict scrutiny because they directly regulate editorial discretion, discriminate based on content and speaker, and can be justified only by reference to the communicative impact of the targeted speech. In any event, they fail any level of First Amendment scrutiny because the State's interest is inextricably tied to the suppression of speech, the State has offered no evidence that the restrictions will alleviate the harms they purport to address, the restrictions are riddled with

exceptions that undermine their stated goals, and less restrictive alternatives—including voluntary parental tools that Meta already offers—remain available.

## III. The Other Preliminary Injunction Factors Are Satisfied.

To obtain a preliminary injunction, Meta must also demonstrate: (1) that it would be irreparably harmed absent an injunction, and (2) that the balance of equities and public interest counsel in favor of injunctive relief. Meta easily satisfies both requirements.

*First*, Meta will suffer irreparable harm without an injunction. "By bringing a colorable First Amendment claim," Meta "raises the specter of irreparable injury." *Bonta III*, 152 F.4th at 1024. Irreparable harm is "relatively easy to establish" because a "plaintiff need only demonstrate the existence of a colorable First Amendment claim." *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022) (cleaned up).

The harm here is stark. SB 976 is in effect, and the State recently refused Meta's requests not only for a stay of enforcement pending appeal, but even for 30 days' notice in advance of any enforcement action. *See, e.g.*, *NetChoice, LLC v. Skrmetti*, __F.4th__, 2026 WL 2546423, at *12 (6th Cir. Aug. 28, 2026) (similar circumstances demonstrated a "credible threat of enforcement" that also established irreparable harm). Without immediate relief, Meta will have to fundamentally transform its services, including "pervasive changes to the design and operation of

Meta's Facebook, Instagram, and Threads services" that will "severely restrict Meta's ability to present affected users with content they might find valuable." 2-ER-34, ¶¶ 3–5 (Decl. of Lars Backstrom ("Backstrom III Decl."). These "significant changes to [Meta's] feeds" will "fundamentally reorient [Meta's] relationship with [its] users," *Bonta II*, 761 F. Supp. 3d at 1236, and thus inflict irreparable harm.

*Second*, the remaining two factors—the balance of equities and public interest—likewise favor Meta. "[W]hen plaintiffs show they are likely to succeed on a First Amendment claim, that 'compels a finding' that the equities and public interest favor an injunction." *Bonta III*, 152 F.4th at 1025. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *United States v. California*, 173 F.4th 1060, 1069 (9th Cir. 2026).

The State's asserted interest in protecting children does not upset that balance. *See Imperial Sovereign*, 170 F.4th at 859–60, 866. As discussed above, the State has not shown that SB 976's personalized-feed restrictions advance that interest. *See supra* at 52-56. And even when evidence exists of harm traceable to the expressive conduct the State seeks to regulate, the First Amendment "reflects a judgment by the American people that the benefits" of free expression "outweigh the costs." *United States v. Stevens*, 559 U.S. 460, 470 (2011). Meta is likely to succeed on the merits. That "tips the public interest sharply in [its] favor." *Baird*, 81 F.4th at 1040.

## CONCLUSION

The district court's order denying Meta's motion for a preliminary injunction should be reversed.

Dated: September 8, 2026

Respectfully submitted,

*<u>/s/ Mark Mosier</u>*

Mark W. Mosier
Teena-Ann V. Sankoorikal
Jeffrey E. Sandberg
Kuntal V. Cholera
Alexandra J. Widas
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000

Isaac D. Chaput
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
(415) 591-6000

Alexander L. Schultz
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
(424) 332-4800

*Counsel for Plaintiff-Appellant*
*Meta Platforms, Inc.*

## STATEMENT OF RELATED CASES

The following related cases are pending in this Court, which "raise the same or closely related issues," 9th Cir. R. 28-2.6:

1. *TikTok, Inc., et al. v. Bonta*, No. 26-5121 (9th Cir.). That case is an appeal from the same district court order denying preliminary injunctive relief against the personalized-feed provisions of California Senate Bill 976, and raises a similar First Amendment challenge to those provisions.
2. *Google LLC, et al. v. Bonta*, No. 26-5132 (9th Cir.). That case is likewise an appeal from the same district court order denying preliminary injunctive relief against the personalized-feed provisions of California Senate Bill 976, and raises a similar First Amendment challenge to those provisions.

On August 28, 2026, this Court consolidated these appeals with the present case. *See Meta Platforms*, 26-5120, ECF No. 8; *TikTok*, 26-5121, ECF No. 8; *Google*, 26-5132, ECF No. 14.

## CERTIFICATE OF COMPLIANCE

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-5120

I am the attorney or self-represented party.

