Nos. 26-5120, 26-5121, 26-5132

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

META PLATFORMS, INC.,
*Plaintiff-Appellant*,

v.

ROB BONTA, in his official capacity as Attorney General of California,
*Defendant-Appellee*.

TIKTOK, INC. and TIKTOK USDS JOINT VENTURE LLC,
*Plaintiffs-Appellants*,

v.

ROB BONTA, in his official capacity as Attorney General of California,
*Defendant-Appellee*.

GOOGLE LLC and YOUTUBE, LLC,
*Plaintiffs-Appellants*,

v.

ROB BONTA, in his official capacity as Attorney General of California,
*Defendant-Appellee*.

**On Appeal from the United States District Court for the Northern District of California**
Nos. 5:25-cv-09789-EJD, -09792-EJD, -09795-EJD
The Honorable Edward J. Davila

# DEFENDANT-APPELLEE'S CONSOLIDATED ANSWERING BRIEF

**[REDACTED]**

ROB BONTA
*Attorney General of California*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*
TODD GRABARSKY
LARA HADDAD
*Supervising Deputy Attorneys General*

ASHA ALBUQUERQUE
WILLIAM BELLAMY
SHIWON CHOE
CHRISTOPHER J. KISSEL
SAMUEL SOKOLSKY
MEGHAN H. STRONG
ZELDA VASSAR
*Deputy Attorneys General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Ave., Ste. 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-4400
Fax: (415) 703-5480
Shiwon.Choe@doj.ca.gov
*Attorneys for Defendant-Appellee*

October 6, 2026

# TABLE OF CONTENTS

Page

INTRODUCTION ........ 1

JURISDICTIONAL STATEMENT ........ 6

ISSUES PRESENTED ........ 6

STATUTORY AUTHORITIES ........ 7

STATEMENT OF THE CASE ........ 7

I. Plaintiffs intentionally designed their platforms and their algorithmically generated personalized feeds to be addictive ........ 7

II. How Plaintiffs' addictive personalized feeds work ........ 13

A. Plaintiffs' feed-personalization algorithms use millions or billions of data points harvested from their users to compile addictive feeds ........ 13

B. Plaintiffs' feed-personalization algorithms do not understand the actual content of any posts or feeds, and instead simply calculate what will increase user "watch time" ........ 16

C. Humans do not know and cannot predict what Plaintiffs' feed-personalization algorithms will "say" ........ 20

D. Feed personalization is separate and distinct from content moderation, which SB976 does not restrict in any way ........ 22

E. In feed personalization, the humans at Plaintiffs' companies have outsourced editorial judgment to their non-human machine-learning algorithms ........ 23

**TABLE OF CONTENTS**
**(continued)**

**Page**

III. Plaintiffs' addictive personalized feeds cause harm to children ..... 29

IV. SB976 regulates only the mechanism of using harvested user data to compile addictive feeds and does not restrict expression of any idea or viewpoint ..... 32

V. Legal and procedural history ..... 34

A. *Moody v. NetChoice* ..... 34

B. *NetChoice v. Bonta* ..... 40

C. The instant cases ..... 42

SUMMARY OF ARGUMENT ..... 47

STANDARD OF REVIEW ..... 51

ARGUMENT ..... 52

I. Plaintiffs failed to establish a likelihood of success on the merits ..... 52

A. Plaintiffs failed to establish that their algorithmically generated personalized feeds are protected under the First Amendment ..... 52

B. Even if Plaintiffs' algorithmically generated personalized feeds were protected, SB976 is a content-neutral law that satisfies intermediate scrutiny ..... 77

C. Even if strict scrutiny applies, SB976 passes constitutional muster ..... 95

## TABLE OF CONTENTS
## (continued)

**Page**

D. YouTube's vagueness argument is makeweight .............. 97

II. Plaintiffs have not established irreparable harm .................... 98

III. Plaintiffs have not established that the equities or public policy favor them ........................................................... 99

CONCLUSION ........................................................................... 101

## TABLE OF AUTHORITIES

**Page**

**Cases**

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ........ 52, 99

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
148 F.4th 648 (9th Cir. 2025) ........ 100

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998) ........ 53, 63

*B&L Prods., Inc. v. Newsom*,
104 F.4th 108 (9th Cir. 2024) ........ 52

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) ........ 70, 88-89, 96

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) ........ 54, 59

*Cal. Tchrs. Ass'n v. State Bd. of Educ.*,
271 F.3d 1141 (9th Cir. 2001) ........ 97

*Chiles v. Salazar*,
607 U.S. 627 (2026) ........ 82

*Cinevision Corp. v. City of Burbank*,
745 F.2d 560 (9th Cir. 1984) ........ 68, 72

*City of Austin v. Reagan Nat'l Advertising of Austin, LLC*,
596 U.S. 61 (2022) ........ 77

*City of Renton v. Playtime Theaters, Inc.*,
475 U.S. 41 (1986) ........ 80, 91-92

**TABLE OF AUTHORITIES**
**(continued)**

**Page**


*Clark v. Cmty. for Creative Non-Violence*,
468 U.S. 288 (1984) .......... 44, 52-53

*Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*,
412 U.S. 94 (1972) .......... 47, 54, 56-57, 62

*Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n*,
447 U.S. 530 (1980) .......... 79

*Council for Responsible Nutrition v. James*,
159 F.4th 155 (2d Cir. 2025) .......... 98

*CTIA v. City of Berkeley*,
928 F.3d 832 (9th Cir. 2019) .......... 51, 76

*Doe v. Harris*,
772 F.3d 563 (9th Cir. 2014) .......... 52, 79, 89

*Drakes Bay Oyster Co. v Jewell*,
747 F.3d 1073 (9th Cir. 2014) .......... 51

*Fla. Bar v. Went for It, Inc.*,
515 U.S. 618 (1995) .......... 95

*Free Speech Coal. v. Paxton*,
606 U.S. 461 (2025) .......... 66-67, 69, 70

*French v. Jones*,
876 F.3d 1228 (9th Cir. 2017) .......... 95

*Gammoh v. City of La Habra*,
395 F.3d 1114 (9th Cir. 2005) .......... 80, 88, 91

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) (en banc) .......... 51

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Ginsberg v. New York*,
390 U.S. 629 (1968) .................................................................. 92

*Goldie's Bookstore, Inc. v. Super. Ct.*,
739 F.2d 466 (9th Cir. 1984) ..................................................... 99

*Green v. U.S. Dep't of Justice*,
111 F.4th 81 (D.C. Cir. 2024) .................................................... 74

*Hill v. Colorado*,
530 U.S. 703 (2000) .................................................................. 82

*Houston Cmty. Coll. Sys. v. Wilson*,
595 U.S. 468 (2022) .................................................................. 82

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., Inc.*,
515 U.S. 557 (1995) ................................................ 37, 55, 67, 71

*Iancu v. Brunetti*,
588 U.S. 388 (2019) .................................................................. 79

*Imperial Sovereign Ct. v. Knudsen*,
170 F.4th 820 (9th Cir. 2026) .................................................... 89

*In re Nat'l Sec. Letter*,
33 F.4th 1058 (9th Cir. 2022) .................................................... 95

*Kleindienst v. Mandel*,
408 U.S. 753 (1972) .................................................................. 74

*Matal v. Tam*,
582 U.S. 218 (2017) .................................................................. 79

*Meinecke v. City of Seattle*,
99 F.4th 514 (9th Cir. 2024) ...................................................... 52

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Menotti v. City of Seattle*,
409 F.3d 1113 (9th Cir. 2005) ........................................................78-79

*Mia. Herald Publ'g Co. v. Tornillo*,
418 U.S. 241 (1974) ..................................................................................55

*Minority Television Project, Inc. v. FCC*,
736 F.3d 1192 (9th Cir. 2013) (en banc) ............................ 85, 88, 93, 97

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ............................................ 4, 35-41, 44, 48, 53-57,
59-60, 62-63, 65-71

*Morse v. Frederick*,
551 U.S. 393 (2007) ........................................................................... 75, 94

*Murthy v. Missouri*,
603 U.S. 43 (2024) ....................................................................................74

*NAACP v. Jones*,
131 F.3d 1317 (9th Cir. 1997) ..................................................................74

*Nat'l Ass'n of Wheat Growers v. Bonta*,
85 F.4th 1263 (9th Cir. 2023)....................................................................90

*NetChoice, LLC v. Bonta*,
152 F.4th 1002 (9th Cir. 2025).......... 4, 40-42, 47, 53, 55, 58, 62-63, 73,
77, 79-81, 83, 88, 91, 94, 96-97

*NetChoice, LLC v. Yost*,
180 F.4th 268 (6th Cir. 2026)...................................................50, 96-97

*Porter v. Martinez*,
68 F.4th 429 (9th Cir. 2023).....................................................77, 89-90

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Price v. City of Stockton*,
390 F.3d 1105 (9th Cir. 2004) ............................................................ 51

*Project Veritas v. Schmidt*,
125 F.4th 929 (9th Cir. 2025) (en banc) ......................................... 79, 82

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992) ........................................................................ 69-70

*Reuber v. Food Chem. News, Inc.*,
925 F.2d 703, 716 (4th Cir. 1991) (en banc) ........................................ 62

*Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.*,
547 U.S. 47 (2006) ................................................................. 39, 44, 54

*Sable Commc'ns of Cal., Inc. v. FCC*,
492 U.S. 115 (1989) ........................................................................ 83, 95

*Schmitz v. Zilveti*,
20 F.3d 1043 (9th Cir. 1994) ............................................................... 59

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) ............................................................................. 63

*State ex rel. Jackson v. TikTok Inc.*,
No. 24CV032063-910,
2025 WL 2399525 (N.C. Super. Ct. Aug. 19, 2025) ............................. 57

*Stockton v. Brown*,
152 F.4th 1124 (9th Cir. 2025) .................................................. 74-75, 98

*Stormans, Inc. v. Selecky*,
586 F.3d 1109 (9th Cir. 2009) ........................................................ 99-100

*TikTok Inc. v. Garland*,
604 U.S. 56 (2025) ........................................................... 41, 78, 86, 92

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994) (*Turner I*) ........................................ 38, 59, 89

*Turner Broad. Sys., Inc. v. FCC*,
520 U.S. 180 (1997) (*Turner II*)............................ 49, 82-90, 93, 94

*United States v. Bronstein*,
849 F.3d 1101 (D.C. Cir. 2017)................................................98

*Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976) ...............................................................70

*Vidal v. Elster*,
602 U.S. 286 (2024) ...............................................................82

*West Virginia v. B.P.J. ex rel. Jackson*,
146 S. Ct. 2356 (2026) ...................................................86, 100

*Williams-Yulee v. Fla. Bar*,
575 U.S. 433 (2015) ..........................................................91-92, 95

*Winter v. NRDC*,
555 U.S. 7 (2008) ...................................................................51

**Statutes**

Cal. Health & Safety Code § 27000.5.............................. 32, 64, 78, 96

Cal. Health & Safety Code § 27001 ...........................................3, 33

Cal. Health & Safety Code § 27002 ...........................................3, 33

**Legislative History**

Assemb. Privacy & Consumer Prot. Comm.,
Bill Analysis, SB 976 (2024) ................................32-33, 49, 87-88

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

S. Judiciary Comm.,
Bill Analysis, SB976 (2024) .......................................... 32, 49, 87-88, 93

**Other Authorities**

Mike Allen,
*Sean Parker unloads on Facebook: "God only knows what it's doing to our children's brains"*, AXIOS, Nov. 9, 2017 ............................. 7

Charlotte Alter,
*Everything I Learned About Suicide, I Learned on Instagram*, TIME, Aug. 20, 2025 ................................................................... 28

David Atkinson et al.,
*Intentionally Unintentional: GenAI Exceptionalism and the First Amendment*, 23 FIRST. AMEND. L. REV. 173 (2024) ............... 55, 59

Mackenzie Austin & Max Levy,
*Speech Certainty*, 77 STAN. L. REV. 1 (2025) ........................... 14, 20, 72

Rob Barry et al.,
*How TikTok Serves Up Sex and Drug Videos to Minors*, WALL ST. J., Sept. 8, 2021 ................................................................... 26

Brian Contreras,
*TikTok is sued over death of two young girls in viral 'blackout challenge'*, L.A. TIMES, July 1, 2022 ....................................... 28

Elizabeth Germino,
*YouTube Algorithms Consistently Push Eating Disorder and Self-Harm Content to Teen Girls, New Study Finds*, 60 MINUTES, Dec. 10, 2024 ............................................................ 28

Tawnell D. Hobbs et al.,
*'The Corpse Bride Diet': How TikTok Inundates Teens With Eating-Disorder Videos*, WALL ST. J., Dec. 17, 2021 ............................ 26

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Investigation: How TikTok's Algorithm Figures Out Your Deepest Desires*, WALL ST. J., July 21, 2021 .......... 26

Merriam-Webster Dictionary, *Verify* (2026) .......... 98

Meta, *Our Agreement With Bipartisan Attorneys General: Calling on TikTok and YouTube to Join Us in Supporting Teens* (Aug. 26, 2026) .......... 2-3

Arvind Narayanan, *Understanding Social Media Recommendation Algorithms* (2023) .......... 13-14, 17

Testimony of Tim Kendall before the H. Comm. on Energy & Commerce (Sept. 24, 2020) .......... 8

Testimony of Brian Thomas Boland before the S. Comm. on Homeland Sec. & Governmental Affairs (Sept. 12, 2022) .......... 20

U.S. Surgeon Gen., *Social Media and Youth Mental Health* (2023) .......... 1, 30, 32, 49, 87-88

## INTRODUCTION

California enacted the Protecting Our Kids from Social Media Addiction Act (Senate Bill No. 976, or "SB976") to protect the mental and physical health of children. SB976 was inspired by research showing that Plaintiffs[1] and other internet companies employ features to keep children maximally "engaged" on their platforms that are fueling an epidemic of compulsive and excessive social-media use. *See, e.g.*, U.S. Surgeon Gen., *Social Media and Youth Mental Health* (2023) (Surgeon General Advisory) (3-MetaER-497-521). The reason Plaintiffs seek to maximize children's "engagement" and time on their platforms is simple: Plaintiffs make money from advertisers paying them to target users with ads. The more "engaged" users—including children—are, the more ad space Plaintiffs can sell, and the more money Plaintiffs make. Essentially, Plaintiffs monetize their child users' time and attention for profit.

One of the key features Plaintiffs utilize to achieve their engagement- and profit-maximizing goals is addictive personalized feeds for children. *See, e.g.*, Surgeon General Advisory 9 (3-MetaER-505). Plaintiffs continually track and harvest millions or billions of data points on each child on their platforms: when that child logs on;

---

[1] Meta Platforms, which owns Facebook, Instagram, and Threads ("Meta"); TikTok and its U.S.-based joint venture ("TikTok"); and Google and its subsidiary YouTube ("YouTube").

how long she stays; how she interacts with every post she comes across; how much each post "engaged" her; and so forth. Plaintiffs then employ machine-learning algorithms to take these data points and calculate, as numeric scores, probabilistic predictions about the child's future behavior. These algorithms use these scores to create and push out to each child a personalized feed, *i.e.*, a compilation of posts that is calculated to most likely "engage" that specific child and keep her on their platforms longer.

Peer-reviewed scientific research confirms that algorithmically generated personalized feeds are habit-forming, addictive, and cause an array of harms to children, including poor sleep, negative self-image, anxiety, and depression. There is good news, however: limiting exposure to these addictive mechanisms can reduce those harms and improve children's well-being. Indeed, just six weeks ago, Meta entered into a landmark consent judgment with Defendant and a bipartisan coalition of 51 other Attorneys General, where it agreed to, among other things, provide teens with an option for non-algorithmic feeds. Request for Judicial Notice ("RJN") Ex. 1, § II.C. While these changes do not fully satisfy SB976's requirements, Meta describes them as "New Protections for Teens," acknowledging that "[e]nsuring teens have a safe and productive experience on our platforms is an absolute imperative" and that "teens benefit from this new industry standard." Meta, *Our Agreement With Bipartisan Attorneys General: Calling on*

*TikTok and YouTube to Join Us in Supporting Teens* (Aug. 26, 2026), https://perma.cc/HR9C-EM4L (Meta Settlement Statement). Meta urged TikTok and YouTube to "join us and state attorneys general in adopting this new standard, to ensure teens use social media in a healthy and responsible way." *Id.* Eleven days ago, TikTok also entered into a separate consent judgment with Alabama's Attorney General where it similarly agreed to provide teens in Alabama with an option for non-algorithmic feeds. RJN Ex. 2, ¶ 3.22.

Meta, TikTok, and YouTube have nonetheless brought as-applied First Amendment challenges to enjoin enforcement of the SB976 provisions that regulate the use of algorithmic personalized feeds on children: §§ 27001(a) and 27002(b)(2) and (4).[2] Plaintiffs claim that the personalized feeds their machine-learning algorithms generate—billions of new feeds every day—are each the product of Plaintiffs' "editorial judgment" and protected under the First Amendment such that SB976 may not regulate them. The district court rejected this theory and denied Plaintiffs' motions for preliminary injunctions, finding that—on the current, fact-intensive record—Plaintiffs failed to demonstrate that their personalized feeds are expressive and thus failed to demonstrate a likelihood of success on the merits.

[2] References to §§ 27000-07 refer to those sections in the California Health and Safety Code, where SB976's operative provisions are codified.

This Court should affirm the district court's assessment of the current record. As this Court explained in the prior challenge to SB976, algorithms must implement "human editorial directions" for their output to be expressive and protected. *NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1014 (9th Cir. 2025). "Editorial" directions are "choices about whether—and, if so, how—to convey posts *having a certain content or viewpoint*" and that "rest on a set of beliefs about *which messages are appropriate and which are not* (or which are more appropriate and which less so)." *Moody v. NetChoice, LLC*, 603 U.S. 707, 738 (2024) (emphasis added). Relying on those standards, the district court found that Plaintiffs have not established through the factual record compiled to date that humans at Plaintiffs' companies are exercising editorial judgment as to Plaintiffs' feed personalization.

As the district court correctly found, humans are not making choices about what content or viewpoints to convey to users or which messages are appropriate to convey to users and which are not. Instead, humans have outsourced these choices to non-human computer algorithms, which simply rely on "number-crunching" and "predictive modelling" to compile personalized feeds. 1-MetaER-17. These algorithms take millions or billions of data points harvested on each user and mathematically calculate which posts will be "interesting" to that user—or, more precisely, which posts have the greatest mathematical probability of keeping that user "engaged" on Plaintiffs'

platforms for as long as possible. In the district court's words, "Plaintiffs themselves are not making any determination of what is 'interesting' when they rely on this predictive modelling, nor do they otherwise seek to convey an expressive message through their personalized feeds"—rather, "an algorithmic function [] make[s] the determination of what is 'interesting,' divorced from any understanding of the underlying content." 1-MetaER-18. The district court did not abuse its discretion in making these factual findings and in concluding that Plaintiffs had failed to show a likelihood that their algorithmic feeds are expressive and protected.

In any event, even if Plaintiffs' algorithmically generated personalized feeds were expressive, SB976 would survive constitutional review. SB976 is a content-neutral law because it regulates all addictive feeds evenly, regardless of their content, and thus is subject to at most intermediate scrutiny. SB976 satisfies that heightened standard of review: it serves a significant government interest—protecting the physical and mental health of children—and is narrowly tailored. And while strict scrutiny does not apply, SB976 would satisfy that standard for similar reasons.

Plaintiffs also have not established irreparable harm. SB976 regulates only Plaintiffs' feed-personalization algorithms, not the speech of any human being, and Plaintiffs identify no idea, thought, opinion, or viewpoint that SB976 prevents them from expressing. Nor

have Plaintiffs established that the balance of equities or public policy favor them. Plaintiffs' addictive-feed mechanisms are inflicting harm on children every day, and allowing SB976 to remain in effect will alleviate those harms, while respecting Plaintiffs' ability to express their own viewpoints and users' ability to access any online content of their choice.

After carefully reviewing the record compiled to this point, the district court issued a narrow decision denying Plaintiffs' preliminary-injunction motions, while leaving open the possibility that further record development might affect its analysis. Because the district court did not abuse its discretion, this Court should affirm.