**This brief contains 13,871 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
- [ ] it is a joint brief submitted by separately represented parties.
- [ ] a party or parties are filing a single brief in response to multiple briefs.
- [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated ______________.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** */s/ Mark Mosier* **Date:** 9/8/2026

# ADDENDUM

# TABLE OF CONTENTS

**Page**

S.B. 976, 2023-2024 Reg. Sess. (Cal. 2024), codified at Cal. Health & Safety Code §§ 2700–27007 .......................................................................... A-1

**Senate Bill No. 976**

**CHAPTER 321**

An act to add Chapter 24 (commencing with Section 27000) to Division 20 of the Health and Safety Code, relating to youth addiction.

[Approved by Governor September 20, 2024. Filed with Secretary of State September 20, 2024.]

LEGISLATIVE COUNSEL'S DIGEST

SB 976, Skinner. Protecting Our Kids from Social Media Addiction Act.

Existing law, the California Age-Appropriate Design Code Act, requires, beginning July 1, 2024, a business that provides an online service, product, or feature likely to be accessed by children to comply with certain requirements. The act requires the business to complete a data protection impact assessment addressing, among other things, whether the design could harm children and whether and how the online product, service, or feature uses system design features to increase, sustain, or extend use of the online product, service, or feature by children, including the automatic playing of media, rewards for time spent, and notifications. Existing law prohibits the business from using the personal information of any child in a way that the business knows, or has reason to know, is materially detrimental to the physical health, mental health, or well-being of a child.

Existing law, the Privacy Rights for California Minors in the Digital World, prohibits an operator of an internet website, online service, online application, or mobile application from specified conduct when minors are involved, including the marketing or advertising of alcoholic beverages, firearms, or certain other products or services. Existing law sets forth other related protections for minors, including under the California Consumer Privacy Act of 2018 and the California Privacy Rights Act of 2020.

This bill, the Protecting Our Kids from Social Media Addiction Act, would make it unlawful for the operator of an addictive internet-based service or application, as defined, to provide an addictive feed to a user, unless the operator

does not have actual knowledge that the user is a minor; commencing January 1, 2027, has reasonably determined that the user is not a minor; or has obtained verifiable parental consent to provide an addictive feed to the user who is a minor.

The bill would define "addictive feed" as an internet website, online service, online application, or mobile application, in which multiple pieces of media generated or shared by users are recommended, selected, or prioritized for display to a user based on information provided by the user, or otherwise associated with the user or the user's device, as specified, unless any of certain conditions are met.

The bill would make it unlawful for the operator of an addictive internet-based service or application, between the hours of 12 a.m. and 6 a.m., in the user's local time zone, and between the hours of 8 a.m. and 3 p.m., Monday through Friday from September through May in the user's local time zone, to send notifications to a user if the operator has actual knowledge that the user is a minor or, commencing January 1, 2027, has not reasonably determined that the user is not a minor, unless the operator has obtained verifiable parental consent to send those notifications, as specified. The bill would set forth related provisions for certain access controls determined by the verified parent through a mechanism provided by the operator.

Under the bill, a parent's provision of consent or use of a mechanism, as described above, would not waive, release, otherwise limit, or serve as a defense to, any claim that the parent, or that the user who is a minor or was a minor at the time of using the internet-based service or application, might have against the operator regarding any harm to the mental health or well-being of the user.

The bill would require an operator to annually disclose the number of minor users of its addictive internet-based service or application, and of that total the number for whom the operator has received verifiable parental consent to provide an addictive feed, and the number of minor users as to whom the access controls are or are not enabled.

Under the bill, these provisions would only be enforced in a civil action brought in the name of the people of the State of California by the Attorney General. The bill would require the Attorney General to adopt regulations to further the purposes of these provisions, including regulations regarding age assurance and

parental consent by January 1, 2027. The bill would authorize the Attorney General to adopt regulations that provide for exceptions to these provisions, but only if those exceptions further the purpose of protecting minors. The bill would require the Attorney General, in promulgating regulations, to solicit public comment regarding the impact that any regulation might have based on certain nondiscrimination characteristics set forth in existing law.

The bill would make these provisions severable.

*The people of the State of California do enact as follows:*

**SECTION 1.** The Legislature finds and declares the following:

**(a)** Social media provides an important tool for communication and information sharing. Approximately 95 percent of 13- to 17-year-olds, inclusive, say that they use at least one social media platform, and more than one-third report using social media almost constantly.

**(b)** However, some social media platforms have evolved to include addictive features, including the algorithmic delivery of content and other design features, that pose a significant risk of harm to the mental health and well-being of children and adolescents.