## JURISDICTIONAL STATEMENT

Defendant agrees with Plaintiffs' jurisdictional statements.

## ISSUES PRESENTED

1. Whether the district court acted within its discretion in finding that Plaintiffs failed to meet their burden to establish their algorithmically generated personalized feeds are expressive and protected under the First Amendment.

2. Whether, assuming Plaintiffs' algorithmically generated personalized feeds are expressive, SB976 is a content-neutral law subject to intermediate scrutiny, a standard SB976 satisfies.

3. Whether SB976 also satisfies strict scrutiny, assuming that standard applies.

4. Whether Plaintiffs have failed to meet their burden to establish that they will suffer irreparable harm absent injunctions.

5. Whether Plaintiffs have failed to meet their burden to establish that the balance of equities and public policy weigh in favor of injunctions.

## STATUTORY AUTHORITIES

SB976 is set forth in the Addendum.

## STATEMENT OF THE CASE

### I. PLAINTIFFS INTENTIONALLY DESIGNED THEIR PLATFORMS AND THEIR ALGORITHMICALLY GENERATED PERSONALIZED FEEDS TO BE ADDICTIVE

Plaintiffs monetize users' time online and engagement through data collection and targeted advertising. The more "engaged" a user is, and the longer the user spends on Plaintiffs' platforms, the more ads Plaintiffs can sell, and the more money Plaintiffs can make. 4-SER-833-34 (¶¶ 17-19); 4-SER-1007-08 (¶¶ 75-76).

To that end, Plaintiffs intentionally designed their platforms to be addictive. Sean Parker, the second president of Facebook (now Meta), explained, "[t]he thought process ... was all about: 'How do we consume as much of your time and conscious attention as possible?' And that means that we need to sort of give you a little dopamine hit every once in a while .... exploiting a vulnerability in human psychology." Mike Allen, *Sean Parker unloads on Facebook: "God only knows what it's*

*doing to our children's brains"*, AXIOS, Nov. 9, 2017 (6-SER-1489). Facebook's former Director of Monetization Tim Kendall testified before Congress, "[w]e sought to mine as much human attention as possible and turn [it] into historically unprecedented profits.... We took a page from Big Tobacco's playbook, working to make our offering addictive at the outset." Testimony of Tim Kendall before the H. Comm. on Energy & Commerce 1 (Sept. 24, 2020), https://perma.cc/7YLT-BSXB. Meta discussed in an internal document entitled "What Makes Teens Tick?" how:

- "the teenage brain happens to be pretty easy to stimulate,"
- "every time one of our teen users finds something unexpected their brains deliver them a dopamine hit,"
- "[t]een brains are much more sensitive to dopamine, one of the reasons that the risk of drug addiction is higher for adolescents and it's the same thing that keeps them scrolling and scrolling," and
- teen brains' "plastic[ity]" and "insatiable" desire for dopamine "can send teens down some interesting rabbit holes—absorbing as much as they can about a particular topic."

7-SER-1729-34. And Meta researchers discussed internally how "IG is a drug.... We're basically pushers.... [T]he top down directives drive it all towards making sure people keep coming back for more." 7-SER-

1635-36; *accord, e.g.*, 7-SER-1623-24 (67:11-68:1). Meta had an internal "teens' team" focused specifically on "maximiz[ing] ... teen time spent" on its platforms, despite Meta's own internal researchers stating how "optimizing for engagement, just naturally distributes more harm to teenagers." 2-SER-308-19 (3573:15-3584:20); 2-SER-522, 9-SER-2065 (¶ 82).

TikTok was likewise designed to be addictive. Internal documents discuss how:

- "The advertising-based business model encourages optimization for time spent in the app,"
- TikTok "utilizes many coercive design tactics that detract from user agency,"
- "TikTok is particularly popular with younger users, who are particularly sensitive to reinforcement in the form of social reward and have minimal ability to self-regulate effectively,"
- "TikTok's success can largely be attributed to strong out of the box personalization and automation, which limits user agenc[y]," and
- TikTok "**Can become too addictive**—A common concern among parents is that their kids have become addicted to TikTok," which "is a good thing for the platform" but "concerning as young minds can get affected[.]"

8-SER-1875; 8-SER-1890; 8-SER-1915 (emphasis in original); *see also* 9-SER-2154 (¶¶ 204-06).

YouTube was designed to be addictive as well. An internal document, "Deep dive with Neal" (Neal Mohan, then Chief Product Officer and now CEO of YouTube), discussed how YouTube "aspire[d] to create an app that is ... **Addictive**[:] Our app experience should compel users to come back more and more often." 8-SER-2030 (emphasis in original). Other internal documents were equally candid, emphasizing how YouTube's "goal[s]" are to:

- "maximize long-term YouTube time,"
- "***<u>Reduce the burden of choice:</u>*** Help a user make a single decision that can lead to a long session,"
- "***<u>Optimize for Long-term YouTube Time</u>***,"
- "<u>Increase habitual users</u>," and
- "focus on making YouTube a daily habit," with the "aim of increasing frequency and long-term YouTube Time."

8-SER-1932-35, 1937 (emphases in original).

Plaintiffs have been successful in achieving these goals. Their platforms are not just addictive from a lay perspective—they satisfy medical and clinical standards for addictiveness. 3-SER-666, 711-16 (¶¶ 13, 116-26); 4-SER-993-95 (¶¶ 48, 50); 5-SER-1060, 1109-12 (¶¶ 68, 157-60).

One of the key mechanisms by which Plaintiffs achieve their platforms' addictive goals is through the use of addictive personalized feeds, compiled by computerized machine-learning algorithms. As discussed in the following sections, Plaintiffs' feed-personalization algorithms track and harvest millions or billions of data points on each of their child users (*e.g.*, which posts the child most engaged with in the past) and use that harvested data to calculate which other posts will engage that child and keep her on Plaintiffs' platform longer—so that Plaintiffs can sell more ads and further monetize her time and attention. These computerized algorithms have no understanding of the actual content of the feeds they are compiling or the posts that go into them. And they are so immensely complex that humans—even their own programmers—cannot understand or explain how the algorithms make their decisions, nor predict with any certainty what the algorithms might do or what posts they might display in any given child's feed.

Platforms can compile feeds in non-addictive ways, such as sorting posts from friends and family chronologically. 4-SER-857 (¶ 22); 4-SER-901 (¶ 38). Users want non-addictive feeds. For example, a Meta study revealed how "[w]e've heard teens complain bitterly about Instagram's nonchronological feed.... Many say that if they could change one thing about IG, this is what they would change. Although the non-chronological feed fuels increased time spent on the site, teen users say

that it makes it much more difficult for them to find relevant info about their closer friends." 7-SER-1765; *accord* 9-SER-2220-23.

Plaintiffs realized, however, that using addictive personalized feeds—and tracking, harvesting, and utilizing users' personal data to compile these addictive feeds—keeps users on their platforms longer and is far more profitable for Plaintiffs. *See* 4-SER-833-35 (¶¶ 17-20); 4-SER-919-21 (¶¶ 53-54); 4-SER-1007-12 (¶¶ 75-83). For example, after Facebook started using algorithmic personalized feeds, Instagram co-founders Kevin Systrom, Mike Krieger, and others discussed internally how that switch led users "to spend 40% more time in the app each day," which prompted Instagram to make the same switch to algorithmic feeds. 7-SER-1659. Meta internal documents discuss how feed personalization "show[s] significant increases in consumption and time spent," "increas[es] the number of sessions and time spent when compared to chronological feed," and "drives revenue! I've never seen anything like it!" 7-SER-1666; 7-SER-1672; 7-SER-1679; *see also* 9-SER-2245-47 ([redacted]). Likewise, internal YouTube documents discuss how "[p]ersonalized recs are the killer app" and "70 percent of watch time comes from personalized recommendations." 8-SER-1955 (185:8-17); *accord* 8-SER-1994 (165:3-15). TikTok at one point considered a "non personalized feed" option to reduce harm to users—but implemented it only in Europe, because "ad

revenues [would] decrease" if a non-personalized-feed option were offered in the United States. 8-SER-1861; 9-SER-2183 (¶ 296).

## II. How Plaintiffs' addictive personalized feeds work

### A. Plaintiffs' feed-personalization algorithms use millions or billions of data points harvested from their users to compile addictive feeds

Each Plaintiff's machine-learning feed-personalization algorithm tracks millions or billions of data points on every user's individual behavior, such as every video that user watches, how long she watches each video, whether she likes them, comments on them, skips past them, and so on. From this data, the algorithms identify statistical relationships between users, posts, and outcomes of interest (such as the length of time a user will spend on a given post). The algorithms then use those relationships to calculate numeric scores predicting the user's future behavior: *e.g.*, for new posts, estimating the probability that the user will spend time on and engage with that new post. 4-SER-858-61 (¶¶ 27-37); Arvind Narayanan, *Understanding Social Media Recommendation Algorithms* 20-24 (2023) (6-SER-1514-18). The algorithms themselves have millions or billions of internal parameters to operate on these millions or billions of data points. 4-SER-860 (¶¶ 32, 35).

The algorithms then construct unique personalized feeds for each given user. Specifically, the algorithms rank posts according to the just-

described numeric scores, placing posts with higher predicted likelihoods of the desired behavior—*e.g.*, the likelihood the user will "engage" with those posts—higher in a user's feed, and placing posts with lower predicted likelihoods down lower in the feed (or omitting them entirely). 4-SER-861-62, 866-67 (¶¶ 38, 41, 47-52); Mackenzie Austin & Max Levy, *Speech Certainty*, 77 STAN. L. REV. 1, 65-66 (2025); Narayanan 18-20 (6-SER-1512-14).

Plaintiffs' witnesses and documents confirm that their algorithms compile personalized feeds simply by calculating mathematical operations on data sets.

Meta's expert Dr. Mobasher attests that Meta's feed-personalization algorithms take various inputs—information about the user, other users the user follows, posts the user interacted with in the past, etc.—to calculate prediction scores, such as the probability that the user will click "like" on a given post, will comment on a given post, will watch a given video to completion, and so on. 2-MetaER-70-73 (¶¶ 77-80). Meta then uses a "value model" that gives a certain "weight" to each prediction score and adds the results to produce a single ranking score for each potential post. 2-MetaER-73 (¶¶ 82, 84). Meta's algorithms then rank posts by these algorithmically calculated scores to create that particular user's feed. 2-MetaER-71 (¶ 77). Additionally, Meta's "machine learning algorithms automatically learn the parameters used to make predictions based on their training data"

and also "set and update" the weights in the "value model," *i.e.*, the algorithms adjust their own rules. 2-MetaER-73, 77 (¶¶ 83, 95); *accord* 7-SER-1550 (¶ 12); 9-SER-2087 (¶ 182).

Similarly, as TikTok algorithm-team head Zhu Wenjia testified, and as TikTok's internal "General Recommendation Intro" explains, TikTok's feed-personalization algorithms track data points on each user, such as how the user commented on prior videos, finished watching videos, re-shared videos, and so forth, and uses a weighted formula to calculate prediction scores. 7-SER-1807-10; 7-SER-1788, 1799 (493:20-22, 505:5-14). The output of these calculations is "a number, just a number, to predict the possibility of [] certain behavior." 7-SER-1788 (493:11-14). TikTok's algorithms then rank videos by these algorithmically calculated scores, with the videos with higher scores for a particular user being placed higher in that user's feed. 7-SER-1799-801 (505:15-507:2); 6-TikTokER-1021 (¶ 17.h). In analyzing the millions or billions of data points TikTok collects on users, TikTok's machine-learning "neural networks" algorithms try to calculate "hidden representations between users and videos, in order to predict which videos a user might like." 7-SER-1809; 7-SER-1787-90 (492:17-495:12).

YouTube's algorithmic feeds work similarly. YouTube "Recommendation System" head Cristos Goodrow testified that YouTube's feed-personalization algorithm considers factors like the user's watch history, "likes," session length, and so on, to rank

candidate videos for that user. 2-SER-490-93 (112:24-115:3); *see* 4-YouTubeER-809 (¶ 22) (YouTube's algorithm uses "'over 80 billion pieces of information' on user behaviors"). "The highest scoring videos are presented to the user, ranked by their score." 7-SER-1555. YouTube's algorithms "dynamically evolve and adapt," and the weight that YouTube's algorithm assigns to the billions of data points YouTube collects on its users "changes constantly." 7-YouTubeER-1336 (¶ 11). YouTube's algorithm "train[s] on its own data" with "[s]trong feedback loops." 8-SER-2057. As Mr. Goodrow acknowledged in deposition, "[i]t's not the engineers who go in and say ... 'This factor gets 8 percent, and that factor gets 10 percent.' The algorithm makes those determinations[.]" 2-SER-497 (119:5-17).

### B. Plaintiffs' feed-personalization algorithms do not understand the actual content of any posts or feeds, and instead simply calculate what will increase user "watch time"

Plaintiffs' feed-personalization algorithms have no understanding of the actual content of the addictive feeds they are compiling or the content of the underlying posts they are selecting for each user's feed. 4-SER-861, 866-67 (¶¶ 39, 47-49). As former Meta "Responsible AI" researcher Dr. Simons explained, "I think it's important not to describe these [algorithmic] systems as agents. They don't see or feel anything." 7-SER-1633 (116:16-18); *accord, e.g.*, 2-SER-325 (3590:2-14); 9-SER-2062-63 (¶¶ 76-77). Similarly, as TikTok algorithm head Mr. Zhu

testified, feed-personalization algorithms "have very limited understanding of what the content actually is. It's different than human[s who] can actually understand every word[] and every image[]. The algorithm ha[s] very limited understanding." 7-SER-1803 (520:13-19). And YouTube Senior Director Mr. Beser likewise testified that "[t]he algorithm is reflecting what the users are telling us they want to watch. And so it's a feedback loop.... [I]t reflects what users tell us with their watch time." 8-SER-1959-60 (252:16-253:1).

The only things Plaintiffs' feed-personalization algorithms can perceive, and try to predict, are numeric data metrics, like the amount of time a user spends on a platform and how much the user engages with content (*e.g.*, watches videos to completion, comments on them, re-shares them, etc.). 4-SER-861-62 (¶¶ 37-41); 4-SER-915-19 (¶¶ 50-53); Narayanan 28-29 (6-SER-1522-23). Because Plaintiffs' algorithms have no understanding of the actual content of any posts, they cannot assess or make judgments about such content, such as whether any particular post is "interesting." Instead, as Plaintiffs' witnesses and documents confirm, Plaintiffs' algorithms track user-engagement metrics, like the amount of time a user spends on posts, as "proxies" for assessing which posts are "interesting," "relevant," or "valuable" that user. Simply put, "interesting," "relevant," and "valuable" reduce to, *whatever will get that user to spend more time on the platform*.

Meta's expert Dr. Birnbaum explained, "relevance and user value are nebulous objectives that can't be measured directly." 2-SER-411-12 (199:14-200:4). Meta's algorithms therefore must use a "proxy"—and the proxies Meta uses are engagement metrics like "video watch time," "time spent," and "average user sessions per day." 2-SER-412-55 (200:5-243:22); *see, e.g.*, 2-SER-295, 330-31, 344 (3560:14-23, 3599:1-3600:16, 3671:11-15) (Meta has no way of measuring whether users actually feel that content is relevant or useful); 2-SER-390, 7-SER-1625-27 (35:19-25, 80:21-82:1) (same); 2-SER-291-98, 325-27, 330-33, 342 (3556:1-3563:16, 3590:2-3592:14, 3599:1-3602:11, 3635:20-25) (Meta therefore seeks to maximize user engagement); 9-SER-2068-69 (¶¶ 91-93); 2-SER-433-34, 459-69 (221:13-222:12, 275:5-285:3) (Meta seeks to increase user engagement as a proxy for "relevance"). As one of Meta's own researchers explained, "the algorithm is absolutely tuned to maximize engagement in a maximally empirical, principle-less way." 6-SER-1299; 9-SER-2069 (¶ 93).

Similarly, as internal TikTok documents stated and TikTok algorithm head Mr. Zhu confirmed, TikTok's "algorithm has no idea what type of content it is recommending to users." 7-SER-1803 (520:2-10). Instead, TikTok's "algorithm is based mostly on user interactions[.]" *Id.* An internal TikTok presentation describes the algorithms' metrics as "[redacted]" and explains that "[redacted]

[redacted]" 9-SER-2137 (¶ 116).

Likewise, YouTube's algorithms use "watch time" as a proxy for assessing what is interesting or valuable to users. YouTube algorithm head Mr. Goodrow explained, "[v]alue is something that's very hard to measure." 2-SER-507 (129:9-10). Mr. Goodrow thus wrote in an internal memo captioned "**Watch time, and only watch time**" how "our goal is to increase (video) watch time," because "[t]ime is a scarce resource" and "[i]f users spend more of their scarce time watching YouTube videos, they are happier with those YouTube videos." 8-SER-2047, 2049 (emphasis in original); *see* 2-SER-509-513 (131:17-132:21, 140:3-142:13). Using the example of videos on how to tie bow ties, Mr. Goodrow wrote how YouTube prefers users watch seven minutes of a ten-minute video, rather than one minute of a one-minute video, "even if [the user] can tie a bowtie after watching 1:00/1:00" and "cannot tie a bowtie after watching 7:00/10:00"—because the way YouTube's algorithms measure "value" to users is just "watch time." 8-SER-2047, 2049; *see* 2-SER-489-90 (111:11-112:22) ("watch time was just the best way we had of measuring [value]"), 505, 511-14, 8-SER-1995, 1998 (127:7-14, 140:11-143:23, 166:15-19, 561:2-9); 2-YouTubeER-250-52 (¶¶ 14-18) (YouTube's "metrics of success" are all variants of "'watchtime,' *i.e.*, the total amount of time users spent watching

YouTube"); 2-SER-377; 3-SER-652-57 (¶¶ 125-37) (YouTube's measurement of "Long-Term Value" provided to users "is just another expression of time spent"); *accord* 1-SER-30-33 (¶¶ 6-15).

### C. Humans do not know and cannot predict what Plaintiffs' feed-personalization algorithms will "say"

The humans at Plaintiffs' companies cannot predict the outputs of their feed-personalization algorithms. Humans do not know what the algorithms will "say" or what the actual content of any user's personalized feed will be. 1-SER-42 (¶ 10); 1-SER-52-60 (¶¶ 6-22); 4-SER-860, 866-67 (¶¶ 32-35, 48, 50-52); 4-SER-896-900, 904-05, 941-42, 947-48 (¶¶ 35-36, 41, 82-84, 91); *see* Austin & Levy 60-64.

Former Meta Vice President Brian Boland testified before Congress, "[c]ontrary to popular belief, technology companies cannot accurately predict what their algorithms will do.... These platforms function as a black box by design." Testimony of Brian Thomas Boland before the S. Comm. on Homeland Sec. & Governmental Affairs 4-5 (Sept. 12, 2022) (7-SER-1566-67); *accord, e.g.*, 7-SER-1611 (274:1-15). Meta's expert Dr. Birnbaum reviewed Meta's source code and agreed that Meta's algorithms are, in general, "so complex their data can't be interpreted by humans" and that "[t]he part of Meta's ranking system that predicts how a given user will react to a piece of content, and on that basis determines the content's relevance, is a black box[.]" 2-SER-405-07, 478-79 (151:9-153:22, 453:13-454:8). Which actual posts, or

what actual content or viewpoints, will end up in any user's feed are unpredictable. *See, e.g.*, 2-MetaER-71 (¶ 78) ("it is often difficult to determine with certainty why a neural network outputs a specific prediction given the inputs"); 2-SER-299-301 (3564:2-3566:2); 2-SER-392-94 (37:25-39:9).