**(c)** As the United States Surgeon General has reported, recent evidence has identified "reasons for concern" about social media usage by children and adolescents. This evidence includes a study concluding that the risk of poor mental health outcomes doubles for children and adolescents who use social media at least three hours a day and research finding that social media usage is linked to a variety of negative health outcomes, including low self-esteem and disordered eating, for adolescent girls.

**(d)** Heavier usage of social media also leads to less healthy sleep patterns and sleep quality, which can in turn exacerbate both physical and mental health problems.

**(e)** Further, social media usage is more strongly associated with negative mental health outcomes, including depressive symptoms and self-harm behaviors,

than is consumption of other forms of media such as television or electronic games.

**(f)** Both California and the country as a whole are facing an ongoing youth mental health crisis, with rates of adolescent suicides, depressive episodes, and feelings of sadness and hopelessness on the rise in recent years.

**(g)** For these reasons, it is essential that California act to ensure that social media platforms obtain parental consent before exposing children and adolescents to harmful and addictive social media features.

**SECTION 2.** Chapter 24 (commencing with Section 27000) is added to Division 20 of the Health and Safety Code, to read:

CHAPTER 24. PROTECTING OUR KIDS FROM SOCIAL MEDIA ADDICTION ACT

27000. This chapter shall be known, and may be cited, as the Protecting Our Kids from Social Media Addiction Act.

27000.5. For purposes of this chapter, the following terms have the following meanings:

**(a)** "Addictive feed" means an internet website, online service, online application, or mobile application, or a portion thereof, in which multiple pieces of media generated or shared by users are, either concurrently or sequentially, recommended, selected, or prioritized for display to a user based, in whole or in part, on information provided by the user, or otherwise associated with the user or the user's device, unless any of the following conditions are met, alone or in combination with one another:

**(1)** The information is not persistently associated with the user or user's device, and does not concern the user's previous interactions with media generated or shared by others.

**(2)** The information consists of search terms that are not persistently associated with the user or user's device.

**(3)** The information consists of user-selected privacy or accessibility settings, technical information concerning the user's device, or device communications or signals concerning whether the user is a minor.

**(4)** The user expressly and unambiguously requested the specific media or media by the author, creator, or poster of the media, or the blocking, prioritization, or deprioritization of such media, provided that the media is not recommended, selected, or prioritized for display based, in whole or in part, on other information associated with the user or the user's device, except as otherwise permitted by this chapter and, in the case of audio or video content, is not automatically played.

**(5)** The media consists of direct, private communications between users.

**(6)** The media recommended, selected, or prioritized for display is exclusively the next media in a preexisting sequence from the same author, creator, poster, or source and, in the case of audio or video content, is not automatically played.

**(7)** The recommendation, selection, or prioritization of the media is necessary to comply with this chapter or any regulations promulgated pursuant to this chapter.

**(b)** (1) "Addictive internet-based service or application" means an internet website, online service, online application, or mobile application, including, but not limited to, a "social media platform" as defined in Section 22675 of the Business and Professions Code, that offers users or provides users with an addictive feed as a significant part of the service provided by that internet website, online service, online application, or mobile application.

**(2)** "Addictive internet-based service or application" does not apply to either of the following:

**(A)** An internet website, online service, online application, or mobile application for which interactions between users are limited to commercial transactions or to consumer reviews of products, sellers, services, events, or places, or any combination thereof.

**(B)** An internet website, online service, online application, or mobile application that operates a feed for the primary purpose of cloud storage.

**(c)** "Media" means text, audio, an image, or a video.

**(d)** "Minor" means an individual under 18 years of age who is located in the State of California.

**(e)** "Operator" means a person who operates or provides an internet website, an online service, an online application, or a mobile application.

**(f)** "Parent" means a parent or guardian, including as defined in regulations promulgated pursuant to this chapter.

**(g)** "User" means a person who uses an internet website, online service, online application, or mobile application. "User" does not include the operator or a person acting as an agent of the operator.

27001. **(a)** It shall be unlawful for the operator of an addictive internet-based service or application to provide an addictive feed to a user unless either of the following is met:

**(1)** **(A)** Except as provided in subparagraph (B), the operator does not have actual knowledge that the user is a minor.

**(B)** Commencing January 1, 2027, the operator has reasonably determined that the user is not a minor, including pursuant to regulations promulgated by the Attorney General.

**(2)** The operator has obtained verifiable parental consent to provide an addictive feed to the user who is a minor.

**(b)** Information collected for the purpose of determining a user's age or verifying parental consent pursuant to this chapter shall not be used for any purpose other than compliance with this chapter or with another applicable law. The information collected shall be deleted immediately after it is used to determine

a user's age or to verify parental consent, except as necessary to comply with state or federal law.