Similarly, as internal TikTok documents stated and TikTok algorithm head Mr. Zhu confirmed, TikTok's algorithms' calculations "are not human readable." 7-SER-1791-92 (496:8-497:8). TikTok's expert Dr. Mattman acknowledges that TikTok's human employees "may not be able to predict output variation at the unit level," *i.e.*, what the feeds that TikTok's algorithms are compiling will actually say. 2-TikTokER-78 (¶ 46). Even when TikTok's humans make a decision—*e.g.*, that they want to promote videos about the Olympics—"the recommendation system will not simply show Olympics videos to every user." 2-TikTokER-76 (¶ 42). Instead, TikTok's algorithms take that decision as just another data point and weigh it in conjunction with the other millions of data points they have harvested on individual users, with the algorithms ultimately deciding whether to show Olympics videos to any given user. *Id.*

YouTube, too, discussed in internal documents how even its own engineers "don't understand why a given recommendation was made" by its algorithms due to "black box optimization" and "heavy duty M[achine]L[earning]." 8-SER-2055; *accord* 2-YouTubeER-254 (¶ 25)

(YouTube's "engineers may not know exactly how every layer of the machine learning model produced the output"). YouTube's expert Dr. Zervas admits that YouTube's "programmer[s] may not be able to predict exactly which video a specific user will see" and that YouTube's "recommendation systems can result in outputs that a system designer may not be able to predict exactly in advance." 4-YouTubeER-832, 838 (¶¶ 48, 54); *see also* 4-YouTubeER-839 (¶ 56) ("Complex software systems ... involve concurrent processes and diverse user interactions that can result in unpredictable emergent behaviors.").

### D. Feed personalization is separate and distinct from content moderation, which SB976 does not restrict in any way

In addition to feed personalization, each Plaintiff also engages in "content moderation" through a set of "Community Standards" or "Community Guidelines" (collectively, "Community Standards") that proscribe certain kinds of user posts (*e.g.*, violent or graphic content, nudity, etc.) from appearing on their platforms, and then by using algorithms to remove those posts from their platforms. Plaintiffs also engage in other user-agnostic decisions such as downranking (without fully removing) certain other posts, such as posts they deem to be "low value," "clickbait," etc. Meta OB 29; TikTok OB 11-13; YouTube OB 5-6.

Those content-moderation processes and algorithms are separate from Plaintiffs' feed-personalization processes and algorithms. 4-SER-868-70 (¶¶ 55-65). All three Plaintiffs acknowledge their content-moderation algorithms work first to remove (or prioritize or deprioritize) posts user-agnostically. Only after the content-moderation stage do Plaintiffs' feed-personalization algorithms select from the posts that remain to compile the feeds that are ultimately pushed out to each user. *See* 3-MetaER-450 (¶ 7); 4-TikTokER-620-22 (¶¶ 3-6); 2-TikTokER-58 (¶ 19); 7-YouTubeER-1341 (¶¶ 24-25); 4-YouTubeER-832 (¶ 48); 7-SER-1794-95 (499:23-500:11); *accord* 1-SER-42-44 (¶¶ 11-16); 2-SER-305 (3570:12-24). Each Plaintiff has the technological ability to provide non-personalized feeds, reconfirming that content moderation and feed personalization are separate and the latter is not required for the former. *See* RJN exs. 1, 2 (Meta and TikTok agreeing to provide option for non-personalized feeds); 2-YouTubeER-85 (providing option "to disable personalization entirely for the youngest users"). SB976 regulates only feed personalization; it does not affect content moderation. *See infra* pp. 32-34.

### E. In feed personalization, the humans at Plaintiffs' companies have outsourced editorial judgment to their non-human machine-learning algorithms

Examining how Plaintiffs' feed-personalization algorithms work in practice only underscores the lack of human involvement in the feeds'

creation. For example, Meta's complaint offers the example of a child user (let's call her "Mary Minor") who demonstrates an interest in local scholarships. 3-MetaER-545 (¶ 72). Meta discussed how Mary might be fed videos about trade schools, colleges and universities, or military recruitment. *Id.*

But humans are not the ones identifying that Mary is interested in local scholarships (or what other interests she might have). Nor have humans identified posts about trade schools, colleges, or military recruitment (as opposed to posts about, *e.g.*, applying for jobs, or joining the Peace Corps) as the categories of posts to possibly show Mary. Nor have humans chosen which posts in which order to compile into the personalized feed that Mary ultimately sees (*e.g.*, whether to include or prioritize videos about California trade schools, East Coast colleges, the Army, the Navy, or other alternatives). And, of course, Mary does not have only one singular interest in scholarships but has other interests as well: say, dancing, or dinosaurs. No human identified these interests, or made any judgment about what mix of what posts about scholarships, or dancing, or dinosaurs, or something else altogether, to compile and feed to Mary. It is Meta's feed-personalization algorithms that make those decisions at each of these steps. *See supra* pp. 13-22.

These "decisions" are not actually "decisions" in any human sense. Rather, they are merely the products of Meta's algorithms' running calculations on millions or billions of data points that Meta tracked and

harvested about Mary to determine the mathematical probability of posts that will "engage" Mary to remain on the platform. And the humans working at Meta have no knowledge of what actually is or is not being conveyed to Mary, or to any of Meta's billions of other users. TikTok's and YouTube's algorithms work the same way. *See supra* pp. 13-22.

One consequence of this system is that Plaintiffs' algorithms often end up conveying content that the humans at Plaintiffs' companies claim they do *not* want to promote. 4-SER-906-11, 963-964, 966-69 (¶¶ 43-46, 111). For example, Meta's policies state that Meta does not allow posts promoting or encouraging suicide or self-injury—yet a study showed that where teenage-user accounts previously accessed posts with suicide, self-harm, or highly depressive content, Instagram's algorithms recommended more such posts: 14-20% referenced suicide methods, 44-55% referenced suicide and/or self-harm ideation, and 97-99% referenced feelings of intense depression, misery, and despair. 4-SER-908-09 (¶ 45). As Meta's former Head of Youth Safety and Well-Being Vaishnavi Jayakumar testified, "there's a disconnect between the suicide and self-injury policy and the aggregated content that actually gets recommended by Instagram's algorithm," and the algorithm "does sometimes push content that, in the aggregate, could be seen as encouraging suicide" and "could be seen as promoting self-injury," including to children, notwithstanding that Meta's policies prohibit

such content. 7-SER-1602-06 (218:5-221:4-222:12); *see, e.g.*, 7-SER-1758-59 (24:22-25:8); 7-SER-1737.

TikTok's algorithm is no different. TikTok states that it does not allow posts that promote suicide or self-harm—yet an audit with teenage-user accounts that "paused briefly on videos about body image and mental health, and liked them" found that "[w]ithin 2.6 minutes, TikTok recommended suicide content. Within 8 minutes, TikTok served content related to eating disorders. Every 39 seconds, TikTok recommended videos about body image and mental health." 4-SER-909-10 (¶ 45); *accord, e.g.*, 7-SER-1836; 8-SER-1847. The Wall Street Journal conducted an investigation finding, for example, that after a user account watched videos about heartbreak, emotional pain, and mental health for just 36 minutes, TikTok's algorithm began filling 93% of the user's feed with depression-related content (with the remaining 7% being mostly ads). *Investigation: How TikTok's Algorithm Figures Out Your Deepest Desires*, WALL ST. J., July 21, 2021, at 7:30-9:30, https://tinyurl.com/ydrb9wa7.[3] TikTok's own data confirmed that 88% of eating-disorder videos viewed by minors were algorithmically recommended. 7-SER-1827.

[3] *See also* Rob Barry et al., *How TikTok Serves Up Sex and Drug Videos to Minors*, WALL ST. J., Sept. 8, 2021 (7-SER-1580-85); Tawnell D. Hobbs et al., *'The Corpse Bride Diet': How TikTok Inundates Teens With Eating-Disorder Videos*, WALL ST. J., Dec. 17, 2021 (7-SER-1587-98).

Likewise, YouTube states that it does not allow content that endangers the emotional and physical well-being of minors—yet a study found that in 3.5% of cases where a toddler starts from a video that appears in the top results of a toddler-appropriate search (*e.g.*, "Peppa Pig"), YouTube's algorithms will send the user to a disturbing video within ten hops. 4-SER-910-11 (¶¶ 45-46). When suicide or self-harm videos are on the platform, and YouTube's trust-and-safety team does not find them and take them down, YouTube's algorithm will distribute them into personalized feeds on users' homepages and their "Watch Next" recommendations. 8-SER-1970-73 (371:15-374:11). YouTube's own internal study found that two-thirds of the watch time spent on suicide and self-harm videos, and 60% of the watch time spent on eating-disorder videos, comes as a result of YouTube's algorithmic recommendations. 8-SER-1967-76 (368:7-377:5).

Indeed, the material Plaintiffs' human employees claim to want to *not* convey is often the material Plaintiffs' algorithms promote *most*, because this material is often "engaging" and maximizes time spent on the platform—and user engagement and time spent (not the actual content of any material) is what drives Plaintiffs' feed-personalization algorithms. *See, e.g.*, 3-SER-574-75 (¶¶ 281-83) ("Mark Zuckerberg revealed that the more similar social media content is to prohibited content, the more engagement it gets"); 7-SER-1648 ("Meaningful Interactions are highly related to harmful content. Interactions such as

clicks, likes, private shares, and comments are associated with sexually suggestive and hate speech content across [Instagram]."); 7-SER-1776-77 (407:10-408:23) ("Transactional sexual content hits most of business's metrics of success and is pushed to top [of TikTok L]ives because algo[rithm] prioritizes engagement."); 8-SER-1971-76 (372:21-377:5) (discussing how YouTube's algorithms recommend suicide and self-harm videos to users).

This has led to devastating consequences. For example, TikTok's feed-personalization algorithm pushed out videos of people choking themselves unconscious to eight-year-old Lalani Erika Walton, who copied what she saw and ended up dead. Brian Contreras, *TikTok is sued over death of two young girls in viral 'blackout challenge'*, L.A. TIMES, July 1, 2022 (7-SER-1571-77). Meta's algorithm pushed out feeds full of "girls falling off buildings, videos of blades cutting into unscarred flesh, and soft music framing stylized photos of hanging bodies" to thirteen-year-old Taylor Little, who attempted suicide at least twice and ended up in a coma. Charlotte Alter, *Everything I Learned About Suicide, I Learned on Instagram*, TIME, Aug. 20, 2025 (2-SER-349-64). YouTube's algorithm pushed out feeds full of "videos glorifying skeletal-looking bodies and hacks for sustaining a 500-calorie daily diet" to fourteen-year-old Anna Mockel, who developed an eating disorder that required multiple hospitalizations and residential treatment. Elizabeth Germino, *YouTube Algorithms Consistently Push*

*Eating Disorder and Self-Harm Content to Teen Girls, New Study Finds*, 60 MINUTES, Dec. 10, 2024 (2-SER-368-72).

The reason this content appears in Plaintiffs' addictive personalized feeds is not because Plaintiffs necessarily want to convey this content. Indeed, Plaintiffs' policies indicate they affirmatively *do not want* to convey this content. Rather, this content appears in the personalized feeds Plaintiffs push out to children precisely because humans are *not* the ones exercising editorial judgment—because, instead, humans have outsourced that judgment to algorithms that have no understanding of the actual content of the feeds they are compiling.

## III. PLAINTIFFS' ADDICTIVE PERSONALIZED FEEDS CAUSE HARM TO CHILDREN

Numerous studies show that Plaintiffs' personalized feeds harm children. For example, in 2023, the U.S. Surgeon General warned that:

- "Social media platforms are often designed to maximize user engagement, which has the potential to encourage excessive use and behavioral dysregulation,"
- platforms use "algorithms that leverage user data to serve content recommendations" to "maximize engagement,"
- "nearly a third (31%) of social media use may be attributable to self-control challenges magnified by habit formation," and

- "social media exposure can overstimulate the reward center in the brain and, when the stimulation becomes excessive, can trigger pathways comparable to addiction" and result in "changes in brain structure similar to changes seen in individuals with substance use or gambling addictions."

Surgeon General Advisory 9 (3-MetaER-505).

Considerable research—as well as Plaintiffs' own internal documents, *e.g.*, 7-SER-1726-35, 8-SER-1915, 8-SER-2006—confirms that habit-forming platform usage generally, and addictive feeds specifically, cause a wide array of harms to children and teens. Those harms include sleep disruption, diminished attentional capacity, lower working memory, increased impulsivity, ADHD, poor school performance, anxiety, and depression. 3-SER-749-807 (¶¶ 195-322); 4-SER-993-94, 1000-07 (¶¶ 49, 58-74); 5-SER-1087-149, 1177 (¶¶ 116-228, 302); 5-SER-1200-02, 1217-28, 1232-34 (¶¶ 50-54, 81-105, 116-21). MRIs have indicated altered brain function among individuals addicted to social media that is similar to that of individuals addicted to drugs or alcohol. 3-SER-717 (¶ 129); 5-SER-1118-19 (¶ 173); 5-SER-1248 (¶ 152).

Addictive personalized feeds exacerbate these problems. Addictive feeds increase the time that children remain on internet platforms. 4-SER-1008-12 (¶¶ 77-83); 5-SER-1055-58 (¶¶ 62-65). "These feeds enable children to keep scrolling (sometimes for hours) without ever

needing to actively search for something, and without the platform prompting or encouraging them to stop." 4-SER-1012-13 (¶ 85) (ellipsis omitted). Viewing feeds of personalized videos activates the brain's dopamine system, in a feedback loop that leads to craving yet more personalized videos and to compulsive use. 5-SER-1057-58 (¶ 64).

This addiction and the attendant harms are content agnostic. Even if the underlying content that a user views does not hold intrinsic harmful or addictive qualities, users may become addicted because platforms continually amplify more of that content to the user—whatever it might be. 5-SER-1061 (¶ 69). Addictive personalized feeds create a targeted stream of material that feels endless, keeping users hooked as they anticipate the next video. 5-SER-1102 (¶ 144). Addictive feeds perpetuate themselves in a feedback loop—the longer a child says on her feed, the more user actions the feed-personalization algorithms have to measure, and the more the algorithms can then further tailor that feed to be even more addictive to that child. 4-SER-1014 (¶ 90); 5-SER-1061, 1114-15 (¶¶ 69, 166). And as teens become accustomed to addictive feeds and rapid feedback from the algorithms adjusting feeds in response to teens' data, their ability to delay gratification may weaken, making it harder for them to develop long-term self-discipline and impulse control. 5-SER-1087 (¶ 114). Excessive exposure may alter dopamine reward pathways in the brain, restructuring pathways to become increasingly tuned to these cues and

making it even harder to disengage. 5-SER-1118-19, 1122-23 (¶¶ 173, 179). And experts confirm that this harm is not merely correlative; it is *causal*. 1-SER-20-21 (¶ 47); 1-SER-186 (¶¶ 5-6); 1-SER-201-03, 230-33 (¶¶ 19-22, 99-104); 1-SER-255-57 (¶¶ 18-21); 3-SER-768, 781, 784, 798, 822-23 (¶¶ 237, 264, 269, 301, 349-50); 4-SER-996 (¶ 53); 5-SER-1046, 1055-56 (¶¶ 44, 62); 5-SER-1182 (¶ 8); Surgeon General Advisory 7 (3-MetaER-503).

## IV. SB976 REGULATES ONLY THE MECHANISM OF USING HARVESTED USER DATA TO COMPILE ADDICTIVE FEEDS AND DOES NOT RESTRICT EXPRESSION OF ANY IDEA OR VIEWPOINT

Prompted by research, including the Surgeon General Advisory and the numerous studies cited therein, showing how addictive internet-platform usage harms children, the California Legislature enacted SB976. *See* SB976 § 1; Assemb. Privacy & Consumer Prot. Comm., Bill Analysis, SB 976 (2024) (Assembly SB976 Analysis) (3-MetaER-478-95); S. Judiciary Comm., Bill Analysis, SB976 (2024) (Senate SB976 Analysis) (5-TikTokER-879-901).

As relevant here, SB976 regulates the use of "addictive feeds" on children. As defined in the statute, "addictive feeds" are those where user posts are "recommended, selected, or prioritized for display to a user based, in whole or in part, on information provided by the user, or otherwise associated with the user or the user's device" (with enumerated exceptions). § 27000.5(a). SB976 requires platforms to

obtain parental consent before providing addictive feeds to children; to limit addictive feeds for children to one hour per day by default; and to allow parents the option to set their children's default to be a non-addictive feed. §§ 27001(a), 27002(b)(2), (4).[4]

As the legislative history makes clear, SB976's focus was "only about algorithmic delivery of user-created content" to children. Assembly SB976 Analysis 11 (3-MetaER-488); *see* SB976 § 1(b). SB976 explicitly protects "[a] minor's ability to search for or follow whatever content or content creators they want" and "[t]he ability of a platform to do content moderation[.]" Assembly SB976 Analysis 10 (3-MetaER-489). For example, nothing in SB976 restricts users, including children, from:

- signing up on any platform,
- posting any content they choose,
- accessing/reading/viewing any other user's posts on any topic,
- searching for any posts, or
- subscribing to follow any content creator.

Similarly, nothing in SB976 restricts Plaintiffs from making any individual-user-data-agnostic decisions they want, including:

[4] Plaintiffs do not challenge any other SB976 provision.

- content-moderating any posts (*e.g.*, removing posts with nudity, violence, or other content Plaintiffs disfavor for any reason or no reason),
- deprioritizing any posts and placing them lower in feeds (*e.g.*, posts Plaintiffs consider to be "low-quality" or "clickbait," or disfavor for any reason or no reason),
- prioritizing any posts Plaintiffs want to promote (*e.g.*, posts from "reputable" sources, posts from smaller "budding creators," sponsored "Super Bowl clips," or any other posts Plaintiffs want to promote for any reason or no reason),
- creating or curating feeds with any content or subject (*e.g.*, sports, arts, politics, affinity and support groups, etc.), or
- using algorithms to carry out these user-data-agnostic decisions.

In short, SB976 regulates only the mechanism of using an individual user's harvested data to compile addictive feeds personalized to that user. SB976 imposes no restrictions on any idea, thought, opinion, or viewpoint whatsoever.

## V. LEGAL AND PROCEDURAL HISTORY

### A. *Moody v. NetChoice*

In *Moody v. NetChoice*, the Supreme Court addressed whether "user-agnostic" Community Standards that social-media companies applied to remove or deprioritize certain posts (*e.g.*, posts with

"pornography, hate speech, or misinformation on select topics")—in other words, content moderation—amounted to expressive activity protected under the First Amendment. 603 U.S. at 719-20, 736 n.5. At issue was a Florida law that "restricts varied ways of 'censor[ing]' or otherwise disfavoring posts ... based on their content or source" and a Texas law that banned "'censor[ing]' a user or user's expression based on viewpoint." *Id.* at 720-21. NetChoice, an internet-company trade association whose members included Facebook and YouTube, brought facial First Amendment challenges to the two laws. *Id.* at 721. The Eleventh Circuit upheld an injunction of Florida's law, and the Fifth Circuit reversed an injunction of Texas's. *Id.* at 722.

The Supreme Court vacated both Circuit decisions and remanded. The Court's opinion began by observing how different platforms, or different functions on the same platform, could "involve different levels of editorial choice, so that the one creates an expressive product and the other does not. If so, regulation of those diverse activities could well fall on different sides of the constitutional line." *Id.* at 725-26. Thus, the Court explained that a facial First Amendment challenge required, among other things, "asking, as to every covered platform or function, whether there is an intrusion on protected editorial discretion." *Id.* at 725. The Court held that neither Circuit had sufficiently "explore[d] the laws' full range of applications," as required for a facial challenge, and

that "[t]he parties have not briefed the critical issues here, and the record is underdeveloped." *Id.* at 726.

In providing guidance for its remand, the Court wrote that "the First Amendment offers protection when an entity engaging in expressive activity, including compiling and curating others' speech, is directed to accommodate messages it would prefer to exclude. The editorial function itself is an aspect of speech.... An entity exercising editorial discretion in the selection and presentation of content is engaged in speech activity." *Id.* at 731 (quotation marks and brackets omitted). The Court noted, however, that "[o]f course, an entity engaged in expressive activity when performing one function may not be when carrying out another." *Id.* at 732 n.4.