27002. **(a) (1)** Except as provided in paragraph (2), it shall be unlawful for the operator of an addictive internet-based service or application, between the hours of 12 a.m. and 6 a.m., in the user's local time zone, and between the hours of 8 a.m. and 3 p.m., from Monday through Friday from September through May in the user's local time zone, to send notifications to a user if the operator has actual knowledge that the user is a minor unless the operator has obtained verifiable parental consent to send those notifications.

**(2)** Commencing January 1, 2027, it shall be unlawful for the operator of an addictive internet-based service or application, between the hours of 12 a.m. and 6 a.m., in the user's local time zone, and between the hours of 8 a.m. and 3 p.m., from Monday through Friday from September through May in the user's local time zone, to send notifications to a user whom the operator has not reasonably determined is not a minor, including pursuant to regulations promulgated by the Attorney General, unless the operator has obtained verifiable parental consent to send those notifications.

**(b)** The operator of an addictive internet-based service or application shall provide a mechanism through which the verified parent of a user who is a minor may do any of the following:

**(1)** Prevent their child from accessing or receiving notifications from the addictive internet-based service or application between specific hours chosen by the parent. This setting shall be set by the operator as on by default, in a manner in which the child's access is limited between the hours of 12 a.m. and 6 a.m., in the user's local time zone.

**(2)** Limit their child's access to any addictive feed from the addictive internet-based service or application to a length of time per day specified by the verified parent. This setting shall be set by the operator as on by default, in a manner in which the child's access is limited to one hour per day unless modified by the verified parent.

**(3)** Limit their child's ability to view the number of likes or other forms of feedback to pieces of media within an addictive feed. This setting shall be set by the operator as on by default.

**(4)** Require that the default feed provided to the child when entering the internet-based service or application be one in which pieces of media are not recommended, selected, or prioritized for display based on information provided by the user, or otherwise associated with the user or the user's device, other than the user's age or status as a minor.

**(5)** Set their child's account to private mode, in a manner in which only users to whom the child is connected on the addictive internet-based service or application may view or respond to content posted by the child. This setting shall be set by the operator as on by default.

27003. (a) This chapter shall not be construed as requiring the operator of an addictive internet-based service or application to give a parent any additional or special access to, or control over, the data or accounts of their child.

**(b)** This chapter shall not be construed as preventing any action taken in good faith to restrict access to, or availability of, media.

27004. (a) An operator may choose not to provide services to minors. However, the operator of an addictive internet-based service or application shall not withhold, degrade, lower the quality of, or increase the price of, any product, service, or feature, other than as required by this chapter, due to a user or parent availing themselves of the rights provided by this chapter, or due to the protections required by this chapter.

**(b)** A parent's provision of consent as described in Section 27001 or 27002, or the use by a parent of a mechanism as described in Section 27002, does not waive, release, otherwise limit, or serve as a defense to, any claim that the parent, or that the user who is a minor or was a minor at the time of using the internet-based service or application, might have against the operator of an addictive internet-based service or application regarding any harm to the mental health or well-being of the user.

**(c)** The protections provided by this chapter are in addition to those provided by any other applicable law, including, but not limited to, the California Age-Appropriate Design Code Act (Title 1.81.47 (commencing with Section 1798.99.28) of Part 4 of Division 3 of the Civil Code).

27005. An operator of an addictive internet-based service or application shall publicly disclose, on an annual basis, the number of minor users of its addictive internet-based service or application, and of that total the number for whom the operator has received verifiable parental consent to provide an addictive feed, and the number of minor users as to whom the controls set forth in Section 27002 are or are not enabled.

27006. (a) This chapter may only be enforced in a civil action brought in the name of the people of the State of California by the Attorney General.

**(b)** The Attorney General shall adopt regulations to further the purposes of this chapter, including regulations regarding age assurance and parental consent by January 1, 2027. The Attorney General may adopt regulations that provide for exceptions to this chapter, but only if those exceptions further the purpose of protecting minors.

**(c)** In promulgating the regulations described in subdivision (b), the Attorney General shall solicit public comment regarding the impact that any regulation might have based on the nondiscrimination characteristics set forth in Section 51 of the Civil Code or in any other applicable law.

27007. If any provision of this chapter, or application thereof, to any person or circumstance is held invalid, that invalidity shall not affect other provisions or applications of this chapter that can be given effect without the invalid provision or application, and to this end the provisions of this chapter are declared to be severable.