Against that backdrop, the Court held that platforms' content moderation could constitute protective activity where such moderation "is the product of a wealth of choices about whether—and, if so, how—to convey posts having a certain content or viewpoint. Those choices rest on a set of beliefs about which messages are appropriate and which are not (or which are more appropriate and which less so). And in the aggregate they give the feed a particular expressive quality." *Id.* at 738. The Court held that, "[a]t least on the current record, the editorial

judgments influencing the content of those feeds are ... protected expressive activity." *Id.* at 744.[5]

The Court separately observed that Facebook and YouTube also use algorithms to personalize feeds for individual users, but it was careful to note that such user-specific personalization was *not* the issue before it: "We [] do not deal here with feeds whose algorithms respond solely to how users act online—giving them the content they appear to want, without any regard to independent content standards." *Id.* at 734-36 & n.5. Rather, the litigated issue in *Moody* concerned only the platforms' Community Standards, which moderated posts based on content and "make a wealth of user-agnostic judgments about what kinds of speech, including what viewpoints, are not worthy of promotion." *Id.*

Justice Barrett, whose vote was necessary to form a five-Justice majority, wrote a concurrence further articulating the difference between potentially protected and unprotected feed curation. As Justice Barrett explained, "[a] function qualifies for First Amendment protection only if it is inherently expressive." *Id.* at 745 (citing *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Bos., Inc.*, 515 U.S. 557, 568 (1995)). If "human beings decide to remove posts promoting a

---

[5] Neither Facebook nor YouTube were parties in *Moody* and thus were not subject to party discovery as to how their algorithms actually worked.

particular political candidate or advocating some position" and "create an algorithm to help them identify and delete that content, the First Amendment protects their exercise of editorial judgment—even if the algorithm does most of the deleting without a person in the loop." *Id.* at 745-46. "In that event, the algorithm would simply implement human beings' inherently expressive choice to exclude a message they did not like from their speech compilation." *Id.* at 746 (quotation marks and brackets omitted).

By contrast, Justice Barrett posited an "algorithm [that] just presents automatically to each user whatever the algorithm thinks the user will like—*e.g.*, content similar to posts with which the user previously engaged," or a scenario where "a platform's owners hand the reins to an AI tool and ask it simply to remove 'hateful' content," after which "the AI relies on large language models to determine what is 'hateful' and should be removed[.]" *Id.* Justice Barrett strongly questioned whether those such actions would be expressive or protected under the First Amendment, because such algorithms "may attenuate the connection between content-moderation *actions* (*e.g.*, removing posts) and human beings' constitutionally protected right to '*decide for themselves* the ideas and beliefs deserving of expression, consideration, and adherence.'" *Id.* (emphases in original; brackets omitted) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994) (*Turner I*)).

"[T]he analysis is bound to be fact intensive, and it will surely vary from function to function and platform to platform." *Id.* at 747.

Justice Jackson concurred in part and concurred in the judgment. In her view, "[t]he question" in First Amendment challenges "is not whether an entire category of corporations (like social media companies) or a particular entity (like Facebook) is generally engaged in expression." *Id.* at 748. Rather, courts must "carefully parse ... how the regulated activities *actually function* before deciding if the activity in question constitutes expression and therefore comes within the First Amendment's ambit." *Id.* at 749 (emphasis in original).

Justice Alito, writing for the three remaining Justices, concurred in the judgment. As he explained, "[b]ecause not all compilers express a message of their own, not all compilations are protected by the First Amendment. Instead, the First Amendment protects only those compilations that are 'inherently expressive' in their own right, meaning that they select and present speech created by other persons in order 'to spread the compiler's own message.'" *Id.* at 781 (quoting *Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 66 (2006) (*FAIR*)). Justice Alito discussed how editors in other contexts, like "[n]ewspaper editors[,] are real human beings," whereas "when AI algorithms make a decision, even the researchers and programmers creating them don't really understand why the models they have built make the decisions they make"; he thus questioned whether "such

decisions [are] equally expressive as the decisions made by humans[.]" *Id.* at 795 (quotation marks omitted).

### B. *NetChoice v. Bonta*

As just described, "*Moody* left open the outer limits of which algorithm-based feeds are expressive for First Amendment purposes[.]" *NetChoice*, 152 F.4th at 1021. This Court addressed some of those open questions in *NetChoice v. Bonta*, the antecedent lawsuit to the present matters. Shortly after SB976 was enacted in 2024, NetChoice brought facial and as-applied challenges on behalf of Meta, YouTube, and others to enjoin it. The district court denied NetChoice's preliminary-injunction motion with respect to SB976's addictive-feed provisions, and this Court affirmed.

This Court rejected the argument that algorithmic personalized feeds are per se expressive for First Amendment purposes. *Id.* at 1014. Rather, the Court held that "determin[ing] whether an algorithmic feed is expressive[] requires review of *each* member's algorithm, and how it functions." *Id.* (emphasis in original) (citing *Moody*, 603 U.S. at 723-26). The Court held that "[t]he First Amendment analysis is 'fact intensive' and will 'surely vary' from 'platform to platform'" and that "[s]uch is the nature of a First Amendment claim related to algorithmic speech[.]" *Id.* (citing *Moody*, 603 U.S. at 747 (Barrett, J., concurring)).

This Court explained, "the more an algorithm implements human editorial directions, the more likely it is to be expressive for First

Amendment purposes." *Id.* "An algorithm that promotes a platform's own message to users is likely to be protected speech." *Id.* (citing *TikTok Inc. v. Garland*, 604 U.S. 56 (2025)). "On the other hand, an algorithm that 'respond[s] solely to how users act online,' merely 'giving them the content they appear to want,' probably is not expressive." *Id.* (quoting *Moody*, 603 U.S. at 736 n.5, and citing *id.* at 746 (Barrett, J., concurring)). "Personalized algorithms might express a platform's unique message to the world, *or* they might reflect users' revealed preferences to them"—the former might be protected, but the latter might not. *NetChoice*, 152 F.4th at 1014 (emphasis in original).

Because First Amendment claims about algorithmic feeds are inherently individualized, the Court held that NetChoice (which has no feeds of its own) lacked associational standing to challenge SB976's addictive-feed provisions on behalf of its members. *Id.* The Court similarly held that NetChoice's facial challenge failed, because NetChoice failed to address how each internet platform's feed-personalization algorithms worked, and "[u]nlike other cases in which the constitutional analysis is materially identical across all applications of a law, here this record development matters." *Id.* at 1021-22.[6]

---

[6] The Court also addressed several other provisions of SB976 not being challenged here. One provision required platforms to default to not showing minors numeric counts of "likes" or feedback on their posts, which the Court preliminarily enjoined. 152 F.4th at 1015-16. Another required platforms to default to putting minor accounts in "private

(continued…)

### C. The instant cases

Following *NetChoice*, Meta, TikTok, and YouTube each filed lawsuits bringing individual as-applied challenges to SB976's addictive-feed provisions and filed preliminary-injunction motions. Notwithstanding this Court's admonition that record development about how feed-personalization algorithms work "matters," *NetChoice*, 152 F.4th at 1022, and despite having full access to all of their internal documents and employees, from which they could build a fulsome record, Plaintiffs each supported their motions with only a few slim employee declarations that discussed their algorithms at a high level of generality. 3-MetaER-448-73; 4-TikTokER-608-34; 7-YouTubeER-1332-69.

Defendant thus sought discovery concerning how Plaintiffs' algorithms actually work. The parties entered discovery negotiations, and Plaintiffs ultimately produced to Defendant a partial subset of the exhibits to a summary-judgment opposition filed in a consumer-

---

mode," where only "connected" users can view or interact with a minor's posts. The Court held this provision was content neutral, rejecting an argument that it was speaker-based, because "[a] speaker preference is problematic only if it 'reflects a content preference.'" *Id.* at 1017. The Court then held this provision satisfied intermediate scrutiny, as it "logically serves the end of protecting minors' mental health by reducing screentime and habit-forming platform usage." *Id.* The Court also considered a challenge to SB976's age-verification requirements, finding it unripe because those requirements not go into effect until 2027. *Id.* at 1018-19. Finally, the Court rejected an argument that SB976 was void for vagueness. *Id.* at 1022-23.

protection action against Plaintiffs: *In re Social Media Adolescent Addiction/Personal Injury Products Liability Litigation*, No. 4-22-md-03047-YGR (N.D. Cal.) (6-SER-1251-1486).[7] Based on this limited discovery, Defendant opposed Plaintiffs' motions, attaching (1) over 300 internal documents and deposition transcripts obtained from Plaintiffs, which help to explain the workings of Plaintiffs' feed-personalization algorithms and Plaintiffs' own understanding of how their feeds harm children, and (2) declarations from seven experts in computer science, algorithms, children's health, developmental behavior, psychology, and neuroscience. Plaintiffs filed replies, with 11 expert declarations of their own and additional employee declarations (but no documentary evidence).

The district court requested supplemental briefing specifically addressing "how much human interaction with an algorithm is needed for the personalized feeds to constitute 'speech,' and how much human interaction occurs specifically in the algorithms for each Plaintiffs' personalized feeds." 3-SER-659. Defendant filed a sur-reply addressing these issues and attaching additional documents obtained from Plaintiffs and additional expert declarations. Plaintiffs filed sur-sur-replies, attaching additional declarations (but, again, no documentary

[7] To date, Defendant has not had the opportunity to take discovery beyond this limited subset of exhibits.

evidence). Following briefing, the district court held oral argument for nearly six hours. 2-YouTubeER-33-231.

Based on its careful review of the current record, the district court denied Plaintiffs' motions. The court held that Plaintiffs bore the burden to establish that their activity is expressive such that the First Amendment even applies. 1-MetaER-16 (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984)). The court noted that where a compilation of third-party speech (here, user posts) is at issue, the compilation is protected only to the extent that it is "'inherently expressive'" in its own right. *Id.* (quoting *Moody*, 603 U.S. at 781 (Alito, J., concurring) (quoting *FAIR*, 547 U.S. at 66)). The court found that Plaintiffs had failed to show at this stage of the litigation that their personalized feeds were expressive. 1-MetaER-17. "Rather, Plaintiffs rely on predictive algorithms that incorporate users' past watch history and other data and then suggest content that the algorithms anticipate will be engaging, or 'interesting' to users. Plaintiffs' decision to rely on these algorithms' number-crunching capabilities is not an expressive judgment." *Id.*

The court acknowledged Plaintiffs' arguments that their personalized feeds conveyed their desired "expressive message," which for each Plaintiff "is some approximation of 'we think you [the end user] will find this content interesting.'" *Id.* But as the court found:

> Plaintiffs are not making any decisions about what content will be "interesting," because they are merely

> relying on predictive modelling to assess what users' characteristics and history on the platform suggest will keep these same users engaged. This decision is not an 'expressive' message; it is merely a mirror that reflects back to users their own perceived interests. In effect, Plaintiffs are relying on an algorithmic function to make the determination of what is "interesting," divorced from any understanding of the underlying content. Plaintiffs themselves are not making any determination of what is "interesting" when they rely on this predictive modelling, nor do they otherwise seek to convey an expressive message through their personalized feeds.

1-MetaER-17-18 (citation omitted).

The court then addressed Plaintiffs' claims that their human employees make decisions in developing and modifying their feed-personalization algorithms. The court found that Plaintiffs' human employees made decisions such as "set[ting] maximization of user engagement as an objective for Plaintiffs' algorithms." 1-MetaER-18. But the court found that these kinds of decisions by human employees were not *editorial* decisions, as Plaintiffs' employees did not actually choose what messages or viewpoints to convey to users—the algorithms, not the humans, were still the ones ultimately "filling in [] the blank" and choosing what messages to convey or not convey to users. 1-MetaER-18-19.

The court next addressed Plaintiffs' claims that their feed personalization was akin to content moderation. The court found that each Plaintiff's feed-personalization and content-moderation processes

were distinct and separable. 1-MetaER-19-21. In content moderation, actual humans "fill in the 'blank'" and actually make decisions about what content to convey—*e.g.*, "we don't want nudity on our platforms.... The blank is nudity." 1-MetaER-22. By contrast, humans were not making such decisions in Plaintiffs' feed-personalization processes; instead, Plaintiffs' feed-personalization algorithms often promoted content that Plaintiffs' humans wanted *not* to convey, such as self-harm content. 1-MetaER-24. The court therefore found that Plaintiffs, in their content-moderation processes, "have made value-laden judgments based on a 'set of beliefs about which messages are appropriate and which are not,'" whereas Plaintiffs' feed-personalization processes involve no beliefs about the messages or content being conveyed. 1-MetaER-26.

The court also rejected Plaintiffs' various other arguments concerning SB976. For example, it rejected Plaintiffs' argument that SB976 violates users' rights to receive information and ideas, noting that SB976 does not require Plaintiffs to remove any content from their platforms. 1-MetaER-27. The court further held that SB976 does not unconstitutionally burden minors' right to access speech, as all posts and content on Plaintiffs' platforms remain fully accessible to minors under SB976. 1-MetaER-28. Nor did SB976 burden Meta's right to disseminate protected speech, because—as the court held—Meta had failed to establish that its personalized feeds were protected.

1-MetaER-28-29. Finally, the court rejected YouTube's argument that the term "verified parent" in SB976 was impermissibly vague, holding that "verify" is readily understood and has a plain meaning. 1-MetaER-29-31.

In denying Plaintiffs' motions, the district court was careful to note that it merely resolved "a *preliminary* injunction" and that "further factual development" might affect its assessment of the merits of Plaintiffs' claims. 1-MetaER-31 (emphasis in original). These appeals followed.[8]

## SUMMARY OF ARGUMENT

1. The district court did not abuse its discretion in finding that Plaintiffs failed to establish a likelihood of success on the merits.

a. Plaintiffs bear the burden of establishing that their algorithmically generated personalized feeds are expressive and protected under the First Amendment. As this Court held, algorithmic feeds are not protected categorically. *NetChoice*, 152 F.4th at 1021-22. Rather, whether a feed is protected turns on whether it is the product of human editorial judgment. *See id.* at 1014. "[E]diting is selection and choice of material," *Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 124 (1972), and editorial judgment requires

[8] Plaintiffs also moved this Court for injunctions pending appeal. After full briefing, the motions panel declined to issue the requested injunctions and instead referred the motions to the assigned merits panel.

making "choices about whether—and, if so, how—to convey posts having a certain content or viewpoint" that "rest on a set of beliefs about which messages are appropriate and which are not (or which are more appropriate and which less so)," *Moody*, 603 U.S. at 738.

Plaintiffs are not exercising human editorial judgment with respect to their algorithmically generated personalized feeds. For instance, in the example of Mary Minor, no human has identified Mary's interests, nor chosen what posts or what content or viewpoint to convey to Mary; indeed, no human even knows what the feed to Mary ultimately will consist of content-wise. Instead, humans have outsourced these decisions to feed-personalization algorithms, which are making the "decisions" not in any human sense but, rather, by mathematically number-crunching data points that Plaintiffs have harvested from Mary to feed her posts that are probabilistically calculated to keep her engaged on the platform as long as possible. And where, as here, algorithmically generated feeds are not the product of human editorial judgment but instead merely respond to how users act online and reflect users' perceived preferences back to them, they are not expressive and protected under the First Amendment.

b. Even if Plaintiffs' algorithmically generated personalized feeds were protected, SB976 is a content-neutral law that satisfies intermediate scrutiny.

SB976 regulates only the *mechanism* of Plaintiffs using harvested user data to compile addictive feeds. SB976 is completely agnostic as to the actual content of any feed. To determine if a feed is subject to SB976, one need only examine whether the backend algorithm is using children's harvested data; one need not examine the content of the feed itself at all. This is the epitome of content neutrality. And SB976 satisfies intermediate scrutiny. SB976 serves a significant government interest: protecting children's health. SB976 is also narrowly tailored: it regulates only addictive-feed mechanisms, while imposing no restriction on any idea or viewpoint whatsoever.

Plaintiffs claim that the State has not established that SB976 will definitively alleviate harms to children, pointing to their own experts' opposing contentions. But intermediate scrutiny requires only that the Legislature's basis for its law be reasonable and supported by substantial evidence—regardless of whether the law's opponents present conflicting evidence. *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 210-12 (1997) (*Turner II*). The Legislature's conclusion that SB976 would alleviate harms to children is reasonable and well supported. *See, e.g.*, Surgeon General Advisory 6-10 (3-MetaER-502-06); Assembly SB976 Analysis 5-7 (3-MetaER-482-84); Senate SB976 Analysis 12-13 (5-TikTokER-890-91); *supra* pp. 29-32.

c. Even if strict scrutiny applies, SB976 passes constitutional muster. By way of example, the lead opinion in a recent Sixth Circuit

decision concluded that a far more restrictive law—which imposed a total ban on children accessing social-media sites without parental consent—satisfied strict scrutiny. *NetChoice, LLC v. Yost*, 180 F.4th 268, 289-92 (6th Cir. 2026) (Clay, J.). So too does SB976.

d. YouTube's argument that SB976's "verified parent" term is unconstitutionally vague because it does not include precise verification procedures, is makeweight. "Verify" has an ordinary plain meaning: "to establish the truth, accuracy, or reality of" something (here, parental status). Statutes routinely use terms, *e.g.*, "promote" or "consent," without including precise promotion or consent procedures, and courts routinely reject vagueness challenges thereto.

2. Plaintiffs have failed to establish irreparable harm. Plaintiffs do not assert any actual idea, thought, opinion, or viewpoint that SB976 prevents them from expressing. And Plaintiffs' complaints about compliance costs and loss of goodwill are entirely speculative and unsupported by the record.

3. Plaintiffs have also failed to establish that the balance of equities or public policy weigh in their favor. The record reflects abundant evidence demonstrating how Plaintiffs intentionally designed their platforms to be addictive, how Plaintiffs' addictive feeds harm children, and how Plaintiffs knew they were harming children but continued to do so anyway. The equities and public policy support

allowing SB976 to alleviate those harms and thereby improve children's mental health and well-being.

## STANDARD OF REVIEW

This Court reviews the denial of a preliminary injunction for abuse of discretion. *CTIA v. City of Berkeley*, 928 F.3d 832, 838 (9th Cir. 2019). This Court "will not reverse the district court where it got the law right, even if [this Court] would have arrived at a different result, so long as the district court did not clearly err in its factual determinations." *Id.* (quotation marks omitted). Additionally, this Court may affirm preliminary-injunction denials "on any ground supported by the record, whether or not the decision of the district court relied on the same grounds[.]" *Price v. City of Stockton*, 390 F.3d 1105, 1109 (9th Cir. 2004).

An injunction is "an extraordinary remedy never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008). A plaintiff "must show that: (1) she is likely to succeed on the merits, (2) she is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in her favor, and (4) an injunction is in the public interest." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc). Where the government is a party, the last two factors merge. *Drakes Bay Oyster Co. v Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). Moreover, if Plaintiffs raise only "serious questions" on the merits without showing an actual likelihood of success, they must establish not just

that the balance of equities favors them, but that it "tips sharply" in their favor. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

# ARGUMENT

## I. PLAINTIFFS FAILED TO ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS

### A. Plaintiffs failed to establish that their algorithmically generated personalized feeds are protected under the First Amendment

The burden of establishing that Plaintiffs' feeds are expressive, such that the First Amendment even applies, falls on Plaintiffs. *Clark*, 468 U.S. at 293 n.5; *B&L Prods., Inc. v. Newsom*, 104 F.4th 108, 112 (9th Cir. 2024). And although Plaintiffs claim they need only make "a colorable claim that [their] First Amendment rights have been infringed," Meta OB 24, YouTube OB 17 (quoting *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024)), that standard applies only where there is no dispute that a plaintiff's conduct is expressive and protected. *See Meinecke*, 99 F.4th at 521 (no dispute that human evangelist's religious speech was expressive).[9] Where, as here, expressiveness is disputed, the Supreme Court has squarely rejected

[9] Plaintiffs cite *Doe v. Harris*, 772 F.3d 563 (9th Cir. 2014), but there, no one disputed the activity (sex offenders speaking on the internet) was expressive; the question was whether the law burdened that activity. *Id.* at 572-74. *Doe* therefore does not rebut that Plaintiffs bear the burden of establishing that their activity is expressive in the first instance.

the idea that a mere "plausible contention" that conduct is expressive is enough to satisfy a plaintiff's burden. *Clark*, 468 U.S. at 293 n.5.

Here, Plaintiffs have not met their threshold burden to establish that their personalized feeds are expressive for First Amendment purposes. *NetChoice* makes clear that algorithmic compilations of third-party speech (*i.e.*, user posts) into feeds are *not* categorically protected under the First Amendment. Rather, "some personalized recommendation algorithms may be expressive, while others are not, and that inquiry is fact intensive" and "record development matters." 152 F.4th at 1021-22.

Whether an algorithmic compilation is or is not protected turns on whether that compilation is the product of editorial judgment. *See, e.g.*, *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998) ("When a [] broadcaster *exercises editorial discretion* in the selection and presentation of its programming, it engages in speech activity.") (emphasis added). "[T]he more an algorithm implements human editorial directions, the more likely it is to be expressive for First Amendment purposes." *NetChoice*, 152 F.4th at 1014. "On the other hand, an algorithm that 'respond[s] solely to how users act online,' merely 'giving them the content they appear to want,' probably is not expressive." *Id.* (quoting *Moody*, 603 U.S. at 736 n.5, and citing *id.* at 746 (Barrett, J., concurring)); *accord Moody*, 603 U.S. at 781 (Alito, J., concurring) ("[T]he First Amendment protects only those compilations

that are ‘inherently expressive’ in their own right, meaning that they select and present speech created by other persons in order ‘to spread the compiler’s own message.’”) (brackets omitted) (citing *FAIR*, 547 U.S. at 66).

Plaintiffs claim their algorithmically generated personalized feeds are the product of their protected editorial judgment. But “editorial judgment” is not an open-ended term that encompasses any and all compilations of third-party speech. “[E]diting is selection and choice of material.” *Columbia*, 412 U.S. at 124. And the function of editorial judgment is, “first and foremost, to make decisions about the ‘content of the [compilation]’ and ‘[t]he choice of material to go into’ it.” *Moody*, 603 U.S. at 728. Editorial judgment requires making “choices about whether—and, if so, how—to convey posts having a certain content or viewpoint.” *Id.* at 738. To constitute editorial judgment, then, one’s choices must “rest on a set of beliefs about which messages are appropriate and which are not (or which are more appropriate and which less so).” *Id.*

Thus, there must actually be *judgment*: actual decisions to convey or not convey messages having a certain content or viewpoint. That judgment must be *editorial*: it must rest on a set of beliefs as to which messages are worth conveying and which are not. And that judgment must be exercised by *human beings*, as only human beings—not algorithms or computers—have First Amendment rights. *See Burwell*

*v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 706-07 (2014); *NetChoice*, 152 F.4th at 1014 (expressiveness turns on "human editorial directions"); *Moody*, 603 U.S. at 746-47 (Barrett, J., concurring); David Atkinson et al., *Intentionally Unintentional: GenAI Exceptionalism and the First Amendment*, 23 FIRST. AMEND. L. REV. 173, 177, 192 (2024). Simply put, it is human beings' "*choice* of material, the decisions made as to *content*, the treatment of public issues—whether fair or unfair—[that] constitute the exercise of editorial control and judgment." *Moody*, 603 U.S. at 738 (emphasis added; quotation marks and brackets omitted).

The newspaper editors in the seminal editorial-judgment case *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974), exercised editorial judgment—actual humans made an actual choice to convey or not convey certain content or viewpoints, namely:

| | |
|---|---|
| We will convey: | editorials criticizing Legislature candidate Pat Tornillo<br>*what content or viewpoints?* |
| We will not convey: | Tornillo's reply<br>*what content or viewpoints?* |

Likewise, in *Hurley*, 515 U.S. 557, actual humans made an actual choice to convey or not convey certain content or viewpoints, namely:

| | |
|---|---|
| We will not convey: | openly gay, lesbian, or bisexual marchers being in our parade<br>*what content or viewpoints?* |

But not so with Plaintiffs' feed-personalization algorithms. Consider the Mary Minor example, discussed above. Humans are not deciding what content or viewpoints to convey in Mary's feeds. At most, humans made a decision that:

| | |
|---|---|
| We will convey: | [BLANK – feed-personalization algorithm fills in this BLANK with whatever posts the algorithm calculates are likely to keep Mary "engaged" on our platform]<br>*what content or viewpoints?* |

The act of *filling in this blank*, and choosing what material goes into the blank—*i.e.*, making definitive judgments over which messages and viewpoints to convey or not convey based on a set of beliefs about which messages are appropriate and which are not—is what constitutes editorial judgment. *See Moody*, 603 U.S. at 738; *Columbia*, 412 U.S. at 124. But it is this act that Plaintiffs have outsourced to their non-human feed-personalization algorithms. Plaintiffs' algorithms "fill in the blank" and choose what material to convey to Mary—not in any human sense of those words, but by drawing upon billions of data points to calculate which posts are probabilistically most likely to keep Mary engaging with Plaintiffs' platforms. And Plaintiffs' algorithms do all of this without humans even knowing what the algorithms will ultimately "say."

TikTok argues that it does make judgments about what should go into that blank, namely, "[c]ontent that Mary likely will find interesting, is from creators new to her, is not repetitive of content she's recently viewed," and so on. TikTok Injunction Pending Appeal Reply 4. But this does not constitute protected human editorial judgment. As discussed, "editing is selection and choice of material" and "mak[ing] decisions about the 'content of the [compilation]' and 'the choice of material to go into' it." *Columbia*, 412 U.S. at 124; *see Moody*, 603 U.S. at 728 (brackets omitted). TikTok's supposed "judgments" do not involve human selection or choice of actual content or material. Take "[c]ontent that Mary likely will find interesting." What material is that? It could be posts about *anything*: scholarships, dancing, dinosaurs, sports, politics, memes, conspiracy theories, anorexia, suicide, and so on. No human knows, and no human decides. TikTok's claimed "judgment" does not involve a human choice to include, or exclude, any certain content or viewpoints in Mary's feed. Rather, it is simply a human choice to outsource judgment to feed-personalization algorithms, and to let those algorithms select how to fill in the blank, with whatever posts the algorithms mathematically calculate will keep Mary "engaged" and spending time on the platform.[10]

---

[10] *See State ex rel. Jackson v. TikTok Inc.*, No. 24CV032063-910, 2025 WL 2399525, at *10 (N.C. Super. Ct. Aug. 19, 2025) (concluding that where "[t]he recommendation engine is content-neutral, meaning it (continued…)

As amici Erwin Chemerinsky et al. discuss, editorial judgment in the context of Plaintiffs' feeds requires making choices about "*what specific content* will interest a user[.]" First Amend. Scholars Br. 8 (emphasis in original); *see id.* at 4 (feed's expressive quality inheres in "*what* content is selected" and "*how* the display will be organized and ordered") (emphasis in original). Plaintiffs' broad assertion that their human employees have decided to provide "[c]ontent that Mary likely will find interesting" is not a choice of *what specific content* will interest Mary or be conveyed to her.

Despite stating that editorial judgment requires making choices about "*what specific content*" to convey, Professor Chemerinsky et al. support Plaintiffs on the theory that "every platform makes those judgments[.]" First Amend. Scholars Br. 9. But it is not enough that "platforms," *i.e.*, algorithms, make those judgments; editorial judgments need to be *human* judgments to be protected. *See NetChoice*, 152 F.4th at 1014 ("human editorial directions").

Plaintiffs attempt to elide the fact that humans are not making editorial judgments by framing their corporate entities as the actors exercising editorial judgment. But a corporation has First Amendment rights only as derived from "the rights and obligations of the *people*"—

---

recommends content based on behavioral and certain device signals, not on the semantic nature of the content itself, ... it's hard to discern any expressive activity").

the actual "human beings"—"who are associated with a corporation in one way or another." *Hobby Lobby*, 573 U.S. at 706 (emphasis in original); *see* Atkinson 192. As Justice Barrett explained in her *Moody* concurrence,[11] the First Amendment protects "human beings' constitutionally protected right to '*decide for themselves* the ideas and beliefs deserving of expression, consideration, and adherence.'" 603 U.S. at 746 (emphasis in original; brackets omitted) (quoting *Turner I*, 512 U.S. at 641). Likewise, as Justice Alito discussed, there is a difference between "editors [who] are real human beings" versus "AI algorithms [that] make a decision, [that] 'even the researchers and programmers creating them don't really understand[.]'" *Id.* at 795.

Plaintiffs argue that their feed-personalization algorithms are not the *only* things that govern the content of their feeds, citing their content-moderation processes and other user-agnostic choices, such as downranking posts they deem to be low-quality. Application of human-delineated, "user-agnostic" standards may constitute protected editorial judgment. *Moody*, 603 U.S. at 736 n.5. But the critical distinction is that in content moderation, humans actually are "filling in the blank" and making the decision whether to convey or not convey certain content or viewpoints (*e.g.*, "we will not convey nudity") based on a set of

---

[11] Because Justice Barrett's vote was necessary to form a majority, her concurrence carries "particular weight." *Schmitz v. Zilveti*, 20 F.3d 1043, 1045 (9th Cir. 1994).

beliefs about which messages are appropriate and which are not. Nothing in SB976 prevents Plaintiffs from doing this, as SB976 does not regulate user-agnostic activities.

But content moderation only throws into stark contrast how humans are not exercising editorial judgment when it comes to their feed-personalization processes. Content moderation is user-agnostic, *see Moody*, 603 U.S. at 736 n.5, and humans can conceivably exercise editorial judgment over these sorts of broad user-agnostic decisions. By contrast, feed personalization is (by definition) different for every individual user, and the sheer size and scale of the data and factors that Plaintiffs' feed-personalization algorithms use to make their calculations belie the conceit that these algorithms are simply carrying out human editorial decisions. Plaintiffs each have billions of users and churn out billions (if not trillions) of different personalized feeds a day. *See* 3-MetaER-523 (¶ 2); 2-TikTokER-78 (¶ 47); 7-YouTubeER-1372 (¶ 3). Each such feed is unique: even the same user logging onto the same platform at two slightly different times will see different feeds, since each user's feed is constantly recalculated based on new data about her that Plaintiffs are continuously tracking. 1-SER-42 (¶ 10); 4-SER-858, 860-61, 866-67 (¶¶ 24, 34, 40, 48, 51). Plaintiffs do not plausibly claim that humans are "filling in the blank" or making those billions or trillions of different decisions about what content or viewpoint to convey to each of Plaintiffs' billions of users. Rather, those

decisions are outsourced to Plaintiffs' feed-personalization algorithms to compile posts based not on the posts' content or messages, but on mathematical calculations about the probability those posts will keep that user engaged on Plaintiffs' platforms.

Plaintiffs argue they have to rely on feed-personalization algorithms because it is impossible for actual humans to make decisions about the billions of feeds Plaintiffs generate each day. Meta OB 7; TikTok OB 10. But the fact that Plaintiffs have grown so large that humans are incapable of making decisions over the billions of feeds Plaintiffs push out every day does not mean that First Amendment protection extends to Plaintiffs' algorithms. Rather, this just confirms how humans do not (and cannot) exercise editorial judgment on the size and scale that Plaintiffs operate.[12]

Plaintiffs' attempt to analogize themselves to newspapers like the New York Times fundamentally misses the mark, and only confirms the gulf between Plaintiffs and actual human editorial judgment. *See* TikTok OB 2, YouTube OB 2. The editors of the Times do not create billions of different versions of their paper, each with a totally different front-page story (cat videos for people who like cats, cosmetics demonstrations for people who like cosmetics, conspiracy theories for

[12] Indeed, until only recently, evaluating data on this scale was beyond the capacity even of computer algorithms, much less the capacity of human judgment. 2-SER-346 (4027:8-17).

people who like conspiracies). Rather, the editors of the Times select which articles go on the front page based on *their* judgment about which articles are the most important and most worth conveying there. That "is what editors are for." *Columbia*, 412 U.S. at 124; *see Moody*, 603 U.S. at 738. And that is precisely what Plaintiffs do not do—and admit they cannot do. No human chooses what post appears at the top of Mary's (or any other user's) feed. No human knows what the posts being fed to Mary are about. And the feeds compiled for Mary do not convey any cognizable message of Plaintiffs' own. They only say to Mary: this is something that *you* might find interesting that we are reflecting back to you. (Or more accurately: this is something that—based on the data points we have collected on you—our algorithms have mathematically calculated is likely to keep you spending more time on our platform.) As this Court explained, an algorithm that just "reflect[s] users' revealed preferences to them" "probably is not expressive." *NetChoice*, 152 F.4th at 1014.

* * *

Plaintiffs offer several additional counterarguments, but none prevail.

Plaintiffs first argue that editors can take the interest of their audience into account in choosing what material to include or exclude in their compilations. Meta OB 26-27; YouTube OB 21 (citing *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703 (4th Cir. 1991) (en banc)). But no

party disputes that truism. Defendant agrees, for example, that "Fox News [may] convey an editorial criticizing Kamala Harris because they think that's what their audience would like," even if that is the only reason why Fox chooses to convey that editorial. YouTube OB 27-28. The key distinction there, though, is that human editors at Fox News are actually selecting the *what*—what content or viewpoints to convey (an anti-Harris editorial)—along with the why. Not so with Plaintiffs' feed-personalization algorithms. There, no human is selecting (or even knows) the *what*. And it is selecting the *what* through human editorial judgment that gives rise to First Amendment protection for compilations. *See NetChoice*, 152 F.4th at 1014; *Moody*, 603 U.S. at 728, 738; *Ark. Educ. Television*, 523 U.S. at 674.

Plaintiffs next argue that editors can use individualized information to personalize speech to individual members of their audience. Meta OB 27; TikTok OB 34; YouTube OB 23-24, 30 (citing *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011)). Again, this misses the point. To be sure, editors can use individualized information to tailor their messages, but they still have to actually decide the *what*: what messages to convey. In *Sorrell*, human salespeople decided *what* to convey—sales pitches about why doctors should use their brand-name drugs over generic alternatives—and used information about individual doctors' prescribing habits to tailor those messages. 564 U.S. at 557-58, 576-78. Here, by contrast, Plaintiffs' human employees are not the ones

deciding *what* messages to convey to any given user but, instead, have outsourced those decisions to their feed-personalization algorithms.

Plaintiffs argue in response that their feed-personalization algorithms do not respond "solely" to how users act online. Meta OB 7-8, 28; TikTok OB 3, 34-36; YouTube OB 26-27. But SB976 regulates feeds only to the extent they rely on user data and respond to how users act online. § 27000.5(a) (only regulating feeds based on information provided by or associated with a particular user or her device). Decisions that are not based on individualized user data are not regulated by SB976, and Plaintiffs remain completely free to continue making such decisions. Nor does it matter that Plaintiffs feed-personalization algorithms do not "solely" give users what they want and instead "diversify" users' feeds to sometimes give users different content. Meta OB 29; YouTube OB 28. Even if content on personalized feeds is "diversified," it remains true that humans are not making content decisions. That "diversified" content could be about *anything*. Mary's "diversified" feed might contain posts about multiple topics instead of just one—but no human chooses, or even knows, whether those topics will be dancing and dinosaurs, or scholarships and suicide. *Cf., e.g.*, 7-SER-1642 ("Increasing topic diversity increased all objectionable content[.]"). No human is making a choice of whether or how "to convey posts having a certain content or viewpoint" that "rest on a set of beliefs about which messages are appropriate and which are

not," which is what constitutes protected editorial judgment. *Moody*, 603 U.S. at 738.

Plaintiffs claim that the algorithms do not simply make all decisions, because their human employees continually monitor and refine their algorithms to better achieve Plaintiffs' "goals." Meta OB 8; TikTok OB 18; YouTube OB 7. But as discussed above, Plaintiffs' goals are not *editorial* decisions. Rather, Plaintiffs' goals are to increase the "relevance" and "value" provided to users—which Plaintiffs measure and equate with increasing the time users stay on Plaintiffs' platforms. *See supra* pp. 17-20; *accord, e.g.*, 2-SER-340-42 (3633:22-3635:25) (evaluating changes to algorithm to see how they increase or decrease users' "total time spent"); 7-SER-1630-31 (103:3-104:23); 2-YouTubeER-250-52 (¶¶ 14-18) ("metrics of success" are "watchtime"); 8-SER-1984-86 (155:24-157:4) (making 150 modifications to algorithm each "hunting for changes that might yield ... more watch time"); 3-SER-653-54, 9-SER-2194-95 (¶ 128) ([redacted] resulting in 13.7% increase in "YouTube Time").[13]

---

[13] YouTube claims as an example that its human employees addressed whether physics and math should be considered similar or different topics. YouTube OB 7 (citing 2-YouTubeER-250 (¶ 13)). YouTube's underlying declaration does not state what, if any, decision its humans actually made, instead posing it as an unanswered hypothetical question. 2-YouTubeER-250 (¶ 13). Additionally, deciding (continued…)

Meta nevertheless argues that because the compilation of its feeds involves some editorial judgment (*e.g.*, content moderation), its feeds are expressive and protected "as a whole," citing *Moody*. Meta OB 37-38. But taking that argument to its logical conclusion would mean that so long as a platform engages in *some* content moderation as it compiles a given feed (*e.g.*, removing one pornographic post), the entire feed is per se protected. *Moody* does not sweep so broadly. To the contrary, the Supreme Court expressly held in *Moody* that "[o]f course, an entity engaged in expressive activity when performing one function may not be when carrying out another." 603 U.S. at 732 n.4; *see id.* at 725-26 (different functions can "involve different levels of editorial choice, so that the one creates an expressive product and the other does not"). And as the Court further held the following year, "[w]hen speech has both protected and unprotected features, ... the unprotected features of the speech are, despite their communicative character, essentially a nonspeech element for purposes of the First Amendment." *Free Speech Coal. v. Paxton*, 606 U.S. 461, 492 (2025) (quotation marks and brackets omitted).

---

whether physics and math are "similar" or "different" is user-agnostic and thus is not regulated by SB976. In any event, this broad categorial decision does not actually select what content or viewpoints are conveyed in any user's feed—it is still the algorithm, not any human, that ultimately decides whether to show any given user physics, math, or something different altogether like music or sports. *See id.*

Applying those rules here, the district court correctly concluded that content moderation and feed personalization are separate and distinct processes. Thus, even if Plaintiffs might be engaged in expressive activity when implementing their Community Standards or other user-agnostic decisions, this does not mean that their *feed-personalization* algorithms amount to expressive activity. *Paxton*, 606 U.S. at 492; *Moody*, 603 U.S. at 725-26, 732 n.4.[14] And here, SB976 targets only Plaintiffs' non-expressive feed-personalization algorithms, without restricting Plaintiffs' ability to engage in content moderation or any other user-agnostic decisions.

Meta argues that "a compilation [need not] convey a 'narrow, succinctly articulable message'" to be protected, and TikTok argues that "[t]he compiler's choices are also protected without regard to whether the compiler endorses—or is even aware of—each particular message conveyed within the compilation." Meta OB 26; TikTok OB 30 (citing *Hurley*, 515 U.S. at 569, 573). But even where protection may exist over aspects of the feeds where humans actually make editorial choices, that does not mean that protection *extends* to the unknown,

[14] Just as fraud, defamation, child pornography, or any other unprotected speech does not become protected simply by being included in a compilation that also incorporates protected speech, the unprotected outputs of feed-personalization algorithms do not become protected simply by being included in feeds that also incorporate protected content-moderation decisions.

inarticulable remainder of the feed for which humans have *not* made an actual editorial choice.[15]

For example, if Plaintiffs make the editorial choice to, *e.g.*, remove nudity from their feeds, or (like the parade organizers in *Hurley*) remove pro-LGBTQ messages, those choices may be protected, as the government cannot force Plaintiffs to carry nudity or pro-LGBTQ messages against their will. *See Moody*, 603 U.S. at 742 ("the question" that "[t]he [Supreme] Court's decisions about editorial control .... ha[ve] in common [i]s whether the government could force a private speaker, including a compiler and curator of third-party speech, to convey views it disapproved"). But this does not mean that protection necessarily extends to the rest of the feed. Rather, whether other parts of a feed are also protected depends on whether those parts are expressive, based on the fact-specific record establishing how those parts operate. Here, the relevant part of the feed is built by feed-personalization algorithms based on users' data without any regard to the content or messages they

[15] Plaintiffs cite *Cinevision Corp. v. City of Burbank*, 745 F.2d 560 (9th Cir. 1984), claiming that the concert promoter there was entitled to First Amendment protection even though it "'did not know specifically what songs each performer would sing.'" *E.g.*, Meta OB 33. But in *Cinevision*, the promoter knew it had made a choice to promote rock concerts and that the city was blocking the concerts precisely because they were "hard rock"—which is what the promoter was challenging. 745 F.2d at 568. Unlike Plaintiffs here, the promoter did not claim it was also entitled to protection over the particular order or arrangement of songs that it neither chose nor knew.

are compiling, such that no editorial choice is being made and no First Amendment protection applies. *See id.* at 725-726, 732 n.4 (each function and activity must be examined separately); *id.* at 783 (Alito, J., concurring) (if the parade organizers in *Hurley* "select[ed] the *groups* that are admitted, but not the *individuals* who are allowed to march as members of admitted groups.... each of these practices would have to be analyzed separately") (emphasis in original); *Paxton*, 606 U.S. at 492 (separating out protected and unprotected features).

Meta argues that unless its algorithmically generated personalized feeds are protected in their entirety, "the First Amendment would provide no protection at all." Meta OB 2. But "[s]uch a simplistic, all-or-nothing-at-all approach to First Amendment protection is at odds with common sense and with [the Supreme Court's] jurisprudence as well." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 384 (1992). In *R.A.V.*, the Supreme Court discussed how the First Amendment places certain limits on the government's regulation of unprotected speech like libel—*e.g.*, the government may not "proscrib[e] *only* libel critical of the government." *Id.* (emphasis in original). But this does not mean that libel becomes protected in its entirety. *Id.* So too here. As discussed above, *Moody* places certain limits on the government's regulation of feeds—namely, that when a platform makes "user-agnostic judgments about what kinds of speech, including what viewpoints, are not worthy of promotion" (*i.e.*, human editorial judgment), the government cannot

override this and force the platform "to convey views it disapproved." 603 U.S. at 736 n.5, 742. But this does not mean that algorithmically generated personalized feeds become protected in their entirety where, as here, they are not the product of human editorial judgment. *Cf. R.A.V.*, 505 U.S. at 384; *Paxton*, 606 U.S. at 492.

Plaintiffs separately claim that the district court erred by imposing a "moral valence" test on editorial judgment. Meta OB 40-41; TikTok OB 39-41; YouTube 40. Plaintiffs argue the First Amendment protects speech regardless of whether the speaker believes it is "good" or "bad," YouTube OB 40, and regardless of whether the speaker's interest is "purely economic" rather than a "'wish to editorialize on any subject, cultural, philosophical, or political,'" Meta OB 41 (quoting *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 761-62 (1976)).[16]

[16] TikTok also makes the curious "moral valence" argument that *Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2011), held that violent video games were protected by the First Amendment, even though (according to TikTok) "they allowed users to create and control the game content themselves," and "the specific content was ultimately determined almost entirely by user preferences, not by the purported 'moral valence' of specific content decisions made by the developer itself." TikTok OB 40. *Brown* does not actually say this, and the premise defies common sense. Video-game developers absolutely make content decisions. The reason there are bloody decapitations in Mortal Kombat but not Mario Bros. is not because of user controller inputs; it is because human developers made (different) choices about what to convey in their respective games.

But Plaintiffs misread the district court's decision. The court used the phrase "moral valence" to refer to "value-laden judgments based on a 'set of beliefs about which messages are appropriate and which are not'"—which is the foundation of editorial judgment. 1-MetaER-25-26 (quoting *Moody*, 603 U.S. at 738). The court nowhere held that such beliefs need to be based on an idea's "goodness" or "badness," or on philosophical precepts, or that they cannot be based on commercial considerations. Indeed, the court explained that a human's decision to showcase cat videos because "something about the cats showcased makes the videos especially fun to watch" might also be protected editorial judgment, even though "fun to watch" is not a matter of morality or philosophy. 1-MetaER-26. What ultimately matters is that even judgments like "fun to watch" are choices about the *content or viewpoint* of the messages being conveyed and "rest on a set of beliefs about which messages are appropriate, and which are not." *Moody*, 603 U.S. at 738. That is the basis of editorial judgment. *Id.*; *accord Hurley*, 515 U.S. at 574 (a parade is expressive because "the [organizer] selects the expressive units of the parade from potential participants" and "each contingent's expression *in the [organizer]'s eyes co*mports with what merits celebration on that day") (emphasis added).

The district court found, based on the record before it, that Plaintiffs do not make such editorial judgments; instead, their feed-personalization algorithms compile their feeds based on data points

they have tracked and harvested on users and not based on "expressive judgment" about "the curated content itself." 1-MetaER-26; *accord, e.g.*, Austin & Levy 26-33. Plaintiffs therefore failed to demonstrate that their algorithmically generated personalized feeds are expressive and protected—not because their algorithmic feeds lack sufficient foundation in ideas about "morality," but because they are not the product of human editorial judgment at all.

* * *

Meta separately argues that—even if its personalized feeds reflect no human editorial judgment—SB976 still may not regulate its feeds, because doing so "burdens [Meta's] dissemination of protected speech." Meta OB 43. Meta does not clearly articulate what this "speech" is, at times suggesting that the relevant speech is *user posts*, *see id.* at 45-46 (claiming SB976 burdens Meta's disseminating "third-party" speech), and at times referring to *Meta's feeds*, *see id.* at 45 (claiming SB976 burdens Meta's disseminating "its current feeds").

Its argument fails, regardless. This Court should reject Meta's argument to the extent it refers to disseminating *user posts*, because SB976 does not burden disseminating posts. No posts are blocked, and users are free to access any posts they want. Meta relies heavily on *Cinevision*, 745 F.2d 560, but its reliance is misplaced. *Cinevision* involved a concert promoter challenging a city's decision to block a category of concerts ("hard rock" concerts). *Id.* at 565-66, 568.

*Cinevision* might be analogous if SB976 similarly blocked a category of users (*e.g.*, hard-rock aficionados) or a category of posts (*e.g.*, rock videos). But SB976 does no such thing—all users remain free to post about any subject they wish, and Meta remains free to disseminate any post on its platform to any user. And if Meta is referring to disseminating *Meta's feeds*, this just begs the question whether its feeds are protected to begin with.[17] Where, as here, Meta's feeds are not protected—because they are not the product of human editorial judgment—regulation of those feeds is not a burden on the dissemination of *protected* speech.

TikTok's and YouTube's similar arguments also fail. They claim that SB976 burdens minor users' right to "receive information and ideas." TikTok OB 44-45; YouTube OB 42-43. Like Meta, TikTok and YouTube are not clear whether they are claiming a burden on minors' ability to receive *user posts* or to receive *Plaintiffs' feeds*. But again, their arguments fail for the same reasons described above.

First, SB976 does not burden users' right to receive posts. All posts remain accessible to all users. Plaintiffs claim that having users search for posts they might wish to view instead of having posts fed to them

[17] As discussed above, the right to disseminate third-party user posts does not render algorithmically generated feeds of those posts independently protected in their own right. If it did, all algorithmic feeds would be per se protected, a premise this Court has squarely rejected. *NetChoice*, 152 F.4th at 1014, 1021.

imposes an unconstitutional burden, but they cite no authority for that proposition. TikTok OB 44-45; YouTube OB 42-43.[18] Rather, "[t]he First Amendment protects a right to read, but it does not grant unimpeded access to every reading material a reader might wish for." *Green v. U.S. Dep't of Justice*, 111 F.4th 81, 97-98 (D.C. Cir. 2024) (rejecting argument that readers have a First Amendment "right to access and learn from digital works" such that statute that places access restrictions on digital works is unconstitutional).

Second, the claim that SB976 burdens users' right to receive Plaintiffs' feeds (as opposed to user posts) again just begs the question of whether Plaintiffs' feeds are protected to begin with—which, as discussed above, Plaintiffs have failed to establish. "[N]o precedent exists for the proposition that the listener's rights are greater than those of the speaker"; rather, "the listener's rights [] derive from the existence of the speaker's rights." *NAACP v. Jones*, 131 F.3d 1317, 1322

[18] TikTok cites *Kleindienst v. Mandel*, 408 U.S. 753 (1972), but that case has nothing to do with searching for or being fed material; it involved a university's invitation to a Belgian journalist to speak at conferences and the government's denial of a visa for him. The Supreme Court has rejected the argument that *Kleindienst* supports a generalized "right to listen" on social media. *Murthy v. Missouri*, 603 U.S. 43, 74-75 (2024). Rather, "a cognizable injury [exists] only where the listener has a concrete, specific connection to the speaker." *Id.* (citing *Kleindienst*, 408 U.S. at 762); *see also Stockton v. Brown*, 152 F.4th 1124, 1145-46 (9th Cir. 2025) (that listener was "avid reader" of particular speaker is insufficient for "concrete, specific connection"). Plaintiffs do not identify any user-recipients with concrete, specific connections to any user-speaker.

& n.5 (9th Cir. 1997); *accord Stockton*, 152 F.4th at 1147. The Supreme Court has upheld restrictions on the speech of students at school based on the theory that students do not have full First Amendment rights, regardless of whether listeners might have wanted to receive that speech. *See, e.g.*, *Morse v. Frederick*, 551 U.S. 393, 404-05 (2007). Listeners do not have any greater right vis-à-vis the computer-generated output of Plaintiffs' feed-personalization algorithms than they do vis-à-vis actual human student speakers.[19]

Plaintiffs and their amici trot out a parade of purported horribles supposedly flowing from the district court's ruling, but these are straw men. For example, Meta claims that the government could force it to provide only randomized feeds. Meta OB 2. TikTok claims that SB976 would force it to feed NFL highlights to users who hate sports. TikTok OB 6. Amici Chamber of Progress et al. suggest that SB976 might prevent certain communities, like women in STEM or LGBTQ+ youth, from finding content relevant to them on social media. Chamber of Progress Br. 24; *accord* Ctr. for Democracy & Tech. Br. 6-11 (similar).

None of this is correct. SB976 does not limit platforms from implementing their own content preferences, whether by moderating

---

[19] TikTok also says in a heading in its brief that "TikTok's feeds ... implicate the expressive rights of creators," TikTok OB 44 (capitalization omitted), but it does not develop this argument and thus has waived it. *Stockton*, 152 F.4th at 1143. In any event, this argument fails. Plaintiffs remain free under SB976 to promote any creators they wish.

content under their Community Standards or organizing feeds around any topics they choose. Nothing in SB976 prevents Plaintiffs from, for example, compiling women-in-STEM feeds, LGBTQ+-support feeds, feeds for even more specific interests (*e.g.*, women-in-math, women-of-color-in-math, women-of-color-in-college-in-math, etc.), or feeds on any other topic or idea whatsoever. Nothing prevents any user from accessing such feeds (or, for the users who hate sports, from *not* accessing sports feeds). Nothing prevents any user from searching for, accessing, or interacting with any post on any topic. And, most importantly, nothing requires a platform to host or remove any post because of its content. Instead, the only thing that SB976 regulates is addictive personalized feeds that recommend, select, or prioritize posts *based on an individual user's harvested data*. And as the district court found, based on the specific factual record before it regarding these specific Plaintiffs' specific feeds, humans are not exercising editorial judgment over the decisions being made on individual users' harvested data; those decisions have been outsourced to algorithms. The feeds therefore are not protected.

* * *

This Court affirms preliminary-injunction denials where the district court "got the law right" and "did not clearly err in its factual determinations." *CTIA*, 928 F.3d at 838. The district court here "got the law right" that—to be expressive and protected—feeds compiling

third-party user posts must be the product of human editorial judgment. *See NetChoice*, 152 F.4th at 1014 (protection turns on "human editorial directions"). And the district court "did not clearly err in its factual determinations" that Plaintiffs' algorithmically generated personalized feeds—which rely on users' data to feed posts probabilistically calculated to be most likely to keep users on the platform without regard to the posts' content—are not the product of human editorial judgment. This Court should affirm.

### B. Even if Plaintiffs' algorithmically generated personalized feeds were protected, SB976 is a content-neutral law that satisfies intermediate scrutiny

Even assuming Plaintiffs' personalized feeds are expressive within the meaning of the First Amendment, Plaintiffs have still failed to show a likelihood of success on the merits, because SB976 satisfies constitutional scrutiny.

Where "the primary distinction the statute makes does not depend on the message that might be conveyed," the statute is content neutral and subject to only intermediate scrutiny. *Porter v. Martinez*, 68 F.4th 429, 441-43 (9th Cir. 2023); *see City of Austin v. Reagan Nat'l Advertising of Austin, LLC*, 596 U.S. 61, 71 (2022) (provisions that "d[id] not single out any topic or subject matter for differential treatment" where "[the] substantive message itself is irrelevant" are content neutral). SB976 makes no distinction based on any message

that might be conveyed. SB976 is entirely agnostic to the actual content of any feed. In fact, to determine whether Plaintiffs' feeds are subject to SB976, one need not look at the content of any particular feed; instead, one need only examine whether Plaintiffs' backend algorithms use "information provided by the user, or otherwise associated with the user or the user's device." § 27000.5(a). This is the epitome of a content-neutral law that is subject to, at most, intermediate scrutiny. *TikTok*, 604 U.S. at 72 (law that "neither references the content of speech on TikTok nor reflects disagreement with the message such speech conveys" is content neutral).

Plaintiffs disagree, but their arguments are unconvincing. For example, Meta and YouTube argue that SB976 is content based because it (supposedly) suppresses speech "reflecting a user's individual interests, hobbies, and goals" and "speech that is likely to be interesting, relevant, and valuable to an individual user." Meta OB 49; YouTube OB 44-45. But SB976 does no such thing—it regulates only the use of harvested user data and says nothing about interests, hobbies, goals, relevance, or value at all. *See Menotti v. City of Seattle*, 409 F.3d 1113, 1129 (9th Cir. 2005) ("In assessing whether a restraint on speech is content neutral, we do not make a searching inquiry of

hidden motive; rather, we look at the literal command of the restraint.").[20]

Meta and TikTok also argue that SB976 regulates feeds of user-generated (*i.e.*, third-party) content differently from first-party content. Meta OB 47; TikTok OB 47. But the First Amendment itself distinguishes between third-party and first-party speech. *See Project Veritas v. Schmidt*, 125 F.4th 929, 955 (9th Cir. 2025) (en banc) (First Amendment "bears less heavily when speakers assert the right to make other people's speeches"). And in any event, this Court made clear in connection with SB976 that "[a] speaker preference is problematic only if it 'reflects a content preference.'" *NetChoice*, 152 F.4th at 1017 (holding that SB976 provision that allows connected users to view or interact with minors' posts but blocks unconnected users nonetheless is content neutral); *accord, e.g.*, *Doe*, 772 F.3d at 575 (law that singled out category of speakers (sex offenders) but "makes no reference to specific subject matters or viewpoints" they discuss is content neutral); *Menotti*, 409 F.3d at 1130 (law that "did not enable [government] to discriminate against ideas it disfavored" was content neutral). SB976 expresses no content preference.

[20] Plaintiffs cite cases involving statutes with express content-based provisions. *Iancu v. Brunetti*, 588 U.S. 388, 390 (2019) ("immoral or scandalous" trademarks); *Matal v. Tam*, 582 U.S. 218, 223 (2017) ("disparag[ing]" trademarks); *Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n*, 447 U.S. 530, 533 (1980) ("controversial" issues). SB976 contains nothing similar.

Plaintiffs also argue that the State has not established that its interests are "unrelated to the suppression of free speech." Meta OB 51; *accord* TikTok OB 46-47; YouTube OB 46-47. Not so. The State's interest in SB976 is to prevent harms to children from the secondary effects of addictive feeds, not suppressing free speech. The Supreme Court has confirmed the constitutionality of similar laws. *City of Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 48-50 (1986) (affirming constitutionality of law singling out adult theaters based on their speech (adult movies) where city's interest was not "the *content* of the films" but "the *secondary* effects of such theaters") (emphasis in original); *accord, e.g.*, *Gammoh v. City of La Habra*, 395 F.3d 1114, 1124 (9th Cir. 2005). And this Court has affirmed that the State's interest reflected in SB976 in "reducing screentime and habit-forming platform usage" and "mitigat[ing] the addictive nature of platforms that provide personalized feeds" are valid content-neutral bases for regulating even direct first-party speech (messages that users themselves post to "maximize interaction and approval of a worldwide audience"). *NetChoice*, 152 F.4th at 1017. These same interests are valid content-neutral bases for regulating Plaintiffs' addictive-feed compilations of third-party speech as well.[21]

---

[21] YouTube has argued that the secondary-effects doctrine applies "only" to sexual or pornographic content. YouTube Injunction Pending Appeal Reply 9-10. None of its cases actually say "only." In any event,

(continued…)

Plaintiffs' attempt to cherry pick from certain expert reports does not change this conclusion. Plaintiffs note that certain experts stated that Plaintiffs' feeds cause content-specific harm, *e.g.*, by promoting topics like suicide, self-harm, and anorexia. Meta OB 49; YouTube OB 46. But the State's interest in enacting SB976 is not limited to these topics: algorithmically generated addictive feeds full of posts promoting, for instance, the virtues of staying in school or saying "no" to drugs, are as equally subject to SB976 as addictive feeds full of posts extolling dropping out or doing drugs. The State's interest is not in suppressing (or promoting) any idea or topic, but rather in curbing addictive internet usage by regulating the *mechanism* of addictive feeds and the use of machine-learning algorithms to feed children more and more of what the algorithms calculate will keep children "engaged" and on the platform for as long as possible—*whatever* that content might be. SB976 § 1; *accord, e.g.*, 5-SER-1061 (¶ 69) (addiction is "not tied to the specific type of content on the platform but rather to the features that facilitate compulsive use").

TikTok separately argues that restrictions that "have no historical precedent" necessarily trigger strict scrutiny. TikTok OB 48. That is not what TikTok's cases actually say—if anything, they say that

---

*NetChoice*'s holding that the State's (non-sexual) secondary interest in "reducing screentime and habit-forming platform usage" is content neutral squarely refutes YouTube's theory. 152 F.4th at 1017.

historical precedent and practice may support *reduced* scrutiny, not strict scrutiny. For example, in *Vidal v. Elster*, 602 U.S. 286 (2024), the Supreme Court refused to subject a trademark law to heightened scrutiny, despite its being "content based," *id.* at 294, because of history and tradition, *id.* at 295-308; *see also Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 475-77 (2022) (holding that college's censure of trustee did not violate First Amendment, based on tradition of censures); *Chiles v. Salazar*, 607 U.S. 627, 641 (2026) (discussing "historic and traditional" content-based restrictions that do not trigger strict scrutiny). In any event, there is a long history and tradition of subjecting content-neutral laws like SB976 to, at most, intermediate scrutiny. *See, e.g.*, *Hill v. Colorado*, 530 U.S. 703, 719-25 (2000).

* * *

To survive intermediate scrutiny, a law "must be narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels for communication of the information." *Project Veritas*, 125 F.4th at 952 (ellipsis omitted). This is a "less rigorous analysis" and "affords the Government latitude in designing a regulatory solution." *Turner II*, 520 U.S. at 213. SB976 easily satisfies these standards.

As this Court has already held, SB976 serves a significant government interest in "protecting minors' mental health by reducing screentime and habit-forming platform usage" and "trying to mitigate

the addictive nature of platforms that provide personalized feeds." *NetChoice*, 152 F.4th at 1017; *see Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989) (government's interest in protecting minors' health is "compelling"). And SB976 is narrowly tailored to curbing the harms of platform addiction and excessive use: it places limits only on the addictive-feed *mechanisms* that Plaintiffs utilize to keep children on their platforms for as long as possible. Finally, SB976 leaves open ample alternative channels for communication: it does not restrict any ideas or viewpoints, prevent minors from signing up for any site, or bar them from accessing any content.

Plaintiffs primarily argue in response that the State has not sufficiently established that SB976 will in fact alleviate the harms to children that the State identified. Meta OB 52-55; TikTok OB 51-53; YouTube OB 48-52. But Plaintiffs fundamentally misstate the standard that applies under intermediate scrutiny and fail to address the key governing precedent.

The seminal precedent is *Turner II*, 520 U.S. 180. In that case, which involved First Amendment challenges to laws compelling cable operators to carry the signals of over-the-air broadcast stations ("must-carry"), the Supreme Court addressed how to apply the intermediate-scrutiny standard. The Court held that "[i]n reviewing the constitutionality of a statute, courts must accord substantial deference to the predictive judgments of [the Legislature]." *Id.* at 195 (quotation

marks omitted). A court's "sole obligation is to assure that, in formulating its judgments, [the Legislature] has drawn reasonable inferences based on substantial evidence." *Id.* (quotation marks omitted). "[D]eference must be accorded to [the Legislature's] findings as to the harm to be avoided and to the remedial measures adopted for that end, lest [courts] infringe on traditional legislative authority to make predictive judgments when enacting [] regulatory policy." *Id.* at 196.

The Court expressly held that "[t]he question is not whether [the Legislature], as an objective matter, was correct to determine [the law] is necessary" to prevent harm and further the Legislature's interests. *Id.* at 211. "Rather, the question is whether the legislative conclusion was reasonable and supported by substantial evidence in the record before [it]." *Id.* "In making that determination, [courts] are not to reweigh the evidence de novo, or to replace [the Legislature's] factual predictions with [their] own." *Id.* (quotation marks omitted). Rather, so long as the legislative conclusion is reasonable, "summary judgment for [the government] is appropriate regardless of whether the evidence is in conflict." *Id.* In other words, even if the law's opponents muster "evidence to support a contrary conclusion" that the law would not further the government's stated interests, the government still prevails, as "the possibility of drawing two inconsistent conclusions from the

evidence does not prevent a finding from being supported by substantial evidence." *Id.* at 210-11 (brackets and ellipsis omitted).

Turning to the facts at hand, the Court explained that although the Legislature had concluded that cable-industry expansion was harming the broadcast industry, that conclusion was not a certainty, and that (contrary to the Legislature's conclusion) the declines in broadcast-station revenues might have been caused by reasons "quite separate" from cable expansion (*e.g.*, a separate economic recession). *Id.* at 211-12. But the Court nevertheless held that "it was for [the Legislature] to determine the better explanation," and that as long as the Legislature had drawn a reasonable conclusion, its laws were constitutional, notwithstanding opponents' arguments that the Legislature was "objective[ly]" wrong in its causation conclusion. *Id.* As the Court explained, "[the Legislature] is under no obligation to wait until the entire harm occurs but may act to prevent it." *Id.* at 212.

The Court further held that "[the Legislature] is not obligated, when enacting its statutes, to make a record of the type that an administrative agency or court does to accommodate judicial review." *Id.* at 213. And this Court, sitting en banc, has explained that "the [Supreme] Court has looked beyond the record before [the Legislature] at the time of enactment," and confirmed that, in defending its laws against a First Amendment challenge, the government can rely on additional evidence that was not before the Legislature. *Minority*

*Television Project, Inc. v. FCC*, 736 F.3d 1192, 1199 (9th Cir. 2013) (en banc); *see Turner II*, 520 U.S. at 209-10 (citing study prepared one year after law's enactment and internal cable-company documents produced only in post-enactment litigation).

This deferential standard makes sense. Requiring a higher standard of proof from the Legislature would open up every content-neutral law to constant attack every time any opponent can muster any expert willing to opine that the government's law was unnecessary to alleviate harm. *See Turner II*, 520 U.S. at 210-11. The Supreme Court rightly held these sorts of conflicts and challenges are not a basis for invalidating laws. *Id.* To the contrary, as the Court reiterated just this year, "in assessing state and federal laws passed under circumstances of medical and scientific uncertainty, ... the Judiciary must be cautious about swooping in and invalidating laws.... [I]t is precisely where such disagreement exists that legislatures have been afforded the widest latitude in drafting such statutes." *West Virginia v. B.P.J. ex rel. Jackson*, 146 S. Ct. 2356, 2379-80 (2026) (quotation marks omitted) (citing *Turner II* and other cases); *accord TikTok*, 604 U.S. at 75 (citing *Turner II*).

The Supreme Court has also addressed how to evaluate "the fit between the [government's] asserted interests and the means chosen to advance them." *Turner II*, 520 U.S. at 213. The Court held that "[c]ontent-neutral regulations do not pose the same 'inherent dangers to

free expression' that content-based regulations do, and thus are subject to a less rigorous analysis, which affords the Government latitude in designing a regulatory solution." *Id.* (citation omitted). "[C]ontent-neutral regulations are not invalid simply because there is some imaginable alternative that might be less burdensome on speech.... [Courts] will not invalidate the preferred remedial scheme because some alternative solution is marginally less intrusive on a speaker's First Amendment interests." *Id.* at 217-18 (quotation marks omitted).

Here, Plaintiffs cannot seriously dispute that the California Legislature's conclusion that SB976 would alleviate harms to children was reasonable and based on substantial evidence. The Legislature had before it the U.S. Surgeon General's Advisory, which in turn cited dozens of studies showing how excessive and problematic social-media use harms children. Surgeon General Advisory 6-10, 21-25 (3-MetaER-502-06, 517-21). The Legislature also had additional studies and articles showing the harms from social-media use generally, and from algorithmically generated addictive feeds specifically. *See, e.g.*, Assembly SB976 Analysis 6 & n.8; *id.* at 5-7 (3-MetaER-482-84); Senate SB976 Analysis 12-13 (5-TikTokER-890-91). And while these alone would be sufficient, here the State has also provided additional evidentiary support from numerous experts attesting to the harms caused by Plaintiffs' algorithmically generated personalized feeds. *See supra* pp. 30-32. This is more than enough to confirm that the

Legislature's conclusions were reasonable and based on substantial evidence, thus satisfying intermediate scrutiny. *Turner II*, 520 U.S. at 210-12; *Minority Television*, 736 F.3d at 1199.

Plaintiffs' contrary arguments all fall short. Plaintiffs first argue that the State's evidence only addresses harms stemming from social-media use generally, not addictive personalized feeds specifically. But "[n]o precedent requires the [State] to obtain research targeting the exact activity that it wishes to regulate: the [State] is only required to rely on evidence 'reasonably believed to be relevant' to the problem being addressed." *Gammoh*, 395 F.3d at 1127. In *NetChoice*, this Court affirmed the constitutionality of SB976's requirement that children's accounts be placed in "private mode" by default based on harms from internet-platform use generally, not non-private-mode specifically. 152 F.4th at 1017. And in any event, the State's evidence *does* establish the myriad harms that can be specifically traced to addictive feeds. *See, e.g.*, Surgeon General Advisory 9 (3-MetaER-505); Assembly SB976 Analysis 6 & n.8 (3-MetaER-483); Senate SB976 Analysis 12-13 (5-TikTokER-890-91); 4-SER-1008-12 (¶¶ 77-83); 5-SER-1055-61 (¶¶ 62-69).

Plaintiffs next improperly try to rewrite the standard the State must meet to show that SB976 furthers the State's interest in preventing harm to children. Meta, for example, cites *Brown*, 564 U.S. 786, to argue that the State's evidence establishes only correlation, not

causation, between internet-platform usage and harm to children. Meta OB 53. But *Brown* is a strict-scrutiny case, and the Court expressly distinguished how the standards there do not apply under intermediate scrutiny. 564 U.S. at 799.[22] Meta and YouTube cite *Doe*, 772 F.3d 563, to argue that the State must "demonstrate that the recited harms are real ... and that the regulation will in fact alleviate [those] harms in a direct and material way." Meta OB 51; YouTube OB 49.[23] But as the Supreme Court held in *Turner II*, what this means is that the State has to show that the Legislature reasonably concluded that the harms were real and that SB976 would alleviate those harms—which the State has done here. Nothing more is required. 520 U.S. at 210-12. Finally, TikTok cites *Porter*, 68 F.4th 429, to argue that the State must provide "more extensive evidentiary documentation" where a plaintiff makes a showing "to cast doubt on the State's justifications." TikTok OB 53. But *Porter* stated this only as passing dicta, and its actual holding (which upheld the constitutionality of the challenged law) rejected the very sorts of arguments that Plaintiffs raise here—namely, that the

[22] Meta also cites *Imperial Sovereign Court v. Knudsen*, 170 F.4th 820 (9th Cir. 2026), but that is also a strict-scrutiny case.

[23] The line in *Doe* that Plaintiffs quote comes from a portion of *Turner I* that was joined by only four Justices, not a majority. 772 F.3d at 577 (quoting *Turner I*, 512 U.S. at 664 (plurality op.)). In any event, *Doe* expressly declined to address whether the law in its case advanced the government's interest or not, so its discussion of this standard is dicta. *Id.* at 582 n.8.

State supposedly "do[es]n't have the science to support" its explanations or that "studies on the issue simply do not exist." 68 F.4th at 445-46.[24]

In any event, the State's evidence satisfies even the (improper) heightened burden that Plaintiffs attempt to impose. The evidence does not just show correlation between internet-platform usage and harm to children; it shows *causation*. *See supra* pp. 30-32 (citing declarations and exhibits). The evidence further shows that harms can be traced not just to internet-platform usage generally, but to addictive feeds specifically. *See, e.g.*, 4-SER-1008-12 (¶¶ 77-83); 5-SER-1055-61 (¶¶ 62-69).

YouTube claims that these studies should be discounted because they are not "peer-reviewed or published." YouTube OB 49. This argument fails twice over. First, there is no "published-and-peer-reviewed-studies-only" requirement under intermediate (or strict) scrutiny; rather, as this Court has held, "[courts] will not specify the

[24] TikTok also cites *National Association of Wheat Growers v. Bonta*, 85 F.4th 1263 (9th Cir. 2023), but that case—a compelled-speech case—is further afield. The law there compelled agricultural producers to affirmatively warn customers that the herbicide glyphosate was a carcinogen. *Id.* at 1266. The primary issue was application of the so-called *Zauderer* compelled-speech test, which applies to compelled speech of "purely factual and uncontroversial information." *Id.* at 1275. The line TikTok cites comes from the Court's finding that the evidence of glyphosate's carcinogenicity was controverted and thus that *Zauderer* did not apply. *Id.* at 1282. But the *Zauderer* test has no relevance here and does not supersede the Supreme Court's express holding in *Turner II* that under general intermediate scrutiny, laws remain valid "regardless of whether the evidence is in conflict." 520 U.S. at 210-12.

methodological standards to which [the State's] evidence must conform." *Gammoh*, 395 F.3d at 1126-27 (citing *City of Renton*, 475 U.S. at 51).[25] Second, in any event, Defendant's experts have cited peer-reviewed studies that support how Plaintiffs' addictive feeds cause harm. *See, e.g.*, 1-SER-255-56 (¶¶ 17-18); 4-SER-1003-05 (¶ 69).

Plaintiffs also claim that SB976 is supposedly both underinclusive and overinclusive. These arguments fail as well. "[T]he First Amendment imposes no freestanding 'underinclusiveness limitation'.... even under strict scrutiny[.]" *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015). Underinclusiveness is not a basis for striking down a law absent an "indication that the selective restriction of speech reflects a pretextual motive." *Id.* at 452. No pretext exists here. As this Court has already held, "the Act is [not] so 'riddled with exceptions' that it raises doubts about whether California is trying to mitigate the addictive nature of platforms that provide personalized feeds." *NetChoice*, 152 F.4th at 1017. Plaintiffs argue that SB976 applies only to compilations of third-party speech, not first-party speech, but "the Government need not address all aspects of a problem in one fell

[25] One reason peer-reviewed studies are limited is because Plaintiffs have kept the details of their algorithms hidden and not cooperated with studies. *See* Surgeon General Advisory 11 (3-MetaER-507); 1-SER-185-86 (¶ 4); 3-SER-563-65 (¶¶ 251-53); 3-SER-823 (¶ 351); 2-SER-343 (3636:7-25) (discussing how Meta sent legal threats to researchers).

swoop." *TikTok*, 604 U.S. at 76 (quotation marks omitted); *City of Renton*, 475 U.S. at 52-53.

Plaintiffs also argue that SB976's decision to allow minors to access addictive feeds if a parent consents, rather than banning addictive feeds entirely, renders SB976 unconstitutionally underinclusive. But courts "will not punish [a State] for leaving open more, rather than fewer, avenues of expression," even under strict scrutiny. *Williams-Yulee*, 575 U.S. at 452. For example, the Supreme Court has upheld laws prohibiting the sale of pornographic magazines to minors, notwithstanding that those laws "do[] not bar parents who so desire from purchasing the magazines for their children." *Ginsberg v. New York*, 390 U.S. 629, 639 (1968). It is absurd to suggest that the government may not regulate at all unless it also enacts a ban that prevents parents from making individual choices for their children. *See Williams-Yulee*, 575 U.S. at 448 (it is "counterintuitive to argue that a law violates the First Amendment by abridging *too little* speech") (emphasis in original).

Plaintiffs' overinclusiveness arguments are likewise unpersuasive. Plaintiffs argue that the State could encourage platforms to offer voluntary content filters, time limits, or other parental controls, in lieu of regulating addictive feeds. But the existence of these supposed alternatives does not render SB976 unconstitutional; it is black-letter law that "intermediate scrutiny does not require that the means

chosen ... be the least restrictive." *Minority Television*, 736 F.3d at 1204.

In *Turner II*, for example, the plaintiffs argued that laws requiring cable companies to carry broadcast signals were unnecessary because other alternatives existed, such as technological "A/B switches" that allowed viewers to switch between cable and broadcast signals. 520 U.S. at 219. The Supreme Court rejected this argument, holding that—even if alternatives existed—the Legislature reasonably concluded that they had technical shortcomings and few customers actually used them, and that the Legislature's decision to enact must-carry laws instead was entitled to deference. *Id.* at 219-21. The same is true here. The Legislature reasonably concluded that other alternatives were insufficient to mitigate the harms to children that SB976 sought to address. *See, e.g.*, Senate SB976 Analysis 16 (5-TikTokER-894) ("[P]arents are trying to do their best to monitor and control their children's social media use, but that [] is a difficult task with the limited set of options made available to them—even for the more tech-savvy parents."); Chamber of Progress Br. 16 (describing how a significant percentage of parents are not tech-literate); 1-SER-85-92, 102-79 (¶¶ 58-64 & Ex. A) (discussing the 21 separate steps required to implement YouTube's claimed parental-control alternative).

Plaintiffs also claim that SB976 is overinclusive because it applies to all children without distinguishing between different ages or each

child's individual level of internet addiction. But the State's interest in safeguarding the mental and physical health of minors applies as much to 17-year-olds as much as it does to younger children. *See*, *e.g.*, 3-SER-688 (¶¶ 65 et seq.) (discussing harms to adolescents up to and beyond age 17); 4-SER-982-83 (¶¶ 25 et seq.) (same); 5-SER-1063 (¶¶ 76 et seq.) (same); 5-SER-1182 (¶¶ 8 et seq.) (same); *NetChoice*, 152 F.4th at 1017-18 (affirming that SB976 private-mode requirement that "applies to all ... minor users" was not overinclusive, because "California's interests are wide-ranging" and "California took a relatively nuanced approach"); *cf. Morse*, 551 U.S. at 407 (State's interest in curbing drug use extended to 12th graders). SB976's application to all children in California is commensurate with its interest.

In the end, Plaintiffs' challenges to SB976 "reflect little more than disagreement over the level of protection [children] are to be afforded and how protection is to be attained. [Courts] cannot displace [the Legislature's] judgment respecting content-neutral regulations with [their] own, so long as [the Legislature's] policy is grounded on reasonable factual findings supported by evidence that is substantial for a legislative determination. Those requirements were met in this case, and in these circumstances the First Amendment requires nothing more." *Cf. Turner II*, 520 U.S. at 224-25.

### C. Even if strict scrutiny applies, SB976 passes constitutional muster

Even assuming that strict scrutiny applies, SB976 remains constitutional. "Under strict scrutiny, restrictions may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *In re Nat'l Sec. Letter*, 33 F.4th 1058, 1070 (9th Cir. 2022) (quotation marks omitted). Restrictions need only "be narrowly tailored," not "perfectly tailored." *Id.* at 1073. "Accordingly, a reviewing court should decline to wade into the swamp of calibrating the individual mechanisms of a restriction." *Id.* (quotation marks and brackets omitted).

SB976 meets those standards. The State's interest in protecting children from the physical and psychological harm of internet addiction and addictive social media feeds is not only significant, it is compelling. *See Sable*, 492 U.S. at 126. And even under strict scrutiny, the State does not need "proof by documentary record" to support its law. *Williams-Yulee*, 575 U.S. at 447. Rather, the Supreme Court has upheld "justif[ications of] speech restrictions by references to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and 'simple common sense.'" *Fla. Bar v. Went for It, Inc.*, 515 U.S. 618, 628 (1995) (citations omitted); *accord, e.g.*, *French v. Jones*, 876 F.3d 1228, 1241 (9th Cir. 2017) (the State "need not present

empirical evidence ... for its rule to survive strict scrutiny"). Of course, here the State has assembled substantial record evidence supporting the constitutionality of its law. *See supra* pp. 29-32.

The Sixth Circuit's recent decision in *Yost*, 180 F.4th 268, is instructive. Unlike here, the Ohio social-media-law at issue in *Yost* banned *all* social-media access for children, absent parental consent. *Id.* at 278-79. The Sixth Circuit's lead opinion applied strict scrutiny to the Ohio law because it was content based; that is, it drew distinctions based on whether sites have content that "appeals to [c]hildren" and whether their primary purpose is "to report news and current events," and therefore applied strict scrutiny. *Id.* at 288 (Clay, J.).[26] But the opinion concluded that the law survived strict scrutiny. It first explained that Ohio's interest in protecting children sufficed to support the law. *Id.* at 289. It then found that *Brown*, 564 U.S. 786, was inapposite, both because *Brown* facially blocked certain specific content (violent video games), whereas Ohio's law "says nothing about what subject matter Children Users may access," and because the evidentiary reports of harm to children in *Brown* suffered from "significant, admitted flaws," whereas the support for Ohio's law—specifically, the Surgeon General Advisory and other research—was stronger and

[26] SB976 draws no similar distinctions. It excludes only cloud-storage sites, a content-agnostic distinction, and commercial-transaction and commercial-review sites, § 27000.5(b)(2), which this Court confirmed is content neutral. *NetChoice*, 152 F.4th at 1015-16.

sufficient. 180 F.4th at 290. It rejected NetChoice's claim that Ohio's law was overinclusive because other alternative internet-monitoring tools existed. *Id.* at 291. It further rejected NetChoice's claim that Ohio's law was underinclusive because it allowed parents to consent to their children accessing the potentially harmful platforms, holding that "[t]he Act strikes a balance between enlisting parents as a line of defense between Children and social media and overstepping into the realm of parent-child relationships." *Id.* Consequently, Ohio's law survived strict scrutiny.[27] Because that law survives, SB976 (which is much more narrowly tailored, less restrictive, and does not impose any outright bans on access) does as well.

**D. YouTube's vagueness argument is makeweight**

YouTube's argument that the term "verified parent" is unconstitutionally vague does not save its claims. As the en banc Court has held, "[a] statute need not have 'mathematical certainty' to survive a vagueness challenge[.]" *Minority Television*, 736 F.3d at 1210 (rejecting challenge to "promote"); *accord, e.g.*, *NetChoice*, 152 F.4th at 1023 (rejecting challenge to SB976's use of the terms "significant part" and "primary purpose"); *Cal. Tchrs. Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1152-54 (9th Cir. 2001) ("approach," "consent," and "reasonably believe"). "Verified" has an ordinary plain meaning: "to establish the

---

[27] Judge Batchelder concurred in the judgment and expressed skepticism that strict scrutiny applied. 180 F.4th at 310.

truth, accuracy, or reality of" something (here, parental status). Merriam-Webster Dictionary, *Verify* (2026), https://www.merriam-webster.com/dictionary/verified. The fact that the term might at times require a party to "estimat[e] rightly some matter of degree" does not render it unconstitutionally vague. *United States v. Bronstein*, 849 F.3d 1101, 1108 (D.C. Cir. 2017) (ellipses omitted).

## II. PLAINTIFFS HAVE NOT ESTABLISHED IRREPARABLE HARM

The Court should also affirm the denial of Plaintiffs' preliminary-injunction motions because Plaintiffs have not established irreparable harm. Plaintiffs claim that SB976 threatens their First Amendment rights. But Plaintiffs do not assert any actual idea, thought, opinion, or viewpoint that SB976 prevents them from expressing. *Cf. Stockton*, 152 F.4th at 1144-45 (First Amendment plaintiff bears the burden of identifying "what [it] wishes to say on those topics"). Nor could they. SB976 does not regulate the free-speech rights of any actual human being; it merely regulates the use of personalized data by machine-learning algorithms that do not even understand the content of the feeds they are generating.

Plaintiffs' claims about compliance costs also fall short. "[O]rdinary compliance costs are typically insufficient to constitute irreparable harm." *Council for Responsible Nutrition v. James*, 159 F.4th 155, 171 (2d Cir. 2025). And Plaintiffs' cost concerns are especially dubious here, where they offer no evidence establishing what those costs might be.

"Speculative injury does not constitute irreparable injury" in the best of circumstances. *Goldie's Bookstore, Inc. v. Super. Ct.*, 739 F.2d 466, 472 (9th Cir. 1984). And here, there is good reason not to entertain Plaintiffs' speculation. All three Plaintiffs either provide or soon will provide the option for non-algorithmic feeds to at least some subsets of users, confirming that doing so does not impose irreparable compliance costs. *See supra* p. 23. Plaintiffs' claim that SB976 will cause them loss of their users' goodwill likewise fails. Plaintiffs offer only speculation about loss of goodwill—not any actual evidence. If anything, the record points the other way. *See, e.g.*, 7-SER-1765 (discussing how teens "complain bitterly" about algorithmic feeds); 9-SER-2220-23.

## III. PLAINTIFFS HAVE NOT ESTABLISHED THAT THE EQUITIES OR PUBLIC POLICY FAVOR THEM

Plaintiffs' demand for a preliminary injunction also fails because neither the equities nor public policy weigh in their favor—much less "tip[] sharply" in their favor. *All. for the Wild Rockies*, 632 F.3d at 1132. "'[S]imply raising a serious First Amendment claim is not enough to tip the hardship scales'" in favor of plaintiffs. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (brackets omitted). Instead, courts must consider, among other things, the negative effect enjoining health-and-safety laws would have on "the health of state residents." *Id.* at 1139 (quotation marks omitted). And here, the record reflects abundant evidence demonstrating a causal link between

Plaintiffs' addictive feeds and ongoing harms to children. *See supra* pp. 29-32. SB976's regulation of addictive feeds would begin to alleviate those harms and lead to improvements in children's mental health and well-being.

Beyond these substantial health-and-safety concerns, enjoining SB976 would also irreparably harm California by further delaying enforcement of a statute enacted two years ago by the legislative representatives the people elected to protect their children. That is its own "form of irreparable injury" that supports the denial of Plaintiffs' requested relief. *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 148 F.4th 648, 656 (9th Cir. 2025); *see also B.P.J.*, 146 S. Ct. at 2380 ("'[C]ourts should be cautious not to rewrite legislation' 'in areas fraught with medical and scientific uncertainties.'"); *Stormans*, 586 F.3d at 1140 ("[C]ourt[s] should give due weight to the serious consideration of the public interest in this case that has already been undertaken by the responsible state officials.").

Even just the preliminary record developed to date presents a comprehensive picture of how Plaintiffs intentionally designed their platforms to be addictive; how Plaintiffs track and collect millions or billions of data points on children; how humans are not exercising editorial judgment over Plaintiffs' personalized feeds; how Plaintiffs' feed-personalization algorithms have no understanding of the content in the feeds they are compiling but merely push out posts calculated to

have the greatest mathematical probability of keeping children on their platforms as long as possible; how these addictive personalized feeds inflict real harm on children; and how Plaintiffs knew they were harming children but continued to do so anyway. Equity and public policy require that SB976 be allowed to take effect to begin to alleviate the harms caused by Plaintiffs and their addictive feeds.

## CONCLUSION

The Court should affirm the district court.

Dated: October 6, 2026

Respectfully submitted,

ROB BONTA
*Attorney General of California*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*
TODD GRABARSKY
LARA HADDAD
*Supervising Deputy Attorneys General*

*s/Shiwon Choe*
ASHA ALBUQUERQUE
WILLIAM BELLAMY
SHIWON CHOE
CHRISTOPHER J. KISSEL
SAMUEL SOKOLSKY
MEGHAN H. STRONG
ZELDA VASSAR
*Deputy Attorneys General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-4400
Fax: (415) 703-5480
Shiwon.Choe@doj.ca.gov

*Attorneys for Defendant-Appellee*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-5120, 26-5121, 26-5132

I am the attorney or self-represented party.

**This brief contains** 22,393 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- ○ complies with the word limit of Cir. R. 32-1.
- ○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - ☐ it is a joint brief submitted by separately represented parties.
  - ☐ a party or parties are filing a single brief in response to multiple briefs.
  - ☐ a party or parties are filing a single brief in response to a longer joint brief.
- ○ complies with the length limit designated by court order dated ______.
- ◉ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Shiwon Choe **Date** 10/6/2026
*(use "s/[typed name]" to sign electronically-filed documents)*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** 26-5120, 26-5121, 26-5132

The undersigned attorney or self-represented party states the following:

○ I am unaware of any related cases currently pending in this court.

○ I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

◉ I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

Meta Platforms, Inc. v. Bonta, No. 26-5120 (9th Cir.); TikTok, Inc., et al. v. Bonta, No. 26-5121 (9th Cir.); and Google LLC, et al. v. Bonta, No. 26-5132 (9th Cir.), are appeals from cases that were related before the district court. These appeals have been consolidated before this Court. Order, No. 26-5120 (9th Cir.), ECF No. 8. The Meta, TikTok, and Google cases are also related to another case before the district court, NetChoice v. Bonta. Related Case Order, No. 5:24-cv-07885-EJD (N.D. Cal.), ECF No. 83. NetChoice previously was appealed to this Court, No. 25-146 (9th Cir.), and remains open and pending before the district court.

**Signature** s/Shiwon Choe **Date** 10/6/2026

*(use "s/[typed name]" to sign electronically-filed documents)*

Nos. 26-5120, 26-5121, 26-5132

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

META PLATFORMS, INC.,
*Plaintiff-Appellant*,

v.

ROB BONTA, in his official capacity as Attorney General of California,
*Defendant-Appellee*.

TIKTOK, INC. and TIKTOK USDS JOINT VENTURE LLC,
*Plaintiffs-Appellants*,

v.

ROB BONTA, in his official capacity as Attorney General of California,
*Defendant-Appellee*.

GOOGLE LLC and YOUTUBE, LLC,
*Plaintiffs-Appellants*,

v.

ROB BONTA, in his official capacity as Attorney General of California,
*Defendant-Appellee*.

**On Appeal from the United States District Court for the Northern District of California**
Nos. 5:25-cv-09789-EJD, -09792-EJD, -09795-EJD
The Honorable Edward J. Davila

**DEFENDANT-APPELLEE'S STATUTORY ADDENDUM**

ROB BONTA
*Attorney General of California*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*
TODD GRABARSKY
LARA HADDAD
*Supervising Deputy Attorneys General*

ASHA ALBUQUERQUE
WILLIAM BELLAMY
SHIWON CHOE
CHRISTOPHER J. KISSEL
SAMUEL SOKOLSKY
MEGHAN H. STRONG
ZELDA VASSAR
*Deputy Attorneys General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Ave., Ste. 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-4400
Fax: (415) 703-5480
Shiwon.Choe@doj.ca.gov
*Attorneys for Defendant-Appellee*

October 6, 2026

**Senate Bill No. 976**

CHAPTER 321

An act to add Chapter 24 (commencing with Section 27000) to Division 20 of the Health and Safety Code, relating to youth addiction.

[Approved by Governor September 20, 2024. Filed with Secretary of State September 20, 2024.]

LEGISLATIVE COUNSEL'S DIGEST

SB 976, Skinner. Protecting Our Kids from Social Media Addiction Act. Existing law, the California Age-Appropriate Design Code Act, requires, beginning July 1, 2024, a business that provides an online service, product, or feature likely to be accessed by children to comply with certain requirements. The act requires the business to complete a data protection impact assessment addressing, among other things, whether the design could harm children and whether and how the online product, service, or feature uses system design features to increase, sustain, or extend use of the online product, service, or feature by children, including the automatic playing of media, rewards for time spent, and notifications. Existing law prohibits the business from using the personal information of any child in a way that the business knows,

or has reason to know, is materially detrimental to the physical health, mental health, or well-being of a child.

Existing law, the Privacy Rights for California Minors in the Digital World, prohibits an operator of an internet website, online service, online application, or mobile application from specified conduct when minors are involved, including the marketing or advertising of alcoholic beverages, firearms, or certain other products or services. Existing law sets forth other related protections for minors, including under the California Consumer Privacy Act of 2018 and the California Privacy Rights Act of 2020.

This bill, the Protecting Our Kids from Social Media Addiction Act, would make it unlawful for the operator of an addictive internet-based service or application, as defined, to provide an addictive feed to a user, unless the operator does not have actual knowledge that the user is a minor; commencing January 1, 2027, has reasonably determined that the user is not a minor; or has obtained verifiable parental consent to provide an addictive feed to the user who is a minor.

The bill would define "addictive feed" as an internet website, online service, online application, or mobile application, in which multiple pieces of media generated or shared by users are recommended, selected, or prioritized for display to a user based on information provided by the user, or otherwise associated with the user or the user's device, as specified, unless any of certain conditions are met.

The bill would make it unlawful for the operator of an addictive internet-based service or application, between the hours of 12 a.m. and 6 a.m., in the user's local time zone, and between the hours of 8 a.m. and 3 p.m., Monday through Friday from September through May in the user's local time zone, to send notifications to a user if the operator has actual knowledge that the user is a minor or, commencing January 1, 2027, has not reasonably determined that the user is not a minor, unless the operator has obtained verifiable parental consent to send those notifications, as specified. The bill would set forth related provisions for certain access controls determined by the verified parent through a mechanism provided by the operator.

Under the bill, a parent's provision of consent or use of a mechanism, as described above, would not waive, release, otherwise limit, or serve as a defense to, any claim that the parent, or that the user who is a minor or was a minor at the time of using the internet-based service or application, might have against the operator regarding any harm to the mental health or well-being of the user.

The bill would require an operator to annually disclose the number of minor users of its addictive internet-based service or application, and of that total the number for whom the operator has received verifiable parental consent to provide an addictive feed, and the number of minor users as to whom the access controls are or are not enabled.

Under the bill, these provisions would only be enforced in a civil action brought in the name of the people of the State of California by the Attorney General. The bill would require the Attorney General to adopt regulations to further the purposes of these provisions, including regulations regarding age assurance and parental consent by January 1, 2027. The bill would authorize the Attorney General to adopt regulations that provide for exceptions to these provisions, but only if those exceptions further the purpose of protecting minors. The bill would require the Attorney General, in promulgating regulations, to solicit public comment regarding the impact that any regulation might have based on certain nondiscrimination characteristics set forth in existing law.

The bill would make these provisions severable.

*The people of the State of California do enact as follows:*

SECTION 1. The Legislature finds and declares the following:

(a) Social media provides an important tool for communication and information sharing. Approximately 95 percent of 13- to 17-year-olds, inclusive, say that they use at least one social media platform, and more than one-third report using social media almost constantly.

(b) However, some social media platforms have evolved to include addictive features, including the algorithmic delivery of content and other design features, that pose a significant risk of harm to the mental health and well-being of children and adolescents.

(c) As the United States Surgeon General has reported, recent evidence has identified "reasons for concern" about social media usage by children and adolescents. This evidence includes a study concluding that the risk of poor mental health outcomes doubles for children and adolescents who use social media at least three hours a day and research finding that social media usage is linked to a variety of negative health outcomes, including low self-esteem and disordered eating, for adolescent girls.

(d) Heavier usage of social media also leads to less healthy sleep patterns and sleep quality, which can in turn exacerbate both physical and mental health problems.

(e) Further, social media usage is more strongly associated with negative mental health outcomes, including depressive symptoms and self-harm behaviors, than is consumption of other forms of media such as television or electronic games.

(f) Both California and the country as a whole are facing an ongoing youth mental health crisis, with rates of adolescent suicides, depressive episodes, and feelings of sadness and hopelessness on the rise in recent years.

(g) For these reasons, it is essential that California act to ensure that social media platforms obtain parental consent before exposing children and adolescents to harmful and addictive social media features.

SEC. 2. Chapter 24 (commencing with Section 27000) is added to Division 20 of the Health and Safety Code, to read:

CHAPTER 24. PROTECTING OUR KIDS FROM SOCIAL MEDIA ADDICTION ACT

27000. This chapter shall be known, and may be cited, as the Protecting Our Kids from Social Media Addiction Act.

27000.5. For purposes of this chapter, the following terms have the following meanings:

(a) "Addictive feed" means an internet website, online service, online application, or mobile application, or a portion thereof, in which multiple pieces of media generated or shared by users are, either concurrently or sequentially, recommended, selected, or prioritized for display to a user based, in whole or in part, on information provided by the user, or otherwise associated with the user or the user's device, unless any of the following conditions are met, alone or in combination with one another:

(1) The information is not persistently associated with the user or user's device, and does not concern the user's previous interactions with media generated or shared by others.

(2) The information consists of search terms that are not persistently associated with the user or user's device.

(3) The information consists of user-selected privacy or accessibility settings, technical information concerning the user's device, or device communications or signals concerning whether the user is a minor.

(4) The user expressly and unambiguously requested the specific media or media by the author, creator, or poster of the media, or the blocking, prioritization, or deprioritization of such media, provided that the media is not recommended, selected, or prioritized for display based, in whole or in part, on other information associated with the user or the user's device, except as otherwise permitted by this chapter and, in the case of audio or video content, is not automatically played.

(5) The media consists of direct, private communications between users.

(6) The media recommended, selected, or prioritized for display is exclusively the next media in a preexisting sequence from

the same author, creator, poster, or source and, in the case of audio or video content, is not automatically played.

(7) The recommendation, selection, or prioritization of the media is necessary to comply with this chapter or any regulations promulgated pursuant to this chapter.

(b) (1) "Addictive internet-based service or application" means an internet website, online service, online application, or mobile application, including, but not limited to, a "social media platform" as defined in Section 22675 of the Business and Professions Code, that offers users or provides users with an addictive feed as a significant part of the service provided by that internet website, online service, online application, or mobile application.

(2) "Addictive internet-based service or application" does not apply to either of the following:

(A) An internet website, online service, online application, or mobile application for which interactions between users are limited to commercial transactions or to consumer reviews of products, sellers, services, events, or places, or any combination thereof.

(B) An internet website, online service, online application, or mobile application that operates a feed for the primary purpose of cloud storage.

(c) "Media" means text, audio, an image, or a video.

(d) "Minor" means an individual under 18 years of age who is located in the State of California.

(e) "Operator" means a person who operates or provides an internet website, an online service, an online application, or a mobile application.

(f) "Parent" means a parent or guardian, including as defined in regulations promulgated pursuant to this chapter.

(g) "User" means a person who uses an internet website, online service, online application, or mobile application. "User" does not include the operator or a person acting as an agent of the operator.

27001. (a) It shall be unlawful for the operator of an addictive internet-based service or application to provide an addictive feed to a user unless either of the following is met:

(1) (A) Except as provided in subparagraph (B), the operator does not have actual knowledge that the user is a minor.

(B) Commencing January 1, 2027, the operator has reasonably determined that the user is not a minor, including pursuant to regulations promulgated by the Attorney General.

(2) The operator has obtained verifiable parental consent to provide an addictive feed to the user who is a minor.

(b) Information collected for the purpose of determining a user's age or verifying parental consent pursuant to this chapter shall not be used for any purpose other than compliance with this chapter or with another applicable law. The information collected shall be deleted immediately after it is used to determine a user's age or to verify parental consent, except as necessary to comply with state or federal law.

27002. (a) (1) Except as provided in paragraph (2), it shall be unlawful for the operator of an addictive internet-based service or application, between the hours of 12 a.m. and 6 a.m., in the user's local time zone, and between the hours of 8 a.m. and 3 p.m., from Monday through Friday from September through May in the user's local time zone, to send notifications to a user if the operator has actual knowledge that the user is a minor unless the operator has obtained verifiable parental consent to send those notifications.

(2) Commencing January 1, 2027, it shall be unlawful for the operator of an addictive internet-based service or application, between the hours of 12 a.m. and 6 a.m., in the user's local time zone, and between the hours of 8 a.m. and 3

p.m., from Monday through Friday from September through May in the user's local time zone, to send notifications to a user whom the operator has not reasonably determined is not a minor, including pursuant to regulations promulgated by the Attorney General, unless the operator has obtained verifiable parental consent to send those notifications.

(b) The operator of an addictive internet-based service or application shall provide a mechanism through which the verified parent of a user who is a minor may do any of the following:

(1) Prevent their child from accessing or receiving notifications from the addictive internet-based service or application between specific hours chosen by the parent. This setting shall be set by the operator as on by default, in a manner in which the child's access is limited between the hours of 12 a.m. and 6 a.m., in the user's local time zone.

(2) Limit their child's access to any addictive feed from the addictive internet-based service or application to a length of time per day specified by the verified parent. This setting shall be set by the operator as on by default, in a manner in which the child's access is limited to one hour per day unless modified by the verified parent.

(3) Limit their child's ability to view the number of likes or other forms of feedback to pieces of media within an

addictive feed. This setting shall be set by the operator as on by default.

(4) Require that the default feed provided to the child when entering the internet-based service or application be one in which pieces of media are not recommended, selected, or prioritized for display based on information provided by the user, or otherwise associated with the user or the user's device, other than the user's age or status as a minor.

(5) Set their child's account to private mode, in a manner in which only users to whom the child is connected on the addictive internet-based service or application may view or respond to content posted by the child. This setting shall be set by the operator as on by default.

27003. (a) This chapter shall not be construed as requiring the operator of an addictive internet-based service or application to give a parent any additional or special access to, or control over, the data or accounts of their child.

(b) This chapter shall not be construed as preventing any action taken in good faith to restrict access to, or availability of, media.

27004. (a) An operator may choose not to provide services to minors. However, the operator of an addictive internet-based service or

application shall not withhold, degrade, lower the quality of, or increase the price of, any product, service, or feature, other than as required by this chapter, due to a user or parent availing themselves of the rights provided by this chapter, or due to the protections required by this chapter.

(b) A parent's provision of consent as described in Section 27001 or 27002, or the use by a parent of a mechanism as described in Section 27002, does not waive, release, otherwise limit, or serve as a defense to, any claim that the parent, or that the user who is a minor or was a minor at the time of using the internet-based service or application, might have against the operator of an addictive internet-based service or application regarding any harm to the mental health or well-being of the user.

(c) The protections provided by this chapter are in addition to those provided by any other applicable law, including, but not limited to, the California Age-Appropriate Design Code Act (Title 1.81.47 (commencing with Section 1798.99.28) of Part 4 of Division 3 of the Civil Code).

27005. An operator of an addictive internet-based service or application shall publicly disclose, on an annual basis, the number of minor users of its addictive internet-based service or application, and of that total the number for whom the operator has received verifiable parental consent

to provide an addictive feed, and the number of minor users as to whom the controls set forth in Section 27002 are or are not enabled.

27006. (a) This chapter may only be enforced in a civil action brought in the name of the people of the State of California by the Attorney General.

(b) The Attorney General shall adopt regulations to further the purposes of this chapter, including regulations regarding age assurance and parental consent by January 1, 2027. The Attorney General may adopt regulations that provide for exceptions to this chapter, but only if those exceptions further the purpose of protecting minors.

(c) In promulgating the regulations described in subdivision (b), the Attorney General shall solicit public comment regarding the impact that any regulation might have based on the nondiscrimination characteristics set forth in Section 51 of the Civil Code or in any other applicable law.

27007. If any provision of this chapter, or application thereof, to any person or circumstance is held invalid, that invalidity shall not affect other provisions or applications of this chapter that can be given effect without the invalid provision or application, and to this end the provisions of this chapter are declared to be severable.